IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JAMIE KAUFMANN WOODS,           )
et al.,                         )
                                )
              Plaintiffs,        )
                                )
      vs.                       )  Case No.:  1:03CV00105 CAS
                                )
BOB WILLS, et al.               )
                                )
              Defendants.        )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFFS JAMIE WOODS, SHARI LUEKEN, ERIKA TEASLEY,
<u>TRACEY OZUNA AND JESSICA DEBOI</u>**

<u>**Introduction**</u>

Plaintiffs, Jamie Woods, Shari Lueken, Erika Teasley, Tracey Ozuna and Jessica Deboi

(collectively "Plaintiffs"), each make numerous claims for relief against Defendants, who were

all officers or employees of Mountain Park Baptist Boarding Academy ("Mountain Park").[1]  As

discussed below, Defendants are entitled to summary judgment as to Plaintiffs' claims.

Plaintiffs' claims include:

A.  Plaintiff Jamie Woods alleges that Defendants violated the Americans with Disabilities

Act  ("ADA").  However, the ADA provides an express exemption from a private right of

---

1      Mountain Park Baptist Boarding Academy was the ministry of Mountain Park Baptist
Church, an unincorporated association. Defendants Bob Wills, Betty Sue Wills, Sam Gerhardt
and Deborah Gerhardt, Julie Gerhardt, Sharon Goodman and Andrea Hill all worked at various
times at Mountain Park.  References to Mountain Park throughout the Motion and this
Memorandum include Mountain Park Baptist Church, Mountain Park Baptist Boarding Academy
and the named Defendants.

action for any religious organization, for which Mountain Park qualifies.  Therefore, as a matter of law, summary judgment is appropriate because she cannot maintain her claim.

B.  Plaintiffs each allege that Defendants violated the Fair Labor Standards Act ("FLSA") because they were not paid as employees by Defendants for "acting as a security guard at all times," or for serving in Mountain Park's  "orientation" or mentoring program, or helping to maintain a safe and secure environment for all students.  As discussed below, when the "economic reality" test is applied to the activities, the undisputed facts are that the activities advance the educational and functional missions of Mountain Park, said activities are not offered to the public and Mountain Park did not derive any substantial economic benefit from said activities.  Therefore, the students were not employees under the FLSA.

C.  Plaintiffs each claim that they suffered intentional infliction of emotional distress as a result of attending Mountain Park.  However, summary judgment is appropriate for their claims because, as a matter of law, none of the Plaintiffs cannot make a submissible case for said claim.  To prove their claims, Plaintiffs must offer expert medical testimony at trial that a physical illness resulted from witnessing one or more events at Mountain Park.  However, after the disclosure of their experts and after the conclusion of discovery, Plaintiffs have failed to disclose any physician who will offer such testimony at trial.

D.  Plaintiffs each claim that they were falsely imprisoned while being at Mountain Park.  However, Plaintiffs were all under the age of 18 when they were at Mountain Park, and their parents all voluntarily enrolled them at the school.  Therefore, as a matter of law, they cannot maintain their claims for false imprisonment.

E.  Plaintiffs each allege that they suffered a battery because Defendants surreptitiously gave them antipsychotic drugs.  However, none of the Plaintiffs was aware that she was allegedly being given antipsychotic drugs while she was at Mountain Park.  The allegations and claims did not arise until after each student left Mountain Park.  None of the Plaintiffs can prove that any one or more of the Defendants actually gave them an antipsychotic drug.  As a matter of law, without such proof, a submissible case for battery cannot be had.

F.  Plaintiffs each allege a claim of negligent medical treatment or negligence for medical care.  However, summary judgment on their claims is appropriate because, (a) in Missouri, a claim of medical negligence arises out of the statute that establishes liability for licensed healthcare professionals and none of the Defendants falls within the statute, and; (b) to make a submissible case for medical negligence, one needs an opinion that the acts of Defendants fell below the standard of care and that said negligent acts resulted in cognizable injuries to Plaintiffs.  Here, Plaintiffs, after the completion of discovery, have no experts who can offer such testimony.  Therefore, they cannot make a submissible case for negligent medical treatment or medical negligence.

G.  Finally, with respect to all of the claims advanced by Tracey Ozuna and Jessica Deboi, summary judgment should be granted to Defendant Sharon Goodman, because she was not an employee of Mountain Park at the time said plaintiffs were students there.

Defendants also seek to dismiss the claims advanced by Erika Teasley because, as a matter of law, she is an "infant" and she cannot sue in her own name.

<u>**Argument**</u>

**Standard for Summary Judgment**

A court may grant summary judgment if all the information before the court shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002); *Mansker v. MMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995). The moving party has the burden of establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir. 1988).

A disputed fact is not material unless it affects the outcome of a suit under governing law. *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1118-19 (8th Cir. 1997). In response to a motion for summary judgment, the nonmovant cannot state mere allegations or denials of the movant's facts. Rather, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Further, the plain language of Rule 56(c) mandates the entry of summary judgment if, after adequate time for discovery, the party with the burden of proof fails to offer any facts as to any single element of her claim. *Celotex*, 477 U.S. at 322-23.

A. **As A Matter Of Law, Jamie Woods Cannot Maintain A Claim for Violation Of The Americans With Disabilities Act Against Any Defendants Because Defendants Were All Employees Of Mountain Park, A Religious Institution That Is Exempt Under The Act.**

In the Complaint, Plaintiff Jamie Woods alleges that Defendants violated the Americans With Disabilities Act ("ADA") because she was not provided with her hearing aids on a timely basis. (Complaint, Part 1, Count I, ¶ 72).

A review of the ADA shows that the only possible provisions under which Woods could even allege a claim against Defendants or Mountain Park is under Title III, 42 U.S.C. §§ 12181 –

4

12189, Public Accommodations operated by Private Entities.  This is because § 12181(7)(j) defines "Public Accommodations" as including a secondary private school or other place of education.  However, 42 U.S.C. § 12187 provides an exemption for:

> [P]rivate clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) or to religious organizations or entities controlled by religious organizations, including places of worship.

Therefore, a violation of the Title III of the ADA cannot be pursued against a religious organization.

At least one court has held that a religious seminary is exempt from the requirements of the ADA because it was a "religious organization."  *White v. Denver Seminary*, 157 F. Supp.2d 1171 (D. Colo. 2001).  In *White*, the court observed that the exemption is very broad and encompassed a wide variety of situations.  Even if a church itself operates a private school, the operations of the school would not be subject to the requirements of the ADA.  *Id.* at 1173; 28 C.F.R., Pt. 36, App. B.

The *White* decision was recently adopted in *Doe v. Abington Friends School*, 2005 WL 289929 (E.D. Pa. Feb. 4, 2005).  In *Doe*, the plaintiff sued a Quaker-operated school alleging maltreatment because of his learning disability.  The *Doe* court granted summary finding that the school was controlled by a religious organization, the school adhered to certain religious principles and taught said principles to students.  As such, the school was a "religious organization" exempt from a private right of action under the ADA.  *Id.* at *2.

In this case, it is undisputed that Mountain Park was an independent fundamental Baptist church.  (Exhibit A at ¶ 2).  The mission of Mountain Park, and Defendants, was to serve troubled teens through a boarding school.  (Exhibit A at ¶ 3; Exhibit B ¶ 3).  Mountain Park

maintained certain fundamental religious principles that were integral to the curriculum. (Exhibit B at ¶ 6).

Plaintiff Woods has offered no material facts to controvert this evidence.  Following *White* and *Doe*, Mountain Park, and Defendants as its agents and employees, was a "religious organization" as defined by 42 U.S.C. § 12187 and associated regulations.  Therefore, Mountain Park, and Defendants, are exempt from a private right of action for an alleged violation of the ADA and summary judgment should be entered on Woods's claim.

**B.    Defendants Are Entitled To Summary Judgment As To The Student Plaintiffs' Fair Labor Standards Act Violation Claims Because, As A Student, Plaintiffs Were Not Employees Under The FLSA.**

Each of the student plaintiffs claims that Defendants violated the Federal Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* because Defendants failed to pay each student any money for "acting as a security guard at all times."  (Complaint at ¶¶ 141, 167, 229, and 307).  The basis for this allegation is that each student was expected to report if another student tried to leave campus without permission.  (*Id.*).  Plaintiff Ozuna alleged that she should be paid for serving as an "orientation guide," and plaintiffs Ozuna and Deboi alleged that they should be paid for being on safety patrol about one hour per day while at Mountain Park.  (Complaint ¶¶ 297, 399, 343-44).

The FLSA provides, in part:

> 206(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages . . . .;
>
> 203(b) "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof;
>
> 203(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee;

203(e) "employee" means any individual employed by an employer;

203(g) "Employ" includes to suffer or permit to work.

In this case, the Court must declare whether: (a) reporting to staff if another student attempts to leave campus without permission, (b) acting as an orientation guide or mentor to other students, and (c) serving "safety patrol" up to about one hour per day render one or more of the student plaintiffs an "employee" of Defendants.

The purpose of the FLSA is to insure that every person whose employment contemplated compensation should be paid the minimum wage. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). The FLSA covers trainees, apprentices and beginners if they are employed for compensation. *Id*. at 151. However, it is not intended to label all persons performing work as employees, otherwise "all students would be employees of the school or college they attended." *Id.* at 152. In *Walling*, the United States Supreme Court held that brakeman trainees at a rail yard, from which the railroad did not reap a commercial advantage, were not "employees" and did not need to be paid the minimum wage. *Id.* at 153.

The principle set forth in *Walling*, was extended to students in *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324 (10th Cir. 1981), where the Secretary of Labor sued a college because it did not pay its student dormitory assistants. The student assistants worked about 20 hours per week in various tasks, including telephone coverage, mail distribution, unlocking doors and maintaining discipline and order. *Id.* at 1326. The students did not receive money for their services, but they did receive a discount on tuition and room and board. *Id.* The Secretary claimed that the students were employees because the college received an immediate economic benefit from the students' services. Without the students, the Secretary contended that the college would have to employ workers to serve the same purposes. The college argued that the

primary purpose of the program was educational and to offer peer counseling and guidance to the student population.  *Id.*

Using an "economic reality" test, which looks at the circumstances of the whole economic activity, the Tenth Circuit agreed with the college that the dormitory assistant program was educational in nature.  The fact that the college derived some economic benefit from the program did not override the primary purpose of the program and is not dispositive on the issue of whether the students were "employees" under the statute.  *Id.* at 1327.

The principle that students are not employees of the schools they attend was extended in *Bobolin v. Board of Education*, 403 F. Supp. 1095 (D. Haw. 1975), where a court addressed whether chores performed by students were covered by the FLSA.  The plaintiff was a student in public school who challenged a state law that required school children to perform work and chores in the school cafeteria without being paid.  The plaintiff claimed the state law violated the FLSA.  In its analysis to determine if the students were "employees" under the FLSA, the district court evaluated the students' tasks by considering the "entire fabric" of the relationship between the student and the school.  403 F. Supp. at 1107.  The court rejected the student's argument and concluded that: (a) the primary purpose of the program was educational—to teach responsibility and civic mindedness, and (b) simply because the school may have derived some economic benefit from the program, this alone could not render the student an "employee."  *Id.* at 1107.  The court stressed that "while not all forms of human experience are educational, it is clear that many services performed by students do serve educational purposes . . . they teach students neatness, responsibility" and civic mindedness.  *Id.* at 1108.

The holdings and reasoning in *Marshall* and *Bobolin* apply to the instant case, and the Court should look at the "economic reality" of the charged activities and the mission of Mountain Park to determine that the students are not "employed" by Defendants.

The twin missions of Mountain Park were (a) to provide a secure environment to nurture Christian values of respect for authority, of Biblical self-image, of self-discipline, and (b) to foster academic development. (Exhibit A at ¶ 4; Exhibit B at ¶ 4 ). To develop the social skills and self-discipline of each student, Mountain Park established and maintained tiers of student status and achievement. (Exhibit A at ¶ 6; Exhibit B at ¶ 7). New students were placed on orientation upon enrollment. The student on orientation has a guide or mentor who helps the student become acclimated to Mountain Park. Both students on orientation and their guides engaged in the same activities, including going to school, performing chores including dorm cleaning, prayer, Bible study and other activities. (Exhibit A at ¶ 8; Exhibit B at ¶ 9). The orientation program was a fundamental part of Mountain Park's mission because it was the primary mechanism for directing the positive peer pressure that was critical to Mountain Park's mission. (Exhibit A at ¶ 8; Exhibit B at ¶ 9).

The students claim that they should be paid for up to 18 hours per day to report to a staff member if, in the course of their daily student activities, including school and Bible study, another student tries to leave campus without permission. This claim is fallacious. The students testified that they engaged in daily activities including getting cleaned and dressed, cleaning their dorm areas, eating, attending school, attending Bible study, engaging in sports/physical education and doing other chores. (Exhibit C at 21; Exhibit E at 51-52, 54; Exhibit K at 74, 77). Essentially, the students seek to be paid for engaging in all of these activities of daily life because they were expected to report if another student tried to leave the campus in the course of

those activities.  However, under the FLSA, Plaintiffs are not entitled to be paid for reporting they see a student leave campus.  The FLSA requires that the activity at issue must include being "engaged in commerce or in the production of goods for commerce."  Being diligent in daily life is not an activity that constitutes "being engaged in commerce" and for which persons in society should be compensated.

To analogize, the request that students watch for the safety and obedience of other students no more made them employees than passengers at an airport are made security guards because they are asked to keep an eye out for suspicious packages and persons.

Plaintiff Ozuna alleges that she should be paid for serving as an orientation guide and mentor to other students.  (Complaint at ¶ 297).  Although the other students do not expressly allege it in their FLSA claims, one or more of them also served as orientation guides while at Mountain Park.  As discussed above, the orientation program was an essential element of Defendants' mission because it provides the positive peer pressure that is critical to the curriculum.  (Exhibit A at ¶ 8; Exhibit B at ¶ 9).  The orientation program fosters Biblical self-image, self-discipline and responsibility, as well as leadership skills.  (*Id.*).

The students acknowledged that, while they were orientation guides, they engaged in the regular activities of daily student life.  (Exhibit C at 21; Exhibit E at 51-52, 54).  Looking at the "economic reality" of the orientation guide program, the educational and developmental aspects of the program are profound, while whatever economic benefit Defendants may reap are nonexistent.  Indeed, it would be difficult, if not impossible, to obtain the positive peer pressure from paid employees.  Furthermore, orientation guides engage in the same daily routine and activities as the persons on orientation.  Like the *Marshall* and *Bobolin* courts noted, if the primary purpose of the activity is educational and developmental, and it provides minimal

10

economic benefit, then the activity is not "employment" under the FLSA.  In this case, serving as an orientation guide is a pivotal part of Defendants' educational curriculum, and it offers no economic benefit.  Therefore, serving as an orientation guide does not constitute employment under the FLSA.

Finally, some of the Plaintiffs contend that they served on "safety patrol" about one hour per day.  One of the primary purposes of Mountain Park is to offer a safe, secure and disciplined environment for students.  More responsible and senior students would monitor certain areas of the dormitory to watch out for newer students.  This is an integral part of Mountain Park's program.  The senior students performed this activity about one hour per day.  It was essential to have senior students who offer the positive peer pressure and guidance that is critical to Mountain Park's philosophy.  (Exhibit A at ¶ 10; Exhibit B at ¶ 11).  Once again, these activities were not offered to the public and any economic benefit derived by Mountain Park was nominal. (Exhibit B at ¶ 24).

Mountain Park's program was similar to that in the *Marshall* case, where students acted as dormitory assistants who helped maintain security, order and discipline in the dormitory were not employees under the FLSA.  This is what more senior students at Mountain Park did. Applying the economic reality test to this situation, said activities do not constitute employment under the FLSA.  Therefore, Defendants are entitled to summary judgment on Plaintiffs' FLSA claims.

    **C.**    **Defendants Are Entitled to Summary Judgment on All of the Plaintiffs' Intentional Infliction of Emotional Distress Claims Because They Cannot Prove That They Have Suffered A Medically-Diagnosable Injury And Plaintiffs Cannot Prove That Defendants Sole Intent In All of Their Actions Was To Cause Emotional Distress To The Plaintiffs.**

Plaintiffs have each alleged intentional infliction of emotional distress against Defendants.  (Part 1, Count III; Part 2, Count I; Part 4, Count I; Part 6, Count I; Part 7, Count I). Defendants are entitled to summary judgment on these claims because, after completion of discovery, none of the Plaintiffs can make a submissible case for intentional infliction of emotional distress.[2]

To make a submissible case for intentional infliction of emotional distress, a plaintiff must prove: (a) the defendant's conduct was extreme and outrageous;  (b) the defendant acted in an intentional or reckless manner; (c) the defendant's acts caused plaintiff severe emotional distress that resulted in bodily harm; (d) the plaintiff's emotional distress is medically diagnosable and medically significant; and (e) the defendant's sole reason for committing the conduct was to cause extreme emotional distress to the plaintiff.  *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997); *Sansonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. 1998); *Snelling v. City of St. Louis Dept. of Public Utilities-Water Div.*, 897 S.W.2d 642, 646 (Mo. App. 1995); *Childs v. Williams*, 825 S.W.2d 4, 10 (Mo. App. 1992).  The exclusive means to prove that the emotional distress is medically diagnosable and medically significant is through expert medical testimony.  *Childs*, 825 S.W.2d at 10.  Testimony of a psychologist is insufficient to make a submissible case.  *Id.*

In this case, none of the plaintiffs have disclosed a physician who will testify regarding any emotional distress.  On or about December 17, 2004, Plaintiffs disclosed their expert witnesses pursuant to Rule 26(a)(2).  Their disclosures included Jeffrey Kline, Ph.D. and Benjamin or Benito Corpus, M.D.  (See Exhibit M).  Dr. Kline, a psychologist and not a medical

---

2       Plaintiffs' claims of intentional infliction of emotional distress, false imprisonment and negligence all are common law state claims.  In cases arising from diversity jurisdiction, where the district court is hearing state claims, the court applies the substantive law of the forum state. *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 292 F.3d 567, 572 (8th Cir. 2002).

doctor, performed evaluations on two of the students, Erika Teasley and Shari Lueken.  (Exhibit N at 6, 12).  Following *Childs*, since he is not a medical doctor, Dr. Kline's testimony or opinions do not establish the threshold requirement to make a submissible case of intentional infliction of emotional distress for Lueken and Teasley.  Dr. Kline has no opinions regarding Woods, Ozuna and Deboi.  (Exhibit N at 7, 15).

Dr. Corpus is a toxicologist plaintiffs retained to perform some hair testing for purposes of the litigation.  (See Exhibit O at 2)  His report is silent as to any opinions about medically-diagnosable injury resulting from alleged emotional distress.  (See Exhibit O).  Dr. Corpus's report has no opinions that any student suffered emotional distress from events at Mountain Park, he has no opinions that any emotional distress is medically diagnosable or that any emotional distress is medically significant.  (*Id.*).  As such, Dr. Corpus's opinions and testimony cannot support a claim for intentional infliction of emotional distress.  Plaintiffs did not identify any other experts that they were going to call at trial.

There is no dispute that none of the plaintiffs have identified a medical doctor who will testify about a medically-diagnosable injury and physical injury resulting from emotional distress allegedly suffered at the hands of Defendants.  Following *Celotex*, if, at the completion of discovery, a plaintiff cannot prove any single element of her claim, then summary judgment is appropriate.  477 U.S. at 322-23.  Since none of the plaintiffs have the requisite expert testimony, none of them can make a submissible case and summary judgment is appropriate.

Plaintiffs must also present facts demonstrating that the **sole** reason why Defendants took action was to inflict emotional distress on them.  *Gibson*, 952 S.W.2d at 249.  Defendants note that plaintiffs have failed to specify what acts or events have caused their alleged emotional distress.  Once again, applying *Celotex*, this posture supports the conclusion that plaintiffs'

cannot make a submissible case.  Through all of the discovery, plaintiffs have offered no facts

showing that the sole reason why the Defendants operated Mountain Park was to inflict

emotional distress.  Indeed, some plaintiffs admitted that the Defendants were trying to teach

students to live a life with Christ and serving the Lord.  (Exhibit C at 93; Exhibit E at 70).

Without said facts, Defendants are entitled to summary judgment as a matter of law on each of

the student's claims for intentional infliction of emotional distress.

> **D.      Defendants Are Entitled To Summary Judgment As To Each Of The Student
> Plaintiffs' Claims of False Imprisonment.**

Each of the student plaintiffs alleges a claim of false imprisonment because they were at

Mountain Park while under the age of 18.    To submit a claim of false imprisonment, a plaintiff

must prove that the defendant intentionally confined the plaintiff without consent and without

legal justification.  *Rankin v. Venator Group Retail, Inc.*, 93 S.W.3d 814, 819 (Mo. Ct. App.

2002); *Gulley v. Werth*, 61 S.W.3d 293, 296 (Mo. Ct. App. 2001); MAI 23.04 [1983 Revision].

In intentional torts, the "intent" denotes that the actor desired to cause the consequences of the

act at the time it is committed.  Thus, intent to imprison without consent must be proven to make

a submissible case.  *Gibson*, 952 S.W.2d at 249.  In addition to intent, the other pivotal issue is

consent.  If there was consent to enroll each plaintiff at Mountain Park, then there is no false

imprisonment.

In Missouri, parents may give consent for the care of their children until the age of 18.

The Missouri Legislature authorizes that parents retain rights over a child "under eighteen years

of age," and a "minor" is a person who has not attained the age of eighteen years.  *See generally*

Sections 211.442, *et seq.*, R.S.Mo. (2000)(actions to terminate or restrict parental rights may be

initiated with respect to his or her child, which is defined as individual under the age of 18).

The father and mother, "with equal powers, rights and duties . . . [are] the natural guardian[s] of their children, and [have] custody and care of their person and education." Section 475.025 R.S.Mo. (2000).  Thus, parents have the right to direct the education of their children, including deciding where and how their minor children will be educated.  *See Doe "A" v. Special Sch. Dist. Of St. Louis Cty.*, 637 F. Supp. 1138, 1146 (E.D. Mo. 1986); *see generally In re Monnig*, 638 S.W.2d 782 (Mo.App. 1982).

Parents can also convey their authority to others with respect to their minor children.[3] For example, parents are authorized to give consent for their child to receive medical care and treatment.  Section 431.061.1, R.S.Mo. (2000).  Parents are authorized to enroll or commit their children to treatment facilities.  Section 631.105, R.S.Mo. (2000).

Following these Missouri cases and statutes, parental consents thwarts any claim of false imprisonment.  In *Blair v. Wills*, Case No. 1:02CV00088 CAS, this Court ruled that if a child's parents chose to enroll the child in Mountain Park, then the child could not sue for false imprisonment.  In so ruling, this Court looked to the laws described above, as well as the decision in *R.J.D. v. Vaughan Clinic, P.C.*, 572 So.2d 1225  (Ala. 1990), where the Alabama Supreme Court held that a teen-aged child could not sue a psychiatric hospital for false imprisonment even though her mother had admitted her to the hospital.  Id. at 1228-29.

---

3       Parents can delegate their powers with respect to a child until that child reaches **the age of 18**.  Section 475.024, R.S.Mo. (2000), Missouri's Probate Code, provides, in part:

> A parent of a minor, by a properly executed power of attorney, may delegate to another individual, for a period not exceeding one year, any of his powers regarding care or custody of the minor child . . . .

Missouri's Probate Code defines a "minor" as "any person who is under the age of eighteen years."  Section 475.010, R.S.Mo. (2000).

In this case, each of the Plaintiffs was enrolled by her parents.  (Exhibit C at 8-10; Exhibit E at 6, 15; Exhibit G at 10; Exhibit I at 8-9; Exhibit K at 26).  At the time they were students at Mountain Park, each of the Plaintiffs was under the age of 18.  (Exhibit C at 8-10; Exhibit E at 6; Exhibit G at 6; Exhibit I at 9; Exhibit K at 30)  Each of the plaintiffs' parents, at the time of enrollment, gave consent to the enrollment at Mountain Park through execution of a power of attorney and application forms.  (Powers of Attorney and Enrollment forms).  With such consent, claims of false imprisonment cannot be maintained and summary judgment is appropriate.

### E.     Defendants Are Entitled To Summary Judgment As To Plaintiffs' Battery Claims.

#### 1.     Plaintiffs Cannot Maintain Battery Claims for Alleged Drugging.

Each of the Plaintiffs alleges that Defendants surreptitiously administered antipsychotic drugs, including chlorpromazine, thioridazine or carbamazepine, to them while they were at Mountain Park and that said administration constituted a battery.  (Complaint at ¶ 23; Part 2, Count I; Part 4, Count I).  However, by virtue of the allegation that Plaintiffs did not know they were being given antipsychotic drugs, and that they cannot identify the specific person or persons who actually committed the battery, Plaintiffs battery claim must fail.

In Missouri, battery is defined as an intended, offensive bodily contact with another. *Phelps v. Bross*, 73 S.W.3d 651, 656 (Mo. App. E.D. 2002).  In *Phelps*, the plaintiff, a hostess at a golf tournament, alleged assault and battery against two men, Bross and Church.  Phelps claimed that, following the tournament, she and Church went with Bross to his house.  She claims that she had one beer at Bross's house and then became unconscious.  When she awoke, she was naked and lying in bed next to Bross.  She became upset, ran out of the house and ran to a neighbor's house.  She was taken to hospital and found to have had sex.  Church admitted that

he had sex with Phelps, but Bross denied that he ever touched her, and Phelps has no knowledge that Bross actually touched her in an offensive manner.  Phelps sued both men for assault and battery.  Bross obtained summary judgment on Phelp's battery claim.  *Id.* at 654-55.

The court of appeals affirmed the summary judgment on the battery.  The court held that, since Phelps could not show that Bross, acting alone or with Church, actually made any offensive contact with her, she could not prove a battery claim under Missouri law.  *Id.* at 656-57.

Here, Plaintiffs allege that each of the Defendants, individually, actually administered an antipsychotic drug to them.  The alleged offensive contact is the administration of an antipsychotic drug.  However, in their allegations and statements, Plaintiffs acknowledge that they did not know that they were being given an antipsychotic drug until after they left Mountain Park.  (Complaint at ¶ 23; Exhibit P at 16; Exhibit K at 93, 95).  Further, the Plaintiffs cannot identify which of the Defendants, if any, actually gave them an antipsychotic drug.  In their answers to the Complaint, Defendants all deny that they ever gave any student an antipsychotic drug.

Since battery is offensive bodily contact suffered by one at the hands of another, it is axiomatic that a battery is a discreet act, undertaken by a person, that occurs at a specific time.  *See id.*  In the *Phelps* case, it was implicit in the court's decision that Ms. Phelps could not prove her battery claim since she was not cognizant of Bross offensively touching her, and she had no facts that he did actually offensively touch her.  *Id.* at 657.  The same is true in this case.  The plaintiffs admit that none of them were actually cognizant of any of the Defendants actually administering an antipsychotic drug to them.  Therefore, to make a submissible case for battery, each Plaintiff must demonstrate that, for example, Mrs. Wills actually handed her an

antipsychotic drug, in a pill form, on a particular day, and instructed her to swallow it.  Yet, none of the Plaintiffs can do that.  A submissible case for battery against any one of the Defendants cannot be made simply because one student claims that traces of an antipsychotic drug appeared in a blood test that was taken after she left Mountain Park.

The Plaintiffs are in the same position as Ms. Phelps.  None of them can prove that any one of the Defendants actually committed the offensive touching, administered an antipsychotic drug, to them.  Therefore, none of the Plaintiffs can make a submissible case for their claims of battery related to alleged drugging, and summary judgment should be entered in favor of Defendants.

### 2.    Defendants Are Entitled To Summary Judgment On Plaintiffs' Other Claims Of Battery.

Plaintiffs allege that they suffered other physical batteries at the hands of the Defendants.  However, many of these claims are unsubstantiated.  All of the Defendants are entitled to summary judgment on Deboi's claims of battery because she admitted that she cannot identify any of the Defendants that actually ever suffered a battery by any of the Defendants.  (Exhibit E at 47).  All of the Defendants are entitled to summary judgment as to Teasley's claims of physical battery because she admitted that none of the Defendants ever hit her.  (Exhibit K at 45).  All of the Defendants are entitled to summary judgment as to Lueken's claims of physical battery because she could not identify any instances when one of the Defendants pushed or shoved her.  (Exhibit I at 35).

All of the Defendants are entitled to summary judgment as to Ozuna's claims of physical battery.  Ozuna's Complaint only identifies a single incident when she was allegedly hit by one Ms. Matthews.  (Complaint at ¶ 263).  None of the Defendants are identified with respect to said allegation.

Defendants Bob Wills, Sam Gerhardt, Deborah Gerhardt, Julie Gerhardt and Sharon Goodman are entitled to summary judgment as to Jamie Woods' claim of physical battery. Woods only identified an incident with Betty Wills and an incident with Andrea Hill. She cannot identify any instances with the other defendants. (Exhibit G at 115).

**F.**     **Defendants Are Entitled to Summary Judgment As To Claims of Medical Negligence Made By Woods, Ozuna and Deboi Because The Students Cannot Establish Duty, Breach of Duty, or an injury resulting.**

Plaintiffs Woods, Ozuna and Deboi each allege claims of medical negligence against Defendants. They allege that Defendants were negligent for failing to sufficiently diagnose or treat certain conditions they suffered, including constipation, missing their menstrual cycles, sore throats and headaches. Plaintiff Woods also alleges that Defendants Betty Wills and Deborah Gerhardt failed to sufficiently treat her when she allegedly and intentionally swallowed a safety pin. (Complaint at ¶ 92, 95, 97).

    **1.**     **Missouri Law Limits Those Who Can Be Sued For Negligent Medical Treatment.**

Chapter 538 of the Missouri Revised Statutes defines the terms for bringing a negligent claim for improper health care. Section 538.210 provides that a defendant in a cause of action for improper health care is defined as:

> (1) A hospital as defined in chapter 197, R.S.Mo., and its employees and physician employees who are insured under the hospital's professional liability insurance policy or the hospital's self-insurance maintained for professional liability purposes;

> (2) A physician, including his nonphysician employees who are insured under the physician's professional liability insurance or under the physician's self-insurance maintained for professional liability purposes;

> (3) Any other health care provider having the legal capacity to sue and be sued and who is not included in subdivisions (1) and (2) . . .

Under said statute, a health care provider is defined as:

> any physician, hospital, health maintenance organization, ambulatory surgical center, long-term care facility, dentist, registered or license practical nurse, optometrist, podiatrist, pharmacist, chiropractor, physical therapist, psychologist, physician-in-training, and any other person or entity that provides health care services under the authority of a license or certificate.  § 538.205(4), R.S.Mo. (2000).

In this case, Plaintiffs have alleged claims of negligent medical treatment and negligence related to the health care and lack of health care provided to them by Defendants.  (Complaint, Part 1, Count II; Part 2, Count II [¶¶ 158, 159]; Part 4, Count II [¶¶ 218-224]; Part 6, Count II; Part 7, Count II).  However, none of the Defendants was licensed in Missouri to engage in the professions or practices identified in Section 538.205(4).  As such, none of the Defendants is a health care provider as defined by the statute that provides for tort claims based on improper health care.  Therefore, Plaintiffs are not entitled to maintain their negligent medical treatment and medical negligence claims as a matter of law.  Entry of summary judgment in favor of Defendants on said claims is appropriate.

### 2.     Summary Judgment On The Negligent Medical Treatment Claims By Woods, Ozuna and Deboi Is Appropriate Because They Cannot Prove Duty, Breach of Duty, Or A Resulting Injury.

To prove a medical negligence claim, plaintiffs must prove: (a) an act or omission of the defendant failed to meet the required medical standard of care, (b) the act or omission was performed negligently, and (c) the act or omission caused the plaintiff's injury which resulted in damages.  *Echard v. Barnes-Jewish Hosp.*, 98 S.W.3d 558, 564 (Mo. App. E.D. 2002); *Boehm v. Pernoud*, 24 S.W.3d 759, 761 (Mo. App. E.D. 2000).  Generally, in such cases, expert testimony is required to offer evidence that the defendant acted below the standard of care.  *Id.*

Once again, the plaintiffs have failed to identify an expert who will offer testimony at trial about the standard of care and whether Defendants have acted below the standard of care.

The plaintiffs identified two experts in their Rule 26(a)(2) expert disclosures.  One is a psychologist, Dr. Kline.  However, psychologists cannot offer expert medical testimony.  *Childs v. Williams*, 825 S.W.2d 4, 10 (Mo. Ct. App. 1992).  The other expert, Dr. Corpus, is a physician, who practices as a toxicologist.  His report only relates to certain hair samples that were taken from plaintiffs Teasley and Lueken.  (Exh. O).  He is not offering any testimony  about the care and treatment Defendants provided to plaintiffs Woods, Ozuna and Deboi.  Without any expert testimony on standard of care, plaintiffs Woods, Ozuna and Deboi are unable to make a submissible case.  Therefore, summary judgment is appropriate on their claims.

### 3.      Summary Judgment Is Appropriate On The Negligent Medical Treatment for Alleged Drugging Made By Woods, Ozuna and Deboi.

Another part of the medical negligence claims advanced by Woods, Ozuna and Deboi is that Defendants were negligent for allegedly administering chlorpromazine to them without a prescription.  Plaintiffs allege that their missed periods, weight gain and other symptoms that allegedly suffered while at Mountain Park resulted from being administered chlorpromazine.  However, Woods, Ozuna and Deboi do not have any evidence that they were actually administered chlorpromazine, which is necessary for causation.

As discussed above, to make a submissible case a plaintiff must establish causation.  *Coon v. Dryden*, 80 S.W.3d 81, 90 (Mo. App. W.D. 2001).  To establish causation, the defendant's conduct must be both the cause in fact and the proximate, or legal, cause of the plaintiff's injury.  *Id.*  Hence, to make a submissible case, plaintiffs must prove that (a) they were, in fact, administered chlorpromazine by defendants and (b) it was both the cause-in-fact and proximate cause of their injury.  Proving cause-in-fact or "but for" causation requires expert testimony.  *Id.*

Woods, Ozuna and Deboi have failed to offer any facts showing that any one or more of the Defendants actually administered chlorpromazine or any other antipsychotic drug to them. The fact that they suffered from constipation, missing periods or other particular symptoms does not, unto itself, establish that they were drugged.  Therefore, on a threshold level, these Plaintiffs cannot demonstrate that they were administered chlorpromazine by the Defendants.

Further, like in Section F.2. above, these Plaintiffs have not identified any experts who will offer testimony establishing that Defendants gave them chlorpromazine.  They have no facts showing that Defendants actually gave them chlorpromazine.  While Plaintiffs complained that they suffered particular symptoms, there is no evidence that those symptoms resulted from the ingestion of chlorpromazine or that it came from the Defendants.    Following *Celotex*, without any facts supporting either cause-in-fact or proximate cause, Defendants are entitled to summary judgment on the negligence claims advanced by Plaintiffs Woods, Ozuna and Deboi.

**G.    Defendant Sharon Goodman Is Entitled To Summary Judgment As To All Claims Alleged By Tracey Ozuna and Jessica Deboi.**

Plaintiffs Ozuna and Deboi allege various general claims of battery, false imprisonment, intentional infliction of emotional distress, negligent medical treatment and violations of the Fair Labor Standards Act.  (*See* Complaint, Part 6, Counts I, II and III; Part 7, Counts I, II and III). Ozuna alleges that she was a student at Mountain Park between December 31, 1995 and April 13, 1996, and February 9, 1997 until December 24, 1997.  (Complaint at ¶ 253).  Deboi alleges that she was a student at Mountain Park from April 26, 1997 and December 24, 1997.  (Complaint at ¶ 310).

Defendant Sharon Goodman did not arrive at and become a staff member at Mountain Park until August of 2000.  (Exhibit B at 27).  This was well after both Ozuna and Deboi left Mountain Park.  As such, summary judgment should be granted in favor of Sharon Goodman as to all of Ozuna's and Deboi's claims.

**H.     Claims Made By Erika Teasley Should Be Dismissed Because She Is An Infant And Cannot Sue In Her Own Capacity.**

Part 4, Counts I, II and III of the Complaint are claims for relief alleged by Erika Teasley in her own capacity.  Section 507.110, R.S.Mo. requires that:

> Suits by infants may only be commenced and prosecuted, either: First, by a duly appointed guardian or conservator of such infant; or, second, by a next friend appointed for him in such suit; or, third, if asserted by counterclaim, by a guardian ad litem.

Infants are defined as persons who have not attained the age of 18 years.  § 507.115, R.S.Mo. (2000).  Erika Teasley admitted that she was 14 years old as of January 18, 2003.  (Exhibit K at 30).  According to her own testimony, she is less than 18 years old as of the filing of this Motion, and by the time of trial, she will still be less than 18 years old.  As such, Erika Teasley is an "infant" under the law and she cannot sue in her own name.  Therefore, her claims should be dismissed.

## Conclusion

For the foregoing reasons, Defendants ask the Court to enter summary judgment on the claims made by Plaintiffs Woods, Lueken, Teasley, Ozuna and Deboi.

Respectfully submitted,

BROWN & JAMES, P.C.

   /s/ John D. Briggs_____
Steven H. Schwartz,  #4316
John D. Briggs,  #86025
1010 Market Street, 20th floor
St. Louis, Missouri  63101
314-421-3400
314-421-3128  FAX

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2005, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Mr. Oscar Stilley                                    Mr. John Oliver
Central Mall Plaza                                 Oliver, Oliver & Waltz, P.C.
Suite 520                                              400 Broadway
5111 Rogers Avenue                            Cape Girardeau, MO  63702
Fort Smith, Arkansas  72903-2041      *Attorneys for Co-Defendants*
*Attorney for Plaintiffs*


                                                      ___/s/ John D. Briggs_____

7737375

24