**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| JAMIE KAUFMANN WOODS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:03-CV-105 CAS |
| | ) | |
| BOB WILLS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on two motions for summary judgment filed by the defendants. Plaintiffs oppose the motions. For the following reasons, the Court will grant in part and deny in part defendants' motion for summary judgment as to plaintiffs Jamie Kaufmann Woods, Shari Lueken, Erika Teasley, Tracey Brazil Ozuna and Jessica Deboi (collectively referred to as the "Student plaintiffs"). The Court will grant defendants' motion for summary judgment as to plaintiffs Ralph Lueken, Marilyn Lueken, Paul Douglas Hoover, Jr., and Katrina Hoover (collectively referred to as the "Parent plaintiffs").

## Background.

The plaintiffs in this action assert various federal and state law claims against the defendants arising from the Student plaintiffs' enrollment at the Mountain Park Baptist Boarding Academy ("Mountain Park"), a boarding school operated by the defendants. The plaintiffs are Jamie Kaufmann Woods, Shari Lueken (a minor), Ralph Lueken and Marilyn Lueken (Shari's parents), Erika Teasley (a minor), Katrina L. Hoover (Erika Teasley's mother) and Paul Douglas Hoover, Jr. (Katrina Hoover's husband), Tracey Brazil Ozuna, and Jessica Deboi. Plaintiffs' twenty-count complaint

asserts federal claims for violations of the Americans with Disabilities Act and the Fair Labor Standards Act, and state law claims of assault, battery, false imprisonment, negligence, negligence in providing medical treatment, intentional infliction of emotional distress, conversion, and fraud. The defendants are Bob Wills, Betty Sue Wills, Sam Gerhardt, Deborah Gerhardt, Julie Gerhardt, Sharon Goodman and Andrea Hill, all alleged to be doing business as Mountain Park Boarding Academy. The defendants filed a counterclaim against the Hoovers and the Lueken parents for indemnification. The counterclaim is not at issue on the summary judgment motions.

One of the primary assertions made by the plaintiffs is that the defendants surreptitiously administered to the Student plaintiffs antipsychotic, psychotropic or behavior modification drugs while they were at Mountain Park. Plaintiffs assert that they were administered the prescription medications chlorpromazine (trade name Thorazine), carbamazepine (trade name Tegretol), and/or thioridazine (trade name Mellaril).

**<u>Legal Standard</u>**.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>See</u> <u>Celotex Corp. v. Citrate</u>, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. <u>City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.</u>, 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing

there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063 (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). The Court is "'not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.'" Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (quoting White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990)). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving the instant motions for summary judgment.

**Facts**.

As a threshold matter, the Court must address plaintiffs' failure to comply fully with Local Rule 4.01(E), and the effect of that failure. Local Rule 4.01(E) provides with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 4.01(E).

Plaintiffs responded to defendants' statements of uncontroverted material facts by filing a document containing numbered paragraphs in which plaintiffs admitted or denied each statement of material fact, often providing affirmative statements in support of the denials. Plaintiffs did not, however, include in their responses "specific references to portions of the record, where available, upon which the opposing party relies." E.D. Mo. L.R. 4.01(E). Instead, plaintiffs submitted their own statement of additional material facts which incorporated by reference certain documents and declarations executed by seven of the plaintiffs.

As a result, plaintiffs have deemed admitted defendants' statements of material fact except to the extent that their affidavits serve to raise a genuine issue of material fact. The Court will therefore repeat defendants' statements of material fact largely verbatim, and will note whenever plaintiffs properly dispute a fact and the ground for their dispute. Cf. Northwest Bank & Trust Co. v. First Ill.

Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003) (holding district court did not abuse its discretion by applying local rules that excluded some of the material facts offered in opposition to a motion for summary judgment); Huckins v. Hollingsworth, 138 F. App'x 860, 862 (8th Cir. 2005) (unpublished per curiam) (where plaintiffs responded to the defendants' statements of material facts by paragraph number as required by local rule but did not fully comply with that rule by submitting their own concise statement of material facts as to which they contended there exists a genuine issue to be tried, and instead provided the district court with affidavits, the district court did not abuse its discretion when it recounted the defendants' statements of facts verbatim but noted whenever the plaintiffs properly disputed a fact and the ground for their dispute).[1]

**Facts Relating to Student Plaintiffs' Claims**.

1. Mountain Park Baptist Church ("Mountain Park") is an independent Baptist church established by defendants Pastor Bob Wills and his wife, Betty Sue Wills, in 1987.

2. The sole ministry of Mountain Park was to serve teens through the operation of a boarding academy that provided a secure, structured Christian environment.

3. The twin missions of Mountain Park, through the defendants, including Bob Bills, Betty Wills, Sam Gerhardt, Debbie Gerhardt, Julie Gerhardt, Sharon Goodman and Andrea Hill, were to

---

[1]The Court notes that at the time the summary judgment motions were filed, several parties had not been deposed. The plaintiffs moved for additional time to file their opposition memoranda, based on the fact that plaintiffs had just completed defendant Hill's deposition and had not yet taken defendant Goodman's deposition. The Court denied the motion but stated, "If plaintiffs deem it appropriate after the depositions in question are taken, plaintiffs may seek leave to file sur-responses in opposition to the motions for summary judgment, which the Court will grant leave for filing." See Docket Text Order of May 25, 2005. Plaintiffs did not seek leave to file sur-responses in opposition to the summary judgment motions.

(a) provide a secure environment to nurture Christian values of respect for authority, Biblical self-image, and self-discipline, and (b) foster academic development.

4.   Defendants' religious beliefs and practices were incorporated into the educational curriculum, policies and practices at Mountain Park.  In addition, defendants regularly conducted group Bible study services and had church services several days per week.

5.   To develop the social skills and self-discipline of each student, Mountain Park and its employees established and maintained tiers of student status and achievement.

6.   The orientation program fosters self-discipline and responsibility, as well as leadership skills that were critical to Mountain Park's missions.

7.   New students were placed on orientation upon enrollment.  The student on orientation has a guide or mentor who helps the student become acclimated to Mountain Park.

8.   Both students on orientation and their guides engaged in the same activities, including going to school, performing chores including dorm cleaning, prayer, Bible study and other activities.

9.   The orientation program was a fundamental part of defendants' mission because it was the primary mechanism for directing the positive peer pressure that was critical to Mountain Park's mission.

10.   More senior or experienced students who demonstrated their faith in God and responsibility served as orientation guides.

11.   More senior and responsible students performed "safety patrol," where a student would observe a part of the dormitory to help maintain the safe and secure environment that was a part of Mountain Park's mission, for approximately one hour during a night.

12. The orientation program and safety patrol were never offered to the public. They were merely part of Mountain Park's mission and Mountain Park never derived a substantial economic benefit from the program.

13. Students are enrolled in Mountain Park by their parents.

14. Typically, when each student was enrolled at Mountain Park, defendant Sam Gerhardt would meet personally with one or both parents to discuss the policies and procedures at Mountain Park as well as go through several forms that are filled out by the parents.

15. Occasionally, initial discussions with parents would be undertaken by telephone.

16. Sam Gerhardt always told the truth about the policies and practices at Mountain Park when he met with parents.

17. Defendant Julie Gerhardt was employed by Mountain Park as a staff member from June 1997 until April 2004.

18. Defendant Sharon Goodman was employed by Mountain Park as a staff member from August 2000 until May 2004.

19. Defendant Andrea Hill was employed by Mountain Park as a staff member from June 1997 until May 2004.

**A. Tracey Ozuna**.

20. Plaintiff Tracey Ozuna was enrolled by her parents at Mountain Park as a student on two occasions. The first occasion was between December 1995 and April 1996 and the second time was from February 1997 through December 1997. She was under the age of eighteen both times.

21. Ms. Ozuna's parents executed a power of attorney to Mountain Park when she was enrolled there.

22. While she was a student at Mountain Park, Ms. Ozuna engaged in activities of daily student life, including having breakfast, Bible memory, school, lunch, exercise, chores and dinner.

23. Ms. Ozuna has no facts demonstrating that defendants actually administered chlorpromazine to her. Her only claimed facts to support the assertion that defendants gave her chlorpromazine are that she purportedly experienced some symptoms which are possible side effects from taking chlorpromazine, that she looked up on an Internet website.

24. While at Mountain Park, Ms. Ozuna was not aware that she was being administered any chlorpromazine or any other antipsychotic medication.

25. Ms. Ozuna acknowledges that the only named defendant she alleges touched her was Betty Wills.

26. Ms. Ozuna was hit with a paddle eight times by Laura Matthews during her first enrollment at Mountain Park. Debbie Gerhardt ordered the paddling in front of Ms. Ozuna.

27. Ms. Ozuna was never given a copy of the rules or the Parent-Student Handbook while at Mountain Park.

28. During both of her enrollments at Mountain Park, Ms. Ozuna had memory loss, disorientation, difficulty differentiating different individuals, increased passivity, inability to think clearly, weight gain, and yellowish skin color.

29. After she left Mountain Park, Ms. Ozuna lost the extra weight she had gained without dieting or other weight loss efforts.

30. During both enrollments, Ms. Ozuna had difficulty urinating and defecating.

31.  During her second enrollment at Mountain Park, Ms. Ozuna did not have her menstrual period for eight months.  She had only one or two menstrual periods at the end of her second enrollment.

32.  Ms. Ozuna spent over a year in other boarding schools and never missed a menstrual period while at the other schools.

33.  Ms. Ozuna has memory gaps that make it hard for remember what happened at Mountain Park.  She has no other memory gaps, although she attended other boarding schools.

34.  Ms. Ozuna thought about running away from Mountain Park but "could not act upon the thought."

35.  All food, drink, medication and other items for ingestion into the body were strictly controlled by the defendants.  Ms. Ozuna was not allowed to take any drugs unless defendants authorized their administration.

36.  Ms. Ozuna was required to drink a specified amount of milk or juice, neither more nor less, and could not share or get refills.

**B.  Jessica Deboi**.

37.  Plaintiff Jessica Deboi was enrolled by her parents at Mountain Park between April 1997 and December 1997.  She was under the age of eighteen at the time.

38.  When her parents enrolled Ms. Deboi at Mountain Park, they executed a power of attorney form to Mountain Park.

39.  While she was a student at Mountain Park, Ms. Deboi engaged in activities of daily student life, including having breakfast, Bible memory, school, lunch, exercise, chores and dinner.

40.  No physician has ever told Ms. Deboi that the symptoms she allegedly suffered while at Mountain Park came from being given chlorpromazine.

41.  Ms. Deboi cannot state that she suffered a battery by any of the defendants.

42.  Ms. Deboi was never given a copy of the rules or the Parent-Student Handbook while at Mountain Park.

43.  Two days after leaving Mountain Park, Ms. Deboi was on a cruise ship and took the medication Sudafed for a sinus problem.  She was not allowed to have Sudafed while at Mountain Park.  After taking the Sudafed, Ms. Deboi vomited, was in great pain, and lost consciousness.  She was taken by lifeboat to a hospital, where tests showed her blood sugar was extremely low and she was dehydrated.  She spent several days in the hospital recuperating.[2]

44.  Ms. Deboi was severely constipated at Mountain Park, and gained almost thirty pounds while there.  After she left Mountain Park, she lost about ten pounds quickly without dieting or other weight loss efforts.

45.  While at Mountain Park, Ms. Deboi had memory gaps, constant fatigue, difficulty concentrating, increased passivity, and an inability to resist aggression in others.  She felt like a zombie.

46.  Ms. Deboi did not have a menstrual period for approximately six months while at Mountain Park.  After six months, she had regular but lighter than normal periods.  After she left Mountain Park, her periods became regular within a couple of months.  She has never had irregular menstrual periods either before or after her time at Mountain Park.

---

[2]Ms. Deboi's Declaration refers to attached medical records of this incident, but no medical records or other documents were attached to the Declaration.

47.  While at Mountain Park, she thought about running away "but could not act upon the thought."

48.  Approximately two to four weeks after she left Mountain Park, Ms. Deboi's senses and faculties began to be normal.  She did not really feel like herself until two months later.

49.  While at Mountain Park, Ms. Deboi was required to drink a specified amount of milk or juice, neither more nor less, and could not share or get refills.

50.  All food, drink, medication and other items for ingestion into the body were strictly controlled by the defendants.  Ms. Deboi was not allowed to take any drugs unless the defendants authorized their administration.

### C.  Jamie Kaufmann Woods.

51.  Ms. Woods' mother and father enrolled her at Mountain Park.

52.  Ms. Woods was at Mountain Park from September 9, 1999 until May 2001.

53.  Ms. Woods' date of birth is July 22, 1983, and she was under the age of eighteen while at Mountain Park.

54.  Ms. Woods graduated from Mountain Park.

55.  At the time of Ms. Woods' enrollment, her natural mother, Christine M. Donley, executed a power of attorney to Mountain Park.

56.  Ms. Woods has no facts to support the allegations that she was given chlorpromazine while she was at Mountain Park.

57.  Ms. Woods alleges that she was battered by defendants Betty Wills and Andrea Hill.

58.  No outside individuals were allowed in Mountain Park's church, except for one of Mountain Park's attorneys, David C. Gibbs.

59.  An orientation guide, Meaghan Richter, pulled Ms. Woods' hair and pushed her to get her attention, because Ms. Woods could not hear her due to hearing loss.

60.  Ms. Woods complained to defendant Hill about the hair pulling but Hill did not do anything about it.

61.  When Ms. Woods arrived at Mountain Park, she was tackled to the ground by a number of girls, and defendant Hill was shouting instructions to the girls to hold her down.  Ms. Woods was falsely accused of trying to run away.

62.  Ms. Woods did try to run away a couple of days after she arrived at Mountain Park, and she was tackled to the ground by other students, who had standing orders to catch and secure runaways, and was taken back to her bed.

63.  Ms. Woods was never given a copy of the rules or the Parent-Student Handbook while at Mountain Park.

64.  While at Mountain Park, Ms. Woods had memory loss, dark urine, constant fatigue, disorientation, increased passivity, inability to resist aggression in others, inability to think clearly, and a weight gain of about thirty pounds.  Ms. Woods felt sluggish and had memory gaps that make it very hard to remember what happened at Mountain Park.

65.  A couple of the students Ms. Woods was assigned to guard had purple urine.

66.  After she left Mountain Park, Ms. Woods lost the extra weight without dieting or other weight loss efforts.

67.  The symptoms she experienced at Mountain Park have not happened to her at any other time except at Mountain Park.

68. For approximately seven to nine months while she was at Mountain Park, Ms. Woods did not have menstrual periods. After that time, she had irregular periods. Within a couple of months after she left Mountain Park, her periods became regular. Ms. Woods has never had irregular periods either before or after Mountain Park, except for two or three months after the birth of her son.

69. Ms. Woods thought about running away from Mountain Park "but could not act upon the thought after the first few days." Later, she could not even think about running away although she was miserable all the time. Ms. Woods began to think about drinking chemicals or committing other self-harm behavior. She swallowed a safety pin during this time.

70. Ms. Woods was required to drink a specified amount of milk or juice, neither more nor less, and could not share or get refills.

71. All food, drink, medication, and other items for ingestion into the body were strictly controlled by the defendants. Ms. Woods was not allowed to take any drugs unless the defendants authorized their administration.

72. About a month after leaving Mountain Park, Ms. Woods' senses and faculties began to be normal. This was the first time after going to Mountain Park that she felt capable of asserting herself or thinking independently.

**D. Shari Lueken**.

73. Ms. Lueken was enrolled at Mountain Park by her parents from June 23, 2000 until June 20, 2002.

74. Ms. Lueken was under the age of eighteen while she was a student at Mountain Park.

75. At the time she was enrolled in Mountain Park, Ms. Lueken's parents executed a power of attorney to Mountain Park.

76. Ms. Lueken testified that she has no facts showing that any pills she was given while at Mountain Park were chlorpromazine.

77. Ms. Lueken contends, however, that she was given chlorpromazine without her knowledge.

78. Ms. Lueken cannot identify any instances when one of the defendants pushed or shoved her.

79. In her Declaration, Ms. Lueken states that different staff members, including defendants Goodman and Julie Gerhardt, gave her pills and checked to make sure she swallowed them.

80. Ms. Lueken felt she was drugged because she "felt like a zombie," she had below normal energy levels, her menstrual periods stopped for a nine-month period, her breasts became enlarged, her hair started falling out, and she experienced increased passivity. After nine months, she began having erratic menstrual periods.

81. Ms. Lueken experienced these symptoms only while at Mountain Park.

82. After leaving Mountain Park, Ms. Lueken's breasts returned to normal size, her hair stopped falling out, her menstrual periods resumed normalcy, and she "began to function normally."

83. All food, drink, medication and other items for ingestion into the body were strictly controlled by the defendants. Ms. Lueken was not allowed to take any drugs unless the defendants authorized their administration.

84. Ms. Lueken was dragged by her arms or other body parts around an exercise track by Amanda File, Natalie Fahnestock, Amanda Krassin, Jamie Kaufman[3] and other girls, many times.

---

[3]It is unclear to the Court whether the "Jamie Kaufman" referred to in Ms. Lueken's Declaration is plaintiff Jamie Kaufmann Woods.

Erin Shanahan, a staff member, dragged Ms. Lueken around the track by the hair. Ms. Lueken was told by other students that Ms. Gerhardt directed them to pull her around the track.[4]

85. Marilyn and Ralph Lueken, Ms. Lueken's parents, observed three musical instruments packed into a package, which was shipped to Ms. Lueken at Mountain Park. When she opened the package, one of the instruments, a piccolo, was not inside. Ms. Lueken has no facts showing that one or more of the defendants actually took possession of the piccolo.

### E. Erika Teasley.

86. Erika Teasley was enrolled by her mother and her mother's husband at Mountain Park from January 18, 2003 until May 2003.

87. Ms. Teasley was under the age of eighteen while at Mountain Park.

88. Ms. Teasley's mother, plaintiff Katrina Hoover, executed a power of attorney to Mountain Park.

89. Ms. Teasley admits that none of the defendants ever hit her.

90. Ms. Teasley was never on safety patrol and was never an orientation guide.

91. Ms. Teasley has no facts to support her assertion that any of the defendants ever administered thioridazine to any students.

92. Ms. Teasley did not think she had been given behavior modification drugs by the defendants until she went to see her doctor, Dr. Beste, after she left Mountain Park.

93. Ms. Teasley engaged in activities of student life, including going to school, Bible memorization, eating meals and chores.

_____

[4]It is unclear whether Ms. Lueken's Declaration refers to defendant Debbie Gerhardt or defendant Julie Gerhardt.

94. According to Ms. Teasley's Declaration, defendants Goodman, Julie Gerhardt and Hill gave her pills and always checked her mouth to make sure she swallowed them. They stopped giving her the pills several days before she left Mountain Park but continued to give pills to the other girls.

95. The pills were given in the cafeteria in the mornings and in the hallways at night.

96. While at Mountain Park, Ms. Teasley's eyesight deteriorated badly, she lost strength, felt drowsy, was quiet and cooperative even in situations where she would normally resist, and was not herself. She had difficulty thinking and reasoning and "felt like walking zombie."

97. Ms. Teasley was struck by a Kenda Landsverk for the alleged offense of looking at a new student. Landsverk also hit Ms. Teasley another time, also for a reason related to a new student.

98. Ms. Teasley describes Landsverk was an "enforcer" of Mountain Park policy. Landsverk would be summoned by Mountain Park staff to assault or restrain students.

**Facts Relating to Student Plaintiffs Generally**.

99. Kennett Asher, D.O., performed a medical examination on each of the plaintiffs and concluded that none of them had any medically significant conditions which can be attributed to their enrollments at Mountain Park.

100. Plaintiffs made Rule 26(a)(2) disclosures in December 2004.

101. A psychologist, Jeffrey Kline, Ph.D., was retained to perform evaluations on plaintiffs Ms. Lueken and Ms. Teasley.

102. Dr. Kline is not licensed to practice medicine and is not a medical doctor.

103. Dr. Kline was not retained to perform evaluations on or offer opinions about plaintiffs Ms. Woods, Ms. Ozuna or Ms. Deboi.

104. Benjamin Corpus was retained by plaintiffs to test hair samples for the presence of certain drugs, including chlorpromazine, thioridazine and carbamazepine.

105. Mr. Corpus only performed testing on hair samples provided to him that were alleged to be from Ms. Lueken and Ms. Teasley. Mr. Corpus did no analysis and offered no opinions about Ms. Woods, Ms. Ozuna or Ms. Deboi.

106. Mr. Corpus offered no opinion about any emotional distress or a medically diagnosable injury.

107. By Memorandum and Order dated October 27, 2005, the Court granted defendants' <u>Daubert</u> motion and excluded the testimony of Mr. Corpus in its entirety.

**Facts Relating to the Parent Plaintiffs' Claims**.

    **A. The Hoovers**.

108. Katrina Hoover (mother of Ms. Teasley) and Paul Hoover, Jr. executed a Hold Harmless Agreement to defendants, as well as an Enrollment Orientation Agreement, Finances Form and Notice of Parental Responsibility.

109. Katrina Hoover paid $500 per month for Ms. Teasley's tuition, which was Mountain Park's cost for room and board.

110. Plaintiffs made Rule 26(a)(2) disclosures in December 2004. The disclosures do not identify any experts offering an opinion about Katrina Hoover or Paul Hoover, Jr.

111. Katrina Hoover cannot state that she ever spoke with defendants Bob Wills, Betty Wills, Deborah Gerhardt, Julie Gerhardt, Sharon Goodman or Andrea Hill in relation to enrolling Ms. Teasley in Mountain Park.

112. The only person Katrina Hoover spoke with about enrolling Ms. Teasley at Mountain Park was Sam Gerhardt.

113. Katrina Hoover cannot specify any misrepresentations that Sam Gerhardt allegedly made.

114. Katrina Hoover did not consult with a State Fire Marshal, County Health Department, or any other person or entity to determine if the dormitory or facilities at Mountain Park were safe.

115. Paul "Doug" Hoover, Jr. is not Ms. Teasley's legal guardian, and has not adopted Ms. Teasley.

116. Sam Gerhardt told Doug Hoover that Mountain Park would not administer psychotropic or behavior modification drugs to Erika Teasley.

117. Doug Hoover relied upon this representation in enrolling Erika Teasley at Mountain Park.

118. The Hoovers removed Erika Teasley from Mountain Park due to "persistent and credible" rumors of physical abuse. Hoover Decl, ¶ 8. When they removed Erika from Mountain Park, she "acted like a zombie" and had what appeared to be burn marks on her arm. Id. "Due to the physical symptoms and rumors of drugging, we chose to have Erika Teasley tested for drugs." Id.

119. Mr. Hoover contributed funds toward the $500 monthly payment to Mountain Park.

120. Mr. Hoover received a copy of the Mountain Park parent-student handbook, which assured him that he would be kept informed concerning any of Erika Teasley's medical or dental needs, and that her needs would receive prompt attention.

121. Mr. Hoover would not have sent Erika Teasley to Mountain Park if he had known she would be forced to wait two and a half months to get dental care for a chipped tooth.

122. Mr. Hoover would not have permitted Erika Teasley to go to Mountain Park had he known how she would be treated, or about the drugging of students, the physical abuse of students, and deprivations of medical care and other essentials of life.

### B. The Luekens.

123. Ralph and Marilyn Lueken each executed a Hold Harmless Agreement to defendants and an Enrollment Orientation Agreement.

124. Ralph Lueken was assured by Mountain Park's documentation, and by oral representations by Sam Gerhardt and others, that his daughter Shari Lueken would be treated humanely and would receive necessary medical care.

125. Sam Gerhardt told Ralph Lueken that Mountain Park was a drug-free facility.

126. Ralph Lueken relied on these representations in deciding to enroll Shari Lueken at Mountain Park.

127. Ralph Lueken received a copy of the Mountain Park parent-student handbook, which assured him that he would be kept informed of any medical or dental needs of Shari Lueken, and that her needs would receive prompt attention.

128. After Shari Lueken was removed from Mountain Park, Ralph Lueken had her tested for drugs.

129. Ralph Lueken has spent tens of thousands of dollars to obtain "competent professional services to undo the damage done by the Defendants" to Shari Lueken. Lueken Decl., ¶ 9.

130.  Ralph Lueken Hoover would not have enrolled Shari Lueken at Mountain Park had he known how she would be treated, or about the drugging of students, the physical abuse of students, including being dragged by other students, and deprivations of medical care and other essentials of life.

**Discussion**.

### A.  Americans with Disabilities Act Claim.

Plaintiff Jamie Kaufmann Woods alleges that defendants violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. (the "ADA").  The complaint (Part 1, Count 1) alleges that Ms. Woods was deaf and wore hearing aids as a result of congenital hearing loss.  Ms. Woods sometimes had difficulty understanding others even while wearing hearing aids, and could hear and understand very poorly or not at all without hearing aids.  Complaint, ¶¶ 74-77.  The complaint states that Ms. Woods wore prescribed hearing aids at the time of her enrollment at Mountain Park, but was not actually wearing the hearing aids at the time her parents took her to Mountain Park, and that she immediately informed the staff that she was deaf and needed her hearing aids.  Id., ¶¶ 79-80. Ms. Woods' parents sent her the hearing aids at an unspecified later time, but Ms. Woods complained that she still could not hear.  Id., ¶ 86.  The complaint alleges that Ms. Woods did not receive hearing aids until approximately seven to nine months after she was enrolled at Mountain Park and did not receive professional medical services during the same period.  Id., ¶¶ 80, 85, 88.  The complaint also alleges that Ms. Woods was constantly derided by her orientation guide, Meaghan Richter, for being unable to hear, and on one occasion defendant Betty Wills shoved her hand and fingers into Ms. Woods'

chest, called her a liar and said she could hear just fine, and punished Ms. Woods by requiring her to write lines.[5]

Defendants move for summary judgment on the basis that the ADA provides an express exemption from a private right of action against a religious organization. Defendants state that plaintiff Woods' claim could only be brought pursuant to the public accommodations portion of Title III of the ADA, 42 U.S.C. §§ 12181-12189.[6] Defendants assert that as a religious organization they cannot be sued under Title III because 42 U.S.C. § 12187 provides an exemption for "private clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) or to religious organizations or entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187.

Defendants assert it is undisputed that Mountain Park, an unincorporated association, was an independent fundamental Baptist church founded by defendants Bob and Betty Wills in 1987 with the mission of serving troubled teens through a boarding school, and that it maintained certain fundamental religious principles which were integral to the curriculum, including regular Bible study services and church services several days per week. Defendants assert that Mountain Park, and the defendants as its agents and employees, was a "religious organization" as defined by 42 U.S.C. § 12187 and associated regulations, and therefore defendants are exempt from a private right of action under Title III of the ADA. Defendants cite two decisions interpreting the religious

---

[5]It is not clear to the Court whether plaintiff Woods is alleging that defendants violated Title III of the ADA by failing to provide her with hearing aids or by harassing her because of her deafness, or both.

[6]42 U.S.C. § 12181(7)(j) defines "public accommodation" to include a secondary private school or other place of education.

organization exemption to Title III, <u>White v. Denver Seminary</u>, 157 F.Supp.2d 1171 (D. Colo. 2001), and <u>Doe v. Abington Friends School</u>, 2005 WL 289929 (E.D. Pa. Feb. 4. 2005).

Plaintiffs respond that defendants have not shown any minutes of a corporation or organization or otherwise established that Mountain Park is run by a bona fide church. Plaintiffs state that the public was not invited to attend Mountain Park's "church" services. Plaintiffs also state that defendants were operating Mountain Park on a for-profit basis, and that real estate records of Wayne County, Missouri show that the defendants paid taxes on the Mountain Park property, which indicate it was a business rather than a church. Plaintiffs also submit the declaration of Ms. Woods, which asserts her belief that Mountain Park was not a church because "outside individuals" were not allowed in the church, and that "church" was "just an excuse to get all the kids together and yell at them." Woods Decl., ¶¶ 2-3. Woods asserts "on information and belief" that Mountain Park is operated as a for-profit business, has never created a formal church or religious organization, or joined any recognized religious group. <u>Id.</u>, ¶ 4. Woods also asserts that while at Mountain Park, she "saw no evidence that the 'church' owned the school" and that it "appeared to [her] that the Wills and the Gerhardts owned the entire property and used them as their personal possessions." <u>Id.</u>, ¶ 6.

Defendants reply that the Woods Declaration cannot create an issue of material fact on the ADA claim because it is mere opinion about what Ms. Woods considers to be a church, and also contains statements made on information, belief and conjecture. Defendants also object that there is no foundation for the purported Wayne County real estate records, as the documents are not authenticated.

As defendants observe, the complaint does not indicate under which aspect of the ADA Ms. Woods asserts her claim. The ADA consists of three titles addressing discrimination against the

disabled in different contexts. "Title I prohibits employment discrimination, 42 U.S.C. § 12112, Title II prohibits discrimination in the services of public entities, 42 U.S.C. § 12132, and Title III prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services, 42 U.S.C. §§ 12182, 12184." Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir. 1998). The Court agrees with defendants that Title III is the only potentially applicable section, as Ms. Woods does not claim that defendants discriminated against her in employment or that defendants are a public entity.

Title III of the ADA prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability. See 42 U.S.C. § 12182(a) (1994). A person alleging discrimination under Title III must show that (1) she is disabled within the meaning of the ADA, (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) the defendant took adverse action against the plaintiff based upon her disability, and (4) the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. See 42 U.S.C. § 12182(a) and (b)(2)(A)(ii); Amir v. St. Louis University, 184 F.3d 1017, 1026 (8th Cir. 1999).

Title III by its terms does not apply to "religious organizations or entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187; PGA Tour, Inc. v. Martin, 532 U.S. 661, 689 n.51 (2001) (noting that Congress "expressly exempted" religious organizations or entities from Title III's coverage). 28 C.F.R. Pt. 36, App. B states,

> The ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations. Religious organizations and entities controlled by religious organizations have no

obligations under the ADA. Even when a religious organization carries out activities that would otherwise make it a public accommodation, the religious organization is exempt from ADA coverage. Thus, if a church itself operates a day care center, a nursing home, a private school, or a diocesan school system, the operations of the center, home, school, or schools would not be subject to the requirements of the ADA or this part. The religious entity would not lose its exemption merely because the services provided were open to the general public. The test is whether the church or other religious organization operates the public accommodation, not which individuals receive the public accommodation's services

In <u>White v. Denver Seminary</u>, 157 F.Supp.2d at 1174, the court held that a religious seminary was exempt from the requirements of Title III of the ADA because the seminary was a "religious organization" as a matter of law. In reaching this conclusion, the court found that the seminary was a "pervasively religious organization" providing a graduate education founded on Biblical teachings, and its sole mission was to train students for Christian ministry. <u>Id.</u> The court observed that the seminary was founded by the Conservative Baptist Association of Colorado, and a majority of its Board of Trustees must be members of the Conservative Baptist Association; faculty and other employees must sign a statement of religious beliefs in order to remain at the seminary; and students are required to participate in a religious curriculum and attend weekly chapel. <u>Id.</u>

In <u>Doe v. Abington Friends School</u>, 2005 WL 289929 (E.D. Pa. Feb. 4, 2005), the court held as a matter of law that a Quaker-operated school was a "religious organization" entitled to summary judgment on an ADA Title III claim by a former student. The court relied on the affidavit of the school's headmaster to find the following facts which established that the school was a religious organization: (1) the school was owned and controlled by the Abington Monthly Meeting of the Religious Society of Friends, which owned the school grounds and building; (2) the Monthly Meeting, through its Schools Committee, ensured the school's adherence to Quaker principles, managed the school's financial welfare and selects its head; (3) students who attend the school are taught Quaker

principles and values and required to attend weekly Quaker meetings; and (4) the Pennsylvania Department of Education classified the school as religiously affiliated. The court also noted that in other contexts, Quaker schools had been found to be religious organizations. Id., *2.

This case differs from White and Doe in several respects. First, the defendants in this case are individuals, not a secondary private school. It is not clear to the Court whether the individual defendants could be considered either a "public accommodation" or a "religious organization" within the meaning of Title III, and the parties did not address these points. Further, although there are uncontroverted affidavits indicating that the Mountain Park curriculum included religious instruction and was based on religious principles, unlike the White and Doe cases there is no evidence in the record that Mountain Park is affiliated with or belongs to a recognized religious organization apart from the two individuals who founded it, or that Mountain Park was recognized by any authority as a religious institution.[7]

_____

[7]In deciding a motion for summary judgment, the Court may consider only admissible evidence, and must disregard portions of declarations that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact. See Shaver v. Independent Stave Co., 350 F.3d 716, 723 (8th Cir. 2003); Fed. R. Civ. P. 56(e). As defendants observe, the Woods Declaration contains in large part Ms. Woods' statements of personal opinion rather than facts, and statements made on "information and belief." "Under Rule 56(e), an affidavit filed in support of or in opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient" to create an issue of material fact. Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1367 (8th Cir. 1983) (citations omitted). The Court therefore does not consider statements made on information and belief or which merely constitute personal opinions as opposed to facts.

In addition, as defendants point out, the records submitted by plaintiffs alleged to be from Wayne County, Missouri are not authenticated. Exhibits to a summary judgment motion or response must be properly authenticated or verified by affidavit. See Country Club Estates, L.L.C. v. Town of Loma Linda, 213 F.3d 1001, 1006 (8th Cir. 2000) (unverified and unauthenticated letter was a "legal nullity."). "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Federal Rule of Civil Procedure 56(e).

The Court need not determine whether the defendants are a religious organization under Title III, however, because it concludes that plaintiff Woods fails to state a claim against defendants under Title III for other reasons. To the extent Ms. Woods' claim is based on defendants' failure to provide her with hearing aids, applicable administrative regulations make it clear that a public accommodation is not required to provide its "customers, clients, or participants with . . . individually prescribed devices, such as prescription eyeglasses or <u>hearing aids</u> . . . ." 28 C.F.R. subpt. C, § 36.306 (emphasis added). This aspect of her claim must therefore fail.[8]

To the extent Ms. Woods' claim is based on other aspects of denial of public accommodation, she cannot state a claim because the only relief she seeks, monetary damages, is unavailable under Title III. Title III borrows the remedies and procedures set forth in section 204(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a). <u>See</u> 28 U.S.C. § 12188(a). Section 204(a) provides for a "civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order . . . ." 42 U.S.C. § 2000a-3(a). The United States Supreme Court has held that monetary damages are not available under 42 U.S.C. § 2000a-3(a). <u>Newman v. Piggie Park Enters., Inc.</u>, 390 U.S. 400, 401-02 (1968).

It is well established that individual claims for damages based on alleged disability discrimination in violation of Title III of the ADA are precluded, and injunctive relief is the only

---

Documents which do not meet those requirements cannot be considered." <u>Stuart v. General Motors Corp.</u>, 217 F.3d 621, 635 n.20 (8th Cir. 2000). Therefore, the Court does not consider the Wayne County records.

[8]"A district court may properly grant summary judgment sua sponte and without prior notice 'if the losing party has failed to state a claim upon which relief may be granted.'" <u>Enowmbitang v. Seagate Technology, Inc.</u>, 148 F.3d 970, 973 (8th Cir. 1998) (quoting <u>Coplin v. Fairfield Pub. Access Television Comm.</u>, 111 F.3d 1395, 1407 (8th Cir. 1997)).

available remedy.[9]  See, e.g., Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000) (recognizing that Title III of the ADA grants a private right of action for injunctive relief); Pona v. Cecil Whittaker's Inc., 155 F.3d 1034, 1038 (8th Cir. 1998) (Panner, D.J., concurring) (in a civil action under Title III of the ADA, a private plaintiff can only obtain injunctive relief), cert. denied, 526 U.S. 1131 (1999); see also Fischer v. SJB P.D. Inc., 214 F.3d 1115, 1120 (9th Cir. 2000) ("Monetary relief is not an option for private individuals under Title III of the ADA."); Riggs v. CUNA Mutual Ins. Soc'y, 171 F.Supp.2d 1210, 1214 (D. Kan. 2001) (where ADA Title III plaintiff's request for relief was limited to money damages, she failed to state a claim upon which relief could be granted and dismissal was appropriate), aff'd, 42 F. App'x 334 (10th Cir. 2003).

Because plaintiff Woods did not seek injunctive relief in the complaint, her claims under Title III of the ADA fail to state a claim upon which relief may be granted.  Defendants' motion for summary judgment, construed as a motion to dismiss, should therefore be granted on this claim.

**B. Fair Labor Standards Act Claims**.

Each of the Student plaintiffs alleges that defendants violated the federal Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-210 (2000), because defendants failed to pay each student for "acting as a security guard at all times."  Complaint, ¶¶ 141, 167, 229 and 307.  The basis for this allegation is that each student was expected to "catch or attack" any other student who tried to "escape."  Id. Plaintiff Ozuna also alleges that she should be paid for serving as an orientation guide, id., ¶ 297, and plaintiffs Ozuna and Deboi allege they should be paid for being on safety patrol for about one hour per day while at Mountain Park.  Id., ¶¶ 299, 303-06, 343-44.

---

[9]Monetary damages are only available under Title III if the cause of action is initiated by the United States Attorney General.  See  42 U.S.C. § 12188(b)(2)(B).

Defendants move for summary judgment on the FLSA claims asserting that the Student plaintiffs were not employees under the FLSA. Defendants assert that the activities at issue did not include being "engaged in commerce or in the production of goods for commerce" as required by 29 U.S.C. 206(a), and under the economic realities of the situation, the duties the students performed were an integral part of the educational curriculum because they provided "the positive peer pressure that is critical to the curriculum" and fostered "Biblical self-image, self-discipline and responsibility, as well as leadership skills." Defs.' Mem. Supp. Summ. J. at 10.

Plaintiffs respond that, at the time of briefing, the issue whether the defendants were subject to the FLSA was before the Eighth Circuit Court of Appeals in Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005). Plaintiffs state, "The most efficient method of dealing with this question is to wait for the Eighth Circuit to render its opinion." Pls.' Consol. Brief in Supp. of Response to Mot. for Summ. J. at 7. As discussed below, the Eighth Circuit has now rendered its decision in the Blair case.

"Under the FLSA, an employer must pay a minimum wage to its employees who work in covered activities. See 29 U.S.C. § 206 (2000)." Blair, 420 F.3d at 829. "The Supreme Court has defined 'work' to include 'physical or mental exertion . . . controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'" Id. (quoted case omitted). "In determining whether an entity functions as an individual's employer, courts generally look to the economic reality of the arrangement." Id. Under the economic reality test, the focus is on "the circumstances of the whole activity," Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947), with the ultimate point of reference being the economic reality of the relationship. Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961).

In Blair, 420 F.3d 823, Blair, a student at Mountain Park and its sister school, Palm Lane Academy in Florida, alleged that he was forced to work without pay in violation of the FLSA. Blair testified he was required to perform chores including laundry, cleaning, lawn mowing, brush clearing, painting, general maintenance, and other chores. The defendants testified that performing the chores was an integral part of the learning environment and was "intended to instill in each student a sense of teamwork, responsibility, accomplishment, and pride." Id. at 829. The Eighth Circuit observed that "although having students perform chores helped defray certain costs that the [defendants] would have incurred had they hired employees to perform those tasks, looking at the totality of the economic circumstances" there was insufficient evidence from which a reasonable jury could conclude that Blair's activities constituted employment under the FLSA. Id. As a result, this Court's grant of judgment as a matter of law on Blair's FLSA claim was proper.

Other courts have addressed the issue of student work in the context of the FLSA. In Marshall v. Regis Educational Corp., 666 F.2d 1324, 1328 (10th Cir. 1981), the Tenth Circuit applied the economic reality test to determine whether student residence hall assistants ("RA's") were employees of a college for purposes of the FLSA. The RA's were required to distribute mail, answer phones, unlock doors, maintain discipline in the halls, be available twenty hours a week and maintain a specified grade point average. In exchange, the college gave them a reduced room rate, free telephone use and a $1,000 tuition credit. Id. at 1326. The Secretary of Labor sued the college, alleging that it violated the FLSA by failing to compensate the RA's at minimum wage for their services. The Secretary argued that the RA's were employees because their services economically benefitted the college. Id. at 1326-27.

The Tenth Circuit disagreed and stated that the government's view ignored the "expressed educational objectives of the student resident assistant program" and did not focus on the whole circumstances of the activity. The Court stated that although the RA's services benefitted the college, the relationship between the RA's and the college had to be considered in light of the educational context. Id. at 1327. Quoting the reasoning of the district court, the Tenth Circuit stated,

> The RA's . . . did not come to [college] to take jobs. They enrolled as full-time students seeking growth and development . . . and desiring to earn the recognition of an academic degree. The opportunity to reduce the cost of college by being helpful to other students and to the administration in assisting the residence hall program is only one circumstance in the whole activity.

Id. at 1328. Thus, the Court considered the students' participation in the RA program as one component of their entire educational experience. Focusing on the circumstances of the whole activity and applying the economic reality test, the Tenth Circuit concluded that the students who participated in the RA program were not employees of the college for purposes of the FLSA. Id.

In an earlier case, Bobilin v. Board of Education, State of Hawaii, 403 F. Supp. 1095 (D. Haw. 1975), a public school student challenged a state law that required school children from fourth to twelfth grades to perform work and chores in the school cafeteria without pay, asserting that the law violated the FLSA. In determining whether the students were "employees" under the FLSA, the district court considered the students' tasks by evaluating the "entire fabric" of the relationship between the students and school. Id. at 1107. The court rejected the student's argument and concluded that the primary purpose of the program was educational, to teach responsibility and civic-mindedness, and the fact that the schools may have derived some economic benefit from the program alone did not render students "employees." Id. at 1108. The court stated,

[W]hile not all forms of human experience . . . are educational, it is clear that many "services" performed by students do serve "educational" purposes. For example, this Court notes the widespread and common practice of requiring elementary school children to perform small tasks such as erasing blackboards, putting their chairs on their desks after school, and serving as crosswalk monitors. These experiences teach not only neatness and responsibility but also civic attitudes fundamental in a collective society where a citizen is often called upon to "do his share" without economic compensation.

Such small tasks admittedly do have economic value to the state in that they save the cost of hiring adults to perform these same tasks. Nevertheless, looking to the "economic reality" of the entire situation, it is obvious to this Court that such economically valuable activities could not reasonably be considered employment under the FLSA, which would require the payment of minimum wages to students.

Id. at 1108.

Based on the reasoning of Blair, Marshall and Bobilin, and applying the economic reality test to the entire circumstances of plaintiffs' enrollment at Mountain Park, the Court concludes that plaintiffs were not employees of Mountain Park for purposes of the FLSA. The defendants' uncontroverted testimony is that the mission of Mountain Park was to develop Christian values of respect for authority, for Biblical self-image, and self-discipline, and to foster academic development. The declarations of Betty and Bob Wills state that to develop the social skills and self-discipline of each student, Mountain Park established and maintained tiers of student status and achievement. New students were placed on orientation upon enrollment. The students on orientation were provided an orientation guide, a more senior student who had demonstrated responsibility and faith in God to help the new students become acclimated to Mountain Park. Both the new students and their guides engaged in the same activities, including attending school, performing chores including dorm cleaning, prayer, Bible study, and other activities. The orientation program was a fundamental part of Mountain Park's curriculum because it "was the primary mechanism for directing the positive peer

pressure that was critical to Mountain Park's missions." Betty Wills Decl., ¶ 8. More senior and responsible students also performed "safety patrol," where a student would observe part of the dormitory for approximately one hour during the night, to help maintain a safe and secure environment. Id., ¶ 10.

These tasks were part of the curriculum and were intended to help the development of personal qualities in the students, such as self-respect and responsibility. Although having students perform these tasks rather than hiring adults helped defray the defendants' costs, under the totality of the economic circumstances, the complained-of activities were not "work" under the FLSA and the defendants were not "employers." Defendants' motion for summary judgment should therefore be granted on the plaintiffs' FLSA claims.

**C. Intentional Infliction of Emotional Distress Claims**.

Each of the Student plaintiffs asserts a claim for intentional infliction of emotional distress under Missouri law.[10] Defendants move for summary judgment on these claims, asserting that plaintiffs are unable to make a submissible case because they lack expert medical testimony to establish that the emotional distress they allegedly suffered is medically diagnosable and medically significant, citing Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. 1997) (en banc) and other cases. Defendants state that plaintiffs have only a psychologist expert, Jeffrey Kline, Ph.D., and that under Missouri law, testimony of a psychologist is insufficient to establish that emotional distress is

---

[10]Where jurisdiction of a case is based on diversity of citizenship, the Court applies the substantive law of the forum state in which it sits. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). The Erie doctrine's principles apply equally in the context of pendent jurisdiction over supplemental state-law claims. Witzman v. Gross, 148 F.3d 988, 990 (8th Cir. 1998) (citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966)). Therefore the Court applies Missouri law to plaintiffs' state law claims.

medically diagnosable and medically significant, citing <u>Childs v. Williams</u>, 825 S.W.2d 4, 10 (Mo. Ct. App. 1992).[11]

Plaintiffs respond that the issue whether a psychologist can supply evidence of legally significant emotional distress is before the Eighth Circuit in <u>Blair v. Wills</u>, and this Court should wait for and be guided by that decision. Plaintiffs also respond that plaintiff Shari Lueken has alleged that defendants caused their servants to drag her around a running track, and this physical injury "takes the place of medical proof," citing <u>Gordon v. City of Kansas City, Mo.</u>, 241 F.3d 997, 1001 (8th Cir. 2001). This is the entirety of plaintiffs' response to defendants' motion for summary judgment on their intentional infliction of emotional distress claims.

Defendants reply that there was no intentional infliction of emotional distress claim tried or appealed in the <u>Blair v. Wills</u> case, so plaintiffs' first point lacks merit. Defendants further reply that plaintiffs misread the <u>Gordon</u> opinion for the proposition that a physical injury obviates the requirement of a medically diagnosable and significant condition because, defendants state, an "intentional infliction claim arises from the principle that a plaintiff who does **not** suffer a physical injury should be able to recover if he or she witnesses or experiences an event so emotionally traumatic that it causes a medically diagnosable and significant condition." Defs.' Reply Mem. at 5 (emphasis in original).

As a threshold matter, defendants are correct that no issue concerning intentional infliction of emotional distress and psychologist testimony was present in the <u>Blair</u> case. The elements of the

---

[11]At the time defendants' summary judgment motion was filed, plaintiffs also had designated Benjamin Corpus as an expert witness. By Memorandum and Order dated October 27, 2005, the Court granted defendants' motion to exclude Mr. Corpus' testimony. Mr. Corpus is not a medical doctor and would not be able to testify concerning plaintiffs' emotional distress claims.

tort of intentional infliction of emotional distress in Missouri are: (1) the defendant acted in an intentional or reckless manner; (2) the defendant's conduct must be extreme or outrageous; and (3) the defendant's conduct caused severe emotional distress that results in bodily harm. Gibson, 952 S.W.2d at 249. The conduct must be "intended only to cause extreme emotional distress to the victim." Id. (quoting K.G. v. R.T.R., 918 S.W.2d 795, 799 (Mo. 1996) (en banc)).

In Bass v. Nooney, 646 S.W.2d 765, 772-73 (Mo. 1983) (en banc), a negligence case, the Missouri Supreme Court abandoned the traditional "impact rule" and permitted a plaintiff to recover for emotional distress even in the absence of physical trauma, if the distress was sufficiently severe to be "medically diagnosable" and "medically significant." Id. at 772-73. Some Missouri courts have extrapolated the Bass standard to cases involving the intentional infliction of emotional distress. See, e.g., Childs v. Williams, 825 S.W.2d 4, 10-11 (Mo. Ct. App. 1992) (summary judgment proper where plaintiff had no medical expert to testify as to the medical significance of her emotional distress and psychologist who was identified as plaintiff's expert stated he could not comment on whether her mental problems were medically significant); Greco v. Robinson, 747 S.W.2d 730, 735-36 (Mo. Ct. App.1988) (summary judgment proper where neither plaintiff sought medical care and no physician would testify at trial as to either plaintiff's mental condition).

The Eighth Circuit has stated it is "satisfied that the cases requiring medically diagnosable distress" for intentional infliction of emotional distress claims "represent current Missouri law," Collins v. Burg, 169 F.3d 563, 569 (8th Cir. 1999), and has so held on more than one occasion. Id. (citing Glover v. McDonnell Douglas Corp., 981 F.2d 388, 395 (8th Cir.1992), vacated on other grounds, 510 U.S. 802 (1993), and Hanks v. General Motors Corp., 906 F.2d 341, 343 (8th Cir.1990)).

Based on <u>Collins</u>, the Court concludes that plaintiffs must prove they suffered medically diagnosable and medically significant distress in order to present a submissible case of intentional infliction of emotional distress. The issue is whether the testimony of a psychologist is sufficient to establish medically diagnosable and significant distress. In <u>Childs</u>, the Missouri Court of Appeals held that a psychologist who admitted he was unable to testify on matters of "medical certainty" and "medical significance" was properly excluded as a witness with respect to the plaintiff's mental condition. <u>Childs</u>, 825 F.2d at 10. The court did not, however, "rule definitively that psychologists can never testify on matters of medicine." <u>Id.</u> at 11.

In this case, plaintiffs have made no effort to argue that their psychologist expert witness, Dr. Kline, is qualified to offer a medical opinion as to their emotional distress. According to Dr. Kline's deposition testimony, he is not a licensed physician or a licensed psychiatrist. Kline Dep. at 7. In the absence of any other information concerning Dr. Kline's qualifications, the Court concludes that Dr. Kline is not qualified to provide expert medical testimony that the plaintiffs suffered medically significant and medically diagnosable emotional distress. <u>See</u> <u>Childs</u>, 825 S.W.2d at 10. Defendants' motion for summary judgment on the plaintiffs' intentional infliction of emotional distress claims should therefore be granted, on the basis that plaintiffs cannot establish that the emotional distress they allegedly suffered was medically diagnosable and medically significant.

With respect to plaintiff Shari Lueken, plaintiffs contend that because she was physically dragged around the school's track, she does not need to establish that her resulting emotional distress was medically significant or diagnosable, citing the Eighth Circuit's statement in <u>Gordon</u> that "in order to recover for emotional distress <u>where no physical injury is involved</u>, there must be proof by

expert medical testimony that the emotional distress or mental injury was medically significant." <u>Gordon</u>, 241 F.3d at 1004 (internal punctuation and citations omitted) (emphasis added).

The Court disagrees with plaintiffs that <u>Gordon</u> obviates the need for expert medical testimony. Prior to the Missouri's rejection of the "impact" rule in <u>Bass</u>, 646 S.W.2d 765, to recover for infliction of emotional distress a plaintiff had to manifest a physical reaction to the distress, such as "long continued nausea, or headaches amount[ing] to physical illness" or "long continued mental disturbance or aberration." <u>Bass</u>, <u>id.</u> at 771 (quoting Restatement (Second) of Torts § 436A, comment b)). A resulting physical injury was required because, <u>inter alia</u>, "emotional disturbance which is not so severe and serious as to have physical consequences is normally in the realm of the trivial" and "is likely to be so temporary, so evanescent, and so relatively harmless and unimportant, that the task of compensating for it would unduly burden the courts and the defendants." <u>Id.</u> (quoting Restatement (Second) of Torts § 436A, comment c)).

<u>Gordon</u> and the Missouri cases it cites refer to the post-<u>Bass</u> need for medical testimony concerning the effects of emotional distress where there is no resulting physical injury of the type discussed in the Restatement, <u>i.e.</u>, a physical manifestation of the victim's subjective emotional pain and distress. <u>Gordon</u>'s reference to "physical injury" does not mean a contemporaneous battery or other physical contact which occurred in connection with the infliction of emotional distress. In fact, the Missouri Supreme Court has made it clear that a contemporaneous battery may preclude the assertion of a claim for intentional infliction of emotional distress:

> [W]here one's conduct amounts to the commission of one of the traditional torts, such as battery, and the conduct was not intended <u>only</u> to cause extreme emotional distress to the victim, the tort of intentional infliction of emotional distress will not lie, and recovery must be had under the appropriate traditional common law action.

K.G., 918 S.W.2d at 799 (emphasis added). The rationale for this rule is that the "tort of intentional infliction of emotional distress is a relative newcomer to the common law. As such, it was intended to supplement existing forms of recovery, not swallow them." Id. (citation omitted). Therefore, "[w]hile recovery for emotional distress caused by battery may be allowable as an element of damages in a battery action, there is no independent action for intentional infliction of emotional distress where the existence of the claim is dependent upon a battery." K.G., id. at 800; see State ex rel. BP Prods. North America, Inc. v. Ross, 163 S.W.3d 922, 926 (Mo. 2005) (en banc).

Thus, to the extent Shari Lueken may even assert an intentional infliction of emotional distress claim as opposed to a battery claim, she must present evidence that she suffered medically diagnosable and medically significant distress in order to establish a submissible case. Plaintiff does not have this evidence. For these reasons, the Court concludes that defendants' motion for summary judgment should also be granted with respect to plaintiff Shari Lueken's claim of intentional infliction of emotional distress.

**D. False Imprisonment**.

Each of the Student plaintiffs asserts a claim for false imprisonment. Defendants move for summary judgment arguing that because each plaintiff was a minor while at Mountain Park and each plaintiff's parents consented to her enrollment, the Student plaintiffs cannot established that they were falsely imprisoned, i.e., intentionally confined without consent and without legal justification, citing Rankin v. Venator Group Retail, Inc., 93 S.W.3d 814, 819 (Mo. Ct. App. 2002) (elements of cause of action).

Plaintiffs respond that their parents' consent was obtained by fraud which renders the consents invalid, and therefore they can assert false imprisonment claims. Plaintiffs cite no legal authority in

support of their argument.[12] Plaintiffs correctly note that false imprisonment issues were before the Eighth Circuit in Blair v. Wills.

To establish a false imprisonment claim under Missouri law, a plaintiff must show that she was confined without her consent and without legal justification. Blair, 420 F.3d at 828 (citations omitted); see also Rustici v. Weidemeyer, 673 S.W.2d 762, 767 (Mo. 1984) (en banc) (elements of false imprisonment claim). In determining whether a minor has consented to a confinement, a court may consider whether the minor's parents consented on her behalf "because parents exercise authority over the custody, care, and management of their children, and may delegate that authority on behalf of their minor children, Mo. Rev. Stat. § 431.061 (2000) (allowing parents to give consent for medical treatment on behalf of minor children); Mo. Rev. Stat. § 631.105 (2000) (authorizing parents to enroll or commit children to treatment facilities)." Blair, 420 F.3d at 828.

In Blair, the Eighth Circuit concluded that because the plaintiff was a minor when enrolled at Mountain Park and his parents consented to the enrollment, he could not maintain an action for false imprisonment. Id. Although Blair argued that his parents' consent was not informed and was therefore invalid, the Court found the consent was informed because Blair's father submitted an affidavit which stated that the Blairs "fully understood and agreed with and to the religious, moral,

---

[12]The Court recognizes that "the logistical burdens of trial advocacy limit the extent to which trial counsel is able to supplement the district judge's legal research with memoranda and briefs. Thus, trial judges often must resolve complicated legal questions without benefit of extended reflection or extensive information." Salve Regina College v. Russell, 499 U.S. 225, 232 (1991) (internal punctuation and citation omitted). Nonetheless, it is to be expected that a party's brief should bring to bear some information and analysis on the legal issues apart from mere unsupported assertions.

and educational principles" of the school and recognized that enrollment was an "alternative to juvenile detention." Id.

Based on the holding in Blair, the Court concludes that defendants are entitled to summary judgment on the false imprisonment claims of plaintiffs Woods, Ozuna and Deboi because it is undisputed that these plaintiffs were minors while enrolled at Mountain Park and their parents consented to their enrollment.

With respect to plaintiffs Shari Lueken and Erika Teasley, the issue is more complicated because their parents have asserted claims for fraud in connection with their daughters' enrollments at Mountain Park. Thus, the issue whether fraud can vitiate the consent to enrollment is squarely before the Court. For the reasons discussed below, however, the Court concludes that defendants are entitled to summary judgment on the parents' fraud claims. As a result, defendants are also entitled to summary judgment on the false imprisonment claims of plaintiffs Lueken and Teasley because it is undisputed that these plaintiffs were minors while enrolled at Mountain Park and that their parents consented to their enrollment.

**E. Battery Claims**.

Each of the Student plaintiffs asserts claims for battery. Defendants move for summary judgment on most of the plaintiffs' battery claims, dividing the claims into two groups: claims based on alleged surreptitious drugging of the plaintiffs, and claims based on other forms of battery. The Court will address these two groups of claims separately.

1. Surreptitious Drugging of Plaintiffs.

The plaintiffs claim that while they were enrolled at Mountain Park, the defendants surreptitiously administered antipsychotic drugs to them, including chlorpromazine, thioridazine or

carbamazepine, and that this administration constituted a battery. Plaintiffs contend that the drugging occurred when the defendants placed pills in their food or drink and required plaintiffs to consume the food or drink. Plaintiffs assert that they suffered numerous unusual physical and mental symptoms consistent with the ingestion of antipsychotic drugs.

Defendants move for summary judgment on these claims, asserting that plaintiffs cannot prevail because they allege they did not know they were being drugged until after they left Mountain Park, and accordingly cannot identify the specific person or persons who actually committed the alleged battery. Defendants rely on Phelps v. Bross, 73 S.W.3d 651, 656 (Mo. Ct. App. 2002), for the proposition that to make a submissible case of battery, a plaintiff must be cognizant of a particular defendant offensively touching her. Defendants assert that to make a submissible case, each plaintiff must demonstrate that a named defendant actually handed her an antipsychotic drug, in pill form, on a particular day, and instructed her to swallow it.

Plaintiffs respond that the Phelps case is distinguishable because here there is proof that the defendants confined the plaintiffs and forced them to ingest pills, with the motive being that drugged teenagers are easier to handle and confine. Plaintiffs assert that their declarations demonstrate they had clear symptoms of Thorazine use and that these symptoms are inconsistent with anything other than Thorazine use, and that defendants controlled all food and drink the plaintiffs ingested while at Mountain Park. Plaintiffs assert that their claims can proceed under the doctrine of res ipsa loquitur, citing Rosenberg v. Pritchard Services, Inc., 774 F.2d 293, 296 (8th Cir. 1985) (elements of res ipsa loquitur under Missouri law).[13]

_____

[13]Plaintiffs also assert that gas chromatograph/mass spectrometry laboratory testing of their hair establishes that plaintiffs Shari Lueken and Erika Teasley had ingested Thorazine. The Court has excluded the testimony of plaintiffs' expert witness, Mr. Corpus, who was to testify about the hair

Defendants reply that <u>Phelps</u> requires each plaintiff to prove that each of the defendants administered a drug to her, because the plaintiffs claim they are suing the defendants individually, and that plaintiffs cannot establish the necessary proof. Defendants also state that although plaintiffs' declarations are replete with claims that they experienced certain symptoms and plaintiffs conclude these symptoms resulted from being given Thorazine, they do not have any admissible evidence that the symptoms were actually caused by Thorazine. Thus, defendants argue that without the requisite admissible evidence, the plaintiffs' declarations are mere conjecture and should not be considered.

Defendants further reply that in Missouri res ipsa loquitur is a mechanism for pleading and proving a negligence claim, not an intentional tort such as battery, citing <u>Rea v. St. Louis-San Francisco Railway Co.</u>, 411 S.W.2d 96, 99 (Mo. 1967) (res ipsa is inapplicable where there is evidence of specific negligence); <u>Marshall Interiors, Inc. v. Young Men's Christian Ass'n of Greater St. Louis</u>, 787 S.W.2d 329, 331 (Mo. Ct. App. 1990) ("the doctrine of res ipsa loquitur permits a jury to infer negligence without proof of specific negligence."). Thus, defendants assert that plaintiffs' arguments regarding res ipsa are inapplicable to their battery claims.

Under Missouri law, battery is defined as an intended, offensive bodily contact with another. <u>Phelps</u>, 73 S.W.2d at 656. Defendants are correct that the doctrine of res ipsa loquitur cannot aid the plaintiffs in establishing a submissible case of battery. Res ipsa loquitur is a rule of circumstantial evidence peculiar to the law of negligence, which concerns proof of a negligent act or omission. <u>Belding v. St. Louis Public Service Co.</u>, 215 S.W.2d 506, 509 (Mo. 1948) (en banc). When a

analysis. <u>See</u> Memorandum and Order of Oct. 27, 2005 [Doc. 82]. The hair testing evidence is therefore not admissible in connection with this motion for summary judgment. <u>See</u> <u>Shaver v. Independent Stave Co.</u>, 350 F.3d 716, 723 (8th Cir. 2003) (court may only consider admissible evidence when ruling on summary judgment motion).

particular occurrence does not ordinarily happen if reasonable care is exercised, upon proof of the occurrence, the doctrine allows the inference to arise that the defendant did not exercise reasonable care. McCloskey v. Koplar, 46 S.W.2d 557, 559 (Mo. 1932) (en banc). "The inference is . . . limited to the facts necessary to establish a lack of reasonable care in the act or omission complained of." Davis v. Jackson, 604 S.W.2d 610, 612 (Mo. Ct. App. 1980). Because issues of negligence and reasonable care are irrelevant to the intentional tort of battery, plaintiffs cannot rely on the res ipsa doctrine in this context.

Returning to the issue of battery, the Court examines the Phelps case on which defendants rely. In Phelps, the plaintiff claimed she was drugged when two men gave her a beer. After drinking a small amount of the beer, the plaintiff became unconscious and awoke to find herself naked in bed next to Bross. The Missouri Court of Appeals held that the plaintiff could not establish a case of battery against Bross because he denied touching her and she had no recollection that he had touched her in any offensive manner or that he encouraged or aided the other man, who admitted he had sexual intercourse with the unconscious plaintiff, in doing so.[14]

The Phelps case holds that to establish a submissible case of battery, a plaintiff must have some proof that a defendant touched her in an offensive manner, or encouraged, incited or participated in a battery by another person. Phelps, 73 S.W.2d at 656-57. As the defendants state, merely being present in a particular place at a particular time is not proof of battery. Phelps does not require such detailed proof as defendants claim, however. For example, nothing in its holding would require the plaintiffs to establish the exact date on which the alleged surreptitious druggings occurred.

---

[14]Bross was liable, however, for assaulting the plaintiff. The other man was liable for battery because he admitted that he had offensively touched the plaintiff by having sexual intercourse with her while she was unconscious.

The Court will examine the declarations of each student plaintiff to determine whether she has raised an issue of fact concerning whether she can establish a submissible case of battery.

### a. Jamie Kaufmann Woods

The Declaration of plaintiff Woods states in pertinent part that she had certain symptoms she attributes to Thorazine use. Woods Decl., ¶¶ 15, 17-21. Woods states that she was required to drink a specified amount of milk or juice, and could not share or get refills. Id., ¶ 22. Woods also states that the defendants strictly controlled all food, drink, medication and other items for ingestion into the body. Id., ¶ 24. Woods does not, however, identify any of the defendants as having ever given her medication, food, drink or other items to ingest. Thus, Woods has no proof that any of the defendants touched her offensively, or encouraged or incited others to do so. See Phelps, 73 S.W.3d at 656-57. The Court therefore concludes that Woods fails to establish a submissible case of battery with respect to surreptitious drugging, and defendants' motion for summary judgment should be granted on this claim. Moreover, as discussed below with respect to plaintiff Shari Lueken, this aspect of Woods' battery claim also fails because plaintiff has no expert testimony to link her claimed symptoms to the alleged administration of Thorazine.

### b. Shari Lueken

The Declaration of Shari Lueken states in pertinent part that she had certain symptoms she attributes to Thorazine use. Lueken Decl., ¶ 7. Lueken states that defendants Sharon Goodman and Julie Gerhardt and "others [she] cannot remember" gave her pills and checked to make sure she swallowed them. Id., ¶ 8. Lueken also states that the defendants strictly controlled all food, drink, medication and other items for ingestion into the body. Id., ¶ 10. Although Lueken has identified specific defendants as having given her pills, defendants are entitled to summary judgment because

Lueken cannot establish that the pills she was given were Thorazine or any other psychotropic or behavior modification drug. The Court notes that Lueken does not allege that the defendants' giving her pills constituted a battery, as opposed to giving her pills alleged to contain Thorazine.

Plaintiff's claim fails because she lacks expert testimony to link her claimed symptoms to the alleged administration of Thorazine. Lueken's testimony that she suffered from missed periods, felt like a zombie, experienced "increased passivity," and had other symptoms does not establish that she was drugged. "Proof of causation requires expert medical testimony when there is a sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis." Portis v. Greenhaw, 38 S.W.3d 436, 441 (Mo. Ct. App. 2001) (internal punctuation and citation omitted). Ms. Lueken's assertions that her various symptoms were caused by the illicit administration of Thorazine are not a matter within the understanding, common knowledge or experience of lay persons. As a result, expert opinion is essential to show that her claimed injuries were caused by the actions to which they are ascribed. The defendants are therefore entitled to summary judgment on Shari Lueken's battery claim relating to surreptitious drugging.

### c. Tracey Brazil Ozuna

The Declaration of plaintiff Tracey Brazil Ozuna states in pertinent part that she had certain symptoms she attributes to Thorazine use. Ozuna Decl., ¶¶ 7-15. Ozuna states that she was required to drink a specified amount of milk or juice and could not share or get refills, and while she does not know how the drug was delivered, she "believes" it was through the milk or juice. Id., ¶ 16. Ozuna also states that the defendants strictly controlled all food, drink, medication and other items for ingestion into the body. Id., ¶ 18. Ozuna does not identify any of the defendants as having ever given her medication, food, drink or other items to ingest. Thus, Ozuna has no proof that any of the

44

defendants touched her offensively, or encouraged or incited others to do so. See Phelps, 73 S.W.3d at 656-57. Ozuna also has no expert testimony to link her claimed symptoms to the alleged administration of Thorazine. The Court therefore concludes that Ozuna fails to establish a submissible case of battery with respect to surreptitious drugging, and defendants' motion for summary judgment should be granted on this claim.

### d. Jessica Deboi

The Declaration of plaintiff Jessica Deboi states in pertinent part that she had certain symptoms she attributes to Thorazine use. Deboi Decl., ¶¶ 4-9. Deboi attributes a medical emergency she suffered on a cruise ship shortly after leaving Mountain Park to an interaction between Sudafed and Thorazine, id., ¶ 3, but has no evidence to support her assertion. Deboi states that she was required to drink a specified amount of milk or juice and could not share or get refills. Id., ¶ 10. Deboi also states that the defendants strictly controlled all food, drink, medication and other items for ingestion into the body. Id., ¶ 12. Deboi does not identify any of the defendants as having ever given her medication, food, drink or other items to ingest. Thus, Deboi has no proof that any of the defendants touched her offensively, or encouraged or incited others to do so. See Phelps, 73 S.W.3d at 656-57. Deboi also has no expert testimony to link her claimed symptoms to the alleged administration of Thorazine. The Court therefore concludes that Deboi fails to establish a submissible case of battery with respect to surreptitious drugging, and defendants' motion for summary judgment should be granted on this claim.

### e. Erika Teasley

The Declaration of Erika Teasley states in pertinent part that she had certain symptoms she attributes to Thorazine use. Teasley Decl., ¶¶ 2-3. Teasley states that defendants Sharon Goodman,

Julie Gerhardt and Andrea Hill gave her pills and checked to make sure she swallowed them, telling Teasley the pills were for a "bug" going around. Id., ¶ 4. The pills were given in the cafeteria in the mornings and in the hallways at night. Id. at 5. The defendants stopped giving Teasley the pills several days before she left Mountain Park, but continued giving them to other girls. Id., ¶¶ 4, 6-7.

As with plaintiff Lueken, although plaintiff Teasley can identify specific defendants who gave her pills, her battery claim relating to surreptitious drugging fails for the lack of expert testimony to establish that her claimed symptoms can be linked to the alleged administration of Thorazine. Defendants are therefore entitled to summary judgment on this claim.

2. Other Battery Claims.

Each of the Student plaintiffs asserts physical battery claims against the defendants, separate from the previously-discussed battery claims based on surreptitious drugging. Defendants move for summary judgment on the physical battery claims as follows: (1) plaintiff Deboi's claim, because she admits she cannot identify any of the defendants who actually committed a battery against her; (2) plaintiff Teasley's claim, because she admits none of the defendants ever hit her; (3) plaintiff Lueken's claim, because she could not identify any instance when one of the defendants pushed or shoved her; (4) plaintiff Ozuna's claim, because she identifies only a single incident when she was allegedly hit by a person named Laura Matthews, and does not identify any of the defendants with respect to this allegation; and (5) plaintiff Woods' claim with respect to defendants Bob Wills, Sam Gerhardt, Deborah Gerhardt, Julie Gerhardt and Sharon Goodman, as Woods only asserts that she was offensively touched by defendants Betty Wills and Andrea Hill.

Plaintiffs respond generally that they have provided additional facts in their declarations concerning the beatings they suffered, which preclude summary judgment. With respect to plaintiff

Lueken, plaintiffs assert that the defendants ordered other students to drag Lueken around the track and therefore the defendants can be liable for battery.

Defendants reply that plaintiffs appear to infer a type of master-servant relationship between one or more of the defendants and other students, but fail to plead the existence of a master-servant relationship in their complaint. Defendants also state that plaintiffs fail to offer facts to show the creation of any express authority by the defendants to drag Lueken around the track, and therefore the master-servant relationship argument lacks merit.

### a. Jessica Deboi

Plaintiff Deboi's Declaration does not contain any assertions with respect to physical battery. Defendants' motion for summary judgment should therefore be granted on Deboi's battery claim.

### b. Erika Teasley

Plaintiff Teasley's Declaration states in pertinent part that she was hit on two occasions by another student, Kenda Landsverk. Teasley Decl., ¶¶ 8-9. Teasley states that Landsverk was "an 'enforcer' of Mountain Park Boarding Academy policy. I know that because Kenda Landsverk would be summoned, sometimes even if she had to be awakened, to assault or restrain students thought by Mountain Park Boarding Academy staff to need to be assaulted or restrained." Id., ¶ 10. Plaintiff Teasley does not state, however, which of the defendants ordered Landsverk to hit her. All of the defendants are entitled to summary judgment on this claim, as Teasley has adduced no proof that any of the defendants touched her offensively, or ordered, encouraged or incited others to do so. See Phelps, 73 S.W.3d at 656-57.

### c. Shari Lueken

Plaintiff Lueken's Declaration states in pertinent part that Amanda File, Natalie Fahnestock, Amanda Krassin, Jamie Kaufman and other girls dragged her by the arms and other body parts around the school track on many occasions, and that staff member Erin Shanahan dragged her around the track by the hair. Lueken Decl., ¶¶ 2-4. Lueken states that "Ms. Gerhardt" told other persons to hit her or pull her around the track and she knows this "because the students told me they had been directed to pull me around the track by Ms. Gerhardt."[15] Id., ¶ 5. Lueken also states in her Declaration, "The people that dragged me around the track and otherwise struck or touched me in an offensive manner were Mountain Park Boarding Academy personnel, paid or otherwise, and were committing those acts at the direction of the Defendants in this case." Id., ¶ 6. Plaintiffs do not submit the affidavits of any of the named students or others to support the assertion that Ms. Gerhardt ordered the hitting and dragging of plaintiff Lueken.

A defendant may be liable for inciting, encouraging or directing someone else to commit a battery. See Phelps, 73 S.W.3d at 656-57. In order to avoid summary judgment, however, plaintiff Lueken must offer sufficient evidence to raise a genuine issue of material fact as to whether the defendants incited, encouraged or directed the other students or Ms. Shanahan to drag her around the track. The Lueken Declaration's statement that "Ms. Gerhardt" ordered the hitting and dragging is hearsay, because it is expressly based on the out-of-court statements of persons other than Lueken and is offered to prove the truth of the matter asserted, i.e., that Gerhardt told other people to hit and drag Lueken. See Barrett v. Acevedo, 169 F.3d 1155, 1168 (8th Cir.) ("Hearsay is ordinarily an

_____

[15]Lueken does not specify in the Declaration if she is referring to Deborah Gerhardt or Julie Gerhardt.

out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)."), <u>cert. denied</u>, 528 U.S. 846 (1999). In addition, paragraph 6 of the Declaration quoted above, which states that the people who hit and dragged Lueken did so at defendants' direction, is a mere legal conclusion. The Court must consider only admissible evidence and disregard portions of the Declaration made without personal knowledge, consisting of hearsay, or purporting to state legal conclusions as fact. <u>See</u> <u>Shaver v. Independent Stave Co.</u>, 350 F.3d 716, 723 (8th Cir. 2003); Fed. R. Civ. P. 56(e).

When the hearsay and legal conclusions contained in the Lueken Declaration are disregarded, plaintiff Lueken has no admissible evidence sufficient to raise a genuine issue of material fact as to whether any of the defendants may have incited, encouraged or directed someone else to commit a battery. Defendants' motion for summary judgment should therefore be granted on this claim.

### d.  Tracey Brazil Ozuna

Plaintiff Ozuna's Declaration states in pertinent part that Laura Matthews hit her with a paddle eight times during her first stay at Mountain Park, and that Deborah Gerhardt ordered the paddling in Ozuna's presence. Ozuna Decl., ¶¶ 2-4. This evidence is sufficient to raise a genuine issue of material fact as to whether Deborah Gerhardt ordered, encouraged or incited others to offensively touch plaintiff Ozuna. <u>See</u> <u>Phelps</u>, 73 S.W.3d at 656-57. Defendants' motion for summary judgment should therefore be denied on this claim with respect to defendant Deborah Gerhardt, and granted with respect to all of the other defendants.

### e.  Jamie Kaufmann Woods

Plaintiff Woods' Declaration states in pertinent part that Meaghan Richter, an orientation guide "given authority over [Woods] by Debbie Gerhardt" pulled Woods' hair, Woods Decl., ¶ 9, and

although Woods complained to defendant Andrea Hill about the hair pulling, she did nothing about it. Id., ¶ 10. Richter also pushed Woods. Id., ¶ 11. Shortly after Woods arrived at Mountain Park, defendant Hill directed other girls to tackle and hold Woods down. Id., ¶ 12. Woods also testified in her deposition that Hill and defendant Betty Wills threw her to the ground and/or poked her. Woods Dep. at 115. Defendants do not move for summary judgment on plaintiff Woods' claims against Betty Wills and Hill, but do move for summary judgment in favor of the remaining defendants.

Woods' assertion that Deborah Gerhardt gave authority over Woods to Richter does not raise a genuine issue of material fact sufficient to preclude summary judgment for two reasons. First, the assertion is a legal conclusion which is not properly considered on summary judgment. See Shaver, 350 F.3d at 723; Fed. R. Civ. P. 56(e). Second, Woods does not state any facts which could tend to establish that Gerhardt ordered, encouraged or incited others to offensively touch Woods. See Phelps, 73 S.W.2d at 656-67. Defendants' motion for summary judgment should therefore be granted with respect to plaintiff Woods' battery claim against Deborah Gerhardt. Because Woods has submitted no evidence concerning any of the other defendants' roles in the alleged batteries, defendants' motion for summary judgment should also be granted as to the defendants other than Betty Wills and Andrea Hill.

In summary, only plaintiffs Ozuna and Woods' claims relating to physical battery remain for trial. Plaintiff Ozuna's claims are against defendant Deborah Gerhardt, and plaintiff Woods' claims are against defendants Betty Wills and Andrea Hill.

### F. Negligence Claims.

In counts entitled "Negligent Medical Treatment" or "Negligent Medical Care," plaintiffs Woods, Ozuna and Deboi assert that defendants were negligent in providing them with medical care.

Plaintiff Woods alleges that she did not receive proper medical attention after she swallowed an open safety pin, and instead of obtaining medical treatment defendant Betty Wills made her drink oil and eat bread. See complaint, Part 1, Count II, ¶¶ 92-97. Woods also alleges that she did not have menstrual periods for a period of ten to eleven months but was never taken to a doctor to ascertain the cause of the missed periods. Id., ¶ 112. Plaintiff Ozuna alleges that she did not have normal menstrual periods during her enrollment at Mountain Park and that she was never taken to a doctor to ascertain the cause of her missed periods. Ozuna attributes her lack of menses to the administration of chlorpromazine. See complaint, Part 6, Count II, ¶¶ 289-91. Plaintiff Deboi alleges that as a result of being administered chlorpromazine, her menstrual periods ceased for a period of six months, that she was severely constipated during her first month at Mountain Park and continued to be constipated thereafter, that defendants failed to inform her of the potentially fatal interaction between chlorpromazine and other drugs, specifically Sudafed, and that defendants failed to give medication when "half of the girls" were sick with the flu. See complaint, Part 7, Count II, ¶¶ 330-38.

Defendants move for summary judgment on these claims, asserting that: (1) they cannot be sued for negligent medical treatment, because none of the defendants is a licensed healthcare provider under Section 538.210 of the Revised Statutes of Missouri (2000); (2) plaintiffs do not have expert testimony necessary to establish the appropriate standard of care and that the defendants acted below the standard of care; and (3) to the extent plaintiffs base their claim on the negligent administration

of chlorpromazine, plaintiffs cannot establish causation because they have no evidence they were actually administered chlorpromazine.[16]

Plaintiffs do not directly respond to any of defendants' arguments. Instead, plaintiffs quote at length from the Missouri Supreme Court's decision in Lopez v. Three Rivers Electric Cooperative, Inc., 26 S.W.3d 151, 155 (Mo. 2000) (en banc), which discusses the elements of a negligence claim in Missouri: the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff. Although it is not entirely clear from their brief, plaintiffs appear to assert that because the defendants had complete control over them at Mountain Park for the necessities of life, including food, water and medical care, the defendants had a duty to provide medical care when needed, failed to do so, and the plaintiffs suffered injury as a result.

---

[16]Plaintiffs Lueken and Teasley also assert negligence claims. Defendants have not moved for summary judgment on Lueken and Teasley's negligence claims. Plaintiff Lueken alleges that as a result of defendants' negligence, she began self-mutilating while at Mountain Park; severely cut her hand on a broken glass, and suffered deterioration of her eyesight after defendants took her eyeglasses away. See Complaint, Part 2, Count II. Plaintiff Teasley alleges that as a result of defendants' negligence, she suffered with a broken molar for over two months, had cessation of her normal menstrual periods, was constipated, and suffered a severe sore throat and fevers. Id., Part 4, Count II. Unlike the claims of plaintiffs Woods, Ozuna and Deboi, the negligence claims of Lueken and Teasley were not designated in the complaint as "Negligent Medical Treatment" or "Negligent Medical Care" claims but rather simply as "Negligence."

The Court assumes that defendants moved for summary judgment on the negligence claims of plaintiffs Woods, Ozuna and Deboi, and not those of Lueken and Teasley, because the former three plaintiffs included the word "medical" in the heading of their negligence count. It is fundamental, however, that "the character of a cause of action must . . . be determined from the facts stated in the petition and not by the prayer or the name given the action by the pleader." McMenamy v. Main, 686 S.W.2d 874, 876 (Mo. Ct. App.1985) (quoting Household Finance Corp. v. Avery, 476 S.W.2d 165, 167 (Mo. Ct. App. 1972)).

Defendants respond that plaintiffs fail to offer facts demonstrating the creation of a duty or defining the parameters of that duty. With respect to claims of negligence in medical treatment, defendants reiterate that they cannot have a duty to plaintiffs in this regard, because they are not healthcare providers. With respect to claims based on the alleged administration of chlorpromazine, defendants assert that the plaintiffs have no facts to show they were actually given drugs by the named defendants, and without such evidence there can be no duty. Defendants also assert that plaintiffs have failed to offer facts to establish causation, because they lack expert testimony to link their claimed symptoms to the alleged administration of chlorpromazine.

The facts alleged in the three counts at issue tend to show that plaintiffs were in need of medical treatment during their stay at Mountain Park, but did not receive it. The Court does not interpret the portions of plaintiffs' complaint at issue to assert that defendants are healthcare providers who provided them with substandard care. The Court notes that Section 538.205(4) of the Missouri Revised Statutes defines a "health care provider" as "any physician, hospital, ambulatory surgical center, long-term care facility, dentist, registered or licensed practical nurse . . . or any other person or entity that provides health care services under the authority of a license or certificate." (Emphasis added). There is no assertion in this case that any of the defendants have a license or certificate to provide health care services. Cf. Ferrier-Harris, Ltd. v. Sanders, 905 S.W.2d 123, 125 (Mo. Ct. App. 1995) (where plaintiff admitted that a nursing home was a licensed, long-term skilled care nursing home, it was a "health care provider" as defined by § 538.205(4)). Thus, the statutory cause of action available against a health care provider appears inapplicable under these circumstances.

Moreover, the Court disagrees with defendants' assertion that plaintiffs have failed to assert the existence of a duty, the breach of that duty, and resulting damages. Although plaintiffs' complaint is vague, unnecessarily prolix, argumentative and confusing, the Court can glean from it that plaintiffs allege they were under defendants' complete control and supervision while enrolled at Mountain Park and therefore defendants had a duty to obtain necessary medical care for them, that plaintiffs became ill while at Mountain Park and needed medical care, but defendants failed to obtain necessary medical care for them, and plaintiffs suffered injury as a result.

Courts have recognized that the relationship between a student and a school she attends gives rise to a duty on the part of teachers or administrators to obtain medical assistance for an injured or ill student. In Stineman v. Fontbonne College, 664 F.2d 1082 (8th Cir. 1981), the Eighth Circuit applied Missouri law to reject the defendant college's argument that it owed no duty to obtain medical assistance for a deaf student who was struck in the eye by a ball during a softball game. The Court noted that "courts have generally found such a duty in similar circumstances." Id. at 1086 (citing O'Brien v. Township High School Dist. 214, 392 N.E.2d 615 (Ill. App. Ct. 1979); Mogabgab v. Orleans Parish School Board, 239 So. 2d 456 (La. Ct. App. 1970); and Welch v. Dunsmuir Joint Union High School Dist., 326 P.2d 633 (Cal. Ct. App. 1958)). See also Declouet v. Orleans Parish Sch. Bd., 715 So.2d 69, 74 (La. Ct. App. 1998) (acting school principal breached duty to obtain prompt medical attention for student suffering asthma attack); Jarreau v. Orleans Parish Sch. Bd., 600 So. 2d 1389, 1393 (La. Ct. App. 1992) (high school football coach and team trainer owed duty to student to enable student to obtain access to medical treatment for wrist injury, even though coach and trainer did not have duty to diagnose student's fractured wrist; coach and trainer should have recognized their limitations with respect to medical care and sought expert medical advice in face of

54

student's continuing complaints of pain and swelling). Based on these authorities, the Court concludes that defendants had a duty to provide necessary medical assistance to the Student plaintiffs.

The defendant in <u>Stineman</u> attempted to rely on a Missouri Court of Appeals decision, <u>Kersey v. Harbin</u>, 531 S.W.2d 76 (Mo. Ct. App. 1975), for the proposition that it owed no duty to the plaintiff. The Eighth Circuit questioned the application of <u>Kersey</u> to the case before it, but concluded that even if <u>Kersey</u> did apply, its elements were met.[17] Specifically, "to find a duty to render medical assistance, the first element under Kersey requires that the defendant must have been able to appreciate the severity of plaintiff's injury." <u>Stineman</u>, 664 F.2d at 1086. In the instant case, the defendants were called upon to appreciate whether teenage girls who ceased to have their menstrual periods for many months, were chronically constipated for months, or who swallowed an open safety pin, should be seen by a physician. The Court finds that plaintiffs raise an issue of fact on this point.

"The second element of <u>Kersey</u> requires a determination that one or more of the defendants had the skill to provide adequate medical treatment." <u>Id.</u> In this case, as in <u>Stineman</u>, "The only treatment required . . . was to get the injured person to a doctor. . . . The defendants certainly had the skill to provide this much treatment." <u>Id.</u>[18] It has been stated that the "duty of medical referral

---

[17]The Eighth Circuit explained why <u>Kersey</u> did not appear to be controlling: "The opinion in <u>Kersey v. Harbin</u>, 531 S.W.2d 76 (Mo. App. 1975), was for the most part concerned with a failure to supervise a class of eighth graders, not a failure to render medical assistance. Moreover, the court applied a strict standard against recovery because the defendants in that case were or could be immune or privileged-a standard that was later criticized. <u>See Kersey v. Harbin</u>, 591 S.W.2d 745, 747 (Mo. 1979)." <u>Stineman</u>, 664 F.2d at 1086, n.3. The instant case is similarly distinguishable from <u>Kersey</u>.

[18]The Eighth Circuit stated in a footnote, "We need not decide how much of an effort must have been made to obtain medical attention when, as here, no attempt was made to even suggest such attention." <u>Stineman</u>, 664 F.2d at 1086, n.4.

requires no particular expertise and can be evaluated by the trier of fact without expert testimony." Jarreau, 600 So.2d at 1393. Thus, the second element of Kersey is readily met.

"The third element of Kersey addresses whether providing medical attention would have avoided the injury's ultimate harm." Stineman, 664 F.2d at 1086. This is where plaintiffs' claims are weakest. Plaintiffs do not present any evidence of permanent injuries, and defendants have offered the testimony of their expert witness, Dr. Asher, who opined that none of the plaintiffs have a medically significant condition resulting from their enrollments at Mountain Park. Plaintiffs allege, however, that they suffered pain as a result of defendants' inaction. Plaintiffs may testify concerning their past pain and suffering,[19] and defendants have not established that plaintiffs cannot pursue their negligence claims in the absence of permanent injury.

Thus, the Court finds that defendants had a duty to provide medical assistance to the Student plaintiffs and that there is sufficient evidence to submit to the jury questions of whether any of the individual defendants breached this duty and whether such breach resulted in damages.[20] Defendants' motion for summary judgment should therefore be denied on these claims.

To the extent, however, that plaintiffs' negligence claims are based on the alleged administration of chlorpromazine or other antipsychotic or behavior modification drugs, defendants'

---

[19]Compare Jones v. Allen, 473 S.W.2d 763, 766 (Mo. Ct. App. 1971) (in Missouri, a plaintiff is entitled to an instruction on future pain and suffering even if the only evidence of that pain and suffering comes from the plaintiff; the alleged pain and suffering need not be corroborated by medical evidence, and in fact may be in conflict with medical evidence on the question).

[20]The Court notes that plaintiffs generally do not assert that a particular defendant had the duty to obtain medical care for them, but does not address this issue further because it was not raised by defendants in their motion for summary judgment. As discussed below at Section G, however, defendant Goodman is entitled to summary judgment on all claims asserted against her by plaintiffs Ozuna and Deboi.

motion for summary judgment should be granted. This is because plaintiffs have failed to offer any facts to establish causation, as they lack expert testimony to link their claimed symptoms to the alleged administration of chlorpromazine. Plaintiffs' testimony that they suffered from missed periods, constipation and other symptoms does not establish that they were drugged. "Proof of causation requires expert medical testimony when there is a sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis." Portis, 38 S.W.3d at 441 (internal punctuation and citation omitted). Plaintiffs' assertions that their various symptoms were caused by the illicit administration of chlorpromazine are not a matter within the understanding, common knowledge or experience of lay persons. As a result, expert opinion would be essential to show that plaintiffs' claimed injuries were caused by the actions to which they are ascribed, and plaintiffs lack such evidence.

### G. Claims of Plaintiffs Ozuna and Deboi Against Defendant Goodman.

Defendant Sharon Goodman moves for summary judgment on all claims asserted against her by plaintiffs Ozuna and Deboi, on the basis that she did not arrive at and become a staff member at Mountain Park until well after these plaintiffs had left. In response, plaintiffs concede that this aspect of defendants' motion is well taken. Defendants' motion for summary judgment on plaintiffs Ozuna and Deboi's claims against defendant Goodman should therefore be granted.

### H. Plaintiff Shari Lueken's Conversion Claim.

In Part 2, Count III of the complaint, plaintiff Shari Lueken asserts a claim against one or more of the defendants for conversion of an item of personal property, a piccolo. Defendants move for summary judgment on this claim on the basis that plaintiff Lueken has no facts tending to show

that any one or more of the defendants actually took and has possession of the piccolo at issue. Plaintiffs made no response to this aspect of the motion for summary judgment.

Under Missouri law, conversion is the unauthorized assumption and exercise of ownership rights over the personal property of another party to the exclusion of the owner's rights. <u>IOS Capital, LLC v. Allied Home Mortgage Capital Corp.</u>, 150 S.W.3d 148, 152 (Mo. Ct. App. 2004) (citation omitted). The elements of the cause of action for conversion are that: (1) the plaintiff was the owner of the property or was entitled to possession of the property, (2) the defendant took possession of the property with the intent to exercise some control over it, and (3) the defendant thereby deprived the plaintiff of the right to possession of the property. <u>Id.</u> at 153. "To make out conversion there must be proof of a wrongful possession, or the exercise of dominion over it, in exclusion of owner's rights." <u>Kreher v. Mason</u>, 33 Mo. App. 297 (Mo. Ct. App. 1889) (quoted case omitted).

The only facts Ms. Lueken has offered in support of her conversion claim are that in January 2001, her parents packed a box containing three musical instruments, a piccolo, a flute and a tenor saxophone, and shipped the box to Ms. Lueken at Mountain Park. In response to her inquiries, Mrs. Lueken, Shari's mother, was told by unnamed Mountain Park staff that the three instruments had arrived. Approximately six months later, the Luekens learned that Shari had not received the piccolo.

Based on the foregoing, the Court finds that plaintiff Lueken has offered no facts tending to establish that any one or more of the defendants took possession of the piccolo or exercised dominion over it with the intent to exercise some control over it. Defendants are therefore entitled to summary judgment on this claim.

## I. Claims of Erika Teasley.

Claims asserted by Erika Teasley are set forth in Part 4, Counts I, II and III of the complaint. Defendants move for dismissal of these claims on the basis that plaintiff Teasley lacks the legal capacity to sue in her own name because she has not attained the age of eighteen years, and will not do so by the time of trial. Defendants asserts that under Missouri law, persons under the age of eighteen years may prosecute a lawsuit only by a duly appointed guardian or conservator, or by a next friend appointed in the suit, citing Section 507.110, Mo. Rev. Stat. (2000).[21] Defendants do not cite any case authority in support of their assertion that dismissal is the appropriate remedy.

Plaintiffs respond that this assertion is "frivolous" because Teasley brings this suit through her next friends, her parents. Defendants reply that there are no allegations in the complaint that Teasley is a minor being represented by a next friend, and no motion for appointment of next friend was filed. Defendants assert that without these "requisite" allegations or motion, the claims have not been properly made and should be dismissed.

To maintain a suit in federal court, a minor must be represented by a competent adult. Gardner v. Parson, 874 F.2d 131, 137 n.10 (3d Cir. 1989). Rule 17(c) of the Federal Rules of Civil Procedure governs the capacity of parties to sue and be sued, including minors. The Rule provides:

> Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

---

[21]All subsequent statutory references are to the Revised Statutes of Missouri (2000) unless otherwise noted.

Rule 17(c), Fed. R. Civ. P.

The caption of the complaint in this case states that Erika Teasley is a minor who asserts her claims through her next friends Paul Douglas Hoover, Jr. and Katrina Hoover. Defendants are correct that the Hoovers did not file a motion for appointment as Ms. Teasley's next friends.

The text of Rule 17(c) does not require a formal motion for appointment as next friend. The Eighth Circuit has not addressed in any published decision the effect of failing to formally seek appointment of a next friend. In T.W. v. Brophy, 124 F.3d 893 (7th Cir. 1997), Judge Posner stated, "The court does not usually appoint a next friend; it is usually the next friend who has taken the initiative in suing on the child's behalf . . . ." Id. at 894. Other cases are similar. See Russick v. Hicks, 85 F. Supp. 281, 283 (W.D. Mich. 1949) (holding that judicial appointment of a next friend for minor plaintiffs was not necessary); DRP v. Cross, 2005 WL 1532929, * 2 (W.D. Mo. June 28, 2005) (refusing to dismiss claim of minor plaintiff for lack of standing where caption of complaint stated it was being brought by the "friend and natural father" of the minor plaintiff; but appointing guardian ad litem where the father was not capable of serving as next friend because he had been charged with endangering the welfare of the child); but see Weber v. United States, 105 F.3d 663, 1997 WL 1591, *1 (8th Cir. 1997) (unpublished per curiam) (magistrate judge did not err in sua sponte dismissing claims of plaintiff's minor children because he failed to file a motion to proceed as next friend on their behalf). In this case, plaintiffs indicated in the case caption that Teasley is a minor and that the Hoovers are her next friends.

The Court believes that Rule 17(c) controls this issue rather than Missouri court rules, and therefore formal appointment of a next friend would not be required. Moreover, even under Missouri Supreme Court rules, dismissal is not the appropriate remedy for a failure to seek formal appointment

of a next friend as required by Rule 52.02(a)-(d). Rule 52.02(m) states, "Failure to appoint a next friend or guardian ad litem for a minor . . . shall not invalidate the proceedings if the court finds that the interests of the minor . . . were adequately protected. In <u>Concerned Parents v. Caruthersville School District 18</u>, 548 S.W.2d 554, 557 (Mo. 1977) (en banc), the Missouri Supreme Court rejected the argument that failure to formally appoint adult plaintiffs as next friends for the minor plaintiffs required dismissal of the action. The court cited Rule 52.02(m), and noted that the adult plaintiffs were the natural guardians of their minor children and also real parties in interest. <u>Id.</u> The court did, however, instruct the parties to comply with the rule for appointment of next friends upon remand. <u>id.</u>, n.3.

Out of an abundance of caution, to the extent that Missouri Supreme Court rules concerning the appointment of a next friend are applicable in this case, the Court will order plaintiff Teasley to file a motion for appointment of next friend within ten (10) days of the date of this order, in compliance with Missouri Supreme Court Rule 52.02(c). Defendants' motion for dismissal of Teasley's claims on this basis should be denied.

**<u>Parent Plaintiffs' Claims</u>**.

Ralph and Marilyn Lueken (the "Luekens"), parents of Shari Lueken, and Katrina Hoover, mother of Erika Teasley, and Paul Hoover, Jr., Katrina's husband (the "Hoovers"), assert claims for fraud in Parts 3 and 5 of the complaint. These plaintiffs, collectively referred to as the "Parent plaintiffs," assert in the complaint that fraudulent representations made to them by one or more unspecified defendants induced them to enroll their children at Mountain Park.

Defendants move for summary judgment on the fraud claims asserting that the Parent plaintiffs have failed to identify any specific representations made to them by a specific person which were

fraudulent. Defendants also assert that summary judgment is appropriate as to the Hoovers' claims because: (1) Mrs. Hoover could not identify a single specific representation that she relied on which was not true at the time it was made; (2) the Hoovers' claimed damages for fraud fail to meet the amount in controversy requirement for subject matter jurisdiction under 28 U.S.C. § 1332; and (3) Mr. Hoover lacks standing to sue because he is not the natural or adoptive parent or legal guardian of Erika Teasley and therefore has no parental authority to determine her care, including whether to enroll her in a particular school.

The Parent plaintiffs respond that the defendants have "chosen to operate as a de facto partnership" and "therefore are each liable for the statements of their partners." Pls.' Consol. Brief at 1-2; see Lueken Decl., ¶ 3; Hoover Decl., ¶ 4. The Parent plaintiffs cite the Declaration of Ralph Lueken, which asserts that Sam Gerhardt told him Shari Lueken would receive humane treatment, medical care would be provided, and that Mountain Park was a "drug free facility." Lueken Decl., ¶ 2. The Parents plaintiffs also cite the Declaration of Paul Douglas Hoover, Jr., which states that Sam Gerhardt told him Mountain Park would not administer psychotropic or behavior modification drugs to Erika Teasley, and that Hoover relied on these representations in deciding to enroll Erika. Hoover Decl., ¶ 2.[22]

The Lueken and Hoover Declarations also state that the Parent plaintiffs subsequently learned beatings, dragging and other direct physical abuse were directly incorporated into Mountain Park's program at the time they were told the children would be treated humanely, and therefore this statement was false when made. Hoover Decl., ¶ 16; Lueken Dec., ¶ 14. The Declarations assert

---

[22]The Parent plaintiffs also cite to the expert report of Mr. Ben Corpus, which the Court has previously excluded from evidence. Therefore, the Court does not consider it.

that the Mountain Park Parent-Student Handbook stated that parents would be kept informed of any medical or dental needs of their children and such needs would receive prompt attention, Lueken Decl., ¶ 10; Hoover Decl., ¶¶ 11-12, but that Erika Teasley did not receive treatment for a broken tooth for over two months. Hoover Decl., ¶ 13.[23]

The Parent plaintiffs further respond that the Hoovers' claims meet the amount in controversy requirement because they have consequential damages, and that Mr. Hoover has standing to sue because he signed the contract to enroll Erika Teasley at Mountain Park and paid some of her tuition with his money.

Defendants reply that plaintiffs sued the defendants individually for fraud, but now assert that defendants operate as a de facto partnership and are each liable for statements of the others. Defendants contend that plaintiffs fail to offer any fact demonstrating the existence of a partnership, and do not allege the existence of a partnership in their complaint.

With respect to Sam Gerhardt's representations that no psychotropic drugs would be used on the students and that Mountain Park was a "drug-free facility," defendants reply that there is no admissible evidence in the record that any of the defendants actually administered any behavior modification drugs to the students. Defendant asserts that the statements in the Lueken and Hoover Declarations concerning drugging are therefore mere conclusions. Thus, defendants contend that plaintiffs cannot show the falsity of Sam Gerhardt's statements, and have not alleged that any of the other defendants made such statements.

Defendants further reply that in the complaint, the Luekens allege that unnamed defendants represented to them that defendants offered hope and help to troubled teens, used positive peer

---

[23]The Mountain Park parent-student handbook is not in the record before the Court.

pressure, offered a loving atmosphere, and that students would not discipline other students. Defendants assert that the Luekens have apparently abandoned these allegations because plaintiffs offer no argument concerning them. Instead, in the Lueken Declaration, Mr. Lueken states that Sam Gerhardt and others, as well as unidentified documentation, assured the Luekens that Shari Lueken "would be treated humanely and would receive necessary medical care." Defendants state that these claimed representations were not included in the complaint, and therefore cannot create an issue of material fact with respect to the alleged misrepresentations set forth in the complaint. Defendants also assert that the Hoover Declaration states only that Mr. Hoover and his wife "presumed" that Erika Teasley would be treated humanely and receive necessary medical care. Defendants contend that a presumption held by Mr. Hoover is insufficient to support a claim that the presumption amounted to a representation actually made by any of the defendants.

Defendants further argue that even if the Court were to consider the representations that Shari Lueken would be treated humanely and receive necessary medical care, these representations are too vague to be considered fraudulent. Defendants assert that to be treated "humanely" is a general and subjective term about the quality of defendants' care, and "necessary medical care" is also a general and vague term about the overall quality of defendants' care. Defendants note that Mr. Lueken's Declaration does not refer to a specific instance where he believed Shari Lueken did not receive necessary medical care, and that plaintiffs have not offered any admissible expert evidence to establish what constitutes "necessary medical care."

Defendants assert that statements in the Lueken and Hoover Declarations that the parents subsequently learned unnamed defendants acted in a manner contrary to that represented to them, including alleged beatings, dragging, drugging and physical abuse, are mere conclusions with no

supporting facts, and do not establish that the statements are based on personal knowledge of the declarants or cite to evidence in the record. Thus, defendants argue these statements should be disregarded.

With respect to the amount in controversy concerning the Hoovers' claims, defendants assert that the Hoovers failed to produce any documents or specific information in response to discovery requests concerning consequential damages. Without any facts showing consequential damages, defendants assert, the mere argument that consequential damages exist is unavailing and this claim should be dismissed for failure to meet the amount in controversy requirement.

The Court will first address the contention that defendants were operating as a de facto partnership, and therefore can be responsible for each others' statements and representations. First, as defendants correctly observe, this contention is not contained in the complaint. A party cannot assert a new theory of his case in defending a summary judgment motion or expand a claim to create a material issue of fact where none existed before. See Wilson v. Westinghouse Electric Corp., 838 F.2d 286, 288-89 (8th Cir. 1988); see also Sorenson v. First Wisconsin Nat'l Bank of Milwaukee, N.A., 931 F.2d 19, 21 (8th Cir. 1991). As such, plaintiffs' contentions concerning the alleged existence of a de facto partnership among the defendants are not properly before the Court.

Even if the issue of a de facto partnership was properly before the Court, plaintiffs fail to show any evidence to establish the existence of partnership among the defendants. Under Missouri law, "A 'partnership' is an association of two or more persons to carry on as co-owners a business for profit and includes, for all purposes of the laws of this state, a registered limited liability partnership." Section 358.060, Mo. Rev. Stat.

Missouri courts have made it clear that the law does not presume the existence of a partnership, and the burden to establish the existence of a partnership is on the party asserting its existence. H2O'C Ltd. v. Brazos, 114 S.W.3d 397, 402 (Mo. Ct. App. 2003). Where there is no evidence of a written or oral partnership agreement, "the only way a partnership can be established is by implication and this can only be done where there is clear, cogent and convincing evidence that the purported partners have made a definite and specific agreement. The clear, cogent and convincing standard is met only when the evidence instantly tilts the scales in favor of the affirmative when weighed against the evidence in opposition and the fact finder is thereby left with the abiding conviction that the evidence is true." Morrison v. Labor and Indus. Relations Comm'n, 23 S.W.3d 902, 909 (Mo. Ct. App. 2000) (internal citations and punctuation omitted). "Indicia of a partnership relationship includes a right to a voice in management of the partnership business, a share of the profits of the partnership business, and a corresponding risk of loss and liability to partnership creditors." Id.

Because the Parent plaintiffs have failed to come forward with any evidence to show that defendants operated as a partnership, as opposed to mere conclusions, the Court rejects their assertion that statements or representations by one defendant could bind any of the others. The Court now turns to the remaining aspects of defendants' motion for summary judgment on the fraud claims.

The elements of a fraud action in Missouri are: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or his ignorance of its truth, (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) the right to rely thereon, and (9) the hearer's consequent and proximately caused

injury." Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo. 1988) (en banc).  The failure to establish any one of the elements is fatal to a fraud claim.  Dolan v. Rabenburg, 231 S.W.2d 150, 154 (Mo. 1950).  "When fraud is alleged the burden of proof as to each element falls on the party asserting the fraud and fraud is never presumed."  Magna Bank of Madison County v. W.P. Foods, Inc., 926 S.W.2d 157, 162 (Mo. Ct. App.1996).

The Parent plaintiffs' primary assertion of fraud is that defendant Sam Gerhardt represented that no psychotropic or behavior modification drugs would be administered to Shari Lueken and Erika Teasley at Mountain Park.  The defendants are entitled to summary judgment on these claims because there is no admissible evidence that any psychotropic medications were ever administered. Thus, the plaintiffs cannot establish the falsity of the representation.  The Court excluded the expert report of Mr. Corpus concerning testing of Shari and Erika's hair for drugs.  The girls' testimony that they suffered from missed periods, constipation and other symptoms does not establish that they were drugged.  As stated above, because the Parent plaintiffs' assertions that their daughters' various symptoms were caused by the illicit administration of chlorpromazine or other drugs are not a matter within the common knowledge or experience of lay persons, expert opinion is essential to show that the claimed injuries were caused by the administration of psychotropic medications.  See Portis, 38 S.W.3d at 441.  Plaintiffs lack this necessary evidence, and therefore summary judgment is proper on this aspect of the Parent plaintiffs' fraud claims.

The Lueken Declaration also asserts that Sam Gerhardt represented that Shari Lueken would be "treated humanely" and "receive necessary medical care." As defendants observe, these assertions are not contained in the complaint.  As stated above, a party cannot assert a new theory of his case in defending a summary judgment motion or expand a claim in an attempt to create a material issue

of fact where none existed before.  See Wilson, 838 F.2d at 288-89.  Thus, these allegations of fraud are not properly before the Court.

Morever, even if these allegations were at issue, defendants are entitled to summary judgment because the representations alleged are not actionable as a matter of law.  See Monsanto Chemical Works v. American Zinc, Lead & Smelting Co., 253 S.W. 1006, 1010 (Mo. 1923) (actionable character of representations is a question of law).  The alleged representations do not relate to a past or existing fact.  "To constitute fraud, the alleged misrepresentation must relate to a past or existing fact."  Titan Const. Co. v. Mark Twain Kansas City Bank, 887 S.W.2d 454, 459 (Mo. Ct. App. 1994).  "Mere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation."  Arnott v. Kruse, 730 S.W.2d 597, 600 (Mo. Ct. App. 1987).

The Court is aware that under Missouri law, "A false statement of present purpose may under some circumstances be a misstatement of fact and will support a cause of action for fraudulent misrepresentation."  Grosser v. Kandel-Iken Builders, Inc., 647 S.W.2d 911, 914 (Mo. Ct. App. 1983) (citations omitted).  "However, the giving of a promise, even though breached the next day, is not such a fraudulent misstatement of fact as will support an action for fraud.  There must be proof of a current intention not to perform and a failure of performance is insufficient to establish this intent or to shift the burden of proof."  Id. (citing Dillard v. Earnhart, 457 S.W.2d 666, 671 (Mo. 1970)).  There is no proof in this case, as opposed to mere conclusory assertions, of a current intention not to perform by Sam Gerhardt.  Defendants are therefore entitled to summary judgment on these claims.

Finally, with respect to all other allegations of fraud, whether asserted in the complaint or in the Declarations of Ralph Lueken and Paul Hoover, Jr., including allegations of representations that no student would punish or discipline another student, the plaintiffs fail to identify the speaker responsible for the alleged fraudulent statement. The Parent plaintiffs therefore cannot establish a submissible cause of fraud on these claims, and defendants are entitled to summary judgment. As a result, the Court does not reach the issue whether the Hoovers' claims meet the requisite amount in controversy, or Mr. Hoover's standing.

**Conclusion**.

For the foregoing reasons, defendants' motion for summary judgment with respect to the Student plaintiffs should be granted in part and denied in part. The motion for summary judgment, construed as a motion to dismiss, should be granted on plaintiff Jamie Kaufmann Woods' ADA claim, and should otherwise be granted on (1) all plaintiffs' Fair Labor Standards Act claims; (2) all plaintiffs' intentional infliction of emotional distress claims; (3) all plaintiffs' false imprisonment claims: (4) all plaintiffs' battery claims based on surreptitious drugging; (4) plaintiffs Jessica Deboi, Erika Teasley and Shari Lueken's physical battery claims; (5) all plaintiffs' negligence claims based on surreptitious drugging; (6) all of plaintiffs Tracey Brazil Ozuna and Jessica Deboi's claims against defendant Goodman; and (7) plaintiff Shari Lueken's conversion claim.

The motion for summary judgment, construed as a motion to dismiss, should be denied as to plaintiff Erika Teasley's claims based on her status as a minor, and should otherwise be denied as to (1) plaintiff Tracey Brazil Ozuna's physical battery claim against Deborah Gerhardt; (2) plaintiff Jamie Kaufmann Woods' physical battery claim against Betty Wills and Andrea Hill; and (3) all plaintiffs'

remaining negligence claims against all the defendants, except for Ozuna and Deboi's claims to the extent they are asserted against defendant Goodman.

Defendants' motion for summary judgment against the Parent plaintiffs should be granted in all respects on the claims of Ralph Lueken, Marilyn Lueken, Paul Douglas Hoover, Jr. and Katrina Hoover.

Paul Douglas Hoover, Jr., and/or Katrina Hoover will be ordered to file a motion for appointment as next friend for Erika Teasley within ten days of the date of this order.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' amended motion for summary judgment as to plaintiffs Jamie Kaufmann Woods, Shari Lueken, Erika Teasley, Tracey Brazil Ozuna and Jessica Deboi is **GRANTED in part** and **DENIED in part** as set forth in this memorandum and order. [Doc. 60]

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment as to plaintiffs Paul Douglas Hoover, Jr. and Katrina Hoover, Ralph Lueken and Marilyn Lueken is **GRANTED**. [Doc. 53]

**IT IS FURTHER ORDERED** that Paul Douglas Hoover, Jr., and/or Katrina Hoover shall file a motion for appointment of next friend on behalf of Erika Teasley within ten (10) days of the date of this order, in compliance with Missouri Supreme Court Rule 52.02(c).

An appropriate partial summary judgment and order of dismissal will accompany this memorandum and order.

CHARLES A. SHAW
UNITED STATES DISTRICT JUDGE

Dated this  18th  day of November, 2005.