1                  UNITED STATES OF AMERICA
                 EASTERN DISTRICT OF MISSOURI
2                   SOUTHEASTERN DIVISION

3    JAMIE KAUFMANN WOODS, et al.,    )
                                      )
4              Plaintiffs,            )
                                      )
5         vs.                         )  No. 1:03-CV-105 CAS
                                      )
6    BOB WILLS, et al.,               )
                                      )
7              Defendants.            )

8
                      TRANSCRIPT OF JURY TRIAL
9
             BEFORE THE HONORABLE CHARLES A. SHAW
10                UNITED STATES DISTRICT JUDGE

11                     December 12, 2005
                          Volume I
12

13   APPEARANCES:

14   For Plaintiff:       Mr. Oscar Stilley
                          2120 North B Street
15                        Fort Smith, AR   72901

16
     For Defendant:       Mr. John D. Briggs
17                        Mr. Steven H. Schwartz
                          BROWN AND JAMES, P.C.
18                        1010 Market Street
                          20th Floor
19                        St. Louis, MO   63101

20
     REPORTED BY:         SUSAN R. MORAN, RMR
21                        Official Court Reporter
                          111 South 10th Street
22                        St. Louis, MO   63102
                          (314) 244-7983
23

24   Proceedings recorded by mechanical stenography, produced by
     computer-aided transcription.
25

I N D E X

OPENING STATEMENTS

    (By Mr. Stilley)          3
    (By Mr. Schwartz)         9


|                        | Direct | Cross | Redirect | Recross |
|------------------------|--------|-------|----------|---------|
| PLAINTIFFS' WITNESSES   |        |       |          |         |
| JESSICA DEBOI          |        |       |          |         |
| (By Mr. Stilley)       | 18     |       |          |         |

1          (The following proceedings were held in open court

2     on December 12, 2005:)

3               (Voir dire conducted and jury selected and sworn.)

4               (Initial instructions given by The Court.)

5          THE COURT:  You ready, Mr. Stilley?

6          MR. STILLEY:  Yes, Your Honor.

7          THE COURT:  Go right ahead.

8          MR. STILLEY:  May it please The Court, counsel,

9     ladies and gentlemen of the jury.  I'm here today as counsel

10    for these five young ladies to present their case.  And as

11    the judge told you, the purpose of opening argument is to

12    give you an outline, give you some kind of a preview so you

13    will have a basis, a better basis of understanding what's to

14    be presented.

15              Now, I really haven't done a formal introduction of

16    myself, and I think I should do that right now.  My name is

17    Oscar Stilley.  I'm an attorney from Fort Smith, Arkansas.

18    I've practiced for about 13 years now I guess, 13 or 14

19    years.  This is not the typical kind of case I do.  This is

20    not my bread and butter.  I do practice regularly in federal

21    courts and I am admitted into a number of federal courts.

22    And I also practice on individual cases in other districts or

23    circuits of which I'm not admitted.  Most of what I do,

24    however, is not this kind of case.  It has to do with federal

25    criminal defense or litigation regarding tax matters.

 1        This is a matter that was brought to my attention

 2   about four years ago, and I have done investigation and come

 3   to the conclusion that it was necessary to bring this lawsuit

 4   to get redress for individuals in this type of circumstance.

 5        Now, you heard the defense counsel say a number of

 6   things about churches.  And let me say this.  I don't want

 7   anybody to think that I am opposed to religion by any means.

 8   My mother was raised to the age of 14 as an Amish person.

 9   When I go visit relatives on her side of the family, I go and

10   visit Amish people.  We're friends.  We get along.  She moved

11   on to a Pentecostal type church.  Personally for many years I

12   have been, well, the same as these defendants will tell you

13   that they are, that is conservative Baptist, go to a

14   conservative Baptist church.  And it is with a heavy heart

15   that I have to be standing here before you today presenting a

16   case against people under these circumstances.

17        However, I also want to let you know that my wife

18   and I are very concerned about the --

19        MR. SCHWARTZ:  Your Honor, objection.

20        THE COURT:  Mr. Stilley.

21        MR. STILLEY:  Yes, Your Honor.

22        THE COURT:  I just told the jury that an opening

23   statement is an outline of what you intend to show as

24   evidence in your case.  It's not about your qualifications,

25   where you go to church, what you think about the case.  You

1    know, that's why we got this jury here, to see what they

2    think about the case.  So forget all this stuff about what

3    you and your wife think.  An outline of what you expect to

4    show, that's what an opening statement is.  It's not about --

5    and it's not opening argument, it is opening statement.  Now,

6    you get to argue when the case is over.  That's why it's

7    called closing argument.  This is not argument here, this is

8    just an outline of what you expect to show.

9         MR. STILLEY:  Certainly, Your Honor.  Thank you,

10   Judge.

11        Ladies and gentlemen, what I think that the evidence

12   is going to show in this case is that these girls were sent

13   to Mountain Park Boarding Academy.  And they run the gambit.

14   You heard during the voir dire, you heard the defense counsel

15   say this is for troubled teens.  Well, ladies and gentlemen,

16   I'm going to be honest with you, I want to present the truth

17   of the matter.  And there are some of these people, for

18   example, Ms. Lueken, we're not going to try to mislead you.

19   She had serious issues.  And she needed some discipline and

20   some assistance with her behavior.  It's beyond doubt.  Her

21   parents were doing the very best that they could for her.

22   They felt like Mountain Park would provide the support and

23   loving atmosphere and consistent discipline necessary to help

24   her conform her behavior to the standards acceptable by

25   society.

1          However, that is not true, for example, of Jessica

2    Deboi.  She was sent there to keep her sister company.  There

3    was no hint that she -- I mean, she had done nothing that a

4    normal teen would not do.  She was simply sent there by her

5    parents at the instigation of the defendants to keep her

6    sister company, and she suffered severe negligent treatment.

7    Our evidence is going to show you she suffered negligent

8    treatment.

9          Now, let me tell you what the core of this case

10   comes down to.  The core of this case comes down to the fact

11   that many, many years the boarding academy or facility that

12   would be run by these individuals sitting back here would

13   treat the students in their care so harshly that they would

14   cease their periods, their menstrual periods.  And this had

15   ceased for six, nine, 12 months.  The defense's argument,

16   their claim is that it's stress.  These girls are just so

17   stressed that they missed their periods.  Now, the plaintiff

18   is not conceding that.  But the evidence is going to show

19   that these girls, which would be in the general rule at the

20   facility, ceased their menstrual periods.

21          And they went and talked to the superiors there

22   about their medical difficulties, and they were just mocked.

23   They were made fun of, discredited.  They got no assistance.

24   They didn't get medical care.  They didn't get the treatment

25   that is normal and natural and has to be or should be done in

1    a case where a young female, young healthy female has ceased

2    her menstrual periods.

3         There were also -- you will also hear other

4    instances of the students asking for medication and being

5    denied that medication, asking to go to a doctor and being

6    denied an opportunity to go to a doctor, asking to go a

7    dentist, begging and saying I'm in terrible pain, and be

8    told, no, you can't go.

9         And it's not that they didn't have the money.

10   They -- these individuals, they had $500 in an account to

11   keep for the medical needs of these students.  They left that

12   money in the account.  And as a matter of fact in Shari

13   Lueken's case, Shari Lueken needed some medical care.  The

14   defendants forced her mother, Marilyn Lueken, to send

15   additional money when she was finally to get the medical care

16   that she needed.  And they used that extra money and never

17   used the $500 for the purpose that it was set up for and

18   never gave it back.

19        Ladies and gentlemen, I don't want to belabor this

20   thing.  I don't want to go over a lot of things.  They will

21   come out on the witness stand.  But that is the thrust of

22   what's going on here.

23        And let me say this too, this is not a situation

24   where these students could go get it themselves.  These

25   defendants here will admit that the students depended

1    absolutely totally on the defendants for everything they got.

2    When they first get there they have an orientation guide and

3    they have to stay within arm's length of the orientation

4    guide.  They can't do anything without permission of that

5    orientation guide.  They can't call the doctor.  They are

6    very, very limited.  They can get, I think, ten minutes twice

7    a month if I'm correct on that, ten minutes twice a month

8    they could call their parents.  But they did not have any

9    other communication with the outside world or the ability to

10   get the things that you and I take for granted, things like

11   Tylenol, Sudafed, things like that.  They didn't have the

12   opportunity to get those medications.

13           And there's also -- you're also told about counts of

14   battery.  Tracey Ozuna was picked out from the students, told

15   we're going to give you a paddling.  She was never told what

16   the paddling was for.  She was told if she resisted, she

17   would get more swats.  She got eight swats.  She couldn't

18   even ask.  And she may have asked, but they wouldn't tell her

19   what it was for.  They didn't tell her what was wrong.  They

20   said you're going to get paddling, you're going to get eight

21   licks.  And these are hard licks, hauling off as hard as they

22   can and hitting this girl in the bottom.  And it hurt really,

23   really bad.  And it's bad enough to be paddled when you've

24   done something wrong, but she hadn't done anything wrong, and

25   they didn't even have anything to say to her that she had

1    done wrong, they just beat her.  And it was so severe that it

2    was a long time before she could sit down with any degree of

3    comfort.

4         So -- and ladies and gentlemen, there's a number of

5    other things that will come out from the testimony, but as

6    The Court said, this is not argument.  This is for the

7    purpose of giving you some idea about where we're going to

8    go.  So with that I would conclude my opening statement.

9    Thanks very much.

10        THE COURT:  Mr. Schwartz.

11        MR. SCHWARTZ:  Thank you, Your Honor.  May it please

12   The Court, counsel.  Ladies and gentlemen of the jury, I

13   first want to thank you in advance for your service.  You're

14   doing your civic duty.  And the jury system is the best

15   system in the world.  We're one of the few countries that are

16   lucky enough to have that system, and I want to thank you in

17   advance for your time.

18        Now, as I told you earlier, I represent Brother Bob

19   Wills and his wife Betty Wills who are sitting over here.

20   Brother Wills is an ordained minister.  And he and his wife

21   Betty founded Mountain Park in 1987.  They had -- they have a

22   daughter Debbie who is sitting second from the right who

23   married Sam who is sitting next to her, Sam Gerhardt.  And

24   Debbie and Sam Gerhardt came into the ministry in 1993 to

25   help run the boarding school and the ministry.

1          This is a family ministry.  These people have

2     brought their families into this ministry.  Debbie and Sam

3     have two children, one is Bo Gerhardt, he's not here, he's

4     not being sued.  But he's married to Julie Gerhardt.  Julie

5     Gerhardt, who is sitting over here in the middle.  She was

6     enrolled as a student at the school and she graduated from

7     the school, and then she came back to work at the school for

8     awhile and she met Bo and they got married and now they have

9     two small children.  So there is four generations of family

10    that was running this ministry.

11          The Wills, as I said, they founded this ministry in

12    1987.  They ran it themselves.  Mrs. Wills used to cook all

13    the food herself.  They lived in the same building, in a

14    separate apartment, but in the same building as the girls'

15    dorm, the same place where the church was and the cafeteria,

16    the dining hall.

17          And so they -- this to them was a 24-hour job.  They

18    lived where they worked because they were very devoted to

19    this ministry.  As I mentioned, Brother Sam and Debbie, and

20    Sam is also an ordained minister, joined in 1993.  They also

21    lived on the promises.  And then when their son was 15, he

22    came to the school.  He wanted to live in the boy's dorm so

23    he helped with the ministry.  So he lived there from the age

24    of 15.

25          Now, the Gerhardts took a pastoral interest in the

1    children who were at the Baptist -- at the boarding school.

2    Their mission was to turn the lives around of these troubled

3    teens.  And what Mr. Stilley says is partially correct, that

4    some of these ladies who are suing now, some of them had

5    problems more than others.  But as a general rule the reasons

6    why these teens were taken to the school was because their

7    parents felt like they needed help to raise them.

8         And they had some -- they were having problems.

9    There were four components to the ministry.  The first was

10   structure.  One of the things that they would do was these

11   teenagers would potentially come from homes where there was

12   not much structure.  They may not have been told when to go

13   to bed, when to get up, that they had to go to school, that

14   they had to do chores.  So one of the things the ministry

15   offered to the teens was structure in their lives.  They were

16   told when to go to bed, they were told when to get up, they

17   were told to clean their rooms, they were required to do

18   chores.  It was made sure that they followed proper hygiene.

19   They were required to go to school.

20        The second thing, the ministry was adding worth to

21   their lives.  Many of these teens came from backgrounds where

22   they just felt worthless.  They felt like they had no future

23   and there was no worth to their lives.  So one of the

24   purposes of the ministry was to convince them that their

25   lives mattered.  That they mattered to God, they mattered to

1    their parents, and they mattered to the Gerhardts and Wills.

2    They were very involved in these teens' lives and they were

3    concerned about them.

4              Next thing they gave was spiritual order to their

5    lives.  The scriptures and the religion and the spirituality

6    was a very, very big part of this ministry.

7              And lastly they gave to them a future, a vision of

8    the future, so that they could see that they have a future.

9    They could think about going to college.  They could think

10   about having a career.  And you'll see that some of the teens

11   that are suing are very successful.  Some of them have gone

12   to college and some are doing very well.

13             Now, when a child was first brought to Mountain

14   Park, it was a shock to their system.  They may have been

15   used to eating junk food or fast food.  They were put on a

16   well balanced diet.  They may have initially felt abandoned

17   by their parents.  That would be a common feeling of a

18   teenage who was brought there.  And they came from all over

19   the country to go to this boarding school.  So they could

20   have come from the West Coast or wherever and brought there

21   and left there by their parents under the care of the

22   Gerhardts and the Wills.  And so that may have made them feel

23   abandoned initially.

24             But when they got structure in their lives and they

25   were required to go to school and they were required to get

1   up at a certain time and go to bed at a certain time and

2   required to do their chores, and they had free time, they had

3   movie night, they had sports, they had an outdoor swimming

4   pool, things started to change for them.  But initially they

5   could be unhappy and initially until they learned the

6   routine, it could be an upset to their system.

7        And that's why you'll hear some of these girls

8   missed their periods initially when they first got there.

9   This was not unusual, it was not harmful, it was not cause

10  for immediate concern.  If they complained about it after

11  several months and they wanted to go to the doctor, they

12  would be taken to the doctor, or if their parents wanted them

13  to go to the doctor, they would be taken to the doctor.

14  Usually, however, this problem went away and their periods

15  returned.  They did provide pregnancy tests for anybody who

16  was missing their period and thought maybe they were

17  pregnant, they could get a home pregnancy test.  So this was

18  not a cause for concern.

19        They had a doctor available nearby, we talked about

20  him earlier, Dr. Gayle, and you'll hear from him.  And if

21  someone was sick, someone broke their leg or hurt themselves

22  or needed a doctor's attention, they could call Dr. Gayle and

23  he was very, very -- they were able to get ahold of him at

24  night or whenever they needed him.  He was very good to the

25  school and he tried to get the students in right away.  And

1    you'll hear that two of the five students that are suing,

2    they went to see Dr. Gayle.  And, in fact, Jessica Deboi --

3    if I'm pronouncing it properly -- she went to see, she was

4    only at the school for less than a year, about eight months.

5    She went to see him twice in that time.  And one time was for

6    a gynecological exam.  And you'll hear from Mr. Gayle she

7    never complained about missing her periods.

8           Shari Lueken, one of the other plaintiffs, saw

9    Dr. Gayle three times during the time that she was at

10   Mountain Park, once because she had flu and cold symptoms and

11   he prescribed medication for that and another time because

12   she cut her finger and she needed some stitches.  And then

13   she had to go back and get the stitches taken out.

14          So when someone was hurt or someone had a complaint

15   that they needed to see a doctor, they would be taken to the

16   doctor.

17          Now, just like if you have your own children, you

18   wouldn't necessarily run to the doctor on the initial first

19   complaint, you have to see how things are going.  If someone

20   has a headache, you don't run to the doctor.  If someone has

21   a cold, you don't run to the doctor.  So the staff at

22   Mountain Park had what they called medicine call.  Three or

23   four times a day they would have anybody who had a complaint

24   could line up, come and see the staff and say whatever their

25   problem is, I missed my period, or I'm having my period and I

1   want some Midol or something for cramps.  And some of these

2   girls did get that.  And they could give over-the-counter

3   things.  For constipation, they had laxatives.  Sudafed for a

4   cold.  Tylenol for headache or fever.  If someone had a

5   fever, they'd have them lay down.  So they treated these

6   students not unlike someone might treat their own children.

7        And if it was something that needed medical

8   attention and they assessed that, they would take the

9   students to the doctor.

10       They also had a dentist and orthodontist that they

11  could call upon.  And, in fact, Erika Teasley had a

12  toothache.  Turned out she had a cavity.  She was taken to

13  the dentist.  She doesn't think she was taken as quickly as

14  she should have been.  That will be for you to decide.  But

15  according to the staff at Mountain Park, she complained about

16  a headache initially, then she complained about a toothache.

17  It may have been the same thing, but she didn't realize.  And

18  ultimately when they realized she had a toothache, they made

19  an appointment, couldn't get in right away, and they got her

20  to the dentist and he filled her cavity.

21       Now, you heard about Tracey Ozuna says that she was

22  swatted.  And as I explained before, the school did have a

23  policy regarding discipline.  They did not swat and they

24  would not swat her if she did nothing wrong.  The policy,

25  which was a very strict policy and was administered only by

1    the -- for the girls, Betty Wills.  Was that initially if a

2    girl misbehaved or didn't follow the rules or whatever the

3    problem was, they would talk to her.  And you'll hear about

4    that.  If that didn't work, the next step was to take away

5    some privilege, dessert or seconds or movie night or maybe

6    they would have them write lines.  If that didn't work and

7    all else failed, in rare instances, and there was only a very

8    small percentage of the students that were ever swatted,

9    they'd be swatted.  They'd never swat more than five times.

10   And the swatting was not intended to cause unusual pain.  It

11   was to discipline the children just like anyone might

12   discipline their own children.

13        The parents were told about it in advance and knew

14   about that this could happen to their children.  But I'll

15   tell you that the testimony is going to be that Tracey Ozuna

16   was not swatted.  The testimony is going to be that for her

17   to have been swatted, it would have to have been done by

18   Betty Wills, and she will say it wasn't done by Betty Wills.

19   It was not approved by any of these defendants, and they have

20   absolutely no record of this happening.  And there would have

21   been a record made, that was the absolute rule.

22        The other thing they're going to find out is that

23   Tracey Ozuna was at the school twice.  She was there starting

24   in December of 1995 until April of '96, and then she went

25   home and she was brought back by her parents in May of '97.

1    She was there until June '97.  She said she was swatted the

2    first time she was there and that she went home and told her

3    parents about it.  And they brought her back to the school.

4    Not only did they bring her back, but they brought her sister

5    back, Jessica, who is also suing.  And after Tracey left the

6    school, she kept in touch with the Gerhardts and the Wills

7    and she wrote them letters.  She called them to let them know

8    how she was doing.  That will be the testimony.

9         What I want you to listen for when you hear the

10   testimony, the background I gave you about the school and

11   the -- what the purpose of this ministry was and what their

12   thought process was as far as taking care of these kids and

13   being concerned about their lives, when you hear the

14   testimony both from the plaintiffs and the defendants, keep

15   in the back of your mind, and you'll hear from them, they'll

16   explain to you, not just me, but they'll explain to you what

17   their thought process was and how they ran the ministry and

18   how much concern they had for these teenagers.

19        When you listen to the testimony, keep in mind what

20   the purpose of this ministry was and what these people were

21   trying to do when they were living there and working there 24

22   hours a day.  Keep in mind and think about the evidence in

23   that context.  And when we're done I'm going to ask that you

24   find a verdict in favor of my clients.  Thank you.

25        THE COURT:  You want to call your first witness,

1    Mr. Stilley?

2         MR. STILLEY:  Yes.  Jessica Deboi.

3                   JESSICA DEBOI,

4    Having been first duly sworn, was examined and testified as

5    follows:

6                   DIRECT EXAMINATION

7    BY MR. STILLEY:

8    Q.   Please state your name.

9    A.   Jessica Deboi.

10   Q.   And how do you spell your last name?

11   A.   D-e-b-o-i.

12   Q.   Where do you live?

13   A.   In Nampa, Idaho.

14   Q.   How long have you lived there?

15   A.   About seven to eight years.

16   Q.   And where did you live before there?

17   A.   In Oakhurst, California.

18   Q.   And how long did you live there?

19   A.   From about the age of seven until the age of 16 when I

20   was sent to Mountain Park.

21   Q.   Can you tell the jury about how that you were raised?

22   A.   I was raised by a two-parent home.  Both my parents

23   were married.  Can you elaborate or narrow that question

24   down?

25   Q.   That's a good answer to the question.  How old are you

1    right now?

2    A.    I'm 24.

3    Q.    And where do you work?

4    A.    I work for the Department of Health and Welfare and

5    Child Protection.

6    Q.    And what is your job description?

7    A.    I'm a licensed social worker, and I work with troubled

8    youth or difficult youth that have mental health issues,

9    substance abuse issues, and I work with those youth who are

10   in foster care as well as their families towards long-term

11   permanency outcomes.

12   Q.    And what is your education?

13   A.    I have a bachelor's degree in social work.  I am in a

14   master's of social work program currently.  And I'm currently

15   licensed for the State of Idaho.

16   Q.    Where did you get your bachelor's?

17   A.    At Northwest Nazarene University.

18   Q.    And when did you get that?

19   A.    In the summer of 2003.

20   Q.    Now, as part of your work do you do considerable

21   testifying in court?

22   A.    Yes, I testify in child protection proceeding cases.

23   Q.    About how often do you do that?

24   A.    I prepare court reports and am involved in court

25   related hearings probably an average of, over a period of one

1   year at least an average of one time per week.

2   Q.    Are you married?

3   A.    Yes, I am.

4   Q.    Any children?

5   A.    No.

6   Q.    How long have you been married?

7   A.    About four years.  My husband and I have been in a

8   committed relationship for about seven years.

9   Q.    And do you have any siblings?

10  A.    Yes, I do.

11  Q.    How many?

12  A.    Two sisters and one brother.

13  Q.    What are their ages?

14  A.    My sister Tracey is 22, and my sister Michele is 27.

15  Q.    How did you find out you were going to Mountain Park

16  Boarding Academy?

17  A.    My parents informed me that the Wills and the Gerhardts

18  had been --

19            MR. SCHWARTZ:  Objection, Your Honor, hearsay.

20            MR. STILLEY:  Your Honor, this is not to prove the

21  truth of the matter asserted, this is just to prove, to show

22  how she was sent to Mountain Park.

23            THE COURT:  Go ahead.  Let's keep that to a minimum.

24  BY MR. STILLEY:

25  Q.    You can go ahead and answer.

1  A.    My parents had informed me that the Wills and Gerhardts

2  had been advising them to send me to Mountain Park for quite

3  some time.

4  Q.    Was there any particular disobedience that precipitated

5  that action?

6  A.    After my older sister was sent to Mountain Park and

7  Mountain Park staff began influencing my parents as far as

8  parenting decisions went, things at home did become very

9  intense and was difficult, so I did have some behaviors.  Can

10  you repeat that question?

11  Q.    Let me ask you another question.  Were you having

12  difficulty with your grades at school?

13  A.    No, I was not.

14  Q.    What kind of grades did you get at that time?

15  A.    Honor roll.

16  Q.    And did you have a reasonably good relationship with

17  your parents?

18  A.    My relationship with my parents was reasonably good up

19  until the point my older sister was sent to Mountain Park and

20  the staff began influencing my parents.

21  Q.    Now, how many times did you go to Mountain Park?

22  A.    One time.

23  Q.    And can you tell us the dates?

24  A.    I was sent after Easter in '97 and was released during

25  a visit in the end of December of '97.

1    Q.    How did you get to Mountain Park?

2    A.    I was transported by some escorts that presented as

3    some type of law enforcement personnel.

4    Q.    Okay.  And what do you remember about the trip?

5    A.    I remember being transported in a vehicle with a male

6    and a female, one by the name of John Kunkel.

7              MR. SCHWARTZ:  Your Honor, this is outside the scope

8    of the case.  It has nothing to do with Mountain Park.

9              THE COURT:  Sustained.

10             MR. STILLEY:  Judge, may I approach on that?

11             THE COURT:  No.

12   BY MR. STILLEY:

13   Q.    Do you remember arriving at Mountain Park?

14   A.    No, I do not.

15   Q.    How much time -- were you conscious when you arrived?

16   A.    No, I was not.

17   Q.    How much time was missing from your memory?

18   A.    A minimum of 20 hours.

19   Q.    What was the first -- what was the last thing that you

20   were conscious of?

21   A.    I remember stopping to get something to eat at a fast

22   food restaurant, and the two people escorting me went in to

23   get the food.  It was daytime.  That's the last thing I

24   remember till I arrived at Mountain Park.

25   Q.    Did you consume the food?

1    A.    Yes, I did.

2    Q.    When did you regain consciousness?

3    A.    When I was in the bathroom at Mountain Park and I was

4    being told to strip off my clothing and take a shower and was

5    given some type of lice treatment and worm medication.

6    Q.    And what was the approximate time of day when you

7    regained consciousness?

8    A.    It was nighttime.

9    Q.    Do you know what time of the night?

10   A.    It was the middle of the night.  Everybody was sleeping

11   in the dorm.

12   Q.    Did you have a method of knowing what day it was?

13   A.    No, I did not.

14   Q.    Is it possible that you woke up the same night that you

15   lost consciousness?

16         MR. SCHWARTZ:  I object.

17         THE COURT:  We've gone far enough with this.

18   Sustained.  Let's move on.

19   BY MR. STILLEY:

20   Q.    And who was with you when you regained consciousness?

21   A.    Debbie Gerhardt, Kim Watson, and it was at least one

22   other person present, but I don't remember who that was.

23   Q.    Did you put up any resistance?

24   A.    I was totally out of it.  All I could do was what I was

25   told to.

1   Q.    And how long did that sensation last?

2   A.    It was more intense when I first arrived, but it was on

3   some level I felt that way the entire time that I was at

4   Mountain Park.

5   Q.    Before Mountain Park did you have a good memory?

6   A.    Yes.

7   Q.    Did you -- were you able to perceive things well?

8   A.    Yes.

9   Q.    After you arrived at Mountain Park were you able to

10  remember things there?

11  A.    Can you rephrase that question?

12  Q.    Was there any difference in your ability to remember

13  things from -- before Mountain Park as compared to during

14  your time at Mountain Park?

15        MR. SCHWARTZ:  Your Honor, I object to the relevance

16  of this.  I believe it's --

17        THE COURT:  Fine.  Relevance, Mr. Stilley?

18        MR. STILLEY:  What?

19        THE COURT:  Relevance?

20        MR. STILLEY:  Your Honor, I want to, I'm just fixin'

21  to move on into her mental state during her time at Mountain

22  Park.  And I'm just going over the various elements of that

23  and the various ability to --

24        THE COURT:  Fine.  Move on then.

25        MR. STILLEY:  I'll move quickly.

1  BY MR. STILLEY:

2  Q.    Okay.  Did you feel alert and -- did you feel alert

3  while you were at Mountain Park?

4  A.    No, I did not, I felt like a zombie, and I felt like I

5  was under the influence of some type of drug.

6         MR. SCHWARTZ:  Your Honor, I object.  This is the

7  area that I think you already excluded.

8         MR. STILLEY:  Well, I'm through now.  Let me go on

9  to this next one.

10        THE COURT:  Sustained.  The jury will disregard the

11  last statement of the witness.  Go ahead.

12        MR. STILLEY:  Your Honor, can I make a little

13  argument on that?

14        THE COURT:  No, we've been talking up here all

15  morning.  Enough talking.

16  BY MR. STILLEY:

17  Q.    Were you allowed to get enough sleep while you were at

18  Mountain Park?

19  A.    Was I allowed to go to sleep?

20  Q.    Were you allowed to get enough sleep?

21  A.    No, I was not.

22  Q.    How much sleep did you normally get?

23  A.    An average of probably five to seven hours of sleep a

24  night.

25  Q.    And before Mountain Park how much sleep did you get?

1    A.    An average of at least eight or nine hours of sleep a

2    night.

3    Q.    And did the eight or nine hours provide you sufficient

4    rest to function properly?

5    A.    Yes, it did.

6    Q.    Did you complain to anybody at Mountain Park that you

7    were not being allowed to get enough sleep?

8    A.    I don't remember.

9    Q.    Did you try to get more sleep?

10   A.    It wasn't allowed.

11   Q.    How were you prevented from getting more sleep?

12   A.    We had a very rigid schedule that required a certain

13   time that we got up every day, and the time we went to bed

14   varied.   And when I became an orientation guide, the sleep

15   decreased because I was put on night patrol which interrupted

16   at least an hour and a half to two hours of sleep per night.

17   Q.    Did you ever get -- did you ever get a cold or the flu

18   while you were at Mountain Park?

19   A.    Yes.

20   Q.    Were you allowed to get additional sleep during that

21   period of time?

22   A.    No.

23   Q.    Did you ask?

24   A.    Yes.

25   Q.    Who did you ask, do you remember?

1    A.    I know I probably asked my orientation guide, but I

2    can't remember specifically who I asked at that time.

3    Q.    Now, can you explain to the jury what an orientation

4    guide is and what they do?

5    A.    An orientation guide is, it's kind of like a level

6    system in a way.  You came in as a new student.

7         MR. SCHWARTZ:  I'm sorry, I can't hear her.  Could

8    you speak a little louder, please.

9         THE WITNESS:  I apologize.  I have a cold so my

10   voice is struggling a little bit.

11        MR. SCHWARTZ:  Maybe she could use some water.

12   Would water help?

13        THE WITNESS:  That would be great.

14   BY MR. STILLEY:

15   Q.    Okay.  Now, if you don't mind, just remember to try to

16   speak into the microphone so that your voice will carry

17   better and explain to the jury about what an orientation

18   guide is.

19   A.    An orientation guide is a position that is a youth who

20   is at the facility can elevate to where they are allowed more

21   privileges.  As an orientation guide I was required to be

22   within an arm's distance of a newer student at all times.  I

23   could tell that new student when they could go to the

24   bathroom, whether or not they could sleep with a pillow.  I

25   basically was there to enforce the policies and regulations

```
 1   that were instilled by the Wills and the Gerhardts in the

 2   program.

 3   Q.    How did you know that it was the Wills and the

 4   Gerhardts who told other orientation guides what to do?

 5              MR. SCHWARTZ:  Your Honor, I object to the hearsay.

 6              MR. STILLEY:  I'm asking the basis of her knowledge

 7   what she just testified to.

 8              THE COURT:  Sustained.

 9   BY MR. STILLEY:

10   Q.    So if you asked the orientation guide for more sleep

11   when you were sick and you were denied, what other remedies

12   did you have at Mountain Park?

13   A.    None that I can think of.

14   Q.    What if you just walked away from your orientation

15   guide and went to talk to the Wills?

16   A.    I would be severely punished if I'd done that.

17   Q.    You would have been punished if you'd done that?

18   A.    Without the orientation guide's approval.

19   Q.    And how did you know that?

20   A.    My orientation guide, and the regular standard or

21   practice at the facility.

22   Q.    Did anybody else tell you that?

23              MR. SCHWARTZ:  Object to the hearsay, Your Honor.

24              THE COURT:  Sustained.

25              MR. STILLEY:  Your Honor, I would make the argument
```

1    this is not for the truth of the matter asserted, it's for

2    showing the impact upon the hearer that she thought that that

3    was a rule she had to comply with.

4         THE COURT:  I understand, but the way you asked the

5    question, did somebody else tell you this.  I mean, you're

6    just opening the hearsay -- you need to rephrase that or

7    something.  But no, same ruling.

8    BY MR. STILLEY:

9    Q.   Was there any doubt in your mind that leaving your

10   orientation guide and going to somebody else to ask for help

11   would result in severe punishment?

12   A.   I have no doubt that I would have been punished if I

13   had done that.

14   Q.   Do you know what kind of punishments were available at

15   Mountain Park?

16        MR. SCHWARTZ:  Your Honor, it lacks foundation.  He

17   hasn't laid a foundation as to the basis of her knowledge.

18        THE COURT:  Go ahead.  Overruled.

19   A.   Can you repeat the question?

20        THE COURT:   Levels of punishment.

21   A.   What were the punishment?

22   Q.   Yes.

23   A.   I could be put on what was called silence, which I was

24   not allowed to speak to anybody at all.  On orientation we

25   could only speak to people designated as persons that staff

```
 1    allowed us to speak to.  I could be given the swats, which
 2    would be somebody -- some of the students or staff holding
 3    that particular person down and repeatedly hitting them with
 4    some type of paddle.  I could be -- one time I had to watch
 5    one of my new students take a shower as one of her
 6    punishments.  So there was public humiliation with that.
 7    There was severe public humiliation regularly practiced.
 8    Sorry.
 9    Q.    Let me ask you, let me help you out here.  Let me ask
10    you about the shower.  Do you know what the temperature of
11    the water would be for that shower?
12    A.    I'm not sure.
13          MR. SCHWARTZ:  Your Honor, I object.  This is
14    irrelevant.  It's not part of the lawsuit.
15          MR. STILLEY:  I'm just trying to establish what kind
16    of punishment it is.
17          THE COURT:  You established what kind of punishment.
18    Now, did she receive some of this?  Let's get on with it.  I
19    gave you the opportunity to paint this broad picture, now
20    let's jump on in this picture and see what happens with this
21    witness.
22          MR. STILLEY:  Can I --
23          THE COURT:  No.  How do you -- please.  Are you
24    talking about a shower she had or are you just talking in
25    general?
```

1          MR. STILLEY:  I'm talking about the threat of the

2    punishment to her.

3          THE COURT:  Please.  No.  Sustained.  How is she

4    going to know the temperature of every time somebody was in

5    the shower?  Please.  She wasn't there with a thermometer.

6    Sustained.  Move on.

7          MR. STILLEY:  Your Honor, what I'm trying to do --

8          THE COURT:  I know what you're trying to do, but

9    you're not doing it right.  So please.  He's objected.  He's

10    got you, so that's that.  He got you -- he's got a hold on

11    you.  You got to break the hold.  You got to figure out

12    another question or something.  But that one isn't flying.

13    Sustained.

14          MR. STILLEY:  Am I prohibited from going anywhere

15    around that question?

16          THE COURT:  Listen, I let you go with the general

17    idea of the types of punishment.  Now it would seem that you

18    would talk to this witness about the punishment that she got,

19    that she can tell us about personally, okay.  Because that's

20    what it's about.  She is a plaintiff in this case, what

21    happened to her.

22          MR. STILLEY:  Well, I do believe -- I don't think

23    that The Court has ruled out assault, and assault would

24    include a threat that she would be punished in a certain way.

25    Now, I can ask the question a different way.  I don't want to

 1   get in trouble for it.

 2          THE COURT:  I'm sustaining that last one about the

 3   temperature of the water of the showers.  That's sustained.

 4          MR. STILLEY:  Okay.  And I -- you know, I will --

 5          THE COURT:  Fine.  That's sustained.  Move on.  I'm

 6   not here to argue with you about this.

 7          MR. STILLEY:  Your Honor, I've got another question

 8   that I want to ask that's close to that.  Can I approach?

 9          THE COURT:  No.

10          MR. STILLEY:  Okay.  Is the ruling that I cannot go

11   to anything related to that or can I just ask --

12          THE COURT:  I don't know what you're going to ask.

13   I have no idea what you're going to ask.

14   BY MR. STILLEY:

15   Q.   Do you know which one of the -- with respect to the

16   shower, do you know which one of the faucets would be turned

17   on for that shower or if both would be?

18          MR. SCHWARTZ:  Same objection.  She hasn't testified

19   that she was punished in the shower.

20          MR. STILLEY:  Your Honor --

21          MR. SCHWARTZ:  There's no claim of that.  There's no

22   claim of that.

23          MR. STILLEY:  Your Honor, it's a threat.  And as far

24   as I can tell, assault is still alive.

25          THE COURT:  You know, it would seem that maybe this

1    would have been covered in the first instance when you asked

2    what the punishments were.  So was the punishment a cold

3    shower, a hot shower?  Please, come on.  You want to get to

4    how far was the dial turned.  She wasn't there every time.

5    Come on.  You're just painting a general picture right now,

6    and I'm giving you the leeway to do it, but you're trying to

7    get too specific about things when she was not there.

8    BY MR. STILLEY:

9    Q.    Okay.  Can you think of any other punishment that you

10   had been informed that might befall you if you tried to go

11   get some medicines or medical assistance without your

12   orientation guide's permission?

13          MR. SCHWARTZ:  Your Honor, I'm going to object to

14   lack of foundation and hearsay.  It's not tied to anything

15   alleged that my clients did.

16          THE COURT:  You can cross-examine.  I'll give him

17   some leeway here.  Go ahead.

18   A.    Some of the punishment could include some of the public

19   humiliation tactics that I referred to.  For example, if I

20   had gone and asked for -- when I went and asked for

21   medication, if I had overstepped my orientation guide's

22   authority, I would be publicly humiliated for that in front

23   of the other girls, which those voices don't -- after eight

24   years they really won't go away.

25          Some of the girls would have to wear binkies around

```
 1    their neck and carry and sit on stools because they are
 2    babies.  The crying, like I am right now -- I'm sorry, I
 3    didn't realize this was going to be so emotional.
 4    Q.    As you sit here today do you have knowledge of a set of
 5    written rules at Mountain Park?
 6    A.    Yes, I did.  Did I have knowledge that there were
 7    rules, is that the question?
 8    Q.    Do you have knowledge as you sit here today of written
 9    rules?
10    A.    I never saw written rules.
11    Q.    Since you've been out of Mountain Park have you seen
12    written rules?
13    A.    I observed that there was a Parent/Student Handbook,
14    but I was never given that while I was there.
15    Q.    Were you ever told of the existence of a written
16    Parent/Student Handbook while you were at Mountain Park?
17    A.    No, I was not.
18    Q.    How did you -- how did you come to have knowledge of
19    any rules that you had to obey there?
20    A.    I was under the complete control of my orientation
21    guide and the staff.  Whatever they said couldn't be
22    questioned, and we had to submit to.
23    Q.    Were you ever -- were you ever personally ordered to
24    discipline another student?
25            MR. SCHWARTZ:  Your Honor, I object.
```

1    MR. STILLEY:  We're talking about her.

2    MR. SCHWARTZ:  Well, this has already been excluded

3  by The Court about other students that aren't defendants in

4  the case.  You've already excluded that, students that are

5  not plaintiffs in this case.  You've already excluded that.

6    (The following proceedings were held at the bench

7  and outside the hearing of the jury:)

8    THE COURT:  It seems that we're talking about

9  emotional distress.  Where are we going with this stuff?

10    MR. STILLEY:  I'm just trying to show what happened,

11  what went on.  I'm just trying to show what happened.

12    THE COURT:  I know it's a lot of stuff happening,

13  I'm glad I wasn't there, you know, what you're talking about.

14  But you just can't -- you're like throwing everything out and

15  if anything sticks, that seems to be your approach.  I don't

16  know where you're going.  You have to have some kind of claim

17  that this is relevant to.

18    MR. STILLEY:  My understanding was that the ruling

19  was we could not put on evidence of a traumatic incident that

20  did not involve one of the plaintiffs.  And if one of the

21  plaintiffs was involved in having to impose the discipline,

22  then they are involved.  That's my understanding what the

23  ruling is.  Now, I surely don't want the ruling --

24    THE COURT:  She says -- okay, she's going to testify

25  she's instructed to impose discipline.  Is it on one of these

1    other plaintiffs?

2         MR. STILLEY:  I'm not actually positive what she's

3    going to testify to.  Shame on me, Judge.  Isn't that

4    terrible.  Doesn't that violate the first rule of doing a

5    good job.

6         THE COURT:  You figured you don't need to know

7    because whatever she is going to say when she up here and

8    crying and carrying on is bad, whatever it is it's going to

9    work for you.

10        But all I'm saying is we got negligence and we got

11   battery.  How does her imposing discipline on another student

12   have anything to do with those things?

13        MR. STILLEY:  Let's clear up this first thing before

14   we go on.  Do we not have assault?  You didn't throw out

15   assault.  I think we still have assault.

16        THE COURT:  Well, somewhat.  I don't think there is

17   a real assault situation.  In the state law it's consumed in

18   the battery situation.

19        MR. STILLEY:  Well, now, Your Honor, can I brief you

20   on that because that's just not so.  I've got case law

21   straight on point.  Let's just go ahead with it.

22        THE COURT:  It doesn't make any difference.  I said

23   it's consumed in there, so your assault is there.

24        MR. STILLEY:  She doesn't have a battery, though, to

25   hang it on.

1           MR. SCHWARTZ:  First of all, Judge --

2           THE COURT:  That's what I'm saying, what's the

3    relevance of this?  I don't know what it's relevant to.

4           MR. STILLEY:  Well, they are going to say that they

5    don't -- their own contract says they don't allow students to

6    discipline other students.  What I'm trying to prove is that

7    they do.  And that here -- wait a minute, and that students

8    have to give credence to the possibility that their

9    orientation guide or some other orientation guide is going to

10   dog paddle them and tear them limb from limb.  That's why

11   they don't just walk off and get some drugs when they need

12   it.  That's why they just don't stay in bed when their nose

13   is blocked up and they are about to fall over, because the

14   alternative is worse.  And I have to show that in order to

15   show the elements --

16           THE COURT:  Mr. Schwartz.

17           MR. SCHWARTZ:  It's pretty farfetched, Judge.  He's

18   talking about -- he doesn't know what she's going to say,

19   but, first of all, there's nothing to indicate any of my

20   clients told her to discipline another student.  No. 1, he

21   hasn't laid that foundation.

22           No. 2, you've already excluded from evidence in the

23   motion in limine any claims about the things that were done

24   to other students.  So that's already been excluded.

25           And, No. 3, this whole thing he's trying to tie it

1     back to why she couldn't go get more aspirin and Sudafed or

2     whatever, and he hasn't established that she needed any.  How

3     is it relevant?  And it's got -- she said I thought I could

4     be punished.  Okay.  What does it have to do with what was

5     done to somebody else?  What she was told by maybe somebody

6     else, I don't know what she's going to say, but I presume

7     that some other student or some other person or some other

8     defendant told her to discipline.  It's way too far remote.

9          THE COURT:  And I guess what you're trying to get is

10    an example of the punishment that can be administered.

11         MR. STILLEY:  Right.

12         THE COURT:  And other students may administer at the

13    behest of who?

14         MR. STILLEY:  I think she's already testified that

15    it's Bob Wills and Betty Wills and Debbie and Sam Gerhardt.

16         THE COURT:  Well, no.  She has just been talking

17    about the orientation guides, what they would do.  My

18    impression is since you don't know what she is about to say,

19    the orientation guide had her discipline somebody else.  Now,

20    if she's going to say the Gerhardts, you know, or the Wills

21    directed her to administer something to somebody then, you

22    know, maybe.

23         MR. SCHWARTZ:  Judge, this hasn't been pled, it

24    hasn't been disclosed, and I don't see how it's negligent.

25    All she has is a negligence claim.

1        THE COURT:  You're talking about the general threat

2   of why she was afraid to leave or doing anything is she could

3   be punished?

4        MR. STILLEY:  Right.

5        THE COURT:  We'll leave it at that.  She can answer

6   this question yes or no, and then we're not going into any

7   specifics.  Did she answer it already?

8        MR. SCHWARTZ:  I don't think so.

9        MR. STILLEY:  No, I don't think she's answered that

10  question yet.

11       THE COURT:  Whether or not she was instructed to

12  administer punishment.  Whatever her answer is then that's

13  the end of it, okay.  We're not going into any specifics.

14       MR. STILLEY:  The only question I ask is whether or

15  not she was ordered to administer punishment?

16       THE COURT:  Yeah.

17       MR. SCHWARTZ:  I still have an objection because,

18  again, ordered by who?  It's not my client.

19       THE COURT:  He has said he doesn't know what she's

20  going to say, so that's the end of it.

21       MR. SCHWARTZ:  Things happen at schools between

22  students all the time.

23       THE COURT:  I know.  I'm stopping right there.

24  That's it.  That's all you get, okay.

25            (The following proceedings continued within the

1    hearing of the jury:)

2    BY MR. STILLEY:

3    Q.    Was there any doubt in your mind that disobeying an

4    orientation guide's order was likely to bring punishment?

5    A.    Was there any doubt in my mind --

6    Q.    Correct.

7    A.    -- that there would be punishment if I disobeyed my

8    orientation guide?

9    Q.    Correct.

10   A.    I had no doubt in my mind.

11   Q.    Now, you told us about times that you were sick; is

12   that correct?

13   A.    Yes.

14   Q.    Did you -- and what kind of illnesses did you have?

15   A.    Sinus and ear problems like I have right now, flu-like

16   symptoms.  I lost my period.  I became severely constipated

17   when I got there.  I had vaginal irritation.  I'm having a

18   hard time thinking of anything else right now currently.

19   Q.    Let's talk about the sinus or cold type problem.  Did

20   you ask anybody for medication?

21   A.    I'm sure I probably asked my orientation guide.  Yeah,

22   actually I do remember, I asked my parents during the phone

23   call.

24   Q.    Do you remember what you asked for?

25   A.    Usually I take Sudafed for my ears for congestion.

1    Q.    Do you remember if that's what you asked for?

2    A.    I don't remember specifically, it's been a long time.

3    Q.    Did you get any medication?

4    A.    No, I did not.

5    Q.    Do you remember about how many times you asked?

6    A.    I can't remember how many times.  I know that it was

7    made clear to me that we weren't allowed to have

8    over-the-counter medications while I was at Mountain Park

9    such as Sudafed or some type of cold medication.

10   Q.    Did this sinus type illness happen once or did it

11   happen several times?

12   A.    It was a chronic problem since I can remember.  So

13   periodically, I know it happened a handful of times that I

14   had those symptoms.

15   Q.    And do you recall if you asked each time for medicine?

16   A.    I don't remember if I asked every time because it was

17   made clear to me at the beginning of my stay there that those

18   medications weren't going to be given to me.

19   Q.    Were you -- well, let's ask about the other things,

20   about constipation, did you complain about that?

21   A.    Yes, I did.

22   Q.    Do you remember who you complained to?

23   A.    My orientation guide.  I ended up being at one point in

24   time given prunes and prune juice, which was something we had

25   to get permission directly from Betty Wills or Debbie

```
 1    Gerhardt to be able to have.
 2    Q.    Did you get those each time you asked?
 3    A.    I didn't -- initially I did not, I was not given
 4    anything for constipation.
 5    Q.    About how long did you have to wait before you got that
 6    assistance?
 7    A.    I don't remember because things were foggy.  I felt
 8    drugged, so I -- time periods like that are hard for me to
 9    remember.
10    Q.    Did you ever have that foggy feeling before you were at
11    Mountain Park?
12    A.    No, I did not.
13    Q.    How about after Mountain Park?
14    A.    No, I did not.
15    Q.    How long did it take after Mountain Park before you
16    began feeling the way you feel now?
17    A.    Probably about a month.
18    Q.    You said something about changes in menstrual periods.
19    Can you -- I know this is a little bit embarrassing, but can
20    you explain to the jury what happened to your menstrual
21    periods after you got to Mountain Park?
22    A.    My menstrual period stopped for about a period of six
23    months during my stay there.  And it came back the last
24    couple months, but it was really light, which was not normal
25    for my periods.  I have a very regular menstrual cycle.
```

```
 1    Q.     Have you ever had that problem before Mountain Park?

 2    A.     No, I had not.

 3    Q.     Have you ever had that problem after Mountain Park?

 4    A.     No, I have not.

 5    Q.     While you were at Mountain Park, how long did it take

 6    before you missed your first period?

 7    A.     I missed my first one.

 8    Q.     Did you say anything to your orientation guide or to

 9    any defendants about this problem?

10    A.     Yes.  I was informed that it was normal for --

11               MR. SCHWARTZ:  Objection, Your Honor, hearsay.

12               MR. STILLEY:  Your Honor, it's not to prove the

13    truth of the matter asserted, it's --

14               THE COURT:  Well, I don't know what it's for.

15    Sustained.

16    BY MR. STILLEY:

17    Q.     About how many times did you bring this to the

18    attention of the defendants?

19    A.     I can't remember the number of times, but I do remember

20    Debbie Gerhardt informing us that it was normal for girls to

21    not have periods while they were at Mountain Park.

22    Q.     And do you remember the circumstances of this

23    statement?

24    A.     I remember that it was -- we were told that it was

25    because of the stress of being at Mountain Park.  And my
```

1     parents were informed the same information.

2     Q.     And who was the speaker at that time?  Was that Debbie

3     Gerhardt?

4     A.     Debbie Gerhardt.

5     Q.     Were you ever taken to a doctor for the condition?

6     A.     For the loss of my menstrual cycles?

7     Q.     Correct.

8     A.     Not specifically for that, no.

9     Q.     Were you taken for some purpose?

10    A.     I was taken to the doctor one time for vaginal

11    irritation that came unexpectedly while I was there, which I

12    had no history of ever having any history of vaginal

13    irritation like that prior to my stay at Mountain Park.

14    Q.     Do you recall if you had the occasion to tell the

15    doctor about your missed periods?

16    A.     I was not the one to be allowed to communicate with the

17    doctor back and forth that I can remember.  I remember he did

18    the exam and left the room.  And I wasn't told -- I was told

19    by the staff what the outcome was, not by the actual doctor.

20    Q.     Now, who was the doctor?

21    A.     I don't remember.

22    Q.     How did you get to his office?

23    A.     I was driven in one of the staff's cars.

24    Q.     Did you go in the front door of the office?

25    A.     No, we were taken -- I was taken in the back door.

1   Q.    And do you remember who it was that drove you to the

2   office?

3   A.    I know Kim Watson and Melissa Edwards were there.  And

4   there was at least one other person, but I can't remember who

5   it was.

6   Q.    Did you see any sign on the door about what doctors

7   were at that clinic?

8   A.    I don't remember.  I was -- I don't remember.

9   Q.    When you left, did you go out the front door or the

10  back door?

11  A.    The back door.

12  Q.    Did you ever see the front of the building?

13  A.    I don't remember.

14  Q.    If you saw the doctor today, do you think you'd be able

15  to recognize him?

16  A.    I don't know.  I was --

17  Q.    Excuse me?

18  A.    Like I said, I was pretty -- felt pretty out of it,

19  pretty drugged while I was there.

20  Q.    About how long did you see the doctor?

21  A.    It was pretty brief.

22  Q.    Did you try to talk to the doctor?

23  A.    I don't remember.

24  Q.    Were you ever made fun of because your periods had

25  ceased?

1          MR. SCHWARTZ:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. STILLEY:

4    Q.    What was your general state of health immediately

5    before Mountain Park?

6    A.    Prior to Mountain Park I was pretty athletic.  I

7    participated regularly in sports through high school.  I had

8    some sinus and allergy problems.  I did not have any mental

9    health issues.  No significant medical issues that I can

10   think of prior to my stay at Mountain Park.

11   Q.    And after Mountain Park what -- how do you describe

12   your general state of health, physical health?

13   A.    I have panic attacks which puts my fight or flight

14   response specifically --

15          MR. SCHWARTZ:  Excuse me, Your Honor, I object.

16          THE COURT:  Hold on.

17          MR. STILLEY:  Your Honor, I'm just trying to show

18   the state of health before, during, and after Mountain Park.

19          THE COURT:  Okay.  But I don't know that you need to

20   go into all this detail that you're doing.  And you're going

21   into the state of her health after Mountain Park, correct?

22   After?  You're going into the state of her health after now?

23          MR. STILLEY:  Yes, that's correct.

24          MR. SCHWARTZ:  Your Honor, this has already been

25   stricken from the case, it's already been excluded.

1            MR. STILLEY:  No, Judge, that's not so.  In your

2    opinion you said that --

3            (The following proceedings were held at the bench

4    and outside the hearing of the jury:)

5            THE COURT:  Okay.  Now you're asking her about what

6    condition?

7            MR. STILLEY:  About her -- what I intended to do was

8    ask her about her general physical condition before, during,

9    and after Mountain Park.

10           THE COURT:  I'm there.  I'm past that.  And so

11   you're asking about what specifically?  You're asking about

12   some special disease or condition?  What are you asking?

13           MR. SCHWARTZ:  She started talking about panic

14   attacks.  That's what she started to talk about.

15           MR. STILLEY:  Well, that's the next place I'm going,

16   what was your mental functioning before Mountain Park, during

17   Mountain Park, and after Mountain Park.  You ruled in your

18   order that that was perfectly acceptable.  I mean, you said

19   that was something the jury is going to have to decide.  You

20   might not think that it's the most strong, but the jury is

21   going to have to decide if that's enough.

22           MR. SCHWARTZ:  Judge, the intentional infliction of

23   emotional distress claim was stricken because they don't have

24   a medical doctor.  They still don't have a medical doctor.

25   They can't have these ladies testify that they have panic

1    attacks now that results from what happened to them at

2    Mountain Park.  They need a doctor to do that.  And if you

3    let the witnesses just say it, it's highly prejudicial

4    because it's not anything they can link up medically, which

5    they need to do.  Again, he's trying to get into the back

6    door what he can't get in through the front.

7         MR. STILLEY:  It's negligence.  It's damages caused

8    by these individual's conduct.  It's damages.  And even if

9    you had a doctor, you'd still put on evidence.  I mean, in

10   the Stacy Keller case we put on evidence from the witness

11   about her mental state, her mental functioning before and

12   after.  I don't think you can find a case anywhere that says

13   a witness themselves can't testify to that.  Other people

14   can't.

15        THE COURT:  Generally we got to have somebody

16   connect it up to the negligence or the battery situation.

17   Her only claim, I believe, is a negligence claim.  And so

18   what is there to connect this up with negligence other than

19   her saying after she left the school where she had these and

20   maybe she -- I don't know.

21        MR. STILLEY:  I can connect it up really good,

22   really good.

23        MR. SCHWARTZ:  You know, I have nightmares about

24   when I went to school too.  I'm not trying to be funny or

25   belittle it, but the fact is she could be unhappy about being

1    there for reasons unrelated to any negligent act.  They need

2    to have a doctor link that up.  And just to allow her to

3    testify that I didn't like the place, and I did not want my

4    parents to send me there, and now I have panic attacks about

5    the fact that I got sent there, it's all pure speculation.

6         THE COURT:  Okay.  You say you're going to link it

7    up.  What does she have panic attacks about, Mr. Stilley?

8         MR. STILLEY:  Well, most of the things she has is

9    she has recurrent nightmares.

10        THE COURT:  About what?

11        MR. STILLEY:  About being at Mountain Park and being

12   cornered and being trapped and being raped.  This is the

13   injury.  This is what she suffered.  This is her only day in

14   court, unless we get a remand, but we want to try this once,

15   right?  This is her only day in court.  This is the only

16   time --

17        THE COURT:  This whole rape thing, you've gone kind

18   of far with that.

19        MR. STILLEY:  Wait a minute.  This individual told

20   me that this was the fact.

21        THE COURT:  I'm not saying that is not a fact.

22        MR. STILLEY:  She had -- before Mountain Park there

23   was no problem.  After Mountain Park there was.  There's

24   nobody else to cause the problem.  Nobody else.  They have --

25        THE COURT:  I don't know that --

1          MR. STILLEY:  Is there a possibility that she just

2     did it to herself?

3          THE COURT:  I don't want to argue with you about

4     this thing.  But it's relatively strong in terms of her --

5     now she has panic attacks since she left there.  And as about

6     being cornered and raped when there is not evidence of a rape

7     in the case, she's cornered and attacked, damages of being

8     paddled or some other punishment that was threatened of her

9     or --

10          MR. SCHWARTZ:  I think this is the Bass versus

11     Nooney problem, this is the very problem that Bass versus

12     Nooney is all about, you can't let somebody just come in and

13     say I have nightmares and I feel bad, I have panic attacks,

14     because it's not a medically diagnosable injury, it doesn't

15     matter if it's negligence or intentional, you still need a

16     medical doctor.  And if you let her say it then the cat's

17     already out of the bag.  And what are we supposed -- we can't

18     put it back.  And he can't prove it.  He can't get to the

19     jury on that theory because he doesn't have the medical

20     doctor, so why should he be allowed to put the evidence in?

21          THE COURT:  I'm sustaining that.

22          MR. STILLEY:  I want to say one more thing.  Can I

23     say this?  The defense is saying that we don't have medically

24     diagnosable, medically significant injury resulting.  We've

25     got that with the missed periods.  That's medically

1    diagnosable.  That's medically significant.  It's not

2    deniable.  It's not a bruise.  It's not a cut.  But there are

3    lots of injuries that are not bruises, that are not cuts.

4    And we need this lady to testify about the injury that

5    happened to her.  It's not just missed periods, it's other

6    things.  Let's do this thing one time.  Let's try this case

7    and --

8            THE COURT:  Fine.  I heard.  But what about that is

9    any different than missing periods the witness has

10   experienced?

11           MR. SCHWARTZ:  Well, Judge, I don't think it's -- I

12   don't think there's any negligence, but she can testify I

13   missed my period.  I don't think there's any medically

14   diagnosable injury from it, but she said I missed my period.

15   You already ruled that can come in in the summary judgment

16   ruling.  But this is part of what you excluded.  This is part

17   of the -- what about the ruling that you made that you need a

18   medically diagnosable injury to have an emotional claim, to

19   have an emotional distress claim, that's the difference.

20           THE COURT:  Are we saying then that basically any of

21   these claims that any of these plaintiffs talk about that are

22   emotionally distress related, you don't bring any to testify

23   about those?

24           MR. SCHWARTZ:  Right.

25           MR. STILLEY:  We've already been down this road and

1    you overruled the objection, strident objection of

2    Mr. Oliver -- please, Judge, you said, no, I didn't, you're

3    mistaken.  And it's in the record.

4              THE COURT:  Well, maybe I got smarter in this case.

5              MR. STILLEY:  Well, no, Judge.  No, that's not the

6    deal.  The deal is that unless she is allowed to testify to

7    the damage that was done to her, people who try to make out

8    I'm the bad guy because the jury figures out there is

9    something else going on.  He's a good cross-examiner.  He's

10   got an expert they can put on the stand and say what they

11   want.

12             THE COURT:  Then we get back into this claim of

13   intentional infliction of emotional distress that is out of

14   this case.

15             MR. SCHWARTZ:  Exactly.

16             MR. STILLEY:  Well, Judge, we had it on the

17   negligence in Stacy Keller's case and it came in and we lost

18   anyway.  Why not just go ahead, let us do that, and based on

19   what they say, we are going to lose anyway.

20             MR. SCHWARTZ:  She didn't see a psychiatrist or

21   psychologist.  There is no witness anyway.  There's not

22   anybody to say, to link it up.  It's pure speculation for her

23   to say I have nightmares because what they did to me at

24   Mountain Park.  Well, you could have nightmares, my kid could

25   have nightmares because they go to school and don't like

1    their teachers.  It doesn't prove negligence.  It doesn't

2    prove a --

3            THE COURT:  Sustained.  We've been over this about

4    no testimony of emotional, psychological nature, okay.

5            MR. SCHWARTZ:  Can we ask the jury to disregard?

6            THE COURT:  Fine.

7            (The following proceedings continued within the

8    hearing of the jury:)

9            THE COURT:  The jury will disregard the last

10   question about the nightmares.

11   BY MR. STILLEY:

12   Q.   Now, did you ask to go to a doctor any other time

13   except the time you were taken to the doctor?

14   A.   Yes.

15   Q.   How many times?

16   A.   I don't remember how many times.

17   Q.   And what was the result of that?

18   A.   That I was not taken.

19   Q.   And do you remember who you asked?

20   A.   My orientation guide.

21   Q.   Did your orientation guide ever give you an opportunity

22   to go to the Wills or the Gerhardts to ask?

23   A.   Not that I can remember.  I was terrified of being

24   publicly humiliated.

25   Q.   Were you -- while you were at Mountain Park were you

1    ever deprived of the privilege of going to the bathroom?

2    A.    Yes.

3    Q.    About how many times?

4    A.    It was probably about daily, the entire time I was on

5    orientation.  I could only go when she wanted to go.

6    Q.    And how much discomfort did that cause you?

7    A.    A lot.  I would go hours without being allowed to use

8    the rest room.  I had a real weak bladder, so --

9    Q.    And did they have exercise that you were forced to do?

10   A.    They had exercise available to me.

11   Q.    Were you denied adequate exercise?

12   A.    Yes.

13   Q.    About how often did that happen?

14   A.    Maybe had an opportunity to do some pretty mild

15   physical exercise maybe an average of one time a week about.

16   Q.    Now, were you allowed to keep a diary or a calendar at

17   Mountain Park?

18   A.    No, I was not.

19   Q.    How did you find out that you were prohibited from

20   having those things?

21   A.    My orientation guide.

22   Q.    Did you ever have an opportunity to ask anybody else if

23   that was really the rule?

24   A.    I don't remember because my sisters had warned me about

25   what the consequences were.

1       MR. SCHWARTZ:  Your Honor, I object to the hearsay.

2       THE COURT:  Sustained.

3   BY MR. STILLEY:

4   Q.    Were you allowed to have a watch?

5   A.    I don't remember having one.

6   Q.    Were you allowed to have contact with other individuals

7   and make friends?

8   A.    No, I was not.  I was not allowed to see or speak with

9   my sister almost the entire time I was there.

10  Q.    And what was the reason that you were sent to Mountain

11  Park?

12  A.    The influence of the Wills and the Gerhardts informing

13  my parents that I needed to be there.

14  Q.    Do you know why your parents thought you were going to

15  be at Mountain Park?

16      MR. SCHWARTZ:  Your Honor, I object, calls for

17  hearsay.

18      THE COURT:  Sustained.

19  BY MR. STILLEY:

20  Q.    Do you know if you were intended to be keeping your

21  sister company at Mountain Park?

22      MR. SCHWARTZ:  Same objection.

23      THE COURT:  Sustained.

24  Q.    Did staff or orientation guides ever mock you or call

25  you hurtful names?

1        MR. SCHWARTZ:  Objection, Your Honor, again, this is

2   not alleged in the case.  It's not anything having to do with

3   my clients.

4        THE COURT:  Sustained.

5   BY MR. STILLEY:

6   Q.    While you were at Mountain Park did you gain weight?

7   A.    Yes, I did.

8   Q.    About how much?

9   A.    About 30 pounds.

10  Q.    Have you ever gained weight before or after Mountain

11  Park?

12  A.    Not that significant of an amount.

13  Q.    After you left Mountain Park what happened to the

14  weight that you gained?

15  A.    I started losing it right away.

16  Q.    And about how long did it take to get back to your

17  normal weight?

18  A.    I probably -- I started losing it immediately.

19  Probably within a few months I had lost about ten pounds

20  maybe at least.

21  Q.    Now, were you hungry while you were at Mountain Park?

22  A.    Yes, I was.

23  Q.    Before and after Mountain Park were you hungry in that

24  sort of fashion?

25  A.    Not in that kind of way in which I could not have any

1    access to food.

2    Q.    While you were at Mountain Park did you have hair loss?

3    A.    Yes, I did.

4    Q.    Can you tell the jury how --

5          MR. SCHWARTZ:  Your Honor, I object to this.  This

6    is not alleged.  It's not part of the case.

7          MR. STILLEY:  Your Honor.

8          MR. SCHWARTZ:  How does it link up to any of the

9    claims in the case?

10         THE COURT:  Sometimes, ladies and gentlemen of the

11   jury, you almost want to say talk to the hand, but I'm

12   bringing them over here and I'll talk to them.  In the

13   meantime it's time for you all to go home.  It's getting old.

14   We're going to start at nine tomorrow.  Is that a problem for

15   anybody?  Okay.

16         Now, you know, the admonition is don't discuss the

17   case until you're in the jury room.  Let me break this down

18   for you right quick.  When you go home your friends and

19   family are going to know you've been down here on jury

20   service, so the first question they will ask you is, "Did you

21   get selected to serve on a case?"  The answer to that is

22   "Yes."  Then the next question they will ask you is, "Well

23   what kind of case is it?"  The answer to that is, "The judge

24   told me not to discuss that with you."

25         Because once you tell them, they are going to start

1   telling you, well, this happened, that happened.  Admonition

2   gone.  You can discuss this case as fully and freely with

3   anyone you choose when it's over, so hopefully by Thursday or

4   late Wednesday.  So that's the way we are.

5          Anybody have a problem going till six tomorrow if we

6   need to?  I'll try to break it up as we go to see where we

7   are.  That will the latest, nine to six.  And we'll have a

8   break for this other matter in the morning and lunch and so

9   forth.

10         So have a pleasant evening.  Recall the admonition

11  and the answer to give these people when they start

12  questioning you, okay.  Have a pleasant evening.

13         (The following proceedings were held outside the

14  hearing of the jury:)

15         THE COURT:  Mr. Schwartz, you say hair loss is not a

16  part of the case relative to Ms. Deboi?

17         MR. SCHWARTZ:  Your Honor, I think that the only

18  thing it could possibly be relevant to, I'm assuming, would

19  be to the claim of surreptitious drugs being given, which

20  you've excluded from the case.  I can't imagine what he is

21  claiming that my clients did wrong that would cause hair

22  loss.

23         THE COURT:  Mr. Stilley.

24         MR. STILLEY:  Your Honor, the defendant said they

25  stressed them too much, that's their theory, so hair loss.

 1            THE COURT:  Fine, okay.  I'm letting it in.  That's

 2      that.  Overruled.  You can ask that tomorrow.  Listen, let's

 3      get this train moving.

 4            MR. STILLEY:  Sure, Judge.

 5            THE COURT:  I'll see you all tomorrow at nine.

 6            (Court in recess at 4:33 p.m.)

```
 1              C E R T I F I C A T E

 2           I, Susan R. Moran, Registered Merit Reporter, in

 3   and for the United States District Court for the Eastern

 4   District of Missouri, do hereby certify that I was present

 5   at and reported in machine shorthand the proceedings in the

 6   above-mentioned court; and that the foregoing transcript is

 7   a true, correct, and complete transcript of my stenographic

 8   notes.

 9           I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12           I further certify that this transcript contains

13   pages 1 - 60 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16           IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this _____ day of

18   _____, 2006.

19

20                      _____

                              /s/ Susan R. Moran
21                            Registered Merit Reporter

22

23

24

25
```