```
 1                    UNITED STATES OF AMERICA
                   EASTERN DISTRICT OF MISSOURI
 2                     SOUTHEASTERN DIVISION

 3   JAMIE KAUFMANN WOODS, et al.,    )
                                      )
 4              Plaintiffs,           )
                                      )
 5        vs.                         )   No. 1:03-CV-105 CAS
                                      )
 6   BOB WILLS, et al.,               )
                                      )
 7              Defendants.           )

 8
                      TRANSCRIPT OF JURY TRIAL
 9
              BEFORE THE HONORABLE CHARLES A. SHAW
10                 UNITED STATES DISTRICT JUDGE

11                     December 13, 2005
                          Volume II
12

13   APPEARANCES:

14   For Plaintiff:       Mr. Oscar Stilley
                          2120 North B Street
15                        Fort Smith, AR   72901

16
     For Defendant:       Mr. John D. Briggs
17                        Mr. Steven H. Schwartz
                          BROWN AND JAMES, P.C.
18                        1010 Market Street
                          20th Floor
19                        St. Louis, MO   63101

20
     REPORTED BY:         SUSAN R. MORAN, RMR
21                        Official Court Reporter
                          111 South 10th Street
22                        St. Louis, MO   63102
                          (314) 244-7983
23

24   Proceedings recorded by mechanical stenography, produced by
     computer-aided transcription.
25
```

```
1                              I N D E X

2                          Direct   Cross   Redirect   Recross

3      PLAINTIFFS' WITNESSES

4      JESSICA DEBOI
            (By Mr. Stilley)      5 (Cont'd)
5           (By Mr. Schwartz)            18
            (By Mr. Stilley)                        32
6
       JAMIE KAUFMANN WOODS
7           (By Mr. Stilley)     34
            (By Mr. Schwartz)            82
8           (By Mr. Stilley)                        99

9      SHARI LUEKEN
            (By Mr. Stilley)    107
10          (By Mr. Schwartz)           126
            (By Mr. Stilley)                       131
11
       MARILYN LUEKEN
12          (By Mr. Stilley)    132
            (By Mr. Schwartz)           179
13          (By Mr. Stilley)                       186

14     ERIKA TEASLEY
            (By Mr. Stilley)    188
15          (By Mr. Schwartz)           205

16     TRACEY OZUNA
            (By Mr. Stilley)    214
17          (By Mr. Schwartz)           254
            (By Mr. Stilley)                       261
18
       BETTY WILLS
19          (By Mr. Stilley)    262

20

21

22

23

24

25
```

1                          E X H I B I T S

2                               Offered        Received

3    PLAINTIFFS' EXHIBITS

4         2                        5              8

5         3 to 6                   5              9

6

7    DEFENDANTS' EXHIBITS

8         63                     143, 148

9         63-A                   153, 154      155

10        63-3, 63-4             168           170

11        63-2                   170           170

12        69                     192

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2     on December 13, 2005 at 9:03 a.m.:)

 3              THE COURT:  Good morning.

 4              THE JURORS:  Good morning.

 5              THE COURT:  You want to continue, Mr. Stilley?

 6              MR. STILLEY:  Yes, Your Honor.

 7              THE COURT:  With Ms. Deboi?

 8              MR. STILLEY:  Yes, I'll continue with Ms. Deboi.

 9              THE COURT:  You want to resume the stand, Ms. Deboi.

10              MR. SCHWARTZ:  Your Honor, can we approach for just

11     a minute?

12              (The following proceedings were held at the bench

13     and outside the hearing of the jury:)

14              MR. SCHWARTZ:  I just want to make a record that

15     Mr. Stilley and I -- I told Mr. Stilley I wanted to invoke

16     the exclusionary rule with respect to witnesses, and he has

17     told me he doesn't have any witnesses in the audience, and we

18     don't either, but I just wanted to make that record.

19              MR. STILLEY:  That is not so.  I do have -- well,

20     it's a party.  It's Marilyn Lueken.  I'm going to have

21     Marilyn Lueken testify.

22              MR. SCHWARTZ:  She's not a party anymore.  She was

23     dismissed.

24              THE COURT:  She's not a party any longer.

25              MR. STILLEY:  Well, I'll put her out.  They invoked
```

1    it now, so I'll go put her out and we'll get started.

2            THE COURT:  I don't care how you do it, that's your

3    business.

4            (The following proceedings continued within the

5    hearing of the jury:)

6            THE COURT:  Go ahead.

7            MR. STILLEY:  Your Honor, before we start I'd move

8    to admit Plaintiffs' Exhibits 2 through 6.  There's no

9    objection from defense.  I mean, they didn't in their written

10   documents, didn't object.

11           MR. SCHWARTZ:  Your Honor, there has been no

12   foundation laid for any of these documents.  There's no

13   relevance to these documents.

14           THE COURT:  I'm going to sustain it for now.  We

15   start off here, one, this handbook and you say this witness

16   has indicated from your questions so far never seen it.

17           MR. STILLEY:  Sure.  Your Honor, if I may approach

18   the witness and present the exhibits?

19           THE COURT:  Go ahead.

20                   DIRECT EXAMINATION (Cont'd)

21   BY MR. STILLEY:

22   Q.    I'd like to draw your attention to a document marked

23   Plaintiffs' Exhibit 2.  Can you take a look at that.  Can you

24   tell us what that document is?

25   A.    It is the Parent/Student Handbook from Mountain Park.

1    Q.    Okay.  And is that the handbook that you were not

2    allowed to see while you were at Mountain Park?

3           MR. SCHWARTZ:  I object to the leading form of the

4    question, Your Honor.

5           THE COURT:  Sustained.

6    BY MR. STILLEY:

7    Q.    When did you first find out about this document?

8    A.    I found about it about the year of 2003, after I had

9    left Mountain Park.

10          MR. STILLEY:  Your Honor, move to admit Plaintiffs'

11   Exhibit 2.

12          MR. SCHWARTZ:  Your Honor, we don't dispute that's

13   the handbook, but I don't really see what the relevance of it

14   is at this point in the trial.

15          THE COURT:  Counsel, come up.

16          (The following proceedings were held at the bench

17   and outside the hearing of the jury:)

18          THE COURT:  Two things that I'm interested in doing.

19   One, I'm interested in moving the trial along.  And secondly,

20   give Cesar what's Cesar.  The woman said she hadn't seen the

21   handbook while she was at school and so forth, she saw it

22   later.  So perhaps in terms of even, you know, getting it in,

23   which, you know, since it's going to come in obviously later,

24   I don't have a big problem with that one way or the other.

25   But is this the proper witness to ask about this?  You know,

1    stop dragging the thing out, Mr. Stilley.  If she didn't see

2    this until later, I mean, what are you trying to do with this

3    witness with this exhibit?  Where we going?

4              MR. STILLEY:  I'm just trying to get this in.

5              THE COURT:  It's going to come in later.

6              MR. STILLEY:  Well, I got six.

7              THE COURT:  Have any others seen them while at the

8    school?

9              MR. STILLEY:  Only one is Marilyn, and she's

10   outside.  Marilyn saw it.

11             THE COURT:  Okay.  If you had it, what would you be

12   able to do with it?

13             MR. STILLEY:  Not much.

14             THE COURT:  What's the point of dragging this and

15   beating this and dragging this trial out because of that?

16             MR. STILLEY:  They didn't object to two through six.

17             THE COURT:  I don't care what they didn't do.  They

18   are objecting now in terms of this coming in.  And so you

19   haven't laid a foundation for it for her to identify the

20   thing other than she saw this afterwards, after she left and

21   so forth, and I'm just trying to see where you're going with

22   this anyway.  What difference does it make?  What are you

23   trying to get out of this?

24             MR. STILLEY:  I'm just trying to get this done so I

25   can put a checkmark on it and move on, and get this thing

1      going.  I know you want to get this done quickly.

2             THE COURT:  I'll tell you what, I'll be okay with

3      that being admitted.  And what about the others, three, four,

4      five, and six.  But you're not going to be able to ask her

5      any questions about it.

6             MR. STILLEY:  I'll finish it up quick, Judge.

7             THE COURT:  That's what I'm talking about.  Maybe if

8      they'll agree to admit it, and then you just forget it, it's

9      just admitted and you won't ask any questions about it, not

10     with this witness.  You say this witness you've no questions

11     about it, she doesn't know anything about it?

12            MR. STILLEY:  That's true.

13            MR. SCHWARTZ:  The other things are photos off our

14     client's web site that were not prepared contemporaneous with

15     their enrollment.  We don't dispute what it is, but I don't

16     know what the relevance of it is.

17            MR. STILLEY:  Judge, you talked to me, you said,

18     hey, this is about process.  The process is if they want to

19     object, they need to object in writing beforehand, and

20     anything they did not object to beforehand is waived.  And

21     we're going to get in anyway, the only thing we're deciding

22     is whether we're going to have walk around with it.

23            THE COURT:  I'm trying to save some time here.  What

24     they are saying, some of the things aren't part of the

25     handbook, some things are not official documents of the

```
 1    institution.  It came off the institution's web site?

 2              MR. SCHWARTZ:  Yes, it is, Your Honor.

 3              MR. BRIGGS:  There's no foundation.  They haven't

 4    laid a foundation for its admission.  We did reserve the

 5    opportunity to object.  They still have to authenticate

 6    things and lay foundation for things.

 7              MR. SCHWARTZ:  We don't object they are what they

 8    purport to be, that's not the issue.

 9              THE COURT:  What I'm saying is how about them being

10    admitted and you ask no questions about it other than this

11    one witness you're talking about.

12              MR. STILLEY:  That's fine by me.  That was my

13    intention.

14              THE COURT:  Fine.  Then it will be admitted.  And no

15    questions until you get to the witness that you say can

16    testify about it, and that's the witness that's been

17    excluded.  If you want to call them next, that's fine.

18              MR. STILLEY:  State it so the jury knows they are

19    admitted.

20              (The following proceedings continued within the

21    hearing of the jury:)

22              THE COURT:  Ladies and gentlemen of the jury, we're

23    trying to get this thing moved along here, so those exhibits,

24    two through --

25              MR. STILLEY:  Six.
```

1          THE COURT:  -- six will be admitted.  Now you can

2     get it back.

3          MR. STILLEY:  Right now?

4          THE COURT:  Yeah.

5          MR. STILLEY:  Thank you.

6     BY MR. STILLEY:

7     Q.    Yesterday we were asking you about hair loss.  Did you

8     have hair loss at Mountain Park?

9     A.    Yes, I did.

10    Q.    And how did this happen?  How did you find out about

11    this?

12    A.    My hair, when I was washing my hair in the shower,

13    chunks of hair would just be falling out, and I'd be holding

14    it in my hand.  A significant amount, more than I've ever

15    lost on any other occasion.

16    Q.    So did you have that problem before Mountain Park?

17    A.    No, I did not.

18    Q.    How about after Mountain Park?

19    A.    No, I did not.

20    Q.    Before Mountain Park Boarding Academy did you have any

21    problems with your motor skills?

22    A.    No, I did not.

23    Q.    After Mountain Park did you have problems with your

24    motor skills?

25    A.    Yes, I did, immediately after leaving.

1           MR. SCHWARTZ:  Objection, Your Honor, this is out of

2   the case.  It's not relevant as to what happened after

3   Mountain Park.

4           THE COURT:  Overruled.

5   A.    After leaving Mountain Park one day I was driving a

6   moped bike and I was holding the handles and my brain was

7   telling my arms to move and to turn it, however, I couldn't

8   turn it, and I ended up crashing it because my brain would

9   not allow my arms to move it.  I wanted to turn the handles,

10  however, I couldn't, so I crashed and suffered injuries.

11  Q.    Can you tell the jury a little bit about the layout of

12  Mountain Park?  What does the facility look like?

13  A.    We were in a facility that was constantly locked.  It

14  was a barbed wire fenced all the way around it.  There was

15  not any fire escape or method of leaving.

16          MR. SCHWARTZ:  Objection, Your Honor.

17          THE COURT:  Hold on.  Go ahead.

18  A.    There was not a method of leaving without the staff

19  using their key to allow us to leave the building.

20  Q.    And about how tall was the fence?

21  A.    At least probably ten feet with barbed wire that

22  wrapped around the top of the fence.

23  Q.    And while you were at Mountain Park did you ever go

24  outside that fence?

25  A.    Yes, we did.

1    Q.     What was the occasion?

2    A.     First occasion I remember was going to a garden with

3    one of the staff members to help with some gardening.   And

4    another time was to spend hours picking up rocks to clear a

5    field.

6    Q.     And can you tell us approximately when this happened in

7    relationship with the time that you arrived at Mountain Park?

8    A.     The first day was while it was warm out, so it had to

9    have been in the spring, summertime.   And I remember thinking

10   that this was my chance to leave, to take off if I wanted to,

11   but I couldn't act on the thought --

12             MR. SCHWARTZ:   Your Honor, I object.

13             THE COURT:   Sustained.   Just answer the questions.

14   BY MR. STILLEY:

15   Q.     Did you gain weight while you were at Mountain Park?

16   A.     Yes, I did.

17             MR. SCHWARTZ:   Objection, asked and answered.

18             THE COURT:   Sustained.

19   Q.     Was anything done to you because you gained weight?

20   A.     I fully believe that there was drugs that were

21   influencing that weight gain.

22             MR. SCHWARTZ:   Objection, Your Honor.   Your Honor,

23   may I approach, please?

24             THE COURT:   Ladies and gentlemen, you will

25   disregard, put that out of your minds, the answer from this

1    witness.  Go ahead with the weight.

2    BY MR. STILLEY:

3    Q.    Please carefully listen to the question and try to

4    answer the question I asked you.  Was there any kind of

5    adverse consequences to you from the defendants because you

6    had begun to gain weight?

7    A.    Yes.  My clothes started fitting more tightly because I

8    gained up to 30 pounds while I was there.  And in public

9    situations the staff, including Ms. Gerhardt --

10            MR. SCHWARTZ:  Objection, Your Honor, this is not

11   part of the case.  It's not related to anything my clients

12   did.  It's not been alleged.

13            MR. STILLEY:  She's testifying about the defendants.

14   It's a negligence case.

15            THE COURT:  I'll give you a little bit of leeway.

16   Go ahead.

17            MR. SCHWARTZ:  He has not laid a foundation with

18   anything having to do with my clients.

19            THE COURT:  Fine.  Let's do that.

20   BY MR. STILLEY:

21   Q.    Okay.  Who are you talking about?  Tell us who did

22   something to you as a result of your weight gain.

23   A.    I'm referring to Ms. Gerhardt.

24   Q.    And what did she do?

25   A.    In front of -- in a group situation she made fun of me

1    for gaining weight, and that I was trying to get the guys to

2    notice me because my clothes were getting tighter.

3    Q.    Where were you at when you found out -- when you first

4    found out that you were going to Mountain Park Boarding

5    Academy, where were you at?

6    A.    I was at my grandparents' in Florida.

7    Q.    And when were you actually picked up to be taken to

8    Mountain Park, where were you at?

9    A.    When I was picked up by the escorts?

10   Q.    Yes.

11   A.    I was at detention.

12   Q.    In what state?

13   A.    In the state of California.

14   Q.    How did you get from Florida to California?

15   A.    When my parents told me I was going to Mountain Park, I

16   ran away with the rental car.

17   Q.    And why would you do something like that?

18   A.    Because I was acting out of desperation.  I was

19   terrified of going there.

20            MR. SCHWARTZ:  Objection.

21            THE COURT:  Sustained.

22   BY MR. STILLEY:

23   Q.    You heard the defense lawyers in opening statement call

24   Mountain Park Boarding Academy a college preparatory school.

25   Would you agree with that statement?

1    A.    Absolutely not.

2    Q.    Was the education that you were provided --

3          MR. SCHWARTZ:  Objection.  This is not part of the

4    case.  This has already been dismissed out of the case.

5          THE COURT:  I'll give him some leeway.  You talked

6    about it in opening statement.

7          MR. STILLEY:  Very well.

8    BY MR. STILLEY:

9    Q.    Was the education that you received at Mountain Park

10   helpful to you?  Was it a valuable college preparatory

11   experience?

12   A.    No, it was not.  I did not read a book, write a paper,

13   and I did below grade school work.

14   Q.    Did you nonetheless function adequately in college?

15   A.    Yes, I did.

16   Q.    Did your experience at Mountain Park impact your

17   ability to handle college work?

18         MR. SCHWARTZ:  Objection, Your Honor, there's no

19   foundation for that.

20         THE COURT:  Sustained.  Let's move on.

21         MR. STILLEY:  Yes.

22   BY MR. STILLEY:

23   Q.    And you also heard in opening statement about defense

24   counsel saying that Mountain Park tried to improve the self

25   worth of the students in their care.  Was there any

1    improvement in your self worth while you were at Mountain

2    Park?

3    A.    No, it was shredded.

4    Q.    Have you seen the medication logs that have been

5    supplied under oath by the defendants in this case that

6    purport to show the medication that you received at Mountain

7    Park?

8    A.    Yes, I have.

9    Q.    Do those documents bear any relationship to what

10   actually happened at Mountain Park?

11             MR. SCHWARTZ:  Your Honor, lacks foundation.  He

12   hasn't shown her anything.  There's been no testimony about

13   these medicine logs yet.  We don't know what logs she has

14   seen.

15             THE COURT:  Overruled.  You can cross-examine her on

16   that.

17   A.    The sheets that were provided were totally inaccurate.

18   Q.    And how do you know that to be true?

19   A.    Because I was never given Sudafed while I was there.

20   Q.    And what do the logs show?

21   A.    That I was being given Sudafed while I was there.

22   Q.    While you were at Mountain Park were you taken out for

23   sort of a vacation or break from Mountain Park?

24   A.    I was on a visit.

25   Q.    Were you expected to return after that visit?

```
1    A.     Yes, I was.

2    Q.     Did you return after the visit?

3    A.     No, I did not.

4    Q.     Why did you not return?

5    A.     Because I nearly died because of the defendants.

6          MR. SCHWARTZ:  Your Honor, objection.  Move to

7    strike, have the jury disregard.

8          THE COURT:  The jury will disregard.  That will be

9    stricken.

10          MR. STILLEY:  Your Honor, may we approach?

11          THE COURT:  Nope.

12   BY MR. STILLEY:

13   Q.    How much compensatory damages did you ask for in the

14   complaint?

15          MR. SCHWARTZ:  Objection, Your Honor, that's

16   irrelevant what she asked for in the complaint.  If she has

17   damages to testify about, he can ask her what her damage was.

18          THE COURT:  Just ask her what her damages are.

19          MR. STILLEY:  Can you tell the jury what you think

20   your damages are.

21          MR. SCHWARTZ:  Same objection, Your Honor.

22          THE COURT:  I'm going to allow that.

23   A.    About $2 million.

24          MR. STILLEY:  Pass the witness.

25          THE COURT:  Cross-examination.
```

```
 1            MR. STILLEY:  Your Honor, may I approach the
 2   witness?  She needs some water.
 3            THE COURT:  Very well.
 4                      CROSS-EXAMINATION
 5   BY MR. SCHWARTZ:
 6   Q.    Good morning.
 7   A.    Good morning.
 8   Q.    How do you pronounce your last name?
 9   A.    Deboi.
10   Q.    Deboi, thank you.  Ms. Deboi, you're 24 years old?
11   A.    Yes, I am.
12   Q.    And you were at Mountain Park from April of 1997 to
13   December of '97; is that right?
14   A.    Yes, it is.
15   Q.    I think you started there about April 7th.  Does that
16   sound about right?
17   A.    Around that time is probably close to accurate.
18   Q.    Now, you have a bachelor's degree in social work?
19   A.    Yes, I do.
20   Q.    And you have worked toward a master's degree; is that
21   right?
22   A.    Yes, I'm currently in a clinical social work master's
23   program.
24   Q.    At what school?
25   A.    Northwest Nazarene University.
```

```
 1    Q.    I'm sorry, could you speak louder?

 2    A.    Northwest Nazarene University.

 3    Q.    And you're a licensed social worker?

 4    A.    Yes, I am.

 5    Q.    And you work for Caldwell, Idaho as a child protection

 6    case manager?

 7    A.    Yes, I do.

 8    Q.    And I think you testified yesterday that you have a lot

 9    of experience testifying.  You do that on a regular basis

10    with your job?

11    A.    I have experience preparing court reports which are

12    given to judges, and I have a lot of experience being in

13    court.  Often my cases don't go to hearing.  However, I've

14    spent a lot of time in court.

15    Q.    So you spend a lot of time around courtrooms and see

16    people testify; is that right?

17    A.    Yes.

18    Q.    When you went to Mountain Park you were 16?

19    A.    Yes, I was.

20    Q.    And before you went to Mountain Park you had

21    experimented with alcohol, marijuana, and cigarettes?

22              MR. STILLEY:  Objection, it's irrelevant.

23              MR. SCHWARTZ:  Your Honor, he raised this on direct.

24              THE COURT:  Briefly.  Get through this quickly.

25    A.    Yes, I experimented with those.
```

```
1    Q.    And your parents told you they thought you were

2    rebellious and out of control?

3    A.    Yes.

4    Q.    And before you went to Mountain Park you stole your

5    parents' vehicle, took their car from Florida and drove to

6    California and you were arrested?

7    A.    I took my parents' car out of desperation and fear of

8    going to Mountain Park and drove from Florida to California.

9    Q.    And you were picked up by the police in California and

10   taken to juvenile hall?

11   A.    Yes, I was.

12   Q.    And your parents told you there was a court order

13   requiring you to go to Mountain Park?

14   A.    They said something to the effect of that.

15   Q.    Now, yesterday you talked about your orientation guide

16   not letting you go to the bathroom for hours at a time.  You

17   said that yesterday, right?

18   A.    Something to the effect of that.

19   Q.    Do you recall at your deposition you couldn't remember

20   that?

21   A.    My orientation guide wouldn't allow me to go to the

22   bathroom.

23   Q.    For hours at a time.  You didn't have a specific

24   recollection about that at your deposition.  Do you recall

25   that?
```

1   A.    I don't think I was asked that -- I don't remember

2   being asked that question.

3   Q.    Well, let me --

4         MR. SCHWARTZ:  May I approach the witness, Your

5   Honor?

6         THE COURT:  Sure.

7   BY MR. SCHWARTZ:

8   Q.    Let me show you your deposition that was taken on March

9   8th, 2005.  And for the jury's benefit, a deposition, the

10  deposition you had was a meeting at a law office where there

11  was a court reporter who put you under oath; is that right?

12  A.    Yes.

13  Q.    And then just like the court reporter here, took down

14  what you said and it was typed up in this book; is that

15  right?

16  A.    Yes.

17  Q.    Now, would you turn to page 62.  Did you give these

18  answers to these questions on line 3?

19        "During orientation if you asked your orientation

20  guide to use the toilet, were you allowed to use the toilet?

21        "ANSWER:  If she wanted to take me.

22        "QUESTION:  Were there occasions when she didn't

23  take you when you asked?

24        "ANSWER:  Yes.

25        "QUESTION:  Can you identify any specific instances

1    when that happened?

2         "ANSWER:  It's kind of a blur.  It's hard for me to

3    recall a specific conversation that I had with her.  I

4    remember when she would have to go to the bathroom, I would

5    have to sit in front of her if I didn't have to go, or she

6    would sit in front of me if I was going to the bathroom."

7         That's what your testimony was at deposition; is

8    that right?

9    A.    Yes.

10   Q.    Now, you didn't have an orientation guide the whole

11   time you were there, did you?

12   A.    No, I did not.

13   Q.    There was a time, in fact, you were what they called a

14   single student, where you didn't have an orientation guide

15   and you were not an orientation guide; is that right?

16   A.    Yes.

17   Q.    And there was also a time that you were an orientation

18   guide?

19   A.    Yes.

20   Q.    And your testimony, as I understand it, is that you

21   could not go to the staff and ask for medicine because your

22   orientation guide wouldn't let you; is that right?

23   A.    Something to the effect of that.

24   Q.    You can close the book because I'm just now asking you

25   about what you said yesterday.  Isn't it the case that they

1    had medicine call at least three times a day where anyone who

2    had a medical complaint could go to medicine call and ask for

3    something, isn't that the case?

4    A.    No, I don't remember there being medicine call three

5    times a day.

6    Q.    You don't remember there being medicine call?

7    A.    I don't remember there being medicine call three times

8    a day.

9    Q.    Is it two times a day, is that what you're saying?

10   A.    It was one, maybe two times a day.  And it was for

11   specific students who -- for example, there was one student

12   that had to take thyroid medication daily.  It was for

13   purposes such as that.

14   Q.    Isn't it the case that if someone had a cold or sore

15   throat or something, that they could go to the medicine call

16   whenever it was called and they could line up and they could

17   tell the staff members their complaint?  Isn't that how it

18   went?

19   A.    No, that wasn't the standard practice.

20   Q.    You're denying that's the standard practice, is that

21   what you're saying?

22   A.    I'm saying there would have been strong repercussions

23   if I had done that.  I would have been publicly humiliated.

24   I would have -- my orientation guide made it clear to me that

25   that was not something that was allowed.

1    Q.    How long did you have an orientation guide?

2    A.    Three to three and a half months.

3    Q.    Okay.  So you started in April, so you would have had

4    an orientation guide in June, July, some time then that

5    period?

6    A.    It would have been July, probably late July-ish.

7    Q.    And you're saying your orientation guide said that you

8    could not go to medicine call; is that right?

9    A.    I'm saying that it was made clear to me through my

10   orientation experience that I could not go to medicine call

11   just because I felt like I needed a Tylenol or some Sudafed.

12   Q.    And so if I understand correctly, you're denying that

13   you were given Sudafed April 8th, April 9th, April 11th,

14   April 12th, April 14th, those days?

15   A.    I was never given Sudafed while I was there.

16   Q.    And you're denying that -- and those would have just

17   been right after you got there, right?

18   A.    Right.

19   Q.    So you did not get Sudafed and you did not get Advil on

20   May the 2nd?

21   A.    I don't remember being given Tylenol or Advil.

22   Q.    You don't remember?

23   A.    I don't remember that specific instance, but I know I

24   was never given Sudafed.

25   Q.    Now, you did frequently see and talk to Betty Wills,

1    Debbie Gerhardt, Sam Gerhardt in the hallway, in the dining

2    room, and the church, right?

3    A.     Did I talk to them or see them?

4    Q.     You saw them there?

5    A.     Yes.

6    Q.     And there were meetings or powwows with Debbie Gerhardt

7    in the evening where you would talk and you would sing,

8    right?

9    A.     I wouldn't call it talk, we were yelled at.

10   Q.     Weren't there times when you would sing for hours?

11   A.     Yes, there were.

12   Q.     And I think you told us yesterday that when you were

13   constipated you went to see Betty Wills and she gave you

14   prunes and prune juice; is that right?

15   A.     I said that it was standard that we had to ask Betty or

16   Debbie if we wanted to have prunes or prune juice.

17   Q.     And you did that when you were constipated and they

18   gave it to you, right?

19   A.     I received the prunes and prune juice.

20   Q.     Now, you talked a little about -- you said you didn't

21   get enough sleep at Mountain Park.  Isn't it the case you

22   were supposed to be in bed by ten o'clock?

23   A.     I think ideally we were supposed to be, but that was

24   often not the case.

25   Q.     Maybe it wasn't till 11, but you were supposed to be in

1    bed by ten o'clock, right?

2    A.    I think I remember that being the goal.

3    Q.    Okay.  And you talked about being on night patrol; is

4    that right?

5    A.    Yes.

6    Q.    And night patrol is when some of the girls are asked to

7    get up for an hour at a time, just to watch the dorm and make

8    sure that everything is okay, right?

9    A.    Just make sure the girls didn't run away.

10   Q.    Make sure everybody was safe and did not run away,

11   right?

12   A.    It was to make sure girls didn't run away.

13   Q.    And are you saying that that's why you didn't get

14   enough sleep, because you were on night patrol?

15   A.    That was a big part of it.

16   Q.    Isn't it true that a lot of girls wanted to be on night

17   patrol?

18   A.    We were -- that was considered a reward, and so when

19   girls, of course, were trying to become orientation guides

20   would get on night patrol because it made our lives easier

21   there because the staff were nicer to us because we were

22   considered trustworthy.

23   Q.    So it was something that some of the girls strived for,

24   to be on night patrol or be an orientation guide; is that

25   right?

1    A.    Because it was looked kindly upon by the Wills and

2    Gerhardts.

3    Q.    Isn't it the case that when the girls were on night

4    patrol, they would sometimes use the time to study or to talk

5    or write letters?

6    A.    Some of that time would be used to write letters and to

7    study.

8    Q.    Now, you talked about having an ear infection and

9    wanted something for it; is that right?

10   A.    I think I said ear pain.

11   Q.    Ear pain.  Now, isn't it the case that you were taken

12   to see Dr. Gayle on May the 8th, just about a month after you

13   got there?

14   A.    I don't remember the specific date, but I was taken to

15   the doctor one time.

16   Q.    And you were taken to see Dr. Gayle for your ear pain

17   and he prescribed something for it; is that right?

18   A.    No, I was not given anything for the ear pain.

19   Q.    You're denying that Dr. Gayle prescribed something to

20   you for your ear pain, is that what you're saying?

21   A.    No, the staff -- I went for vaginal irritation, and the

22   staff informed me that I was given antibiotics or some sort

23   of medication for a yeast infection.

24   Q.    Well, I don't want to get confused here.  Isn't it the

25   case you went back to see Dr. Gayle on May 28th for vaginal

1    irritation?  You saw him twice?

2    A.    I only remember seeing him one time.

3    Q.    Are you denying here today in front of this jury and

4    this judge in this federal court that you saw Dr. Gayle

5    twice?

6    A.    I'm telling you I only remember seeing him one time.

7    Q.    All right.  So are you telling me you don't remember

8    seeing him for ear pain?

9    A.    I'm telling you the purpose that I went, that I

10   remember was for vaginal irritation.

11   Q.    Well, I'm going to ask you about that in a minute, but

12   isn't it the case -- well, let me just ask you again.  You

13   just don't recall seeing him for the ear pain, you may have

14   gone but you just don't remember; is that right?

15   A.    I have memory gaps from my experience there.

16   Q.    So you don't recall that on May the 8th you were taken

17   to see Dr. Gayle, which was about a month after you got

18   there, for ear pain and he prescribed Poly-Histine.  You

19   don't remember that?

20   A.    I don't remember seeing him for that specific reason.

21   I think I would have remembered that because it was

22   significant if I went outside of the building.

23   Q.    And you don't remember being given Poly-Histine the day

24   after you went on May the 9th and on May the 10th and May the

25   11th, the 12th, the 13th, the 14th, the 15th, the 16th, the

```
 1    17th, the 18th, the 19th?  You don't remember that?

 2    A.     Given what?

 3    Q.     Poly-Histine.

 4    A.     What is Poly-Histine?

 5    Q.     Well, Dr. Gayle will tell us when he comes to testify.

 6    I'm not a doctor so I don't know, but it was what he

 7    prescribed for you for your ear pain.  You don't remember

 8    being given that?

 9    A.     I remember being -- going through the medicine line for

10    about a period of one week.  But I remember going to the

11    doctor, like I said, for vaginal irritation.  I don't

12    remember anything being addressed as far as ear pain.

13    Q.     Was it the one week that I just talked about that you

14    got that Poly-Histine, is that what you remember?

15    A.     I don't remember the exact date.

16    Q.     So you went back to Dr. Gayle on May the 28th because

17    you complained about vaginal irritation; is that right?

18    A.     Like I said, the one time I remember seeing him was for

19    vaginal irritation.

20    Q.     And it was on May the 28th, which would have been about

21    a month and a half after you started there; is that right?

22    A.     I can't tell you specifically what the date was.

23    Q.     It was during the time that you still had an

24    orientation guide, right?

25    A.     I think I remember it being in my earlier stay at
```

1    Mountain Park, so I was probably on orientation.

2    Q.    So you had a medical complaint, you reported the

3    medical complaint, and you were taken to the doctor during

4    the time you had an orientation guide; is that right?

5    A.    Like I said, it was during my earlier stay there.  So

6    to the best of my knowledge, I was on orientation.

7    Q.    And Dr. Gayle -- I'm not trying to embarrass you, but I

8    do have to ask you these questions.  He did a pelvic exam and

9    did a pap smear test; is that right?

10   A.    I believe that's what occurred.

11   Q.    And you asked him to test you for sexually transmitted

12   disease?

13   A.    I don't remember.

14   Q.    Now, you went to see Dr. Gayle.  You didn't tell

15   Dr. Gayle that you were missing your period, did you?

16   A.    I don't remember Dr. Gayle having a conversation with

17   me.

18   Q.    Are you saying that neither Dr. Gayle nor his nurse

19   took a history from you?  Do you know what that means?

20   A.    As in asking me questions?

21   Q.    Right.  When you go to the doctor, when you first go to

22   the doctor and usually the nurse and sometimes the doctor

23   also asks you what your complaint, what are your problems, do

24   you have any allergies to medication, tell us what's going on

25   with you so we can treat you.  Are you saying that nobody

1    asked those questions to you when you went to the doctor?

2    A.    I remember the staff talking with the doctor and he

3    came in and out of the room fairly quickly, but I don't

4    remember having a conversation with him.

5    Q.    All right.  But the fact is you didn't tell him that

6    you were missing your period, right?

7    A.    I informed the people who were responsible for taking

8    care of me.

9    Q.    Are you telling us that you went to see Dr. Gayle for

10   vaginal irritation, had a pelvic exam, and didn't tell him

11   you were missing your period?

12   A.    I'm saying that I don't remember having a conversation

13   with him.

14   Q.    You didn't tell him that you were foggy, you didn't

15   tell him you were constipated, you didn't tell him you were

16   gaining weight, and you didn't tell him that your hair was

17   falling out, did you?

18   A.    I didn't trust him.  I was taken through the back door

19   and left through the back door.

20   Q.    You were taken to see a physician because you were

21   complaining about medical problems, and you decide you didn't

22   trust this physician to tell him about any of your

23   complaints; is that right?

24   A.    Like I said, I can't remember having a conversation

25   with him.

```
 1    Q.    Now, one or two other things and then I'll be finished.

 2    Isn't it the case that when you were a child your mother

 3    spanked you?

 4    A.    Yes.

 5          MR. SCHWARTZ:  One moment, Your Honor.  I have no

 6    further questions, Your Honor.

 7          THE COURT:  Anything else?

 8          MR. STILLEY:  Yes, Your Honor.

 9                    REDIRECT EXAMINATION

10    BY MR. STILLEY:

11    Q.    Is there a particular reason you have difficulty

12    identifying dates and times at Mountain Park?

13    A.    Yes, there is.

14    Q.    And what are those reasons?

15          MR. SCHWARTZ:  Your Honor, this is completely

16    irrelevant.

17          THE COURT:  I don't know -- I mean, where are we

18    going with this?  I mean, we going back to the same place

19    we've been?  I'm sustaining that.  I'm sustaining that

20    objection.

21    Q.    Did you take Sudafed after Mountain Park?

22    A.    Yes, I did.

23    Q.    How soon?

24    A.    A couple days at least, a day or two after leaving.

25    Q.    Where were you at?
```

1    A.    I was with my parents on a visit on a cruise ship.

2    Q.    And what happened?

3    A.    I passed out --

4         MR. SCHWARTZ:  Objection.

5         THE COURT:  Hold on.  When there's an objection,

6    just hold on.

7         MR. SCHWARTZ:  I don't know what happened

8    afterwards, what Sudafed she took afterwards makes any

9    difference.

10         MR. STILLEY:  Can I explain?

11         THE COURT:  Well, if you're off on a cruise ship,

12    you got way away from Mountain Park.

13         MR. STILLEY:  Two days.

14         THE COURT:  Well, she took Sudafed.  Did she get all

15    right?  The case, where we going?

16         MR. STILLEY:  She nearly died.  It nearly killed her

17    to take Sudafed.

18         MR. SCHWARTZ:  I object, Your Honor.

19         THE COURT:  Sustained.  Forget it.  The jury will

20    disregard that.

21    BY MR. STILLEY:

22    Q.    Can you tell us what a powwow is?

23    A.    When Debbie Gerhardt would come in the girls' room and

24    yell at us for hours with a microphone.

25         MR. STILLEY:  Pass the witness.

```
1              THE COURT:  Anything else?

2              MR. SCHWARTZ:  Nothing further, Your Honor.

3              THE COURT:  You may step down, Ms. Deboi.  Thank you

4    very much.  Call your next witness.

5              MR. STILLEY:  Jamie Kaufmann Woods.

6                   JAMIE KAUFMANN WOODS,

7    Having been first duly sworn, was examined and testified as

8    follows:

9                    DIRECT EXAMINATION

10   BY MR. STILLEY:

11   Q.    Please state your name.

12   A.    Jamie Kaufmann Woods.

13   Q.    And where do you live?

14   A.    Brookfield, Illinois.

15   Q.    Now, do you have a hearing impairment?

16   A.    Yes, I'm deaf.

17   Q.    And how much of a hearing impairment do you have?

18   A.    It depends.  Usually between 75 and 80 right now.

19   Q.    And what does 75 and 80 mean?

20   A.    75 to 80 percent of my hearing I don't have.

21   Q.    And how do you cope with that?

22   A.    I have two hearing aids.

23   Q.    Can you tell the jury where you were born and raised?

24   A.    I was born in La Grange, Illinois, lived in Oak Park

25   for a couple years, and then moved to Brookfield.
```

1    Q.    And can you tell the jury about your education before

2    Mountain Park?

3    A.    I went to a public high school.  I also went to

4    Christian schools.  I was a straight A honor student.

5    Q.    Did you participate in sports?

6    A.    I did.  I was all star track and field, swimming, and

7    cross country.

8    Q.    How old are you right now?

9    A.    Pardon me?

10   Q.    How old are you right now?

11   A.    Twenty-two.

12   Q.    And how old were you when you went to Mountain Park?

13   A.    Sixteen, 15 or 16.

14   Q.    And how long did you stay at Mountain Park?

15   A.    About a year and eight months.

16   Q.    What kind of work do you do?

17   A.    Right now?

18   Q.    Correct.

19   A.    I am the director of human resources and recruitment

20   retention.

21   Q.    At what facility?

22   A.    Home Instead Senior Care.

23   Q.    How do you spell Home Instead?

24   A.    Home, like home, h-o-m-e, instead, home instead of the

25   nursing home.

```
 1    Q.     And how long have you had that job?

 2    A.     I was employed there in December of last year and I had

 3    left there for about three months, upon my boss calling me

 4    back for this position.

 5    Q.     And are you engaged in any educational pursuits

 6    subsequent to Mountain Park?

 7    A.     Can you repeat the question?

 8    Q.     Have you engaged in educational pursuits after Mountain

 9    Park?

10    A.     I attended the community college in my area for about a

11    year, and then I got accepted to Loyola University premed

12    program, but I haven't been able to finish a full semester.

13    Q.     Are you still qualified for that program?

14    A.     Yes.

15    Q.     Do you have a certain time limit before you have to

16    demonstrate that progress?

17    A.     Yes.  My lab credits, they go away after five years.  I

18    would have to retake my biology and start over because my

19    major is biology.

20    Q.     Was your educational experience at Mountain Park

21    particularly helpful to you in preparing for college?

22    A.     Not at all.

23    Q.     Why not?

24    A.     They started me in adding and subtracting PACES.  And I

25    had never had a college prep course work.  I got a college
```

```
 1   prep diploma, that's what it said on my diploma, but the
 2   course work did not in any way prepare me for college, I had
 3   to rely on everything from the public school that I went to.
 4   Q.    Do you know what grade level of PACES you were placed
 5   on?
 6   A.    When I first went there -- I actually think it was
 7   about first grade.  It was adding and subtracting.
 8   Q.    And what grade were you in school when you went to
 9   Mountain Park?
10   A.    I was a junior in high school.
11   Q.    Did you inform the defendants of your academic
12   achievements?
13   A.    All the time --
14          MR. SCHWARTZ:  Your Honor, I object to this as not
15   part of the case.
16          THE COURT:  All right.  Let's move on.
17          MR. STILLEY:  We're moving fast.
18   BY MR. STILLEY:
19   Q.    After you got out of Mountain Park were you allowed to
20   get a transcript of your record at Mountain Park?
21   A.    They would not release it to me.
22          MR. SCHWARTZ:  Excuse me, I object.  This is not
23   relevant.
24          THE COURT:  Sustained.
25          MR. STILLEY:  Your Honor, can I --
```

 1              THE COURT:  Let's move on from this.  Let's move on

 2     from this.

 3     BY MR. STILLEY:

 4     Q.    How did you find out you were going to Mountain Park

 5     Boarding Academy?

 6     A.    Well, I had two of my close friends were there.  My dad

 7     had escorted one of them.  But when it was my turn to go,

 8     they told me I was going to Taco Bell.  It was a long ride.

 9     Q.    How long did it take before you figured out that you

10     weren't actually going to Taco Bell?

11     A.    A couple hours.

12     Q.    When you got to Mountain Park, did you have any

13     particular medical needs that were not supplied for you at

14     that time?

15     A.    Other than hearing --

16              MR. SCHWARTZ:  Your Honor, he's getting into an area

17     that's been excluded by a motion in limine.

18              MR. STILLEY:  Negligence.  Medical needs.

19              MR. SCHWARTZ:  Your Honor, it's already been

20     excluded in the motion in limine.

21              THE COURT:  Come on.

22              (The following proceedings were held at the bench

23     and outside the hearing of the jury:)

24              THE COURT:  You know, here we are in a whole

25     situation that, you know, you, Mr. Stilley, feel that, oh,

1    yes, you're doing the right thing.  But let me tell you

2    something.  When you come to court and you come and represent

3    some people and you come against some people with money, as

4    they say, you got to bring some to get some.  Now, you, maybe

5    you didn't want to ask these clients for the money trying to

6    be Mr. Nice Guy.  But, hell, you are the one who didn't get a

7    medical doctor with this hair test.  You didn't get a

8    psychiatrist, you know.  You didn't spend -- you didn't take

9    the deposition.  I mean, come on.

10            But then you come in here now as an officer of this

11   court trying to always slide things in across that have been

12   excluded.  And you are an officer of the court.  There are

13   certain rules.  If you didn't want to do the things that you

14   were supposed to do, you should have known that these things

15   would happen, but you still come in here and try to skate

16   across the line.

17            Now, I don't know if you're trying to do in this

18   instance, but it just wears me down that you do this, you

19   know.  But, and you see, you think, well, because I'm right

20   and it's the truth.  But this is a system of rules.  And

21   that's how we keep things in some kind of order.  It's not

22   about right or wrong or the truth or any of that.  This is a

23   system of laws and rules.  This is what this is.  That's all

24   this is.

25            And you're the one who made a decision to use some

1     lab technician.  You have to look at these things at that

2     point in time and say will it get admitted.  Just like law

3     school, they tell you, what's going to happen next, what's

4     going to happen there.

5            Now, what about this thing on her going there with

6     some medical needs?

7            MR. SCHWARTZ:  She made an ADA claim based on she

8     didn't get a hearing aid, and you struck that from the case

9     in summary judgment.  Then you granted our motion in limine

10    to keep out these matters that were taken out in summary

11    judgment including this claim about hearing loss and the ADA

12    claim.  That's what he's getting into.

13           MR. STILLEY:  Your Honor, you left in the

14    negligence.  And clearly it's negligence for somebody to ask

15    for their hearing aids and explain I can't hear and yet being

16    made fun of.  The defense is misrepresenting what this court

17    has done.  This court took out the Americans with Disability

18    Act claim.  I will concede that.  I'm not trying to get into

19    that, but I --

20           THE COURT:  Hold on.  So you're saying she has

21    hearing difficulty when she went there, and that they didn't

22    give her any hearing aids, is that it?

23           MR. STILLEY:  That's it.

24           THE COURT:  What about that?

25           MR. SCHWARTZ:  Your Honor, that was the ADA claim.

1   It wasn't pled as a negligence claim.  You struck that part

2   out of the case.  Now he's trying to back it in the back

3   door.

4           MR. STILLEY:  Your Honor, I incorporated the one

5   count into the other and all the counts together.  So it all

6   comes in.  And it's all part of the negligence, provided it

7   is a negligent sort of thing.

8           MR. SCHWARTZ:  How do you prove it's negligence?  We

9   don't have a doctor to testify about what kind of hearing

10  loss she had, what kind of damages she has from that.  I

11  mean, how do you get to negligence?  How do you turn that

12  into a negligence --

13          THE COURT:  I'm excluding it.

14          MR. STILLEY:  Wait.

15          THE COURT:  I'm excluding it because it goes nowhere

16  in terms of the whole medical evaluation of her hearing aids

17  and so forth and so on.

18          MR. STILLEY:  Can I make a record on that?

19          THE COURT:  Go ahead.  What are you talking about?

20          MR. STILLEY:  What I want to say, Judge, is that you

21  don't have to have an eye doctor to find out that somebody

22  has got to have glasses.  If they say I've got to have

23  glasses, here's my prescription -- they don't even have to

24  have a prescription, if they say that, then somebody that has

25  custody of a person has to get them their glasses unless it's

1    proven they are lying.  The same thing is true if you got

2    hearing aids.

3              THE COURT:  Fine.  What do you want to ask, did she

4    have a hearing problem, did she tell them about it?

5              MR. STILLEY:  She did.

6              THE COURT:  Be quiet.  Listen.  Did they take her to

7    see someone for treatment, is that what you want to ask?

8              MR. STILLEY:  Here's what the testimony is going to

9    be.  Here's what I'm going to ask and what the testimony is

10   going to be.  I'm going to ask her if she asked for hearing

11   aids.  They mocked her and made fun of her.  It was between

12   seven to nine months before she ever got her hearing aids.

13   And they punished her because she couldn't hear.  And that's

14   negligence pure and simple.

15             MR. SCHWARTZ:  Her testimony in her deposition was

16   that her parents dropped her off without hearing aids.  She

17   told her parents I need my hearing aids.  And they didn't

18   bring them to her.  In fact, they came to visit her and they

19   didn't bring them.  And eventually the school took her to be

20   evaluated for hearing and she got her hearing aids.  Her own

21   testimony was her parents left her there without her hearing

22   aids.  She had hearing aids, but the parents didn't send

23   them.

24             THE COURT:  Go through this quickly about, you

25   know -- you get too emotional about this stuff.  You're

```
1    supposed to be the person staying calm so you can keep these
2    people calm.  And perhaps if you'd stayed calm and evaluated
3    this thing right, you'd have had the proper qualificated
4    witnesses and you wouldn't be in this pickle trying to
5    squeeze one thing off into another, trying to squeeze these
6    things, these round pegs into these square holes.  That's
7    what you keep doing, and that makes it a mess.  It just makes
8    it a mess.
9         MR. STILLEY:  I'll be quick.
10        THE COURT:  God, it's sickening.  Because the reason
11   is you, and you want to set up and cry about you, I'm doing
12   the righteous right thing.  Had you done the right thing in
13   the first place as a lawyer, you would have been calm and
14   figured the darn case out and would have had the right
15   witnesses and we wouldn't be up here with this stupid stuff.
16   God.  You are the problem.  You want to blame these people.
17   Oh, they not -- you have some responsibility too as a lawyer
18   to do the right thing and have the right people.  You have
19   let these people down.  You have let them down.
20        MR. STILLEY:  I don't --
21        THE COURT:  Go ahead, Mr. Schwartz.  I don't want to
22   hear it.
23        MR. SCHWARTZ:  Your Honor, while we're here on the
24   record, I want to request a mistrial because of Mr. Stilley's
25   comment that she almost died as a result of things that
```

1   happened at Mountain Park, the last witness Deboi.  And that

2   she also made the same statement.  I know you instructed the

3   jury to disregard it, but it's highly prejudicial, and they

4   are making -- they are now trying to get that in that she

5   almost died.  There's absolutely no basis.  He had no

6   reasonable basis to make that claim whatsoever to even make

7   that comment in front of the jury.  It's highly prejudicial.

8        MR. STILLEY:  Your Honor, can I speak to that?

9        THE COURT:  No, because I'm denying that.  I'm

10  denying that.  I told the jury to disregard that.  You need

11  to stop these things.  Don't you realize, see, you can't look

12  past the fact at how stressful this is to these people.

13  Everybody here, it is stressful.  But you do things that are

14  prejudicial that may cause this thing to have to be repeated

15  over.  You're trying to go on the cheap, you know, by not

16  doing the right thing, but you had these people spending

17  money and the stress, going through the stress of this.  This

18  is stressful.

19       So since you didn't do what you should have done in

20  the first place, you got to stop trying to cross the line,

21  end up redoing it again, stressing these people out, having

22  to keep going through this stuff.

23       No, you want to say that, you know, the defendants

24  did wrong.  But you didn't do your job as a lawyer.  You

25  didn't do your job.  So stop hollering and screaming about

 1   them.  Go look in the mirror sometimes and think about all

 2   this stuff that has been excluded in terms of witnesses

 3   without qualifications.  You've been doing this long enough

 4   now to have figured out what you need before you get up on

 5   it, you know.

 6            MR. STILLEY:  Can I respond to that?

 7            THE COURT:  No.  No.  No point.  Maybe you got it

 8   late, but you should have still backed it up with some doctor

 9   some kind of way.  It's just a mess.  You push me with all

10   these things with these unqualified people, and then we have

11   to go through all these changes about this stuff.  I am

12   sorry, but if it doesn't fit, it doesn't fit.

13            Now, ask her, go ahead and ask her about did she go

14   there without her hearing aids and did she ask for them and

15   didn't get them and just move on.

16            MR. STILLEY:  Okay.

17            (The following proceedings continued within the

18   hearing of the jury:)

19   BY MR. STILLEY:

20   Q.    Did you ask for hearing aids?

21   A.    Yes.

22   Q.    Who did you ask?

23   A.    My orientation guide primarily, and she got so sick of

24   hearing me ask that she took me to the staff.

25   Q.    How long did you ask, how many months?

1    A.    Definitely four months.  The whole time I was on

2    orientation.  And then after I got off orientation, was a

3    single girl, I still would ask about it, but it wasn't going

4    to happen.

5    Q.    And you were punished because you couldn't hear?

6    A.    Yes.

7    Q.    How were you punished?

8    A.    My hair was pulled.  I had to write lines.  They called

9    me a liar and said I was going to stay there longer.

10         MR. SCHWARTZ:  Objection, Your Honor, there is no

11   foundation for this.  It's not part of the case.

12         THE COURT:  Who is -- you got to -- who was "they"

13   in all this?  You're talking about the defendants in this

14   case?

15   Q.    Tell us who it was that did that.

16         THE COURT:  Overruled.

17   A.    Pardon me?

18   Q.    Tell the us who did that.

19   A.    My orientation guide was the one who carried it out.  I

20   was taken to Betty Wills, and she is the one who told me that

21   I talked to your mama, you're fine, you're faking it, you're

22   lying, and did the -- she like poked me in the chest with her

23   fingers, said I was a liar.  Andrea Hill.  Those are the

24   three main ones.

25   Q.    Did it hurt when she poked you, when Ms. Wills poked

```
 1    you in the chest?

 2    A.     Yes.

 3    Q.     About how long did she poke you in the chest?

 4    A.     Pardon me?

 5    Q.     About how long did she poke you in the chest?

 6    A.     It was just a -- it just hurt.  For such a tiny woman,

 7    she packs a punch.  Just once.

 8    Q.     Now, did you have changes in your menstrual periods

 9    when you arrived at Mountain Park?

10    A.     Yes, I did.

11    Q.     When did the changes occur?

12    A.     Immediately.

13    Q.     And what happened, did the periods cease?

14    A.     They stopped.

15    Q.     How long did the periods stop?

16    A.     Between 10 and 11 months.

17    Q.     How long did you say you were at Mountain Park?

18    A.     About a year and eight months, I think.  I went there

19    in September of '99 and I graduated in May of '01.

20    Q.     When the periods came back, were they normal?

21    A.     Yeah, kind of.

22    Q.     Did you ever have problems with cessation of menses or

23    ceasing of your menstrual periods before Mountain Park?

24    A.     No.

25    Q.     How about after Mountain Park?
```

```
 1    A.    Only after I had my son and while I was pregnant, but
 2    after that it went back to normal.
 3    Q.    Did you tell anyone about your problem with missed
 4    menstrual periods?
 5    A.    Yes, I did.
 6    Q.    Who did you tell?
 7    A.    Megan Richter, Andrea Hill, Nicole Vaughn.
 8    Q.    Do you have any personal knowledge that any of the
 9    other defendants were made aware of this condition?
10          MR. SCHWARTZ:  Objection, lack of foundation.  Calls
11    for hearsay.
12          MR. STILLEY:  I'm trying to lay the foundation, does
13    she have personal knowledge.
14          THE COURT:  I'll give you a little bit of leeway.
15    Go ahead.
16    A.    Pardon me?
17    Q.    Do you have personal knowledge that any of the other
18    defendants knew about your condition of cessation of menses?
19    A.    I know Andrea Hill did.  She said that it was normal
20    and we all went through it, but I'm not sure about --
21    Q.    Did anybody tell you what they thought the cause was,
22    any of the defendants?
23    A.    Stress.
24    Q.    Do you remember who said that?
25    A.    Andrea Hill and Nicole Vaughn, Megan Richter.  They
```

1    were the three I was around most.

2    Q.    What was your general state of health before Mountain

3    Park?

4    A.    It was healthy.

5    Q.    What is your health, general state of health been like

6    after Mountain Park?

7    A.    Mental or emotional or physical?

8    Q.    Let's start with the physical.

9    A.    (Nodding.)

10   Q.    You'll have to answer out loud.

11   A.    I'm okay.  I'm healthy.  I have back pain, but that's

12   about it.

13   Q.    Okay.  How about the other health parameters, your

14   mental state of health?

15        MR. SCHWARTZ:  Your Honor, this has already been

16   excluded.

17        THE COURT:  Sustained.

18   BY MR. STILLEY:

19   Q.    While you were at Mountain Park did you have

20   constipation?

21   A.    Yes.

22   Q.    How long did you have constipation?

23   A.    It seemed like forever.  Over a month.

24   Q.    Did you ask the defendants for some assistance or some

25   medicine to take care of that?

```
1    A.    I did.

2    Q.    And who did you ask?

3    A.    Christy O'Brien.

4    Q.    And what was Christy O'Brien's position?

5    A.    She wouldn't give me anything at first.  She gave me

6    prune juice.

7    Q.    Do you know -- what I'm trying to find out, did she

8    work for the defendants?  Did Christy O'Brien work for the

9    defendants?

10   A.    I can't hear you.

11   Q.    Was Christy O'Brien employed by the defendants?

12   A.    Yes.

13   Q.    Was that made clear to you?

14   A.    She was a married staff member.

15   Q.    And did you say she gave you some prune juice?

16   A.    Yeah.

17   Q.    How many times did she give that to you?

18   A.    Only once.

19   Q.    Did you ask for it at other times?

20   A.    Pardon me?

21   Q.    Did you ask for it at other times?

22   A.    No, it didn't work.  I asked for something stronger, a

23   laxative or something.  She did give me -- I believe she gave

24   me the laxative once and then the castor oil.

25   Q.    When did you get the castor oil?
```

1    A.    After I swallowed a safety pin.

2    Q.    Why did you swallow a safety pin?

3    A.    I had no communication with my parents and I needed to

4    tell them what was going on.  I swallowed the safety pin in

5    hopes it would be serious enough that they would take me to

6    the emergency room, and my parents would have to sign for

7    consent and I'd see them, and I'd get to tell them what was

8    going on.

9    Q.    Were you taken to the doctor for that?

10   A.    No.

11   Q.    Did you ask to go to the doctor?

12   A.    When I swallowed it I couldn't talk.

13   Q.    You told us about -- was that when you got the castor

14   oil?

15   A.    (Nodding.)

16   Q.    And did the castor oil relieve the constipation?

17   A.    It ran through me, so yeah.

18   Q.    Did the -- what happened to the safety -- open safety

19   pin that you swallowed?

20         MR. SCHWARTZ:  Object to the leading form of the

21   question.

22         THE COURT:  You added a little something there,

23   Mr. Stilley.

24   Q.    Let me ask then, when you swallowed the safety pin, was

25   it open?

1    A.    It was open and pointing down, so that the needle was

2    pointing down.

3    Q.    Okay.  And what you were given -- who did you ask for

4    assistance after you swallowed the safety pin?

5    A.    I didn't really ask anybody for anything.  I was

6    gagging.  I couldn't really cough.  I was gagging.  And we

7    were in a team meeting, so there was like six girls or so all

8    sitting in a circle, and they saw that something was wrong,

9    and they picked me up.  You know, I was choking, they picked

10   me up and they put me in a hot shower for the steam.  And the

11   rest of them ran up to get Mrs. Wills and Mrs. Gerhardt.

12   They came downstairs, told the girls to get me out of the

13   shower because I was faking it, and it's not that bad, and

14   I'm going to be here for a long time because of what I did.

15   Q.    Now, how long had you had the constipation before you

16   swallowed the open safety pin?

17   A.    The constipation happened almost immediately because we

18   didn't really get sufficient water.  I mean, we had water at

19   meals and we really weren't around the drinking fountain for

20   most of the day.

21   Q.    Were you allowed to go to the bathroom when you needed

22   to go?

23   A.    No.

24   Q.    How much were you deprived of the privilege to go to

25   the bathroom?

1    A.     Pardon me?

2    Q.     How much were you deprived of the privilege to go to

3    the bathroom?

4    A.     My orientation guide had a million and one different

5    jobs.  She set up and took down the school which took a

6    really long time.  She was on drinks.  And it was really

7    whenever she would let me go.  Whenever she was in the dorm.

8    Whenever she said I could go, which wasn't often.

9    Q.     Did that cause you a lot of discomfort?

10   A.     Yes.

11   Q.     Did that make the constipation worse?

12   A.     Yes.

13   Q.     Did you ask that your exercise regimen be reduced

14   because of the constipation?

15   A.     Yes, I did.

16   Q.     And who did you ask?

17   A.     My orientation guide, after I swallowed the safety

18   pin -- I don't know it was before or after I swallowed the

19   safety pin.  I was really constipated and I had to wear fat

20   people clothes, and I wasn't fat.  It got to the point where

21   I couldn't take it anymore, and I told my orientation guide

22   that I wanted to see, you know, the person in charge.  You

23   know, I wanted to tell him what was going on and that I just

24   couldn't do it, I couldn't do PE this day.  And they said he

25   doesn't want to see you, he'll make you do more anyway.

1          MR. SCHWARTZ:  Objection, Your Honor.

2     A.    And I started to walk around and they threw me on the

3     ground.

4          MR. SCHWARTZ:  It's way beyond the question.  It's

5     hearsay.  Move to strike and move the jury to disregard.

6          MR. STILLEY:  Your Honor, if you don't mind, I'll

7     find out who it was that made that statement.

8          THE COURT:  Go ahead.

9     BY MR. STILLEY:

10    Q.    Can you tell the jury who it was that made the

11    statement you just said about what would happen if you talked

12    to the main person?

13    A.    That was Megan Richter.

14    Q.    Was she an employee of the defendants?

15    A.    No.

16    Q.    What was her position, if any?

17    A.    She was my orientation guide.

18         MR. SCHWARTZ:  Your Honor, I move to strike the

19    statement and ask the jury be instructed to disregard.

20         MR. STILLEY:  Your Honor, I would object to that

21    because the orientation guide is put in charge of the

22    students.

23         THE COURT:  I'll give you some leeway.  Go ahead.

24    You got that there.  Let's move on.

25

```
 1    BY MR. STILLEY:
 2    Q.    Okay.  When you talk about the main person, who are you
 3    talking about?
 4    A.    Well, I know him now as Sam Gerhardt.  I saw his face
 5    upon being enrolled in the school, so I knew he was there, I
 6    just didn't know who he was.  I didn't know his name.
 7    Q.    Did you ever meet Bob Wills?
 8    A.    Not until later.  Not until later.
 9    Q.    Now, as a result of your request to see the main
10    person, did you get to see this person?
11    A.    No.
12    Q.    Did any adverse consequences flow from having made the
13    request?
14    A.    I can't understand you.
15            MR. SCHWARTZ:  Objection, Your Honor.  Lacks
16    foundation, not tied to anything regarding my clients.
17            THE COURT:  Overruled.  Go ahead.
18    BY MR. STILLEY:
19    Q.    Did you have any adverse consequences from having asked
20    to see the main person in charge?
21    A.    Yes, I did.
22    Q.    And what were they?
23    A.    I started to walk towards the door where he was and my
24    orientation guide screamed for other girls to come in.  And
25    they, along with Andrea Hill, who was a staff member, threw
```

```
 1    me on the ground by my hair and held me down.  And they
 2    wouldn't let me get up.  And after I stopped kicking and
 3    screaming, they picked me up and they carried me on to the PE
 4    court where they made me do PE.
 5    Q.    And was that painful to you?
 6    A.    Extremely.
 7    Q.    How many girls came and pulled you down?
 8    A.    I would say about six.
 9    Q.    Now, when you had the pin in your mouth, did that cause
10    bleeding?
11    A.    Pardon me?
12    Q.    When you had the pin in your mouth, did that cause
13    bleeding?
14    A.    When it was in my throat, yeah.  I wasn't coughing or
15    anything.  I could taste it.  I knew that there was blood in
16    my mouth.  And when I excreted it, not a lot, but yeah.
17    Q.    Did you ever ask to see a dermatologist while at
18    Mountain Park?
19    A.    Yes, I did.
20    Q.    Who did you ask?
21    A.    I know there was more than just her, but Nicole Vaughn.
22    Q.    And who was Nicole Vaughn?
23    A.    She was a staff member.
24    Q.    And what did Nicole Vaughn say?
25          MR. SCHWARTZ:  Objection, Your Honor.
```

```
 1    A.     It would be evil coming out in me --

 2           THE COURT:  Hold on.  Who is this person?

 3           MR. STILLEY:  Well, let me back up.

 4           THE COURT:  Let's find out who we're talking about

 5    here.

 6    Q.     This Nicole Vaughn, is she employed by the defendants?

 7    A.     She was when I left.

 8           MR. SCHWARTZ:  Excuse me, that lacks foundation.

 9    That question lacks foundation.

10           THE COURT:  Well --

11           MR. SCHWARTZ:  I mean, she said she was a staff

12    member, but she's not a defendant.  The defendants are

13    individuals.

14           THE COURT:  Very well.  Overruled.  Go ahead.

15    BY MR. STILLEY:

16    Q.     Okay.  Can you tell us, do you know if Nicole Vaughn,

17    what her position was at Mountain Park?

18    A.     She was a single staff member.

19    Q.     And was she employed by the defendant?

20    A.     Yes, she was.

21    Q.     What kind of response did you get to your request for

22    the dermatologist?

23    A.     She said that my acne was a result of the evil coming

24    out of me.

25    Q.     Did you have a problem with acne then at Mountain Park?
```

1   A.    Horribly.

2   Q.    Did you have a problem with acne before Mountain Park?

3   A.    No.

4   Q.    Did you have a problem with acne after Mountain Park?

5   A.    No.

6   Q.    Were you given any medication to deal with the acne at

7   Mountain Park?

8   A.    No.

9   Q.    To your recollection did you ask anybody else for a

10  dermatologist or for medicine for your acne?

11  A.    Not at this point in time I can't remember.

12  Q.    Why not?

13        MR. SCHWARTZ:  Well, Your Honor.

14  A.    I don't remember.

15        THE COURT:  Sustained.

16  Q.    Were you allowed to keep a calendar at Mountain Park?

17  A.    No.

18  Q.    How about a diary?

19  A.    No.

20  Q.    You told us about some incident in which you were

21  physically touched, but were you placed in fear of physical

22  injury by the defendants --

23  A.    Yes.

24  Q.    -- or their agents?

25        MR. SCHWARTZ:  Excuse me, Your Honor, I object.

1    Lacks foundation.  Calls for a conclusion.

2              THE COURT:  Overruled.

3    BY MR. STILLEY:

4    Q.    Were you placed in fear of physical injury by the

5    defendants or their agents at other times while at Mountain

6    Park?

7    A.    Yes.

8    Q.    And what kind of things would cause you to be placed in

9    that fear?

10   A.    I've seen them beat girls.  I've seen them throw girls

11   on the ground and hold them by pressure points.

12             MR. SCHWARTZ:  Your Honor, excuse me, I object to

13   this.  This lacks foundation.  It calls for a conclusion.

14   It's not tied to anything in the case.  It's already been

15   excluded by -- in the motion in limine.

16             THE COURT:  Okay, I'll tell you what.  We'll take

17   our morning recess at this time.  And we'll get ready to do

18   this other matter.  And, ladies and gentlemen of the jury,

19   we'll take a recess, let's say for a half hour here, 30

20   minutes.  Be ready to return to your jury room at 15 minutes

21   of 11.  Recall the admonition.

22             (The following proceedings were held outside the

23   hearing of the jury:)

24             THE COURT:  You get a break from the hot seat for a

25   minute.  Now, let's deal with this problem here.

1      MR. SCHWARTZ:  Your Honor, you ruled that he could

2 not get into things that happened to other students, and

3 that's exactly what she's getting into now.

4      MR. STILLEY:  Your Honor, what I'm trying to do is

5 to show as part of the assault that she was placed in fear of

6 injury.  And we've already established that she was placed in

7 fear of injury of certain circumstances.  And, you know, I've

8 established that, she was placed in fear.  I just want to

9 find out now what she was placed in fear of physical injury

10 for, what were those things.  So if we can just --

11      THE COURT:  No, I'm going to exclude that.  I think

12 we're going -- just like I said at our conference earlier, we

13 have to talk about things that happened to them, to that

14 plaintiff.

15      MR. STILLEY:  Okay, Judge.  Then if it pleases The

16 Court, what I'll do, I'll just ask her what kind of things

17 would she -- did she have a fear would cause her to be

18 physically harmed, because I'm trying to --

19      THE COURT:  No, it's about what things happened to

20 her.

21      MR. STILLEY:  Well, she was told if you do certain

22 things, you get a paddling, you get this, you get hurt.  And

23 I have to --

24      THE COURT:  Okay.  Well, if the proper person told

25 her that, then I'll allow that, what would happen to her,

1    okay.

2             MR. STILLEY:  Certainly.  Thank you, Judge.

3             MR. SCHWARTZ:  Your Honor, I'd like to ask when the

4    jury comes back that they be instructed to disregard the

5    comment --

6             THE COURT:  About her seeing what she saw happen to

7    other people?

8             MR. SCHWARTZ:  Right.

9             THE COURT:  Fine.  We'll do that when the jury comes

10   back.

11            MR. SCHWARTZ:  I'd also ask for a mistrial.

12            THE COURT:  That's denied.  I'll ask them to

13   disregard that, put that out of their minds.  Okay.  Give us

14   a little room.  What else?  I got to do this criminal matter.

15            MR. SCHWARTZ:  Judge, while we're here, I'd ask that

16   The Court instruct these plaintiffs that they are not to talk

17   about these things so that we don't have this problem

18   continually arise.

19            THE COURT:  It doesn't matter what we tell them too

20   much.  We already told Mr. Stilley, that doesn't matter

21   either.

22            MR. SCHWARTZ:  Well, I think it could matter if the

23   witnesses are instructed not to testify about the --

24            THE COURT:  No, I'm not going through all that.  Let

25   Mr. Stilley do that.  He's the one participating in the

1    conference and he was advised to instruct.  But he keeps

2    stepping over the line here.

3         Now, as I told you up here, you know, at our

4    conference up here at the bench, this is a system of laws and

5    rules, it's not about a system of the truth or any of that

6    stuff.  That isn't what it's about.  It isn't about that.

7    And there are certain rules in terms of who can testify about

8    what, who is qualified to testify, all those kinds of things.

9    So, you know, it's about that as opposed to what the truth of

10   the matter is.  And not so that the procedures that go on

11   here can go on regularly and with some degree of assurance

12   that we have witnesses who have some degree of qualification

13   as to what they are going to testify about.  So, you know,

14   here we are with this lab technician about some hair not

15   qualified under the rules.  Got to be a medical person.

16   Boom, all that's gone.

17        Then we got you up here with a psychologist, so

18   intentional infliction of emotional distress, we need a

19   medical doctor.  The rules require that.  So we don't have a

20   psychiatrist.  All that's out.  And I don't have the

21   responsibility for getting these witnesses.  The parties get

22   their witnesses together and go through these things and then

23   they file motions.  But when we have people that aren't

24   qualified under the rules, they got to go.  It doesn't matter

25   what is the truth.  That's the way it is.  I'm just an

1    administrator of the rules.  So that's that.

2          Give us some room here unless somebody wants to do

3    some time, because I got a criminal matter.

4          (Court in recess from 10:22 a.m. until 10:51 a.m.)

5          THE COURT:  Ms. Woods.

6    BY MR. STILLEY:

7    Q.    What kinds of different behaviors were you told that

8    might cause you to be punished?

9          MR. SCHWARTZ:  Your Honor, same objection as before.

10   There's no foundation as to who told.

11         THE COURT:  Who?

12   Q.    Okay.  Can you tell us who told you what different

13   things you might be punished for at Mountain Park?

14   A.    My orientation guides.

15   Q.    And what you were told were punishable offenses?

16         MR. SCHWARTZ:  Your Honor, I object to the

17   irrelevance.  Absolutely irrelevant to this case what the

18   orientation guide said.

19         MR. STILLEY:  Your Honor, I'm not sure --

20         THE COURT:  We need -- you need to lay a little bit

21   more foundation relative to these orientation guides.

22         MR. STILLEY:  Sure.

23         THE COURT:  As to what, if any, authority did they

24   have.

25

BY MR. STILLEY:

Q.    Do you have personal knowledge of how individuals at Mountain Park became orientation guides?

A.    After you were a new student there and you got off orientation, and you became a single girl, if you got saved, and only if you were saved, could you become an orientation guide.

Q.    Who made the decision that a person could be an orientation guide?

A.    Debbie Gerhardt.

Q.    And when was this decision made or was there a particular time the decision to make orientation guide was made?

A.    Yes, in powwows.

Q.    And about how often did these powwows occur?

A.    Whenever she wasn't busy.  Usually every like three to four months at a max.

Q.    Who was present at the powwows?

A.    All of the female students.  All of the single staff and the female married staff and Mrs. Gerhardt.

Q.    And when a student was made into an orientation guide, were the other students told anything about the authority of that orientation guide?

A.    It was just understood.

Q.    And what was understood?

1          MR. SCHWARTZ:  Well, Your Honor, I object.

2          THE COURT:  What foundation?  How does one get an

3     understanding?  Where does it come from?

4     BY MR. STILLEY:

5     Q.    How did you get the understanding that she told you?

6     A.    When I first arrived at Mountain Park and there was a

7     girl there who was at the door waiting for me along with the

8     pack of girls, and Brother Gerhardt said this is Megan

9     Richter and she will be your orientation guide, and I had to

10    follow her.  And when we were downstairs waiting for my

11    parents to sign all the paperwork, she kind of told me what

12    the orientation guide was and what it entailed and what my

13    responsibilities were, what I had to do.

14    Q.    And who was the "she" you were talking about?

15    A.    Megan Richter.

16    Q.    Now, you also told us that Sam Gerhardt told you

17    something about your duties with respect to the orientation

18    guide.  What did he say?

19    A.    All he said was that she was going to be my orientation

20    guide.  He told me her name and that I should follow her

21    because she was leaving and he was taking my parents

22    someplace else.

23    Q.    So then did you follow her and go?

24    A.    I did.  Did I hear that whole question?

25    Q.    Yes.  So at that point in time you just followed the

1    orientation guide, correct?

2    A.    Correct.

3    Q.    At that point in time did you have personal knowledge

4    of the rights and duties of the orientation guide?

5    A.    No, I did not.

6         MR. SCHWARTZ:  I object, he's already laid a

7    foundation that she didn't have that knowledge.

8         THE COURT:  I'll allow it.  Overruled.  Go ahead.

9    A.    No, I did not.

10   Q.    And did you later come to have an understanding of the

11   rights and duties of an orientation guide?

12   A.    Yes, I did.

13   Q.    Did you later come to have an understanding of the

14   source of their power, of the orientation guide's power?

15   A.    Yes, I did.

16   Q.    And how did you -- what was your basis of information

17   to find that out?

18   A.    You saw it.  You couldn't not see it.  My orientation

19   guide was constantly enforcing it.  And when she wasn't, she

20   was taking me to the staff for them to enforce it.  You saw

21   it at the powwows, you knew what an orientation guide was.

22   Q.    Was there any possibility that the orientation guide

23   was just doing the things they did to the students on their

24   own without the permission of the defendants?

25        MR. SCHWARTZ:  Your Honor, excuse me, calls for

1    speculation, lacks foundation.

2              THE COURT:  Sustained.

3    BY MR. STILLEY:

4    Q.    Were you told what the rules were?

5    A.    Pardon me?

6    Q.    Were you told what the rules were?

7    A.    Well, pretty much I was told that I was not allowed to

8    talk to anybody.

9              MR. SCHWARTZ:  Your Honor, again, this whole line of

10   questioning, he hasn't laid a foundation for this.

11             MR. STILLEY:  Let me back up.

12   BY MR. STILLEY:

13   Q.    Were you ever given a copy of the Parent/Student

14   Handbook at Mountain Park?

15   A.    No, I was not.

16   Q.    Did you ever become aware during your time at Mountain

17   Park that such a document existed?

18   A.    Pardon me?

19   Q.    During your time at Mountain Park did you ever become

20   aware that such a document existed?

21   A.    No, I did not.

22   Q.    When did you become aware that such a document existed?

23   A.    Upon leaving Mountain Park.

24   Q.    And did you at some point in time become aware of

25   certain rules that would be enforced by the defendants at

1    Mountain Park?

2    A.    Did I --

3    Q.    Did you become aware of certain rules that you had to

4    obey because the defendants said you had to?

5    A.    Yes.

6    Q.    And when did that happen or did that happen over a

7    period of time?

8    A.    You learned more the longer you were there, but

9    primarily the big stuff you learned the first two or three

10   days that you were there.

11   Q.    And how did you come to know that during the first two

12   or three days?

13   A.    Because you're not used to the way that they did

14   things, and so you would just do your natural things, and

15   they would tell you that's not allowed, you don't do that.

16   Q.    Was there ever a formal time when you or perhaps you

17   and other students were taken into a room and told what the

18   rules were?

19   A.    No.

20   Q.    When you first came to Mountain Park were you given any

21   particular kind of medication then?

22   A.    Yes, I was.

23   Q.    What was it?

24   A.    A worm medicine.

25         MR. SCHWARTZ:  Excuse me, this has already been

1    excluded.   This is part of what was excluded prior to the

2    trial.

3              MR. STILLEY:   Your Honor, I'm just trying to

4    establish the medication that was given because, I mean, the

5    defendants have supplied their medicine logs that purport to

6    show all the medicine that was given to the students.   I just

7    need to lay the foundation of what was given.

8              THE COURT:   Go ahead.

9    BY MR. STILLEY:

10   Q.    Were you given worm --

11   A.    It was like a worm medicine.   I didn't know that at the

12   time.

13   Q.    Did you resist?

14   A.    Pardon me?

15   Q.    Did you resist taking the medicine?

16   A.    Yes, I did.

17   Q.    And what -- how did you resist?

18   A.    I said I wasn't going to take it, that they were

19   drugging me.

20             MR. SCHWARTZ:   Your Honor, I object.

21             MR. STILLEY:   Your Honor, that's her statement.

22             THE COURT:   Fine.

23             MR. SCHWARTZ:   Instruct the jury to disregard.

24             THE COURT:   The jury will disregard anything about

25   drugging that the witness said.   Go ahead.

```
 1   BY MR. STILLEY:

 2   Q.    Okay.  And who was trying to make you take the

 3   medicine?

 4   A.    It was Megan Richter and Andrea Hill.

 5   Q.    And was the medicine labeled?

 6         MR. SCHWARTZ:  Your Honor, excuse me --

 7   A.    No.

 8         MR. SCHWARTZ:  This is way --

 9         THE COURT:  Sustained.

10   BY MR. STILLEY:

11   Q.    Did you have to take this same medicine at a later

12   time?

13   A.    Yes, I did.

14   Q.    About how long after you first got there?

15   A.    I believe about two weeks.  I could be a little bit off

16   on it, but I believe it was two weeks.

17   Q.    Now, do your parents support you in this litigation or

18   do you --

19         MR. SCHWARTZ:  Your Honor.

20         THE COURT:  Sustained.

21   BY MR. STILLEY:

22   Q.    Were you ever required to write lines at Mountain Park?

23   A.    Yes, I was.

24   Q.    And can you tell the jury what writing lines entailed?

25   A.    It was more like every day writing lines except my
```

1    lines were about a paragraph long, and I just had to keep

2    writing them until somebody told me to stop.

3    Q.    And what kind of conduct would cause -- would have

4    caused you to have to write lines?

5    A.    For me it was -- I was a kitchen worker, so I was

6    always in the kitchen and we would talk on the tile.  We had

7    to write lines for talking on the tile, but I had to talk on

8    the tile because I had a new student on orientation with me,

9    so if she was doing something she couldn't do, I had to say

10   you can't do that, then I would get in trouble for talking.

11   Q.    Were you deprived of sleep while you were at Mountain

12   Park?

13   A.    Yes, I was.

14   Q.    How much?

15   A.    A couple hours less than normal, but not enough sleep

16   to get through a whole day there.  It was exhausting.

17   Q.    Did this persist the entire time you were at Mountain

18   Park?

19   A.    Pardon me?

20   Q.    Did this persist the entire time you were at Mountain

21   Park?

22   A.    For the most part.  At the beginning when I was a new

23   student the only reason it was a lack of sleep was just

24   because my orientation guide had to get up a little bit

25   earlier to get ready to do all of her chores.  And later on

 1   when I was on safety patrol, you know, you have to wake up

 2   and then you have to fall back asleep, and you're awake for

 3   an hour and it's hard.

 4   Q.    And how did you feel during the daytime?

 5   A.    During the day or --

 6   Q.    During the day at Mountain Park.

 7   A.    Tired and lethargic.

 8   Q.    Were you ever told by the defendants to lie on their

 9   behalf?

10        MR. SCHWARTZ:  Your Honor.

11   A.    Not --

12        THE COURT:  Hold on.  Hold on.  I'm sustaining that.

13   I don't know where we're going.  Sustained.  Move on.

14   BY MR. STILLEY:

15   Q.    Were you ever forced to drag another student at

16   Mountain Park?

17   A.    Yes, I was.

18        MR. SCHWARTZ:  Objection, Your Honor, this has been

19   excluded.  It's already been excluded.  We've already had

20   motions on this.  I ask the jury to disregard it.

21        THE COURT:  Come up.

22        (The following proceedings were held at the bench

23   and outside the hearing of the jury:)

24        THE COURT:  Before we get to this whole issue here

25   of dragging the student, because I think that that was a

1    situation where there was no indication that there was

2    direction from the staff for this dragging to occur.  And so

3    I'll hear what you have to say about that, but I forgot to

4    admonish the jury when they came back about what?

5         MR. SCHWARTZ:  Judge, I'm afraid -- I didn't raise

6    it because if you admonish them now, it's going to bring it

7    up again.  So just let it go.

8         THE COURT:  Very good.  Now, what about this whole

9    situation here?  I mean, I excluded it earlier because there

10   was no -- you had no indication in the motions to exclude it,

11   that it was anything about the student's own decision to do

12   it rather than the direction from the staff or the

13   defendants.

14        MR. STILLEY:  Your Honor, if you want me to back up,

15   I will back up, but it makes it a little difficult to ask

16   somebody about an abstract event and somebody tell you to do

17   something.  But here's what the testimony is going to be.

18   The defendants themselves told this person to drag Shari

19   Lueken, who is also a plaintiff in this case, so it's not

20   covered by the exclusion.  She was told to drag Shari Lueken.

21   She dragged Shari Lueken.

22        THE COURT:  What happened in the motions to exclude

23   this?  Why is this different now?

24        MR. SCHWARTZ:  You granted our motion on this very

25   issue.

1          MR. STILLEY:  No.

2          MR. SCHWARTZ:  You granted our motion on this very

3     issue and you ruled on a motion in limine that anything that

4     was out of the case would not be brought back into the case.

5          THE COURT:  Because there was no indication that

6     there was any direction from the defendants for this to

7     occur.

8          MR. SCHWARTZ:  That's correct.  That was in the

9     summary judgment.

10          THE COURT:  Why has this changed?  Now you're saying

11     that she was directed by the defendants to do this.

12          MR. STILLEY:  Your Honor, we've got -- for one

13     thing, I don't recall The Court ruling on our motion to

14     reconsider.  Let me say this, on the motion to reconsider,

15     the defendants had a duty to prevent, a duty to prevent

16     damage to the students there.  Now, I know the suggestion

17     that we didn't put on proof of exactly who gave the

18     instruction to drag Shari Lueken around.  It was the

19     defendants.  I believe it was both the Wills and the

20     Gerhardts, but nonetheless, that instruction was given by

21     those persons.

22          Now, here, let me link this up.  This injured Shari

23     Lueken to the extent that she has scars to this day from the

24     dragging that she can show to the jury.

25          THE COURT:  Fine, fine, fine.  As I recall now, it

1    related to Shari Lueken giving such testimony because there

2    was no indication in our pretrial motions that this evolved

3    from any direction by one of the defendants.  And you never

4    indicated otherwise.  Now, here we are at trial and you're

5    saying here you have some evidence that it was directed by --

6    this defendant was directed.  And, you know, it seemed to me

7    also that there was some duty to disclose statements or there

8    was a request at least for statements or whatever from these

9    defendants.

10         MR. STILLEY:  Your Honor, this was disclosed when

11   this witness was deposed.  She was asked.

12         THE COURT:  What about this?  Did this witness

13   disclose this in the deposition?

14         MR. SCHWARTZ:  Your Honor, I'll have to ask John

15   about that.  But this -- take a step back.  He filed a motion

16   for summary judgment on this claim.  He did not file -- he's

17   saying now she's going to testify to this.  He didn't file a

18   declaration of his own client on this in his motion for

19   summary judgement -- I mean, in response to our motion for

20   summary judgment.  He filed a motion for reconsideration.  He

21   still didn't file the declaration of his own client that he

22   now wants her to testify about.  You've ruled on this twice

23   already that this is out of the case, and now after two

24   motions where he never filed the declaration, he could have

25   done it with his own client, he wants to bring it in.  It's

1    out of the case.

2         THE COURT:  You know, part of the problem,

3    Mr. Stilley, it's like you cannot hide the ball and then all

4    of a sudden come up with the ball and sneak out on the court

5    for a slam dunk.  I have to blow the whistle.  I mean, you

6    had these opportunities to come forward with this.

7         MR. STILLEY:  Your Honor, we did come forward with

8    this.

9         THE COURT:  When?

10        MR. STILLEY:  In deposition.

11        MR. SCHWARTZ:  Well, if it was in the deposition,

12   why didn't he raise it in response to the summary judgment

13   motion.  You've already ruled on it.  He had two

14   opportunities to raise this with The Court.

15        THE COURT:  I don't review the depositions.  You're

16   supposed to tell us what this information is when there is

17   motion for summary judgment.  And, you know, here there were

18   two occasions here, the motion for summary judgment you

19   didn't indicate there was some direct testimony by this

20   witness of being directed by defendants.  Then, you know, as

21   Mr. Schwartz said, you didn't bring this up in your motion

22   for reconsideration.  And now all you have to say is in the

23   depositions.

24        MR. STILLEY:  Your Honor, let me explain.

25        THE COURT:  Please.

1          MR. STILLEY:  Let me explain.  We are talking about

2     an issue that is clearly purely before The Court.  And this

3     court has rejected the motion for summary judgment on the

4     negligence.  I need to prove that Shari Lueken was injured.

5     And in order to prove that, I need to prove how.  And how she

6     got injured was when defendants told this young lady to drag

7     the girl.  She drug the girl.  And we've got scars to prove

8     it.  We can show it.

9          THE COURT:  I'm not disputing any of that.  Again,

10    you end up staying on your situation is what is the truth.

11    But we have a process, and that's what summary judgment, we

12    try to narrow the issues down so that we can focus on them

13    and proceed to trial in some kind of orderly fashion.  And

14    that is what the summary judgment procedure is about.  And,

15    you know, it's like I keep telling you, it's as simple as a

16    card game, you have to turn your cards up.  And here you were

17    given an opportunity to turn your card up to show that you

18    had some involvement by the defendants.  And you failed to do

19    it in the motion for summary judgment, your motion for

20    reconsideration, and now you're here trying to do it now

21    belatedly at trial.  I'm excluding it.

22         MR. STILLEY:  Wait a minute, I'm not through.  Your

23    Honor, I'm not through.  Let me make a record on this.

24         THE COURT:  You've made a record.

25         MR. STILLEY:  No, I've not made the record the way I

 1    want to make it.  Here's what we need to consider.  This is a

 2    negligence claim.  All the case law says that there's a

 3    special relationship of student to school.  School/student or

 4    teacher/student relationship, there's a special relationship.

 5    They have the duty to prevent this from happening.  The test

 6    is not did we go and personally tell somebody, although we've

 7    got proof of that, the test is did they take reasonable

 8    actions to prevent it from happening.  Now, are we going to

 9    prevent Shari from testifying I was dragged around and then

10    denied medical care?  Are we going to make her testify, oh, I

11    was all scarred up, I got all scarred up, but I can't tell

12    you why I got scarred up?  All that's going to do is make the

13    jury --

14         THE COURT:  We'll deal with that when we get to

15    Ms. Lueken.  But right now I'm excluding any testimony about

16    her being directed --

17         MR. STILLEY:  Can I elicit testimony about what she

18    did?

19         MR. SCHWARTZ:  Your Honor, that's out of the case.

20    That was the battery claim of Shari Lueken.  You dismissed

21    the battery claim of Shari Lueken.  She doesn't have a

22    battery claim anymore.

23         MR. STILLEY:  Your Honor, I had not heard you rule

24    on the motion for reconsideration.  I put my motion for

25    reconsideration --

1          THE COURT:  I told you that I had looked them over

2     this weekend and --

3          MR. STILLEY:  You're going to, nonetheless, despite

4     the fact that there is a special relationship, a special duty

5     to take care --

6          THE COURT:  It doesn't have anything to do with that

7     situation.  The basis of the ruling is more or less procedure

8     in terms of the summary judgment.  You know, when you're

9     supposed to set forth material facts to show that you have

10    some semblance of attaching your case to these defendants and

11    you failed to do so.  So I granted the motion for summary

12    judgment in that regard.  And now you are trying to revive it

13    as to Shari Lueken because now you have a witness who will

14    attach it.  But it is too late.

15         MR. STILLEY:  Your Honor, let's remember this too,

16    the rules of summary judgment say that until a prima fascia

17    case is made by the defendants, the plaintiff doesn't have to

18    do anything.  And let's remember what these defendants did.

19    Nothing.  They just said, you can't prove it.

20         THE COURT:  Okay.  I'll tell you what, that's my

21    ruling.  We're going to move on from this.  And if you want

22    me to tell the jury to disregard any testimony about her

23    dragging someone, Mr. Schwartz, I'll do so.

24         MR. SCHWARTZ:  Yes, sir.

25         MR. STILLEY:  Wait a minute.  Let me make sure I

1    understand the whole deal.  Am I prohibited from testifying

2    that she drug anybody?  Can I just get her to testify that

3    she drug somebody and that she had got in trouble -- hey, let

4    me explain this.  I need to show that she would have been

5    punished if she had not done it.

6         MR. SCHWARTZ:  How is that relevant to the lawsuit?

7    The lawsuit is about negligent medical care, not providing

8    medical care.

9         THE COURT:  She's not going to be testifying about

10    doing any dragging.

11        MR. SCHWARTZ:  Your Honor, for the record I'd like

12    to ask for a mistrial because Mr. Stilley raised this after

13    The Court had already ruled on the motion in limine that it

14    was excluded.

15        THE COURT:  That will be denied.  And I will

16    instruct the jury to disregard.

17        (The following proceedings continued within the

18    hearing of the jury:)

19        THE COURT:  The jury is instructed to disregard any

20    testimony about this testimony about dragging someone.  Go

21    ahead.

22   BY MR. STILLEY:

23   Q.    Were you allowed to wear makeup at Mountain Park?

24        MR. SCHWARTZ:  Your Honor --

25        THE COURT:  Sustained.

1  Q.    How did defendant Sam Gerhardt refer to you, what did

2  he call you?

3  A.    He called the girls as a whole in a preaching service

4  used tires.

5  Q.    What was school like for you before Mountain Park

6  Boarding Academy?

7  A.    High school.

8  Q.    Did you enjoy it?

9  A.    Yeah.

10  Q.    How have you taken school -- how has school been for

11  you after Mountain Park?

12  A.    Rough.  It's going to be a long road.

13  Q.    Did you typically -- scratch that question.  Can you

14  tell the jury how your experience at Mountain Park affects

15  your daily life and your daily routine?

16         MR. SCHWARTZ:  Your Honor, again, I object to things

17  that occurred after she leaves Mountain Park.  That's what I

18  think he's asking about.  It's not relevant to the lawsuit in

19  any way.

20         THE COURT:  It's too broad a question, Mr. Stilley.

21  Sustained.

22  BY MR. STILLEY:

23  Q.    Well, before Mountain Park did you lock your car and

24  your home?

25  A.    Yes, I did.

 1    Q.    After Mountain Park do you lock your car and your home?

 2    A.    No.

 3          MR. SCHWARTZ:  Your Honor, I object to this line of

 4    questioning.

 5          THE COURT:  Sustained.

 6    Q.    While you were at Mountain Park did you have any close

 7    relatives to die?

 8    A.    Yes, I did, two of my great grandparents.

 9    Q.    And did you find out about that?

10    A.    Yes, I did, within two days of each other they died.

11    Q.    Did you ask to go to the funerals?

12    A.    Yes, I did.

13    Q.    Were you allowed to go to the funerals?

14    A.    No, I was not.

15          MR. STILLEY:  Pass the witness.

16          THE COURT:  Cross-examination.

17                      CROSS-EXAMINATION

18    BY MR. SCHWARTZ:

19    Q.    Good morning, Ms. Woods.

20    A.    Good morning.

21    Q.    Can you hear me okay?

22    A.    I can now.

23    Q.    You attended Mountain Park for basically the last two

24    years of your high school education; is that right?

25    A.    Yes, I did.

```
 1    Q.     From September 1999 to May 2001?

 2    A.     Yes, I did.

 3    Q.     And you graduated from Mountain Park?

 4    A.     Yes, I did.

 5    Q.     And you then went to community college in River Grove?

 6    A.     Yes, I did.

 7    Q.     Where is River Grove?

 8    A.     Where?

 9    Q.     Yes.

10    A.     About ten miles from my home.  It's in Illinois.

11    Q.     Illinois, okay.  And then you went to Loyola premed?

12    A.     Yes, I did.

13    Q.     Loyola is in Chicago?

14    A.     Yes, it is.

15    Q.     It's a very good school.

16    A.     Yes, it is.

17    Q.     And you currently have a child?

18    A.     Yes, I do.

19    Q.     You also have a job for Instead Senior Care where you

20    provide home health or home services for elderly people; is

21    that right?

22    A.     My staff do.

23    Q.     You supervise people to do that?

24    A.     When depositions were taken, I supervised.  Now I am

25    HR, so I retain my employees, I recruit new employees, do
```

1    their paperwork and everything.  So I'm not managing all

2    those people anymore.

3    Q.    Okay.  Can you move a little closer to the microphone.

4    A.    Yeah.

5    Q.    When we took your deposition I think you told us at the

6    time you were supervising about 50 people?

7    A.    Yes.

8    Q.    And they were people that were going into elderly

9    people's homes to help them with errands, preparing meals,

10   that sort of thing?

11   A.    Yes.

12   Q.    Now, your parents brought you to Mountain Park because

13   you were having some difficulties as a teenager; is that

14   right?

15   A.    Yes.

16   Q.    You had run away from home and been picked up by the

17   police?

18   A.    Yes.

19   Q.    You were dating someone who you now believe was not

20   right for you?

21   A.    I knew then that he wasn't right for me.

22   Q.    Okay.  And you were smoking cigarettes and lying about

23   it?

24   A.    Yes.

25   Q.    Now, I want to ask you a little bit about this incident

 1     that you testified about having to do with swallowing a

 2     safety pin.  This happened shortly after you came to Mountain

 3     Park?

 4     A.     Yes.

 5     Q.     And you were upset about being there, you didn't want

 6     to be there; is that right?

 7     A.     It wasn't that shortly after I arrived at Mountain

 8     Park, but yes.

 9     Q.     Within the first month?

10     A.     Yeah.

11     Q.     Okay.  And you wanted to draw attention to yourself and

12     get your parents' attention, and that's why you swallowed a

13     safety pin?

14     A.     The purpose was not to draw attention to myself, it was

15     to draw attention to my parents, that's why I swallowed it.

16     Q.     To get your parents' attention so that you could tell

17     them you wanted to leave; is that right?

18     A.     Not to tell them I wanted to leave, to tell them what

19     was happening there.

20     Q.     And you're telling us that you swallowed a safety -- an

21     open safety pin and you put it in your mouth such that the

22     open, the pin part was facing into your mouth; is that right?

23     A.     Correct.

24     Q.     And you swallowed that; is that right?

25     A.     Yes.

```
1    Q.    And it went down into your stomach?

2    A.    Yes.

3    Q.    And when the other students realized what you had done,

4    they went and got Ms. Wills and Ms. Gerhardt; is that right?

5    A.    After they put me in the shower room, yes.

6    Q.    Okay.  They came down and assessed what was going on

7    with you and then they later brought you bread and castor

8    oil; is that right?

9    A.    When they first came down there was no assessing.  They

10   said I was faking it and they told the girls to go upstairs

11   and get bread and castor oil, that part is correct, but there

12   was no assessment.

13   Q.    Well, isn't it the case, ma'am, at some later point you

14   told Ms. Gerhardt, in fact, you really didn't swallow a

15   safety pin?

16   A.    I did not ever.

17   Q.    You did not.  Ultimately they gave you bread and castor

18   oil?

19   A.    Yeah.

20   Q.    And it made you go to the bathroom, right?

21   A.    Yes.

22   Q.    And you excreted the safety pin?

23   A.    A couple days later, yes.

24   Q.    And you talked about a time while you were at Mountain

25   Park that you were constipated, and you reported that and I
```

1    think you said you were given a laxative and prune juice; is

2    that right?

3    A.    Yes.

4    Q.    And also given the castor oil to make you go to the

5    bathroom, right?

6    A.    To make the safety pin go down.

7    Q.    Right.  Now, you talked about -- you talked about

8    having an orientation guide and having -- and what the

9    orientation guide may have told you.  Isn't it the case that

10   you had regular contact with the staff at Mountain Park?

11   A.    I had what contact?

12   Q.    Regular contact with the staff?

13   A.    The single staff primarily, yes.

14   Q.    But you would see, for example, Debbie Gerhardt, Sam

15   Gerhardt, Betty Wills in the dining room, the church, is that

16   right, in the hallway?

17   A.    I would see them around, yes.

18   Q.    And, now, you also talked about not having your period

19   when you first went to Mountain Park; is that right?

20   A.    Yes.

21   Q.    And I think you told us the periods came back later; is

22   that right?

23   A.    Pardon me?

24   Q.    I think you said that your period did ultimately come

25   back?

1    A.    Yes.

2    Q.    And if you had cramps for your period, you could go to

3    the medicine call and get something for that like Midol or

4    something like that, right?

5    A.    Well, you could go to medicine call when medicine call

6    was offered.  Whether or not they gave you medication was the

7    staff's discrepancy.

8    Q.    Okay.  But there was a time two or three times a day

9    where you could go to medicine call and say I have something

10   that I would like medicine for; is that right?

11   A.    It was three times a day for the most part, but not

12   consistently.  We'd either be busy cleaning or something and

13   we wouldn't --

14   Q.    So sometimes it might have been twice a day, right?

15   A.    (Nodding.)

16   Q.    Yes?

17   A.    Yes.  I'm sorry.

18   Q.    And you could go and you could say, you know, I'm

19   having my period, I have cramps, and I'd like Midol or

20   something like that for it, right?

21   A.    I suppose so, but Midol wasn't part of it.

22   Q.    Well, how about something called Ms-Aid?  Did they ever

23   give you that, which is maybe a generic version of Midol?

24   A.    I never heard of it.

25   Q.    Never heard of it.  Well, do you recall being given

1   Ms-Aid on January 22nd, January 24th?

2   A.    No.

3   Q.    Are you saying you were not given it?

4   A.    I'm saying I was not given it.

5   Q.    And how about on March the 29th, do you recall being

6   given Midol twice on March the 29th and also on the 30th and

7   31st of 2000?

8   A.    No, I was only given medication three times that I was

9   there, the whole stay.

10   Q.    Well, you started at the school I think we indicated in

11   September of '99.  And if you had been given Ms-Aid or Midol

12   in January, you would have been there about four months; is

13   that right?

14   A.    Yes.

15   Q.    Now, I want to ask you about this -- you had mentioned

16   that there was a time that Ms. Wills poked you with her

17   finger; is that right?

18   A.    Yes.

19   Q.    Now, she didn't -- she was trying to make a point, she

20   was talking to you, right?

21   A.    She made her point when she told me I was a liar.

22   Q.    Well, we'll get into that in a second.  But she was

23   talking to you and she touched you with her finger like that,

24   right?

25   A.    Yes.

1    Q.    She didn't push you, you didn't fall back or anything

2    like that, right?

3    A.    No.

4    Q.    Now, you talked about this issue where you say that

5    Andrea Hill and some of the students pushed you to the

6    ground.  We heard about that.  That was, I think you

7    testified, shortly after you started with the school, right?

8    A.    The time frame kind of gets messed up.  I don't know if

9    it was before I swallowed the safety pin or after.  So I'm

10   thinking it was before, but it could have been after.

11   Because I know I was constipated at both times.

12   Q.    Well, it was at a time when you didn't know Sam

13   Gerhardt's name?

14   A.    Right.

15   Q.    So it would have to be shortly after you started at the

16   school, right?

17   A.    Correct.

18   Q.    And the safety pin incident we already established was

19   some time shortly after you started at the school too, right?

20   A.    Correct.

21   Q.    And also you testified right after you started the

22   school you told them I need my hearing aids?

23   A.    Yes.

24   Q.    Now, you have hearing aids at home, right?

25   A.    Yes.

```
 1   Q.    And when your parents dropped you off, I think you
 2   testified about them saying we're going to Taco Bell but you
 3   ended up at Mountain Park.  They dropped you off without
 4   hearing aids, right?
 5   A.    Yes.
 6   Q.    And you called your parents and said, "I need my
 7   hearing aids," but they didn't send them, right?
 8   A.    I never got to call my parents.
 9   Q.    Well, do you recall that you testified at your
10   deposition that you called your parents and you were crying
11   and you asked for your hearing aids?
12   A.    We were not allowed to make outgoing phone calls.
13   Q.    Oh, okay, you corrected me.  You talked to your parents
14   on the phone?
15   A.    Yes.
16   Q.    You told them you wanted the hearing aids?
17   A.    Yes.
18   Q.    They didn't send them?
19   A.    Not in that first phone call.  They said -- they were
20   just not going to talk to me about anything that first phone
21   call.
22   Q.    They came to visit you, right?
23   A.    (Nodding.)
24   Q.    You have to give a verbal response.
25   A.    Yes.  I'm sorry.
```

1    Q.    And they didn't bring your hearing aids, right?

2    A.    No.

3    Q.    They did not bring them?

4    A.    They did not.

5    Q.    Okay.  You told them, I need my hearing aids, they

6    didn't bring them to you.  They didn't send them to you?

7    A.    They wouldn't talk to me about it.  They wouldn't tell

8    me why.  They said -- they kept saying that they were going

9    to send them or my mom said she did send them, but when I

10   said I never got them, they wouldn't talk about it.

11   Q.    At any rate you told your parents and they didn't send

12   the hearing aids, and ultimately when you told the people at

13   Mountain Park about it, the people at Mountain Park took you

14   to be evaluated for hearing; is that right?

15   A.    A long time after this whole thing had started, very

16   long time.

17   Q.    It was in the first year you were at the school?

18   A.    I think it's around the first year I was at the school.

19   Q.    They took you to be evaluated and then you got the

20   hearing aids as a result; is that right?

21   A.    Correct.

22   Q.    Now, you were able to write letters to your parents and

23   you could have put in the letter, mom, dad I need the hearing

24   aids.  You could do that, right?

25   A.    Correct.

1    Q.    Also when you complain about not being able to hear,

2    Pastor Gerhardt had a PA system in the church enhanced and

3    gave you special headphones for that purpose, right?

4    A.    Towards the end of my stay at Mountain Park, after I

5    had gotten my hearing aids, I was still having some trouble

6    hearing and just in church and big rooms kind of like this.

7    I told him that I needed some help, and he called one of the

8    boys in to set me up with these headphones, so yeah.

9    Q.    Now, after you had been at Mountain Park for awhile and

10   you no longer were an orientation guide, then you at some

11   point later became an orientation guide -- let me start over.

12   After you had been at Mountain Park and you no longer had an

13   orientation guide, you later became an orientation guide; is

14   that right?

15   A.    Correct.

16   Q.    Okay.  And that was something you asked to do, right?

17   A.    Yes.

18   Q.    In fact, you wanted to be a team leader?

19   A.    Yes.

20   Q.    What's a team leader?

21   A.    A status, that's all it was.  We had six girls under

22   you, and you would meet a couple times during the day and you

23   would talk about the Lord and what he's doing in your life

24   and encourage each other and stuff like that.

25   Q.    So the team leader would talk to the other girls and

1    help minister to the girls, right?

2    A.    Yes.

3    Q.    And you also talked about you were on safety patrol and

4    you lost some sleep over that, right?

5    A.    Yes.

6    Q.    Okay.  And that was also something that girls chose to

7    do, right?

8    A.    To gain trust, yes.

9    Q.    Okay.  And you -- now, you started at the school in

10   September of 1999.  So by July 2000 you had been there ten

11   months or so, right?

12   A.    Around there, yeah.

13   Q.    Do you recall writing a letter to Mrs. Gerhardt around

14   that time?

15   A.    I'm sure I did.

16   Q.    Did you sometimes write -- did the girls sometimes

17   write notes or letters to Mrs. Gerhardt, Debbie Gerhardt, to

18   let them know how they were doing and what they were

19   thinking?

20   A.    Not for that reason.

21   Q.    Did you sometimes write letters?

22   A.    We did sometimes write letters.

23   Q.    Let's see if this works.  I want to show you Exhibit P.

24   See if you can see it on the screen.  Can you see that?  Can

25   the jury see it?  Now, this is a letter that you wrote to

1    Mrs. Gerhardt on January -- I'm sorry, July the 10th, 2000,

2    right?

3    A.    Yes.

4    Q.    After you had been at the school for awhile.  And this

5    would have been after you complained about your hearing aids,

6    after this safety pin incident, after the claim about Andrea

7    Hill pushing you, all that stuff happened before July of

8    2000?

9    A.    Yes.

10   Q.    So the letter says, "Mrs. Gerhardt, I wanted to take

11   some time out and tell you a little about what the Lord has

12   been showing me and how he's been dealing with me."  And you

13   tell me if I'm not reading your handwriting correctly.

14   A.    Dealing.

15   Q.    Okay.  "It's not often I have the chance to talk to

16   you, that's why I'm writing.  First, I want to thank you and

17   Brother Gerhardt for being patient with me through this whole

18   hearing thing."  Now, you were referring to your hearing aid,

19   your hearing problem, the hearing aid issue; is that right?

20   A.    (Nodding.)

21   Q.    And Brother Gerhardt is Sam Gerhardt, we've talked

22   about him, right?

23   A.    I'm sorry, what?

24   Q.    Brother Gerhardt is Brother Sam Gerhardt who is a

25   defendant in the case that you're suing, right?

```
 1    A.     Yes.

 2    Q.     "It has always been easy for me to give the future to

 3    the Lord, however, I made" -- I'll tell you what, why don't

 4    you go ahead and start reading from "It has always been

 5    easy."

 6    A.     I think I meant to say has not always been easy.  But

 7    it says, "It has always been easy for me to give the future

 8    to the Lord.  However, I made trusting him --"

 9             THE COURT:  You want to read it?

10    Q.     I'll read it.  And I'm sorry if this is emotional for

11    you.  "It has always been easy for me to give the future to

12    the Lord.  However, I made trusting him from day to day much

13    harder than it really was.  The past few weeks I've been

14    wrestling with the Lord (kind of like Jacob).  I surrender to

15    stay and graduate.  I wanted to."  You said you surrendered

16    to stay and graduate.  You wanted to stay at the school to

17    graduate, that's what you're saying in the letter?

18    A.     In this letter, yes.

19    Q.     "But then my hearing started to discourage me.  I kept

20    thinking I'd have to sit through another year of this

21    frustration.  It made me miserable.  There has never been a

22    time when the presence of the Lord has been more real to me

23    than the night I let go and put my trust in him.  I can't

24    explain the place -- I can't explain the peace he's given to

25    me.  Through the struggles, trials, and victories he's put in
```

1    my life, he's given me more than I can write.  He's given me

2    a peace and joy that's always there even if I'm not happy.

3    He's given me a bigger burden for the girls.  I know they

4    watch me.  I know every night that I failed the Lord at some

5    time that day.  But I pray I'm always faithful and consistent

6    testimony for the Lord.  The girls need to see someone who's

7    yielded to the Lord.  I hope I can be that person."

8           Now, you were saying to Mrs. Gerhardt you wanted to

9    help to minister to the other girls, right?

10   A.    Yes.

11   Q.    "Mrs. Gerhardt, I understand I can't have a full-time

12   student.  I was wondering if you might consider me for a team

13   one day (and this one may make you laugh) but I was also

14   wondering if until the Lord says I'm ready to minister

15   to a team if I could be in the kitchen.  I know it's hard,

16   but I'm a hard worker and I know the kitchen well."  And you

17   ultimately did work in the kitchen, didn't you?

18   A.    Pardon me?

19   Q.    You did work in the kitchen?

20   A.    Yes, I did.

21   Q.    "Again, thank you for all you've done for me and my

22   family.  Love always, Jamie Kaufmann."  That was your letter?

23   A.    Yes.

24   Q.    And you also wrote a psalm in the margin.  Is this a

25   psalm that you learned at the school?

1    A.    I knew the bible before I went to school there.

2    Q.    And you also wrote a note, a P.S. at the bottom.   It

3    says, "Did you know if you ask the Lord to reveal himself to

4    you, he will."  That was your note?

5    A.    Yes.

6    Q.    And in this note you were asking to be a team leader or

7    an orientation guide and you later were made an orientation

8    guide, and you also asked to work in the kitchen and you were

9    allowed to work in the kitchen, right?

10   A.    I asked to work in the kitchen, and I was allowed to

11   work in the kitchen?

12   Q.    Yes.

13   A.    Okay.

14   Q.    And you asked to be an orientation guide and you were

15   allowed to be an orientation guide?

16   A.    Yes.

17   Q.    Now, after you left Mountain Park isn't it the case

18   that you called back Debbie Gerhardt, Sam Gerhardt, and you

19   asked if you could come to work there?

20   A.    Yes.

21   Q.    And you also had expressed an interest in wanting to go

22   to another children's ministry in Idaho and administer to

23   young girls there?

24   A.    I wanted to work in a ministry, one where they helped

25   you and built you up, not one where they break you down and

1    leave you like that.

2    Q.    Well, maybe I misunderstood, but I thought your

3    testimony was that you called Debbie Gerhardt and you told

4    her you wanted to go to work at the school after you had

5    graduated?

6    A.    Yeah, that's Mountain Park.  But not the one in Idaho.

7    Q.    I understand.  But you did ask Debbie Gerhardt if you

8    could come to work there?

9    A.    Not -- in the letter?

10    Q.    No, after you left the school, you called her up and

11    said I'm interested in coming to work at Mountain Park as a

12    staff member?

13    A.    I talked to, I believe, Brother Gerhardt and he

14    transferred me to Mrs. Wills.  And I spoke to Mrs. Wills.

15    Q.    And you asked if you could go to work there as a staff

16    member?

17    A.    Yes.

18          MR. SCHWARTZ:  One second, Your Honor.  That's all I

19    have, Your Honor.

20          THE COURT:  Very well.  Redirect.

21                    REDIRECT EXAMINATION

22    BY MR. STILLEY:

23    Q.    Why did you write the letter?

24    A.    After being taken away from my parents and trashing

25    that relationship, I just wanted that relationship back.  And

1    when they were proud of me, my parents were proud of me.  I

2    would have done anything -- I would have done anything to be

3    back in the good graces of my parents.

4    Q.    Was there a penalty at Mountain Park for writing or

5    saying things the defendants disagreed with?

6    A.    Yes.

7              MR. SCHWARTZ:  Your Honor, again, this is going back

8    to this vague statement, claims about penalties.  There's no

9    tying it to my clients or anything they said.

10             MR. STILLEY:  Your Honor, there's a letter that's

11   been put in here.  And it's put in for the purpose of showing

12   that -- whatever it's to show.

13             THE COURT:  Well, you got to lay some foundation

14   relative to the defendants.

15   BY MR. STILLEY:

16   Q.    Did the defendants do anything to cause you to believe

17   that you would be punished for saying or writing things that

18   displeased the defendants?

19   A.    Yes.

20             MR. SCHWARTZ:  Again, Your Honor, it's calling for a

21   conclusion.  I think he can ask what they said, but he ought

22   not to be able to ask about her conclusion about what was

23   said.

24             MR. STILLEY:  Well, that's the next question.

25             THE COURT:  Overruled.  Go ahead.

1    Q.    Tell us about what statements were made or what acts

2    were taken to cause you to think writing or saying something

3    that's pleasing to the defendants --

4    A.    If you didn't conform to the rules of Mountain Park --

5          MR. SCHWARTZ:  I have the same objection, Your

6    Honor, to that question.  If he wants to ask what any of my

7    clients said, that's one thing, but now he's again asking for

8    a conclusion.

9          THE COURT:  You need some specific instances related

10   to the defendants.

11         MR. STILLEY:  Or their employees I presume.

12         THE COURT:  Go ahead.

13   BY MR. STILLEY:

14   Q.    Were there any specific instances related to the

15   defendants or their agents that led you to believe that you

16   were not free to say what you wanted to say or that you might

17   be punished for saying things that the defendants did not

18   like?

19         MR. SCHWARTZ:  Your Honor, again, I object, that is

20   such a broad compound question, it's calling for a

21   conclusion.  It's not asking for anything my client said.

22   He's asking her about who she thinks an agent is.

23         THE COURT:  We'll give a little leeway so we can get

24   through this.  Go ahead.  You may answer the question.

25   A.    Can you repeat the question?

1    Q.    Yes.  Well, I'll try.  I can't repeat the same

2    question.  What I'm trying to find out is if the defendants

3    or their agents said or did anything to lead you to believe

4    that you might be punished for saying things that the

5    defendants did not like.

6    A.    If you did not conform to the ways of Mountain Park,

7    you were put back on orientation.  Your stuff could be taken

8    away from you.  You wouldn't be allowed to talk.  You

9    wouldn't be allowed to eat the dessert, the little piece of

10   anything that they would give you.

11   Q.    And were there any specific instances that led you to

12   this conclusion related to the defendants or their agents?

13   A.    It happened every powwow.  Every time we all met, you

14   saw results of what happened if you didn't conform to

15   Mountain Park's rules.

16   Q.    Now, in this letter you asked to be an orientation

17   guide?

18   A.    Yes.

19   Q.    Why did you want to be an orientation guide?

20   A.    So they would leave me alone.  When you're an

21   orientation guide, it's a sign of status, and it's a sign of

22   trust.  And when you're trusted by them and you have that

23   higher status and responsibility, they are not as mean.  They

24   don't pay attention to you.  They pay more attention to the

25   single girls and the girls in orientation.  But I would have

 1   just been in the background.

 2   Q.    Did you ever tell the defendants or their agents that

 3   you wanted to leave Mountain Park?

 4          MR. SCHWARTZ:  Your Honor, again, the question is

 5   way too broad and it's not specific, and he put it in this

 6   about the agents.

 7          THE COURT:  Go ahead.

 8   A.    What was the question?

 9   Q.    Did you ever tell the defendants or their agents that

10   you wanted to leave Mountain Park?

11   A.    Yes, I did.

12   Q.    And about how many times?

13   A.    Well, a million times at the beginning.  I told

14   everybody I wanted to leave and that I didn't want to be

15   there.

16   Q.    And can you remember who you told?

17   A.    My orientation guide, Andrea Hill -- my orientation

18   guide, Andrea Hill.  My orientation guide was the only person

19   I was allowed to talk to.

20   Q.    And what kind of response did you get to that?

21   A.    That my parents signed me over to them, and that I no

22   longer belonged to them.

23   Q.    And was that -- is that substantially the full

24   response?

25   A.    Pardon me?

1    Q.    Is that substantially the full response that you can

2    recall?

3    A.    Did I give a response to that?

4    Q.    No. Is that substantially the full response that you

5    got from your orientation guide and Ms. Hill?

6          MR. SCHWARTZ:  Well, Your Honor, again, anything the

7    orientation guide said is hearsay and should not be admitted.

8          THE COURT:  Overruled.

9    A.    Can you rephrase that?  I can't understand what you're

10   saying.

11         THE COURT:  Why don't you use plain English

12   sometimes.

13         MR. STILLEY:  It's hard, Judge.

14         THE COURT:  Sometimes you jump from down here with

15   your language to way up there.  You know, just

16   substantially -- please.  Is that all they said?  Come on.

17   BY MR. STILLEY:

18   Q.    Well, I like that.  Is that all they said?

19   A.    Is that all they did?

20   Q.    Is that all that your orientation guide and Ms. Hill

21   said?

22   A.    Yes.  And actually I believe Ms. Vaughn said that as

23   well.

24   Q.    Now, in this letter you also asked to work at Mountain

25   Park.  Why would you do that?

1    A.    I loved those girls there.  And I thought -- we weren't

2    allowed to cry or to show each other love.  We weren't

3    allowed to give hugs or comfort anybody in their loss or

4    whatever happened.  And the girls loved me and they looked up

5    to me.  And I promised them I would come back and help them.

6    And whether it would be letting them cry, I wanted to still

7    go back and help them because I said I would.

8          MR. STILLEY:  Pass the witness.

9          MR. SCHWARTZ:  I have nothing further.

10         THE COURT:  Thank you, Ms. Woods.  Call your next

11   witness.

12         MR. STILLEY:  Ms. Shari Lueken.

13         (The following proceedings were held at the bench

14   and outside the hearing of the jury:)

15         MR. SCHWARTZ:  Your Honor, this lady testified at

16   her deposition that while she was at Mountain Park she would

17   injure herself, cut herself.  And her interrogatory answers

18   state that she never told anyone, anyone at the staff -- the

19   defendants about this, that she was going in and, you know,

20   cutting herself from a self injury.

21         THE COURT:  What do you want me to do?

22         MR. SCHWARTZ:  That should not be allowed.  That

23   should be excluded.

24         THE COURT:  What about that, Mr. Stilley?

25         MR. STILLEY:  Well, I really think it should be

1    included.  My theory is that the defendants had a duty to

2    prevent psychological harm.  It's clear that somebody that

3    cuts on themselves has a --

4         THE COURT:  Psychological and intentional infliction

5    of emotional distress is out.  So, I mean, it could come in

6    as medical, but if she didn't tell anybody, nobody knows.

7    It's like the tree that just fell in the forest.  The leaf

8    that just fell.  Didn't see it, didn't happen.

9         I mean, because the only thing it goes to is

10   psychological damages.  I mean, in terms of intentional

11   emotional distress, that's out.

12        MR. SCHWARTZ:  She was cutting herself before she

13   went there too from her own testimony.  So this is really

14   something that's highly prejudicial to allow that to go to

15   the jury.  She admits in her interrogatory she didn't tell my

16   clients about it.  It's just --

17        MR. STILLEY:  Generally people that are in this

18   condition don't go tell people who are treating them in a

19   very bad way that they are cutting themselves.

20        THE COURT:  You know, what does it go to other than

21   the psychological?

22        MR. STILLEY:  She was -- had an adverse reaction.

23   This was injury to her.  This was -- despite the fact that it

24   was self inflicted, it was injury.  She suffered --

25        THE COURT:  I'm sustaining the objection.  We're not

1    going to get into this.  So no questions about this self

2    infliction.

3              MR. STILLEY:  Sure.

4              (The following proceedings continued within the

5    hearing of the jury:)

6                        SHARI LUEKEN,

7    Having been first duly sworn, was examined and testified as

8    follows:

9                      DIRECT EXAMINATION

10   BY MR. STILLEY:

11   Q.    Please state your name.

12   A.    Shari Lueken.

13   Q.    Where do you live?

14   A.    Washington.

15   Q.    And how old are you?

16   A.    Nineteen.

17   Q.    Did you go to Mountain Park Boarding Academy?

18   A.    Yes, sir.

19   Q.    How did you find out you were going to go?

20   A.    My parents told me.

21   Q.    Were you scared about that?

22   A.    No, I was excited.

23   Q.    So it was your choice to go?

24   A.    Yes.

25   Q.    And how did you travel to Mountain Park?

```
1    A.    We drove.

2    Q.    You and your parents?

3    A.    Uh-huh, yes.

4    Q.    What are your parents' names?

5    A.    Marilyn and Ralph Lueken.

6    Q.    And how long were you at Mountain Park?

7    A.    Two years.

8    Q.    While you were at Mountain Park, were there any changes

9    in your menstrual periods?

10   A.    Yes.

11   Q.    And when did this change start?

12   A.    Six days after I got there.

13   Q.    And did you miss your period?

14   A.    For nine months.

15   Q.    And after the nine months did the periods come back?

16   A.    Yes, after I went on my first pass.

17   Q.    And were the periods normal after that period of time?

18   A.    Yes.

19   Q.    Were you forced to exercise while at Mountain Park?

20   A.    Yes.

21   Q.    Were you capable of doing the exercise that you were

22   required to do?

23   A.    Capable?  What do you mean by capable?

24   Q.    Well, were you asked to do exercise that was too much

25   for your body to take?
```

```
 1   A.     I had no energy to do it, no.

 2   Q.     Did you try to stop doing the exercise?

 3   A.     Yes.

 4   Q.     And what happened next?

 5          MR. SCHWARTZ:  Your Honor, I object, this is

 6   something we've already discussed this morning at side bar.

 7   That was already excluded.

 8          THE COURT:  Sustained.  Let's move on.

 9   BY MR. STILLEY:

10   Q.     While you were at Mountain Park did you suffer physical

11   injuries in the nature of cuts or abrasions?

12   A.     Yes.

13          MR. SCHWARTZ:  Objection, Your Honor.

14          THE COURT:  Sustained.

15          MR. SCHWARTZ:  This has already been excluded.

16          MR. STILLEY:  Judge, can we approach?

17          THE COURT:  We just talked about this.

18          MR. STILLEY:  I'm asking about the medical care.

19   It's negligence.

20          MR. SCHWARTZ:  Your Honor, we had a long discussion

21   about this this morning.

22          THE COURT:  We just talked about this.

23          MR. STILLEY:  Your Honor.

24          THE COURT:  Hold on.  We just talked about this.

25   The jury will disregard any questions -- the last question.
```

1    Move on.

2    BY MR. STILLEY:

3    Q.    Did you ask for medical care while you were at Mountain

4    Park?

5    A.    Yes.

6    Q.    For what?

7    A.    Which time?

8    Q.    Well --

9    A.    The entire time I was there?

10   Q.    How many times did you request medical care?

11   A.    Quite a few.

12   Q.    Were you allowed to keep a calendar?

13   A.    No.

14   Q.    How about a diary?

15   A.    No.

16   Q.    When you say several times, can you give an estimate of

17   how many times?

18   A.    No, I don't even know.  The whole two years I was there

19   I --

20   Q.    Okay.  Now, what different kinds of injuries or

21   ailments did you request medical care for?

22   A.    Almost exactly a year after I got there I accidentally

23   cut my finger on a piece of glass.  And so I got like rubbing

24   alcohol and stuff for that for the stitches.

25   Q.    Well, did you also get stitches?

```
 1    A.    Yes, six.

 2    Q.    Who put the stitches in?

 3    A.    I don't remember.

 4    Q.    Was it a doctor?

 5    A.    Yes.

 6    Q.    Did they take you somewhere?

 7    A.    Yes.

 8    Q.    Do you remember where?

 9    A.    No.

10    Q.    Do you remember if you went in the front door or the

11    back door?

12    A.    No.

13    Q.    Do you remember what town it was in?

14    A.    I think it was Poplar Bluff.

15    Q.    And do you remember who took you?

16    A.    Yes, but I can't remember her name.

17    Q.    Did you -- now, I presume then that you asked to get

18    medical treatment for this cut?

19    A.    I didn't have to ask.

20    Q.    How did you get the cut?

21    A.    I was doing dishes and it was Friday lunch time, so

22    there was leftovers.  And we had to hurry to get to bible

23    memory.  And I decided to take some glasses over to the

24    smaller sinks in the corner.  And I brought -- I took one in

25    each hand, and I brought them up, but I forgot to bring them
```

1  out because there was like very, very little crawl space that

2  you could stand in.  And I forgot that the sinks were right

3  above them, and so this hand was higher than this hand and

4  the glass shattered on this hand from the sink.

5  Q.    Now, do you have any complaints with the way the

6  defendants provided medical care in this instance?

7  A.    In that instance, no.

8  Q.    Were there other instances in which you received cuts

9  or scrapes or bruises?

10  A.    Yes.

11       MR. SCHWARTZ:  Your Honor, this is what has already

12  been excluded.

13       MR. STILLEY:  Judge --

14       THE COURT:  Well, I have excluded this unless you're

15  going to talk about you got something relative to the

16  defendants on this.

17       MR. STILLEY:  Well, I can lay a foundation, Judge.

18       THE COURT:  Well, you better do that instead of

19  going where, you know, if it has nothing to do with these

20  defendants.

21       MR. STILLEY:  Well, let me lay that.  I'm trying to

22  lay a foundation right now.

23       THE COURT:  Well, try that.

24  BY MR. STILLEY:

25  Q.    Were there other cuts, scrapes, bruises of which the

1    defendants had knowledge that you made the defendants aware

2    of your injuries and requested medical care?

3    A.    Yes.

4    Q.    And describe the nature of those injuries.  Well,

5    scratch that.  Let me back up.  Who of the defendants were

6    made aware that you had this injury?

7    A.    It was either Julie or Debbie.

8    Q.    Debbie Gerhardt?

9    A.    Yes.

10   Q.    And what -- how do you know that Debbie Gerhardt had

11   knowledge of this injury?

12   A.    Because my orientation guide, Natalie, told her right

13   in front of me.

14   Q.    And so you heard that?

15   A.    Yes.

16   Q.    So what did Natalie Gerhardt -- what did Natalie tell

17   Ms. Gerhardt about the injuries?

18        MR. SCHWARTZ:  Your Honor, I object, he hasn't laid

19   a foundation that she was present at the conversation.  This

20   is what the orientation guide said to the witness.  That's

21   what she's testifying to.

22        THE COURT:  Well, I think you may need to rephrase

23   it.  But he's saying something she heard being told to one of

24   the defendants, is that correct?

25        MR. STILLEY:  That is correct.  Let me lay the

```
 1    foundation and make sure that she's listened to it.

 2    BY MR. STILLEY:

 3    Q.    Were you present at the conversation between Natalie

 4    and Ms. Debbie Gerhardt?

 5    A.    Yes.

 6    Q.    And did you hear what was said between the two of them?

 7    A.    Most of it.

 8    Q.    And did you speak during this conversation?

 9    A.    No.

10    Q.    Why were you at this meeting?

11    A.    I cannot go more than arm's length away from Natalie.

12    Q.    Now, had you received cuts, scrapes, or bruises at that

13    point in time?

14    A.    Yes.

15    Q.    And was part of the purpose of this meeting to request

16    medical care?

17    A.    No, that wasn't the actual purpose of the meeting.

18    Q.    Was the request for medical care made at the meeting by

19    anyone?

20    A.    I don't think she asked that I be taken care of, but

21    she told Ms. Gerhardt that I had scrapes from --

22              MR. SCHWARTZ:  Your Honor.

23              THE COURT:  Move on from this.

24    BY MR. STILLEY:

25    Q.    Okay.  Were these serious scrapes or bruises?
```

1    A.    I wouldn't consider them serious.  But I still have the

2    scars to this day.

3    Q.    Can you show the jury the scars?

4         MR. STILLEY:  Your Honor, can we have the witness

5    show the scars to the jury?

6         MR. SCHWARTZ:  Your Honor, I object to this, this is

7    part of what's been excluded.

8         THE COURT:  Well --

9         MR. STILLEY:  If I need to back up, I'll back up.

10   Here's what I'm trying to do.  I think I've laid the

11   foundation.

12        THE COURT:  I know what you're trying to do, but you

13   got to connect the defendants to this.

14        MR. STILLEY:  Okay.  Well, let me back up then and

15   make another run at this.

16   BY MR. STILLEY:

17   Q.    Was Debbie Gerhardt made aware of the injuries that you

18   just told me about that -- at this meeting?

19   A.    Yes.

20   Q.    And what is your basis for personal knowledge that she

21   was made aware of that?

22   A.    I was there.  I was standing next to Natalie.

23   Q.    Okay.  And as a result was the request made by anyone

24   for medical care?

25        MR. SCHWARTZ:  Objection, asked and answered.  She

```
 1   said there was not.

 2        THE COURT:  I'll allow it again.  Go ahead.

 3   A.    No.

 4   Q.    Was Ms. Gerhardt made aware of the wounds?

 5   A.    Yes.

 6   Q.    And how do you know that she was made aware of the

 7   wounds?

 8   A.    I was there.

 9   Q.    Had she been made aware of the wounds beforehand to

10   your personal knowledge?

11   A.    I don't know.

12   Q.    Did -- was Ms. Gerhardt made aware of how serious the

13   wounds were?

14        MR. SCHWARTZ:  Well, again, Your Honor, I'm going to

15   object.  I think she already testified what the conversation

16   was.

17        THE COURT:  Well, maybe you better deal with more

18   about the conversation.

19   BY MR. STILLEY:

20   Q.    Okay.  Let me back up a little bit.  Do you remember

21   approximately what day we're talking about?

22   A.    It was a Sunday afternoon.

23   Q.    Do you remember what time of year it was?

24   A.    Springtime or summer.  It was really warm, so spring or

25   summer.
```

1    Q.    And what had you been doing on that Sunday afternoon?

2    A.    I was being dragged around the field.

3          MR. SCHWARTZ:  Your Honor, I object.  This has been

4    excluded.  Move that the jury disregard.

5          MR. STILLEY:  Let me go --

6          THE COURT:  Forget all that.  Come on up.

7          (The following proceedings were held at the bench

8    and outside the hearing of the jury:)

9          THE COURT:  I'm inclined to move on from this

10   altogether even if she shows which one occurred before or

11   which one, you know, the self mutilation before she got there

12   and after she left.  You know, how do you determine which is

13   which?  Now we're getting into dragging, which that whole

14   situation, you know, unless she's requested -- she requested

15   or somebody else, or you didn't even say that they looked at

16   them to see to see if they were serious.  Who looked at them?

17         MR. SCHWARTZ:  She said it wasn't serious.

18         THE COURT:  She said it wasn't serious.

19         MR. SCHWARTZ:  And she didn't ask for medical care.

20         THE COURT:  Yeah, we got nobody asking for medical

21   care.  They didn't look at them.

22         MR. STILLEY:  Judge, can I lay a foundation that

23   this --

24         THE COURT:  I think you've tried to lay a

25   foundation.  I'm inclined to think the foundation is not

1    there that's going to rectify or give you the ability to show

2    these particular, whatever is left for these cuts and bruises

3    and so forth.  And here this matter is even more complicated

4    by the fact she was into self mutilation before she came to

5    Mountain Park as well as when she left.

6        MR. STILLEY:  If they want to go into self

7    mutilation and she's mutilating herself, then showing those

8    to the jury, let them do it, that's fine.

9        THE COURT:  No, no, no, you know, I'm not here to

10   create confusion.  And that's what I'm trying to avoid by

11   this whole situation.  So that's why I'm telling you, let's

12   move on from this whole situation about these bruises and

13   cuts when you don't have a situation where they saw them,

14   nobody asked for medical care, and as well as the fact that

15   there were these cuts and bruises before and after.  You said

16   self mutilation before and after being at Mountain Park.  So

17   let's just move on.

18       MR. SCHWARTZ:  Your Honor, I want to make a record

19   that I want the jury to be instructed to disregard the last

20   statement and that we get a mistrial.  He specifically --

21       THE COURT:  The last statement about what?

22       MR. SCHWARTZ:  She said I was being dragged around,

23   that's what her comment was.  And he specifically asked her

24   what were you doing just before you got the cuts and bruises

25   after you had excluded that several times in this trial.  And

1    you've told him several times he can't get into it, and he

2    asked her the question.  I think he ought to be sanctioned.

3            THE COURT:  Fine.  I'll tell the jury to disregard

4    it.

5            (The following proceedings continued within the

6    hearing of the jury:)

7            THE COURT:  The jury will disregard this answer

8    about dragging around.  Move on, Mr. Stilley.

9    BY MR. STILLEY:

10   Q.    Do you have a good memory of events at Mountain Park?

11   A.    Not very much, no.

12   Q.    Do you have a good memory of events before Mountain

13   Park?

14   A.    Yes.

15   Q.    What about events after Mountain Park?

16   A.    Yeah.

17   Q.    Were you forced to write lines at Mountain Park?

18   A.    Yes.

19   Q.    For what?

20   A.    A lot of different things.  I can't remember all of

21   them, but lying, stealing, stuff like that.

22   Q.    About how many times?

23   A.    Until they told me to stop.

24   Q.    But on about how many different occasions?

25   A.    Oh, I have no idea.

1          MR. SCHWARTZ:  I didn't hear the last answer.

2    A.    I have no idea.

3    Q.    Were you ever given a cold shower?

4    A.    Yes.

5    Q.    And what was the reason for that?

6          MR. SCHWARTZ:  Well, Your Honor, this is not tied to

7    my client.  There is no --

8          THE COURT:  You don't tie these things --

9          MR. STILLEY:  Let me see if I can lay a foundation

10   for that.

11         THE COURT:  Well, try to do that before you jump

12   like you do.  Go ahead.

13   BY MR. STILLEY:

14   Q.   Did the defendants or their agents ever give an order

15   that you be given a cold shower?

16         MR. SCHWARTZ:  Again, he hasn't laid a foundation

17   for that question.  He's trying to bring in inadmissible

18   evidence.

19         MR. STILLEY:  They want a foundation.  I'm trying to

20   lay a foundation.

21         THE COURT:  Try again.  Try again.

22   BY MR. STILLEY:

23   Q.   Well, did the defendants personally give orders that

24   you be given a cold shower?

25         MR. SCHWARTZ:  Again, Your Honor, he needs to lay a

1    foundation as to what she heard, and he hasn't asked that.  I

2    think deliberately he's not asking the question.

3         MR. STILLEY:  Well, let me rephrase.  I'll help them

4    out.

5    Q.   Did you hear any of the defendants personally give

6    orders that you be given a cold shower?

7    A.   No.

8    Q.   Who was the person -- did you hear any person directly

9    give orders that you be given a cold shower?

10        MR. SCHWARTZ:  Your Honor, objection, irrelevant,

11   prejudicial, he hasn't laid a foundation.  He's actually

12   shown that she doesn't have a foundation.

13        MR. STILLEY:  Your Honor, I'm trying to get this

14   information and to proceed on the basis of the foundational

15   information that I can gain from this because we don't have

16   the defendants personally doing it.  I need to find out who

17   it was that did it.  And then if it's not a person that's an

18   agent, I'll move on.

19        THE COURT:  Well, part of the thing is you already

20   know who did it, and you know what connection it is, but, you

21   know, I feel like that story about how to keep somebody

22   suspended, and so I don't like going through this when if you

23   don't have the connection with the defendants, then, you

24   know, it's already out on the table.  And that's the problem.

25   But you know.  And you're an officer of this court.  That's

1    the problem.  That is the problem.

2         MR. STILLEY:  Judge, can we get the witness and have

3    a side bar, and see what the witness is going to say and let

4    you make a ruling?

5         THE COURT:  I'll tell you what.  Why don't we do

6    this.  See, some people think this job is easy, like I'm up

7    here flipping coins and stuff.  This stuff stresses you out,

8    get more gray hair and all this stuff, take time off how long

9    you're here on earth.  Goodness gracious.

10        Ladies and gentlemen of the jury, we're going to

11   take our luncheon recess at this time while I deal with these

12   recalcitrants here.  Recall the admonition.  Return to your

13   jury room at 1:15.

14        (The following proceedings were held outside the

15   hearing of the jury:)

16        MR. STILLEY:  Your Honor, can I shorten this up?

17   I'm asking the wrong question.

18        THE COURT:  That's what I'm been talking about.  I

19   started talking about that the first day when you said I was

20   awfully ambitious.

21        MR. STILLEY:  Judge, I will make this -- I'll ask

22   the right question next time, I'll ask who rushed down to

23   give you the cold shower.  It was Ms. Gerhardt herself.  She

24   did it personally.  I was asking who said it.  It was

25   Ms. Gerhardt who did it personally, so we don't have a

1    problem.

2         MR. SCHWARTZ:  Your Honor, you know what the problem

3    is, that this is cumulative and prejudicial.  This has

4    nothing to do with the claims in the lawsuit.  The claims in

5    the lawsuit is about failing to give -- her claim is a

6    negligence claim, failing to give adequate medical care.  And

7    she's testified about that already.  But there's nothing in

8    the lawsuit about cold showers.  There's no -- you've already

9    said you're not going to have testimony about emotional

10   distress damages.  So what damage --

11        THE COURT:  The only claim left of Ms. Lueken is a

12   negligence claim, so are you saying that that relates to the

13   negligence, Mr. Stilley?

14        MR. STILLEY:  Absolutely.  It's the negligence.

15   They were so stressful to her even by her their own theory

16   that it caused cessation of menses, and it's very stressful

17   to get a cold shower.

18        MR. SCHWARTZ:  That's not the claim in the lawsuit,

19   that's a new claim he's come up with.

20        THE COURT:  Well, he's always got new ones.

21        MR. SCHWARTZ:  I mean, what your summary judgment

22   order said was they could say we had sensation of menses and

23   weren't taken to the doctor, and they could testify about

24   whatever harm that was.

25        THE COURT:  Fine.  I'm going to allow him to ask

```
1    that.  Go ahead with it and get on past it and move on.

2              MR. STILLEY:  We'll go real fast.

3              THE COURT:  Right.  Have a pleasant lunch.

4              MR. SCHWARTZ:  Thank you, Judge.  What time do you

5    want us back?

6              THE COURT:  Same time I told the jury to come back,

7    1:15.

8              (Court in recess from 12:15 p.m. until 1:22 p.m.)

9              (The following proceedings continued within the

10   hearing of the jury:)

11             THE COURT:  Good afternoon, ladies and gentlemen of

12   the jury.  Shall be continue?

13             MR. STILLEY:  Yes, Your Honor.

14   BY MR. STILLEY:

15   Q.    Who gave you the cold shower?

16   A.    Debbie Gerhardt.

17   Q.    Were there other punishments applied to you?

18   A.    Yes.

19   Q.    And what were those punishments?

20   A.    I was required to wear what was called an ugly dress.

21   I had to carry around a baby stool, stand in the corner in

22   all my spare time.  I was on silence.  I was required to

23   write lines.  And I had no sweets.

24   Q.    And what?

25   A.    I had no sweets.  I couldn't have anything that had
```

1    sugar in it.

2    Q.    Did you turn 16 while you were at Mountain Park?

3    A.    Yes.

4    Q.    Did your mother send you a cake?

5    A.    Yes.

6    Q.    Did you --

7          MR. SCHWARTZ:  Objection, Your Honor.

8          THE COURT:  Sustained.

9          MR. STILLEY:  Well, can we approach on that?

10         THE COURT:  No.

11   BY MR. STILLEY:

12   Q.    Did your parents send you some musical instruments?

13   A.    Yes.

14         MR. SCHWARTZ:  Objection, you have already heard

15   this and you have --

16         THE COURT:  Sustained.

17   Q.    Did your eyesight deteriorate while you were at

18   Mountain Park Boarding Academy?

19   A.    Yes.

20   Q.    Was it severe enough that you could tell yourself?

21   A.    Yeah.  Yes.

22   Q.    Did you ask for any sort of assistance in that regard?

23   A.    Yes.

24   Q.    Did you get any of it?

25   A.    I did when I went on pass with my parents.

1    Q.    And how long from the time that you asked for it until

2    you received the assistance?

3    A.    It was when I went on pass.  I can't remember how long

4    it was before I asked and then I went on pass.

5    Q.    Now, did you wear glasses before you went to Mountain

6    Park?

7    A.    Yes.

8    Q.    And we see that you're still wearing glasses now.  Was

9    there a material deterioration in your eyesight that occurred

10   after Mountain Park as well?

11        MR. SCHWARTZ:  Your Honor, I object to this.  This

12   is irrelevant.

13        MR. STILLEY:  We've got before, we've got then, and

14   I want to know what happened after.

15        THE COURT:  Rephrase the question.

16   BY MR. STILLEY:

17   Q.    Did your eyesight deteriorate further after you left

18   Mountain Park?

19        MR. SCHWARTZ:  Same objection.

20        THE COURT:  Sustained.

21        MR. STILLEY:  Pass the witness.

22        THE COURT:  Cross-examination.

23                      CROSS-EXAMINATION

24   BY MR. SCHWARTZ:

25   Q.    Good afternoon, Ms. Lueken.  You were enrolled in

```
1    Mountain Park for about two years, between June of 2000 and

2    2002; is that right?

3    A.    Yes.

4    Q.    And how old were you when you went to Mountain Park?

5    A.    Fourteen.

6    Q.    And your parents enrolled you in Mountain Park because

7    you had been smoking cigarettes, you had gotten in fights; is

8    that right?

9    A.    Yes, but mainly because I was lying to them.

10   Q.    And you were also on heroin before you went to Mountain

11   Park?

12   A.    Yes.

13   Q.    And you were selling heroin?

14   A.    No.  I don't remember.

15   Q.    I'm sorry?

16   A.    I don't remember.

17   Q.    Well, let me ask you if you recall this testimony at

18   your deposition on page 11, line 10.

19        "QUESTION:  When you were using heroin, did you ever

20   try to distribute or sell heroin to somebody else?

21        "ANSWER:  Yes."

22        Do you recall that testimony at your deposition?

23   A.    Yeah.

24   Q.    Before you went to Mountain Park when you were in

25   elementary school you had been suspended from school several
```

1    times?

2    A.    Yes.

3    Q.    Now, you came to Mountain Park in June of 2000, and

4    from time to time you may have complained about headaches or

5    other things and you were given Tylenol, do you recall that?

6    A.    Yes.

7    Q.    And in January of 2001 you had complaints of maybe sore

8    throat or flu-type symptoms and you were taken to the doctor?

9    A.    Yes.

10   Q.    You were taken to see Dr. Gayle?

11   A.    I don't remember who it was.  I remember going to the

12   doctor.

13   Q.    You remember being taken to the doctor by Mountain Park

14   employees?

15   A.    Yes.

16   Q.    And Dr. Gayle saw you and listened to whatever

17   complaints you had?

18   A.    Yes.

19   Q.    And he prescribed some medication for you?

20   A.    Yes.

21   Q.    And he prescribed?

22   A.    Amoxicillin.

23   Q.    I'm sorry?

24   A.    Amoxicillin.

25   Q.    An antibiotic.  And possibly something to help with

1    your cold symptoms, right?

2    A.    Uh-huh.

3    Q.    You have to respond.

4    A.    Yes.

5    Q.    And you were given those medications by Mountain Park?

6    A.    Yes.  The first time, but because it was amoxicillin,

7    I'm allergic to it, so I couldn't take it, so they gave me

8    Tylenol to bring down the fever.

9    Q.    Okay.  But any rate, based on a prescription that

10   Dr. Gayle gave you, you were able to go to medicine call and

11   get the medication that you needed; is that right?

12   A.    Yes.

13   Q.    And there was a time that you had a fever at Mountain

14   Park and you were given Tylenol for it?

15   A.    Yeah, that was the time that they took me to the doctor

16   for the flu.

17   Q.    They took you to the doctor for the fever and you had

18   the medication?

19   A.    Yes.

20   Q.    Now, you also testified that you were taken to the

21   doctor for stitches; is that right?

22   A.    Yes.

23   Q.    And that would have been in May of 2001.  Does that

24   sound about right?

25   A.    I think so.  I know I was there about a year, but I

1    couldn't remember the date.

2    Q.    So you were taken to see -- to Dr. Gayle's office.  You

3    had a cut on your finger, they gave you six stitches, right?

4    A.    Yes.

5    Q.    And then later you were brought back to the same

6    office, had the stitches taken out?

7    A.    Yes.

8    Q.    And when you went to the doctor on those three

9    occasions, you didn't make any other complaints about not

10   having your period or any other problems you were having, did

11   you?

12   A.    I don't think so, no.

13   Q.    Now, isn't it the case that part of the reason you were

14   not given sweets is because you were -- that Mountain Park

15   put you on a no sweet diet to help you lose weight?

16   A.    Yes.

17   Q.    And I think you testified that while you were at

18   Mountain Park you were lying and stealing; is that right?

19   A.    Yes.

20   Q.    And tell us some of the things you lied about.

21   A.    I can't remember.  I remember the punishments for it,

22   but I can't remember what it was exactly that I was lying

23   about.

24   Q.    And tell us some things you were stealing.

25   A.    Shampoo, perfume, mints, stuff like that.

1    Q.    And some of the punishments included, as you said, no

2    sweets?

3    A.    Yes.

4    Q.    Writing lines, that sort of thing?

5    A.    Yes.

6         MR. SCHWARTZ:  Thank you, Your Honor.  No further

7    questions.

8         THE COURT:  Redirect.

9                    REDIRECT EXAMINATION

10   BY MR. STILLEY:

11   Q.    You said you got in trouble for stealing shampoo,

12   right?

13   A.    Yes.

14   Q.    Did your parents not send you shampoo?

15   A.    I can't remember.  I know they did once, but -- and I

16   brought some back from the passes that I went on.

17   Q.    Well, did you steal the shampoo because you were out or

18   for some other reason?

19   A.    I had my stuff taken away, and the shampoo -- they

20   would always complain about my hair being greasy, and the

21   shampoo that I had didn't help.  And --

22   Q.    So did you steal shampoo?

23   A.    Yes.

24   Q.    Who did you steal it from?

25   A.    I don't remember.

1    Q.    Where was the shampoo at?

2    A.    In their closet.

3    Q.    In some other student's closet?

4    A.    Yes.

5    Q.    Did you put it back when you got done?

6    A.    Sometimes.

7    Q.    Sometimes not?

8    A.    Yes.

9         MR. STILLEY:  Pass the witness.

10        MR. SCHWARTZ:  No further questions, Your Honor.

11        THE COURT:  Very well.  Thank you, Mr. Lueken.  You

12   may step down.  You may call your next witness.

13        MR. STILLEY:  Marilyn Lueken.

14                  MARILYN LUEKEN,

15   Having been first duly sworn, was examined and testified as

16   follows:

17                  DIRECT EXAMINATION

18   BY MR. STILLEY:

19   Q.    Please state your name.

20   A.    Marilyn Lueken.

21   Q.    And who are you married to?

22   A.    Ralph Lueken.

23   Q.    Is he here in the courtroom?

24   A.    Yes.

25   Q.    Is that the gentleman sitting back in the pews on this

1    side?

2    A.     Yes.

3    Q.     And how long have you been married to him?

4    A.     Twenty years.

5    Q.     And tell me a little bit about your family history,

6    starting with your employment and your husband's employment.

7    A.     Okay.  I was an elementary school teacher for 30 years.

8    My husband retired from Boeing Aircraft Company.

9    Q.     And how long had he worked at Boeing?

10   A.     When he retired, he got credit for 18 years.

11   Q.     And so I take it then -- what state have you lived in

12   for the last several years?

13   A.     Washington state.

14   Q.     And I take it you're both retired at this point in

15   time; is that correct?

16   A.     Yes, we both took early retirement.

17   Q.     How many children do you have?

18   A.     One.

19   Q.     And how did you come to have this child?

20   A.     Soon after we were married I became pregnant and lost

21   the baby and --

22          MR. SCHWARTZ:  Your Honor, I object to this.

23          THE COURT:  Why don't we get to the meat of this.

24   You've laid enough foundation.  Why don't you get to what

25   this case is about.

```
1              MR. STILLEY:  Sure.  It won't take long.

2    BY MR. STILLEY:

3    Q.    Okay.  How did you come to -- what I'm trying to find

4    out, how did Shari come to be in your family, was she born to

5    you?

6    A.    No.

7    Q.    Was she adopted?

8    A.    She was adopted because I lost a baby and I decided

9    that was a sign.

10             MR. SCHWARTZ:  Your Honor, I object.  This is really

11   prejudicial.

12             MR. STILLEY:  I'm through.

13   Q.    Okay.  How old was Shari when you adopted her?

14             MR. SCHWARTZ:  Your Honor, again, we need to get to

15   the point here.

16             THE COURT:  Let's get to the point.  Let's get to

17   Mountain Park.  Let's get there.

18             MR. STILLEY:  We'll get there real quick.

19             THE COURT:  I guess she was 15 you said.  Let's get

20   up to somewhere close to that, okay.

21             MR. STILLEY:  Well, can she answer the question of

22   how old the child was when she was adopted?

23             THE COURT:  No, I'm sustaining the objection.

24   BY MR. STILLEY:

25   Q.    How long have you known Shari Lueken?
```

1    A.    I've known Shari for 18 years.

2    Q.    And how old is Shari Lueken?

3    A.    How old is Shari?  19.

4    Q.    And can you tell -- just give the jury a little

5    thumbnail sketch of the growing up years of Shari Lueken.

6         MR. SCHWARTZ:  Well, again, Your Honor, it's not

7    relevant to the lawsuit.  I don't see how it's relevant.

8         MR. STILLEY:  Your Honor.

9         THE COURT:  If you want to get to the point of how

10   she came to be to go to Mountain Park or be sent to Mountain

11   Park, that is fine.

12        MR. STILLEY:  That's where we're going exactly.

13        THE COURT:  Well, I know.  But, listen, I don't know

14   what you're going to talk about, but I've already instructed

15   this jury that we are not involved in sympathy or prejudice.

16   Now, it seems to me that you want to sing a sympathetic song.

17   And, I'm sorry, let's move to the point of Mountain Park.

18   That's the play.  Okay.  Let's get there.

19        MR. STILLEY:  Well, am I prohibited from saying

20   anything about before Mountain Park?

21        THE COURT:  About what?

22        MR. STILLEY:  Anything about Shari Lueken's life

23   before Mountain Park.

24        THE COURT:  Well, you need to get to the point

25   that's relevant to Mountain Park.  What is relevant to

1    Mountain Park?  If something that happened in her life

2    relevant to Mountain Park or is it just something that you

3    want to put on to show that something, you know, is bad has

4    happened to her and whatever, I don't know.  I don't know

5    where you're going with this.  But let's get close to

6    Mountain Park.

7            MR. STILLEY:  I'm trying to explain how the Luekens

8    came to the conclusion that they needed to send their

9    daughter away to Mountain Park.

10           THE COURT:  It obviously didn't happen when she was

11   one.  Okay.  Now, they take teenagers, don't they?  Isn't

12   that the testimony?

13           MR. STILLEY:  And some others younger.

14           THE COURT:  Let's move up there.

15   BY MR. STILLEY:

16   Q.    Can you tell the jury why did you decide to send Shari

17   Lueken to Mountain Park?

18   A.    The main reason I sent her to Mountain Park was because

19   I believed at that time that it was a Christian school.  She

20   needed positive reinforcement and she needed a structured

21   environment, a sheltered environment.  And at that time we

22   were told that they would provide that plus an excellent

23   education.

24           MR. SCHWARTZ:  Excuse me, if I could have an

25   objection.  This is one of the things you've already heard

1    and you've already ruled on.

2           THE COURT:  I'll give him some leeway with this.  Go

3    ahead.  Overruled.

4    Q.    Okay.  Go ahead.

5    A.    Would you like me to pull out my letter on the reasons

6    why I sent her to Mountain Park?  Because I have them listed

7    in the letter.

8    Q.    Well, actually we'll be getting into that.  That's your

9    Plaintiffs' Exhibit 63.  We'll get to that in just a little

10   bit.

11   A.    Okay.

12   Q.    But I just want to ask you some questions right now if

13   you don't mind.  Let me back up just a little bit and ask you

14   how you found out about the existence of Mountain Park.

15   A.    The first time that I recall I heard about it was from

16   her -- Shari's singing teacher had a daughter -- had a

17   stepdaughter there.

18   Q.    And then did you call Mountain Park?

19   A.    No, not until the Buckley doctor, Tim Buckley and

20   Connie Buckley, we were in a support group that met in their

21   home.  And their adopted daughter was going to Mountain Park

22   at that time.

23   Q.    So then did you make contact with Mountain Park?

24   A.    Not until we were ready to send her to Mountain Park

25   did we contact them.

1    Q.    And about what time was this?

2    A.    That would have been -- and I'm just going as close as

3    I can, spring of 2000.

4    Q.    Who did you talk to at Mountain Park?

5    A.    I talked to Mrs. Gray.

6    Q.    Mrs. who?

7    A.    Gray.

8    Q.    And who is Mrs. Gray?

9    A.    She was a secretary at that time at Mountain Park.

10   Q.    Was she the person that answered the phones?

11   A.    Yes.

12   Q.    Did she represent herself to be a secretary to you?

13   A.    Yes.

14   Q.    Did she represent herself to you to have authority to

15   speak on behalf of Mountain Park?

16         MR. SCHWARTZ:  Your Honor, I object to the leading

17   form of the question.  I really think this is an area that

18   you've already heard and already ruled on and ruled that

19   should not come into the case.  I don't see how any of it's

20   relevant to any issues in the case.

21         MR. STILLEY:  Your Honor, there are representations

22   I'm trying to establish.

23         THE COURT:  Is it relevant to battery or negligence,

24   which one?

25         MR. STILLEY:  Both, I think.

1          THE COURT:  Go ahead.

2    BY MR. STILLEY:

3    Q.    Okay.  What were you told about Ms. Gray's authority to

4    speak on behalf of Mountain Park?

5    A.    That she took the calls that the parents gave and that

6    I was to call her just before we left for Mountain Park.

7    Q.    Now, before you left for Mountain Park did you talk to

8    anybody else at Mountain Park?

9    A.    I have no distinct memory that I talked to anybody

10   else.  But I probably talked to Sam Gerhardt, but I'm not

11   sure.

12   Q.    After you got to Mountain Park did you talk to some of

13   the other defendants?

14   A.    Nobody was there except Mrs. Gray.

15   Q.    So when you dropped Shari Lueken off at that time did

16   you talk to any of the other defendants?

17   A.    No.

18   Q.    When you were there did you sign all the paperwork that

19   was necessary to enroll Shari Lueken?

20   A.    The following day.

21   Q.    Okay.  On the following day did you see any of the

22   other defendants?

23   A.    No, they weren't there.

24   Q.    Later on during the two years that or approximately two

25   years that Shari Lueken was there, did you talk to the

1    defendants during that period of time?

2    A.    I talked to Sam Gerhardt occasionally.  Most of my

3    communication was with Mrs. Gray.  And I talked to him

4    personally on a visit.

5    Q.    Did you explain to the defendants or Ms. Gray or any of

6    their other agents the situation that your daughter was in?

7    A.    Yes, I talked extensively --

8              MR. SCHWARTZ:  Your Honor.

9              THE COURT:  I'm going to sustain it.

10             MR. STILLEY:  Let me rephrase it.

11             THE COURT:  Yeah.

12   BY MR. STILLEY:

13   Q.    Did you explain to any of the defendants or their

14   employees Shari Lueken's physical or mental condition?

15   A.    Yes.  I talked to Mrs. Gray extensively.

16             MR. SCHWARTZ:  Your Honor, I object.

17             THE COURT:  Hold on.  Physical?

18             MR. STILLEY:  Well, her --

19             THE COURT:  Well, there are no mental claims in this

20   case.  It's only -- and the only claim that Ms. Lueken has is

21   negligence.  That's the only claim that's there.

22             MR. STILLEY:  Well, you already ruled that physical

23   damages --

24             THE COURT:  Well, no, no, no, you need to quit it.

25   This is very stressful for everybody trying this case.  I

1    tried to tell you about this the first time.  You don't seem

2    to get it.

3              MR. STILLEY:  Judge, may we approach?

4              THE COURT:  No.  Rephrase your question.

5    BY MR. STILLEY:

6    Q.    What kind of information did you provide to Mountain

7    Park or its employees for the purpose of assisting them in

8    providing care for Shari Lueken?

9              MR. SCHWARTZ:  The same question.

10             THE COURT:  Listen, there are only certain claims in

11   this case and you know what they are and you know what they

12   are relative to Ms. Lueken.  Now, you are expected to act as

13   a surgeon and go in toward those subject matters that are

14   there, not just open the door for anything to come out.

15   That's where we are and that's what you continue to do.

16             Now, what has been talked about I assume are, what,

17   the sight situation, eye glasses?  You don't ask about that.

18   Please.  We're not -- that's not what we're doing here.  We

19   will be here forever.

20             MR. STILLEY:  We will be here for a very short

21   time --

22             THE COURT:  Right.

23             MR. STILLEY:  -- to put this information.

24             THE COURT:  Tailor your question to this case.

25

1    BY MR. STILLEY:

2    Q.    What kind of promises or representations were made to

3    you by the defendants with respect to the care and treatment

4    they would provide for Shari Lueken?

5          MR. SCHWARTZ:  Your Honor, that's one of the issues

6    that you have already heard all about and stricken from the

7    case.  You have already ruled on this.  And I would ask that

8    he not be allowed to get into that again.  You've already

9    said that he should not be allowed to get into it.

10         THE COURT:  Well, I'm going to allow that as far as

11   the negligence is concerned.  Go ahead.

12   Q.    Do you remember the question?

13   A.    What kind of promises were made to us.

14         THE COURT:  About care.

15   A.    About care, okay.  Boy.  Those were the important ones.

16   And that was that she would be in a positive learning

17   environment so that she could gain self confidence.  I wrote

18   that in my initial letter to Mountain Park.  They knew

19   exactly what we expected, both my husband and I talked on

20   that subject.

21         MR. STILLEY:  Your Honor, may I approach the witness

22   with some exhibits?

23         THE COURT:  Go ahead.

24   Q.    I'd like to draw your attention to Plaintiffs'

25   Exhibit 63.  Do you recognize that exhibit?

1    A.    Yes, that's my handwriting.

2    Q.    Can you tell us what this exhibit consists of?

3    A.    It's a letter to my daughter, and I always tried to

4    write very positive letters.

5    Q.    Are there some other materials also included?

6    A.    And then there's some comments by Sam Gerhardt.

7    Q.    And there are some other documents that are included in

8    this exhibit, correct?

9    A.    Yes.

10         MR. STILLEY:  Move to admit Plaintiffs' Exhibit 63.

11         MR. SCHWARTZ:  Your Honor, this is a letter to her

12   daughter, and there are a bunch of other things identified.

13   None of this is relevant to any issue in the case.

14         THE COURT:  Sustained.

15         MR. STILLEY:  Okay.

16   BY MR. STILLEY:

17   Q.    We've identified the letter.  Let's go to the next

18   item.  What is the next item?

19   A.    The next one is the one that she refers to her half

20   brother Lennie, which she had never met.  And Brother

21   Gerhardt says --

22         MR. SCHWARTZ:  Your Honor, I object.

23         MR. STILLEY:  We just want to identify the letter.

24         THE COURT:  Okay.

25   Q.    And what's the date of that letter?

```
 1    A.    I can't see a date on it, unless he wrote over it.

 2    Q.    Can you look at the top right-hand corner.

 3          MR. SCHWARTZ:  Counsel, can you show me what letter.

 4    There's a number of letters.  What letter are you referring

 5    to?

 6          MR. STILLEY:  The second letter.

 7    A.    The one where Lennie is circled?

 8    Q.    Oh, okay, that's the second letter.  I'm sorry, yes,

 9    there is another letter there.  So that is the third page,

10    correct, the third page of the exhibit?

11    A.    Yes.

12    Q.    Okay.  And then there's -- so that's an undated letter,

13    correct?

14    A.    Yes.

15    Q.    Wait a minute.  Now, on the side if you'll turn it

16    sideways, is there a date, 7/28/02?

17    A.    That's when I wrote my comment on the side.

18    Q.    Okay.  Now, let's look at the next page.  Is there

19    another letter there?

20    A.    Yes.

21    Q.    And what's the date of that letter?

22    A.    3/11/01.

23    Q.    And who wrote that letter?

24    A.    I did.

25    Q.    To whom?
```

1    A.    It says, Dear Mountain Park Staff.

2    Q.    Okay.  And turn the two pages of that letter over to

3    the next page and tell us what that is.

4    A.    Two pages over?

5    Q.    Correct.

6    A.    Visit request.

7    Q.    And was this -- who was this for?  Was this for your

8    daughter Shari Lueken?

9    A.    This was for a request that Ralph and I visit Shari at

10   Mountain Park.

11   Q.    And look at the next page.  Can you tell us what that

12   is?

13   A.    Visit report.

14   Q.    What's the date on that?

15   A.    6/23/2000.

16   Q.    And is this something that you filled out and gave to

17   the defendants?

18   A.    Pardon me?

19   Q.    Is this something you filled out and gave to the

20   defendants?

21   A.    Yes.

22   Q.    And what's the next item?

23   A.    Another page of that report.

24   Q.    What's the next page after that?

25   A.    First Baptist Church of South Whidbey.

1   Q.    And that's a two-page church bulletin, correct?

2   A.    Yes.

3   Q.    And turn those two pages and look to the next item.

4   And can you tell the jury what that is?

5   A.    Visit report.

6   Q.    What's the date of that visit?

7   A.    They write their numbers British, it's August 3rd to

8   August 11th.

9   Q.    And, let's see, that's two pages, correct?

10  A.    Yes.

11  Q.    And can you turn those two pages and tell me what's

12  after that?

13  A.    Visit request.

14  Q.    And was that another visit request for you to visit

15  Shari Lueken?

16  A.    Yes.

17  Q.    And this appears to be undated; is that correct?

18  A.    Yes.  It looks like the same as the other one.

19  Q.    And look at the next page.  Can you tell us what that

20  is?

21  A.    Visit request.

22  Q.    And is this another visit request or is this a copy of

23  one we've already seen?

24  A.    That's the same March one, yes, we've seen it.

25  Q.    And look at the next page.  Can you tell us what that

1    is?

2    A.    Visit request.

3    Q.    Okay.  And what's on the page after that?

4    A.    Visit request.

5    Q.    Now, look at the previous page.  Is that not actually a

6    visit report?

7    A.    Yes.

8    Q.    Okay.  And what's the date of that visit report?

9    What's the date of visit?

10   A.    Okay.  Oh, this is written regular, 4/4 to 4/7.

11   Q.    Of 2002?

12   A.    Yes.

13   Q.    And look at the next page and tell us what that is.

14   A.    That says -- oh, it's backwards eight -- it must have

15   been August.  It's back to '01.  August 4th, '01.

16   Q.    August 4, '01 visit request?

17   A.    Yes.

18   Q.    And look on the next page.

19   A.    Uh-huh.

20   Q.    And can you identify this document?

21   A.    Yes, it's a letter from me.

22   Q.    From you to who?

23   A.    Mountain Park staff.

24   Q.    And can you see the date on that?  I think the first

25   part of that date might be a little blurred.

1    A.    It's some month on the 16th, so it's probably January

2    or February.  It might be 1/16/02, because I plan things

3    ahead.

4           MR. STILLEY:  Your Honor, move to admit Plaintiffs'

5    Exhibit 63.

6           MR. SCHWARTZ:  Your Honor, there hasn't been any

7    indication to any relevance of any of these documents.  I

8    don't know what it has to do with any issues in the case.

9           MR. STILLEY:  Judge, you said -- this is about

10   process.  And unless you make your objection, you waive it.

11   They objected to nearly everything but not this, so they

12   waived it.

13          THE COURT:  That is only as to issues that are not

14   in the case.  That does not pertain to matters that are in

15   the case.  Now, you got a number of documents here, and the

16   negligence matters that you talked about with this witness, I

17   think they have to do with medical care?  I mean, with this

18   plaintiff, Ms. Shari Lueken?

19          MR. STILLEY:  Well, Your Honor --

20          THE COURT:  Hold on.  Just answer my question.  Do

21   they have to do with medical care?

22          MR. STILLEY:  Medical care and general negligence.

23          THE COURT:  Well, I don't know what these letters --

24   these communications have to do with those subjects other

25   than the dental care is mentioned, but I don't know about the

1    other things.  They are just information about visiting and

2    not visiting and so forth and so on.

3              MR. STILLEY:  Your Honor --

4              THE COURT:  So what's the point?

5              MR. STILLEY:  There is party admissions on there.

6    There is admissions about the defendants --

7              THE COURT:  Why don't you get to that what you think

8    is particularly relevant to issues of negligence and then see

9    about that particular document, okay.

10             MR. STILLEY:  Your Honor, what I'm trying to do is

11   to make this so it doesn't take too long.

12             THE COURT:  Right, right, right.

13             MR. STILLEY:  And until --

14             THE COURT:  Just go ahead with some matter that is

15   relevant to this negligence, and then go to that document

16   that supports or whatever or does something for that.

17             MR. STILLEY:  Your Honor, can we approach?

18             THE COURT:  No.

19             MR. STILLEY:  I want to raise another reason that

20   this needs to be let in.

21             THE COURT:  No.

22             MR. STILLEY:  And let me explain this.

23             THE COURT:  I'm tired of your other reasons.

24             MR. STILLEY:  Your Honor, I think due process gives

25   me a right to be heard.

1          THE COURT:  Let's go with something that's relevant

2     about some issue of negligence in this case relative to

3     Ms. Lueken.

4          MR. STILLEY:  So I take it then that Exhibit 63 is

5     not admitted?

6          THE COURT:  That's right.  That's too much.  You got

7     too many things in that exhibit.  If you want to break it

8     down and ask about something that's in there, then we'll see

9     about it, but not that whole exhibit.

10    BY MR. STILLEY:

11    Q.    Ms. Lueken, you heard the defendants' lawyer say that

12    they were to build up the self esteem of their students,

13    correct?

14    A.    Yes, I did.

15    Q.    And was part of the reason you contacted with the

16    defendants to get them to help to build up the self esteem of

17    Shari Lueken?

18    A.    Yes.

19    Q.    I want to draw your attention to the first letter in

20    Exhibit 63.  I want you to take a look at that.  Now, there

21    is some -- there is some paragraphs that you wrote in that

22    letter, correct?

23    A.    Yes.

24    Q.    There's also some writing in the margins, and below

25    that was written by one of the defendants?

```
 1    A.     Correct, yes.

 2    Q.     Which one of the defendants?

 3    A.     Sam Gerhardt.

 4    Q.     And what did Sam Gerhardt say?

 5           MR. SCHWARTZ:  Your Honor, there's been no

 6    foundation that she knows that other than from this

 7    production of documents in the lawsuit.  There's no

 8    foundation that she received the document back or that she

 9    knows that other than from this lawsuit.

10           MR. STILLEY:  Let me lay that foundation.  I can do

11    that.

12           MR. SCHWARTZ:  And the other objection I have is

13    this has got nothing to do with the case.  Nothing to do with

14    Shari Lueken's negligence.

15           MR. STILLEY:  Do I get to respond to this?

16           THE COURT:  It seems now you got a breach of

17    contract claim.  We don't have a breach of contract claim.

18    We got negligence and battery.  Now you're up with a breach

19    of contract or something.

20           MR. STILLEY:  Your Honor, we've already in this case

21    had The Court rule correctly that when the defendants put

22    things in as issues in the case and the other side gets to

23    have their say to say it's not so.  And what the defendants

24    have gotten up and told the jury is --

25           THE COURT:  Okay, fine.  Well, I thought you put in
```

1    some of that, what was asked for, and in terms of going to

2    the school.  But you just can't throw any documents in

3    without a foundation for the document.

4              MR. STILLEY:  That's what I'm fixin' to lay.

5              THE COURT:  Well, go ahead with the foundation.

6    BY MR. STILLEY:

7    Q.    Ms. Lueken?

8    A.    Yes.

9    Q.    How many times have you had the occasion to read the

10    handwriting of Sam Gerhardt?

11    A.    Quite a few.

12    Q.    And how did you obtain these writings?  Did they come

13    to you in the U.S. mail?

14    A.    Yes.

15    Q.    And what kind of address was on the outside of the

16    envelope?  Who was the sender on the outside of the envelope?

17    A.    Mountain Park, it was envelopes I supplied to them with

18    stamps.

19    Q.    And did Sam Gerhardt sign his name to these comments

20    that he wrote on the letters?

21    A.    Yes.

22    Q.    Did you at other times talk to Sam Gerhardt about the

23    contents of things that he had written?

24    A.    Usually I had to go through somebody else.

25    Q.    Now, did Sam Gerhardt ever contend that he had not

1    written those things that you called him about?

2    A.    No.

3         MR. STILLEY:  Your Honor, with that foundation I

4    would move to admit the first letter under Plaintiffs'

5    Exhibit 63.  It's a two-page letter, it's Exhibit 63-A.

6         THE COURT:  Well, still you haven't connected this

7    letter to the defendant other than you laid some general

8    foundation about recognizing Mr. Gerhardt's writing and so

9    forth.  But what about this particular letter?

10        MR. STILLEY:  Let me work on that, Judge.  We'll try

11   that.

12        MR. SCHWARTZ:  Your Honor, we don't dispute that

13   Brother Gerhardt wrote the note on the bottom.  That's not an

14   issue.  But it's not relevant to the lawsuit.  There's

15   nothing in that note that has any relevance to the lawsuit.

16   Nothing relevant to what I said in the opening statement.  I

17   think this is repetitious and a waste of time.

18        MR. STILLEY:  It's certainly not, Judge.  They are

19   the ones that opened the door.  They are the ones that tried

20   to present this to the jury.  This is our case.  And what we

21   have now is a document that shows precisely the opposite of

22   what the defense has said.  And that also that these comments

23   show what was being done negligently to Shari Lueken to cause

24   the damage that she suffered.  And they are party admissions.

25   They are statements made by opposing party in litigation.  It

1    doesn't have to be against interest.  That's a separate idea.

2    It is a party admission.  So, I mean, if I can --

3            THE COURT:  Well, go ahead with the comments that

4    are in the letter and move on quickly from this.  I don't

5    know what they show.

6            MR. STILLEY:  Sure.

7    BY MR. STILLEY:

8    Q.    Okay.  Ms. Lueken, can you read us the comments that

9    were written by Sam Gerhardt?

10   A.    Okay.  It's a little difficult.  First he has circled

11   what I wrote, "Darling we are proud of you.  Keep working

12   hard."  He wrote, "Proud of her doing what is demanded

13   because the price will be higher than she wants to pay if she

14   doesn't?"  And then he wrote, "Proud of what specifically?

15   Working hard at what specifically?  Shari does what she must

16   under a supervised structured environment.  Very little is

17   done under her own volition or appropriate motivation.

18   Brother Gerhardt."

19           MR. STILLEY:  Your Honor, with this being stated, I

20   once again move for the admission of Plaintiffs'

21   Exhibit 63-A, a letter 1/24/02 from Ms. Lueken to Shari.

22           MR. SCHWARTZ:  Just the one letter?

23           MR. STILLEY:  Yes, at this point in time.

24           MR. SCHWARTZ:  We object based on relevance.

25           THE COURT:  Well, it's only a portion of this

1    letter.  It's a two-page letter and there's a lot of other

2    information in here that is not relevant.  I'll allow for the

3    admission of the portion that's been referred to and that's

4    it, an expurgated version.

5              MR. STILLEY:  So we're going to have to just put in

6    what she read, correct?

7              THE COURT:  That's it, okay.  That portion only,

8    okay.

9    BY MR. STILLEY:

10   Q.    Did you later talk to Sam Gerhardt about the comments

11   in this letter?

12   A.    I don't recall, but I do not let things slide, so I

13   probably talked to somebody.

14   Q.    I'd like to draw your attention to the next letter in

15   Plaintiffs' Exhibit 63.  Did Mr. Gerhardt also write some

16   comments on this letter?

17   A.    Yes, this letter is written by Shari to me and her dad.

18   Q.    And do you know how Sam Gerhardt came to have

19   possession of this letter to write anything on it?

20   A.    Censoring her mail.

21   Q.    And now can you look at the date and give the jury some

22   idea of when this letter was sent?

23   A.    I'm going to say around January 2001.

24   Q.    And how long had Shari been at Mountain Park at that

25   point in time?

```
 1    A.     About six or seven months.

 2    Q.     Can you read the statements that were made on this

 3    letter by Sam Gerhardt?

 4    A.     He has circled the name Lennie.  And he says, "She

 5    should be scolded strongly by you for inquiring about people

 6    who are old friends and identify with her wrongdoings."

 7    Q.     Is that signed?

 8    A.     Brother Gerhardt.

 9    Q.     And who is Lennie?

10    A.     Lennie is Shari's half brother that she had never met

11    but she knew of him and had pictures of him and she was

12    asking me about him in her letter.

13    Q.     Did you make any -- did you make any response to the

14    comments in this letter?

15    A.     I called the school.

16    Q.     And what did you say -- who did you talk to?

17    A.     I can't remember for sure.

18    Q.     What did you say?

19           MR. SCHWARTZ:  Objection, Your Honor, this is really

20    far afield from the issues in the lawsuit.

21           THE COURT:  Yeah, I don't know where we're going.  I

22    think we need to move on from this.

23    BY MR. STILLEY:

24    Q.     Why did you not take Shari Lueken out at that point in

25    time?
```

```
 1              MR. SCHWARTZ:  Well, Your Honor, I object to this.
 2    This has nothing to do with the claims in the lawsuit.
 3              THE COURT:  Sustained.
 4    Q.    Did you frequently ask about Shari's progress?
 5    A.    Yes.  And I asked to speak to Brother Gerhardt.  He was
 6    often in Palm Lane and not there.
 7    Q.    And what is Palm Lane?
 8    A.    Palm Lane is another --
 9              MR. SCHWARTZ:  Your Honor.
10              THE COURT:  Hold on.
11              MR. SCHWARTZ:  I object.  This is one of the issues.
12              THE COURT:  I'm with you.  I know.  No, no, no.
13    It's not in the case.
14    BY MR. STILLEY:
15    Q.    So about how often did you inquire as to Shari Lueken's
16    progress?
17    A.    At least monthly.
18    Q.    What representations were made to you about the final
19    outcome of Shari Lueken's attendance at Mountain Park?
20              MR. SCHWARTZ:  Your Honor, I object, it lacks
21    foundation.
22              MR. STILLEY:  Let me back up.
23              MR. SCHWARTZ:  It's hearsay.
24              THE COURT:  Let him try it again.
25    Q.    Did any of the defendants or their employees or agents
```

1    make representations to you about the outcome of keeping

2    Shari Lueken at Mountain Park?

3            MR. SCHWARTZ:  Your Honor, this again is one of the

4    things that you've already heard and decided should not be in

5    the case.

6            THE COURT:  What does this have to do about the

7    negligence, the medical, and so forth?

8            MR. STILLEY:  I'm just trying to show the basis for

9    her making routine inquiry about Shari's progress, and in

10   order to have a complete story, I need to show what she's

11   trying to check on to see if it's happening.

12           MR. SCHWARTZ:  Your Honor, that's not part of the

13   lawsuit.

14           THE COURT:  Sustained.

15   BY MR. STILLEY:

16   Q.   Was it easy for you to get the information from

17   Mountain Park?

18   A.    No.  The answers were very vague, like she's --

19           MR. SCHWARTZ:  Excuse me, Your Honor.  Again, this

20   is irrelevant.  It's not part of the lawsuit.  It has nothing

21   to do with the negligence claim.

22           THE COURT:  Sustained.

23   Q.   Now, where did Shari live and attend school?  Can you

24   start from kindergarten and go on?

25   A.   In Marysville, Washington, Kellogg Marsh Elementary

1    School, Tenth Street Middle School, Cedarcrest Middle School,

2    and something on the reservation.  I can't remember the name,

3    Tulalip something.

4    Q.    Where was she going to school immediately before going

5    to Mountain Park?

6    A.    Tulalip.

7    Q.    And how long had she attended there?

8    A.    I believe a month to a month and a half.

9    Q.    And was she doing well in school there?

10   A.    No, it was an all boys' school.

11   Q.    Okay.  How about the school that she had been to

12   immediately preceding that school?

13   A.    She was only there a couple of months.

14   Q.    Did she do well at that school?

15   A.    No.

16   Q.    How about the previous school?

17   A.    Tenth Street, she did outstanding in music.

18   Q.    Did she do well at anything else?

19   A.    No.

20   Q.    Was she socially well adjusted?

21   A.    No.

22   Q.    Had you -- previous to Mountain Park had you had to put

23   her in any sort of treatment facility?

24        MR. SCHWARTZ:  Objection, Your Honor.

25        THE COURT:  Sustained.

1    Q.    What were the costs of the schools that you sent Shari

2    to before you sent Shari to Mountain Park?

3              MR. SCHWARTZ:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              MR. SCHWARTZ:  Completely irrelevant.

6    Q.    How much did you pay for tuition at Mountain Park?

7              MR. SCHWARTZ:  Same objection.

8              MR. STILLEY:  Your Honor.

9              THE COURT:  I'll allow the question.

10             MR. STILLEY:  Okay.

11   A.    $1,200 a month plus all the extras, the uniform, the

12   medical escrow, the whatever they call it, the special items

13   account.

14   Q.    And how much did you put into the medical escrow?

15   A.    $500.

16   Q.    How about the incidental expense account?

17   A.    $300 each time I put it in.

18   Q.    To your knowledge was anything used out of those

19   accounts?

20             MR. SCHWARTZ:  Objection, Your Honor, this is not

21   part of the lawsuit.

22             THE COURT:  Sustained.

23             MR. SCHWARTZ:  Highly prejudicial, is absolutely

24   irrelevant.

25

```
 1    BY MR. STILLEY:

 2    Q.    Did you at the end of your -- of Shari Lueken's stay at

 3    Mountain Park, did you try to settle up with the defendants

 4    and get an accounting for any of the money you deposited?

 5              MR. SCHWARTZ:  Same objection.

 6              MR. STILLEY:  I think it's proper.

 7              THE COURT:  You can't bring a breach of contract

 8    case in the middle of the case.

 9              MR. STILLEY:  Well --

10              THE COURT:  I'm sustaining the objection.  No.  This

11    is about negligence and battery.  Please.  And it's only a

12    negligence claim relative to this witness' daughter.  So

13    there we are.

14    BY MR. STILLEY:

15    Q.    Did you buy shampoo for Shari?

16    A.    Pardon me?

17    Q.    Did you buy shampoo for Shari?

18    A.    Yes.

19    Q.    Did you buy shampoo so she wouldn't have to steal other

20    people's shampoo?

21    A.    Yes, but they kept taking it away from her.

22    Q.    When you went to pick up Shari, how much shampoo did

23    you get?

24    A.    We have enough that we're still using it.

25    Q.    How many years has it been since you picked her up?
```

```
 1   A.     Three and a half.

 2   Q.     Do you have any of the shampoo left?

 3   A.     Yes.

 4   Q.     How much?

 5   A.     Oh, my.  Quite a bit.  We probably can make it through

 6   the rest of this year and maybe next.

 7   Q.     Did the defendants ever apologize to you for anything?

 8          MR. SCHWARTZ:  Objection, Your Honor.

 9   A.     Never.

10   Q.     Did you ever hear the defendants say anything positive

11   about Shari?

12   A.     Never.

13          MR. SCHWARTZ:  Your Honor, I object to this whole

14   line of questioning.  There is nothing relevant to this line

15   of questioning.

16          THE COURT:  Let's move away from this line of

17   questioning.  I'm sustaining the objection.

18   BY MR. STILLEY:

19   Q.     Did the defendants ever tell you to write a letter?

20   A.     Yes.

21   Q.     Who told you that?

22   A.     Sam Gerhardt.

23   Q.     And about when did this happen?

24   A.     I'm thinking around March 2001, after our visit, I'm

25   thinking.
```

1   Q.    And what were you told to write?

2   A.    We were told to write a very negative letter.

3         MR. SCHWARTZ:  Excuse me, Your Honor, this is not

4   relevant to the case.  I don't know what she's going to say,

5   but I can't see how it's relevant to this lawsuit.

6         THE COURT:  I have no idea where you're going.  I

7   don't know how it relates to the issues in this case.

8         MR. STILLEY:  Your Honor, can I explain?

9         THE COURT:  I'm scared of your explanations.

10        MR. STILLEY:  That's why I asked to come up here.

11        THE COURT:  But you're going to wear The Court's

12  carpet out if you keep coming up here so much.  I'll tell you

13  what, approach cautiously, okay.

14        (The following proceedings were held at the bench

15  and outside the hearing of the jury:)

16        THE COURT:  You seem to think that anything you can

17  say bad about these people is fine.  You know, as a lawyer

18  you have to think about you're producing a play.  And so you

19  have to say, what story do I wish to tell.  And the story you

20  seem to wish -- Mr. Stilley.

21        MR. STILLEY:  I'm listening.

22        THE COURT:  Yeah, right.

23        MR. STILLEY:  I got a two-track mind, Judge.

24        THE COURT:  Right.  You probably got an eight track.

25        MR. STILLEY:  That went out in the seventies, Judge.

1          THE COURT:  That's what I'm talking about.  But,

2     again, the story you wish to tell has to do with a breach of

3     contract.  You know, you had the parents and you had a breach

4     of contract suit, the parents, then you get into a whole

5     story about something.  But, see, you didn't do that.  And so

6     now you're trying to do -- you know, I keep telling you, you

7     did these people wrong by bringing this kind of lawsuit and

8     not the one you should have done.  But now you're punishing

9     everybody else because we got to keep -- there's objections

10    and then I got to sustain them and go through all this mess

11    because you didn't bring the kind of lawsuit you brought to

12    bring all these issues in that you keep throwing up and down.

13    It's like you're throwing everything up against the wall and

14    whatever sticks, bam.  Please.  That's not the way it works.

15    Okay.  Now, how is this relevant?

16         MR. STILLEY:  Well, we've got the defendant making a

17    statement, telling someone to write a harsh letter to their

18    daughter.  And what I'm trying to get out from this witness

19    is that she contracted with these folks to help a child that

20    she knew to be troubled.  Everybody knew that she was

21    troubled.  The only thing --

22         THE COURT:  Well, hold on.  You said that you wanted

23    to bring out evidence that would contradict the opening

24    statement about the positive self development and so forth.

25    And so you brought up some things, a couple of letters and

 1    statements, and now you want to bring out something

 2    Mr. Gerhardt said for her to write in a letter.  Now, what is

 3    going to happen?  What is he going to say?  Hold on just a

 4    minute.  What is she, rather, going to say?  What is she

 5    going to say?

 6         MR. STILLEY:  She is going to say she was told to

 7    write a harsh letter to her daughter scolding her, being

 8    cruel to her, and which demonstrates that the claim that they

 9    were trying to build up these children's self esteem is just

10    false.  The defendants put this into play.

11         THE COURT:  But we can't go so far with that.

12    That's not one of the claims in the case.

13         MR. SCHWARTZ:  The problem with it, Judge, is it

14    forces us to then have to have our witnesses testify about

15    all these different things.  And you keep asking --

16         THE COURT:  I think you brought enough in relative

17    to this in terms of the two letters because it's of the same

18    tenor.  And that's sufficient in terms of the lawyer's

19    opening statement, which is not argument -- I mean, which is

20    not evidence in the first place.  So I'm sustaining the

21    objection.  We're moving on from this.

22         MR. STILLEY:  Can we solve some problems here so we

23    don't have to wear this carpet out?

24         THE COURT:  You got so many problems, I don't know

25    how we can solve them.

```
1            MR. STILLEY:  I'm trying to be a good boy here.

2            THE COURT:  Right.

3            MR. STILLEY:  Can I ask her about did she send a

4    cake?

5            THE COURT:  You did that already.  It was sustained.

6    She sent her the cake, they didn't give her the cake.  So.

7            MR. STILLEY:  They made her stand in the corner.

8            MR. SCHWARTZ:  She doesn't know that.

9            THE COURT:  You brought up that she -- the witness

10   herself testified herself about standing in the corner but

11   her mother wasn't there.  What you're trying to get into with

12   the mother is the breach of contract situation.  You didn't

13   file a breach of contract suit.

14           MR. STILLEY:  Yes, I did.  Well, fraud, same deal.

15           MR. SCHWARTZ:  That is out of the case.

16           MR. STILLEY:  Let me go to the next one.  Let's not

17   waste time.

18           THE COURT:  Fine.  Go to the next one.

19           MR. STILLEY:  I would like a ruling that the

20   defendants -- and I've been letting the defendants do this,

21   but I would like a ruling that the defendants cannot bring up

22   anything, prior bad acts on any of the plaintiffs unless

23   there is an attempt on direct to show good character.  Unless

24   character has been an issue, I don't think it needs to be

25   raised.  I don't think we need to go down these roads.  My
```

1    clients don't need to be slashed if I can say almost nothing

2    to the other side any way.

3              MR. SCHWARTZ:  So far there hasn't been an

4    objection.

5              THE COURT:  Fine.  I'll sustain the objection, so

6    stay off of they was doing drugs or whatever they were doing

7    before they got to the school.

8              MR. SCHWARTZ:  On direct he brings out why were you

9    brought to the school.  So that's all I crossed them on, why

10   were you brought to the school.

11             MR. STILLEY:  I'll solve that problem.  I'll be a

12   good boy.

13             THE COURT:  Okay.  Don't bring it up.  As the guy

14   said, don't start none, won't be none.  Okay.

15             MR. STILLEY:  Fine.

16             THE COURT:  Okay.

17             MR. STILLEY:  Thank you, Judge.

18             (The following proceedings continued within the

19   hearing of the jury:)

20   BY MR. STILLEY:

21   Q.    Did you have some visits with Shari while she was at

22   Mountain Park?

23   A.    Pardon me?

24   Q.    Did you have some visits with your daughter Shari while

25   she was in Mountain Park?

1    A.    Yes.

2    Q.    Do you recall about how many times?

3    A.    Two.

4    Q.    And do you recall the approximate times that these

5    visits occurred?

6    A.    March 8th to the 11th, March 4th to the 7th -- I'm

7    sorry, April the following year, 4th to the 7th.

8    Q.    Now, did you have to get permission to come visit your

9    daughter?

10   A.    Yes.

11   Q.    How far in advance did you have to ask?

12   A.    I believe I asked in January.

13   Q.    Now, did you have to give a report of what went on

14   during the visit?

15   A.    Yes.

16   Q.    And are those the visit reports that you sent to the

17   defendants?

18   A.    Yes.

19   Q.    Now, we've got two visit reports within Plaintiffs'

20   Exhibit 63, correct?

21   A.    Yes.

22         MR. STILLEY:  Your Honor, I would move to admit the

23   two visit reports within Plaintiffs' Exhibit 63 as

24   Plaintiffs' Exhibit 63-3.

25         MR. SCHWARTZ:  Can you show me which of these

1   documents you're referring to?

2           MR. STILLEY:  Or 63-3 and -4.  Sure.

3           MR. SCHWARTZ:  Your Honor, I'm not sure he

4   established this is all her handwriting, and I don't see how

5   it's relevant.

6           MR. STILLEY:  I can establish that.

7           THE COURT:  Establish the handwriting and I'll let

8   you --

9   BY MR. STILLEY:

10  Q.   Ms. Lueken --

11          THE COURT:  I don't know the relevance either, but

12  go ahead.

13  Q.   Ms. Lueken, did you write these visit reports?

14  A.   The top part was not filled out by me, but the bottom

15  part was.

16  Q.   Is that true on both reports?

17  A.   True.

18          THE COURT:  They will be received.

19          MR. STILLEY:  Thank you, Judge.

20          THE COURT:  Sure.

21          MR. STILLEY:  Judge, a little technical detail.  I'm

22  not sure I did move to admit Plaintiffs' Exhibit 63-2, the

23  second letter in the set.  And I'm --

24          THE COURT:  No, you did not.

25          MR. STILLEY:  Okay.  Your Honor, I would move that,

1    move to admit that.  It's the third page.  And I move that to

2    be admitted, that's Plaintiffs' Exhibit 63-2.

3              MR. SCHWARTZ:  Relevance, Your Honor, and hearsay.

4              THE COURT:  I'll receive it on the same basis as the

5    first letter.

6              MR. STILLEY:  Okay.  So we'll have to cut out

7    everything except the party admissions, correct?  Or you're

8    going to receive the whole thing?

9              THE COURT:  Well, it's got a lot of hearsay in it.

10   A lot of hearsay in it.  I'll take that under advisement.

11             MR. STILLEY:  But I do understand correctly that the

12   previous one will only include --

13             THE COURT:  They are admitted on that limited basis,

14   okay.  Let's move on.

15             MR. STILLEY:  But we'll have to take out the

16   parts --

17             THE COURT:  We're not worrying about all that right

18   now, we're trying to get through with this case.  So go ahead

19   with your question.

20             MR. STILLEY:  Sure.

21   BY MR. STILLEY:

22   Q.    Can you describe for the jury how Shari Lueken behaved

23   on the first visit?

24   A.    She was well behaved.  We had -- I had a lot of

25   activities planned out.  She canned for the county fair, the

1    Island County fair, and entered things in the fair.  We

2    worked in the garden.  We visited friends and relatives.

3    Q.    Was her demeanor about the same as it was before

4    Mountain Park?

5    A.    No, she was calmer.

6    Q.    Did she talk about Mountain Park?

7    A.    Yes.

8    Q.    Did she talk positively about Mountain Park?

9    A.    Yes.

10   Q.    With how long -- about how much did you discuss

11   Mountain Park?

12   A.    Not a lot.

13   Q.    And how about the second time that you took Shari --

14   you went to visit Shari Lueken, can you tell us about that

15   visit?

16   A.    The second visit they, Mountain Park, told me we could

17   come and then they changed their mind and said we could not

18   come.  And I said I already had set up dental and eye

19   appointments.  So they took it in a conference and then they

20   said I could come, we could come, but we could not take her

21   off campus.

22   Q.    And did you come?

23   A.    Except for the appointments, sorry.

24   Q.    And did you come nonetheless?

25   A.    Yes.

```
 1    Q.    Did you take her off campus?

 2    A.    For the appointments.

 3    Q.    And did you then take her back to campus?

 4    A.    Yes.

 5    Q.    And what was her demeanor like on that visit?

 6    A.    She was more subdued, withdrawn, tense, saying she was

 7    having a hard time making it.

 8              MR. SCHWARTZ:  Excuse me, Your Honor, I object to

 9    the hearsay.

10              THE COURT:  Sustained.

11    BY MR. STILLEY:

12    Q.    Now, how long was it after that visit that you took

13    Shari Lueken out of Mountain Park?

14    A.    Two and a half months.

15    Q.    And why did you take Shari Lueken out?

16    A.    Because I felt she was being abused.

17              MR. SCHWARTZ:  Excuse me, Your Honor, I object to

18    this.  It's irrelevant.  It's based on hearsay.  There's no

19    foundation.  Ask that the jury be instructed.

20              THE COURT:  The same, the jury is instructed to

21    disregard that statement.

22              MR. SCHWARTZ:  Also, Your Honor, that was an

23    objection that was already previously sustained.

24    BY MR. STILLEY:

25    Q.    Now, you told us about the shampoo.  Did you send other
```

```
 1    items to Shari at Mountain Park?

 2              MR. SCHWARTZ:  Your Honor, this is an area we

 3    already heard.

 4              THE COURT:  You're going to end this.

 5              MR. STILLEY:  I'm going as fast as we can.

 6              THE COURT:  You've been there.  Haven't you asked

 7    this before?  Please.

 8    Q.    Were you ever denied telephone contact with Shari

 9    Lueken?

10    A.    Yes.

11    Q.    Why?

12              MR. SCHWARTZ:  Well, Your Honor, again, it lacks

13    foundation.  It's not relevant to the lawsuit.

14    BY MR. STILLEY:

15    Q.    Well, let me ask you, by whom?

16    A.    By Debbie Gerhardt, Sam Gerhardt.

17    Q.    And why were you denied this phone contact?

18              MR. SCHWARTZ:  Same objection.

19              MR. STILLEY:  Your Honor, I think it's perfectly

20    relevant to a number of the issues in the case including what

21    the defendants have said and the negligence of the defendants

22    and the care and treatment that they provided to Shari

23    Lueken.  It's relevant to all those things.

24              THE COURT:  Right.  Sustained.  Move on.

25    Q.    Did you ever ask Mountain Park to take Shari to an eye
```

 1   doctor?

 2   A.     Yes.

 3   Q.     Who did you ask?

 4   A.     I believe it was Mrs. Gray.

 5   Q.     Do you remember asking anyone else?

 6   A.     No.

 7   Q.     What response did you get?

 8          MR. SCHWARTZ:   Objection hearsay, not relevant to my

 9   client.

10          THE COURT:   Overruled.

11   A.     I can answer that?

12   Q.     Yes.

13   A.     I was told that they would not take her for an eye

14   appointment.  I had to arrange to come and take her, and it

15   had to be after she was there for at least four and a half

16   months.  I believe that's the time frame.

17   Q.     And about when did this take place?

18   A.     It would have been the fall of 2000.

19   Q.     Okay.  And when this took place, how long had Shari

20   been at Mountain Park?

21   A.     Probably almost four months, but they told me she

22   couldn't go out at that time.

23   Q.     And how much longer did they want her to wait?

24   A.     Until they decided she was ready.

25   Q.     Did you ever ask the defendants to take Shari Lueken to

1    the dentist?

2    A.    No.

3         MR. STILLEY:  Your Honor, can we take a little

4    break?  I'm missing the second sheet.  I can't find the

5    second sheet of questions.

6         THE COURT:  Ladies and gentlemen of the jury, we'll

7    take our afternoon break at this time.  Recall the

8    admonition.  We'll return at three o'clock.

9         (The following proceedings were held outside the

10   hearing of the jury:)

11        THE COURT:  You now have time to do this.  You all

12   may be seated.  The other case that the Court of Appeals

13   reversed that talked about all these objections, and all this

14   extraneous stuff that you brought in and got to redo the

15   case.  Now, this case is very stressful.  Don't you see your

16   clients up there crying and going through all this stress?

17   It's costly to come out here, for everybody to stay in hotels

18   and all this kind of stuff.  But here we are again with the

19   same scenario.

20        But I have a solution for myself.  When they reverse

21   this one, I'm going to recuse myself so I won't be bothered

22   with it anymore.  Because I can't seem to handle you.  I

23   can't seem to keep you in line.  You're still on this stuff

24   happened, but it's not part of the case.  What can I do.

25   I'll see you at three o'clock.  Go ahead and find whatever it

```
 1    is, that other sheet you had.

 2              MR. STILLEY:  Thank you, Judge.

 3              THE COURT:  But this time scratch out the irrelevant

 4    questions that you have, okay.

 5              MR. STILLEY:  Thank you, Judge.

 6              (Court in recess from 2:42 p.m. until 3:03 p.m.)

 7    BY MR. STILLEY:

 8    Q.    Were you supplied with the handbook when you enrolled

 9    Shari in Mountain Park?

10    A.    Yes.

11    Q.    Were you told that Shari would not get a copy of the

12    handbook for herself?

13    A.    No.

14    Q.    When did you find out that she didn't get a copy of the

15    handbook?

16    A.    After she left Mountain Park.

17    Q.    Where did you put Shari Lueken after she left Mountain

18    Park?

19              MR. SCHWARTZ:  Your Honor, I object to this, it's

20    irrelevant.

21              THE COURT:  Sustained.

22              MR. STILLEY:  Your Honor, can we approach?  I'll

23    walk real careful.

24              THE COURT:  No.

25    BY MR. STILLEY:
```

1    Q.    Where is Shari Lueken right now?

2    A.    At this moment?  In the courtroom.

3    Q.    I'm sorry.  Let me make this a little better question.

4    Where does she normally stay?  I know she's in court today.

5    A.    Okay.

6    Q.    But where did she come from to get to court?

7    A.    Mukilteo.

8    Q.    Is that where you live?

9    A.    No.

10   Q.    What kind of place is it where she stays?

11   A.    An apartment.

12   Q.    She stays in her own apartment?

13   A.    Yes.

14   Q.    How long has she been in that apartment?

15   A.    Almost six months.

16   Q.    And where was she before she was in the apartment?

17   A.    Our house.

18          MR. SCHWARTZ:  Your Honor, The Court has sustained

19   this objection.

20          THE COURT:  I don't know what this is about at all

21   relative to this case.  Sustained.

22          MR. STILLEY:  Your Honor, there's one other thing.

23   Can I approach?  Please.

24          THE COURT:  Come up.  Pretty please?

25          (The following proceedings were held at the bench

1    and outside the hearing of the jury:)

2          MR. STILLEY:  I want to ask a question that I don't

3    want to get a spanking, and here's what the deal is.

4          THE COURT:  No, it's called a swatting.

5          MR. STILLEY:  Ms. Lueken was sitting at Mountain

6    Park and Bob Wills came up and started talking about his

7    method of dealing with lawsuits and claims against the

8    defendants.  And -- wait a minute, let me make my record.

9          THE COURT:  Well, what did he say?

10          MR. STILLEY:  He said, I just pay them off.  I pay

11    them off.  I tell my lawyers to pay them off with $10,000 and

12    they take care of it.

13          MR. SCHWARTZ:  That's never been disclosed in

14    discovery, Your Honor.  We specifically asked for all

15    statements of our clients, and it was never disclosed.

16          MR. STILLEY:  Well, they had an opportunity to

17    depose her and didn't depose her, and they had the

18    opportunity to ask her those things.

19          MR. SCHWARTZ:  How would we know to ask that?

20          MR. STILLEY:  I thought that she did, maybe I'm

21    wrong.

22          THE COURT:  I will sustain the objection.  It should

23    have been disclosed as a statement of a party.

24          MR. STILLEY:  Well, I won't ask the question then,

25    Judge.  I'll save us all a lot of problems.

1           THE COURT:  Thank you.

2           (The following proceedings continued within the

3     hearing of the jury:)

4           MR. STILLEY:  Pass the witness.

5           THE COURT:  Cross-examination.

6           MR. SCHWARTZ:  Thank you, Judge.

7                           CROSS-EXAMINATION

8     BY MR. SCHWARTZ:

9     Q.    Good afternoon, Mrs. Lueken.  I just have a few

10    questions for you.  I want to ask you about the two visit

11    reports that you testified you filled out after you had the

12    visits with your daughter.  You have those in front of you?

13    Do you have those?

14    A.    Yes.

15    Q.    What I see is there's two of them.  One is dated March

16    8, 2001 to March 11.  The other is dated August 4, 2001 to

17    August 17.  Is that right?

18    A.    Okay.  So you're talking about the home visit?

19    Q.    Well, I thought that's what was identified by you.  Is

20    there another visit, a third visit?

21    A.    We visited her in March 2001 and April 2002.  In

22    between time she went for a home visit August 2001.

23          MR. SCHWARTZ:  Your Honor, I'm sorry, I'm having

24    trouble understanding what is in evidence.  And I only have a

25    one-page --

1    Q.    Is your April 2002 visit a one-page report?

2    A.    April 2000 -- well, the visit report looks like it's

3    one page.  You're talking about April 2002?

4          MR. SCHWARTZ:  What's in evidence is this one page;

5    is that right?

6          MR. STILLEY:  Correct.

7    A.    There's only one page.

8    Q.    So you actually had three visits with Shari while she

9    was there, one in March of 2001 where you went to the school,

10   right?

11   A.    Yes.

12   Q.    One in August of 2001 where she came to visit you; is

13   that right?

14   A.    Yes.

15   Q.    And then another one in April of 2002 where you went to

16   visit her at the school?

17   A.    Yes.

18   Q.    Okay.  All right.  And is it the case that both times

19   you came to the school you took Shari to the dentist and the

20   eye doctor?

21   A.    Yes.

22   Q.    Okay.  Now, I want to ask you about the March 8, 2001

23   visit.

24         MR. SCHWARTZ:  Which I think this document is in

25   evidence, right?

1    MR. STILLEY:  Yes.

2  Q.    Okay.  Let me -- I'm going to put on the screen the

3  report form that you filled out.  You should have it there,

4  but it's going to be on the screen.  Can you see that?

5  A.    Sort of.

6  Q.    You can refer to the paper if that is easier.

7  A.    Let me find the paper.  Okay.

8  Q.    All right.  So this is a report you filled out after

9  your first visit with Shari at Mountain Park, right?

10 A.    Yes.

11 Q.    And you wrote down that you took her -- or the plan was

12 to take her to the dentist, eye doctor, and do some crafts or

13 museums or other calm activities, right?

14 A.    Yes.

15 Q.    And you also wrote down that everything went well.  And

16 we could even go at a slower pace instead of at a hyperactive

17 level; is that right?

18 A.    True.

19 Q.    She was calmer than she had been previously; is that

20 right?

21 A.    On that day, yes.

22 Q.    Okay.  And then you wrote down -- now, this is a form

23 that's provided to you by Mountain Park.  They want you to

24 report back to them how things went on the visit, right?

25 A.    No.

1    Q.    It's a form that you filled out and gave to Mountain

2    Park?

3    A.    True, but not on day one.

4    Q.    Well, it's a form they ask you to fill out for the

5    visit?

6    A.    After the visit.

7    Q.    Right.  And you wrote down that they asked about bible

8    reading, and you wrote down memory work, evening bible

9    reading and devotions, right?

10   A.    True.

11   Q.    And they asked about witnessing.  And you wrote, often

12   while we were driving from area to are -- area to area, I

13   guess that is what that is supposed to say.  Can you tell us

14   what witnessing is.

15   A.    Well, we didn't go pounding on any doors, no.  But

16   witnessing is telling people what your life is like with God

17   in it.

18   Q.    All right.  And then they asked you about

19   entertainment, and you said you did sightseeing museums in

20   the general area, and you took her to the dentist and eye

21   doctor?

22   A.    Yes.

23   Q.    And they asked you about respect and submission, and

24   you said very respectful to us and others, a much calmer

25   child, often told us how thankful she is to be here, much

1    easier to get along with.  And when you say "be here," that's

2    at Mountain Park, right?

3    A.    I would assume.

4    Q.    They asked you about manipulation, and you said tried a

5    couple of times, but shortlived, it was not accepted.

6    Manipulation would be if your child is trying to manipulate

7    the parent, right?

8    A.    True.

9    Q.    And then they asked whether or not you discussed with

10   her returning home, and you said not returning home, but

11   visiting home some time, right?

12   A.    True.

13   Q.    All right.  Now, let me show you if you could look at

14   the report that you wrote when Shari came to visit you in

15   August of 2001.  Do you have that there?

16   A.    Give me a minute.  I do.

17   Q.    Okay.  I'm going to show this on the screen as well.

18   This is your report from the visit where she came to

19   Washington to visit you in August of 2001.  And by now Shari

20   had been there over a year, right, or about a year?

21   A.    Yes.

22   Q.    And they asked, "What went well with the visit?"  You

23   said, "She was polite and well mannered and she accepted

24   restrictions."  Right?

25   A.    Yes.

1    Q.    "And she was willing to help with jobs.  She picked

2    blueberries for the first time.  She wanted to help with the

3    canning."  Right?

4    A.    Yes, I mentioned canning before.

5    Q.    And you said what would be -- you said she liked your

6    choice of churches, right?

7    A.    Right.  But it wasn't Mountain Park's choice.

8    Q.    I understand that.  It was the church in Washington

9    that you went to?

10   A.    Well, they -- she said they had to go to one in Seattle

11   because it was the right kind.

12   Q.    They asked, "What could have gone better about the

13   visit?"  You said, "It would be easier not to go shopping."

14   And you said something about staying focused when shopping.

15   I take it that means that she wasn't focused when you were

16   shopping?

17   A.    That's true today, yes.

18   Q.    And you were asked, "What expectation do you have for

19   the next visit?"  And you said, "Organized, focused

20   shopping."  So that's the same thing.  So let's turn to the

21   next page.  You were asked about bible reading.  You said,

22   "Daily as a family, memory work in the car while going from

23   place to place."  That's memorizing verses, right?

24   A.    True, because she was required to at Mountain Park.

25   Q.    Okay.  Witnessing.  "Often people are impressed with

1    the positive changes."  Is that right?

2    A.    Yeah, that was a witnessing.  It didn't work.

3    Q.    At that time there was positive changes, right?

4    A.    She was easy to get along with, yes.

5    Q.    I'm sorry, I couldn't hear what you said.

6    A.    Yes.

7    Q.    And then appearance, you wrote, "Always careful with

8    her appearance."  For entertainment, you did some beach

9    walks, visited positive people, family picnic, et cetera.

10   And then when you were asked about respect, submission, you

11   said, "A joy to be around.  A joy for others to see positive

12   changes.  Positive with new people."  Is that right?

13   A.    Right.

14   Q.    And you were asked about her appreciation, gratitude,

15   and thankfulness, and she said, and you wrote, "Great.

16   Telling us of her appreciation and talking with parents about

17   the benefits of going to Mountain Park."  That's what she

18   told you?

19   A.    Right.  Brainwashing.

20          MR. SCHWARTZ:  Your Honor, move to strike that.

21          THE COURT:  It will be stricken.

22   Q.    You were asked about manipulation.  And the last

23   sentence on that you wrote, "Actually so much easier to deal

24   with."  Right?

25   A.    Manipulation.

1    Q.    The last sentence on the -- highlighted it on the

2    screen, it says --

3    A.    The last sentence, yes.

4    Q.    I'm sorry?

5    A.    Yes, the last sentence says that.

6    Q.    And then it says, "Next visit discussed.  Shari feels

7    she can visit more than once a year now that her first year

8    is finished if we arrange it."  And then below that was a

9    discussion about returning home.  The question was, "Did you

10   discuss returning home?"  And you wrote, "In three years.

11   Shari feels it will take her four years to finish high

12   school."  Is that what you wrote down?

13   A.    That's what I wrote down.  So she thought she needed an

14   extra year there, that they'd take longer to get her through.

15            MR. SCHWARTZ:  I have nothing further, Your Honor.

16                        REDIRECT EXAMINATION

17   BY MR. STILLEY:

18   Q.    Were these positive changes permanent?

19   A.    No.

20   Q.    About how long did they last?

21   A.    Not long at all.  She said she was afraid to tell the

22   truth.

23            MR. SCHWARTZ:  Your Honor, I object to hearsay to

24   what she said.

25            THE COURT:  Sustained.

```
1              MR. STILLEY:  Okay.

2    Q.    Can you give us about how many weeks that these

3    positive changes lasted?

4    A.    When we took her out of Mountain Park we traveled

5    around Missouri because she had seen nothing for a week, and

6    then we took her directly to Cross Creek Manor.

7              MR. SCHWARTZ:  Your Honor, I object to this.  This

8    has already been excluded, and he's already asked this more

9    than once after you've excluded it.

10             MR. STILLEY:  I just asked how long.  I just want to

11   know how long.

12             THE COURT:  You asked how long these positive

13   changes had endured.

14             MR. STILLEY:  Right.

15             THE COURT:  So let's try that again or move on.

16   Q.    Can you --

17   A.    One week.

18   Q.    Since that time have you worked on the preface of

19   producing positive changes in Shari Lueken?

20   A.    Yes.

21   Q.    Have you been successful in those efforts?

22   A.    Somewhat.

23   Q.    And were those changes, positive changes shortlived or

24   more general in nature?

25   A.    Much longer.  She learned real skills.  Life skills.
```

1          MR. STILLEY:  Pass the witness.

2          MR. SCHWARTZ:  No questions, Your Honor.

3          THE COURT:  Very well.  Thank you, Ms. Lueken.  You

4    may step down.  Call your next witness.

5          MR. STILLEY:  Erika Teasley.

6                         ERIKA TEASLEY,

7    Having been first duly sworn, was examined and testified as

8    follows:

9                      DIRECT EXAMINATION

10   BY MR. STILLEY:

11   Q.    Please state your name.

12   A.    Erika Teasley.

13   Q.    Where do you live?

14   A.    Texas.

15   Q.    How old are you?

16   A.    Seventeen.

17   Q.    Who are your -- who is your mother?

18   A.    Sir?

19   Q.    Who is your mother?

20   A.    Katrina Louise Hoover.

21   Q.    And who is she married to?

22   A.    Douglas Paul -- or Paul Douglas Hoover.

23   Q.    Do you remember attending Mountain Park Boarding

24   Academy?

25   A.    Yes, I do.

1    Q.    When did this occur?

2    A.    January 18th of '03.

3    Q.    And how long were you there?

4    A.    Four and a half months.

5    Q.    And did you miss any periods while you were there?

6    A.    Yes, sir, I never had one.

7    Q.    Did you ever have any problems with your periods before

8    Mountain Park?

9    A.    No, sir, I started whenever I was 11 years old, and I

10   was pretty regular all the way up until I went to Mountain

11   Park.

12   Q.    Had you had any problems with your periods after

13   Mountain Park?

14   A.    No, sir.

15   Q.    Did you tell any of the defendants or their agents that

16   you were having problems with periods at Mountain Park?

17   A.    Yes, sir.

18   Q.    Who did you tell?

19   A.    I told Julie Gerhardt and I told Sharon Goodman.  And

20   also I believe I told Andrea Hill.

21   Q.    And what kind of response did you get?

22   A.    Different ones with the different people.  Ms. Goodman

23   said that I was still young and that my body was still

24   maturing and that it was normal.  Ms. Julie said, oh,

25   goodness -- I can't exactly remember what Ms. Julie said.  I

1    don't want to say anything she didn't say.  But I do remember

2    what Ms. Goodman had told me.  And Andrea, it was just like a

3    mockery with her, like, oh, it's normal, you know what I

4    mean.  To the girls it was a normal thing, so she really just

5    blew it off.

6    Q.    And how old were you when you entered Mountain Park?

7    A.    Fourteen.

8    Q.    So you had periods for about three years at that point

9    in time?

10    A.    About two and a half, three years, yes, sir.

11    Q.    After you got out of Mountain Park how long did it take

12    to get the period back?

13    A.    In fact, I started exactly like a month afterwards, a

14    month and a half after that.

15         MR. STILLEY:  Your Honor, may I approach the

16    witness?  Wait a minute, the witness already has the

17    exhibits.

18    Q.    Could you take a look at -- wait a minute, I need to --

19    I would like to show the witness the Defense Exhibits W

20    through CC if I could.

21         THE COURT:  What is it?

22         MR. STILLEY:  Defense exhibits.

23         THE COURT:  Numbers what?

24         MR. STILLEY:  W through CC.

25         THE COURT:  Are they here?  Do we have them here?

```
 1              MR. STILLEY:  Yes.  Maybe you don't have a set of

 2    those.

 3              THE COURT:  Whatever.  I'll find it.  Don't worry.

 4              MR. STILLEY:  Well, actually let me do this a little

 5    different way.

 6              THE COURT:  No, why don't you just go ahead with

 7    them.  I'm sure they'll look at them.  And if I need to, I'll

 8    look at them.  Go ahead.

 9    BY MR. STILLEY:

10    Q.    Let's look at Plaintiffs' Exhibit No. 69 since

11    apparently everyone has those.  Do you recognize the

12    document?

13    A.    Yes, sir.

14    Q.    What is it?

15    A.    I guess is this the paper -- my enrollment paperwork,

16    is this what this is?

17    Q.    Yes.  I'm asking if you can identify it.

18    A.    Yes, I believe it's the enrollment sheet that my

19    parents filled out.

20    Q.    Would you recognize your parents' signature?

21    A.    Yes, I would.

22    Q.    If you look on the second page and see if it looks like

23    your parents' signature?

24    A.    That does look like my mother's signature, but my

25    father, he signs differently every time, so I'm not going to
```

1    say anything about that.

2           MR. STILLEY:  Your Honor, I move to admit

3    Plaintiffs' Exhibit No. 69.

4           MR. SCHWARTZ:  Your Honor, this is not relevant to

5    any --

6    A.    Sixty-nine?

7           MR. SCHWARTZ:  -- to any of the issues that are

8    still in the case.  This is relevant only to the issues

9    you've already heard and already dismissed from the case.

10          THE COURT:  What's the relevance?

11          MR. STILLEY:  Well, I just wanted to show the terms

12   on which she was sent to Mountain Park.

13          THE COURT:  I thought there was some discussion

14   about why people went to Mountain Park and that we weren't

15   going to go into that.  You said you weren't going to go into

16   that because you didn't like the reasons why other people

17   brought up why people went to Mountain Park.

18          MR. STILLEY:  Oh, that's a different situation,

19   Judge.  I'm just trying to show the written agreement between

20   the parents and the defendant, that's all.

21          THE COURT:  What does that have to do with the claim

22   left for Mr. Teasley, which is negligence?

23          MR. STILLEY:  Well, the defendants made

24   representations in their documents concerning the care that

25   would be provided to the students at Mountain Park.  And, for

1    example, this particular document says --

2          MR. SCHWARTZ:  Your Honor, this is just so far

3    removed from any claim of negligence, failure to provide

4    medical treatment.  It's nothing in there about it.

5          THE COURT:  I don't see anything in this document

6    about negligence or medical treatment.

7          MR. STILLEY:  Can I read what the statement I think

8    is relevant?  It's short.

9          THE COURT:  Why don't you point that statement out

10   to me.  I have the document here.  Point it out.  Where is

11   it?

12         MR. STILLEY:  Okay.  It's at the top of the page.

13   You go down to -- actually it's the second sentence.  Just

14   read the second sentence.

15         THE COURT:  You mean in the very first paragraph at

16   the top of the page?

17         MR. STILLEY:  Yes.

18         THE COURT:  Where is starts with I understand?

19         MR. STILLEY:  Yes.

20         THE COURT:  I'm sustaining the objection.  I don't

21   see that this has anything to do with --

22         MR. STILLEY:  Your Honor, can I have another run at

23   it on the second page?

24         THE COURT:  What's on the second page?

25         MR. STILLEY:  Let's look at the agreements pursuant

1  to this application.  It's a short paragraph.  You read that

2  and see if we can chin the bar on that one.

3          THE COURT:  What are you talking about, the first

4  sentence?

5          MR. STILLEY:  Actually I think that whole thing,

6  it's the agreement.  It's the agreement whereby this young

7  lady was committed to Mountain Park.  And I think that it's

8  relevant to show the terms under which that she was sent

9  there.

10          MR. SCHWARTZ:  Your Honor, that's the very issue

11  that you dismissed from the case.  It's the very issue.

12          THE COURT:  I'm sustaining the objection.

13          MR. STILLEY:  Now, is it the same for the following

14  exhibit?

15          MR. SCHWARTZ:  Same objection, Your Honor.

16          THE COURT:  Sustained.

17  BY MR. STILLEY:

18  Q.    Okay.  Let me see if I can lay a foundation for No. 71.

19  I would like to draw your attention to Plaintiffs'

20  Exhibit 71.  Do you recognize that document?

21  A.    Yes, I do.

22  Q.    Do you know where it came from?

23  A.    I believe it came from Mountain Park's medical log,

24  medicine run, whatever.

25  Q.    Is that the document obtained in discovery?

```
1    A.    What did you say?  Sorry.

2    Q.    Is that the document supplied by the defendants in

3    response to discovery --

4    A.    Yes.

5    Q.    -- by the plaintiffs?  And does that purport to be the

6    medication log or the log of the record of the medication

7    that was administered to you while you were at Mountain Park?

8    A.    No, sir, there's no truth to this.

9         MR. SCHWARTZ:  Your Honor, I object to this.

10   There's no -- we don't have a problem with the document

11   itself.  But she's not the appropriate witness to show it to.

12   She's never seen it before the lawsuit was filed.

13        MR. STILLEY:  Your Honor, let me solve a lot of

14   trouble by just backing up and I'll just ask her some

15   questions.

16        THE COURT:  Okay.

17   BY MR. STILLEY:

18   Q.    You've had a chance to look at this document that

19   purports to state what medicines you were given, correct?

20   A.    Yes, sir.

21   Q.    Is there any truth to it?

22   A.    No, sir.

23   Q.    How do you know?

24   A.    Well, there's some.  I'm going to take that back, I'm

25   sorry.  If you look on -- where -- okay, there is a piece of
```

1    paper, I don't see it here.  There's a piece of paper that my

2    mother filled out, and it asks for any allergies or anything

3    like that, anything that I would be allergic to.  And it

4    says -- in my mother's handwriting it says, no Midol, and

5    it's underlined.  In here it said that I was administered

6    Midol for something, for cramps, but I never had periods.  I

7    never had periods at all.

8        MR. SCHWARTZ:  Excuse me, Your Honor, I object.  She

9    doesn't have the ability to read the document.  She's not --

10   this is not her document.  She didn't write the document.

11   The jury will hear from the witnesses who prepared the

12   document.

13       MR. STILLEY:  Your Honor, she can read Midol, and

14   she knows she didn't get it.

15       THE COURT:  Well, you should just ask her that.  You

16   should just ask her -- what you need to do is lay a

17   foundation for the witnesses that will come on who have

18   something to do with this document.  That's what you need to

19   be laying a foundation for in terms of asking her what she

20   did or did not receive.  And then when you have the witness

21   on who prepared or had something to do with this document,

22   then you could ask them about that.

23       MR. STILLEY:  Well, the trouble with that is I don't

24   know of any witness that can do that.  And it's our position

25   that it's not an accurate contemporaneous record anyway.  Let

1    me just ask some questions.

2            THE COURT:  Fine, whatever.

3    BY MR. STILLEY:

4    Q.    Did you get some medication while you were at Mountain

5    Park?

6    A.    Yes, sir, I did.

7    Q.    Did you see whether or not there was a contemporaneous

8    record made of that?

9    A.    Yes, sir.

10   Q.    And who would be the person that made those records?

11   A.    The person that was administering the medication.

12   Q.    And do you know the names?

13   A.    Sharon Goodman, Julie Gerhardt, Andrea Hill.  I

14   believe -- I mean, there was even some of the single staff.

15   No -- yes.  I believe there was Ms. Combs.  I don't remember

16   her first name.  But Ms. Combs, she did medicine call once or

17   twice.  But every time they would give you medicine, they

18   would put it down in a log book like this, with the date, the

19   time, what it was for, and their signature right next to it

20   or their initials right next to it.

21   Q.    So you actually saw those logs being made?

22   A.    Yes, sir, right in front of my face.

23   Q.    When you first got to Mountain Park did you get a

24   certain type of medication at that time?

25   A.    Yes, sir, I got wormer.

```
 1    Q.    And what's your best knowledge of that?

 2    A.    They didn't give one, it was a cup, they said drink it.

      I asked what it was, they said it's a wormer, okay.  I mean,

 3

 4    it was 5:30 in the morning, six o'clock, not even.

 5    Q.    Do you remember who did that?

 6    A.    Andrea Hill.

 7    Q.    I want you to take a look at Plaintiffs' Exhibit 71.

 8    Do you see this medication being given at any time?  Is that

 9    logged?

10    A.    No, sir.

11    Q.    When did you arrive at Mountain Park, what date?

12    A.    January 18th of '03.

13    Q.    Did you get the wormer later as well?

14    A.    No, sir.  I got it the next day because it was in the

15    middle of the night, and they just gave me a shower and did

16    all that stuff.  And then they put me on my bunk and then the

17    next morning when I woke up they got me situated, and then

18    they gave me the wormer then.

19    Q.    Okay.  Sometimes they would give wormer again in two

20    weeks.  Did you get the wormer again in two weeks?

21    A.    No, sir, they only gave it to me once.

22    Q.    Did you have any weight gain or loss during -- at

23    Mountain Park?

24    A.    I lost about 30 pounds while I was there.

25    Q.    Was there any reason to your knowledge for that?
```

1    A.    Honestly, I couldn't tell you why.  I mean, they put --

2    they put everyone on a diet, but I wasn't on a diet whenever

3    I got there.  I didn't know -- like just eventually

4    throughout the couple months I was there, I ended up losing

5    the 30 pounds.  I went in, it was my freshman year, and I

6    went in benching 165 pounds, and I didn't even weigh that

7    much, because I was playing softball, and by the end of my

8    stay there, even though I was still on orientation the whole

9    time, and they normally keep orientation students on the top

10   bunk, they moved me down to the bottom bunk because I

11   physically got so weak that I couldn't pull myself out of my

12   bunk anymore, and so they moved me down to the bottom bunk.

13   And they moved my orientation guide, they moved her right

14   next to me.  So my bottom bunk was right here and her bunk

15   was right here.

16   Q.    Did you know of any reason why you would lose strength

17   that way?

18   A.    I had no explanation.  I mean, I was eating every day.

19   Q.    Do you know who was made aware of this problem?

20   A.    Who was made aware of what?

21   Q.    Of the loss of strength.

22   A.    The loss of strength, it was -- who told me that I

23   was -- it was a worker, because I had my orientation guide

24   had to get permission for me to move down.  I believe it was

25   Julie Gerhardt.  I believe -- because it had to be one of the

1   married staff ladies who gave my orientation guide

2   permission.

3   Q.    Did you get any medical assistance with respect to that

4   condition?

5   A.    No, sir.

6   Q.    Did you ask for it?

7   A.    No, sir, I was just happy to be off the top bunk.

8   Q.    Did you get enough sleep while you were at Mountain

9   Park?

10   A.    Excuse me?

11   Q.    Did you get enough sleep for you to function?

12   A.    I'll be honest with you, I got about three or four

13   hours a sleep a night only because I was still on

14   orientation, but I could not sleep at all.  It was where I

15   was constantly opening up my eyes.  I was always looking

16   behind my back.  I was always making sure that nothing was

17   going to happen to me or anything like that.  I was just -- I

18   don't know.  I can't explain it.  I did not get much sleep

19   while I was there.  I took naps on Sundays after church.

20   You'd have quiet time or you'd have nap time, and just, you

21   know what I mean, just quiet time.  And I would take a nap

22   then or I'd stay with my orientation guide.  But, no, I

23   really didn't get much sleep when I was there.

24   Q.    How did you feel as far as your mental functioning

25   while you were there?

1    A.    How did I feel?

2    Q.    Right.

3    A.    I felt very isolated.  I felt like I was in a -- I felt

4    like I was in a shell.  I didn't really talk to anyone.

5    And -- I didn't talk to anyone just because it was either I

6    wasn't saying the right thing or I didn't say it properly or

7    I -- I mean, just the littlest things, I really didn't say

8    much to anybody because I would get yelled at every time I

9    opened my mouth.  So I really just shut up.

10          And I wasn't myself there at all.  I'm a very

11   outgoing, outspoken person, and while I was there I didn't

12   say -- I didn't stand up for myself like I would out in the

13   real world.  I didn't -- I let everyone control what I did.

14   Every little aspect of me, I let someone else control.  I was

15   not mentally, physically, emotionally myself at all.

16   Q.    Now, for the benefit of the jury, can you tell us your

17   approximate weight when you went into Mountain Park?

18   A.    When I went in to Mountain Park I was probably 150,

19   155.  Whenever I left Mountain Park, I was about 125, 130

20   when I went to the doctor.

21   Q.    And what's your approximate weight now?

22   A.    About 175 -- 165, 175, something like that.

23   Q.    What happened to your weight in the weeks immediately

24   after you left Mountain Park?

25   A.    As soon as I got out of Mountain Park, my first meal I

```
 1    had, my parents took me to Subway and I couldn't keep it

 2    down.  We didn't know if it was because I had been in a car

 3    and we were driving back to Texas or what it was, but I could

 4    not keep it down at all.  And then immediately in the next

 5    few months I started gaining all my weight back, just to

 6    about, you know, the 155, 160, my normal weight that I had

 7    been then.

 8    Q.    And about how long did it take to gain back to that

 9    normal weight?

10    A.    Just within a few months.  My parents were like -- my

11    mom was like, watch what you eat because you're going to gain

12    all that weight back.  And it didn't matter.  Like I was

13    eating salads, and everything from salads to proteins, I

14    mean, being on a good healthy diet like I was before I went

15    in, but it didn't matter, I gained it all right back.

16    Q.    Did you chip a tooth while you were at Mountain Park?

17    A.    Yes, I did.

18    Q.    Approximately when did that happen?

19    A.    I'm going to say just about a month after I went in.

20    Well, yeah, about three, four weeks.

21    Q.    Did that cause pain?

22    A.    Yes, sir.

23    Q.    How bad was the pain?

24    A.    It was horrible.  I couldn't eat.  I couldn't -- I had

25    migraines that would just -- everything from the side of my
```

1    ear all the way up my face.  My face was swollen from where

2    it happened.  Mainly it was my headaches that were the worst.

3    But they came first before my actual pain in my tooth started

4    becoming really bad.

5    Q.    Who did you tell about this?

6    A.    Everybody.  Everybody.  Everybody from my orientation

7    guide to Julie Gerhardt to Debbie Gerhardt to Sharon Goodman.

8    Everybody.  My mom even called up there telling them that

9    this was going on.

10          MR. SCHWARTZ:  Objection, Your Honor, that's

11   hearsay.  Move to strike.  Move to have the jury disregard.

12          THE COURT:  Sustained.  The jury will disregard what

13   her mother did.

14   BY MR. STILLEY:

15   Q.    Did you get the medicine you asked for?

16   A.    At first I was given Tylenol.  I mean, they gave me

17   Tylenol for my headaches.  They gave me Tylenol for my

18   toothache.  I believe they gave me ibuprofen a few times for

19   my swelling.  It does say that, ibuprofen for tooth pain and

20   headache.

21   Q.    Did you get as much medicine as you needed?

22   A.    No, sir.  I needed to go to the dentist.  I begged and

23   begged and begged every day to go to the dentist every day,

24   and not one time.  I mean, Julie Gerhardt told me, Erika

25   Lynn, you cannot go until you've been here four to six

1    months.  And that was my first month of me being there.  So

2    she expected me to go through those, you know, until God

3    knows when my mom and dad were going to come and do whatever,

4    you know, she just expected me to sit there with that pain in

5    my mouth and in my head until I was there four to six months.

6    Q.    How long did it actually take before you were taken to

7    the dentist?

8    A.    Two months after that.  I didn't go until April 15th.

9    Q.    And did that resolve the problem?

10   A.    No, sir.  I mean, they took me to the dentist, that's

11   what I asked.  And he cleaned it and he, in his words, fixed

12   it.  And as soon as I got back to Texas my parents had to

13   take me back to the dentist and they had to fix it the right

14   way.  So my parents had to pay again for another dentist.

15   Q.    The second time, did that repair the problem?

16   A.    Yes, it's just a crown.  It's been in ever since.

17   Q.    Did that cause the pain to go away?

18   A.    Yes, sir.

19   Q.    Why were you taken out of Mountain Park?

20   A.    I was taken out of Mountain Park --

21         MR. SCHWARTZ:  Your Honor.

22         THE COURT:  Hold on.

23         MR. SCHWARTZ:  Your Honor, there's no foundation as

24   to why her parents took her out.  It's hearsay.

25         THE COURT:  Sustained.

```
 1              MR. STILLEY:  Pass the witness.

 2                     CROSS-EXAMINATION

 3    BY MR. SCHWARTZ:

 4    Q.    Good afternoon, Ms. Teasley.

 5    A.    Hi.

 6    Q.    You were at Mountain Park for about four months?

 7    A.    Yes, sir.

 8    Q.    From about January 18 to May 16th of 2003?

 9    A.    Yes, sir.

10    Q.    And your testimony, I think you told us at your

11    deposition after about a month and a half of being at

12    Mountain Park you started to have a toothache?

13    A.    I was estimating the time, but around there.  It ended

14    up being right at a month, but I think I said at my

15    deposition a month and a half.

16    Q.    So it would be some time in mid February to late

17    February, right?

18    A.    Excuse me?

19    Q.    Sometime -- you got there on January the 18th, 2003?

20    A.    Yes, sir.

21    Q.    And so a month and a half or a month to a month and a

22    half would be somewhere between mid February and late

23    February?

24    A.    Yes, sir.

25    Q.    Now, you didn't -- you did complain about a toothache?
```

1    A.    And migraines or headaches.

2    Q.    Headaches and toothache.  But you didn't tell anyone

3    that you had a broken tooth?

4    A.    Yes, sir, I did.

5    Q.    You did?

6    A.    I actually took my tooth that was cracked, I took it to

7    them and I showed them at the medicine call in a cup.

8    Q.    Well, when you went to the dentist did they have you

9    fill out a form to say what your complaint was, what your

10   problem was?

11   A.    Did they -- they might have.  I couldn't tell you.  I

12   don't remember.  I remember filling out -- no, I don't even

13   remember that.  I don't remember filling out paperwork, but I

14   might have.

15          MR. SCHWARTZ:  Your Honor, may I approach the

16   witness?

17   A.    Yes, I did.  There we go.

18   Q.    This is Defendants' Exhibit CC from your dentist

19   records.  And it has a form that's entitled dental health

20   history.  Is this something you filled out when you went to

21   the dentist?

22   A.    Yes, sir, it is.

23          MR. SCHWARTZ:  Your Honor, I'd like to show this to

24   the jury.

25          THE COURT:  Any objection?

```
 1            MR. STILLEY:  No objection, Your Honor.

 2            THE COURT:  Very well.

 3  BY MR. SCHWARTZ:

 4  Q.    All right.  So at the top it says dental health

 5  history, confidential.  And at the bottom it has your

 6  signature and the date you were taken to the dentist,

 7  April 15, 2003, right?

 8  A.    Yes, sir.

 9  Q.    And this is in your handwriting?

10  A.    Yes, sir.

11  Q.    All right.  And it says reason for today's visit, hole

12  in tooth?

13  A.    Yes, sir.

14  Q.    And isn't it the case that you went in because you had

15  a cavity and it was filled?

16  A.    No, sir.  I had never had a cavity in my life, in fact.

17  And I found that very funny when you said that yesterday.

18  But, no, it was actually I had a cracked tooth.  It was --

19  whenever I had bit down, whatever it was I was eating there,

20  the actual part of my tooth came out in my mouth.  And I

21  chomped on it again on this side, and whenever I spit out my

22  food, not to be disgusting or anything, that tooth or that

23  piece of my tooth was in my hand.  And I kept it, and put it

24  in a cup and I went and I showed them.  Now, I know the

25  doctor, I read my records, and the doctor or the dentist told
```

1    me on that he --

2    Q.    Listen, I'm just asking about this form right now.

3    A.    Okay.

4    Q.    You wrote on the form?

5    A.    Hole in tooth.

6    Q.    Hole in tooth.  You didn't write cracked tooth, did

7    you?

8    A.    No, because -- can I explain that?  If you look at

9    where my tooth was, it was in the back of my tooth.  So the

10   way my tooth was, it went like this and then came over like

11   that.  And I had a hole where the crack or the tooth had come

12   out.

13   Q.    Now, when you first complained, you were complaining

14   about headaches?

15   A.    Yes, sir.

16   Q.    And you were given Excedrin Migraine; is that right?

17   A.    I never got Excedrin.  I got Tylenol and ibuprofen.

18   Q.    Okay.  You were given that on several occasions.  And

19   then you started complaining about it being a headache

20   resulting from a toothache?

21   A.    That's the only thing I could come up with because I

22   had never had problems with migraines or headaches before.

23   Q.    So initially the complaint was headache, and then you

24   realized this might really be caused by a cracked tooth?

25   A.    Yes.

1    Q.    So you started telling them about that at some point

2    later?

3    A.    I started telling them about what?

4    Q.    After you complained about the headache for awhile and

5    you were given medicine for that, then you started

6    complaining about the toothache?

7    A.    I had a headache for about a day or two, something to

8    that effect, and then -- because I told them about my tooth

9    immediately when it happened.

10   Q.    I understand.  But you started complaining about pain

11   from the tooth rather than a headache after you had been

12   given medicine for the headache, right?

13   A.    Yes, about a couple of days.

14   Q.    All right.  And they also gave you Orajel to put on

15   your tooth, right?

16   A.    Orajel?  Oh, that -- yes, a couple times with a Q-tip,

17   they gave me a little of it to numb it.

18   Q.    And you were able to get these medications when you

19   went to the medicine call that they had several times a day,

20   right?

21   A.    Yes, they continued to give me Tylenol, but they did

22   not take me to the dentist like I asked them.

23   Q.    We're going to get into that in a minute.  But you

24   agree with me that you had the ability to go to the medicine

25   call -- while you were on orientation, you had the ability to

1   go to medicine call and get medicine?

2   A.    Yes, because my orientation guide had no control over

3   that.  Ms. Goodman, in fact, told my orientation guide that

4   she needed to take me to medicine call every time they had

5   it, because if not, if she wouldn't have said that, I

6   wouldn't have been able to go.

7   Q.    But you were allowed to go to medicine call and get

8   medication for your complaints, right?

9   A.    Yes, because I complained about it.

10  Q.    Okay.  And you were also given during this time period

11  cold medicine, weren't you?

12  A.    No, sir, I never had a cold.

13  Q.    You never had a cold?

14  A.    I never had a cold.

15  Q.    Did they ever give you Alka-Seltzer?

16  A.    No.  No, sir, they never gave me Alka-Seltzer.  So

17  you're telling me I had a cold one day and they gave me

18  Alka-Seltzer one day but the next day I was fine?

19  Q.    Now, when you went to the medicine call, you saw them

20  write down in a log what they gave you?

21  A.    Yes, I did.

22  Q.    And ultimately you were taken to the dentist by a staff

23  member at Mountain Park?

24  A.    Yes, sir, I was.

25  Q.    And you were taken to the dentist on April the 15th,

1    2003?

2    A.    Yes, I was.

3    Q.    And that would have been, I take it from your

4    calculations, about a month and a half after you first --

5    after you broke your tooth and some time subsequently started

6    complaining about a toothache; is that right?

7    A.    If you look, it says February 21st --

8    Q.    I'm not asking you about this log.  I'm going to let

9    the people who prepared the log --

10   A.    Okay, that's fine.  I was there --

11   Q.    I just want to establish at the end of February as

12   we've established, your testimony is that at the end of

13   February 2003 is about when you broke your tooth.  Some time

14   thereafter you realized that your head pain was caused by the

15   toothache?

16   A.    Okay.

17   Q.    Right?

18   A.    Yes.

19   Q.    And that's when you started complaining about a

20   toothache.  So it would have been some time in March?

21   A.    I didn't start complaining about my toothache until it

22   happened.  My headaches, I was having headaches before that.

23   And I was saying, well, maybe it was because I was crying.  I

24   cried for two weeks straight whenever I got put in there.

25   And I was like, okay, well, maybe I had headaches from when I

1    was crying.  Then whenever I had messed my tooth up, I was

2    saying, okay, well, maybe now that I'm still having my

3    headaches, maybe it's my tooth, me having a cracked tooth has

4    something to do with my headaches.

5    Q.    So you're saying you started having headaches before

6    you broke your tooth?

7    A.    If you look at it, they gave me medicine -- I'm not

8    even going to look at that.

9    Q.    I'm interested in your recollection, all right.  Are

10   you able to testify based on your recollection --

11   A.    Yes, I am.

12   Q.    -- that you had a headache before you broke your tooth?

13   A.    I had a headache the day I walked in that place.

14   Q.    Now, isn't it the case that after you had your tooth --

15   after you were taken to the dentist on April the 15th, 2003,

16   you were given Tylenol thereafter to help you because any

17   pain that you had from going to the dentist; is that right?

18   A.    No.  I did not take any medication for, I'm going to

19   say, three -- two or three weeks before I left.

20   Q.    Well, you were given Aleve for the cramps you

21   complained of since you were having your menstrual cycle,

22   right?

23   A.    I had -- so you're going to tell me I had cramps with

24   no period, no menstrual cycle?  I was never once on my

25   menstrual cycle while I was in there.

```
1    Q.    Ma'am, just answer the question.  Didn't they give you

2    Aleve because you complained about cramps?

3    A.    No, sir, they did not.

4    Q.    You're denying that?

5    A.    I'm denying that.

6    Q.    All right.  You do admit that they told you -- that

7    they took note of the fact that your mother said don't give

8    her any Midol, right?

9    A.    Excuse me?

10   Q.    Your mother brought you in and said don't give her any

11   Midol.

12   A.    My mother did not bring me in.  My mother wrote on

13   those pieces of paper before -- or after she was sticking me

14   in there, I guess when she was signing all that paperwork

15   with Mr. Gerhardt, I'm assuming she wrote it then.

16   Q.    Okay.  But you weren't to have Midol if you complained,

17   right, you were not to have Midol?

18   A.    Why?  I could have Pamprin.  I could have any other

19   medication but Midol.  There is something in Midol that I'm

20   allergic to, and I've never been able to take it.

21   Q.    And isn't it the case about a month after you went to

22   the dentist, you had complaints about wisdom teeth?

23   A.    Wisdom teeth?

24   Q.    Yes.

25   A.    I believe it was the same tooth that I was having
```

1   problems with.

2   Q.    But you may have thought it was a wisdom tooth and you

3   complained about it as a wisdom tooth, right?

4   A.    I believe I complained about it, and Sharon Goodman

5   said that that was my wisdom tooth, that she thought my

6   wisdom teeth were growing in.

7            MR. SCHWARTZ:  Nothing further, Your Honor.

8            THE COURT:  Redirect?

9            MR. STILLEY:  No redirect.

10           THE COURT:  Very well.  Ms. Teasley, you may step

11   down.  Call your next witness.

12           MR. STILLEY:  Tracy Ozuna.

13                         TRACEY OZUNA,

14   Having been first duly sworn, was examined and testified as

15   follows:

16                    DIRECT EXAMINATION

17   BY MR. STILLEY:

18   Q.    Please state your name.

19   A.    Tracey Ozuna.

20   Q.    And where do you live?

21   A.    Kuna, Idaho.

22   Q.    And what kind of employment do you have?

23   A.    I manage an apartment complex.

24   Q.    Are you married?

25   A.    I am.

1   Q.    Children?

2   A.    I have a two-year-old and a three-year-old.

3   Q.    And you're Jessica's sister?

4   A.    Yes.

5   Q.    And can you tell the jury the times that you were at

6   Mountain Park Boarding Academy?

7   A.    I was sent the first time to Mountain Park when I was

8   12 years old.  I was sent there at Christmas of 1995.  And I

9   was there until mid to late April of '96.  I returned -- over

10  that period my birthday occurred and turned 13.  I returned

11  when I was 14, in February of '97, and stayed until Christmas

12  of '97.

13  Q.    And were you having menstrual periods when you first

14  went?

15  A.    When I first went, no.  I was only 12.

16  Q.    How did you find out you were going to Mountain Park

17  Boarding Academy?

18  A.    My sister Michele returned home for a Christmas

19  visit -- not home, she wasn't allowed to go home yet.  She

20  was on a Christmas visit.  We were in Lake Tahoe.  And my

21  parents decided to send me back with her to keep her company

22  because she was having some problems being there.

23  Q.    And how did you travel the first time?

24  A.    I flew on a plane with my sister, and there were

25  several other girls returning from visits to Mountain Park on

1    the same plane.

2    Q.    While you were there did you have occasion to talk with

3    anyone from -- well, scratch that question.   Was there an

4    occasion when certain public officials came?

5            MR. SCHWARTZ:   Objection, Your Honor, this is

6    something you have already heard and you decided it should be

7    excluded from the court.   And I would ask it not be got into.

8            THE COURT:   Sustained.

9    BY MR. STILLEY:

10   Q.    How many students were there at that point in time?

11   A.    There were -- the first time I went there were 240

12   girls and about 45 boys.   That's an estimate.   I could be off

13   by at least a few numbers, but roughly.   The second time when

14   I returned there were almost 100 girls and about 20 boys

15   maybe.

16   Q.    Now, the second time that you went, did you go in a

17   little different fashion that time?

18   A.    I'm sorry?

19   Q.    Did you go in a little different fashion that time?

20   A.    I was taken from my bed by escorts in the middle of the

21   night.

22   Q.    And how long did it take you to get to Mountain Park?

23   A.    Well, they told me there were two ways that they could

24   do it, they said you can do it the easy way or --

25           MR. SCHWARTZ:   I object to the hearsay and

1    relevance.  This is not -- these alleged escorts are not my

2    clients, they don't work for my clients.

3              THE COURT:  Sustained.  Sustained.

4    BY MR. STILLEY:

5    Q.    So you did get to Mountain Park then, right?

6    A.    I did.  And they were referred -- I was --

7    Q.    That's a good enough answer.  When you went, were you

8    put on orientation?

9    A.    Yes.  I was put on orientation the first time.  The

10   minimum amount of time you could be on orientation was three

11   months.  I was on for three months when I first went in and

12   separated from my sister immediately, even though that was my

13   parents' reason for sending me there.  And they --

14   orientation was where you have to be within arm's length

15   literally from another girl 24/7 where she can tell you what

16   to do.  She's -- if she was there just to acclimate you to

17   the rules then why is the minimum time three months?  I was

18   on for -- that's a very long time.  I learned the rules way

19   before that.

20   Q.    Were you deprived of sleep?

21   A.    I was.

22   Q.    Can you describe that for the jury?

23   A.    Well, we got up really early.  It varied.  It could be

24   anywhere from 4:30 a.m. to 6 a.m. at different times during

25   my stays.  The majority of the time it was at 5:15 a.m.

1    There were other times where we had to get up earlier because

2    we didn't do a good enough job cleaning or we were being

3    punished for something.  I was also on safety patrol, which

4    disrupted at least two hours of my sleep each night at a

5    later point in my second stay.  You were woken up 15 to 20

6    minutes before your shift, you had an hour long shift,

7    afterwards you met with the people -- with the other girls on

8    it, signed your reports, and were allowed to go back to bed.

9    This disrupted quite a bit of sleep because I have difficulty

10   falling asleep, and so it was hard to wake up in the middle

11   of the night and then go back to sleep.

12   Q.    Could you think clearly while you were at Mountain

13   Park?

14   A.    No, I could not.  I have quite a bit of memory lapse.

15            MR. SCHWARTZ:  Excuse me, this is getting into an

16   area we've already heard; you've already excluded.

17            THE WITNESS:  I haven't spoken on it.

18            MR. STILLEY:  Your Honor, I think we're just showing

19   the general --

20            THE COURT:  Why don't you ask her if she remembers

21   whatever is relevant.

22            MR. STILLEY:  Sure.

23            THE COURT:  Then you can get to that.

24   BY MR. STILLEY:

25   Q.    When you got to Mountain Park, did you cry?

 1            MR. SCHWARTZ:  Your Honor, I object to this.  This

 2    is not at all relevant to anything that is alleged in the

 3    lawsuit.

 4            THE COURT:  Sustained.

 5    BY MR. STILLEY:

 6    Q.    Were you allowed to wear makeup?

 7    A.    No, I was not.  I was not allowed to wear any type of

 8    makeup, and even though I requested it when I did have some

 9    acne problems, it was embarrassing to me not to be allowed to

10    wear makeup.  They said I was too young.

11            MR. SCHWARTZ:  Excuse me, Your Honor, I object, this

12    is not relevant.  There is no basis of who said what.

13            THE COURT:  Move on.

14            MR. STILLEY:  Thank you, Judge.

15    BY MR. STILLEY:

16    Q.    Before Mountain Park did you have a lot of problems

17    with acne?

18    A.    No, I did not.

19    Q.    After Mountain Park did you have problems with acne?

20    A.    No, I do not.

21    Q.    How much problem did you have with acne while you were

22    at Mountain Park?

23    A.    Quite a bit more than I ordinarily do.

24    Q.    Were you -- while you were at Mountain Park were you

25    subjected to sufficient stress to explain the acne?

1          MR. SCHWARTZ:  Objection, Your Honor, that calls for

2   a conclusion.  It's beyond -- there's no foundation for it.

3          THE COURT:  Sustained.

4   BY MR. STILLEY:

5   Q.    What kind of things were left to your discretion at

6   Mountain Park?

7   A.    Absolutely nothing.

8   Q.    What about your personal grooming, were you allowed to

9   do your personal grooming the way you wanted to?

10  A.    For instance, my first day I was just getting up,

11  brushing my hair out, and --

12         MR. SCHWARTZ:  Your Honor, I object to this.  This

13  is not relevant to any claim in the lawsuit at all, and it's

14  got nothing to do with anything against my clients.

15         THE COURT:  I don't know where we're going.

16         MR. STILLEY:  I was trying to go fast, Judge, real

17  fast.

18         THE COURT:  Right.

19         MR. STILLEY:  Couldn't I have just a little bit on

20  this?  Please.

21         THE COURT:  No.  You were asking about things left

22  to their discretion.

23         MR. STILLEY:  Yes.  And she said she didn't have

24  any.  But I want to --

25         THE COURT:  Fine.  I don't know where you are now.

1    She wasn't answering the question, she was giving some

2    example.

3         MR. STILLEY:  Well, I wanted to ask about personal

4    grooming.

5         THE COURT:  Yes, you're asking about personal

6    grooming.

7         MR. STILLEY:  And if I could, I would like her to

8    answer that just a little bit.  But if I can't then I won't.

9         THE COURT:  Well, you need to kind of corral and

10   control it and direct it.  Go ahead.

11        MR. STILLEY:  So she can answer the question?

12        THE COURT:  Not with some example that I don't know

13   where it comes from.  She can answer the question as to

14   personal grooming.  That was the question.

15        MR. STILLEY:  Okay.  Sure.

16   A.   There were two ways I was allowed to do my hair.  I

17   could either part it --

18        MR. SCHWARTZ:  Your Honor, this is not tied to

19   anything in the lawsuit.  When she says allowed, there is

20   nothing tying it to my clients.  This there is nothing

21   about -- this has nothing to do with failing to give medical

22   care.  It has nothing to do with battery.

23        MR. STILLEY:  Your Honor, let me explain.  The

24   defendants claim the reason for the missed periods is stress.

25   I want to see how much stress was put on.  The jury needs to

1    know.

2            MR. SCHWARTZ:  Your Honor, I object to argument in

3    front of the jury.

4            THE COURT:  Sustained.  Sustained.  I don't know

5    whether different hairstyles go either to negligence in any

6    kind of way, so I'm sustaining that.  Move on.

7    BY MR. STILLEY:

8    Q.    What did the defendants say about God and his

9    relationship with you?

10           MR. SCHWARTZ:  Again, Your Honor.

11           THE COURT:  Sustained.

12   Q.    Did you enjoy church --

13           MR. SCHWARTZ:  Same objection.

14           THE COURT:  Sustained.

15           MR. STILLEY:  I wasn't through with the question.

16   Can I say the whole question?

17           THE COURT:  Can you do what?

18           MR. STILLEY:  Say the whole question.

19           THE COURT:  I thought you asked the whole question,

20   did she enjoy church.  It's sustained.

21           MR. STILLEY:  Well, I meant church before Mountain

22   Park.

23           THE COURT:  Don't matter.  Sustained.  As well as

24   after.

25           MR. STILLEY:  Thank you, Judge.

BY MR. STILLEY:

Q.    How did the Mountain Park Boarding Academy experience affect your daily life after you got out of Mountain Park the second time?

MR. SCHWARTZ:  Same objection, Your Honor.  This is irrelevant as to what happened after she left.

MR. STILLEY:  Damages, what happened.

THE COURT:  Well, you know, it's a whole range of things.  It's like that's just so broad.  Why don't you get to the things that relate to the battery and this negligence claim relative to Ms. Ozuna and then perhaps you can go from there.  But you just throw it out about the whole, you know, world, the whole world.  Please.  We've got to get into what the situation is and then some causes and effects from what you're putting forth as to this battery and negligence aspect of it.

BY MR. STILLEY:

Q.    Now, I want to ask you a question.  Please listen carefully to the question and just answer the question that I ask you.  Had you had a traumatic experience just preceding the second trip to Mountain Park?

A.    Yes, I did.

MR. SCHWARTZ:  Your Honor, I object.  I object. This is out of the case.  You already said this is out of the case.

1          THE COURT:  Something before she got to Mountain

2     Park?

3          MR. STILLEY:  Can I approach?  Please.

4          THE COURT:  You know, they say that one year Casey

5     Stengel set up his batting rotation for the whole year, for

6     the whole season, at least his pitching rotation.  And the

7     first game got rained out.  His whole year was in disarray.

8     Come on.

9          (The following proceedings were held at the bench

10     and outside the hearing of the jury:)

11          THE COURT:  What is this about something happened

12     outside the school?

13          MR. STILLEY:  Your Honor, here's what the deal is.

14     What I'd like to get her to testify to is that she was raped

15     five days before, and she asked for --

16          MR. SCHWARTZ:  Keep your voice down.

17          MR. STILLEY:  Sure.  And she asked for a pregnancy

18     test, and she was denied it.  Betty Wills said no.

19          MR. SCHWARTZ:  There's no evidence that my clients

20     knew about that.

21          MR. STILLEY:  She said she wanted a pregnancy test

22     and the defendants say they let them have a pregnancy test if

23     they want one.

24          MR. SCHWARTZ:  There's no evidence that -- I'm

25     sorry.

1          MR. STILLEY:  It's embarrassing enough to be raped

2     and to have to tell the world.

3          THE COURT:  It's very prejudicial.  So, I mean, did

4     she tell them that she was raped?

5          MR. STILLEY:  I couldn't tell you absolutely.  I

6     know she told them that she needed the -- wait a minute, let

7     me tell you this.  Let me help out here.

8          THE COURT:  Well, I'll tell you what.  You can ask

9     them about did she ask them for a pregnancy test.  Forget

10    about the rape business.

11         MR. STILLEY:  Well, you know what, that's a problem,

12    that puts before the jury that my client is a slut.

13         THE COURT:  I don't know what the --

14         MR. STILLEY:  I don't want the jury to think she's a

15    slut.

16         THE COURT:  I think it's too prejudicial to put

17    forth this whole rape situation.  It's just too overwhelming

18    for sympathy.  I mean, if she told them that, that's

19    something different.  And you should be aware of whether she

20    told them that and that was the reason she was requesting it.

21         MR. STILLEY:  Well, Your Honor, I know that there

22    was a police officer that came to talk to her about it later,

23    so the defendants cannot really say that they have any

24    ignorance about it.

25         THE COURT:  I'm not talking about what they can say,

1    we're talking about what this witness can say.

2           MR. SCHWARTZ:  There's been no allegation about this

3    in the complaint.  It's not even mentioned in the complaint,

4    not even a general allegation.

5           MR. STILLEY:  We're talking about a denial of

6    medication.

7           THE COURT:  Fine.  Well, then you can ask about that

8    denial, but you can't bring up this rape when you have no

9    indication that they were told that's why she wanted that and

10   that's why she's asking for this.

11          MR. STILLEY:  Well, let me go to the next one.

12   Because I don't want to bring that up.  All that's going to

13   do is make out that my client was sleeping around before she

14   went and that she's a bad girl.  And I've been staying away

15   from that, Judge, and I don't want that up.

16          THE COURT:  Very well.

17          MR. STILLEY:  What I want to do is to ask her about

18   being questioned about a crime committed against her without

19   saying what it is.

20          THE COURT:  Questioned by who?

21          MR. STILLEY:  The police officer came up and

22   questioned her.

23          THE COURT:  What has that got to do with these --

24          MR. STILLEY:  She asked to speak privately and was

25   denied that.

1          MR. SCHWARTZ:  Judge, we've never heard about any of

2     this stuff before.  This is the first time we're hearing

3     this.

4          MR. STILLEY:  You had an opportunity to talk to your

5     clients.

6          MR. SCHWARTZ:  We didn't know it was an allegation

7     in the case.  This is all brand new stuff.

8          THE COURT:  I'm granting that also.  I'm granting

9     that objection to that which I assume there would be.  I

10    don't see what relevance it has to these defendants.  They

11    claim you've never brought this up before or anything.  It's

12    not part of the claims, and I don't see how it relates to

13    either the negligence or the battery.

14         MR. STILLEY:  Well, let me ask you this.  It's rough

15    here.  I don't want to wear this carpet out.  The witness

16    would also testify that she and other girls were called sluts

17    and whores by the defendants.  Can I get testimony to that?

18         MR. SCHWARTZ:  What does that go to, Judge?

19         MR. STILLEY:  The central allegation is that the

20    girls missed their menses, and the defense is that stress --

21         THE COURT:  Fine, I'll allow that.  Anything else?

22         MR. STILLEY:  Let me see.  We're going into a whole

23    different incident with that.

24         THE COURT:  James Brown.  Papa got a brand new bag.

25    Hey, I'm just afraid what's going to come out of it.

1          MR. STILLEY:  You are slicing and dicing my four

2    pages.  I'm half way through already.

3          THE COURT:  Pardon?

4          MR. STILLEY:  You're slicing and dicing my four

5    pages.

6          THE COURT:  Well, did you understand what I was

7    talking about, Casey Stengel's pitching rotation?

8          MR. STILLEY:  I understood it so well, you cannot

9    believe how well I understood it.

10         THE COURT:  Well, good.  See, you got your pitching

11   rotation set up, and you can't -- when things change, you

12   can't even change your rotation.  You can't figure it out.

13   Okay.

14         (The following proceedings continued within the

15   hearing of the jury:)

16         MR. SCHWARTZ:  Can we approach one more time on this

17   last thing that he's now raising.

18         (The following proceedings were held at the bench

19   and outside the hearing of the jury:)

20         MR. SCHWARTZ:  This business about my client's

21   allegedly said that they were sluts and whores, that's never

22   been disclosed.  That's not alleged.  That's not disclosed in

23   any interrogatory answers.  We asked them for all the

24   statements.  They never told us anything about that.  And let

25   me just add one other thing.  He made this claim for

1    intentional interference -- I mean, intentional infliction of

2    emotional distress.  You struck that claim.  And now he's

3    just trying to get into the back door what he can't get into

4    the front door.  How does this -- this does not tie into

5    his -- the medical claim is they had -- didn't have their

6    period and we should take them to the doctor because they

7    didn't have their period.  It's got nothing to do about this

8    idea of stress.

9         THE COURT:  Yeah, how is that going to connect up to

10   missing the periods, the menstrual periods?

11        MR. STILLEY:  Well, that's a stressful thing when

12   somebody makes such terrible allegations against you.

13        MR. SCHWARTZ:  Well, they don't have a doctor that

14   comes in and testifies that that would cause the menstrual

15   period to, you know --

16        THE COURT:  Well, it looks like I got to change my

17   ruling on that then, Mr. Stilley.  Yep, it's a hurtin' thing.

18   You better go to that new bag.  Is it a brown bag or what?

19        MR. STILLEY:  I got to go to another bag.

20        THE COURT:  Yeah, you say you were cutting out four

21   pages.  You got to go to a new bag.

22        MR. SCHWARTZ:  He has a battery claim for her.  We

23   haven't heard anything about that.

24        THE COURT:  Yeah, we haven't heard anything about --

25        MR. STILLEY:  Do I have to get to that first?

1           THE COURT:  You need to get to what this case is

2      about so you can expand from there.  You start out here

3      someplace around the world instead of focusing on what you

4      have, which will allow you to go other places.  You don't

5      have that in.

6           MR. STILLEY:  Well, I'll go there and see if I can

7      get something.

8           THE COURT:  You have to go there and extrapolate

9      from there.

10          (The following proceedings continued within the

11     hearing of the jury:)

12     BY MR. STILLEY:

13     Q.    Were you paddled by one of the defendants or at their

14     direction?

15          MR. SCHWARTZ:  Objection, Your Honor, compound.

16     Lacks foundation.

17          THE COURT:  Go ahead.

18     Q.    Were you paddled while you were at Mountain Park?

19     A.    Yes, I was.

20     Q.    Who did the paddling?

21     A.    Laura Mathews, who was a staff member.  She was ordered

22     to do it by Debbie Gerhardt in front of me.

23     Q.    Okay.  And can you tell the jury what you allegedly did

24     or were told that you did that caused you to get a paddling?

25     A.    My pillow fell off my bed and we weren't allowed to get

1      off of our beds without our orientation guide's permission.

2      She was watching and she saw it fall off.  And her name was

3      Jennifer Jones.  And she was watching me.  I was trying to

4      get her attention to come over and pick it up for me or let

5      me get down off of the top bunk to get it.  I couldn't reach.

6              And we were getting ready for a movie night.  And I

7      had to wait there until she came to get me.  She ignored me

8      for about five minutes and then was just sitting there.  So I

9      got down and grabbed my pillow and got back up on my bed.

10     She immediately ran over there and started yelling at me

11     saying --

12             MR. SCHWARTZ:  Your Honor, I object to the hearsay

13     from the orientation guide.

14             MR. STILLEY:  Agent of the defendants.

15             MR. SCHWARTZ:  She's not an agent of the defendants.

16             THE COURT:  I'll allow it in terms of the res jestae

17     situation.  Go ahead.

18     A.    She told me she was sick of my attitude and that she

19     was going to take me to a worker.  She first took me to Amy

20     Hutchinson and said, "I'm having a really, really big problem

21     with my new student's attitude."  I wasn't allowed the

22     opportunity to defend myself or talk.  Amy Hutchinson

23     directed me to Debbie Gerhardt.  She said I'm not even going

24     to deal with this, this is the third complaint I've had from

25     her on you.  So she sent me to Debbie.

1        My orientation guide took me to her.  And she said I

2   was a spoiled brat who had nothing good to say, and it was

3   time for me to have evil beat out of me.  She dismissed my

4   orientation guide and had Laura Mathews and Sarah Day, two

5   staff members, come and take me.  They took me to fifth dorm

6   and they got out a paddle.  It was about a foot long, at

7   least an inch maybe more thick.  It was wooden.  And in order

8   to make sure that I didn't fall down during the forceful

9   swats, they had me lean over with my hands on a chair.  They

10  told me I was going to get eight swats and that I would get

11  one more for every time that I fought.  I was only 12.  I

12  wasn't going to fight.  They were bigger than me.  I was

13  outnumbered and I knew it wouldn't do any good.  So I didn't

14  fight.

15       They gave me eight swats where this lady reached

16  back with the paddle as far as she could go and she hit me as

17  hard as she could.  If I had not been leaning on that chair,

18  I would not have been able to stand.

19       I was shaking so bad afterwards I could barely walk.

20  They kept me down there for five, ten minutes afterwards

21  before they would take me back past the girls because I

22  couldn't handle it.

23       They had me sign a card.  It had Laura Mathews

24  administered the swats on it.  And it had Sarah Day as a

25  witness.  It didn't say anything else, except for my

1    signature.

2         They -- all the girls during this time had gone into

3    the dining hall for movie night and were in there laying on

4    their pillows.  I was still crying.  They took me past all of

5    the girls and into the dining room where you couldn't see the

6    TV and made me sit down.  And it hurt really bad to sit down

7    right afterwards.  I sat there for the entire movie and wrote

8    lines.  And I don't remember exactly what the lines said,

9    something to the extent of while at Mountain Park I'll behave

10   accordingly, and just a really long line.

11        And then that wasn't the end of it though.  Betty

12   Wills decided that since I had nothing better to say when she

13   heard about it --

14        MR. SCHWARTZ:  Your Honor, excuse me, I have to

15   object at this point to the narrative.  There's been no

16   question.  And also that this is outside the scope of the

17   claim.

18        MR. STILLEY:  Let me ask another question.

19        THE COURT:  Sure.

20   BY MR. STILLEY:

21   Q.   What did Ms. Wills say to you?

22   A.   She said I was a spoiled brat who had nothing good to

23   say and therefore was no longer allowed to speak or be spoken

24   to for an indefinite period of time, which ended up lasting

25   for about two weeks at least.  I don't remember the exact

1    time frame.  It felt like forever.  I was allowed to say one

2    word, and that was bathroom to the orientation guide, and

3    only that word.  But she didn't have to take me, so it didn't

4    really matter.

5    Q.    Were you deprived of the privilege to go to the

6    bathroom?

7    A.    Well, yes.  My orientation guide would take me when she

8    felt like it, but there were no stalls on the bathroom doors.

9    Probably part of why I sometimes had trouble going to the

10   bathroom -- I'm sorry, there were dividers between the

11   toilets, but there were no doors.  They would sit in front of

12   you and they would watch you while you were using the

13   bathroom.  And it's really humiliating for a young girl to be

14   watched while using the rest room.

15   Q.    Now, how much physical discomfort was caused by not

16   being allowed to go to the bathroom?

17          MR. SCHWARTZ:  Well, Your Honor, I object.  There's

18   no foundation for that.  She testified that she was watched

19   going to the bathroom, not being --

20          THE COURT:  Overruled.  Go ahead.

21   A.    Well, it hurts.  When you can't go to the bathroom for

22   an extended amount of time, it starts to hurt and you just

23   feel sick almost because you need to use the bathroom.

24   Q.    What would have happened to you if you had just went

25   and used the bathroom anyway without permission?

1    A.    I could not go and do anything by myself.  I had to

2    have my orientation guide's permission because if I had

3    stepped out of that length then all the girls would have come

4    over and for whatever reason they would just -- they would

5    hold you down or they would tackle you or they would prevent

6    you from leaving your orientation guide's side.  You could

7    not walk away, ever.

8    Q.    Well, if you did walk away would there be some

9    punishment?

10          MR. SCHWARTZ:  Your Honor, I'm objecting now because

11   it's going beyond a specific instance, it's just talking

12   about general and talking about other --

13          THE COURT:  Sustained.

14   BY MR. STILLEY:

15   Q.    Now, when you started to say about this incident, you

16   said that a pillow fell off the top bunk, correct?

17   A.    Yes.

18   Q.    Why couldn't you just get down and get it yourself?

19   A.    I was not allowed to get off of my bed until my

20   orientation guide came to get me.

21   Q.    Did you try then to get the orientation guide to give

22   you permission or ask for help to get the pillow?

23   A.    I tried to get her attention.  She purposely ignored

24   me.  She saw I was trying to get her attention.  She was at

25   the other side of the dorm.  And she looked at me.  And then

1   I tried to wave her down and she just ignored me and turned

2   around and kept doing what she was doing.

3   Q.    How do you know that it was deliberate?

4   A.    Because she looked at me in my eyes, saw me waving at

5   her, and she turned around and put her back to me and ignored

6   me.  But I saw her watching me.  Like when I was trying to

7   get her attention, she kept on keeping an eye out.  And the

8   second I got off my bed, she ran over there and yelled at me

9   and said, "I was watching you."

10  Q.    What kind of rule was it that required you to stay on

11  the bed?

12  A.    When -- like I said, when you're on orientation, you

13  can only be in arm's length.  So the only time you're not in

14  arm's length is when like, for instance, you're in bed.

15  You're on your bed.  They take you to your bed.  They put you

16  there.  You're not allowed to leave your bed until they come

17  back for you.

18  Q.    Now, when Debbie Gerhardt was there, did you try to

19  explain your side of the story to her?

20  A.    I did.  She would not listen to me.  I was never

21  allowed to explain my side of the story.  She -- my

22  orientation guide did not tell the story.  She just walked up

23  to her and said my new student is having a bad attitude.  And

24  she had apparently been making more than just that complaint

25  about me having a bad attitude.

1    Q.    Was there any other humiliation involved in this

2    incident?

3    A.    In this particular incident?

4    Q.    Correct.

5    A.    There was the paddling, there was the lines, there was

6    the silence.  In that particular instance that was my --

7    those were my only punishments.  But I did have other ones at

8    other times.

9    Q.    Did this paddling cause bruises?

10   A.    Yes, it did.

11   Q.    About how long did it take for those bruises to heal

12   up?

13   A.    I don't remember checking to see how long the bruises

14   were there.  I wasn't really paying that much attention.  I

15   know I saw the bruises in my shower the next day because I

16   checked.  It hurt to sit down for at least the first week

17   where I could not sit down without it being extremely painful

18   for me.  So it was a minimum of a week that I did have

19   bruises.  But I don't know the exact time frame.

20   Q.    Approximately how large of a person is Laura Mathews?

21   A.    She is shorter, probably around -- around five feet,

22   maybe a little -- an inch or two higher.  But she was larger

23   around.  And she was -- she was a little heavyset.

24   Q.    While you were at Mountain Park did your menstrual

25   periods cease for awhile?

```
 1   A.    My first time there I didn't really have -- I was only

 2   12.  I didn't have a period yet.  My second time there I had

 3   had a regular period since leaving Mountain Park the first

 4   time.  So for the ten months in between I was having regular

 5   periods.  When I went back there I had no period for I think

 6   the first eight months.  And then I had one or two light ones

 7   before leaving.

 8   Q.    Did you say anything to anyone about this?

 9   A.    I said something to everybody.  I asked for a pregnancy

10   test.  I thought I could be pregnant.  I asked Betty Wills.

11   I asked Debbie Gerhardt.  I asked my orientation guide and I

12   asked other staff members that are not plaintiffs in this

13   case -- or that are not people in this case, quite a few.

14   Nearly every female staff member there I talked to about

15   missing my periods and being concerned.

16   Q.    Did you talk to Betty Wills?

17   A.    I did.

18   Q.    What kind of response did you get from Betty Wills?

19   A.    She told me that girls miss their periods all the time

20   because of stress and that it's normal.  And I shouldn't

21   worry about it, it will come back when I'm ready.

22   Q.    What was your general health before your second stay at

23   Mountain Park?

24   A.    You mean between my two stays?

25   Q.    Correct.
```

1    A.    I was terrified of being sent back there.  I was

2    threatened constantly.

3            MR. SCHWARTZ:  Your Honor, I object to this.  This

4    is about not when she's there.

5            THE COURT:  Sustained.

6    BY MR. STILLEY:

7    Q.    After you left Mountain Park did your menstrual periods

8    return?

9    A.    Yes.

10   Q.    Have they been normal since that time?

11   A.    Yes.

12   Q.    The second time that you went to Mountain Park, I want

13   to ask you a few questions about a certification, but I want

14   you to listen very carefully and just answer the question

15   that I'm asking you here.  Was there -- without saying

16   further was there an event during that time that was --

17           MR. SCHWARTZ:  Your Honor, I have to object to this.

18           THE COURT:  Sustained.

19           MR. STILLEY:  Your Honor, can we approach?

20           THE COURT:  No.  This is what we talked about.  No,

21   we're not going there.

22   BY MR. STILLEY:

23   Q.    Did Sam and Debbie call you to them at one point in

24   time and send you away from Mountain Park?

25   A.    Yes.

1          MR. SCHWARTZ:  Objection, Your Honor, can we

2     approach, please?

3          THE COURT:  No.  Sustained.

4          MR. STILLEY:  Your Honor, I want to approach.  Can

5     we please approach?  I'm trying to do this straight.  I'm

6     really trying hard.  Just let me approach.  Please.

7          THE COURT:  Ladies and gentlemen of the jury, we'll

8     take our evening recess at this time.  Recall the admonition.

9     Return to your jury room at five after five.  Recall the

10    admonition.

11         (The following proceedings were held outside the

12    hearing of the jury:)

13         THE COURT:  Okay.  Go ahead.  What is it?

14         MR. STILLEY:  Your Honor, let me explain that -- I

15    understand your ruling.

16         THE COURT:  Right.

17         MR. STILLEY:  I think I do anyway.  And I'm trying

18    not to say murder, but, however, I know what you said about

19    that.  Here's the problem that I've got.  We've got a witness

20    here who is going to testify, if she is allowed to, of the

21    practice at Mountain Park before this event happened, which

22    I'd like to call a significant event.  Before this happened

23    the Wills and the Gerhardts typically would go and say to an

24    orientation guide, you do this to your student.  After this

25    event, and there were weeks of State personnel at the

1    facility and asking questions and doing a lot of things,

2    after this event the defendants instead of going to the

3    orientation guide to tell them to do something would tell

4    some third party, you go tell the orientation guide, so that

5    they weren't involved.  They had one person between them and

6    the orientation guide.

7         And, furthermore, this witness was told to go off

8    the property.  She was told to ride around with Matt

9    McFadden.  And she was told that if anybody asked who she

10   was, to say she was a staff person's child, which is

11   obviously not true.

12        And this coming directly from the defendants.  And

13   she was taken.  And they stopped and bought her some food.

14   And when she ate the food and lost consciousness and some

15   hours later came back to consciousness.  But in the meantime

16   she listened to the -- to Matt McFadden and his wife -- just

17   a minute now, let me say, they were calling back to Mountain

18   Park and asking, "Have these people left?  Are they gone?"

19        THE COURT:  Is the coast clear?

20        MR. STILLEY:  Yes.

21        THE COURT:  Yes, I got you.  And listening all the

22   time while she was unconscious.

23        MR. STILLEY:  No, wait a minute.  She was

24   unconscious part of the time.  But she did regain

25   consciousness.  So all those things are very important.

1          THE COURT:  Okay.  Very good.  Mr. Schwartz.

2          MR. SCHWARTZ:  Your Honor, I don't think it's even

3  appropriate for Mr. Stilley to be raising this at this time.

4  You have excluded this numerous, numerous times already.

5          THE COURT:  I know.  I know.  We talked about this

6  Monday, Monday morning.

7          MR. SCHWARTZ:  This was a subject of a tortious

8  interference claim that you have kicked from the case.  It is

9  not incorporated by reference into the negligence claim.

10         THE COURT:  It doesn't connect up.

11         MR. STILLEY:  I never had a tortious interference

12  claim.

13         THE COURT:  It doesn't matter.  Whatever you had, it

14  wasn't --

15         MR. SCHWARTZ:  I'm sorry, I misspoke, intentional

16  infliction.

17         MR. STILLEY:  Let me say this, it goes to the

18  assault.

19         MR. SCHWARTZ:  What assault?

20         MR. STILLEY:  She was put --

21         THE COURT:  The assault was the paddling.

22         MR. STILLEY:  Well, that was the battery.  The

23  assault is when she's told, you go do this, and knowing that

24  if she doesn't, she's going to be beaten.  That's clear as

25  anything.  I can connect that up.

1          THE COURT:  To you.

2          MR. STILLEY:  Well, I'll make it clear to the jury

3     if you let me.

4          THE COURT:  Right.  Because I'm sustaining the

5     objection.

6          MR. STILLEY:  I cannot even go there at all?

7          THE COURT:  Can you do that?

8          MR. STILLEY:  I cannot say anything at all about

9     that?

10         THE COURT:  Oh, no.

11         MR. STILLEY:  Now, let me ask this, before we get

12    through, let me ask this.  Can I pick the date without saying

13    why it's important or anything about it and then say was

14    there a change in the practices before then as opposed to

15    after then?  She's got personal knowledge.  She witnessed it.

16    I want to do this straight.  I want to do what's right.  I

17    think that's fair.  Because the defendants are saying, "I

18    didn't tell anybody, I don't know."

19         THE COURT:  Right, right, right.  Well, that

20    objection is sustained also.  We're moving on.

21         MR. STILLEY:  So I'm prohibited from allowing my

22    witness to testify about the difference in the operations

23    before the murder and after the murder; is that correct?

24         THE COURT:  Right.

25         MR. STILLEY:  Now, let me ask you this.  Can we

1   revisit this if any of the defendants get on the stand and

2   put their credibility at stake?

3           THE COURT:  Well, the problem is, as you say, this

4   whole hearsay situation.

5           MR. STILLEY:  No, we've got the Gerhardts standing

6   in front of the witness, Ms. Ozuna, and saying things

7   straight in front of her.  That's a party admission.  It's

8   not hearsay.

9           THE COURT:  Well, it depends upon what they say.

10  What they say has something to do with this case.

11          MR. STILLEY:  That's a statement against interest.

12  There you have to say it's against interest.

13          THE COURT:  Did they say something that has to do

14  with this case?

15          MR. STILLEY:  Yes, they did.

16          THE COURT:  What did they say?

17          MR. STILLEY:  They told her to go with Mr. McFadden

18  and told her to lie.  Now, if they get on the stand, is their

19  credibility not at issue?  Sure it is.  Their credibility is

20  at issue.  If they get on the stand, I want to be able to

21  revisit this and put this young lady right back on the stand

22  to say things to prove that these folks are not truthful

23  folks.  I'm just trying to be fair, let it be known, not that

24  I really wanted to, but, heck, I'm here.

25          THE COURT:  Mr. Schwartz.

1          MR. SCHWARTZ:  Well, he's talking about impeaching

2     my clients, but they haven't testified yet.  But I think it's

3     so collateral anyway, it would not be proper impeachment

4     anyway.  This has nothing to do with the claims that she

5     made.  She testified I think very brilliantly about the

6     battery.  And she's testified about the negligent issues.

7     But that's got nothing to do with this other incident.  And

8     it's all speculation on speculation on speculation as to why

9     they may have done certain things.

10          THE COURT:  I can't connect it up with the battery

11     nor the negligence, and as far as credibility is concerned, I

12     think Mr. Schwartz is right.  You're looking to impeach them

13     on a collateral area about truthfulness.

14          MR. STILLEY:  Well, isn't all impeachment of

15     truthfulness collateral?  Isn't it all collateral?

16          THE COURT:  Not exactly all of it.  Some of it is.

17          MR. STILLEY:  Most of it is.

18          THE COURT:  No, not most of it.  Maybe there's some

19     way it may come up in terms of their testimony or something

20     that may revive it, may give it mouth-to-mouth resuscitation.

21     But at this point it's not quite dead as fried chicken, but

22     it's getting close.  Okay.  So that's that.  Anything else?

23          MR. STILLEY:  That's all I can think of, Judge.  So

24     we'll be starting in the morning, nine o'clock?

25          THE COURT:  No, the jury is coming back at five

1    after five.

2         MR. STILLEY:  Now, wait a minute, Judge, let me ask

3    for this.  I think we've really went fast.  This is what I'd

4    really like to do.  I'd like to go ahead and take a break and

5    let everybody go home and come back in the morning because

6    I'll be real fast.

7         THE COURT:  Yeah, when you become the judge you can

8    make those calls, but I asked this jury if they could stay

9    until at least six, and they told me yes.  So you knew what

10   time of day it was and what's going to happen.  That's the

11   play.  And as you said, I'm ambitious.  That hasn't changed,

12   okay.  So we're going to do that.  And then we're going to do

13   that and then we're going to stay here and work on these

14   instructions, see.  You're going no place.

15        MR. STILLEY:  Your Honor, I need to send somebody --

16        THE COURT:  They may leave, but you and

17   Mr. Schwartz, you all are going to stay here.  We've got to

18   work on the instructions.

19        MR. STILLEY:  I need to send somebody back to the

20   hotel and get the instructions.  When we finish this witness,

21   can we break for the night?

22        THE COURT:  We'll see.

23        MR. SCHWARTZ:  Are you done with this witness?

24        MR. STILLEY:  No, no, no, no.

25        THE COURT:  Well, we're going to start back at five

```
 1    minutes after five.  And we'll work on these instructions

 2    when we get close to six.

 3               (Court in recess from 4:47 p.m. until 5:05 p.m.)

 4    BY MR. STILLEY:

 5    Q.    Were you ever deprived of medication that you asked for

 6    at Mountain Park?

 7    A.    Yes, I was.  I asked for Sudafed when I had a cold and

 8    my ears were plugged up, and I was not given it.

 9    Q.    Who did you ask?

10    A.    I went to medicine call.  I believe I was a single

11    student at the time.  I can't recall who specifically

12    was heading up the medicine line.  But I know I went at least

13    once to medicine call and asked for it and was not given it.

14    Q.    Do you know about any other times?

15    A.    That I went to medicine call?

16    Q.    That you were denied medicine.

17    A.    I -- oh, I have asthma and I asked for my inhaler at --

18    several times, I don't recall exactly how many times I asked

19    for my inhaler.  But I know there were at least several

20    occasions where I asked Kim Watson for my inhaler, and she

21    was a staff member, and she told me I didn't need it.

22               MR. SCHWARTZ:  Objection, Your Honor, it's not the

23    defendants.

24               MR. STILLEY:  Staff member.

25               THE COURT:  Well, overruled.
```

1    A.    She told me I didn't need it, and that I wasn't having

2    an asthma attack, even though I was wheezing and I couldn't

3    breathe well.

4    Q.    And how much pain or physical discomfort did that cause

5    you?

6    A.    A lot.  I mean, when you can't breathe you -- it gives

7    you anxiety too.  You panic because you -- because you're not

8    getting enough oxygen and then it makes it so you can't

9    breathe even more when you're already having trouble

10   breathing.  And so it was -- it was quite awhile before it

11   went away.  I mean, at least a few hours before I could

12   breathe normally and where I just felt like really freaked

13   out that I couldn't breathe.

14   Q.    Were you given any explanation of why you wouldn't be

15   allowed to get Sudafed?

16   A.    No, I was not.

17   Q.    Have you seen the medicine log that was provided by the

18   defendants in response to discovery?

19   A.    I have.

20   Q.    Does that record bear any relationship to the reality

21   of the medicine that was given to you?

22         MR. SCHWARTZ:  Your Honor, I object to the question.

23   It's not a proper form.

24         THE COURT:  Sustained.

25

1    BY MR. STILLEY:

2    Q.    Was that document an accurate description of the type

3    of medicine and the times of medicine given to you?

4         MR. SCHWARTZ:  Same objection.

5         THE COURT:  Sustained.

6    Q.    Did you look at the entries on the log?

7    A.    The log while I was in medicine call at Mountain Park

8    or the log that is listed as the log?

9    Q.    Well, let me back up here.  Did you see when you went

10   to medicine call how the entries were entered?

11   A.    I don't remember every entry that was made, but my

12   mother sent me vitamins.  And when I went to medicine call, I

13   didn't go every day, but I sometimes went to medicine call

14   and got vitamins.  And they wrote on the log, and I saw them

15   write it on it and initial it.  And it's not on the log in

16   this book.  That's not my log.

17   Q.    Did you almost have to go back to Mountain Park a third

18   time?

19   A.    Yes.

20   Q.    Why were you not sent?

21        MR. SCHWARTZ:  Objection, Your Honor.

22        THE COURT:  Sustained.

23   Q.    Did you have the occasion to observe your sister

24   Jessica shortly after she left Mountain Park?

25   A.    Yes, I did.

1   Q.     Did you have occasion to observe her ingest certain

2   medication?

3              MR. SCHWARTZ:  Objection, Your Honor.

4              THE COURT:  Sustained.  Sustained.

5              MR. STILLEY:  Your Honor, can we approach on that?

6              THE COURT:  No.

7   BY MR. STILLEY:

8   Q.     Did you see within two or three days after your sister

9   left Mountain Park, did you see her in the state of

10  delirious -- the state of being delirious?

11             MR. SCHWARTZ:  Excuse me, Your Honor, move to

12  strike.

13             THE COURT:  Sustained.  It will be stricken.  The

14  jury will disregard her statement -- the question.

15  Q.     Did -- have you ever went to any other boarding school?

16  A.     Yes, I have.

17  Q.     Did that -- was that boarding experience, boarding

18  school experience similar to the experience at Mountain Park?

19             MR. SCHWARTZ:  Objection, relevance.

20             THE COURT:  Sustained, relevance.

21             MR. STILLEY:  Beg your pardon?

22             THE COURT:  The objection is sustained.

23  BY MR. STILLEY:

24  Q.     What was the name of the other boarding school?

25             MR. SCHWARTZ:  Same objection.

1          THE COURT:  Please.  The objection has been

2     sustained, let it go.  You try some other way to violate my

3     rulings.  You're an officer of the court, okay.

4          MR. STILLEY:  Well, that's why I like to approach.

5          THE COURT:  Well, you like to whatever.  The

6     objection has been sustained.  Move on.

7     Q.    Did Betty Wills at one time come and put her finger in

8     your chest?

9     A.    Yes, she did.

10    Q.    Can you tell the jury about that incident?

11    A.    During my first --

12         MR. SCHWARTZ:  Excuse me, Your Honor, I object to

13    this.  This is not part of the case.  This is excluded by the

14    pretrial motion, the summary judgment motion specifically.

15         MR. STILLEY:  No, it's not, the finger in chest --

16         THE COURT:  Whatever.  Come up.

17         (The following proceedings were held at the bench

18    and outside the hearing of the jury:)

19         THE COURT:  Go ahead, Mr. Schwartz.

20         MR. SCHWARTZ:  Yes, in your summary judgment order

21    you limited her battery claim only as to Deborah Gerhardt.

22         THE COURT:  That's what I thought.

23         MR. SCHWARTZ:  That's the only battery claim she

24    has.

25         MR. STILLEY:  I thought you said the finger in the

1    chest could also come in.

2              THE COURT:  That was as to Ms. Woods.

3              MR. SCHWARTZ:  Right.

4              MR. STILLEY:  Wouldn't this be about the same deal?

5              THE COURT:  We've only got the claim against Deborah

6    Gerhardt, that's from the motion for summary judgment.

7              MR. STILLEY:  Okay.  Since we're up here anyway, let

8    me ask you this.  I'm just about through with this witness.

9    After this witness can we let the jury go home.

10             THE COURT:  Let's finish this witness.  I will make

11   that decision at the time, okay.

12             MR. STILLEY:  Okay.

13             (The following proceedings continued within the

14   hearing of the jury:)

15   BY MR. STILLEY:

16   Q.    Were you allowed to have a diary at Mountain Park?

17   A.    No, I was not.

18   Q.    How about a calendar?

19   A.    No, I was not.

20   Q.    How about a watch?

21   A.    My watch was taken when I first came in along with any

22   other jewelry that I came in with.

23   Q.    And was that returned later?

24             MR. SCHWARTZ:  Objection, Your Honor, irrelevant.

25   Not part of the lawsuit.

```
1            THE COURT:  Sustained.

2    Q.    Did you have an occasion to look at a letter that is

3    proposed by the defense as Exhibit E?

4    A.    Yes, I did.

5            MR. SCHWARTZ:  Hold on a second.  I'm sorry, go

6    ahead.

7    Q.    Did you write that letter?

8    A.    Yes, I did.

9    Q.    So that is an authentic letter, that is actually a

10   letter, a copy of a letter?

11   A.    I did write it, yes.

12   Q.    And about when did you write that letter?

13   A.    Two to two and a half months after I left Mountain Park

14   the second time.

15   Q.    And why did you write that letter?

16   A.    Because I was under constant fear of being sent back to

17   Mountain Park, and I was attempting to stay in good relations

18   with them in the event that I was sent back.

19   Q.    Did you get any response to the letter?

20   A.    No, I did not.

21   Q.    Now, you said you were afraid of going back.  How long

22   did that fear last?

23   A.    From the ages of 12 to 18.  I counted down every day.

24   I lived in the fear of being sent back to Mountain Park and

25   constant threats of being sent back to Mountain Park until
```

```
 1    the day I turned 18.
 2              MR. STILLEY:  Pass the witness.
 3                        CROSS-EXAMINATION
 4    BY MR. SCHWARTZ:
 5    Q.    Good afternoon, Ms. Ozuna.  Did I pronounce your name
 6    properly?
 7    A.    Pardon?
 8    Q.    Did I pronounce your name properly?
 9    A.    Yes.
10              MR. SCHWARTZ:  Your Honor, I've shown this to
11    counsel, it's just a demonstrative exhibit showing the times
12    that the plaintiffs were at --
13              THE COURT:  Any objection?
14              MR. STILLEY:  No objection, Your Honor.  Can we put
15    a letter to that at the end of that?
16              THE COURT:  If he's going to introduce it.
17              MR. SCHWARTZ:  It's a demonstrative exhibit, Your
18    Honor.
19    BY MR. SCHWARTZ:
20    Q.    Now, Ms. Ozuna, you were at Mountain Park from -- the
21    first time from December 1st, 1995 till April 30, '96?
22    A.    No, I came in at the end of Christmas visits in
23    December '95.  So it was at the end of the month.  It was
24    after Christmas.
25    Q.    Okay.  So it was closer to January of '96, and you were
```

1    there until end of April?

2    A.    Mid to end April, yes.

3    Q.    Okay.  And you went home and then you came back around

4    early February '97 until the end of '97?

5    A.    Yes.

6    Q.    Okay.  Now, you testified that you were never given --

7    that you asked for something for a cold and you were not

8    given anything.  Is that your testimony?

9    A.    I was not given Sudafed when I asked for it in the

10   medicine call line, that was my testimony.

11   Q.    Okay.  Did they give you something else?

12   A.    When I asked for something at that time?  No.

13   Q.    Okay.  You don't recall being given Tavist-D?

14   A.    No.

15   Q.    And you don't recall being given Sudafed; is that

16   right?

17   A.    No.

18   Q.    Your cold was -- would have been some time in March,

19   around that time?

20   A.    I don't remember the exact date that I had a cold.  I

21   did have an occasion where I had a really bad cold and fever

22   and was allowed to stay in bed.  And they did not give me

23   Sudafed or Tavist-D for that.

24   Q.    Okay.

25   A.    And I did not go to medicine call for that, they had me

1    in bed.

2    Q.    It could have been in March that you had the cold,

3    right?

4    A.    It's a possibility.  I was still on orientation, so it

5    was some time around there.

6    Q.    All right.  Would that have been the first time or

7    second time you were there?

8    A.    The first time.

9    Q.    All right.  Now, you had mentioned the inhaler.  Isn't

10   it the case that at the time you were asking for an inhaler

11   you weren't sure if your parents had actually sent you an

12   inhaler?

13   A.    I do not know if they did or not.  I requested one from

14   the staff, and I let it be known that I was having breathing

15   difficulties.  And there were other girls that had the same

16   inhaler that said I could have borrowed theirs, but they

17   would not allow me access to any type of inhaler.

18   Q.    All right.  But you could have asked your parents to

19   send you one, right?

20   A.    We had very brief phone calls that were also monitored.

21   Q.    And you were able to write letters to your parents?

22   A.    Yes, but they sometimes made us rewrite them.

23   Q.    All right.  But you didn't -- you were never -- they

24   never told you told you couldn't tell your parents, "I need

25   an inhaler."

1    A.    They did not tell me that I could not tell them.

2    Q.    So if you needed an inhaler, you could have had a phone

3    call to your parents or written to them and asked for it?

4    A.    That is correct.

5    Q.    And as far as you know at the time you asked for them,

6    you had no way to know whether Mountain Park actually had one

7    for you?

8    A.    I can't prove it.  I didn't go in there and check.

9    Q.    Okay.  Now, you talked about the paddling.  That

10   happened the first time you were at the school?

11   A.    Yes.

12   Q.    Okay.  You went home and told your parents about it?

13   A.    That is correct.

14   Q.    Okay.  Now, prior to you going to the school, your

15   sister Michele was also at the school, right?

16   A.    That is correct also.

17   Q.    Okay.  You went home in April of '96 and told your

18   parents about this paddling, and then within a few months or

19   later in 1997 they brought you back to the school, is that

20   right, or they sent you back to the school?

21   A.    They -- they sent me back ten months, about ten months

22   or so.

23   Q.    And a few months later they sent your sister Jessica?

24   A.    That is correct.

25   Q.    Now, you referenced this letter that you wrote, and I'd

 1   like you to take a look at the letter.

 2   A.     Where is it?

 3          MR. SCHWARTZ:  Your Honor, may I approach the bench?

 4          THE COURT:  Sure.

 5   Q.     This is defendants' Exhibit E, which I'd like to show

 6   to the jury.  This is your letter, right?

 7   A.     Yes, it is.

 8   Q.     This is written in your handwriting, and you wrote it

 9   on February 14th, 1998; is that right?

10   A.     Yes.

11   Q.     And that would have been a couple of months after you

12   left the school the second time?

13   A.     A little over two months, yes.

14   Q.     And you wrote this to Debbie Gerhardt?

15   A.     Correct.

16   Q.     And she's the person that you say ordered you to be

17   paddled?

18   A.     Correct.

19   Q.     It says, "Dear Ms. Debbie, although I promised I would

20   write, it took me a little longer to do it than I expected.

21   I was really nervous about being in Idaho, but it's not that

22   bad actually.  Boise is only 20 minutes away and I'm living

23   in some apartments across the street from the Christian

24   school that I'm going to.  The school is really nice.  It has

25   a very good sports program.  And after I get back into shape,

1   I plan to start running cross country."  Now, I don't want to

2   read the whole letter because most of it is probably not

3   relevant.  But I'm going to offer it into the evidence so the

4   jury can see it if they want to.  But let's skip down.

5        You see where I've highlighted a sentence that says:

6   "I miss everyone at Mountain Park."  Can you tell me what it

7   says after that?

8   A.    I believe that you can read it as well as I can.  Do I

9   have to read that out loud?

10  Q.    I'll read it.  It says:  "I miss everyone at Mountain

11  Park a lot.  It gets lonely here."  Is that what it says?

12  A.    It is.

13  Q.    And then lower down it says, "While I'm not in a

14  certain church yet, we go to a different one every week so

15  that we can find one that we really like here.  We have found

16  two that seem great so far."  And then below that it says:

17  "Please tell everyone I love and miss them a lot."  Is that

18  what it says?

19  A.    It is.

20  Q.    "How are all my old new students?"  Now, the new

21  students would have been the ones you had when you were an

22  orientation guide, right?

23  A.    The second time I was there, yes.

24  Q.    Right.  They would have been the ones -- the students

25  you were helping to minister as the orientation guide, right?

 1    A.    That is correct.

 2    Q.    And it says they were Chrissy Imel, Bridget -- what's

 3    her last name?

 4    A.    Gangey.

 5    Q.    Gangey, Rachel Friedman, Quanetta --

 6    A.    Quanetta Hansmeyer.

 7    Q.    Amy Hoffer and Megan Talbot.  "Is Rachel saved yet?"

 8    That would have been one of the students, right?

 9    A.    Yes.

10    Q.    And Quanetta -- I'm sorry.

11    A.    Rachel Friedman listed above.

12    Q.    "Is Quanetta an orientation guide?  Tell them all I

13    love and miss them and I still pray for them.  Tell third

14    dorm I miss them.  The only thing I don't miss is the

15    ten-minute showers.  Oh, yeah, and getting up at 5:15."  Did

16    you write that?

17    A.    I did.

18    Q.    And then it says:  "If mama and papa ever come to

19    Idaho, tell them to say with us."  Now, mama and papa, would

20    that be --

21    A.    Mr. and Mrs. Wills required that we called them mama

22    and papa, and I actually did get in trouble for not calling

23    Ms. Wills mama when I first came in.  So, yes.

24    Q.    That's who you're referring to, Mr. and Mrs. Wills?

25    A.    Yes.

1    Q.     And you're saying that they should -- that

2    Mrs. Gerhardt should tell them that if they ever come to

3    Idaho where you were living, to stay with you; is that right?

4    A.     That is what I said in the letter.

5    Q.     And it says, "We're planning on getting a new house

6    over the summer, then we'll have plenty of room for them."

7    Is that what it says?

8    A.     Yes.

9    Q.     And then toward the end it says, "Thanks for

10   everything.  The Lord -- Thanks for everything.  The Lord has

11   blessed you for everything you've done for me and all the

12   others.  I love you all.  Love in Christ.  Tracey Brazil."

13   And that's your signature?

14   A.     Yes.

15   Q.     And Tracey Brazil was your maiden name?

16   A.     Yes.

17          MR. SCHWARTZ:  Thank you.

18          THE COURT:  You finished?

19          MR. SCHWARTZ:  Yes, sir.

20          THE COURT:  Mr. Stilley.

21                    REDIRECT EXAMINATION

22   BY MR. STILLEY:

23   Q.     And what was your age at the time you wrote this

24   letter?

25   A.     I had just turned 15 in January.

1    Q.    Was there any guarantee that if your parents actually

2    sent an inhaler to you that you would get that inhaler?

3              MR. SCHWARTZ:  Objection, Your Honor, it calls for

4    speculation.

5              THE COURT:  Sustained.

6              MR. STILLEY:  Pass the witness.

7              MR. SCHWARTZ:  No further questions, Your Honor.

8              THE COURT:  Very well.  Thank you, Mrs. Ozuna.  You

9    may step down.  Call your next witness.

10             MR. STILLEY:  Judge, I'd like to move The Court to

11   go ahead and recess for the evening.  And if I could explain,

12   it would be a whole lot easier simply for everybody involved.

13             THE COURT:  No, there's no explanation.  Call your

14   next witness.

15             MR. STILLEY:  Betty Wills.

16             THE COURT:  Very well.

17                         BETTY WILLS,

18   Having been first duly sworn, was examined and testified as

19   follows:

20                     DIRECT EXAMINATION

21   BY MR. STILLEY:

22   Q.    Please state your name.

23   A.    Betty Wills.

24   Q.    Where do you live?

25   A.    Florida.

```
 1   Q.    And you also live sometimes -- some of the time in
 2   Tennessee?
 3   A.    I do.
 4   Q.    About what percentage of the time?
 5   A.    50/50.
 6   Q.    And you own property both places?
 7   A.    No, sir.
 8   Q.    Only own the property in Florida; is that correct?
 9         MR. BRIGGS:  Objection, Your Honor.
10   A.    Yes, sir.
11         THE COURT:  Let's get to what this case is about.
12         MR. STILLEY:  Okay.
13   BY MR. STILLEY:
14   Q.    You are the individual who was called mama at Mountain
15   Park, correct?
16   A.    Yes, sir.
17   Q.    And the students were required to call you mama,
18   correct?
19   A.    No, sir.
20   Q.    That was not required?
21   A.    No, sir.
22   Q.    Nobody ever got in trouble for that?
23   A.    No, sir.
24   Q.    They could call you whatever they wanted?
25   A.    It would have to be Mrs. Wills.
```

1    Q.    So they were allowed to call you Mrs. Wills or mama?

2    A.    Yes, sir.

3    Q.    Now, you have a handbook that you give out to parents

4    called the Parent/Student Handbook, correct?

5    A.    Yes, sir.

6    Q.    However, isn't it true that that handbook is only given

7    to parents?

8    A.    Yes, sir.

9    Q.    Do you care to explain to the jury why you would call

10   the document the Parent/Student Handbook but only give it to

11   the parents?

12   A.    We give it to the parents so that they will understand

13   our day-by-day processes with the children, what the children

14   would be doing, bible study, schooling, everything that they

15   are doing, their discipline, everything is in that handbook

16   for the parents.

17   Q.    The students have rules to go by, correct?

18   A.    They have what?

19   Q.    Rules to go by, correct?

20   A.    Yes, sir.

21   Q.    But all those rules are oral rules, not written,

22   correct?

23   A.    Correct.

24   Q.    Any particular reason why the -- that you do not allow

25   these students to have a written copy of the rules?

1    A.    No particular reason, no, sir.

2    Q.    Now, in this document you tell parents to take

3    advantage of your 25 years experience in operating boarding

4    academies, correct?

5         MR. BRIGGS:  Objection, vague.  Your Honor, you've

6    actually already excluded this information and issue.

7         MR. STILLEY:  Your Honor, I believe your ruling was

8    we could go into whatever could be brought out from the

9    handbook, and that's what they say in the handbook.

10        THE COURT:  Well, not everything in the handbook.

11   Please.  That's a document of numerous pages.  I mean, we're

12   not going to go through everything that's in the handbook.

13   It has to relate to this case.

14        MR. STILLEY:  It does, very.

15        THE COURT:  Right.

16        MR. STILLEY:  It is.

17        THE COURT:  Try it.  Try something related to the

18   case.

19   BY MR. STILLEY:

20   Q.    Can you tell the jury what your education is?

21   A.    I have a GED diploma.  I got married when I was 16

22   years old.  I quit school in the tenth grade.  And then after

23   that I went to vocational school and did typing and auditing.

24   And then I went to bible school and got a degree in Christian

25   education.

```
 1    Q.    And tell the jury about your employment from the age
 2    of, say, 21.
 3    A.    I've worked part-time at Sears.
 4    Q.    And what dates?
 5    A.    I don't remember, that's been so long ago.
 6    Q.    Can you get close?
 7    A.    No.
 8          THE COURT:  Counsel.  Counsel.  This seems to be
 9    very far removed, you know.
10          MR. STILLEY:  I can link it up, Judge.  You'll like
11    it too.
12          THE COURT:  Yeah, right.  Well, hurry up.  Give me a
13    link with a quickness.
14    BY MR. STILLEY:
15    Q.    How long did you work at Sears?
16    A.    Through the Christmas holidays.
17    Q.    Of what year?
18    A.    I don't remember.
19    Q.    Do you remember the decade?
20    A.    Do I remember what?
21    Q.    The decade?
22    A.    Probably in the sixties.
23    Q.    What was your next job?
24    A.    Alabama Power Company.
25    Q.    And how long did you work there?
```

1    A.     Two years.

2    Q.     And do you remember when you quit that job?

3    A.     In 1972.

4    Q.     What was your next job?

5    A.     Working with Brother Lester Roloff.

6    Q.     And what kind of facility did Lester Roloff have?

7           MR. BRIGGS:  Your Honor, I'm going to object at this

8    point as to relevance.

9           THE COURT:  Sustained.  If you have a question, you

10   need to get to this.  What are you trying to do, get to her

11   background in terms of the position that she held?  You ought

12   to just go straight to it.  Go straight to it.

13          MR. STILLEY:  Your Honor, when I go straight to it,

14   you say you have not laid a foundation.  I'm laying a

15   foundation.

16          THE COURT:  Oh, please.  This is a question.  Go

17   ahead.

18   BY MR. STILLEY:

19   Q.    How many different boarding schools have you worked at?

20          MR. BRIGGS:  Your Honor, I'm going to object again

21   at this point, No. 1, as to relevance.  And, No. 2, you've

22   already excluded this issue from the case.

23          MR. STILLEY:  What issue?  How can we have an issue

24   about how many boarding schools she's worked at?

25          THE COURT:  You can ask that question.  Go ahead.

1   BY MR. STILLEY:

2   Q.     How many boarding schools have you worked at?

3   A.     Four, five.

4   Q.     How many of those have you had an ownership interest

5   in?

6   A.     I haven't owned any of them.

7          MR. BRIGGS:  Object.

8          THE COURT:  Sustained.

9   Q.     How many of those have you been either the chief

10  officer or married to the chief officer?

11         THE COURT:  Hold on again.  Sustained.

12         MR. STILLEY:  Your Honor, this is very important.

13         THE COURT:  Negligence.  Battery.

14         MR. STILLEY:  That's exactly what I'm going to.

15         THE COURT:  Well, I don't see a connection here.  So

16  you got to move on to that, and then maybe you can get back.

17         MR. STILLEY:  I can show you the connection.  I'll

18  jump.  I'll jump and dive like a hawk.

19  BY MR. STILLEY:

20  Q.     Isn't it true that you've never operated or worked at a

21  boarding school where the students did not normally have

22  cessation of menses for six to 12 months?

23         MR. BRIGGS:  Your Honor, same objection.

24         THE COURT:  Sustained.

25

1  Q.    Isn't it true that you operated a school in Mississippi

2  called Bethesda?

3          MR. BRIGGS:  Your Honor, at this point may we

4  approach?

5          THE COURT:  Sustained.  I think you need to just

6  stay on Mountain Park.

7          MR. STILLEY:  Judge, can I approach?  I really need

8  to approach on this.  This is very important.  This is the

9  heart of the case.  This is the guts of it.

10          THE COURT:  Please.  Come on.

11          (The following proceedings were held at the bench

12  and outside the hearing of the jury:)

13          THE COURT:  Now, listen, you're trying to get to

14  prior similar acts, all kinds of things.  And, you know, I

15  don't know where you're going.  Prior similar acts?

16          MR. BRIGGS:  Your Honor, just one brief point.  We

17  went through this yesterday during the motions in limine.

18  You ruled on this.  You kept all of this stuff out.  You

19  specifically excluded it.  And he's trying to bring it into

20  the case.  He's trying specifically to.  And it's causing my

21  clients to be prejudiced.

22          MR. STILLEY:  First of all, I highly disagree that

23  that was the ruling, that we could not even say anything --

24          THE COURT:  What are you trying to do?  You're going

25  through all this stuff about ownership, and that's not in

1    this case.  It's a battery and assault case.

2           MR. STILLEY:  Wait a minute.  It's a battery and

3    assault and it's negligence.

4           THE COURT:  It's not assault.

5           MR. STILLEY:  Wait a minute.

6           THE COURT:  Listen, I'm the judge.  The battery

7    consumes the assault.  So that's the way that is.  And so

8    it's just two claims, battery and negligence.  Now, what have

9    you got to ask her about negligence and battery?

10          MR. STILLEY:  Let me explain this to you.  I need

11   this on the record.  This lady operated other homes.

12          THE COURT:  Uh-huh.

13          MR. STILLEY:  She won't even tell me all of them.  I

14   know some of them, but she won't even tell me all of them.

15   But every one of these boarding schools, every one of them,

16   the girls ceased their periods routinely.  And she told the

17   newspapers it was stress that caused that.  On many occasions

18   she said that it was stress that caused that.

19          THE COURT:  Maybe she's going to say the same thing

20   when you ask her about that.  And that's what you need to get

21   up on right now.  Anything else?

22          MR. STILLEY:  Are you forbidding me from going back

23   anything behind Mountain Park?

24          THE COURT:  Right.

25          MR. STILLEY:  Can I even ask what the name of the

1    schools are that she was at?

2         THE COURT:  That's right.

3         MR. STILLEY:  I cannot?

4         THE COURT:  That's right.  Because we are not going

5    into these other cases and what was in the newspaper and what

6    happened at these other institutions.  It's not going to

7    happen.  So you just as well get on with whatever you're

8    going to get on relative to this case.

9         MR. STILLEY:  Can I ask about anything about the 25

10   years?  Can I ask what they disclosed to the parents?

11        THE COURT:  I don't know what you want to know about

12   25 years.  I think you've gone far enough.  I thought you

13   were trying to get her training, background in terms of the

14   ability to do what she's doing briefly or something.  But,

15   no, we're not going back over all these schools,

16   institutions, ownership, none of that.  That's out.  You just

17   as well get to the meat of your case about the assaults and

18   batteries in this case.

19        MR. STILLEY:  Can I ask her if she told the parents

20   about the history of students in her facilities ceasing their

21   menses?

22        MR. BRIGGS:  What's the relevance of that to

23   parents?

24        THE COURT:  That is sustained.  I don't see any

25   relevance to that.

1          MR. STILLEY:  Okay.  They are telling the parents

2     they are going to do a good job, they are going to take good

3     care of these kids.  And the kids are the ones that are the

4     beneficiaries of that.

5          THE COURT:  You need to -- I'll give you some leeway

6     in terms of proper medical treatment and not committing

7     batteries or something on the children, on these students,

8     that's it, at Mountain Park.

9          MR. STILLEY:  Okay.  Let me ask you this, I want to

10    get this on the record.  There was a court order in

11    Mississippi.

12          THE COURT:  That's out.  That's out.

13          MR. STILLEY:  Wait a minute, can I make my record?

14          THE COURT:  There's no point in making it, because

15    whatever other case is out.

16          MR. STILLEY:  Due process involves the right to be

17    heard.  It won't take long.  Can I say --

18          MR. BRIGGS:  We went through this yesterday.

19          THE COURT:  No.  We've done this.  This has been

20    done.  We're not hearing anything about any other case.

21          MR. STILLEY:  Well, as to the matters before

22    Mountain Park, can I ask if the parents were informed of any

23    of those matters?

24          THE COURT:  No.

25          MR. STILLEY:  I can only ask about Mountain Park?

```
 1              THE COURT:  Mountain Park and this situation that's

 2   going on that's before this court today.  That's it.  Let's

 3   go.

 4              (The following proceedings continued within the

 5   hearing of the jury:)

 6   BY MR. STILLEY:

 7   Q.    How long have you lived in Missouri?

 8   A.    How long have I lived in Missouri?

 9   Q.    Yes.

10   A.    I went there in 1986 or seven, seven, I believe.

11   Q.    And why did you come to Missouri?

12   A.    To start Mountain Park.

13   Q.    And did you bring any students with you?  Did you have

14   students to start with?

15   A.    Yes, sir.

16   Q.    How many?

17   A.    About 17.

18   Q.    From --

19              MR. BRIGGS:  Your Honor, objection.  We've been

20   through this.

21              THE COURT:  Yes.

22              MR. STILLEY:  I'll withdraw that question, okay.

23   BY MR. STILLEY:

24   Q.    How many did you say you had?

25   A.    About 17.
```

```
1    Q.    Males?  Females?

2    A.    Females.

3    Q.    All females?

4    A.    Females.

5    Q.    And you bought a certain piece of real property nearby

6    to Patterson, Missouri, correct?

7    A.    Correct.

8    Q.    And you set about to build buildings to create a

9    boarding school there, correct?

10   A.    To build a boarding school, yes, sir.

11   Q.    And you began to solicit business for the school,

12   correct?

13   A.    No, sir.

14   Q.    You didn't solicit business for the school?

15   A.    No, sir.

16   Q.    You just kept the students that you had?

17   A.    We had the students and then by word of mouth we got

18   other students.

19   Q.    By what?

20   A.    Word of mouth.

21   Q.    Did you at some point in time begin to put information

22   on the Internet?

23   A.    We put information about Mountain Park, but that was

24   not soliciting students.

25   Q.    Did you also go around to various churches, to take
```

1    your students to the churches?

2    A.    Yes, sir, but not to solicit students.

3    Q.    Did you ever solicit students while at Mountain Park?

4    A.    No, sir.

5    Q.    So it's all just word of mouth?

6    A.    Yes, sir.

7    Q.    Now, you've seen the little chart that shows the time

8    periods involving the student plaintiffs in this case,

9    correct?

10   A.    Yes, sir.

11   Q.    Was there a material difference in the way that

12   Mountain Park was operated during that period of time and the

13   other periods of time that Mountain Park was operated?

14   A.    Was there what kind of difference?

15   Q.    Was there a material difference in the operations of

16   Mountain Park in the other times that are not the times where

17   these student plaintiffs were at Mountain Park?

18   A.    There were some changes that we made, yes.

19   Q.    Were they big changes?

20        MR. BRIGGS:  Your Honor, at this point I'll object

21   as vague.

22   Q.    Were they changes that may have any --

23        THE COURT:  What are we talking about?

24   BY MR. STILLEY:

25   Q.    Were there changes that made any difference with

1    respect to the cessation of menses of the girls?

2    A.    Repeat your question.

3    Q.    Were the differences that you made, differences that

4    made any change or any substantial change with respect to the

5    cessation of menses in girls, stopping their periods?

6    A.    No, sir.

7    Q.    So basically you had the same situation the entire

8    time?

9    A.    Yes, sir.

10   Q.    You started in 1988, correct?

11   A.    1987.

12   Q.    1987.  With 17 girls?

13   A.    Yes, sir.

14   Q.    And by about 1996 you had about over 250 students,

15   correct?

16   A.    Boys and girls, yes, sir.

17   Q.    And when did Mountain Park cease operations?

18   A.    2004.

19   Q.    And why?

20   A.    My husband had had a massive heart attack, he had lost

21   his gall bladder, he had pneumonia, his health was going

22   down, my health was going down, so we just discussed it and

23   decided that it was time for us to just close and retire.

24   Q.    How many students did you have at that point in time?

25   A.    I'm not sure.  You'd have to ask someone that knew how

1    many were there.

2    Q.    Isn't it true that there was a precipitous decline in

3    the number of students from actually the early 2000s until

4    the time that this school was closed?

5              MR. BRIGGS:  Your Honor, objection, relevance.

6              THE COURT:  Sustained.  Let's move on.  Let's move

7    on.  Let's move away from this.

8    BY MR. STILLEY:

9    Q.    Isn't it true that you had told the girls and other

10   individuals that the reason they missed their periods was

11   because of stress?

12   A.    I don't remember that, but I could have.

13   Q.    Is there another reason?

14   A.    I don't know, I'm not a doctor.

15   Q.    Well, this has happened over many years, correct?

16   A.    Yes, sir.

17   Q.    And you inquired of doctors about this?

18   A.    Yes, sir.

19   Q.    And is it your -- are you telling this jury that you

20   don't know the reason for this cessation of menses?

21   A.    I don't know why they stopped their periods, no, sir, I

22   don't.  I do know that I would take them to the doctor and he

23   would examine them and see if there was anything wrong with

24   them.

25   Q.    Some of the girls said that they didn't get taken to

1   the doctor.  Is that true?

2   A.    I don't know.

3   Q.    Might be true?

4   A.    I don't know.

5   Q.    Well, isn't it true that during all time periods

6   relevant to this lawsuit you and your husband were the chief

7   officers of Mountain Park?

8   A.    My husband and I, yes.

9   Q.    You were responsible for day-to-day operations?

10  A.    My husband and I were gone some of the time after 1996,

11  and we designated Brother Gerhardt and Mrs. Gerhardt to be

12  over the school.

13  Q.    So if you take the four of you, you and your husband

14  and the Gerhardts, those four were responsible for the

15  operations of Mountain Park at all times relevant to this

16  lawsuit, correct?

17  A.    Yes, sir.

18  Q.    And the students were not allowed to leave, correct?

19  A.    They could not leave, no.

20  Q.    They depended upon you for their medicine, their food,

21  and everything else, correct?

22  A.    Yes, sir.

23  Q.    And they couldn't call out to their parents, correct?

24  A.    Their parents called in every two weeks for ten

25  minutes.

1    Q.    But they were not allowed to call out to their parents,

2    correct?

3    A.    No, sir.

4    Q.    So these students were totally dependent upon you for

5    everything they got, correct?

6    A.    Yes, sir.

7    Q.    Do you agree that you had a duty to provide the medical

8    needs of these students?

9          MR. BRIGGS:  Objection, Your Honor, it's a legal

10   conclusion.

11         THE COURT:  Overruled.

12   A.    Yes, sir, I feel like I was.

13   Q.    And did you feel like that you had a responsibility to

14   care for the emotional needs of these students?

15   A.    Yes, sir.

16   Q.    And you heard your lawyer make opening statements,

17   correct?

18   A.    I heard what?

19   Q.    Your lawyer making opening statements?

20   A.    Yes, sir.

21   Q.    And you heard him say that one of the reasons for

22   Mountain Park was to help build up the self esteem of

23   students?

24   A.    Yes, sir.

25   Q.    Would you consider that to be your responsibility to

1    make sure that the procedures were in place so that that

2    process would take place?

3    A.    Yes, sir.

4    Q.    So do you agree then that, for example, when Erika

5    Teasley broke her tooth, that it was Mountain Park's

6    responsibility to make sure that Erika Teasley got medical

7    care for that?

8    A.    I think Mountain Park did.

9    Q.    Would you agree that it was Mountain Park's

10   responsibility to get timely medical or dental care?

11   A.    I think they did.

12   Q.    You think that it was timely?

13   A.    Yes, sir.

14   Q.    Did you hear the time periods that were testified to?

15   A.    Yes, sir, I did.

16   Q.    Do you think that's timely?

17   A.    Yes, sir, because we couldn't get her into the dentist

18   until then.

19   Q.    Do you just have one dentist?

20   A.    We used one dentist in Poplar Bluff.

21   Q.    And did you explain that to Erika Teasley?

22   A.    I wasn't there.  I don't know if they explained it to

23   her or not.

24   Q.    So would you not consider that to be an emergency sort

25   of dental care?

1          MR. BRIGGS:  Objection, Your Honor, I think that

2     would require expert opinion.

3          THE COURT:  Sustained.  Let's not argue with the

4     witness.

5          MR. STILLEY:  Oh, I'm not arguing, I'm just asking

6     questions.

7          THE COURT:  I know.  But you get into argument with

8     the witness, and let's refrain from that.

9     BY MR. STILLEY:

10    Q.    Now, you agree with me Mountain Park had a

11    responsibility to these students, correct?

12    A.    Yes, sir.

13    Q.    When you say Mountain Park, who did that include?

14    A.    That includes myself, my husband, all the workers, all

15    the staff.

16    Q.    Does it include the orientation guide?

17    A.    No, sir.

18    Q.    So that Mountain Park is not responsible for the acts

19    of the orientation guides?

20    A.    Oh, yes, sir.

21    Q.    You are responsible?

22    A.    We're responsible for the orientation guides, yes, sir.

23    Q.    Do you acknowledge responsibility to make sure that

24    they are adequately supervised?

25    A.    I think they were, yes, sir.

1    Q.    And isn't it true also that you advertise or you tell

2    parents that one student will not be allowed to discipline

3    another?

4    A.    That's true.

5    Q.    And isn't part of that representation, a representation

6    that the students won't be allowed to dog pile another

7    student if they start to run or something like that?

8          MR. BRIGGS:  Objection, Your Honor, I think that's

9    argumentative.

10         MR. STILLEY:  I'm trying to find out what the

11   representation is.

12         THE COURT:  Rephrase your question.

13   BY MR. STILLEY:

14   Q.    When you say students aren't allowed to discipline

15   other students, what does that include?

16   A.    That includes everything.  They can't slap them and

17   tell them what to do and how to do it and all that.  It's up

18   to the staff to oversee the orientation guides.

19   Q.    And that is Mountain Park's responsibility, correct?

20   A.    Yes.

21   Q.    Which includes responsibility of Bob and Betty Wills

22   and Sam and Debbie Gerhardt, correct?

23   A.    True.

24   Q.    And the staff?

25   A.    Yes, sir.

```
 1    Q.    Now, let me see if I got an understanding on this.  Are
 2    you saying that the staff and Mountain Park instead of the
 3    defendants have a duty to adequately supervise the
 4    orientation guides so they don't cause injury to one of the
 5    students?
 6    A.    Yes, sir.
 7    Q.    Did you keep records of when the girls missed their
 8    periods?
 9    A.    No, sir.
10    Q.    Was that not something that you would consider
11    important enough to write down?
12    A.    No, sir.
13    Q.    How long did the student have to miss their periods
14    before they could go to the doctor?
15    A.    Normally we'd wait about three months.
16    Q.    Okay.  You heard some of these girls testify that they
17    went up to nine months at least without going to see a
18    doctor.  Are they just lying?
19    A.    I don't know.
20          THE COURT:  Mr. Stilley.
21          MR. STILLEY:  You want us to come up?
22          THE COURT:  No.  I don't want you to argue with the
23    witnesses or comment on the credibility of another witness.
24          MR. STILLEY:  I'm just asking.
25          THE COURT:  But it speaks for itself.  It speaks for
```

1    itself.

2    BY MR. STILLEY:

3    Q.    Now, is it fair to say that stress would at least be a

4    contributor to missed periods?

5    A.    Stress is a contributor to lots of things.

6    Q.    What about missed periods?

7    A.    Could be.

8    Q.    Could be or is?

9    A.    I don't know.  I'm not a doctor.  It could be.

10   Q.    Have you ever done anything in order to lessen the

11   stress on the students in your facility in the roughly 15, 16

12   years that you operated it?

13   A.    Have I done anything to put stress on them?

14   Q.    No, to reduce the stress.

15   A.    I'm being like a mother to them.  I treat each one like

16   my own child.  I love them like my own children.

17   Q.    Well, when did you start that?

18   A.    When I was called into the ministry in 1972.

19   Q.    And --

20   A.    I told the girls all the time that I loved them.

21   Q.    And what about 1987, were you loving the girls then?

22   A.    Yes, sir.

23   Q.    But the new girls would typically miss their periods

24   when they came to Mountain Park, correct?

25   A.    Not every girl, no, sir.  Some of them did, yes, sir.

1    Q.    The majority of them, correct?

2    A.    Sir?

3    Q.    The majority of them, correct?

4    A.    I don't know that it's the majority of them, no, sir.

5    Q.    Well, without records of that, you really wouldn't have

6    a way to know?

7    A.    No, sir.

8    Q.    Did you ever get any prescriptions for the girls that

9    were in your custody?

10   A.    Did I get prescriptions for them from a doctor?

11   Q.    Yes.

12   A.    Yes, sir.

13   Q.    Did you have a policy about whether or not the students

14   would be required to see the doctor in order to get the

15   prescription?

16   A.    The doctor would require that.

17   Q.    So was that the way that it was done at Mountain Park?

18   A.    Yes, sir, we would take them to the doctor and he would

19   give us a prescription.

20   Q.    Now, isn't it a practice of Mountain Park that when the

21   girls come to the facility they are given the dewormers?

22   A.    Yes, sir.

23   Q.    And isn't it the policy that they get the dewormers

24   when they first get there and then two weeks later?

25   A.    Yes, sir.

1  Q.    Can you tell the jury what the reason is for that?

2  A.    I sure can.  We had a girl go on a visit, and when she

3  came back she had worms, and the whole dorm had to take the

4  medicine.  I took her to the doctor.  And he said everybody

5  that lived in the dorm with her had to take this medicine.

6  My family and all of us had to take this medicine.  And then

7  he said the best way to prevent this from happening again is

8  for you to dewormer the girls when they first come in, so

9  that's what we've done.

10  Q.    Now, during the periods of time relevant to this

11  lawsuit did Mountain Park have a policy of maintaining

12  accurate logs of the medication given to girls?

13  A.    Yes, sir.  Before this lawsuit?

14  Q.    No, during the periods of time relevant to this

15  lawsuit.

16  A.    As far as I know, yes, sir.

17  Q.    And those records were supposed to be made

18  contemporaneous; that is, at the time of giving the medicine,

19  correct?

20  A.    That's right, yes, sir.

21  Q.    So the logs should have an entry for each of the girls

22  for wormer when they arrived and then within a couple weeks,

23  right?

24  A.    Not the worm medicine we didn't.  No, sir.  That was

25  just something the doc told us to do so we did it, and then

1    two weeks later she got another dose.  And it's just a policy

2    that we do.  We don't mark that down.

3    Q.    So that's -- well, now, one of the girls does have that

4    on her record.  Why would you have one girl have it on her

5    record and not the rest of them?

6    A.    I have no idea why the worker would write on one record

7    like that and not the rest of them.

8    Q.    Are these records supposed to be complete other than

9    what you just mentioned, the worm medicine?

10   A.    We don't write down their vitamins.

11   Q.    And is there a policy on that?

12   A.    We just don't write down vitamins.

13   Q.    Do all the -- do the workers all know that they are not

14   supposed to write down vitamins?

15   A.    Yes, sir.

16   Q.    How do they know that?

17   A.    We told them.

18   Q.    Now, you also told parents that any time a student was

19   disciplined that there would be a written record of that,

20   correct?

21   A.    I don't know if we told the parents that.  It was just

22   our policy that we made the record.

23   Q.    Was there a limit on how many swats that a girl could

24   get?

25   A.    Yes, sir.

1  Q.     How many?

2  A.     Five.

3  Q.     Do you know why that a girl might get eight swats?

4  A.     No, sir.

5  Q.     That would be against policy then I presume?

6  A.     Yes, sir.

7  Q.     Now, did you in -- for purposes of this litigation did

8  you search your records to see if you could find a record of

9  a paddling of Tracey Ozuna?

10  A.     I didn't, but Ms. Gerhardt did.

11  Q.     And do you know what was found?

12  A.     No, sir, we did not find one.

13  Q.     Now, in your handbook you say that you -- that you and

14  your husband invented the orientation guide system, correct?

15  A.     We originated it, the orientation guide, yes, sir.

16  Q.     And you tell parents in the Parent/Student Handbook

17  that your system is so successful that other programs have

18  copied it, correct?

19  A.     Yes, sir.

20  Q.     Isn't it true that sometimes the system brings tragic

21  results to the student who is in somebody else's control?

22         MR. BRIGGS:  Objection, Your Honor, speculative,

23  argumentative.

24         THE COURT:  Sustained.

25

```
1    BY MR. STILLEY:

2    Q.    When you had an order that you wanted to give to one of

3    the orientation guides prior to 1998, how did you give that

4    order?

5    A.    I would usually tell them.  If I wanted an orientation

6    guide to do something, I would tell them myself.

7    Q.    You would tell the orientation guide directly?

8    A.    Yes, sir.

9    Q.    Now, isn't it true that after -- maybe it was 1997.

10   But isn't it true that after about --

11            MR. BRIGGS:  Your Honor, at this point the objection

12   to this continuing line of questions is to relevance.  It's

13   calling for speculation.

14            MR. STILLEY:  I'm asking her --

15            MR. BRIGGS:  It's also been raised before.  This has

16   been discussed before.

17            THE COURT:  Yeah, what I think you're trying to do

18   is get to something that has been excluded about this vehicle

19   situation and all.  The vehicle situation where you -- but as

20   far as the orientation guide's authority, that's fine.  But I

21   don't know where you're going beyond that.  So rephrase your

22   question.

23   BY MR. STILLEY:

24   Q.    Let me back up and take just a little bit different run

25   at it and maybe I can do this easier.  Would it be fair to
```

1   say that during all periods relevant to this lawsuit that the

2   defendants would all acknowledge responsibility for acts done

3   by an orientation guide against a student if they were

4   negligent or harmful to that student?

5           MR. BRIGGS:  Objection, Your Honor, at this point

6   this would be argumentative.  It would call for speculation.

7   And where is the relevance to this?  Where are we going?

8           MR. STILLEY:  Your Honor, I think it would be a

9   perfectly fair question.

10          THE COURT:  No.  There's no question in there about

11  negligence.  I mean, it's too many things.  It's too

12  convoluted.  You need to rephrase that.  You got a double

13  question.

14  BY MR. STILLEY:

15  Q.   At all times relevant to this lawsuit did Mountain Park

16  maintain strict controls over what an orientation guide would

17  do?

18  A.   Yes, sir.

19  Q.   Did Mountain Park allow the orientation guides to do

20  things that they were told -- allow them to do things without

21  permission from management of Mountain Park?

22  A.   If they did, they were no longer orientation guides.

23  Q.   And you would find out about that real quickly,

24  correct?

25  A.   Yes, sir.

```
1    Q.    Now, was -- what was the policy of Mountain Park with

2    respect to incoming mail for the students?  Was it open and

3    read by Mountain Park staff?

4    A.    Yes, sir, it was.

5    Q.    And you said a number of things in the Parent/Student

6    Handbook about the policy --

7          THE COURT:  Mr. Stilley, hold on a minute.  I think

8    we're just about ready to call it a day for today.  Now, I

9    don't know which it is in terms of me being awfully ambitious

10   or something else, which I'm reluctant to describe, but in

11   any event, I'm trying to figure out where we are, when this

12   case is going to finish so I can tell these ladies and

13   gentlemen of the jury so they can make their personal plans

14   for their lives.  Where are we in terms of who are you going

15   to call and so forth?

16         MR. STILLEY:  Your Honor, I think I'll probably be

17   done with -- don't hold me to this, but I think within an

18   hour or so in the morning with the case in chief, I think.

19         THE COURT:  Can you make some kind of promise?

20         MR. STILLEY:  Not a promise.

21         THE COURT:  Yeah, right, okay.  Mr. Schwartz, where

22   are you all?  What's the story with you all?

23         MR. SCHWARTZ:  If we start our case at 10 o'clock

24   tomorrow morning, I would hope we would try to finish

25   tomorrow.  But I can't guarantee that to you, Judge.  I think
```

1    we would very possibly have to go into Thursday.  I can't say

2    we will finish in time to do anything else tomorrow if we do

3    finish tomorrow.

4            THE COURT:  There it is.  We're into Thursday.  I

5    tried.  What you going to do?

6            Ladies and gentlemen of the jury, we'll adjourn for

7    the day.  Recall the admonition.  You're going home again.

8    Return to your jury rooms at 9 a.m. tomorrow morning.  And

9    the way this thing is going, we'll just try to look at

10   leaving around five, okay.  Because it does not seem that

11   it's going to finish tomorrow.  We'll be in Thursday.  Plan

12   accordingly.  Have a pleasant evening.

13           (The following proceedings were held outside the

14   hearing of the jury:)

15           THE COURT:  I suggest since you've gotten your

16   instructions, you all need to make exchanges.  I want a stack

17   of clean and a stack of citated instructions.  And a stack

18   that's agreed and disagreed -- a big stack of the ones that

19   you all agree on, and a little bitty stack of the ones that

20   you all disagree upon, and we will visit this tomorrow.

21   Okay.

22           MR. STILLEY:  Your Honor, we might even be able to

23   get this where we have just one big stack.  Do I understand

24   correctly that the --

25           THE COURT:  Please.

1           MR. STILLEY:  Do I understand correctly that assault

2   is gone and it's just gone, gone, gone?

3           THE COURT:  Assault is consumed within the battery,

4   okay.  It's not going to be -- it's not but two counts, a

5   battery count that consumes the assault, and the negligence,

6   okay.  That's it.  Just two counts, that's all.  You know, as

7   they say, please, sometimes you just keep on -- and I'll tell

8   you, that dog won't hunt.  It just won't hunt.  Have a

9   pleasant evening.

10          MR. STILLEY:  Thank you.

11          MR. SCHWARTZ:  Thank you, Judge.

12          THE COURT:  Okay.

13          (Court in recess at 6:07 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      C E R T I F I C A T E

2              I, Susan R. Moran, Registered Merit Reporter, in

3     and for the United States District Court for the Eastern

4     District of Missouri, do hereby certify that I was present

5     at and reported in machine shorthand the proceedings in the

6     above-mentioned court; and that the foregoing transcript is

7     a true, correct, and complete transcript of my stenographic

8     notes.

9              I further certify that I am not attorney for, nor

10    employed by, nor related to any of the parties or attorneys

11    in this action, nor financially interested in the action.

12             I further certify that this transcript contains

13    pages 1 - 294 and that this reporter takes no responsibility

14    for missing or damaged pages of this transcript when same

15    transcript is copied by any party other than this reporter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17    at St. Louis, Missouri, this _____ day of

18    _____, 2006.

19

20                        _____

21                        /s/ Susan R. Moran
                          Registered Merit Reporter

22

23

24

25
```