1        UNITED STATES OF AMERICA
         EASTERN DISTRICT OF MISSOURI
2          SOUTHEASTERN DIVISION

3    JAMIE KAUFMANN WOODS, et al.,    )
                                      )
4            Plaintiffs,              )
                                      )
5         vs.                         )   No. 1:03-CV-105 CAS
                                      )
6    BOB WILLS, et al.,               )
                                      )
7            Defendants.              )

8
                    TRANSCRIPT OF JURY TRIAL
9
           BEFORE THE HONORABLE CHARLES A. SHAW
10              UNITED STATES DISTRICT JUDGE

11                  December 14, 2005
                      Volume III
12

13   APPEARANCES:

14   For Plaintiff:      Mr. Oscar Stilley
                         2120 North B Street
15                       Fort Smith, AR   72901

16
     For Defendant:      Mr. John D. Briggs
17                       Mr. Steven H. Schwartz
                         BROWN AND JAMES, P.C.
18                       1010 Market Street
                         20th Floor
19                       St. Louis, MO   63101

20
     REPORTED BY:        SUSAN R. MORAN, RMR
21                       Official Court Reporter
                         111 South 10th Street
22                       St. Louis, MO   63102
                         (314) 244-7983
23

24   Proceedings recorded by mechanical stenography, produced by
     computer-aided transcription.
25

```
 1                          I N D E X

 2                     Direct   Cross   Redirect   Recross

 3    PLAINTIFFS' WITNESSES

 4    BETTY WILLS
          (By Mr. Stilley)      4 (Cont'd)
 5        (By Mr. Briggs)              11
          (By Mr. Stilley)                        37
 6

 7    DEFENDANTS' WITNESSES

 8    DEBORAH GERHARDT
          (By Mr. Briggs)      62
 9        (By Mr. Stilley)              90
          (By Mr. Briggs)                        125
10

11    RICHARD GAYLE, D.O.
          (By Mr. Briggs)     126
          (By Mr. Stilley)             140
12        (By Mr. Briggs)                        171
          (By Mr. Stilley)                                 172
13

14    SHARON GOODMAN
          (By Mr. Briggs)     174
          (By Mr. Stilley)             182
15        (By Mr. Briggs)                        190

16    SAM GERHARDT
          (By Mr. Briggs)     192
17        (By Mr. Stilley)             205

18    BOB WILLS
          (By Mr. Briggs)     222
19        (By Mr. Stilley)             224

20    JULIE GERHARDT
          (By Mr. Briggs)     225
21        (By Mr. Stilley)             238

22    ANDREA HILL
          (By Mr. Briggs)     248
23        (By Mr. Stilley)             252

24

25
```

```
 1              E X H I B I T S

 2                      Offered      Received

 3    DEFENDANTS' EXHIBITS

 4       E, P, JJ, KK         61           61

 5       D                    71           72

 6       I                    74           75

 7       O                    78           78

 8       V                    81           81

 9       BB                   83           83

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (The following proceedings were held in open court

2    on December 14, 2005 at 9:04 a.m.:)

3              THE COURT:  Good morning.

4              THE JURORS:  Good morning.

5              THE COURT:  Shall we continue?

6         MR. STILLEY:  Yes, Your Honor.

7              THE COURT:  Ms. Wills.

8                   DIRECT EXAMINATION (Cont'd)

9    BY MR. STILLEY:

10   Q.   Ms. Wills, is it true at page 7 of the Mountain Park

11   handbook it says that telling a child when they will come

12   home constitutes a reason to remove the child from Mountain

13   Park?

14   A.   Yes, sir.

15             MR. BRIGGS:  Objection, Your Honor, relevance.

16             THE COURT:  Sustained.

17             MR. STILLEY:  Well, the handbook is in evidence, and

18   it does go to --

19             THE COURT:  We have to deal with what does that have

20   to do with this case.

21             MR. STILLEY:  Would you like me to --

22             THE COURT:  We can go through every page of the

23   handbook.  We could be here forever.

24             MR. STILLEY:  Your Honor, can I explain why that's

25   relevant?

1           THE COURT:  You need to get to why it's relevant and

2    then ask that question.

3    BY MR. STILLEY:

4    Q.    Ms. Wills, isn't it true that when a student is sent to

5    Mountain Park that the contract calls for one full year of

6    tuition?

7           MR. BRIGGS:  Your Honor, same objection.  At this

8    point what's the relevance with respect to this?  We went

9    through this yesterday and you ruled.

10          THE COURT:  Sustained.

11   Q.    Isn't it also true that keeping secrets was forbidden

12   to the students?

13   A.    Yes, sir.

14   Q.    And isn't it also true that whenever a student went on

15   a leave, that the parents had to make a report of the visit?

16   A.    Yes, sir.

17   Q.    And one of the required items to be completed was

18   whether or not that child had said anything about wanting to

19   leave Mountain Park?

20   A.    Yes, sir, I think so.

21   Q.    And isn't it true that you wanted that information so

22   that you could find out if the child --

23          MR. BRIGGS:  Objection, Your Honor, this would be

24   argumentative.  I mean, we still haven't got to the relevance

25   I don't think.

1      THE COURT:  Well, we got into all those visit

2  sheets, so I'll allow it.  Go ahead.

3  BY MR. STILLEY:

4  Q.    Isn't it true that the reason you wanted that

5  information was to know if the child was still wanting to go

6  home?

7  A.    It helped us to deal with the child, yes, sir.

8  Q.    And isn't it true that you said on numerous occasions

9  that a student was not ready to go home until they didn't

10  want to go home?

11  A.    Yes, sir.

12  Q.    So really that would give the child, if the child

13  wanted to go home, they would have to say they didn't,

14  correct?

15      MR. BRIGGS:  Objection, Your Honor, that would call

16  for speculation.

17      THE COURT:  Sustained.

18  BY MR. STILLEY:

19  Q.    Mountain Park had a policy concerning girls that missed

20  their periods during the times relevant to this lawsuit,

21  correct?

22  A.    Yes, sir.

23  Q.    And can you tell the jury what that policy was?

24  A.    That if a girl missed three months of her period then

25  she was to go to the doctor.

1    Q.    And was that only upon request of the student?

2    A.    That was only if we knew that the child had missed her

3    period.

4    Q.    Did you ever ask if the child was missing a period?

5    A.    If I knew a child had missed her period for one month,

6    then I would go back again and ask her if she had a period

7    yet.

8    Q.    Were you aware that any of the plaintiffs in this case

9    were missing their periods?

10   A.    I don't remember it, no, sir.

11   Q.    Isn't it true that not a single one of these girls were

12   taken to the doctor with respect to a complaint about

13   cessation of menses?

14   A.    I don't remember that either.

15   Q.    Isn't it true that you had a policy to keep records of

16   the times that the girls were taken to the doctor?

17   A.    We had an appointment book where we made our

18   appointments with the doctor.

19   Q.    And in that appointment book you put down the reason

20   for the visits, correct?

21   A.    I don't remember putting down the reasons.  We just had

22   the girl had an appointment with the doctor.

23   Q.    Well, isn't it fair to say if that visit was made or an

24   appointment with the doctor was scheduled for the purpose of

25   dealing with cessation of menses, you would be able to go

1    back and find that?

2    A.    Not necessarily, no, sir.

3    Q.    Well, did you have a particular doctor that you took

4    the girls to?

5    A.    Yes, sir, we did.

6    Q.    Who was it?

7    A.    Dr. Richard Gayle.

8    Q.    Was he the proper doctor that you took the girls to for

9    this problem for the duration of the period relevant to this

10   lawsuit?

11   A.    Yes, sir.

12   Q.    So if the girls had actually been taken to this doctor,

13   the doctor should have a record of that too, correct?

14   A.    Yes, sir.

15   Q.    And also I believe you said in your deposition that if

16   the girls missed their period for at least three months, they

17   would get some kind of hormone therapy; is that correct?

18        MR. BRIGGS:   Objection, Your Honor, at this point if

19   he's referring to another document like a deposition, let's

20   refer to the document.

21        THE COURT:   Well, let's see if this witness recalls

22   first.

23   A.    Repeat your question again.

24   Q.    Do you recall saying in your deposition that if the

25   girls missed their periods for three months, that you would

1   take them to get a prescription for some sort of hormones?

2   A.    I would do whatever the doctor told me to do.  If he

3   gave them hormones, they would take them.

4   Q.    So it would be simply up to the doctor to decide what

5   to do, correct?

6   A.    Yes, sir, it wouldn't be up to me.

7   Q.    Now, you told us yesterday that the reason for shutting

8   down Mountain Park was because of your husband's health; is

9   that correct?

10  A.    Yes, sir.

11  Q.    Isn't it really true that the main operations --

12        MR. BRIGGS:  Objection, Your Honor, this would be

13  argumentative at this point.

14        THE COURT:  Sustained.

15        MR. STILLEY:  Your Honor, can we approach on that?

16        THE COURT:  No.  Shutting down the school is not

17  relevant to this lawsuit.

18  BY MR. STILLEY:

19  Q.    Isn't it true that immediately before you shut down you

20  only had about 30 or 40 students?

21        MR. BRIGGS:  Objection, Your Honor.

22        THE COURT:  Sustained.

23  A.    We were gradually --

24        THE COURT:  Well, you don't have to answer.

25        THE WITNESS:  Okay.

1    Q.    Did Mountain Park have a philosophy of mental health

2    care?

3              MR. BRIGGS:  Your Honor, I'm going to object at this

4    point.  This has been excluded from the case.

5              THE COURT:  Sustained.

6    BY MR. STILLEY:

7    Q.    Isn't it true that in your deposition you said that if

8    the girls asked for their medicine, they would always get

9    that medicine?

10   A.    Yes, sir.

11   Q.    And isn't it also true that you stated in your

12   deposition that there would be a record of paddlings kept?

13   A.    Yes, sir.

14   Q.    So if there was a paddling of Tracey Ozuna, you should

15   have a record of that, right?

16   A.    We should have, yes, sir.

17   Q.    And that record should say how many swats were given,

18   correct?

19   A.    Yes, sir.

20   Q.    Did you check the records to see if you could find that

21   record?

22   A.    Mrs. Gerhardt did.

23   Q.    And what was the result?

24   A.    She didn't find a record.

25   Q.    What is your net worth?

```
 1              MR. BRIGGS:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              MR. STILLEY:  Pass the witness.  Judge, can I

 4   approach on that?

 5              THE COURT:  No.

 6                        CROSS-EXAMINATION

 7   BY MR. BRIGGS:

 8   Q.    Good morning, Mrs. Wills.

 9   A.    Good morning.

10   Q.    Mrs. Wills, I want to start out just a little bit about

11   kind of laying the land with respect to Mountain Park.  You

12   had answered some questions from Mr. Stilley about certain

13   things that were on the Mountain Park campus, so I want to

14   kind of help the judge and the jury understand how things

15   were set up.  Now, about how big was the campus at Mountain

16   Park?

17   A.    Well, the campus is 180 acres.  The dorm is three

18   stories with a school, church, dining hall, kitchen,

19   apartment upstairs up front, and two apartments in the back

20   and one apartment downstairs.

21   Q.    Okay.  So now you mentioned that there were some

22   apartments.  I guess is this kind of like a bunch of

23   buildings that are all attached to each other?

24   A.    Yes, sir.

25   Q.    And just outside, I guess near the dining hall and the
```

1    church, is there a courtyard with a pool?

2    A.    Yes, sir.

3    Q.    And is there also another area just outside where there

4    is basketball and volleyball courts.

5    A.    The basketball court is inside right next to the dorm,

6    and then the volleyball court is outside out in the play

7    field.

8    Q.    Now, Mr. Stilley had asked you something about some

9    fencing.  And I just want to clarify, is there some fencing

10    around the pool and around the basketball court?

11    A.    Yes, sir.

12    Q.    And those are immediately adjacent to the dorm area,

13    correct?

14    A.    Yes, sir.

15    Q.    Now, could you tell the judge and jury why there is

16    some fencing in those areas?

17    A.    We had a boys dorm on the outside of the fence, and

18    that was to keep the boys out and keep the girls in.

19    Q.    Very good.  Now, Mrs. Wills, we heard some testimony

20    from the plaintiffs with respect to fire exits and such.

21    Now, did the fire marshal come out and inspect Mountain

22    Park's property?

23    A.    Yes, he did.

24    Q.    And he did that on a regular basis, didn't he?

25    A.    Yes, sir.

```
 1   Q.     And he approved Mountain Park?

 2   A.     Yes, sir.

 3   Q.     Okay.  Now, also with respect to the areas, I think you

 4   described that there was a front office attached to all these

 5   buildings; is that right?

 6   A.     Right next to my apartment, yes, sir.

 7   Q.     Okay.  And so you actually had an apartment right in

 8   this cluster of buildings; is that right?

 9   A.     Yes, sir, I did.

10   Q.     And was that also adjacent to the dining hall?

11   A.     Yes, sir.

12   Q.     With respect to the apartment then, I guess did you and

13   Brother Wills actually live in the apartment?

14   A.     Yes, sir, we did until March of 1996.

15   Q.     Okay.  And so that means you actually lived I guess

16   down the hall kind of from the girls.

17   A.     Well, it was the girls back here and then the dining

18   hall and then the kitchen and then my apartment right next to

19   the kitchen.

20   Q.     Now, Mrs. Wills, tell me really what the ministry was,

21   what you and Brother Wills were trying to achieve.

22   A.     The Lord called Brother Wills and I in 1972 to minister

23   to young girls in trouble, to teenagers in trouble.  And he

24   gave us such a burden for them until we wanted to start a

25   ministry and start taking girls that had problems and to keep
```

1   them from going to detention centers and keep them from

2   getting into more problems before it got really serious.  And

3   so our job -- our burden was to see that they got started in

4   life, got a new start in life, could go to college.  Some of

5   these girls came in with backgrounds that --

6   Q.    Well, I tell you, I mean, were some of them, for

7   examples, runaways?

8   A.    Yes, sir.

9   Q.    Now, this was really a devotion for you, wasn't it?

10  A.    Oh, yes, sir.

11  Q.    This wasn't the kind of thing where you could go home

12  at the end of the day like a job?

13  A.    No, this is a 24-hour day.  These were just like our

14  own children.

15  Q.    And once again, you lived in an apartment that was down

16  the hall essentially from the girls, right?

17  A.    Yes, sir.

18  Q.    Now, for a spell when you and your husband set up

19  Mountain Park, who was doing the cooking?

20  A.    I was.

21  Q.    So does that mean actually you had to get up before the

22  girls in the morning and prepare breakfast for them?

23  A.    Yes, sir, my day started at 4:30 in the morning.

24  Q.    And that was before the girls got up?

25  A.    Yes, sir.

1    Q.    And typically then did you go to bed before the girls

2    did?

3    A.    Oh, no, sir.  My night ended about 11 o'clock at night.

4    Q.    When a student was enrolled at Mountain Park,

5    Mrs. Wills, did you also develop a relationship with the

6    student's parents?

7    A.    Yes, sir.

8    Q.    And over time those relationships grew, didn't they?

9    A.    Yes, sir, they did.

10   Q.    And even after the students left or graduated from

11   Mountain Park, did you still keep in touch with the students

12   and their parents?

13   A.    Yes, sir.

14   Q.    So there are circumstances where you've had long-term

15   friendships and relationships developed, haven't you?

16   A.    Yes, sir.

17   Q.    And isn't it true, some of the folks with whom you

18   developed those relationships are even here with you today?

19   A.    Yes, sir, they are.

20   Q.    I think we've already heard this, but isn't it the

21   parents who enroll the student at Mountain Park?

22   A.    Yes, sir.

23   Q.    I guess maybe I should back up just a little bit.

24   You've talked about your faith and your ministry.  How would

25   you describe the type of church that you have?  I mean, I've

1    heard of Baptist churches and I've heard of Presbyterian

2    churches.   What are you all --

3    A.     We're Independent Baptist.

4    Q.     Independent Baptist?

5    A.     Yes, sir.

6    Q.    Now, relating back to the ministry and the devotion

7    that you had, would it be fair to say that you were trying to

8    put structure into these students' lives?

9    A.     Yes, sir.

10   Q.    And also you're trying to develop their worth and self

11   image, weren't you?

12   A.     Yes, sir.

13   Q.    And at the same time, you've already talked about this,

14   faith was a big part of your mission, wasn't it?

15   A.     Yes, sir, it was.

16   Q.    Now, were you also trying to get the students a

17   positive outlook and hope for the future?

18   A.     Oh, yes, sir.

19   Q.    Now, first thing they talked about is structure.   I

20   take it then that Mountain Park, you all had kind of a pretty

21   formal structure in how you did things, didn't you?

22   A.     Yes, sir, we did.

23   Q.    The students all got up at the same time every day?

24   A.     Yes, sir, they all got up, went to bed, ate at the same

25   time.

1  Q.    And also did schooling at the same time?

2  A.    Yes, sir.

3  Q.    I think you already said that the girls and boys were

4  kept separate, right?

5  A.    Yes, sir, they were.

6  Q.    Was there ever occasions when they really mixed?

7  A.    Oh, yes, sir.  We ate together.  We went to church

8  together.  We had banquets together.

9  Q.    Okay.  But like going to school, that was separate?

10  A.    They had separate rooms.  They went to school at the

11  same time, but they had separate rooms they were in.

12  Q.    Now, as part of the structure, were there some rules

13  that students had to follow?

14  A.    Yes, sir.

15  Q.    And did the rules include stuff like no cheating on

16  school work?

17  A.    Yes, sir.

18  Q.    What were some of the other rules?

19  A.    No cheating, no lying, no stealing, do your chores.

20  Q.    No fighting, I take it?

21  A.    No fighting.

22  Q.    Now, how did the students learn these rules?

23  A.    From other students.

24  Q.    And I think we've already heard testimony that there

25  was an orientation guide and program.  Could you briefly

1    describe that for the judge and jury so they understand what

2    we're talking about.

3    A.     An orientation guide was a young lady that had been

4    with us for awhile and she was doing very well.  She was a

5    saved young lady, and she had a desire to help another young

6    girl that would come in.  So we would give her that

7    responsibility.  And her responsibility was to outlove this

8    girl, not to mistreat her, not to keep from going to the

9    bathroom, not to do all these things, but to outlove and help

10   her and help her to get adjusted to being at Mountain Park.

11   Q.     Now, I think you said that the girls had to be saved.

12   And I think that's a term that you use in your faith, and I

13   know not everybody shares your faith.  Could you briefly

14   explain what that means for the judge and jury?

15   A.     Being saved is when you accept Jesus Christ into your

16   heart, and that you are saved and on your way to heaven and

17   you want to help others.

18   Q.     So these orientation guides are the more senior

19   students, right?

20   A.     Yes, sir.

21   Q.     And you said they have to outlove their new students?

22   A.     Every time I would meet with the orientation guide, I

23   said if you're not outloving your student, then you're

24   failing in your ministry to your student.

25   Q.     So being an orientation guide, that was part of the

1    ministry, wasn't it?

2    A.    Yes, sir.

3    Q.    Now, we also heard some of that safety patrol, where

4    some of the more senior girls I guess stayed up for an hour

5    in the evening or overnight for safety and security.  And

6    tell me something, was that a voluntary position as well?

7    A.    Yes, sir, it was.

8    Q.    Was that another part of -- was that another way that

9    students could be in the ministry?

10   A.    Yes, sir, it was.

11   Q.    Was another way students could work in the kitchen?

12   A.    Yes, sir, many of them enjoyed working in the kitchen.

13   Q.    Now, did you require the students at Mountain Park to

14   be saved?

15   A.    No, sir.

16   Q.    Okay.

17   A.    You can't require somebody to be saved.

18   Q.    Can you explain why that is?

19   A.    Because this is your own personal relationship with the

20   Lord Jesus Christ, and you can't make somebody accept Jesus

21   as their Savior.

22   Q.    Now, even if a student wasn't saved, did they still

23   have opportunities to participate in the ministry?

24   A.    Yes, sir.

25   Q.    Okay.  Give me an example of that.

1    A.    They could work in the kitchen.  They could have

2    outside the dorm duties, different things like this.

3    Q.    I think you said this a moment ago, but, Mrs. Wills,

4    we've heard that some orientation guides didn't allow their

5    new student to go to the bathroom when they asked to.  Was

6    that permitted under this program?

7    A.    No, sir, it was not.

8    Q.    If you had found out that an orientation guide had

9    taken that position, what would you do?

10   A.    She would no longer be an orientation guide.

11   Q.    Now, what about -- now, students had access to

12   medication throughout the day; is that correct?

13   A.    Yes, sir.

14   Q.    And that was a program called medicine call?

15   A.    Yes, sir.

16   Q.    Now, we also heard testimony that orientation guides

17   sometimes wouldn't let their student go to medicine call; is

18   that right?

19   A.    That's what I heard.

20   Q.    Okay.  Well, was that acceptable?

21   A.    No, sir, it was not.

22   Q.    And if you found out that an orientation guide had done

23   that, what would you do?

24   A.    Take her off of being an orientation guide.

25   Q.    To be taken off -- being taken off as an orientation

1    guide, was that like a demotion?

2    A.    Yes, sir.

3    Q.    If a student had a health complaint, could they talk to

4    the person, a staff member on medicine call about it?

5    A.    Yes, sir, they could.

6    Q.    Could they talk to other staff members about it?

7    A.    Yes, sir.

8    Q.    But going back to this issue about orientation guides,

9    I guess since they could be demoted, could they also be

10   disciplined or corrected if they engaged in the conduct we

11   talked about a moment ago?

12   A.    They could have written some lines or something like

13   that, yes, sir.

14   Q.    So, in essence, they are kind of treated just like all

15   the other students?

16   A.    Oh, yes, sir.

17   Q.    Now, we just talked about discipline.  There was a

18   practice with respect to discipline, wasn't there?

19   A.    Yes, sir.

20   Q.    And was there kind of a hierarchy of correction if a

21   student misbehaved or broke the rules?

22   A.    Yes, sir.

23   Q.    Could you kind of describe for the judge and jury what

24   that was?

25   A.    If a girl did something wrong then usually I would talk

1    with her, maybe twice, maybe three times, and then if that

2    didn't work then we would have her do lines.  If that didn't

3    work then she would have extra duty.  If that didn't work

4    then we'd start taking some privileges away from her.  We'd

5    take her sweets away from her.  We'd take her makeup away

6    from her.  Something that she really, really loved, we'd take

7    away from her.  And generally these things would work before

8    it came to paddling.  If none of that worked then she would

9    get a paddling.

10   Q.    Okay.  So one part of time the paddling was part of the

11   discipline practice?

12   A.    Yes, sir.

13   Q.    Now, let's go back a little.  You said first one a

14   couple of times that you talked -- that you dealt with a

15   misbehavior issue, that you talked to the student, right?

16   A.    Yes, sir.

17   Q.    Now, we've heard some testimony that when you were

18   talking to students that you sometimes had occasion to point

19   at them with your finger; is that right?

20   A.    Yes, sir.

21   Q.    And actually Jamie Woods, one of the plaintiffs, has

22   claimed that you actually poked her when you were talking

23   to -- poked her with your finger right in the chest.  Is that

24   something that you've done before?

25   A.    Yes, sir.

1    Q.    Okay.  And actually was that kind of well known by the

2    students and staff at Mountain Park?

3    A.    Yes, sir.

4    Q.    Was there a particular euphemism they had for that?

5    A.    Yes, sir.

6    Q.    And what was that?

7    A.    The bony finger.

8    Q.    Now, just so the judge and jury understand what we're

9    talking about, could you just stand up and demonstrate on

10   yourself what the bony finger was like?

11   A.    When I was talking to a girl and I felt like I really

12   needed to get her attention, I would do it this way.

13   Q.    And that was it, correct?

14   A.    Yes, sir.

15   Q.    You weren't intending to hurt them, were you?

16   A.    No, sir.

17   Q.    You weren't trying to cause them to lose their balance

18   or fall down?

19   A.    No, sir.

20   Q.    Mrs. Wills, you mentioned that there were some other

21   corrections that you had, writing lines, taking away sweets,

22   assigning extra work duty.  But you also talked about

23   ultimately there was paddling.  If a student didn't correct

24   her behavior even after being paddled, what would happen?

25   A.    If the paddling didn't work, then there's a policy we

```
 1    had to send her home.

 2    Q.    So you'd ask the parents to pick her up and take her

 3    home?

 4    A.    Yes, sir.

 5    Q.    So in a sense paddling was really your final course of

 6    action before you just said that's it; is that right?

 7    A.    Yes, sir.

 8    Q.    And was it typical -- could a student be paddled just

 9    for misbehaving once?

10    A.    No, sir.

11    Q.    So there had to be multiple misbehaviors, correct?

12    A.    Yes, sir.

13    Q.    Could you describe for the judge and jury what your

14    practice was with respect to paddling?

15    A.    The girl would come into my office.  And I had a chair

16    in my office, and she would lean over the chair.  And I would

17    swat her with a paddle.  And there would be a witness in

18    there with me.  And then after I got through paddling, I

19    would sit her down and talk to her and tell her that I loved

20    her, I was paddling her because I loved her.  And she would

21    sign the card and write down how many swats she got and why

22    she got paddled, and then the witness would sign the card.

23    Q.    So you always made a record of the student's paddle?

24    A.    Yes, sir.

25    Q.    Now, with respect to this issue, you said that you took
```

1    her into your office.  Did you -- was it your practice to

2    paddle the students in the office?

3    A.    Yes, sir.

4    Q.    It wasn't your practice to paddle students in any of

5    the dorms, was it?

6    A.    No, sir.

7    Q.    Was it your practice to always talk to the student

8    after the paddling and explain that you loved them?

9    A.    Yes, sir.

10   Q.    And, Mrs. Wills, who can authorize the paddling of a

11   student?

12   A.    Myself.

13   Q.    Was there anybody else other than Brother Wills at

14   Mountain Park who could authorize the paddling of a student?

15   A.    No, sir.

16   Q.    Now, with respect to girls, were you the only one who

17   could authorize paddling?

18   A.    Yes, sir.

19   Q.    Your daughter, Debbie Gerhardt, is also a defendant.

20   Could she authorize a student to be paddled?

21   A.    No, sir, she could not.

22   Q.    Could a staff member take it upon herself to paddle a

23   student without your specific authority?

24   A.    No, sir, she could not.

25   Q.    And, indeed, now you said that even into 1996 you were

1    living in the apartment next to the dorm, weren't you?

2    A.    Yes, sir.

3    Q.    So was it also your practice then that if you were

4    there, you were the one who paddled the student?

5    A.    Yes, sir, I did.

6    Q.    Now, Tracey Ozuna, one of the plaintiffs in this case,

7    I think you've heard her testimony.  She claims that she was

8    paddled by a staff member who is not a defendant in this

9    case.  Did you ever give authority for Tracey Ozuna to be

10   paddled?

11   A.    I don't remember ever giving authority for Tracey to be

12   paddled.

13   Q.    And was it your practice to remember the students you

14   paddled?

15   A.    Most of them, yes, sir.

16   Q.    Now, Ms. Ozuna also claims that Ms. Mathews, the staff

17   member who is not a defendant, that she paddled her in a

18   dormitory.  Was that an acceptable practice?

19   A.    No, sir.

20   Q.    Now, where was this paddle kept?

21   A.    In my office.

22   Q.    And about how big was it?  Could you describe it?

23   A.    I guess it was about that long and maybe about that

24   thick and had a handle.  You couldn't get two hands on the

25   handle, you could just only put one hand on the handle.

1    Q.    And when you paddled a student, where did you paddle

2    them at?

3    A.    On their bottom.

4    Q.    And were they fully clothed?

5    A.    Yes, sir.

6    Q.    What was the maximum number of paddlings you would give

7    or spankings -- I guess what's the maximum number of times

8    that you would use the paddle on a student?

9    A.    About five.

10   Q.    Now, Mrs. Wills, I think you told Mr. Stilley yesterday

11   that at one point you had probably somewhere around 200

12   students at Mountain Park; is that right?

13   A.    Yes, sir.

14   Q.    That seems like an awful lot of students to have at

15   once, isn't it?

16   A.    Yes, sir.

17   Q.    I imagine did a lot of health care issues come up with

18   respect to the students?

19   A.    Yes, sir.

20   Q.    Now, had some of the girls been prescribed medication

21   that they had to take?

22   A.    Yes, sir.

23   Q.    Where was the medication kept?

24   A.    We had what we call our medicine cabinet hall closet in

25   the girls' dorm.

1    Q.    So inside the dormitory there was a closet.  Can you

2    describe how the closet was set up?

3    A.    Yes, sir, there were shelves all in the closet.  And

4    there were little boxes with the girls' medicine in it with

5    their initial or name on it.  And the worker would have a

6    podium that she would pull out with the log on there, and

7    then she gave medicine out.  She would put the date, what

8    kind of medicine she was giving, how many times a day she was

9    giving it, and then she would sign it.

10   Q.    Okay.  Now, this log, was this like a three-ring

11   notebook?

12   A.    Yes, sir.

13   Q.    Okay.  And each student had a page in the notebook?

14   A.    Yes, sir.

15   Q.    When -- well, I guess tell me something, if a student

16   was given vitamins, was that put into the log?

17   A.    No, sir.  We had a separate column for vitamin call.

18   Q.    How would the students know that -- well, strike that.

19   Were there set times throughout the day when the students

20   could come and get medicine?

21   A.    Morning, noon, and evening.  But when medicine call

22   started, you could hear the girls hollering, "Medicine call,

23   medicine call, medicine call," all through the dorm.

24   Q.    And would all the girls line up at once?

25   A.    Yes, sir.

1    Q.    So sometimes there would be a whole gaggle of them?

2    A.    There would.

3    Q.    Was it you who always did the medicine call?

4    A.    No, sir.

5    Q.    Was this assigned to other staff members?

6    A.    Yes, sir, it was.

7    Q.    With respect to those staff members, was it a position

8    of responsibility?

9    A.    Yes, sir, big responsibility.

10   Q.    Now, in addition to prescription medications, did

11   Mountain Park also keep some over-the-counter medications in

12   the medicine cabinet?

13   A.    Yes, sir, we did.

14   Q.    And did those medications include stuff like Tylenol or

15   Excedrin for headaches?

16   A.    Yes, sir.

17   Q.    Was there always a preparation in there for kids who

18   had cold symptoms too?

19   A.    Yes, sir, all kinds of cold medicine.

20   Q.    And did you also keep medication for the girls if they

21   had cramps in relation to their periods?

22   A.    Yes, sir, Midol and Pamprin.

23   Q.    Were there occasions that you got generic versions of

24   those also?

25   A.    Yes, sir.

1    Q.     And if a student was given oral medication, so a pill

2    or some type of syrup or something like that, that was put

3    down in the medication log, right?

4    A.     Yes, sir.

5    Q.     Now, at some point in time did you also keep

6    over-the-counter acne medication for the students?

7    A.     Yes, sir, they could have their parents send anything

8    they wanted for them for that.

9    Q.     And would that be kept in a medicine closet?

10   A.     Yes, sir.

11   Q.     So the student could come and get that whenever there

12   was medicine call?

13   A.     Medicine call, yes, sir.

14   Q.     Would the acne medication, you know, like a cream or

15   something like that, would that be recorded in the medication

16   log?

17   A.     No, sir.

18   Q.     Why was that?

19   A.     It wasn't oral medication, it was just something

20   applying to their face, so we didn't mark that down.

21   Q.     Now, with all the students you had, I imagine you had

22   to take them to the doctor fairly regularly, at least some of

23   them, right?

24   A.     Yes, sir.

25   Q.     Were staff taking students to the doctor several times

1    a week?

2    A.    Oh, yes, sir.

3    Q.    Is there a doctor who you called on most often?

4    A.    Yes, sir, Dr. Richard Gayle.

5    Q.    And you've already talked a little about Dr. Gayle.  Do

6    you know where he kept his office?

7    A.    Yes, sir, Piedmont.

8    Q.    Now, is that near the Mountain Park campus?

9    A.    Yes, sir, it is.

10   Q.    Did you have a good long-standing relationship with

11   Dr. Gayle?

12   A.    Yes, sir, I do.

13   Q.    So could you call him at night if you had to?

14   A.    Yes, sir.

15   Q.    Were there occasions that you called Dr. Gayle with

16   respect to certain complaints that a student had, students

17   had before you actually just set up appointments for them?

18   A.    Yes, sir, sometimes.

19   Q.    Now, Mr. Stilley has asked you some questions about

20   students missing their periods.  When students had complaints

21   about missing their periods, you said you'd take them to

22   Dr. Gayle; is that right?

23   A.    Yes, sir.

24   Q.    And over time did Dr. Gayle give you some

25   recommendations and advice with respect to students missing

 1    their periods?

 2    A.    Yes, sir, I even had to take them to the hospital in

 3    Poplar Bluff because they would have female problems that he

 4    couldn't handle that he said they need to go see a female

 5    doctor up in Poplar Bluff.

 6    Q.    When you say female doctor, do you mean like

 7    obstetrician gynecologist?

 8    A.    Yes, sir.

 9    Q.    Did you talk to Dr. Gayle about the female students

10    missing their periods?

11    A.    Yes, sir.

12    Q.    What did he have to say with respect to that?

13    A.    I really can't remember except that he seemed like he

14    says that they are in a new environment, they are having to

15    do things that they don't want to do and things like this.

16    It's like going off to college, that many students that go

17    off to college start missing their periods.

18    Q.    Did he tell you that if a student missed one period,

19    that she should be taken in to see him?

20    A.    No, sir.

21    Q.    What did he tell you about students if they were

22    missing their periods per say more than one month?

23    A.    About three months, he said, three or four months, no

24    longer than that, to bring them in and let him check them and

25    see if there's something physically wrong or if he could give

1    them some kind of medication that they could get started.

2    Q.    But I guess in order to know if a girl is missing her

3    period, did they kind of have to tell you?

4    A.    Yes, sir, they have to tell me.

5    Q.    If a student needed to see the doctor, could they get

6    to the doctor?

7    A.    Yes, sir.

8    Q.    Now, we heard from one of the plaintiffs that one of

9    the staff members had said that they couldn't go to a doctor

10   or dentist for the first four months that they are at

11   Mountain Park.  Was that the practice at Mountain Park?

12   A.    No, sir.  You also heard a girl say she went in the

13   back door.  That's because she was a new student and

14   Dr. Gayle would let us come to the back door so we wouldn't

15   sit there all morning with a new student waiting to get in to

16   see him.

17   Q.    So his clinic, was that kind of operated like a first

18   come first serve kind of thing?

19   A.    Yes, sir.

20   Q.    Now, with respect to this four month policy, what was

21   the practice at Mountain Park?

22   A.    Four months is when they'd have their first visit, not

23   when they go to the doctor, but when they have their first

24   visit.  And that four months is for an orthodontist.  We

25   didn't take them for four months for an orthodontist.  But

 1   for any other thing we would take them to the doctor or the

 2   dentist.

 3   Q.    When you say four months for the first visit, is that

 4   with the parents?

 5   A.    Yes, sir.

 6   Q.    Jamie Woods is complaining that she swallowed a safety

 7   pin.  Do you remember hearing that testimony?

 8   A.    Yes, sir.

 9   Q.    Do you have a recollection of the incident, I guess

10   kind of what she described?

11   A.    Yes, sir, I do.

12   Q.    What day of the week was that?

13   A.    I don't know exactly what day.  I do know that

14   Dr. Richard was not in the office, I had to call him at home.

15   Q.    And what happened?  I guess, were you actually there

16   when she swallowed it?

17   A.    No, sir, I think I was in the kitchen and Ms. Gerhardt

18   sent for me.

19   Q.    And so did you go to see Jamie at that point?

20   A.    Yes, sir, I did.

21   Q.    Now, could Ms. Woods speak to you at that point?

22   A.    Yes, sir, she did.

23   Q.    What did she say to you?

24   A.    I just asked her what happened.  She said she swallowed

25   a safety pin.  And I said, "Why did you do that?"  She said,

1    "Because I want to go to the hospital."  So I went upstairs

2    and called Dr. Richard.

3    Q.    Now, did you discipline or correct her with respect to

4    that?

5    A.    No, sir.

6    Q.    When you went upstairs, you said you called

7    Dr. Richard?

8    A.    Yes, sir.

9    Q.    Did you actually speak with him?

10   A.    Yes, sir, I did.

11   Q.    And what were you told to do?

12   A.    He told me to give her two slices of bread to eat.  And

13   I did that.

14   Q.    Now, we heard something about castor oil too.

15   A.    I do not remember the castor oil, no, sir.

16   Q.    Were you instructed to take her to his office or the

17   hospital?

18   A.    No, sir, he said she would be fine just eating the

19   slices of bread.

20   Q.    And based on her testimony, I guess what we heard was

21   she did actually secrete the safety pin; is that right?

22   A.    Yes, sir.

23   Q.    Mrs. Wills, we heard from Jessica Deboi that she had

24   complained about being constipated.  Do you have a specific

25   recollection of giving her anything with respect to that?

 1   A.    No, sir.  When the girls were constipated, we would

 2   give them prunes, prune juice, Metamucil, different things

 3   like this.  And I don't remember the girls that were

 4   constipated, no, sir.

 5   Q.    And did any of the plaintiffs who are sitting at the

 6   table, did they ever complain to you about being groggy or

 7   lethargic?

 8   A.    No, sir, they sure didn't.  They all seemed to get

 9   their memory work and all this.  And I don't know how you

10   could do your memory work when you're groggy and couldn't

11   function.

12   Q.    Now, with respect to Ms. Teasley, she was at Mountain

13   Park in early 2003.  Mrs. Wills, were you actually living on

14   Mountain Park campus at that point?

15   A.    No, sir, I wasn't.

16   Q.    I believe actually you had earlier testified that you

17   were spending time in Florida; is that right?

18   A.    Yes, sir.

19   Q.    And do you recall, is that where you were in early

20   2003?

21   A.    Yes, sir.

22   Q.    Might you have visited the campus even briefly during

23   that time period?

24   A.    I did, yes, sir.

25   Q.    Did Ms. Teasley ever complain to you about having a

1    toothache or chipped tooth?

2    A.    No, sir.  I don't really remember Ms. Teasley much, but

3    she said that we were on the ball field playing one day when

4    I was there, that she came up and the girls introduced her to

5    me.

6            MR. BRIGGS:  That's all I have at this time.  Thank

7    you, Mrs. Wills.

8            THE COURT:  Mr. Stilley.

9                         REDIRECT EXAMINATION

10   BY MR. STILLEY:

11   Q.    You told us the fences were to keep the boys and girls

12   separate, right?

13   A.    Right, to the keep them in and keep them out.

14   Q.    The fences were about 12 feet tall, correct?

15   A.    Yes, sir.

16   Q.    They had barbed wire on both sides?

17   A.    Yes, sir.

18   Q.    You really didn't need such tall fences just to keep

19   the boys and girls separate, did you?

20           MR. BRIGGS:  Objection, Your Honor, argumentative.

21   Calls for speculation.

22           THE COURT:  Refrain from arguing with the witness.

23   BY MR. STILLEY:

24   Q.    Well, you also had your orientation guide system to

25   keep the boys and girls separate, correct?

1    A.    Correct.

2    Q.    So -- well, the students were told that they not only

3    could not -- the girls were told that they not only could not

4    go to the boys, they could not go outside the fence without

5    permission, correct?

6    A.    No, they could not go outside without permission,

7    correct.

8    Q.    Now, you said that you had the fire marshal inspect the

9    facility, correct?

10   A.    Correct.

11   Q.    That always happened when the girls were gone; isn't

12   that correct?

13   A.    No, sir, that isn't correct.

14   Q.    That's not correct?

15   A.    No, sir.

16   Q.    He sometimes inspected the facility when the girls were

17   there?

18   A.    Yes, sir.

19   Q.    Now, you said you started this ministry in 1972.  Is

20   this true?

21        MR. BRIGGS:  Objection, Your Honor, that

22   mischaracterizes her earlier testimony.

23        THE COURT:  Well, I'm sure it will be straightened

24   out.

25   Q.    Well, maybe I wrote this down wrong.  When did you say

1    you started the ministry?

2    A.    We started this ministry in 1987.

3    Q.    And you said you were trying to keep the girls from

4    detention centers?

5    A.    Yes, sir.

6    Q.    As a matter of fact, your own facility was a --

7          MR. BRIGGS:  Your Honor, objection, argumentative.

8    This has been excluded.

9          MR. STILLEY:  They raised the question.  That's what

10   they said, they were trying to keep the kids out of detention

11   facilities.

12         MR. BRIGGS:  Your Honor, we actually discussed this.

13         THE COURT:  Rephrase your question.

14   BY MR. STILLEY:

15   Q.    Well, isn't it fair that you wanted them, the girls,

16   not to be in any other detention facility?

17         MR. BRIGGS:  Same objection, Your Honor.  If -- side

18   bar.

19         MR. STILLEY:  I'll withdraw that question.  Move on

20   down the road.

21         MR. BRIGGS:  Your Honor, if you can instruct the

22   jury, please, to disregard the prior question?

23         THE COURT:  No.

24   BY MR. STILLEY:

25   Q.    Now, you told us about this ministry that you devoted

1    so much time to, correct?

2    A.    Yes, sir.

3    Q.    Isn't it true that for most of the time periods

4    relevant to this lawsuit, you flew in your own private

5    airplane back and forth between Mountain Park and your air

6    strip in Florida?

7         MR. BRIGGS:  Objection, Your Honor.  Your Honor,

8    objection.  This is totally outside the scope of the case.

9         MR. STILLEY:  She is making out that she was there

10   nearly all the time, and it's not true.

11        MR. BRIGGS:  Your Honor, if we're going to argue

12   this, could we do it at side bar, please.

13        THE COURT:  Well, I think you need to keep all the

14   embellishments out of your question, Mr. Stilley.  I will

15   allow you to inquire as to when Ms. Wills was there.  But you

16   are, as they say, gilding the lily.

17        MR. STILLEY:  I am what?

18        THE COURT:  It's just like going to, what's that

19   place, they say you get extra sauce, take the extra sauce

20   off.

21        MR. STILLEY:  Let me see if I can make this simpler.

22   BY MR. STILLEY:

23   Q.    Isn't it true that during the periods relevant to this

24   lawsuit that you also owned a property --

25        MR. BRIGGS:  Your Honor, objection.  This has been

1    excluded.  We've talked about this.

2            MR. STILLEY:  Your Honor.

3            MR. BRIGGS:  This is outside the scope.

4            THE COURT:  Well, I'm going to allow you your

5    questions about -- that relate to the time and frequency of

6    this witness being at Mountain Park.  Now, confine it to

7    that.  If you focus on something else, you got a problem,

8    okay.  You need to focus.  You know, too many times you're on

9    the periphery instead of shooting this thing in the heart in

10   terms of the question you want to ask.  You need to go to the

11   center and then you can -- you might extrapolate then.  You

12   need to deal with what is relevant, the times that Mrs. Wills

13   was at Mountain Park.

14           MR. STILLEY:  I'll take care of it this time, Judge.

15   Q.   Ms. Wills, isn't it true that you had other girls at a

16   school in Florida who also --

17           MR. BRIGGS:  Your Honor, objection.  This has been

18   specifically excluded from the case.

19           MR. STILLEY:  Your Honor, I'm specifically trying to

20   hit straight to the heart that she's saying she loves these

21   girls and spends so much --

22           THE COURT:  Hold on.  You don't have to go so much

23   into some other location.  Why don't you get to the heart of

24   the matter.  You seem to always start with what's on the

25   periphery.  The focus is when, the times she was at Mountain

1    Park.  You seem to focus on something else.  If that's the

2    gist of your question, which I'll allow, but you're someplace

3    else.  You're over at some other place.  You need to start at

4    Mountain Park.

5    BY MR. STILLEY:

6    Q.    Isn't it true that you spent, or for much of the time

7    relevant to this lawsuit that you spent the majority of your

8    time outside of the state of Missouri?

9    A.    I spent some time outside the state of Missouri, yes,

10   sir, I was in Florida.  But I was back and forth to Mountain

11   Park.

12   Q.    And you would fly between those two places, correct?

13   A.    Drive or fly.

14   Q.    And when you flew, you flew your --

15             MR. BRIGGS:  Your Honor, objection.  This is outside

16   what you just limited to.  May I approach?

17             THE COURT:  We're talking times.

18             MR. STILLEY:  We're talking time.

19             THE COURT:  Yes, time.

20             MR. STILLEY:  Flying and driving takes different

21   amounts of time.  So --

22             THE COURT:  Yeah, well, you want to embellish again.

23             MR. STILLEY:  I just want the basic facts, Judge.

24             THE COURT:  Right.  Go ahead.  Let's try it.

25   BY MR. STILLEY:

1    Q.    About how many trips back and forth would you make

2    between Missouri and Florida per month during the time

3    periods relevant to this lawsuit?

4    A.    Most of the time until 1998 I was at Mountain Park.

5    About 1998 I started spending more time in Florida.

6    Q.    And isn't it true that after 1998 you spent the

7    majority of your time in Florida?

8    A.    The majority of time, yes, sir.

9    Q.    So other people were handling the day-to-day affairs at

10   Mountain Park at that point in time, correct?

11   A.    Yes, sir, but I was in contact with those people.

12   Q.    And generally speaking when you were in Florida, your

13   husband was in Florida too, correct?

14   A.    Correct.

15   Q.    And the operations of Mountain Park functioned more or

16   less as planned for several years after 1998, correct?

17   A.    Rephrase your question.

18   Q.    Isn't it true that Mountain Park operated, functioned

19   normally as you had planned it to function for several years

20   after 1998?

21   A.    We had made some changes during that time.

22   Q.    But the school functioned the way you wanted it to

23   function?

24   A.    Yes, sir.

25   Q.    And someone else was as a general rule on the ground

1    operating that school?

2    A.    Yes, sir.

3    Q.    Now, you said that you still keep in touch with a lot

4    of the girls, correct?

5    A.    Yes, sir.

6    Q.    Tracey Ozuna sent you a letter, did she not?

7    A.    No, sir.

8    Q.    She did not send you a letter?

9    A.    She didn't send me one, no, sir.

10   Q.    Did she send someone a letter?

11   A.    Yes, sir.

12   Q.    Did you have an opportunity to see the letter?

13   A.    Yes, sir, I saw that letter.

14   Q.    Did you typically -- if a girl wrote a letter, would

15   you typically respond to that letter?

16   A.    Not necessarily, no, sir.  I have boxes and boxes of

17   letters that I got from the girls.

18   Q.    Now, you said that girls could be orientation guides

19   only if they were saved?

20   A.    Yes, sir.

21   Q.    They had to make a profession of faith?

22   A.    Yes, sir.

23   Q.    And they had to satisfy you as to the genuineness of

24   that profession?

25   A.    Well, we had to know that the girl was really true in

1    what she wanted to do with the student, yes, sir.

2    Q.    Just because they made a profession of faith wasn't

3    good enough, correct?

4    A.    No, sir.  All girls that make profession of faith did

5    not become orientation guides.

6    Q.    Well, that's not the question.  In order to be

7    qualified to be an orientation guide, they had to satisfy you

8    that they were truly converted?

9    A.    Yes, sir.

10   Q.    And being an orientation guide gave the student much

11   more liberty than they had otherwise, correct?

12   A.    No, sir, it did not.

13   Q.    It did not give them more liberty?

14   A.    No, sir, it did not.

15   Q.    Didn't give them more privileges?

16   A.    No, sir, it did not.

17   Q.    They just decided that they wanted to do that?

18   A.    They decided they wanted to help a new student as she

19   came into the dorm, yes, sir.

20   Q.    Was that just kind of a ministry thing, kind of like

21   your ministry?

22   A.    That was their ministry.

23   Q.    Now, I asked you some questions about the fence

24   earlier.  As a general rule the fence did its job of keeping

25   the kids where you wanted the kids; is that correct?

1    A.    Yes, sir.

2    Q.    And isn't it true that right before the school was

3    closed down, there was a rash of runaways?

4            MR. BRIGGS:  Objection, Your Honor, this is outside

5    the scope.  Also relevance.

6            MR. STILLEY:  They testified about the fence.  They

7    asked questions about the fence.  I'm just asking about the

8    function of that fence.

9            MR. BRIGGS:  Raising this issue, it's outside the

10   scope.  There's no relevance.  Please move to strike, Your

11   Honor.

12           THE COURT:  I'm going to sustain and grant the

13   request that it be stricken and the jury to disregard.

14   BY MR. STILLEY:

15   Q.    Now, you said that the students learned the rules from

16   their orientation guide, correct?

17   A.    From other students, their orientation guide, yes, sir.

18   Q.    Was there a particular reason not to have written

19   rules?

20   A.    No, sir.

21   Q.    Well, actually you had the written rules, correct?

22   A.    We had the handbook, yes, sir.

23   Q.    And that contained the written rules?

24   A.    Yes, sir.

25   Q.    Students just weren't allowed to actually read those

1    rules, correct?

2    A.    We gave the handbook to the parents.  The parents could

3    have read it to them.  The parents, when they went on visit,

4    they could have seen it.

5    Q.    But the student only had ten minutes to talk to their

6    parents, correct?

7    A.    On the telephone, ten minutes twice a month, yes, sir.

8    Q.    And the parents didn't know that the student didn't

9    have the handbook, correct?

10   A.    I don't know that.

11   Q.    You didn't do anything to tell the parents that the

12   student wouldn't have a handbook, did you?

13         MR. BRIGGS:  Your Honor, at this point I'm going to

14   interpose an objection.  This wasn't raised in my cross.

15   This is outside the scope.  And he's already touched on this

16   in his own direct.

17         THE COURT:  I think you're outside the scope of

18   cross-examination.

19         MR. STILLEY:  Well, Your Honor, my notes here say

20   that she testified on cross that the students learned the

21   rules from the other orientation guides.  That's what I've

22   got written down.

23         THE COURT:  Okay.  Well, what do you want to ask

24   about that?

25         MR. STILLEY:  Well, I'm trying to find out why it

 1    was not allowed for the students --

 2            THE COURT:  Well, then you need to go to that.  Go

 3    to that.  And extrapolate out and maybe you may get

 4    somewhere.

 5    BY MR. STILLEY:

 6    Q.    Now, didn't you testify that the students were never

 7    prevented from going to the bathroom when they needed to to

 8    your knowledge?

 9    A.    To my knowledge they were never prevented from going to

10    the bathroom when they needed to.

11    Q.    Isn't it true that you have personal knowledge of some

12    of the students who urinated and defecated on themselves?

13            MR. BRIGGS:  Your Honor, objection.  It has been

14    excluded, Your Honor.

15            THE COURT:  Well, I'm going to give you some leeway

16    about this rest room situation.  Go ahead.  Overruled.

17    BY MR. STILLEY:

18    Q.    Did you understand the question?

19    A.    Ask it again, please.

20    Q.    Isn't it true that you had personal knowledge that some

21    of the students urinated and defecated on themselves?

22            MR. BRIGGS:  Same objection, Your Honor.

23            THE COURT:  Overruled.

24    A.    I don't remember it, no, sir.

25    Q.    Isn't it true that some of the students urinated in

 1    their beds?

 2    A.    Some of them have, yes, sir.

 3    Q.    Isn't it true that the students were punished for

 4    that?

 5    A.    Not to my knowledge they were not.

 6    Q.    Isn't it true that in the dorms there were motion

 7    detectors to detect when a girl got up to go to the bathroom?

 8    A.    The motion detector was to make sure everybody stayed

 9    in bed, yes.

10    Q.    And if they got up, there would be a guard there and

11    they couldn't go to the bathroom without permission, correct?

12    A.    There was not a guard there, no, sir.  There were

13    students, other students there, and they could let them go to

14    the bathroom, yes, sir.

15    Q.    What would be done if a girl or a boy urinated in their

16    bed, what would happen to them?

17    A.    Well, they would have to --

18          MR. BRIGGS:  Your Honor, I'm going to object.

19    Again, this is outside th scope.  It doesn't relate to these

20    plaintiffs.  And this was not raised in cross.

21          MR. STILLEY:  It does relate to these plaintiffs.

22          THE COURT:  I'm going to give a little leeway.  Go

23    ahead with this question and move on.

24    A.    They'd have to get up and change their clothes and wash

25    their sheets, put clean sheets on their bed.  They would have

 1    to get their mattress outside and air it out, put clean

 2    sheets on their bed, wash their sheets.

 3    Q.    Isn't it true that some of the students were forced to

 4    sleep without a mattress because of this problem?

 5    A.    No, sir.

 6    Q.    Isn't it true that at certain times the girls would be

 7    watched while they toileted?

 8    A.    No, sir.

 9    Q.    That never happened?

10    A.    No, sir.

11    Q.    Isn't it true that for at least some periods of time

12    relevant to this lawsuit that the girls' toilets did not have

13    stall doors?

14    A.    There was a time we did not have stall doors, yes, sir,

15    that's when we were rebuilding, remodeling.

16    Q.    Isn't it true that when a girl who was on orientation

17    and went to the bathroom, that her orientation guide would go

18    with her?

19    A.    She would go to the bathroom with her, but she would

20    stand at the door and let the girl go to the bathroom by

21    herself.  That's what she was supposed to do.

22    Q.    But was there no door on the stall that the girl could

23    close?

24    A.    There was dividers, but there was no doors there, but

25    she didn't have to stand in front of her.

1    Q.    Now, you testified that the paddling ceased at some

2    point in time, correct?

3    A.    Yes, sir.

4    Q.    When did that happen?

5    A.    Probably about 1998.

6    Q.    And there was a particular reason for that, was there

7    not?

8    A.    Because my husband and I decided to stop it.

9    Q.    Was that all that there was?

10   A.    Yes, sir.

11   Q.    No external factor?

12   A.    No, sir.

13   Q.    Now, you testified a little bit about the conditions

14   under which a paddling would be appropriate?

15   A.    Yes, sir.

16   Q.    You also heard Tracey Ozuna testify about the

17   circumstances of the paddling that she alleges, correct?

18   A.    Yes, sir.

19   Q.    Isn't it true that a paddling would be totally

20   inappropriate under those circumstances?

21   A.    Yes, sir.

22   Q.    Isn't it true that if there was a prior discipline to

23   be used as a basis for the paddling that that prior

24   discipline should have been written down?

25   A.    That prior discipline was not written down.  The only

1    discipline that was written down was the paddlings.

2    Q.     Didn't you say you first try to use other methods?

3    A.     Yes, sir.

4    Q.     Are you telling me that those other disciplines were

5    not recorded anywhere?

6    A.     No, sir, they were not.

7    Q.     So we wouldn't have any way to know from a written

8    record whether or not there was previous discipline on Tracey

9    Ozuna, correct?

10   A.     No, sir, you wouldn't.

11   Q.     Now, the paddle was only seen when a student was being

12   paddled, correct?

13   A.     Correct.

14   Q.     Do you have that paddle?  Is that paddle still

15   available?

16   A.     Not that I know of.

17   Q.     Now, are you saying that you were the only one who

18   could have authorized a paddling at the time that Tracey

19   Ozuna alleges she was paddled?

20   A.     Yes, sir.

21   Q.     If there was an unauthorized paddling, is it not fair

22   to say that you would have gotten information about that?

23   A.     Yes, sir, I would have.

24   Q.     If an unauthorized paddling had been administered, what

25   would you have done?

1    A.    I would have corrected the worker that did it.

2    Q.    You would have also made a written record of that,

3    would you not?

4    A.    Yes, sir.

5    Q.    That would be a very important thing?

6    A.    That would be in the worker's file, yes, sir.

7    Q.    And there's nothing in Ms. Mathews file to indicate

8    that she was disciplined, correct?

9    A.    Correct.

10   Q.    Now, didn't I hear you testify in response to

11   Mr. Briggs' questioning that the maximum number of swats was

12   about five?

13   A.    Five, yes, sir.

14   Q.    What does about five mean?

15   A.    Five, five swats.

16   Q.    So it's not about five, it's exactly five?

17   A.    Yes, sir.  It could be less than five, but five was the

18   maximum.

19   Q.    Why would you say then -- or do you recall saying that

20   it was about five?

21   A.    Yes, sir.

22   Q.    Why would you say about five instead of saying exactly

23   five?

24   A.    I don't know.

25   Q.    Isn't it true that you had many other complaints of

1    denial of medication of students?

2    A.    Ask that question again.

3    Q.    Isn't it true that many students other than these

4    students who are plaintiffs in this case have complained

5    about denial of medication?

6         MR. BRIGGS:  Objection, this is outside the scope.

7    This doesn't relate to the plaintiffs.  This has already been

8    excluded by The Court.

9         THE COURT:  Sustained.

10   BY MR. STILLEY:

11   Q.    Did I hear you suggest that college is sometimes

12   stressful enough to cause missed periods?

13   A.    Yes, sir.

14   Q.    Once again, that would be stress, right?

15   A.    Well, I guess so.

16   Q.    So, so far I've heard you say that stress is a possible

17   cause of missed periods.  Can you think of anything else?

18   A.    No, sir.

19   Q.    Now, you testified that you had a quick back door

20   approach so that you could get a quick appointment for the

21   girls at the doctor, correct?

22   A.    Did I say a quick appointment?  I said so we didn't

23   have to sit with a new student in the front office all

24   morning.

25   Q.    So you wouldn't have to sit and wait?

```
 1    A.     Yes.

 2    Q.     Did you not have that kind of arrangement with the

 3    dentist?

 4    A.     No, we did not.

 5    Q.     Did you not have any kind of arrangement with a dentist

 6    for emergency dental care?

 7    A.     No, we did not.

 8    Q.     You operate -- you tell the parents that you've

 9    operated for 25 years, correct?

10           MR. BRIGGS:  Your Honor, objection.  We've already

11    talked about this.  You've already ruled with respect to this

12    issue.

13           MR. STILLEY:  Your Honor, she testified about this.

14    They brought this up.  And what I'm saying here --

15           THE COURT:  I don't know how far you are going

16    beyond this.  I don't know where you're going.

17           MR. STILLEY:  The excuse for not getting

18    Ms. Teasley her --

19           MR. BRIGGS:  Your Honor.

20           THE COURT:  Then get to that then.  Get to that.

21           MR. STILLEY:  That's where I'm going.

22           THE COURT:  Well, get there.

23           MR. STILLEY:  Okay.

24    BY MR. STILLEY:

25    Q.     During your experience you've had many occasions where
```

 1    there was emergency dental care needed, correct?

 2    A.    I imagine there's been some, yes, sir.

 3    Q.    And you had some kind of provision for that, correct?

 4    A.    We'd call the doctor, the dentist and get an

 5    appointment as fast as we could.

 6    Q.    And sometimes you needed at least within a week,

 7    correct?

 8    A.    I don't remember.

 9    Q.    Do you not ever remember a time that you needed

10    emergency dental work done within a week?

11    A.    No, sir, I don't.

12    Q.    Not one time?

13    A.    No, sir.

14    Q.    Now, you testified a little bit about the safety pin

15    incident?

16    A.    Yes, sir.

17    Q.    Was there a particular reason why that Jamie did not

18    receive her hearing aids?

19          MR. BRIGGS:  Objection, Your Honor, that wasn't

20    raised on cross.

21          MR. STILLEY:  Well, she asked about the --

22          THE COURT:  Well, briefly.  It wasn't raised, but

23    I'll give you a little leeway.  Go ahead with it.

24    A.    I don't know why Jamie did not get her hearing aids.  I

25    heard that she could not hear and she needed hearing aids and

 1    that they asked her parents to send them, but they did not

 2    get them.

 3    Q.    And you knew that almost from the time Jamie arrived,

 4    correct?

 5    A.    Yes, sir.

 6    Q.    And do you recall when she finally got the hearing

 7    aids?

 8    A.    No, sir.  I remember Ms. O'Brient telling me she took

 9    her to the doctor to get the hearing aids.

10    Q.    And that was many months later, after Jamie arrived?

11    A.    I don't remember how many months later.

12    Q.    Was there a particular -- scratch that.  With respect

13    to the constipation, you said you would give things like

14    prune juice and fiber and things like that?

15    A.    Prunes, yes, sir.  Fiber, yes, sir.

16    Q.    If that didn't work, did you have a policy to get

17    stronger medicine?

18    A.    Yes, sir, we had laxatives.

19    Q.    Do you recall if Jamie Woods -- Jamie, it was Woods at

20    that time -- was given any stronger medication for her

21    constipation?

22    A.    No, sir, I don't recall.

23    Q.    Would there be any particular reason that she would be

24    denied that medicine?

25    A.    No, sir.

1          MR. STILLEY:  Pass the witness.

2          MR. BRIGGS:  Nothing further, Your Honor.

3          THE COURT:  Very well.  Thank you, Ms. Wills.  You

4     may step down.  Call your next witness.

5          MR. STILLEY:  Your Honor, could I have about five

6     minutes with my clients?

7          THE COURT:  Ladies and gentlemen of the jury, we'll

8     take our morning recess at this time.  Recall the admonition.

9     Be prepared to return to your jury rooms at 10:30.  We're

10    also going to break by 12:15 this morning for our luncheon

11    recess because there is another matter that needs to be

12    handled here in this courtroom.  So we'll go to lunch at

13    12:15.  Come back at 10:30.  Recall the admonition.

14          (Court in recess from 10:11 a.m. until 10:30 a.m.)

15          (The following proceedings were held outside the

16    hearing of the jury:)

17          THE COURT:  Good morning again.  Mr. Stilley, is it

18    correct what you advised the clerk, that you're resting at

19    this time?

20          MR. STILLEY:  That is correct, Your Honor.

21          THE COURT:  Very well.  And I see I then have the

22    defendants' motion for judgment as a matter of law.

23          MR. SCHWARTZ:  Yes, sir.

24          THE COURT:  Anything further besides this written

25    motion?

1              MR. SCHWARTZ:  Your Honor, I want to add to the

2     motion that I left out at 12:30 last night that in addition

3     to what I've said in here, that we think we should have a

4     judgment as a matter of law based on punitive damages.

5     There's been no evidence of anything that would make a

6     submissible case for punitive damages, so in addition to what

7     I've said in the motion, we don't believe that there ought to

8     be -- that that ought to go forward.  The negligence case,

9     Your Honor, there's been no -- first of all, there's been no

10    evidence about anything having to do with Sam Gerhardt or Bob

11    Wills or that these plaintiffs made any complaints to them at

12    all.  So there's no evidence as to those two defendants at

13    all.  They were not involved in dealing with the girls on a

14    regular basis.

15             The claims about missed periods, there's no evidence

16    that the girls needed medical help as a result of missing

17    their period.  There's no evidence they suffered any damages

18    as a result of it.  They all said their periods came back.

19             With respect to the constipation, the undisputed

20    evidence from the plaintiffs was they were given prune juice

21    and other things for their constipation.  There's really no

22    evidence of a lack of medical care for the negligence.  And

23    so the negligence claim ought to be dismissed.

24             The claim of Jamie Kaufmann for battery regarding

25    the poking incident, as a matter of fact there is no

1   offensive contact that could go to the jury.  And so based on

2   that we believe the case ought to be dismissed.

3          The last thing on the paddling, the undisputed

4   evidence is that the parents knew about the paddling, brought

5   their daughter back to the school.  And the jury instruction

6   says that if they consented, if the parents consented by

7   words or actions, that that is a complete defense to the

8   paddling.  And so that's a basis for a dismissal as well.

9          THE COURT:  Right, that's denied.  Other than this

10  punitive damages situation, you got anything to say about

11  that, Mr. Stilley?

12         MR. STILLEY:  Your Honor.

13         THE COURT:  I do not -- your case, you want to ask a

14  question about net worth and this and that.  I didn't allow

15  it because I don't see punitive damages.

16         MR. STILLEY:  I took that to be the case, but I want

17  to make sure I didn't get in trouble for not asking.  If we

18  can take that up after the defendants' case, I would prefer

19  it.

20         THE COURT:  Okay.  I'm going to deny this motion for

21  judgment as a matter of law at this time.  We'll go on with

22  the defendants' case, and, you know, I'm looking at granting

23  their motion as to punitive damages, but I'll take that under

24  advisement until the conclusion of defendants' case.

25         MR. STILLEY:  Thank you, Judge.

1            THE COURT:  Okay.  Very good.  Let's go.  Bring the

2       jury on.

3            (The following proceedings continued within the

4       hearing of the jury:)

5            THE COURT:  Very well.  Are the defendants ready?

6            MR. SCHWARTZ:  Yes, Your Honor.  At this time we

7       would like to offer into evidence Defendants' Exhibit E and

8       P.  E is the letter written by Tracey Ozuna to Debbie

9       Gerhardt, which was testified about.  P is the letter written

10      by Jamie Kaufmann Woods to Mrs. Gerhardt, which she testified

11      about.  And we'd also like to offer into evidence Exhibit JJ

12      and KK.  JJ is the two-page visit report from August 2001

13      that Mrs. Lueken testified about.  And KK is the one-page

14      form filled out by Erika Teasley when she went to the

15      dentist, which she testified about.

16            MR. STILLEY:  What was the last one there?

17            MR. SCHWARTZ:  KK.

18            MR. STILLEY:  What is it?

19            MR. SCHWARTZ:  That's the one-page form filled out

20      by Erika Teasley.  It was already showed to the jury.

21            MR. STILLEY:  No objection to any of those.

22            THE COURT:  Very well.  They will be received.  Call

23      your first witness.

24            MR. BRIGGS:  May it please The Court, defendants

25      call Deborah Gerhardt.

1                      DEBORAH GERHARDT,

2   Having been first duly sworn, was examined and testified as

3   follows:

4                      DIRECT EXAMINATION

5   BY MR. BRIGGS:

6   Q.    Good morning, Mrs. Gerhardt.  Would you please state

7   your full name for the record.

8   A.    Deborah Gerhardt.

9   Q.    And you're the daughter of Bob and Betty Wills; is that

10  right?

11  A.    Yes, that's correct.

12  Q.    And you're also married to the Defendant Sam Gerhardt;

13  is that correct?

14  A.    Yes, sir.

15  Q.    Now, were you and your husband, did you have occasion

16  to join the ministry at Mountain Park?

17  A.    Yes, sir, in the spring of 1993.

18  Q.    Okay.  I'll tell you what, why don't you move the

19  microphone stand just a little closer to you so we can all

20  hear you.  Thanks.  Mrs. Gerhardt, what were your duties when

21  you first joined the ministry back in 1993?

22  A.    I worked in the school with the girls, and in the dorms

23  with the girls, supervisor in the school and the dorms.

24  Q.    When your mother, Mrs. Wills, was on the stand, we

25  heard testimony from her that part of the mission, the

1    ministry was to put structure and work and faith and also

2    future into the students' lives.  Is that right?

3    A.    Yes, sir, we strived to make opportunities for it to

4    become a real well-rounded individual and hopefully accept

5    the Lord into their lives and make some spiritual changes in

6    their lives.

7    Q.    Now, Mrs. Gerhardt, we heard from Mrs. Wills that there

8    was a discipline practice and policy in place at Mountain

9    Park; is that right?

10   A.    Yes, sir.

11   Q.    Now, working at Mountain Park, did you have authority

12   to administer discipline and correction?

13   A.    Very limited.

14   Q.    Okay.  Back, say, around 1996, what sort of discipline

15   could you administer?

16   A.    I could have a student write lines or maybe erase a

17   PACE.  I'm sorry, I have to stop and think.  They might miss

18   their sweets.

19   Q.    Could you assign them additional chores or job duties?

20   A.    Yes, sir.

21   Q.    Now, going back just a minute, you said erase a PACE.

22   Can you just describe briefly for the judge and jury what

23   you're referring to?

24   A.    Well, the students had a workbook that they did all

25   their school work in.  And it was sort of a trust.  They had

1    to score their own work.  And if they were cheating when they

2    were doing that and we caught them cheating, we would make

3    them erase that work and then go back and do it again and try

4    to complete that work without cheating.

5    Q.    Mrs. Gerhardt, did you ever have authority to paddle a

6    student?

7    A.    No, sir.

8    Q.    Could you authorize that another staff member paddle a

9    student?

10   A.    No, sir, I could not.

11   Q.    Now, we heard from your mother, Mrs. Wills, that

12   there was a time when she and her husband started spending

13   time down in Florida, and that you and your husband, Brother

14   Gerhardt, were managing the day-to-day business at the

15   school; is that right?

16   A.    Yes, sir.

17   Q.    Now, at that period in time could you authorize that a

18   student be paddled?

19   A.    No, sir, not without -- I could not authorize that.

20   She was the only one that could authorize it.

21   Q.    So even when she was away and down in Florida, she

22   still had to authorize a paddling?

23   A.    Yes, sir, she authorized it.

24   Q.    Do you remember Tracey Ozuna as a student?

25   A.    Yes, sir, I do.

1   Q.    Did you ever authorize that she be paddled?

2   A.    No, sir.

3   Q.    Did you ever tell Laura Mathews to paddle her?

4   A.    No, sir, I did not.

5   Q.    And why is that?

6   A.    I didn't have that authority, and I never recall Tracey

7   doing anything to -- Tracey was a very well-behaved student.

8   Q.    Now, was it your mother's policy that if a student was

9   paddled that a record was made?

10   A.    Yes, sir.

11   Q.    And did you have occasion to go through the student

12   files and try to look for a record of this?

13   A.    I did, and there was no record.

14   Q.    Now, we've heard from Ms. Ozuna that she was enrolled

15   twice at Mountain Park, correct?

16   A.    Yes, sir.

17   Q.    And you were on staff on both times?

18   A.    Yes, sir, I was.

19   Q.    Now, just like your mother, did you have occasion to

20   develop lasting relationships with some of the students even

21   after they left the school?

22   A.    Yes, sir.

23   Q.    Was it uncommon for you to receive correspondence from

24   students who used to be at the school?

25   A.    No, sir, I quite often would receive letters and phone

1    calls.

2    Q.    And, indeed, I think we've already heard that after

3    Ms. Ozuna left Mountain Park the second time, did she send

4    you a letter?

5    A.    Yes, sir, she did.

6    Q.    And, Mrs. Gerhardt, I'll show you on your television

7    screen, you can see there's a letter that's addressed, is

8    that addressed to you?

9    A.    Yes, sir.

10   Q.    Okay.  And the date on it is February 14th, 1998,

11   correct?

12   A.    Correct.

13   Q.    And if we turn to the last page, who signed the letter?

14   A.    Tracey Brazil.

15   Q.    And Brazil, is that your understanding that that's the

16   maiden name for Tracey Ozuna?

17   A.    Yes, sir.

18   Q.    And did you, indeed, receive this letter from

19   Ms. Ozuna?

20   A.    Yes, sir, I did.

21   Q.    Did you have occasion to write back to her with respect

22   to this letter?

23   A.    I did not write her back.  We talked on the telephone

24   and talked about some of the same things in this letter, so I

25   did not write a letter to her.

1    Q.    Your mother already testified that some students were

2    prescribed medication while they were at Mountain Park; is

3    that right?

4    A.    Yes, sir.

5    Q.    How was the prescribed medication kept at Mountain

6    Park?

7    A.    We had a little small room that we called the medicine

8    closet, and it was locked at all times.  And if a person, a

9    student had prescription medicine, they had a little basket

10   that we kept their prescriptions in.

11   Q.    And the basket had their name on it?

12   A.    The basket would have like S for anyone whose last name

13   started with S, and their prescriptions would go in that box.

14   Q.    And how was it that the students got that medication?

15   A.    We would have medicine call several times a day, and

16   when it got close to medicine call, another student would run

17   through the dorm and tell everybody we're fixin' to have

18   medicine call.  They would all line up in the hallway.  A

19   staff member would be there.  She would unlock the door, get

20   out our little medicine log book.  The students would line up

21   and come one at a time to that staff member and tell them

22   what was wrong with them, what they felt like they might

23   need.  And then that staff member would give them -- if they

24   had a prescription, we would give them their prescription

25   medicine.  If they had a cold or headache, we would give

 1    whatever medicine they would need for that particular

 2    ailment.

 3    Q.    So, for example, did you have something available if

 4    the student just complained of headache?

 5    A.    Yes, sir, we did.

 6    Q.    What would you give that student typically?

 7    A.    Usually Tylenol for a headache.

 8    Q.    And just to make sure that I understand this, how

 9    exactly would the students know that it was time for medicine

10    call?

11    A.    Whichever staff member was doing medicine call on that

12    day would tell one of the students that was hanging around

13    there with her that, hey, why don't you go announce medicine

14    call, and they would run through the dorm hollering,

15    "Medicine call, medicine call."  And we'd make sure that we'd

16    tell them, you know, run to the dining hall, go everywhere,

17    let them know it's medicine call.  And that's how they found

18    out.

19    Q.    Now, we've heard that students were on orientation and

20    they had to be with their guide.  If a student on orientation

21    had a health complaint, did their guides have to take them to

22    medicine call?

23    A.    Yes, sir.

24    Q.    And if you found out that an orientation guide did not

25    permit a student to go to medicine call if they requested,

```
 1   would that orientation guide be corrected?

 2   A.    Yes, sir.

 3   Q.    How many times a day was medicine call?

 4   A.    Three, maybe four.  It varied.  Three was the standard.

 5   Four is if -- if we had someone that had a prescription that

 6   was supposed to be given four times a day, we would make sure

 7   that someone was there to give it on that fourth time.

 8   Q.    Now, it sounds like you were pretty familiar with the

 9   medication log and how medication was addressed?

10   A.    Yes.

11   Q.    Indeed, were you intimately familiar with that?

12   A.    Yes, sir, I was.  I routinely had meetings with the

13   staff ladies and we would go over the medicine log books and

14   make sure that everything was being entered correctly, and we

15   talked about the importance of it.

16   Q.    So was the medication log, was that something that was

17   kept on a daily basis at Mountain Park?

18   A.    Every day.

19   Q.    And it was kept in the regular course of what you did?

20   A.    Yes, sir.

21   Q.    Was this an important thing to keep and maintain

22   accurately?

23   A.    Very important.

24   Q.    And did you tell the staff who were doing medicine call

25   that?
```

1   A.    Yes, sir, we did, stressed how important it was.

2         MR. BRIGGS:  May I approach, Your Honor?

3         THE COURT:   Sure.

4   Q.    Mrs. Gerhardt, I'd like to have you take a look at

5   what's been marked as Defendants' Exhibit D there in front of

6   you.  Mrs. Gerhardt, have you seen that document before?

7   A.    Yes, sir, I have.

8   Q.    And you're familiar with that document?

9   A.    Yes, sir, I am.

10  Q.    Okay.  Is this a document that was created and kept in

11  the ordinary course at Mountain Park?

12  A.    Yes, sir, it is.  It's a medicine log for Tracey

13  Brazil.

14  Q.    Very good.  And did you have occasion to pull -- well,

15  strike that.  Are these medicine logs kept in the students'

16  files at Mountain Park?

17  A.    Once they have withdrawn from enrollment, the medicine

18  log is pulled and placed in their file.

19  Q.    And did you have occasion to pull Ms. Brazil's medicine

20  log out of her file?

21  A.    Did I have occasion?

22  Q.    Yes.

23  A.    Yes, sir, I did.

24        MR. BRIGGS:  Your Honor, I'd like to show Exhibit D.

25        MR. STILLEY:  Your Honor, that's not been admitted

```
 1    yet, and I would object to its admission until we have

 2    testimony that this is true, correct, and complete.

 3              MR. BRIGGS:  I'll accommodate, Your Honor.

 4              THE COURT:  What?

 5              MR. BRIGGS:  I can accommodate Mr. Stilley.

 6              THE COURT:  Whatever, fine.

 7    BY MR. BRIGGS:

 8    Q.    Now, Mrs. Gerhardt, to the best of your knowledge this

 9    is a complete document; is that right?

10    A.    Yes, sir, it is.

11    Q.    And this is the only thing that you found in her file?

12    A.    Correct.

13    Q.    And as you said, the medication logs are kept in the

14    student files after the student withdraws, correct?

15    A.    After they withdraw, we pull the medical logs on that

16    student and place it in their file.

17              MR. BRIGGS:  At this point, Your Honor, I ask it be

18    admitted.

19              MR. STILLEY:  Your Honor, I'm going to object.  The

20    question was to the best of your personal knowledge.  And if

21    that's not good enough, I would object on the grounds of the

22    best evidence.  And I'd like to see the original document if

23    that's possible.

24              MR. BRIGGS:  Your Honor --

25              THE COURT:  I'm not going to say talk to it, but I'm
```

1    going to say hold on.  Business record?

2         MR. BRIGGS:  Yes, Your Honor, I went through the

3    authentication process, that this was kept in the ordinary

4    course.

5         THE COURT:  Okay.

6         MR. STILLEY:  Your Honor, what I'd really like to

7    see is the original document, the original signed ink

8    document if it's available.  But if it's not available.

9         THE COURT:  I have no idea about that.

10        MR. BRIGGS:  The best evidence rule, Your Honor.  I

11   mean this is a photocopy of it.

12        MR. STILLEY:  Well, could we have an inquiry of the

13   witness if the original is available.

14        THE COURT:  Why don't you inquire about the

15   original.

16   BY MR. BRIGGS:

17   Q.   Mrs. Gerhardt, did you bring the original of Exhibit D

18   with you to court today?

19   A.   I did not.

20        THE COURT:  I'm going to allow this in as a business

21   record.

22   Q.   Mrs. Gerhardt, I think you testified that there were

23   over-the-counter preparations available to distribute to the

24   student if they had complaints; is that right?

25   A.   Yes.

1    Q.    Now, taking a look on Exhibit D, the first entry,

2    Mrs. Gerhardt, can you tell what that entry is?

3    A.    Tavist-D.

4    Q.    Okay.  And what's your understanding what Tavist-D is?

5    A.    A cold medication.

6    Q.    Is that an over-the-counter preparation?

7    A.    Yes, sir.

8    Q.    Is that something that you procured for Mountain Park

9    students?

10   A.    Yes, sir.

11   Q.    And is the date on this March 23rd?

12   A.    Yes, sir.

13   Q.    Now, looking down, are there some additional entries

14   for Tavist-D?

15   A.    Yes, sir, on the 24th.

16   Q.    And thereafter are there some other entries on here?

17   A.    Yes, sir, Sudafed.

18   Q.    And what were the dates -- or strike that.  Were the

19   dates that the Sudafed was given between March 24th and

20   March 28th?

21   A.    That's correct.

22   Q.    Mrs. Gerhardt, if medication was written down in the

23   medication log, did the staff member give that medication to

24   the student?

25   A.    Yes, sir.

1    Q.    Now, I'd like to draw your attention to Defendants'

2    Exhibit I, the next document there.  Now, once again is this

3    a medication log for Jessica Brazil?

4    A.    Yes, sir, it is.

5    Q.    And this is kept in the ordinary course by Mountain

6    Park, correct?

7    A.    Yes, sir.

8    Q.    Is this a true and accurate copy of what you pulled

9    from her file?

10   A.    It is.

11   Q.    And you're familiar with this document?

12   A.    Yes, sir, I am.

13          MR. BRIGGS:  Your Honor, I ask that Exhibit I be

14   admitted.

15          MR. STILLEY:  Your Honor, foundation.  I didn't hear

16   any testimony that it was a complete document, and I'll make

17   the best evidence objection requesting to be able to see the

18   original.

19   BY MR. BRIGGS:

20   Q.    Mrs. Gerhardt, did you bring the original of Exhibit I

21   to court today?

22   A.    I did not.

23   Q.    But this is a true and accurate copy of it?

24   A.    Yes, it is.

25          THE COURT:  What's your objection?

1          MR. STILLEY:   The objection is there's no testimony

2     that it's complete.

3     Q.    Mrs. Gerhardt, was this -- you pulled this out of

4     Jessica Brazil's files, correct?

5     A.    Yes, sir.

6     Q.    Was this the entire medication log that was in her

7     file?

8     A.    Yes, sir, it is.

9     Q.    And as you've already testified and to make it clear

10    for the jury, that it was important that all the medication

11    logs once the student was withdrawn was kept in that

12    student's file, correct?

13    A.    Yes, sir, every log.

14          MR. BRIGGS:  Your Honor, I ask --

15          THE COURT:  Fine.  It will be received.

16    BY MR. BRIGGS:

17    Q.    Now, we heard previously from Ms. Deboi that she

18    believed she was enrolled at Mountain Park sometime around

19    April 7th or April 8th, 1997.  Do you recall that?

20    A.    Yes.

21    Q.    Taking a look at Exhibit I, what's the first entry on

22    that medication log?

23    A.    April the 8th.

24    Q.    Would this have been around the time that she was

25    enrolled?

1    A.     Yes, sir.

2    Q.     And what's the medication given?

3    A.     Sudafed.

4    Q.     And if we continue to look down, was there -- did there

5    continue to be entries for Sudafed?

6    A.     Yes, sir.

7    Q.     Okay.  And what are the dates of the dispensations?

8    A.     From April the 8th through May the 2nd she received

9    Sudafed.  And there's a notation that her mother gave us the

10   Sudafed at the top.  The Sudafed came from her mother.  Then

11   on the May the 2nd she received Advil for her earache.

12   Q.     Now, if we look on the right-hand column, if you look

13   down, the second entry from the top, what's the medication

14   that's listed there?

15   A.     Suphedrin.

16   Q.     And what is that?

17   A.     A form of Sudafed.

18   Q.     Is it like a generic?

19   A.     Yes, sir.

20   Q.     And did you have occasion to procure that drug for

21   students at Mountain Park?

22   A.     Yes.

23   Q.     When was that given to Ms. Ozuna?

24   A.     May the 5th, 8 p.m.

25   Q.     And with respect to further down, we see an entry for

1    Poly-Histine.  Do you see that about midway down the page?

2    A.    I do.

3    Q.    Now, with respect to this Poly-Histine, do you know

4    what that is?

5    A.    From the word histine, I'm supposing it's for sinuses,

6    but I'm not for sure.

7    Q.    Do you know if Ms. Ozuna or, excuse me, Ms. Deboi had

8    occasion to go to the doctor?

9    A.    I can't remember for sure.

10   Q.    Okay, very well.  Next we'll have you take a look at

11   Exhibit O.  Now, Mrs. Gerhardt, are you familiar with this

12   document?

13   A.    Yes, sir, I am.

14   Q.    What is this document?

15   A.    This is a medicine log for Jamie Kaufmann.

16   Q.    And once again, was this created and kept in the

17   ordinary course at Mountain Park?

18   A.    Yes, sir, every day.

19   Q.    And did you pull this from her file?

20   A.    Yes, sir.

21   Q.    Based on your previous testimony, is this the complete

22   medication log from her file?

23   A.    Yes, sir, it is.

24   Q.    And to the best of your knowledge this is accurate,

25   correct?

1    A.     Correct.

2    Q.     And is this a true and accurate copy of what you pulled

3    from her file?

4    A.     Yes, sir, it is.

5    Q.     And did you happen to bring the original?

6    A.     I did not.

7           MR. BRIGGS:  Your Honor, I ask that it be received.

8           MR. STILLEY:  We'd reserve our best evidence

9    objection.

10          THE COURT:  Okay.  It will be received.

11          MR. BRIGGS:  Thank you, Judge.

12   BY MR. BRIGGS:

13   Q.     And taking a look at Exhibit O.  And it looks like the

14   form of the medication log, did this change periodically over

15   time?

16   A.     It did.

17   Q.     Now, I want to direct your attention to right around

18   there.  Do you see where I made that mark?

19   A.     Yes, sir, I do.

20   Q.     And on January 22nd, 2000, there is an entry that's

21   made there, correct?

22   A.     Yes, sir, there is.

23   Q.     Okay.  Can you tell by looking at the initials who made

24   that entry?

25   A.     I did.

1    Q.    And what's the drug that's referenced as being given to

2    the student?

3    A.    Ms-Aid, which is a generic form of Midol.

4    Q.    And did you have occasion to procure Ms-Aid for

5    students at Mountain Park?

6    A.    Yes, sir, I did.

7    Q.    And once again, if you put this in the medication log,

8    it would have been given to Jamie Woods; is that correct?

9    A.    Yes, sir.  I would not write down anything that I did

10   not give to the student.

11   Q.    Now, if we look at the entry just below that, what's

12   that entry?

13   A.    January the 24th for Ms-Aid.

14   Q.    And if we look at -- what's the next entry after that?

15   A.    March the 29th for Midol.

16   Q.    And did she continue to have Midol three more times

17   after that?

18   A.    On the 29th, the 30th, and the 31st.

19   Q.    And why would you dispense Ms-Aid or Midol to a

20   student?

21   A.    If they told me they were having cramps.

22   Q.    Now, then we also see an entry on April 1st, do we not?

23   A.    Yes, sir.

24   Q.    And what's that for?

25   A.    Ms-Aid.

1    Q.    Now, if we turn to page 2 of Exhibit O, I'll direct

2    your attention to an entry made on February 19th, 2001.  You

3    see that?

4    A.    Yes, sir.

5    Q.    And what's that entry for?

6    A.    For Tylenol for cramps.

7    Q.    And do you also see another entry for Tylenol a couple

8    days later?

9    A.    On the 20th.

10   Q.    And what was that for?

11   A.    Cramps.

12   Q.    Ma'am, I'd like to direct your attention to the next

13   exhibit.  And this is a multi-page exhibit, is it not?

14   A.    Yes, sir, it is.

15        THE COURT:  What's the -- identify the exhibit, the

16   letter.

17        MR. BRIGGS:  I'm sorry, Exhibit V, Your Honor.

18        THE COURT:  V as in Victor?

19        MR. BRIGGS:  V as in Victor.  Thank you.

20   BY MR. BRIGGS:

21   Q.    If you can, I'd like to direct your attention to page 5

22   of that exhibit.  First off, Mrs. Gerhardt, you're familiar

23   with Exhibit V, are you not?

24   A.    I'm sorry, I couldn't hear.

25   Q.    You're familiar with Exhibit V, are you not?

1    A.    Yes, sir.

2    Q.    This is prepared in the ordinary course of Mountain

3    Park?

4    A.    Yes, sir.

5    Q.    And this is a true and accurate copy of what you pulled

6    from Shari Lueken's file; is that correct?

7    A.    Yes, it is.

8    Q.    And based on your previous testimony, all of Shari

9    Lueken's medical log data would have been put into her file,

10   correct?

11   A.    Yes.

12   Q.    Did you bring the original with you today?

13   A.    I did not.

14   Q.    But is this a true and accurate copy of the original?

15   A.    Yes, sir, it is.

16         MR. BRIGGS:  Your Honor, I ask Exhibit V be

17   admitted.

18         MR. STILLEY:  I reserve the same objection.  Best

19   evidence.

20         THE COURT:  Very well.  It will be received.

21   BY MR. BRIGGS:

22   Q.    Mrs. Gerhardt, turn to page 5 of Exhibit V.  Is this

23   the medication log that you pulled or part of the medication

24   log that you pulled from Ms. Lueken's file?

25   A.    Yes, sir.

1    Q.    If you could, Mrs. Gerhardt, can you count and tell the

2    jury and judge how many pages there are to Exhibit V.

3    A.    Eight.

4    Q.    Very good.  Finally, ma'am, I'd like to have you look

5    at the last exhibit there I put in front of you, please,

6    Exhibit BB.  Mrs. Gerhardt, have you seen this document

7    before?

8    A.    Yes, sir, I have.

9    Q.    Are you familiar with this document?

10   A.    Yes, sir.

11   Q.    Okay.  What is this document?

12   A.    This is a medication log for Erika Teasley.

13   Q.    And was this prepared in the ordinary course of

14   Mountain Park?

15   A.    Yes, sir.

16   Q.    And did you pull this document from Erika Teasley's

17   file?

18   A.    Yes, sir, I did.

19   Q.    And once again, all of her medication log would have

20   been put into her file, correct?

21   A.    That's correct.

22   Q.    Did you bring the original with you today?

23   A.    I did not.

24   Q.    Okay.  Is this a true and accurate copy of the original

25   Exhibit BB?

1    A.    Yes, sir, it is.

2          MR. BRIGGS:  I'd ask that it be admitted, Your

3    Honor.

4          MR. STILLEY:  I didn't hear the testimony that it

5    was complete.

6          MR. BRIGGS:  I went through it, Your Honor.

7          THE COURT:  Why don't you just ask her.

8          MR. BRIGGS:  I'm sorry?

9          THE COURT:  Ask the witness.

10         MR. BRIGGS:  Very good.

11   BY MR. BRIGGS:

12   Q.    Mrs. Gerhardt, once again, it was the policy of

13   Mountain Park that once a student withdrew or left Mountain

14   Park, their entire medication log, the complete medication

15   log went into the student's file, correct?

16   A.    That's correct.

17   Q.    And Exhibit BB is the entire medication log from Erika

18   Teasley's file, correct?

19   A.    Correct.

20         MR. BRIGGS:  Your Honor, I'd ask it be admitted.

21         MR. STILLEY:  We just reserve the best evidence.

22         THE COURT:  Very well.  It will be received.

23   BY MR. BRIGGS:

24   Q.    Now, taking a look at Exhibit BB.  Mrs. Gerhardt, if

25   you can take a look at illness or injury, when is the first

1   time that you see tooth pain on there?

2   A.      March the 15th.

3   Q.      Okay.  And was that in 2003?

4   A.      Yes, sir.

5   Q.      Okay.  Was Ms. Teasley only enrolled at Mountain Park

6   in 2003?

7   A.      That's correct.

8   Q.      And thereafter do you see entries in there for her

9   having a cold?

10  A.      Yes, sir.

11  Q.      And after that a headache?

12  A.      Yes, sir, I do.

13  Q.      And actually there's repeated entries for headache,

14  correct?

15  A.      Several for headaches.

16  Q.      And then what's the entry at the bottom?

17  A.      April the 11th, Tylenol for a toothache and a headache.

18  Q.      And do you know, did Ms. Teasley have occasion to go to

19  the dentist?

20  A.      Yes, sir.

21  Q.      Do you know when she went to the dentist?

22  A.      I don't remember the exact date.

23  Q.      If we could, let's turn to page 2 of Exhibit BB.

24  There's an entry on there on April 22nd.  Can you tell the

25  judge and jury what that entry is?

```
1    A.    Aleve for cramps.

2    Q.    Okay.  And is there also another entry on the 28th?

3    A.    Yes, sir, Aleve for cramps.

4    Q.    And are there -- is there another entry on the 29th?

5    A.    3 p.m., Aleve for cramps.

6    Q.    Do those check marks signify that it is the same thing

7    as referenced above?

8    A.    Yes.

9    Q.    Mrs. Gerhardt, if a student thought that she was

10   pregnant, what would you do?

11   A.    I kept a supply of pregnancy tests, and we would

12   administer a pregnancy test.

13   Q.    And how did you come about to procure those pregnancy

14   tests?

15   A.    I had to make trips to Wal-Mart, and I would have to

16   buy a lot of feminine hygiene supplies like sanitary napkins.

17   And I'd go through Wal-Mart with -- it's very embarrassing,

18   I'd go through Wal-Mart with a cart full of sanitary napkins.

19   And that little part where you'd sit your children, I would

20   put the pregnancy tests and any other feminine hygiene items

21   I needed right there and have to proceed to the checkout.

22   Q.    Did you do that very often?

23   A.    All the time.

24   Q.    Mrs. Gerhardt, we heard from Jamie Woods that she had

25   swallowed a safety pin shortly after she was enrolled at
```

1    Mountain Park.  Do you recall hearing that testimony?

2    A.     I do.

3    Q.     Do you recall what day of the week that was?

4    A.     A Sunday.

5    Q.     And, now, how did you come to find out that she had

6    indicated she had swallowed a safety pin?

7    A.     Oh, one of the students originally told me.  And then I

8    went to where Jamie was, and she told me she swallowed a

9    safety pin.

10   Q.     And what did you do in response to that?

11   A.     I asked her a couple of questions about it.  First, she

12   didn't say safety pin, she said pin, I swallowed a pin.  I

13   first thought ink pen, you know, straight pin, I didn't know,

14   so I asked her some questions about what kind of pin she

15   swallowed.  She told me a safety pin.  I asked her where she

16   got it.  And then I called -- sent for my mother.

17   Q.     Now, I take it by what you've just testified about that

18   Ms. Woods could speak to you about that?

19   A.     Yes, she did.

20   Q.     And with respect to the incident, where did you say she

21   had gotten the pin from?

22   A.     She told me she had gotten it out of one of the

23   student's clothes.

24   Q.     And after the incident, did you ever speak with Jamie

25   Woods about this incident again?

1   A.     Yes, I did.   That afternoon after church I spoke to her

2   again, and she told me that she really didn't swallow a pin.

3   Q.     Did she give you any explanation for why?

4   A.     No, sir.

5   Q.     Was Jamie Woods given any correction or discipline with

6   respect to the incident?

7   A.     No, sir.

8   Q.     And did Jamie Woods graduate from Mountain Park?

9   A.     Yes, sir, she did.

10   Q.     Now, Mrs. Gerhardt, did you ever speak with Jamie Woods

11   after she left Mountain Park?

12   A.     On the telephone.

13   Q.     Did she have occasion to call Mountain Park?

14   A.     Yes, sir.

15   Q.     And you talked to her?

16   A.     Yes, sir.

17   Q.     And what was that conversation about?   What did she

18   indicate to you?

19   A.     We spoke very briefly, but she told me she was doing

20   well and that she would like to come back to be on staff.

21   Q.     Okay.   So this is after she graduated and left Mountain

22   Park, correct?

23   A.     Yes, sir.

24   Q.     She's indicated to you that she wants to come back as a

25   staff member?

1    A.    Yes, sir.

2    Q.    Now, what did you do with respect to her request?

3    A.    I didn't do anything with the request.  We -- the staff

4    all, you know, we discussed it.  But it wasn't really my

5    decision at that time.  So we just discussed it.

6    Q.    Do you know if she was invited to come to work as a

7    staff member?

8    A.    Yes, she was.

9    Q.    Now, when a new student is enrolled at Mountain Park,

10   are they expected to actually participate in all the

11   activities of the other students immediately?

12   A.    Not immediately.  We have what we call a little grace

13   period.  And we know that when a student first comes in, the

14   first couple days that they are -- it's all new to them, so

15   we don't really push anything at first.

16   Q.    However, they still have to be around staff and other

17   students, don't they?

18   A.    Yes, sir, they have to maintain the group activities

19   and be with us.

20   Q.    Mrs. Gerhardt, did Erika Teasley ever complain to you

21   about having a toothache?

22   A.    She did not.

23   Q.    Did any of the plaintiffs ever complain to you

24   personally about missing their period?

25   A.    No, sir.

1    Q.    Mrs. Gerhardt, in 2003 who was it who typically made

2    the appointments for students to see the doctor or dentist?

3    A.    I usually asked someone to make an appointment for

4    them, whoever was manning the telephones on that day.

5    Q.    Did you have occasion to set up an appointment for

6    Erika Teasley to see the dentist?

7    A.    Yes, I did.

8    Q.    And did you do that personally?

9    A.    No, I did not.

10   Q.    Okay.  Can you tell us what happened with respect to

11   that?

12   A.    I had someone call Dr. Price's office and ask for an

13   appointment.  They came back to me and told me that there was

14   no available appointments for awhile.  He was very hard to

15   get into, a very busy dentist.  And so we scheduled an

16   appointment at a later date.  But actually we had another

17   student who had to cancel their appointment, so she went in

18   their place at an earlier time.

19   Q.    So you actually got her in on an appointment that was

20   earlier than was originally scheduled?

21   A.    Yes.

22   Q.    Earlier, Mrs. Gerhardt, I showed you a letter that

23   Tracey Ozuna had written to you after she left Mountain Park.

24   Do you recall that?

25   A.    Yes, sir.

1    Q.    Other than that letter, did you have occasion to speak

2    with her on the telephone after she left?

3    A.    I did.

4    Q.    Can you tell us a little about those telephone calls

5    and what the subject of the communication was?

6    A.    All I remember is talking to her once, but we talked

7    about her new school, all her sisters, her family, their new

8    place.  They had moved to a different state and how she was

9    enjoying it.

10   Q.    Very good.

11         MR. BRIGGS:  That's all I have at this time, Your

12   Honor.

13         THE COURT:  Very well.

14                        CROSS-EXAMINATION

15   BY MR. STILLEY:

16   Q.    You said you joined Mountain Park in 1993, correct?

17   A.    Yes, sir.

18   Q.    And I didn't catch exactly what your duties were at the

19   various periods of time.  Can you tell us first what your job

20   title was for the various periods of time there?

21   A.    To begin with I was a school supervisor in the learning

22   center.

23   Q.    And how long were you in that position?

24   A.    I don't remember the dates.

25   Q.    Can you get close?

1    A.    Several years.

2    Q.    What was your next position?

3    A.    I worked in the office.  I had a lot -- I worked in the

4    kitchen some.  I worked in the office.  I worked in the

5    computer room, just everywhere.

6    Q.    Did your job title ever change --

7    A.    From --

8    Q.    -- from school supervisor?

9    A.    Yes, sir.

10   Q.    And what did it change to?

11   A.    I have to think about what it was actually called now.

12   It just slipped my mind, I'm sorry.  I know what the position

13   was, but it slipped my mind.  Lay director of women.  I can't

14   remember exactly what the --

15   Q.    Can you tell us briefly what your duties were in that

16   position?

17   A.    To oversee the activities of the girls' dorm.

18   Q.    And can you tell us approximately when you started and

19   stopped this position?

20   A.    I don't remember the dates I started exactly.  About

21   '99, 2000.  I don't remember the dates.  I'm a terrible

22   person with dates.  But it stopped when Mountain Park was

23   closed.

24   Q.    What were your duties in that position?

25   A.    To oversee the activity of the girls' dorm.

1    Q.    Did you ever have another position with respect to

2    Mountain Park?

3    A.    I worked in the computer room.  I worked in the

4    kitchen.

5    Q.    Didn't you tell us in your deposition that you were the

6    treasurer of Mountain Park?

7    A.    No, I was not the treasurer.  I did take care of the

8    checkbook, but I wasn't the treasurer.  I never had that

9    title.

10   Q.    Was somebody else the treasurer?

11         MR. BRIGGS:  Your Honor, I'm going to object at this

12   point as to relevance.

13         MR. STILLEY:  Your Honor, I'm trying to find out

14   what her duties were.  Just very basically.

15         MR. BRIGGS:  Your Honor, he already --

16         THE COURT:  I'm sustaining the objection.

17   BY MR. STILLEY:

18   Q.    Nonetheless, you did keep the books, correct?

19   A.    Yes, sir.

20   Q.    And I believe you heard testimony that this is a sort

21   of a ministry type thing, correct?

22   A.    It is a ministry, yes, sir.

23   Q.    But it does cost some money to provide care for the

24   students at Mountain Park, correct?

25   A.    Yes, sir, it does.

1   Q.    And I believe that your husband, Sam Gerhardt, made a

2   declaration that it would cost $500 per month.

3            MR. BRIGGS:  Your Honor, I'm going to object at this

4   point.  What's the relevance of this going to the negligence

5   or the battery claims?

6            THE COURT:  Mr. Stilley, I'll allow you this.  You

7   want to ask what the tuition was per student per year, do

8   that, and cut it and move on.

9            MR. STILLEY:  I've got that evidence in.  I just

10  want --

11           THE COURT:  Fine, then I don't know where you're

12  going.

13           MR. STILLEY:  I want to show what the defendants

14  said cost per student was.

15           MR. BRIGGS:  Your Honor --

16           MR. STILLEY:  Maybe this is the wrong witness.  Let

17  me wait until I get to Mr. Gerhardt.

18           THE COURT:  Still may be the wrong question.

19  BY MR. STILLEY:

20  Q.    Now, were you on salary?

21  A.    Yes, sir.

22  Q.    And were you just an employee, a salaried employee?

23  A.    Yes, sir.

24  Q.    Did your duties and responsibilities go beyond that?

25  A.    I don't understand that question.

1    Q.    Well, there's employment and then there's ownership.

2    Did you have ownership interest?

3           MR. BRIGGS:  Your Honor, at this point I would

4    object.  We need to approach.  I don't know what the

5    relevance --

6           THE COURT:  We don't need to approach.  Where you

7    going, Mr. Stilley?

8           MR. STILLEY:  I'm just trying to find out what her

9    interest was.  Let's approach if you don't mind.  Well, I can

10   explain where I'm going if you'd like.

11          THE COURT:  Tell me.

12          MR. STILLEY:  Where I'm going is to show that

13   Ms. Gerhardt after Mountain Park was closed --

14          MR. BRIGGS:  Your Honor, I'm going to object at this

15   point, you've already excluded the punitive damage count.

16          THE COURT:  After it was closed?  I'm sustaining the

17   objection.  Move on.

18          MR. STILLEY:  Your Honor, can we --

19          THE COURT:  No.

20          MR. STILLEY:  I want to approach.

21          THE COURT:  No.

22          MR. STILLEY:  I want to ask the next question, and I

23   don't want to ask.

24          THE COURT:  You never start from the relevant

25   portion and move out.  You're always out there someplace.

1    Start from what's relevant and then maybe somebody could see,

2    but you want to go to something after the school closed.  I'm

3    sustaining the objection.

4    BY MR. STILLEY:

5    Q.    Where have you lived since Mountain Park?

6              MR. BRIGGS:  Objection, Your Honor, relevance.

7              MR. STILLEY:  Your Honor, I'm just trying to show

8    that -- well, let me just say this --

9              THE COURT:  Since Mountain Park?

10             MR. STILLEY:  Yes.

11             THE COURT:  Sustained.

12   Q.    Now, with respect to this litigation, you had your

13   deposition taken at a certain point in time; is that correct?

14   Well, scratch that.  Let me withdraw that question.  Didn't

15   you testify on direct that there are certain punishments for

16   the students?

17   A.    There's certain discipline correction.

18   Q.    You didn't testify on direct that there's punishments?

19   A.    Discipline correction.  We did not administer

20   punishment.

21   Q.    There were no punishments?

22   A.    There was discipline correction.

23   Q.    But you understand the question?  What I'm trying to

24   find out --

25             THE COURT:  Let's not argue with the witness.

1    Please.

2            MR. STILLEY:  Let me see if she can answer the

3    question.

4            THE COURT:  Well, you asked the question.  You

5    called it punishment, she called it discipline.  So what.

6    Move on.

7    BY MR. STILLEY:

8    Q.    And you told us about what punishments were leveled --

9    excuse me, what disciplines or corrections were available,

10   correct?

11   A.    Yes, sir.

12   Q.    I don't think I heard you say anything about cold

13   showers.  That was one of the disciplines or corrections,

14   correct?

15   A.    That was a protection.  It was not a discipline or

16   correction, no, sir.  If a student was ever harming

17   themselves or harming another student, they may be escorted

18   to a cold shower to calm them down if there was nothing else

19   that was available.

20   Q.    So you're telling us that that's not a correction?

21   A.    It was a calming.

22   Q.    Okay.  I'd like to show you --

23           THE COURT:  Hold on a minute.  You got to --

24           MR. STILLEY:  Page 47.

25           THE COURT:  Page 47 of what?

1          MR. STILLEY:  Of her deposition of --

2          MR. BRIGGS:  Your Honor, she was not deposed in this

3     case.

4          MR. STILLEY:  October 16, 2003.

5          MR. BRIGGS:  That's not in this case.

6          MR. STILLEY:  Well, it's another case and I can

7     question her about sworn statements.

8          THE COURT:  Why don't you ask her about her

9     statement before you put her -- are you asking her did she

10    say something at some other time?  Did you ask her that?

11         MR. STILLEY:  I will certainly ask that.

12         THE COURT:  Why don't you do that.

13    BY MR. STILLEY:

14    Q.   Isn't it true that you were involved in other

15    litigation with respect to Mountain Park?

16         MR. BRIGGS:  Your Honor, this is outside the scope.

17         THE COURT:  No, no, no.

18         MR. STILLEY:  They asked for it.

19         THE COURT:  Please.

20         MR. BRIGGS:  Your Honor, may we approach?

21         THE COURT:  Ask her what she has previously said.

22    Q.   Isn't it true that you previously stated under oath:

23         "QUESTION:  Is cold shower still a potential

24    correction?

25         "ANSWER:  Yes."

| | |
|---|---|
| 1 | A.    I don't remember.  I really can't remember. |
| 2 | Q.    Do you think that if you saw those words in writing |
| 3 | that might refresh your recollection? |
| 4 | A.    If I -- |
| 5 | MR. BRIGGS:  Your Honor, I'm going to object. |
| 6 | MR. STILLEY:  She said she didn't remember.  I can |
| 7 | refresh with anything. |
| 8 | THE COURT:  See if you can lay a foundation to do |
| 9 | it. |
| 10 | MR. STILLEY:  Certainly. |
| 11 | BY MR. STILLEY: |
| 12 | Q.    Do you think that you might be able to recall having |
| 13 | said that if you saw the words in print? |
| 14 | A.    I guess it would depend on what I saw in print. |
| 15 | MR. STILLEY:  Enough foundation? |
| 16 | MR. BRIGGS:  I still object at this point.  May we |
| 17 | approach with respect to this? |
| 18 | THE COURT:  Come on down. |
| 19 | (The following proceedings were held at the bench |
| 20 | and outside the hearing of the jury:) |
| 21 | THE COURT:  Listen, you know, basically lay a |
| 22 | foundation for a deposition.  Why do I have to be a lawyer |
| 23 | for you?  Please.  You know, do you recall giving a |
| 24 | deposition, and such and such and such.  You always want to |
| 25 | add another litigation.  You're always gilding the lily, and |

```
1    that's what creates the problem.

2          Now, you ask her the question.  She recall?  No, she

3    don't recall.  Then you have to lay a foundation about do you

4    recall giving a deposition on such and such a date, da, da,

5    da.  Then you got to come up, show them the deposition, and

6    come up with the deposition.  So they say you only got one

7    page or something.

8          MR. STILLEY:  Wait a minute, Judge.  I got the

9    deposition.  I'll be glad to take it up there and show it to

10   her.

11         THE COURT:  You got to show it to them first.  You

12   got it?

13         MR. STILLEY:  Sure.

14         THE COURT:  Bring it on up.

15         MR. STILLEY:  Sure.  Sorry, Judge, it's in a box

16   back in my hotel room.  I don't have the whole thing.

17         THE COURT:  Well, it don't -- we can't use it back

18   from your hotel room.

19         MR. STILLEY:  Now, here's what I'll do then, I will

20   not refer to the deposition, I'll ask her if she previously

21   stated under oath --

22         MR. BRIGGS:  Your Honor, he already did.

23         MR. STILLEY:  I can have this in about 30, 35

24   minutes.

25         THE COURT:  Fine, whatever.  I'm going to allow you
```

1    to ask did she previously state under oath, but you got to

2    move because you don't have no deposition.

3               MR. STILLEY:  I'll be stuck with her answer.

4               THE COURT:  That's right.

5               MR. SCHWARTZ:  The way he has to say it, did you say

6    in this deposition these questions and these answers.  It's

7    not appropriate for him to say did you previously state under

8    oath because it leaves a false impression with the jury that

9    she said that, and then he never has to come back and prove

10   it.

11              THE COURT:  Fine.  You indicate a deposition, did

12   you previously state in a deposition.  And you can say that

13   the deposition was under oath, but her deposition, I agree.

14              MR. SCHWARTZ:  I think he has to say did you give

15   these answers to these questions.  That's the way that it's

16   required to be done.  Because otherwise he could just say did

17   you say this, did you say that, and she's denying it, and

18   then he has no --

19              THE COURT:  What about that, Mr. Stilley?

20              MR. STILLEY:  I'm not going to ask the question --

21              THE COURT:  You have that here and you're ready to

22   do that?

23              MR. STILLEY:  I have all this right here.  I can

24   send somebody back and have the other stuff --

25              THE COURT:  We're not going to wait forever.  We're

```
 1    trying to get this train going here.

 2              MR. STILLEY:  Sure.

 3              THE COURT:  Fine.  You can ask did she state under

 4    oath in her deposition these answers to these questions and

 5    go with it.

 6              MR. SCHWARTZ:  Your Honor, I think she's entitled to

 7    see the deposition to -- if she has to answer the question,

 8    did I say this.  Your Honor, I mean --

 9              THE COURT:  Well, if he don't come up with the

10    deposition, then you get to bust his chops later on.  He said

11    all this, he never came up with any deposition and so forth

12    and so on.

13              MR. STILLEY:  If it pleases The Court, that's not --

14              THE COURT:  Make yourself happy.

15              MR. SCHWARTZ:  The damage is done at that point

16    because we're in a position rehabilitating her about

17    something in a deposition we don't have and he doesn't have.

18    The requirement is that you have to -- that he has to say did

19    you give these answers to these questions, and she says, I

20    don't remember, then he has to show her the deposition.

21              THE COURT:  That's generally the procedure.  I'm

22    trying to give you some leeway in terms of going back to the

23    hotel.  But if you want to ask these questions about a

24    deposition, again, it's like you have no plan, you know.  You

25    start out with these darn medicine charts and asking these
```

1   witnesses these questions.  If you had a plan about that, you

2   would have called Debbie Gerhardt as your first witness to

3   lay the foundation, get those things in, then ask.  It's like

4   it's crazy, it's insane.

5          MR. STILLEY:  Well, Judge --

6          THE COURT:  It's lack of -- if you have a plan to do

7   these kinds of things, you have to think this through.  I'm

8   going to sustain the objection because you don't have -- you

9   know, you don't give them any chance to rehabilitate the

10  witness or to confirm that this was a deposition.  It's not

11  here.  You don't have it.  So I'm sustaining that.  Move on

12  from that.

13         MR. STILLEY:  Hey, Judge, let me ask you this.  What

14  he was asking is that I only ask if she had stated a certain

15  thing previously and then be stuck with her answer.

16         THE COURT:  Well, he has rethought this and so have

17  I.  Because suppose you never come up with the deposition.

18  Then -- and so the proper way to do it, Mr. Schwartz is

19  correct, that then you should be able to show her the

20  deposition and have her confirm or not confirm, and then they

21  have the deposition.  So since you don't have it here and we

22  can't do it, I'm sustaining the objection.  So no more

23  questions about that deposition.  What else?

24         MR. SCHWARTZ:  I'd like -- since we're up here, I'd

25  like to move for a mistrial because you excluded issues about

1    other lawsuits and he intentionally brought up this issue of

2    other lawsuits after you ruled that other lawsuits would not

3    be in the case.  He has intentionally brought it up at every

4    opportunity he can get.

5           MR. STILLEY:  Your Honor, they complained that I had

6    not said anything about it.  That's the only reason anything

7    was said about it.

8           THE COURT:  They didn't say anything about it.

9           MR. SCHWARTZ:  That's not case.

10          MR. STILLEY:  Yes, they did.

11          MR. SCHWARTZ:  The objection was that he hadn't

12   asked her about a particular deposition.  That was the

13   objection.  He says well -- then he starts saying, well,

14   weren't you in another lawsuit.  That violates The Court's

15   clear ruling and he ought to be sanctioned.  He ought not be

16   allowed to practice in this court and then we ought to have a

17   mistrial.

18          THE COURT:  Yeah, you went overboard with this whole

19   thing, Mr. Stilley.

20          MR. STILLEY:  Judge --

21          THE COURT:  But there was an objection.  I'll give

22   you some leeway.  I don't know that it does any good to tell

23   the jury to disregard about this whole deposition situation.

24   And it's in a deposition.  You just have to avoid these

25   things that are out.  You could have clearly explained what

 1    you were talking about without bringing up another lawsuit.

 2    But you look at every opportunity, your own landing strip,

 3    your own -- I mean, come on, you just go overboard every

 4    time.  Didn't you see what the Court of Appeals said about

 5    that?  Haven't you realized how much stress your clients are

 6    under, crying and going on?  And the money.  I've tried to

 7    explain this to you.  You don't seem to understand.  You have

 8    to try to do what you can do with what you have, not going

 9    overboard.  So the deposition is out.  You don't have

10    anything here, forget it.

11              (The following proceedings continued within the

12    hearing of the jury:)

13    BY MR. STILLEY:

14    Q.    Did you -- you testified a little on direct about

15    school work, correct?

16    A.    Yes.

17    Q.    And you said that the students could be required to

18    erase the PACE if they cheated?

19    A.    Correct.

20    Q.    Isn't it true that they can also be required to erase

21    the PACE if they failed it?

22    A.    There was a point in time where they erased a PACE and

23    then they would rework the PACE if they failed it.  You had

24    to redo the PACE.  If you failed a PACE, you had to redo it.

25    And sometimes they would erase that one and redo that one

1    instead of having to buy a new PACE.

2    Q.    And that was true for certain periods of time relevant

3    to this lawsuit too, correct?

4    A.    I don't recall what the dates were on that.

5    Q.    And you said Tracey Ozuna was well behaved; is that

6    correct?

7    A.    Yes.

8    Q.    Now, concerning this letter that was sent by Tracey,

9    you said there was a telephone call made after that letter,

10   correct?

11   A.    Some time around that letter, yes.  I don't know if I

12   got the phone call before I received the letter or after.

13   Q.    It was a phone call from Tracey to you, not the other

14   way around, correct?

15   A.    Correct.

16   Q.    Sometimes students were put on silence, correct?

17   A.    Yes.

18   Q.    If they were on silence, how could they ask for their

19   medications?

20   A.    They could always talk to staff.

21   Q.    I want to draw your attention to Defendants' Exhibit I.

22   A.    Is that what I have right here?

23   Q.    I think that's the wrong one.  I'll lay this on the

24   ELMO so that you can hopefully see that.  Let me take this

25   out.  Can you tell us whose initials are placed in here?  How

```
1    many different initials do you recognize?

2    A.    About five I think is what I counted.

3    Q.    What names?

4    A.    Laura Mathews, Sarah Day, myself, Kim Watson, that's

5    all I see.  I might be looking over one, but that's all I

6    see.

7    Q.    How many -- can you look at this and tell me how many

8    days this covers?

9    A.    I can count it.  I'd have to look because some entries

10   are for the same day.

11        THE COURT:  Mr. Stilley, are you concerned about

12   what period of time?

13        MR. STILLEY:  Yes.

14        THE COURT:  Why don't you just ask this instead of

15   counting days.  Let's try to move this, you know, show along.

16   Please.

17        MR. STILLEY:  Sure.

18   BY MR. STILLEY:

19   Q.    The first date is 4/8, correct?

20   A.    Yes.

21   Q.    Do you know what year that was?

22   A.    I don't remember.

23   Q.    The last date is 5/19?

24   A.    Yes.

25   Q.    And this covers exactly one page, correct?
```

1    A.    Yes.

2    Q.    Any particular reason this log would encompass just one

3    page?  Was it just a stroke of luck that it came out to one

4    page?

5    A.    Yes, sir.

6    Q.    Jessica was there for a considerably longer period,

7    correct?

8    A.    Unless you tell me what those dates were, I can't

9    remember.

10   Q.    Okay.  4/7/97 to 12/23/97, does that sound right?

11   A.    Yes.

12   Q.    So this was just about the first month that she was

13   there, correct?

14   A.    Yes.

15   Q.    So would it be your testimony that there was no

16   medicines given except for approximately -- actually the

17   first month and a half?

18   A.    Yes.

19   Q.    Now, I don't see any worm medicine on this document; is

20   that correct?

21   A.    That's correct.

22   Q.    But, however, the girls were routinely given worm

23   medicine when they came; isn't that correct?

24   A.    At some point in time, that's correct, yes.

25   Q.    And that some point in time would be right when they

1    got there first, correct?

2    A.    Right when they first got there, but I don't remember

3    what dates we started giving that worm medicine.  I don't

4    remember those dates.

5    Q.    Oh, are you saying that the administration of worm

6    medicine is a recent thing?  Was that not done for the entire

7    period of time relevant to this lawsuit?

8    A.    I don't know.

9    Q.    Well, now, you were there at Mountain Park for that

10   entire time, correct?

11   A.    Yes, I was.

12   Q.    And you processed the girls in repeatedly, correct?

13   A.    All the time, yes.

14   Q.    So you should know the protocol for doing that,

15   correct?

16   A.    Yes, I do.

17   Q.    Was there any point in time when the protocol was not

18   to give the girls worm medicine when they first got there?

19   A.    Yes, there was.

20   Q.    What dates?

21   A.    I don't remember.

22   Q.    Well, did this change come and go or did the change

23   happen just one time that you started giving worm medicine?

24   A.    Correct.  We didn't give it, then we started giving it.

25   And I do not remember what those dates were.

1    Q.    And so it would be your testimony then based on this

2    log the worm medicine was not being given at approximately

3    4/7 of '97?

4    A.    I don't know.  The worm medicine was not recorded on

5    this log.

6    Q.    Well --

7    A.    The worm medicine was recorded in the office just --

8    that's the only -- that's where it was recorded, that worm

9    medicine was.

10   Q.    During your direct examination I was looking at the

11   exhibits since they came in, and I saw one of them that said

12   Pin-X?

13   A.    I did too, yes, I did.

14   Q.    Pin-X is the wormer, correct?

15   A.    That's correct.

16   Q.    Why would one of them have the logs but nothing else?

17   A.    Excuse me?

18   Q.    Why would one of the girl's medicine logs have the

19   wormer but nobody else would have the wormer?

20   A.    I was looking at it.  It looked like that staff member

21   recorded it there because she wanted to.  I don't know.  She

22   recorded it on there.  That's the only one I saw.  I don't

23   remember what those dates were.

24   Q.    Did the staff members typically do things just because

25   they wanted to?

1    A.    I'm sorry?

2    Q.    Did the staff members typically do things just the way

3    they wanted to?

4    A.    No, but she may not have been a staff that typically

5    gave the worm medicine, so she wanted to make sure it got

6    recorded, but didn't know where to record it.

7    Q.    So this log is not a complete log of the medication

8    given to the girls, correct, for Jessica?

9    A.    I do not know if Jessica received any worm medication.

10   Q.    Well, if there was a separate log kept somewhere else

11   in the office, wouldn't that --

12   A.    It wasn't a log.  We just wrote down when we gave them

13   the worm medicine so that we would know that seven days later

14   they were supposed to get it again.

15   Q.    What was that written down on?

16   A.    Just a piece of paper in a calendar.  Times we wrote it

17   on the calendar.  They came in on the 12th, we gave them the

18   worm medicine, and then we would mark the day, seven days

19   later they were supposed to get it again.

20   Q.    So it was a calendar that was written on?

21   A.    Sometimes it was a calendar, sometimes it was just a

22   piece of paper.

23   Q.    Were those papers maintained?

24   A.    No, sir.

25   Q.    Records were not kept?

A. Not of the worm medication, no.

Q. Now, didn't Ms. Brazil get some prescription medication from a doctor?

A. I don't remember. She might have.

Q. Do you see any prescription medication from a doctor on this sheet?

A. I see medication here that I don't know if it's a prescription or not. But I see a medicine on here that I don't remember ever buying, this Poly-Histine. I'm assuming it's a prescription, but I lack that medical knowledge.

Q. Now, it appears that the times of the administration of these drugs, it kind of varies, it goes in various different times. Was that the way it was normally done?

A. Can you be a little more clear on what you're asking me?

Q. Well, I see an 8 p.m., a 7 p.m., a 1 p.m., an 8:30 p.m., and 7:15 a.m., 10 p.m., 6 p.m. Was that the way it was done, you would just pass out the medicine at all different times of the day?

A. If they needed it at any time we would. But we did have scheduled medicine calls. And, you know, we would try to schedule it at 7:15, but it may start at 7:15 but there were so many girls in line by the last time the last person got in line it may be 7:30 by the time she received hers.

Q. How many times a day did you have regular medicine

1    call?

2    A.    Three times.

3    Q.    And when was that?

4    A.    Times changed, you know, but morning, noon, and

5    evening.

6    Q.    I'd like to draw your attention to the first page of

7    Exhibit O.  And I want to ask you a general question about

8    these logs.  When you made the copies that have been brought

9    here today, did you make copies of the originals?

10   A.    Yes.

11   Q.    Where were those originals at at that point in time?

12   A.    In each individual student's file.

13   Q.    And where were those files maintained?

14   A.    In the filing cabinet in the office.

15   Q.    At Mountain Park?

16   A.    Yes.

17   Q.    Is that where those records are at right now?

18   A.    Some of them.  I'm not sure where their exact records

19   are at this time.

20   Q.    But you're saying that you did make these from original

21   documents?

22   A.    Yes, sir, from originals.

23   Q.    Now, this starts 12/20 of 1999, correct?

24   A.    Yes, sir.

25   Q.    And on the second page it ends 5/7/01, correct?

1    A.    Correct.

2    Q.    Does that cover more or less the full time that Jamie

3    was there?

4    A.    Well, you'll have to tell me what dates she was there.

5    I can't remember every student's dates of enrollment.

6    Q.    From approximately 9/7/99 to 5/24/01.

7    A.    Yes.

8    Q.    So it's fair to say that that -- that medicine was

9    apparently distributed over the period of time that she was

10    there, correct?

11    A.    Can you ask me that one more time?

12    Q.    The medication represented by this log was evenly

13    distributed over time, correct?

14    A.    I really don't know what you're asking me.  I'm sorry.

15    I'm a little bit confused on what you're asking me.

16    Q.    Well, I believe with respect to the previous student

17    that the medication was all crammed in a short period of time

18    whereas with this student the medication is sprinkled out

19    over the period of the enrollment?

20    A.    That's correct.

21    Q.    And there is Midol on this sheet, correct?

22    A.    Yes.

23    Q.    Did you testify on direct that that was for cramps?

24    A.    Yes.

25    Q.    What's your basis of knowledge that this was for

1  cramps?

2  A.    When a student would come and tell us that they had

3  cramps, we would give them Midol.

4  Q.    You did testify on direct that it was for cramps,

5  correct?

6  A.    I don't know if I testified for this particular one,

7  but Midol was for cramps, yes.  I didn't have any other

8  reason to give Midol.  That's what that medication is for.

9  Q.    And I heard you testify about the Tylenol too, correct?

10  A.    Yes.

11  Q.    And you also testified that the Tylenol was for cramps,

12  correct?

13  A.    Correct.  Sometimes a girl would tell me I've taken the

14  Midol, it just doesn't work, can we try something else.

15  Q.    What's the basis of knowledge that Tylenol is for

16  cramps?

17  A.    In what instance?

18  Q.    Well, there are several instances of Tylenol, and I've

19  got the first sheet on.  You tell me if you can tell which

20  one of these were for cramps.

21  A.    I don't know if any of these Tylenol was for cramps.  I

22  did not say that these Tylenol were for cramps.

23  Q.    You don't have any personal knowledge that any of them

24  are for cramps, do you?

25  A.    Any of these Tylenol, no, but I had a form a minute ago

1   and it had cramps written beside the Tylenol, so I knew that

2   one was for cramps.  This one does not say that so I don't

3   know exactly what this one was given for.

4   Q.    I'd like to draw your attention to Exhibit Z.  That's

5   Shari Lueken's medication log, correct?

6   A.    Correct.

7   Q.    And the first two entries are Pin-X?

8   A.    That's correct.

9   Q.    And that is a wormer, correct?

10  A.    Correct.

11  Q.    And the dates on that are 6/28 and then 7/3 of 2000,

12  correct?

13  A.    Correct.

14  Q.    Those are one week apart, correct?

15  A.    Yes.

16  Q.    And the dosage is given?

17  A.    Yes.

18  Q.    Whose initials?

19  A.    Rachel Smith and Julie Gerhardt.

20  Q.    Who is Rachel Smith?

21  A.    That's my daughter and a staff member.

22  Q.    Who is Julie Gerhardt?

23  A.    That was a staff member and my daughter-in-law.

24  Q.    They had lots of experience at Mountain Park, correct?

25  A.    They had lots of experience at Mountain Park?

1    Q.    Correct.

2    A.    Yes.

3    Q.    They knew the protocol very well, correct?  They knew

4    what forms had to be filled out and how they needed to be

5    filled out, correct?

6    A.    I wouldn't say they knew what every form was supposed

7    to be filled out, no.  Some of us dealt with different forms.

8    Not everybody dealt with every form, no, sir.  There were

9    some forms that I would go to the staff and say -- I may have

10   implemented the form, but I didn't have, you know, direct

11   working with it every day, and I would go to the staff and

12   say now how are we filling this out and what are we doing.  I

13   would have to do that quite often.

14   Q.    You aren't suggesting that Rachel Smith was not

15   competent to fill this out, are you?

16   A.    Oh, no, not in any way.

17   Q.    And you aren't saying that Julie Gerhardt was

18   incompetent to fill this out, are you?

19   A.    Absolutely not.  But Rachel Smith wasn't always an

20   employee there.  You know, there was -- so she may not have

21   known where we filled that out.  There was a time when she

22   got married, she was in college and away, and when she came

23   back she may have -- you know, she would have filled this

24   out.  She would have filled this out.  Things change.  She

25   may not have known where to fill that out at.

1   Q.    Now, this medication log actually covers four pages,

2   correct?

3   A.    I have more than four pages here.  Are you asking --

4   Q.    Maybe I'm missing one.  Okay.  There's just a little

5   bit on the fifth page; is that correct?

6   A.    I have eight pages here.

7   Q.    Okay.  But that includes a blank page and a medical

8   information sheet?

9   A.    That's correct.

10  Q.    And a record of illnesses and injuries, correct?

11  A.    Correct.

12  Q.    The record of illness and injury should include a

13  record of things like scrapes, bruises, cuts, correct?

14  A.    Yes, if it warranted some medication.

15  Q.    You had substantial contact with Shari Lueken, correct?

16  A.    Yes, I did.

17  Q.    You really were in charge of her for most, if not all,

18  of her stay, correct?

19  A.    Yes.

20  Q.    Didn't it come to your attention that Shari Lueken had

21  received some severe cuts and bruises?

22         MR. BRIGGS:  Objection, Your Honor, you've ruled on

23  this already.

24         THE COURT:  Sustained.

25         MR. STILLEY:  Your Honor, can we approach on that?

1          THE COURT:  No.

2    BY MR. STILLEY:

3    Q.    Can we rely on this record of illness and injuries to

4    say that this was all that was treated as far as illness and

5    injuries while Shari was at Mountain Park?

6    A.    All that was treated by a staff member, yes.

7    Q.    And that was supposed to be the only persons allowed to

8    treat other students, correct?

9    A.    Yes.  I mean, a doctor -- if a doctor treated a student

10   I didn't record it here because the doctor had records.

11   Q.    I'd like to draw your attention to Exhibit CC, Erika

12   Teasley -- I'm sorry, BB, that's correct.  This covers the

13   dates from 2/21 of 2003 to 5/12 of 2003, correct?

14   A.    Yes.

15   Q.    And you would have no way to dispute that Erika Teasley

16   came on 1/18 of 2003, correct?

17   A.    I have no way of knowing what now?

18   Q.    You wouldn't -- you could not dispute that Erika

19   Teasley came on the 18th of January 2003, correct?

20   A.    No.

21   Q.    So apparently there is no entry from that date until

22   2/21; is that correct?

23   A.    That's correct.

24   Q.    Did you look carefully to see if there was another page

25   that was missing?

1    A.    Yes.

2    Q.    Now, as part of this information that you got, one of

3    those sheets says no Midol, correct?  And this is not -- you

4    have this in front of you.  I'll lay this on the screen.

5    A.    Yes, I do see that.

6    Q.    So Mountain Park staff would be on notice that they

7    should not give Midol to this particular student, correct?

8    A.    Correct.

9    Q.    Take a look at these times.  These times appear to be

10   quite random.  And would it not be fair to say that these

11   really don't match up with the three times a day of

12   administration of medicine?

13   A.    The 7 a.m. is a very good time for medication -- I

14   mean, it was a very good possibility that that was a regular

15   medicine call.  Like I said, a student could get medication

16   any time of the day.  If they were complaining of a headache

17   at 4:30 in the afternoon and they needed Tylenol, we did not

18   make them wait until medicine call to get their Tylenol.

19   Q.    Were they allowed to take any Tylenol with them at

20   medicine call so they could take some in between times?

21   A.    No, sir.

22   Q.    Now, you testified on direct that the girls could get a

23   pregnancy test at any time they wanted it, correct?

24   A.    If they were a student that had been there for several

25   months and thought they were pregnant, yes, we would give

1    them a pregnancy test.  Now, if you'd say any time they want

2    it.  If a student had been there seven months and she just

3    decided she wanted a pregnancy test, I would not see any

4    reason to give her one.  She had not had any contact with any

5    young men.  So I would not see any reason to give her a

6    pregnancy test at that time.

7    Q.    So within the first three months are you saying the

8    student could get a pregnancy test any time they wanted it?

9    A.    If they asked for a pregnancy test and thought they

10   might be pregnant, it was to my advantage to know if they

11   were pregnant, so I would need to know if they were pregnant.

12   Q.    And you purchased a whole lot of these tests?

13   A.    I did.

14   Q.    And used a whole lot of these tests?

15   A.    Yes, I did.

16   Q.    And isn't it true there was only perhaps a couple of

17   actual pregnancies of the girls during the time that you

18   worked at Mountain Park?

19   A.    That's correct.

20   Q.    Now, when you went to Wal-Mart to get these goods for

21   the girls, you never got any tampons, correct?

22   A.    No, I did not.

23   Q.    They were not allowed to have those, were they?

24   A.    That's correct.

25   Q.    Is there a particular reason for that?

1   A.   It was policy when I started on staff there.

2   Q.   You testified also on direct about the safety pin that

3   Jamie Kaufmann says she swallowed.  Did you look at Jamie

4   Kaufmann when the incident occurred?

5   A.   Did I look at her?  I spoke with her.

6   Q.   Did you look in her mouth?

7   A.   No, I did not look in her mouth.

8   Q.   You did not check for blood?

9   A.   No, I did not.

10   Q.   Was she obviously in distress?

11   A.   No.

12   Q.   Was she able to talk to you easily?

13   A.   Yes, she did.

14   Q.   Did she seem calm?

15   A.   I would -- you know, calm has -- I guess I could say

16   that someone was calm and you might think they were not calm

17   or I might not think they are calm and you think they are

18   calm.  I don't know if I have the -- she was not acting

19   irrational.

20   Q.   Was she showing signs of distress?

21   A.   No, she was not.  She was walking around and talking to

22   me.

23   Q.   Wouldn't it make sense if someone said they did

24   something like this to check, to try to somewhat verify the

25   story to see if there was any blood or any anything of that

1    nature to verify the claim?

2    A.    She told me she swallowed a safety pin.  I mean, she

3    swallowed it, it's gone so --

4    Q.    An open safety pin could very well cut as it's going

5    down.

6    A.    She did not tell me it's an open safety pin.

7    Q.    Did you think it was a closed one?

8    A.    Yes, I did.  To my recollection she told me it was

9    closed.  We discussed in length about what she had swallowed,

10   and, you know, I thought it was a straight pin at first, and

11   she said, no, it was a safety pin.  So I started asking her

12   about the safety pin.  I came to the understanding that that

13   safety pin was a closed safety pin and that she swallowed it.

14   Q.    Did you say it was really hard to get into the dentist,

15   hard to get an appointment?

16   A.    It was.  He was very busy dentist, very good dentist.

17   Q.    Did you have any other dentist that you could take the

18   girls to?

19   A.    There were other dentists in Poplar Bluff, yes.  I

20   chose this one because he was a very good dentist.

21   Q.    Did you have a relationship with any of the other

22   dentists?

23   A.    Not me personally, no.

24   Q.    Did Mountain Park have a relationship with any of the

25   other dentists?

1    A.    With an orthodontist.

2    Q.    What about a dentist?

3    A.    There were other dentists that we had used in the past.

4    I don't know that there was a relationship with them.  But we

5    did use other dentists at times.

6    Q.    Would you agree that Erika Teasley's broken tooth was a

7    dental emergency?

8          MR. BRIGGS:  I'll object, Your Honor, to the extent

9    it calls for a medical conclusion or dental conclusion.

10         MR. STILLEY:  It relates to her reaction and how she

11   would provide care.

12         THE COURT:  Well, you better rephrase that.

13   BY MR. STILLEY:

14   Q.    Did you find out about Erika Teasley's broken tooth?

15   A.    I did not know she had a broken tooth.  I knew she had

16   a toothache.

17   Q.    Did you see any swelling?

18   A.    I did not look.

19   Q.    Well, did you look at her face?

20   A.    I saw her face every day.

21   Q.    Did you know that she was repeatedly getting medication

22   for this?

23   A.    I knew that she got some medication for a toothache,

24   yes.

25         MR. STILLEY:  Your Honor, if I could have just a

1    moment with my clients.

2            THE COURT:  A moment?

3            MR. STILLEY:  Thank you, Judge.

4    BY MR. STILLEY:

5    Q.    Tracey Ozuna was at Mountain Park twice?

6    A.    Yes.

7    Q.    But there's only one sheet in the records; is that

8    correct?

9    A.    That's correct.

10   Q.    Why would there only be one sheet?

11   A.    Because she didn't take any medication.

12   Q.    On one of her stays at Mountain Park she took no

13   medication whatsoever?

14   A.    We had a lot of students who never asked for any

15   medication.

16   Q.    Well, wasn't it your protocol to set up a sheet when

17   the student got there and to put medical information like

18   allergies and things like that in the record?

19   A.    That form came later.  I don't know what date, but we

20   did not always have that form.  We had a place for allergies

21   in their application, but not -- we didn't always have a form

22   in the medical log for allergies, that came later.

23   Q.    When did that come?

24   A.    I do not remember when.

25           MR. STILLEY:  Pass the witness.

1        THE COURT:  Counsel, come up.

2        (The following proceedings were held at the bench

3    and outside the hearing of the jury:)

4        THE COURT:  You going to give him time to get the

5    depositions?  You better cut it or let it go.  We need to

6    take a recess now.

7        MR. BRIGGS:  I just have one or two questions.  You

8    want to take a recess now?

9        THE COURT:  We're going to take a recess now.  You

10   going to ask the one or two questions, you better ask them

11   quick then because we need to get this courtroom open.  Let's

12   end this stuff.

13       MR. BRIGGS:  Very well.

14                    REDIRECT EXAMINATION

15   BY MR. BRIGGS:

16   Q.   Mrs. Gerhardt, did you ever give Shari Lueken a cold

17   shower?

18   A.   No, sir.

19       MR. BRIGGS:  That's all I have, Your Honor.

20       MR. STILLEY:  That's all I have of this witness.

21       THE COURT:  Very well.  Thank you, Ms. Gerhardt.

22   You may step down.

23       Ladies and gentlemen of the jury, we'll take our

24   luncheon recess at this time.  Return to your jury room at

25   1:15.  Recall the admonition.  Have a pleasant lunch.

1           And, counsel, where are we?  Where are we?  It

2    didn't look good to me today what we got accomplished.

3           MR. SCHWARTZ:  As far as finishing today, Judge?

4           THE COURT:  Yes.

5           MR. SCHWARTZ:  I don't think we're going to finish

6    today.

7           THE COURT:  When do you think we'll finish with the

8    evidence?

9           MR. SCHWARTZ:  Tomorrow.

10          THE COURT:  How long tomorrow?

11          MR. SCHWARTZ:  Before lunch, by lunch time.

12          (Court in recess from 12:14 p.m. until 1:24 p.m.)

13          THE COURT:  You may be seated, please.  You want to

14   call your next witness.

15          MR. BRIGGS:  Your Honor, defendants call Dr. Richard

16   Gayle.

17          THE COURT:  Very well.

18                    RICHARD GAYLE, D.O.,

19   Having been first duly sworn, was examined and testified as

20   follows:

21                    DIRECT EXAMINATION

22   BY MR. BRIGGS:

23   Q.    Please state your name for the record.

24   A.    Richard Gayle.

25   Q.    And how do you spell your last name?

```
1    A.    G-a-y-l-e.

2    Q.    Sir, what's your profession?

3    A.    I'm a family physician.

4    Q.    Do you go by doctor?

5    A.    Yes.

6    Q.    Doctor, could you briefly describe for the judge and

7    the jury your educational background and professional

8    training?

9    A.    I attended Central College for four years for my

10   undergraduate training.  I went to medical school at

11   Kirksville College of Osteopathic Medicine and Surgery in

12   Kirksville, Missouri for four years.  I interned at Ft. Worth

13   Osteopathic Hospital for one year in Ft. Worth, Texas.  I was

14   drafted into the U.S. Army.  I served two years in the Army,

15   and one year of it was in Vietnam.  One year was at Fort

16   Hood, Texas.  I was discharged from the Army in 1970.  And

17   I've been in general practice in Piedmont, Missouri ever

18   since.

19   Q.    In the course of your training did you have occasion to

20   do some research, Doctor?

21   A.    Yes, I did.

22   Q.    And what was that in?

23   A.    I spent one year in cancer research at Washington

24   University School of Medicine in St. Louis, Missouri, and I

25   spent one year in muscular dystrophy research at the
```

 1    University of Arkansas Medical School at Little Rock.

 2    Q.    And when did you graduate from medical school?

 3    A.    In 1967.

 4    Q.    So you've been practicing now 38 years or thereabouts?

 5    A.    Yes, sir.

 6    Q.    Doctor, are you a general or family practitioner?

 7    A.    Yes, sir.

 8    Q.    Where do you practice?

 9    A.    In Piedmont, Missouri.

10    Q.    How is that practice set up?

11    A.    It's a clinical practice.  We have four physicians now

12    and two nurse practitioners.

13    Q.    And, Doctor, do you also have privileges at any

14    hospitals?

15    A.    Yes, I do.  I have courtesy privileges at Poplar Bluff

16    Regional Medical Center in Poplar Bluff, Missouri.

17    Q.    And what's the name of your practice?

18    A.    Wayne Medical Center.

19    Q.    Doctor, in the course of this litigation one of the

20    plaintiffs has claimed that she was brought to your office

21    and went in through a back door.  Could you explain what that

22    refers to?

23    A.    We have an emergency entrance in the back of our clinic

24    that permits us to bring people in by either gurney or

25    wheelchair or they can walk in.

1    Q.    In the course of your practice have you had occasion to

2    treat children?

3    A.    Yes, I have.

4    Q.    And you've also consulted and treated women I take it?

5    A.    That's correct.

6    Q.    Are you trained and experienced in obstetrics and

7    gynecology?

8    A.    Yes, I am.

9    Q.    And in your practice have you had an opportunity to

10   become familiar with the defendants, Pastor Bob and Betty

11   Wills and their ministry at Mountain Park?

12   A.    Yes, I have.

13   Q.    Can you describe that?

14   A.    I have treated their students since they started their

15   school several years ago, and I treated them until they

16   closed the school.

17   Q.    And in the course of that professional relationship did

18   you ever have occasion to go out to Mountain Park and visit

19   the campus?

20   A.    Yes, on several occasions.

21   Q.    And you saw what the campus was like?

22   A.    Yes.

23   Q.    Did you have occasion ever to treat any patients out

24   there?

25   A.    Yes, I did.

1    Q.    Could you describe that?

2    A.    At one time Mrs. Wills called me, they had an outbreak

3    of stomach flu, and she said that she had numerous girls that

4    were sick.  They had vomiting and diarrhea, and she couldn't

5    bring them all to the clinic.  She wanted to know if there

6    was something that I could do to help her out.  And I told

7    her that I would just come out and see some of the girls and

8    take care of her problem.  Which I took a nurse, we went to

9    Mountain Park.  We set up a make-shift clinic in the girls'

10   dormitory and treated numerous girls.

11   Q.    Now, that's not your typical practice, though; is that

12   correct?

13   A.    No, that's not.

14   Q.    Typically if a student needs to see you, they are

15   brought to your clinic?

16   A.    That's correct.

17   Q.    How frequently would you see students from Mountain

18   Park?

19   A.    Every day.

20   Q.    Now, getting into the issues of this case, Doctor,

21   we've heard that some of the plaintiffs have complained that

22   they had missed their periods while they were at Mountain

23   Park for several months.  Did you ever have occasion to

24   discuss students missing their periods with Mrs. Wills?

25   A.    Yes, several times.

1    Q.    And can you describe the nature of those discussions?

2    A.    Usually we discussed about how long the girl had been

3    at Mountain Park, what background she came from, how long

4    that she had missed the period, and we went from there.

5    Q.    And, Doctor, if a student had just missed her period

6    for one month, typically would you want to see that student?

7    A.    No.

8    Q.    Did you ever discuss with Mrs. Wills generally how that

9    issue should be addressed with respect to students?

10   A.    Yes, we talked about that.  And if the girl wasn't

11   having any other symptoms, and we would let it ride for maybe

12   two, three, four months.

13   Q.    Now, Doctor, have you ever heard of something called

14   summer camp syndrome?

15   A.    Yes.

16   Q.    Can you describe for the judge and jury what that is?

17   A.    That's where you take a person from their normal

18   habitat and put them into a different situation.  It changes

19   their bodily functions.

20   Q.    And has this, quote, syndrome been referred to with

21   respect to girls who miss their periods if they change their

22   habitats?

23   A.    Yes.

24   Q.    And if a student didn't have any other medical process

25   or disease process, would simply just missing a period for

1    several months, would that be an indication of an independent

2    disease process or injury?

3    A.    Not always.

4    Q.    Indeed, in looking at young women who have missed their

5    periods in relationship to this summer camp syndrome, is it

6    frequently the case they go back to their ordinary cycles?

7    A.    Yes.

8    Q.    And there's no long-term pathological defect or

9    disease; is that correct?

10   A.    That's correct.

11   Q.    Now, in the course of your 38 years of practice, have

12   you had occasion to hear from parents who have complained

13   that their children have swallowed foreign objects?

14   A.    Yes.

15   Q.    Is that really that unusual a situation?

16   A.    Not in small children, no.

17   Q.    And, for example, children might swallow pennies or

18   other small objects.  Is that what you're referring to?

19   A.    Yes.

20   Q.    In this particular case we've heard from one of the

21   plaintiffs that she swallowed a safety pin.  Now, Doctor,

22   based upon your experience dealing with persons who swallow

23   foreign objects, what would be the appropriate course of

24   treatment for someone who had swallowed a safety pin in your

25   opinion?

1    A.    We usually just treat them with a high bulk or high

2    fiber diet and wait for two or three days and everything

3    usually passes.

4    Q.    Now, would giving a student then bread, for example,

5    would that constitute what you're referring to?

6    A.    Yes.

7    Q.    And is just giving bread in your experience and opinion

8    sufficient to address it?

9    A.    Yes, it is.

10   Q.    Now, if the safety pin happened to be open, in your

11   opinion and experience would it be reasonable that a safety

12   pin could actually be swallowed without getting caught on

13   something in the mouth or throat?

14   A.    It would be very difficult.

15   Q.    Okay.  Why is that?

16   A.    Well, there's numerous structures in the mouth and the

17   back of the throat that the pin could probably lodge on, and

18   it would also be very difficult for an open pin to pass

19   through the esophagus into the stomach.

20   Q.    And with respect to that, some of the places where it

21   could get caught, where would those include inside your mouth

22   and throat?

23   A.    The roof of the mouth, the tongue, the tonsils, the

24   tonsillar pillars, the soft pallet, many structures back in

25   the back of the throat.

1    Q.    Now, Doctor, we've heard that some of the students

2    complained that they suffered constipation while at Mountain

3    Park.  Doctor, what do you recommend as the first course of

4    treatment for a student who has constipation?

5    A.    Usually a high fiber diet.

6    Q.    Are there any particular foods that you would associate

7    with that?

8    A.    Vegetables and lots of fruits -- excuse me, lots of

9    fruits.

10   Q.    Lots of fruits.  What about prunes?

11   A.    Yes.

12   Q.    Actually is that probably the best fruit you could

13   have?

14   A.    Yes, it is.

15   Q.    Would prune juice help?  Do you need some water,

16   Doctor?

17   A.    No.

18   Q.    Would prune juice be something that could be given to a

19   patient that has constipation to treat them?

20   A.    Yes, on lots of occasions we use a mixture of prune

21   juice and apple juice in a 50/50 mixture and heat it and have

22   them drink it warm.

23   Q.    Now, Doctor, we have five plaintiffs in this particular

24   case.  I want to refer you to two particular plaintiffs; one,

25   Jessica, her maiden name is Brazil and now Deboi, and Shari

1    Lueken.   Doctor, did you have occasion to see those students?

2    A.    Yes, I did.

3    Q.    And, Doctor, if we could, let's just start with Jessica

4    Deboi.  On how many occasions did you see her?

5    A.    On two occasions.

6    Q.    And when was the first occasion?

7    A.    It was May the 8th of 1997.

8    Q.    Doctor, maybe I should just back up a little bit.  When

9    you saw students from Mountain Park, did you take histories

10   from them before you examined them?

11   A.    Yes, I did.

12   Q.    And you talked to them personally?

13   A.    Yes.

14   Q.    And when you took the history, what were you -- what

15   information were you seeking?

16   A.    Usually we were asking what their chief complaint was,

17   why they were there, why they came to see us.   And some

18   history and to -- their past illnesses.

19   Q.    Now, with respect to Ms. Brazil and now Deboi, what was

20   her chief complaint the first time you saw her in May 1997?

21   A.    She was complaining that she had an earache and she had

22   some congestion in her sinuses.

23   Q.    And did you treat that, Doctor?

24   A.    Yes, I did.

25   Q.    Now, you said there was a second occasion when you saw

1    her.   When was that?

2    A.     That was May the 28th of 1997.

3    Q.     And, Doctor, once again, did you take information as

4    far as what her complaints were?

5    A.     Yes, I did.

6    Q.     And did you do an examination of her?

7    A.     Yes, I did.

8    Q.     What was her chief complaint or complaints?

9    A.     She had come back because she was still having some

10   problems with her ear infection.   And she requested to be

11   tested for STDs.

12   Q.     Okay.   And with respect to the STDs, did you have

13   occasion to do a pelvic exam with her at that time?

14   A.     Yes, I did.

15   Q.     And did you conduct a pap, what's commonly referred to

16   as a pap smear with her?

17   A.     Yes, I did.

18   Q.     And, Doctor, during that visit did she complain to you

19   that she had missed her periods while at Mountain Park?

20   A.     No, she didn't.

21   Q.     Referring to the earlier, the first visit, during that

22   visit did Ms. Brazil, now Deboi, did she complain to you

23   about missing her period?

24   A.     No, she did not.

25   Q.     Now, Doctor, if we could, let's refer to Shari Lueken.

1    Did you have occasion to see Ms. Lueken?

2    A.    Yes, I did.

3    Q.    And on how many occasions, Doctor?

4    A.    On three occasions.

5    Q.    And what was the date of the first occasion?

6    A.    January the 10th, 2001.

7    Q.    And once again, did you take a history from her?

8    A.    Yes, I did.

9    Q.    And then you did an examination of her?

10   A.    Yes.

11   Q.    And what was her chief complaint?

12   A.    Her chief complaint was generally feeling achy all

13   over, having a fever and a sore throat.

14   Q.    And, Doctor, what was her diagnosis?

15   A.    She had an upper respiratory infection and influenza.

16   Q.    And did you treat that?

17   A.    Yes, I did.

18   Q.    Now, let's go to the second visit.  I'm sorry, let's

19   back up.  With respect to the first visit, did Ms. Lueken

20   complain about missing her period during that visit?

21   A.    No, she did not.

22   Q.    Did she complain about being constipated during that

23   visit?

24   A.    No, she did not.

25   Q.    Did she complain about feeling groggy or lethargic?

1    A.    No.

2    Q.    And did she complain that her vision was bad?

3    A.    No.

4    Q.    Now, going to the second visit, when was that, Doctor?

5    A.    That was May the 29th of 2001.

6    Q.    And once again, you took a history and did an

7    examination?

8    A.    Yes, I did.

9    Q.    And what was her complaint at that time?

10   A.    She had a laceration to the right index finger.

11   Q.    And, Doctor, did you verify that?

12   A.    Yes.

13   Q.    And what did you do?

14   A.    We sutured the finger with six nylon sutures.  She was

15   given a tetanus booster and told to return in ten days for

16   removal of sutures.

17   Q.    And at that time did she complain about missing her

18   period?

19   A.    No, she did not.

20   Q.    Did she complain about being constipated?

21   A.    No, she did not.

22   Q.    Did she complain about blurry vision?

23   A.    No.

24   Q.    Did she complain about feeling groggy or lethargic?

25   A.    No, she did not.

1   Q.    Now, you said there was a third visit.  When was that,

2   Doctor?

3   A.    She returned on June the 8th, 2001 for suture removal.

4   The sutures were removed and the wound was dressed and that

5   was the last time she was seen.

6   Q.    And, Doctor, during that visit did she make any

7   complaints at all about missing her periods, feeling

8   constipated or feeling groggy or lethargic or having vision

9   problems?

10  A.    No, she did not.

11  Q.    Doctor, I hate to backtrack, I missed something I want

12  to pick up.  If we could go back to Jessica Brazil for just a

13  moment.  Now, with respect to her first visit, I know I'd

14  asked you if she had complaints about missing her period

15  during that time.  And I believe your answer was she didn't

16  complain of that; is that correct?

17  A.    She did not.

18  Q.    Did she complain about being constipated?

19  A.    She did not.

20  Q.    Did she complain about feeling groggy or lethargic?

21  A.    No, she did not.

22  Q.    Now, Doctor, your findings based on your evaluation

23  when you actually met with these students and your earlier

24  testimony, those opinions and findings, were those given by

25  you based upon your training and experience and education and

```
 1    to a reasonable degree of certainty?

 2    A.    Yes.

 3    Q.    Okay.  And that's to medical certainty?

 4    A.    Yes, sir.

 5          MR. BRIGGS:  One minute, Your Honor.  Very good.

 6    Thank you.  Thank you, Doctor.

 7          THE COURT:  Cross-examination.

 8                     CROSS-EXAMINATION

 9    BY MR. STILLEY:

10    Q.    How many times have you testified in court?

11    A.    How many times have I testified in court?

12    Q.    Correct.

13    A.    Numerous times.

14    Q.    You testified as an expert on numerous occasions,

15    correct?

16    A.    Yes, sir.

17    Q.    About how many times?

18    A.    Fifteen.

19    Q.    And of those 15 times, can you tell us what percentage

20    of those times were for the defendant?

21          MR. BRIGGS:  Objection, Your Honor.  What's this

22    relevant to?  Also I think this is an issue on which we've

23    already discussed and you've ruled.

24          THE COURT:  I'm going to sustain this.  You better

25    start someplace else.
```

1          MR. STILLEY:  Your Honor, can we approach?  I've got

2     some other things I do not want to say.  Can I approach?

3          THE COURT:  I think you need to start someplace

4     else.

5          MR. STILLEY:  Your Honor, it will make this a whole

6     lot simpler if I can approach.  Please.

7          (The following proceedings were held at the bench

8     and outside the hearing of the jury:)

9          THE COURT:  Now, it only seems that you want to ask

10    him about -- the only thing is relevant is if he has some

11    bias or something on behalf of the defendants in this case.

12    So you need to ask him, if that's your pitch, about a special

13    relationship.  But if you want to bring up other cases, which

14    it seems you're always going off on some tangent, then no.

15    But you got to -- see, you don't go to the heart of the

16    matter first about a special arrangement or connection with

17    these people, with the defendant.  That's where you have to

18    start and then you go off from there.  But if you don't start

19    there, I don't know where you're going.  Because it's like

20    I'm at the rodeo with you, big boy, I need a rope and a gun

21    and a whip.

22          MR. STILLEY:  Judge, I think you got all three.  Let

23    me say this, Judge.

24          MR. BRIGGS:  He hasn't used them.

25          MR. STILLEY:  Judge, here's what I'm trying to do.

1    And maybe somebody misunderstood my question.  I was asking

2    if they testified for these defendants those 15 times, that's

3    not the question.

4              THE COURT:  Okay.

5              MR. STILLEY:  The question is how many times have

6    you testified for the defense in a case.  Is he primarily

7    defense, is he 50/50, what is he.

8              MR. BRIGGS:  We don't have an objection to that.

9              THE COURT:  Fine.  We're not getting into any other

10   lawsuits relative to these defendants, okay.

11             MR. STILLEY:  That's not what I was talking about.

12   I had no intention of going there.

13             THE COURT:  Fine.

14             (The following proceedings continued within the

15   hearing of the jury:)

16   BY MR. STILLEY:

17   Q.    You have testified on various -- on behalf of various

18   different parties in lawsuits, correct?

19   A.    That's correct.

20   Q.    Do you remember how many times that your client was a

21   plaintiff as opposed to a defendant?

22   A.    No, I don't.

23   Q.    Have you done some work for some other defendants?

24   A.    Yes, I have.

25   Q.    Have you done some work or some testimony for some

1    plaintiffs?

2    A.    Yes, I have.

3    Q.    Do you remember how long it's been since you've done

4    any work for a plaintiff?

5    A.    It's been several years.

6    Q.    Have you testified very often in the last, say, five or

7    six years?

8    A.    Probably three times.

9    Q.    And you have an hourly rate that you charge to testify,

10   correct?

11   A.    I guess my office has an hourly rate.  I don't set an

12   hourly rate.

13   Q.    Do you not know what the hourly rate for you to testify

14   here is?

15   A.    No, I don't.  I'm sorry.

16   Q.    Now, you said that you've worked for Mountain Park

17   since they opened up, correct?

18   A.    I've seen students from there.  I don't work for

19   Mountain Park.

20   Q.    Who do you work for?

21   A.    I work for Wayne Medical Center in Piedmont, Missouri.

22   Q.    Do you see -- in working for Wayne Medical Center, do

23   you see patients from Mountain Park?

24   A.    That's correct.

25   Q.    And you have done that since about 1987, correct?

1    A.    That's correct.

2    Q.    And you've been the primary physician for the students

3    at Mountain Park, correct?

4    A.    Yes.

5    Q.    So you've seen a whole lot of girls from Mountain Park,

6    right?

7    A.    That's correct.

8    Q.    And from -- isn't it true from the very inception of

9    your relationship with Mountain Park, you had a great number

10   of girls coming up with missed periods?

11   A.    That's correct.

12   Q.    Would it be fair to say that a majority of the girls

13   there missed their periods for an extended period of time?

14   A.    I wouldn't say the majority.  There was several, but

15   not -- no, I wouldn't say the majority of them.

16   Q.    And that frequently extends to six, nine, or 12 months,

17   correct?

18   A.    Sometimes, yes.

19   Q.    Would it be fair to say frequently?

20   A.    Yes.

21   Q.    Have you ever seen any other organization that had so

22   much of the cessation of menses?

23   A.    Yes, the military.

24   Q.    Okay.  So you're telling us that females in the

25   military also have the same problem, at least to some degree?

1    A.    Yes.

2    Q.    Would you say it was to the same degree that it is at

3    Mountain Park?

4    A.    Probably, maybe even higher.

5    Q.    And how long does that last with females in the

6    military?

7    A.    It varies with each individual.

8    Q.    How many females in the military have you treated?

9    A.    That's difficult to say.  I spent a year at Fort Hood,

10   Texas, and we saw numerous females.  I probably saw an

11   average of ten a day when I was in the clinic there.

12   Q.    Okay.  Is that the basis of your knowledge about

13   females in the military having cessation of menses?

14   A.    Yes.

15   Q.    Have you ever read any articles or periodicals or

16   treatises on that subject?

17   A.    No, I haven't.

18   Q.    So did you keep records from which you could determine

19   what percentage of the females in the military had a

20   substantial problem with cessation of menses?

21   A.    No, I haven't.

22   Q.    Did you see any substantial problem with cessation of

23   menses after the initial boot camp training?  Let me rephrase

24   that question.  Isn't it true that you did not see

25   substantial problems with cessation of menses after the

1    initial boot camp training?

2    A.    That I can't say.

3    Q.    You cannot recall having a substantial problem with

4    females in the military after the boot camp, correct?

5    A.    I really didn't know if they were in boot camp or not

6    in boot camp when I saw them.  That wasn't part of the

7    treatment.

8    Q.    Did you not get a complete medical history on them?

9    A.    Yes.

10   Q.    You got a complete medical history.  Did you also get a

11   history of their enlistment in the military?

12   A.    Not at that time.  I had a medical record on them, and

13   I had, you know -- and it was probably recorded in there.

14   But that was not part of my treatment.  That was not part of

15   my examination.

16   Q.    Now, did you say that was Fort Hood you were at?

17   A.    Yes.

18   Q.    Was that the only place where you treated the females

19   in the military?

20   A.    No, I treated some in Vietnam.

21   Q.    Did you have a bigger problem in Vietnam or a lesser

22   problem in Vietnam with the cessation of menses?

23   A.    I don't recall that there was any problem.

24   Q.    You don't recall any problem with cessation of menses?

25   A.    No.

1    Q.    But you do recall the problem of cessation of menses at

2    Fort Hood?

3    A.    Yes.

4    Q.    What kind of facility is Fort Hood?  Do they have a

5    boot camp program?

6    A.    No, they do not.

7    Q.    What kind of program do they have?

8    A.    They have the first and second armored division there

9    with all of their support troops, and they have a large

10   hospital.

11   Q.    About how many females were there when you were

12   involved with that program that were within your care that

13   you might be called upon to treat?

14   A.    You're asking me things that I don't really know.

15   Q.    What I'm trying to find out is if you can give me some

16   idea what percentage of the females there had cessation of

17   menses.

18   A.    You're still asking me something that I can't answer.

19   Q.    So then you don't have any way to compare the cessation

20   of menses at that military facility with the program at

21   Mountain Park, correct?

22   A.    It was a problem at Mountain Park and it was a problem

23   in the military, but I can't tell you specific numbers.

24   Q.    Do you also treat girls with -- at various other

25   schools?

1    A.    No, only the local high school, local grade school.

2    Q.    And isn't it true at the local high school you have

3    virtually no problem with the cessation of menses?

4    A.    Occasionally.

5    Q.    It would only be occasionally, correct?

6    A.    Yes.

7    Q.    Where at Mountain Park it could be fairly characterized

8    as persistent and fairly significant, correct?

9    A.    Well, it was more significant there than in the local

10   high school, yes.

11   Q.    Very more significant, was it not?

12   A.    Yes.

13   Q.    The cessation of menses, sometimes it's as serious --

14   as an indicator of serious underlying problems, correct?

15   A.    Sometimes, yes.

16   Q.    Is it fair to say that cessation of menses is a

17   medically significant condition?

18   A.    Sometimes, yes.

19   Q.    Well, tell us when it is and when it isn't.

20   A.    When a girl is pregnant.

21   Q.    Okay.  Let's assume she's not pregnant and she's had

22   cessation of menses for at least three months.  Is that a

23   significant medical condition?

24   A.    Not necessarily.

25   Q.    Tell us -- tell the jury what circumstances would cause

1    you to say that that might not be a significant medical

2    condition.

3    A.    If she had other symptoms that went along with that.

4    Q.    And what other symptoms would that be?

5    A.    If she had other symptoms of hormonal imbalance,

6    thyroid dysfunction, things like that.

7    Q.    So you don't think that if a person had hormonal

8    imbalance or thyroid dysfunction, that wouldn't be a

9    significant medical condition?

10   A.    Yes, it is.

11   Q.    And the cessation --

12   A.    But they would have other symptoms beside just

13   cessation of menses.

14   Q.    Okay.  Well, but the fact that they might have another

15   condition wouldn't make the cessation of menses medically

16   insignificant, would it?

17   A.    No.

18   Q.    It would still be medically significant if they had

19   unexplained cessation of menses for at least three months?

20   A.    If they had other symptoms.

21   Q.    You're telling me if they don't have other symptoms

22   it's not medically significant?

23   A.    What I'm telling you is that if a girl has cessation of

24   menses for three to four months and she does not have any

25   other symptoms, it's not an alarming problem.

1    Q.    Are you saying it's not medically significant?

2    A.    Anything that changes your normal bodily function is

3    significant.

4    Q.    Well, how many months do you have to go before it

5    becomes medically significant, assuming that there is no

6    other explanation such as pregnancy?

7    A.    I've seen girls go for as high as two years without

8    menses and they had no other medical problems.

9    Q.    Isn't it true that the literature on the subject

10   routinely says that a female who misses periods for more than

11   three months without an explanation should see a doctor?

12   A.    Well, I think they should.

13   Q.    Well, the question is doesn't the medical literature

14   state that if a girl or female who misses their period for

15   three months needs to see a doctor?

16   A.    Yes, I would say so.

17   Q.    So now let me ask the question again.  Isn't it true

18   that cessation of menses for at least three months without an

19   explanation constitutes a medically significant condition?

20   A.    No, it's still not a significant problem.

21   Q.    Well, how many months do you have to go before it

22   becomes a medically significant condition?

23   A.    Well --

24         MR. BRIGGS:  Your Honor, I think we've kind of tread

25   this ground before a couple times.

1          THE COURT:  Okay.  Stop arguing with this witness.

2    Answer this question and then move on.

3          MR. STILLEY:  I'm not arguing with the witness.

4          THE COURT:  He can answer this question and move on.

5    How many months does it have to go, da, da, da, da.  Go

6    ahead.

7    A.    How many months do they have to go to make it -- I just

8    told you.  If the girl has another problem, if she has

9    another symptom then it's a significant problem.  But there's

10   lots of girls that go for months and months without periods

11   and it doesn't mean anything.

12   Q.    Well, how are the girls supposed to --

13         THE COURT:  I told you, that was it.  Move on.

14         MR. STILLEY:  I'm moving on.  This is new.

15         THE COURT:  Right.

16         MR. STILLEY:  I'm moving on to the next subject.

17         THE COURT:  Go ahead.

18   BY MR. STILLEY:

19   Q.    How does the girl who has had the cessation of menses

20   figure out whether she needs to go to the doctor or not?

21         THE COURT:  Sustained.  Sustained.

22         MR. STILLEY:  There's no objection.

23         THE COURT:  He's not a mind reader.  Go ahead to

24   another subject.  You think he's the Great Carnack or

25   somebody?  Please.  How does the girl know?  How does he know

```
 1    what they know?
 2          MR. STILLEY:  Your Honor, let me ask a different
 3    question.
 4          THE COURT:  No, you go on to another subject.
 5    BY MR. STILLEY:
 6    Q.    Do you know what the National Institutes of Health is,
 7    do you not?
 8    A.    Yes, I do.
 9    Q.    It's a very respected medical institution, correct?
10    A.    That's correct.
11    Q.    And they put out news releases from time to time,
12    correct?
13    A.    Yes, they do.
14    Q.    Let me read a statement to you and ask if you agree
15    with this statement.  "Irregular periods in young women could
16    be a warning sign for later osteoporosis."
17    A.    That's correct.
18    Q.    And would you agree that -- now, what is the name for
19    absence or cessation of menses?  What's that called
20    medically?
21    A.    Amenorrhea.
22    Q.    If a girl -- if a female has amenorrhea, absence of a
23    menstrual period, of three months or more, would you not
24    agree that that indicates a serious probability of
25    osteoporosis risk later in life?
```

1          MR. BRIGGS:  Objection, Your Honor, asked and

2    answered.

3          MR. STILLEY:  It's been answered?  It's been asked,

4    but not answered.

5          THE COURT:  You still on the same subject.  But I'll

6    allow this.  Go ahead.

7    A.    If you take a 15-year-old girl that has cessation of

8    menses and you're wanting me to say that that's an indication

9    that she's going to have osteoporosis later in life, I can't

10   say that.

11   Q.    It's a risk factor, it's an indicator?

12   A.    Yes, it's a risk factor, but there's lots of risk

13   factors to indicate osteoporosis later in life.

14   Q.    Now, isn't the -- tell the jury what kind of doctor you

15   are.  What goes at the end of your name?

16   A.    D.O.

17   Q.    Explain to the jury what a D.O. is?

18   A.    It's a doctor of osteopathic medicine and surgery.

19   Q.    And what's the function of a D.O.?

20   A.    To treat illnesses in human beings.

21   Q.    Isn't it true that the stated purpose of a D.O. is to

22   work to help the body heal itself?  Isn't that one of the

23   primary differences between a D.O. and an M.D., that the D.O.

24   tries to work to help the body heal itself?

25   A.    I think that's the primary purpose of all doctors.

1    Q.    Well, isn't that what the literature says that the

2    difference between a D.O. and an M.D. is?

3    A.    Maybe.  I'm not familiar with that.

4    Q.    Well, you're familiar with the functions of a D.O.,

5    correct?

6    A.    I'm familiar with the training of a D.O. and what they

7    do after they get out of the training.

8    Q.    And isn't it fair to say that the one important way to

9    help a female's body not develop complications later is to

10   examine abnormal signs when they arise to see what's causing

11   the problem?

12   A.    That's the purpose of all physicians is preventive

13   medicine.

14   Q.    And it's your job to discover why that the abnormality

15   has surfaced, correct?

16   A.    Yes.

17   Q.    And as part of your job in trying to determine how the

18   abnormality has arisen, you need to look -- first, you need

19   to look at the complete medical history; is that correct?

20   A.    Repeat that, please.

21   Q.    You need to look at the patient's complete medical

22   history, correct?

23   A.    That's correct.

24   Q.    Did you get the complete medical history on any of

25   these young ladies sitting at this table?

1    A.    I don't know these young ladies.

2    Q.    You would know her as Jamie Kaufmann.  Did you ever get

3    Jamie Kaufmann's complete medical record?

4    A.    I don't believe I ever saw Jamie Kaufmann.

5    Q.    How about Shari Lueken, you did see her.

6    A.    Yes, I have a chart on her.

7    Q.    Do you have a complete medical record?

8    A.    Yes, I have.

9    Q.    If she asked for that, can she get a copy of that later

10   on today?

11   A.    She sure can.  She has to sign a medical release and

12   she can have it.

13   Q.    And Tracey, you would know her as Tracey Brazil.  Did

14   you ever see -- did you ever get a complete record?

15   A.    I have a Jessica Brazil.

16   Q.    Okay.  There is Jessica and there's also Tracey.  Did

17   you get a complete medical record on Jessica?

18   A.    Yes, I did.

19   Q.    How about Tracey Brazil?

20   A.    I don't recall seeing her.

21   Q.    And how about Erika Teasley?

22   A.    I don't recall seeing her either.

23   Q.    Would it be fair to say if you had seen these girls as

24   part of your practice or provided any sort of medical

25   treatment, that you would have a record of that?

1    A.    Yes, I would.

2    Q.    So the absence of that record is a good indication that

3    you didn't treat these girls?

4    A.    That's correct.

5    Q.    And do you have personal knowledge that in all

6    probability you would be the only doctor to provide treatment

7    if it was provided for the girls at Mountain Park?

8    A.    Probably, yes.

9    Q.    Now, you told the jury about something about summer

10   camp syndrome?

11   A.    Yes.

12   Q.    That's one possible cause of amenorrhea.  Is that how

13   you pronounce that?

14   A.    That's correct.

15   Q.    That's one possible cause, correct?

16   A.    That's correct.

17   Q.    And there are a number of other -- there are a number

18   of other things that can cause amenorrhea, correct?

19   A.    That's correct.

20   Q.    Can you tell the jury, just start with what you can

21   think of that can cause this.

22   A.    Pregnancy, a female infection, cancer, hormonal

23   imbalance, thyroid imbalance, multiple diseases such as

24   diabetes.

25   Q.    Anything else?

1    A.    That's the most common.

2    Q.    The medical literature does indicate that there are

3    certain other things that do cause amenorrhea, correct?

4    A.    Yes.

5    Q.    Can you think of what they are?

6    A.    Well, there's numerous diseases that will cause

7    amenorrhea.

8    Q.    How about things other than?

9    A.    Other than what?

10   Q.    Disease.

11        MR. BRIGGS:  Your Honor, at this point can we

12   approach for a moment, please?

13        MR. STILLEY:  Sure.  I mean, if you don't mind.

14        (The following proceedings were held at the bench

15   and outside the hearing of the jury:)

16        THE COURT:  One of these times you're going to get

17   it short.  You see how he went straight to summer camp.  He

18   went straight to his home run, didn't he?  What do you do,

19   you beat around with the cancer, you talk all this crap.  Why

20   don't you go straight to your home run.  You haven't figured

21   that out on nothing because you always want to go way around

22   the corner to get next door instead of walk right across the

23   yard and you're right there.  See, and this jury, they get

24   tired.  You need to go straight to your damn point.  What's

25   the objection?

1          MR. BRIGGS:  My objection at this point, Your Honor,

2     he's asking for things other than disease processes that can

3     cause a women to lose her menstrual cycle.  You know where

4     he's going, he's going straight to the drugs.  He's going

5     straight to drugs.

6          THE COURT:  No drugs.

7          MR. STILLEY:  I'm not asking him what to say.  I

8     think I can keep him away from that.  If they want to take

9     him off the stand and tell him not to say that, that's fine.

10    All I want him to do is have him admit that there were things

11    that he knew caused the problems, he didn't test for it.

12         THE COURT:  Like what?

13         MR. STILLEY:  We got a whole list of things.

14         THE COURT:  Oh, come on now.  I'm going to preclude

15    you from asking any more questions about this if you don't

16    put your cards on the table.

17         MR. STILLEY:  Judge -- just a minute, Judge.  Let me

18    put my cards on the table.  I'm going to ask him what tests

19    he did.  Because there are some tests that are normally done

20    to see what's going on.

21         MR. BRIGGS:  This expert is going to -- who is his

22    expert that's going to say that?  These girls that he saw

23    complained about cessation of menses, so why would he test

24    for it.

25         MR. STILLEY:  Well, they complained to the

1    personnel.  They didn't get taken to the doctor.

2          THE COURT:  They didn't complain to him.

3          MR. STILLEY:  Well, they didn't get a chance to.

4    One was only there two or three months.

5          THE COURT:  It doesn't matter.  So there is nothing

6    relative to him and these particular students as to cessation

7    of menses, because there is no indication of any complaint to

8    him about this by anybody.  And you're just asking him

9    generally, and here we are we've got this problem with this

10   drug situation that you are -- it's out of the case.  So I

11   don't know where you are going with this.

12         MR. STILLEY:  Judge, let me ask you this.  How can

13   we take drugs out of the case when drugs are what happened?

14         THE COURT:  I don't know that.

15         MR. STILLEY:  Judge, I've got two tests.  I've got

16   one test that says --

17         THE COURT:  I'll tell you what, we're going to take

18   a recess at this time, a brief one, about ten minutes, and

19   you're going to move on from this whole subject matter of

20   cessation of menses since it's clear that you want to move

21   toward these drug tests.  That's the end of it.  I'll take a

22   brief recess.

23         (The following proceedings continued within the

24   hearing of the jury:)

25         THE COURT:  We're going to take a brief recess.

1    Recall the admonition.  Return to your jury room at 20 after.

2    We're just going to take a ten-minute recess and we'll be

3    right back.  Recall the admonition.

4              (Court in recess from 2:12 p.m. until 2:23 p.m.)

5              THE COURT:  You may be seated, please.  You

6    finished?

7              MR. STILLEY:  No, Your Honor.  May I approach just

8    briefly?  I think I've got a solution.

9              THE COURT:  No.  No.

10   BY MR. STILLEY:

11   Q.    Who accompanied Jessica when she went to the clinic?

12   A.    I can't tell you that.  It was either Mrs. Wills or

13   some of her employees.

14   Q.    Did you allow the students to speak to you privately?

15   A.    On some occasions I did.

16   Q.    Some you did, some you didn't?

17   A.    Yes.

18   Q.    Typically the employee of Mountain Park would be in the

19   room with the student, correct?

20   A.    Yes, that's correct.

21   Q.    And they would listen to everything that was said

22   between the doctor and the patient, correct?

23   A.    That's correct.

24   Q.    Isn't it typically the case that the patient has the

25   right to privacy?

1    A.    Yes.  And occasionally they did ask for -- to talk to

2    me privately, and we did.

3    Q.    They were forced to do that in front of the

4    orientation -- strike that.  They were forced to do that in

5    front of the employee --

6         MR. BRIGGS:  Objection.

7    A.    They were forced --

8    Q.    Let me rephrase that then.  Were they given an

9    opportunity to make that request so that the employee at

10   Mountain Park wouldn't know about it?

11        MR. BRIGGS:  Objection, Your Honor, that would call

12   for speculation.  What's the relevance?

13   A.    I don't know about that.  If the student said that she

14   wanted to talk to me in private, I excused whoever was with

15   her.

16   Q.    But they had to make the request, correct?

17   A.    But -- yeah, if they made the request to me.

18   Q.    Did you tell us that Jessica asked for a test for STDs

19   on her second visit?

20   A.    Yes, that's correct.

21   Q.    And you know from the way that Mountain Park was

22   operated that there wouldn't be any reason to have concern

23   about that from the first time to the second time, correct?

24   A.    That's correct.

25   Q.    And so you knew there must be some reason she wanted a

1   test, correct?

2   A.    That's correct.

3   Q.    Did you ask Jessica if she was missing her periods?

4   A.    No, I did not.

5   Q.    You knew there was a serious problem at the facility

6   with cessation of menses?

7   A.    Yes.

8   Q.    And you knew that this young lady thought that she had

9   some kind of problem?

10  A.    Yes.

11  Q.    And you didn't take it upon yourself to ask or find out

12  if cessation of menses had occurred with her, correct?

13  A.    She told me why she requested that.

14  Q.    Do you have a copy of the results of the test?

15  A.    Yes, I do.

16  Q.    Can I take a look at that?

17        MR. STILLEY:  Your Honor, may I approach?

18  Q.    Do you have Jessica's complete medical history in front

19  of you?

20  A.    Yes, I do.

21  Q.    How thick is it?  It's just really thin?

22  A.    Yes.

23  Q.    Did you get any medical records from any previous

24  providers?

25  A.    No, I did not.

1    Q.    So that's her complete medical record with respect to

2    treatment at your clinic?

3    A.    That's correct.

4    Q.    Were you not concerned with what her medical history

5    might be?

6    A.    I ask them about their medical history in the past.

7    Q.    Isn't it customary in the medical profession to request

8    a complete medical history on a new patient?

9    A.    Not always.

10   Q.    When is it not appropriate to do that?

11   A.    Only if it pertains to the problem she has at the time.

12   Q.    Were you asked to provide records with respect to

13   either Jessica or Shari Lueken in regard to this case?

14   A.    Was I asked to provide them?

15   Q.    Correct.

16   A.    No, I have the records right here.

17   Q.    You were not asked for copies then, correct?

18   A.    I don't know if my office was asked to provide records

19   or not, but I was not personally asked for them.

20   Q.    Isn't it true that if a person actually did swallow an

21   open safety pin that that would require a trip to the doctor?

22   A.    Yes.

23   Q.    Were you informed about the safety pin incident?

24   A.    Yes, I was called.

25   Q.    What were you told?

1    A.    I was told that the girl swallowed a -- told Mrs. Wills

2    that she swallowed a safety pin.

3    Q.    Were you told whether it was open or closed?

4    A.    No.   I asked if it was open or closed, and she didn't

5    know at the time.

6    Q.    Did you ask her to go check in the subject's mouth?

7    A.    I don't recall to be truthful with you.   I don't recall

8    if I asked if she looked in her mouth.

9    Q.    That would be a normal thing to do, would it not?

10   A.    My first thought is, is the girl in any pain, is she

11   bleeding anyplace.   And those questions were negative.

12   Q.    So you were told she was not in pain?

13   A.    Yes.

14   Q.    And you were told she was not bleeding?

15   A.    Yes.

16   Q.    You told us about various places that a safety pin

17   could get hung, correct?

18   A.    Correct.

19   Q.    And most of those -- well, were there any of those

20   places where they would be likely to get hung that would be

21   below the place you could see if you opened the mouth?

22   A.    Yes.

23   Q.    And what places would that be?

24   A.    In the esophagus.

25   Q.    And what places did you tell us about such that you

1    would still be able to see the safety pin?

2    A.    Would be in the mouth or the back of the throat.

3    Q.    And given the nature of a safety pin, is it fair to say

4    there would be a substantial likelihood that an open safety

5    pin would get stuck in one of those places whether you could

6    still see it?

7    A.    Probably.

8    Q.    So based on your recollection, did you think that was a

9    closed safety pin?

10    A.    Yes.

11    Q.    And so you didn't think it was necessary for the

12    subject to come in?

13    A.    She wasn't in any pain, she wasn't bleeding, it wasn't

14    necessary for her to be seen.

15    Q.    Now, how would you know she wasn't bleeding?

16    A.    Because I was told that.

17    Q.    By who?

18    A.    By Mrs. Wills.

19    Q.    And did Mrs. Wills tell you the basis of her knowledge

20    that she was not bleeding?

21    A.    Yes.

22    Q.    How did she say she knew the subject was not bleeding?

23    A.    She just told me she was not bleeding and she was not

24    in any pain, was in no discomfort.

25    Q.    But then she didn't tell you that she opened the mouth,

1    correct?

2    A.    I don't recall that she did.

3    Q.    I mean, you didn't tell her to open the subject's

4    mouth, correct?

5    A.    No, I didn't.

6    Q.    Now, any time that you give out a prescription, there

7    should be a record of that, correct?

8    A.    Yes, there is.  There is a record in my record.

9    Q.    Did you give out any prescriptions for worm medicine?

10   A.    Yes, on several occasions.

11   Q.    Was it a rare thing or was it a common thing?

12   A.    No, it was rare.

13   Q.    When you did prescribe a medicine like that, was it

14   always the same thing or was it a different kind of

15   medication?

16   A.    There's several different kinds.

17   Q.    What kinds are they?

18   A.    Back in those days there was Antiminth.  And I can't

19   remember the other one.  It's not on the market anymore.

20   Q.    It sounds like it's been a long time since you

21   prescribed any worm medicine; is that correct?

22   A.    To Mountain Park, yes.

23   Q.    To any Mountain Park student?

24   A.    Yes.

25   Q.    About how many years?

1    A.    How many years has Mountain Park been closed?  I don't

2    recall.  I can't recall how many years.

3    Q.    Would you say it was over five years?

4    A.    Oh, yes.

5    Q.    Maybe over ten years too?

6    A.    Probably not that long.

7    Q.    What's Poly-Histine?

8    A.    It's an antihistamine.

9    Q.    Is it a prescription drug?

10   A.    Yes, it is.

11   Q.    So if you -- do you have to see the patient in order to

12   prescribe Poly-Histine?

13   A.    No.

14   Q.    You can -- what kind of information do you have to make

15   the prescription?

16   A.    If the patient has nasal congestion.

17   Q.    So if Ms. Wills calls you and tells you a certain

18   student has nasal congestion, is that enough information for

19   you to prescribe the drug?

20   A.    I usually ask if they have a fever.  And if she said

21   they didn't have a fever, they just had nasal congestion,

22   upper respiratory symptoms, I'd probably give her

23   Poly-Histine.

24   Q.    Are there any other drugs that interact with

25   Poly-Histine and cause a dangerous possibility?

1    A.    Yes.

2              MR. BRIGGS:  Your Honor, may we approach?

3              MR. STILLEY:  Judge, this is not --

4              THE COURT:  Where are we with your claims of battery

5    and negligence that relate to where you're going?

6              MR. STILLEY:  Your Honor, we've got this

7    Poly-Histine on the sheets.  We're told --

8              THE COURT:  Right.

9              MR. STILLEY:  -- this was given to these people.

10             THE COURT:  Right.  You're past that.  What are you

11   talking about now?

12             MR. STILLEY:  I want to find out what it takes more

13   to get this done, and I believe the doctor is going to say

14   that there are drugs --

15             THE COURT:  You don't know what he's going to say.

16   You're the Great Carnack now, huh.

17             MR. STILLEY:  Judge, let me see what he says.

18             THE COURT:  No.

19             MR. STILLEY:  Can I just get him to say --

20             THE COURT:  You can't get him to say nothing.  Now

21   you're a ventriloquist?  Please.

22             MR. STILLEY:  I don't want to throw it -- I want to

23   see what he says.  And I think what he's going to say is that

24   there are drugs --

25             THE COURT:  Please.  We don't want to know what you

1    think he's going to say.

2             MR. BRIGGS:  Your Honor, we've been through this

3    before.  The Court has already excluded the issue we're

4    pretty certain he's going to delve into.

5             MR. STILLEY:  This has --

6             THE COURT:  I have no idea where you're headed.

7             MR. STILLEY:  I'm not headed down any forbidden

8    path.

9             THE COURT:  Right.

10            MR. STILLEY:  This is another path.

11            THE COURT:  For sure you're right.  For sure.  Make

12   an effort.  Take a couple of steps down the path, let me

13   check you out.

14   BY MR. STILLEY:

15   Q.    Isn't it true that Poly-Histine can have an adverse

16   reaction mixed with other -- certain other drugs?

17   A.    Yes, all drugs can do that.

18   Q.    So wouldn't you want to know what other drugs the

19   patient is taking before you made a prescription?

20   A.    I knew what drugs she was taking.

21   Q.    How would you know?

22   A.    Because I asked.

23   Q.    You would ask Ms. Wills?

24   A.    I would ask -- yes.

25   Q.    So you got your information about the other drugs that

1    were being taken from Ms. Wills?

2    A.    Yes.

3    Q.    What was your basis for believing that Betty Wills had

4    the authority to make medical decisions for the students at

5    Mountain Park?

6    A.    I don't understand.

7    Q.    Did you have any powers of attorney on file for the

8    students at Mountain Park?

9    A.    Yes, she had power of attorney on all students.

10   Q.    That's what she told you, correct?

11   A.    Oh, I saw them.

12   Q.    Did you have copies?

13   A.    Yes.

14   Q.    You have copies in each file?

15   A.    She sent -- she usually sent them -- she sent them

16   every time that they brought a student in.

17   Q.    Okay.  So that went in the file, correct?

18   A.    Well, I didn't keep them.  But she had them on file at

19   her school.

20   Q.    So you're telling me that this power of attorney or

21   this power was not kept as a part of your records?

22   A.    No, this was an understanding that we had with Mountain

23   Park.

24   Q.    Well, isn't it important that you have authority before

25   you treat a minor, somebody with a proper power --

1    MR. BRIGGS:  Your Honor, we're going to object at

2    this time.

3    THE COURT:  Sustained.  That's not part of the case.

4    Move on from that.

5    BY MR. STILLEY:

6    Q.    Now, I asked you about your role as -- in testifying in

7    cases for other individuals.  Have you been involved in

8    litigation of your own or involving your practice?

9    A.    No.

10    MR. STILLEY:  Pass the witness.

11    THE COURT:  Anything else?

12    MR. BRIGGS:  Briefly, Judge, hopefully.

13    REDIRECT EXAMINATION

14    BY MR. BRIGGS:

15    Q.    Dr. Gayle, to the best of your knowledge did the folks

16    at Mountain Park, including Mrs. Wills and Mrs. Gerhardt, did

17    they follow your advice to the best of your knowledge?

18    A.    Yes.

19    Q.    And was there anything that you saw or heard about to

20    indicate that the girls at Mountain Park were not getting

21    proper medical care?

22    A.    I never had that feeling.

23    Q.    Okay.  Now, going back to this issue of the summer camp

24    syndrome.  That can apply to literally students going to

25    summer camp, is that fair?

1    A.     That's correct.

2    Q.     Could it also apply to a student going off to college?

3    A.     Yes.

4    Q.     And I think would it also be fair to relate to people

5    in the military?

6    A.     Yes, that's correct.

7                MR. BRIGGS:  That's all I have.  Thank you.

8                THE COURT:  Anything else, Mr. Stilley?

9                          RECROSS-EXAMINATION

10   BY MR. STILLEY:

11   Q.     You never heard of any summer camp that had the

12   problems of the nature that Mountain Park had with

13   amenorrhea, correct?

14   A.     I don't think that I can honestly answer that.  I mean,

15   I know it's a problem in summer camp the same as it's a

16   problem in the military.  But as far as me giving you that

17   there are 50 percent of the girls have amenorrhea at summer

18   camp and 50 percent of them had amenorrhea at Mountain Park,

19   I can't say that.

20   Q.     Well, didn't you already tell this jury that amenorrhea

21   at Mountain Park was worse than amenorrhea of females you

22   visited in Vietnam?

23   A.     No, I didn't say that.  I said it was significant.  It

24   was a significant problem at Mountain Park, but I didn't say

25   it was worse.

1   Q.    You do not -- did you treat female patients in the

2   military in Vietnam?

3   A.    Yes.

4   Q.    Did you have a basis for calculating what percentage of

5   the female military personnel had amenorrhea?

6   A.    No, I did not.

7   Q.    So if you were going to make a comparison, it would

8   simply have to be on the basis of your recollection --

9   A.    Yes.

10  Q.    -- as between the two?

11  A.    That's correct.

12  Q.    Did you get enough information with the treatment in

13  Vietnam and in Mountain Park to make that comparison?

14  A.    I saw more females from Mountain Park than I saw in the

15  military in Vietnam.

16  Q.    But we're talking percentages, correct?

17  A.    That's what I'm telling you.  I can't put a percentage

18  on it because, you know, it was a significant problem in both

19  places.

20  Q.    But it sounds to me like what you're telling the jury

21  is you don't have enough information from which that you can

22  make a valid comparison between those two locations, isn't

23  that true?

24  A.    No, I can't.  I'm saying that I saw more girls from

25  Mountain Park, and so I saw more cases of amenorrhea from

1    Mountain Park than I did in the military, but I saw more

2    girls from Mountain Park.

3    Q.    Well, when you were in Vietnam, how many females did

4    you have that were potentially your patients?

5    A.    Probably on the neighborhood of five to a dozen, and

6    they were mostly nurses.

7    Q.    So there would be only a very few individuals, correct?

8    A.    Yes.

9    Q.    And they might rotate -- how long were you in Vietnam?

10   A.    How long?  One year.

11        MR. BRIGGS:  Your Honor, I'm going to object.  We've

12   been through this a couple times already.

13        THE COURT:  Fine.  That's enough.  You're arguing

14   with the witness.  That's enough of this.

15        MR. STILLEY:  Your Honor.

16        THE COURT:  No, that's the end of that.  That is the

17   end of that.  You got anything else?

18        MR. STILLEY:  That's all I got on this witness.

19        THE COURT:  Fine.  Sit down.  Thank you, Doctor.

20   You may step down.  Call your next witness.

21        MR. BRIGGS:  Your Honor, defendants call Sharon

22   Goodman at this time.

23                    SHARON GOODMAN,

24   Having been first duly sworn, was examined and testified as

25   follows:

```
1                          DIRECT EXAMINATION

2     BY MR. BRIGGS:

3     Q.    Please state your name for the record.

4     A.    Sharon Goodman.

5     Q.    Ms. Goodman, did you work at Mountain Park for a time?

6     A.    Yes, sir.

7     Q.    And when was that?

8     A.    I was there from August of 2000 to December of 2000.  I

9     took a leave of absence.  I came back the last few days of

10    September in 2001, and worked until May of -- the end of May

11    of 2004.

12    Q.    And during the first time that you were at Mountain

13    Park in 2000, were you a staff member?

14    A.    Yes.

15    Q.    And what was your job title at that time?

16    A.    Just a monitor in the girls learning center.

17    Q.    And what does a monitor do in the learning center?

18    A.    A monitor assists the supervisor.  In this kind of

19    schooling it's an individual schooling where each student is

20    doing something different, and they have little flags that

21    they put up.  And if a student wants to get academic help,

22    the supervisor helps them.  And if they want to go score

23    their work or just various things, then they'll have to

24    monitor.  It's just like a teacher's helper.

25    Q.    In that job those first few months at Mountain Park,
```

1    where did you live?

2    A.    I lived in a room up on the same -- down the hall from

3    where the girls were at in a room.

4    Q.    And in the course of the job did you frequently

5    actually sleep with the girls in the dorm?

6    A.    No, I didn't actually sleep in the dorm, but I was

7    right around the corner from them.

8    Q.    Now, the second time when you went back to Mountain

9    Park in late September 2001, what job duties did you assume

10   at that time?

11   A.    I started working as a supervisor in the learning

12   center.  And I worked in the kitchen.  And just later on as

13   time went on I picked up other duties.  I did a lot of just

14   paperwork.  And I took the girls to the doctor a lot.  And at

15   times I went to town and got supplies.  And at some point in

16   time then I was helping with medicine call.

17   Q.    When you first came back in 2001, were you doing the

18   medicine call?

19   A.    No, sir.

20   Q.    About how long did it take before you started doing the

21   medicine call?

22   A.    I picked up medicine call, it was January, February of

23   either 2002, 2003 somewhere.  I can't remember which year.

24   Q.    Fair enough.  Now, we've already heard testimony with

25   respect to how the medicine call worked at Mountain Park for

1    the girls.  We heard that from Deborah Gerhardt.  Were you

2    here to hear Ms. Gerhardt's testimony?

3    A.    Yes, sir.

4    Q.    Okay.  And her description of the medicine call, is

5    that similar to your recollection of what medicine call was

6    like?

7    A.    Yes, sir.

8    Q.    Now, you said that you did handle medicine call.  When

9    a student came with a complaint like a headache, did you give

10   them something?

11   A.    Yes, sir.

12   Q.    And typically what would you give them?

13   A.    A Tylenol or a generic Tylenol.  Sometimes we had

14   generic brands.

15   Q.    And when a student asked about something like that, I

16   mean, did you ever do any kind of what we sometimes call

17   differential diagnosis where you kind of figure out or rule

18   some other things out before you determine what may be best

19   for them?

20   A.    Sometimes.  It would be more or less if they wore

21   glasses or do you feel like your glasses might need to be

22   changed.  Or are you also having sinus problems, you know, is

23   your headache in the front -- across the front of your head

24   or is it in the back of your head.  Are you having persistent

25   headaches.  Something of that nature.

1    Q.    Okay.  And did you also have, for example, something

2    like Excedrin Migraine, an over-the-counter product you might

3    be able to give based upon what they say?

4    A.    Yes, but most of the time it was just Tylenol, generic

5    Tylenol.  Sometimes a parent would send something.  I had one

6    young lady who used to get a lot of migraine headaches, and

7    mom just sent it.  So when she came to get medicine, we had

8    it in her little basket because the Tylenol really didn't

9    help her.

10   Q.    Was there always some sort of cold preparation

11   available?

12   A.    Yes, sir.

13   Q.    Were there laxatives available?

14   A.    At least a Metamucil, and sometimes we'd have, not

15   Pepto-Bismal, I'm trying to think, like Milk of Magnesia.

16   Q.    And, Ms. Goodman, if a student came to you and ever

17   complained about missing her period, what would you ask or do

18   in response?

19   A.    Well, first of all, I'd ask, well, how long and if she

20   was feeling pain with it, and then from there because of my

21   position, I would -- Julie usually dealt with that.  And I

22   would either tell Julie myself or refer them to Julie,

23   because for certain things it's good to have one person who

24   is dealing with one thing because students a lot of times

25   would have a tendency to tell one staff and then come back

1    and then tell another staff something different.  And it was

2    just good to have one person who dealt with a particular

3    area.  And so ultimately I would refer the girls to Julie

4    because then she had the whole picture to deal with.

5    Q.    When you gave out oral medication on medicine call, was

6    that entered into a medicine log?

7    A.    Yes, sir.

8    Q.    And was that important -- an important part of the job,

9    handling medicine call?

10   A.    Yes, sir.

11   Q.    And you took that very seriously, didn't you?

12   A.    Yes, sir.

13   Q.    If a student ever complained of a fever, would you tell

14   Mrs. Gerhardt about it?

15   A.    Well, first of all, I would take their temperature and

16   make sure.  A lot of girls would come up and say I feel like

17   I have a temperature, and it's like, okay, let's check this

18   out.  And a lot of times they really didn't have a

19   temperature.  But if they did have a temperature, then just

20   depending if it was like cold or whatever, they were put to

21   bed, and of course I would notify the other staff.

22   Q.    Mrs. Goodman, when you were at Mountain Park was Jamie

23   Woods a student there?

24   A.    Possibly in that -- the first four months I was there.

25   But I wasn't around the students a lot then.  Because we knew

1    when I went there that I was going to be taking a short term

2    to leave, and so I guess I don't even really know.  I mean,

3    I'm not familiar with her at all.

4    Q.    You don't have any recollection that she ever told you

5    she was missing her period, do you?

6    A.    No.

7    Q.    Now, how about Shari Lueken, do you recognize Shari

8    Lueken?

9    A.    I recognize Shari Lueken.

10   Q.    Did Ms. Lueken ever complain to you about missing her

11   period?

12   A.    Not that I recall.  It would be so long ago, that if

13   somebody did tell me, I mean, I would just take it up the

14   hierarchy and pass on the information.  And I know that I

15   would do that.

16   Q.    And Ms. Lueken -- well, Ms. Lueken didn't complain to

17   you about being constipated, did she?

18   A.    Again, there's just no way that -- you have so many

19   girls when you're doing medicine call day after day after

20   day.  And if she did, it would have been dealt with at the

21   time.  And you give them prunes or prune juice or something,

22   a stool softener or whatever.  But I don't recall anything.

23   There's just no way I can remember that.

24   Q.    Now, looking to Exhibit BB.  Ms. Goodman, have you seen

25   this document before?

1    A.    Yes, sir.

2    Q.    And is this the medication log for Erika Teasley?

3    A.    Yes, sir.

4    Q.    Are your initials on any of the entries on the first

5    page of Exhibit BB?

6    A.    Yes, sir.

7    Q.    When is the first indication on Exhibit BB that there

8    is a complaint of tooth pain?

9    A.    It would be on 3/15.

10   Q.    March 15th.  Was that 2003?

11   A.    Yes, sir.

12   Q.    And thereafter did Ms. Lueken -- excuse me, did

13   Ms. Teasley come to you and complain after that date about

14   having a toothache?

15   A.    If she did, we would have given her medication, and it

16   would have been put in the log.

17   Q.    Now, with respect to Ms. Teasley, did she come to you

18   three times a day complaining about tooth pain?

19   A.    According to the log, no.  If she did, it would have

20   been in the log.

21   Q.    And do you know if Ms. Teasley was ever taken to the

22   dentist?

23   A.    I only know because of us talking about that here.

24   Personally I don't -- I didn't remember anything about that.

25         MR. BRIGGS:  One minute, Your Honor.  That's all I

1    have, Your Honor.

2         THE COURT:  Cross-examination.

3                    CROSS-EXAMINATION

4    BY MR. STILLEY:

5    Q.    Is it fair to say you don't have a clear recollection

6    of the actual administration of the medication represented in

7    Erika Teasley's treatment log?

8    A.    What I remember is from looking at the log, I can look

9    back and see that I put my initials on there, so I know that

10   she came in and went through medicine call, and I dealt with

11   it.

12   Q.    Are you basing your testimony on the initials that you

13   see?

14   A.    Well, those initials are mine in certain cases.

15   Q.    Where it represents to be your initials, you're saying

16   those are your initials; is that correct?

17   A.    Yes, my initials are on those logs in many places, yes.

18   Q.    Do you have actual personal recollection of the events

19   that are represented by these log entries?

20   A.    I don't understand what you're saying.

21   Q.    Do you actually recall the administration of the

22   medication on the occasions where it's logged that you gave

23   out the medication?

24   A.    The particular days, no.  I remember standing day after

25   day after day having lots of girls come through medicine

1    call.  And every time they came through medicine call our

2    procedure was to mark down why they came, give them the

3    medicine, and put your initials.

4    Q.    Long and short of it, you cannot testify from your

5    personal knowledge that this log is accurate, can you?

6          MR. BRIGGS:  Your Honor, I'm going to object.

7    A.    Well, I know it's accurate.

8          MR. STILLEY:  I'm asking her about her personal

9    knowledge, her personal recollection.

10         THE COURT:  What was your objection?

11         MR. BRIGGS:  Your Honor, the phrase of the question,

12   do you have a recollection as to whether it's accurate or

13   not.

14         MR. STILLEY:  Well, let me strike that, and I'll

15   rephrase it.

16   BY MR. STILLEY:

17   Q.    Do you have personal recollection of the actual events

18   that are recorded on this log with your initials by them?

19   A.    I don't have personal recollection.  There's just too

20   many girls that go through medicine call day after day after

21   day, and it's just an everyday thing.  And to remember one

22   particular girl back at that time on a particular day, no, I

23   can't remember that.  I don't think anybody really can.

24   Q.    Now, you were a monitor at Mountain Park?

25   A.    A monitor at the beginning.

1    Q.    And did you change positions?  Did you get another

2    position later?

3    A.    Yes, when I came back I was a supervisor instead of a

4    monitor.

5    Q.    Okay.  And a monitor is just an employee; is that

6    correct?

7    A.    Well, both are employees.

8    Q.    Okay, but I'm just asking about the monitor.  When you

9    were a monitor, were you a volunteer?

10   A.    No, sir.

11   Q.    You were paid?

12   A.    Yes, sir.

13   Q.    Rate of pay?

14   A.    Excuse me?

15   Q.    What was your rate of pay?

16   A.    I have no idea.  I mean, I don't remember back then.

17   Q.    Do you remember your rate of pay at any time?

18        MR. BRIGGS:  Your Honor, objection.  We've been

19   through this.  What's it relevant to?

20        MR. STILLEY:  I'm just trying to establish her level

21   in the hierarchy.

22        THE COURT:  Well, me and the jury and everybody else

23   want to know if we're going to finish this case within our

24   lifetime.  That's what we're trying to figure out.  And

25   you're just asking all kind of stuff, you know what I mean.

1    Please.

2              MR. STILLEY:  Simple question, short answer.

3              THE COURT:  Yeah, but you got all these simple

4    questions.

5              MR. STILLEY:  Just one page.

6              THE COURT:  Sustained.

7    BY MR. STILLEY:

8    Q.    What's your highest level of education?

9    A.    I have an applied science degree in accounting and I

10   have a two-year liberal arts degree.

11   Q.    From where?

12   A.    Spokane Community College in Spokane, Washington.

13   Q.    Now, did I hear you testify on direct that you would

14   sometimes rule out certain medications, you would rule

15   certain medications out for a particular student?

16   A.    No, I don't think I said that.  Maybe I don't

17   understand what you're asking me.

18   Q.    Well, when a student came to you and they had a

19   problem, let's say it's a cold.

20   A.    Yes, sir.

21   Q.    You had more than one medication for the cold, correct?

22   A.    We could have at the time.

23   Q.    There are a lot of cold medicines.  Did you have more

24   than one or just one?

25   A.    It would just depend on -- we could have several

1    different kind of cold medicines, yes.

2    Q.    Isn't it true that at all times that you were there,

3    that there were several different cold medicines available?

4    A.    Yes.

5    Q.    And when a student asked for cold medicine, you didn't

6    always just let the student have whatever medicine they

7    thought was best for them, correct?

8    A.    Sometimes we would -- some of the cold medicines made

9    them sleepy, and so at night we might want to give one of

10   those cold medicines.  And maybe during the day, say, the

11   Alka Seltzer Plus that didn't make them sleepy because they

12   are in school.  But -- and sometimes a student would come in

13   and say may I have this one instead of that one because this

14   one works better for me.

15   Q.    Isn't it true that sometimes you had to go up the chain

16   to your superiors to find out if a particular student could

17   have a particular cold medicine?

18   A.    If there was something in the log that said that they

19   were allergic to something, I didn't have to go ask anybody,

20   it was written there in their log, and I would know that

21   particular medicine that I couldn't -- that particular cold

22   medicine that I would give them, that I would give them

23   another one.

24   Q.    Well, let's assume that there was no statement in the

25   log about an allergy to a medicine and a student is asking

1    for cold medicine, did you sometimes ask a superior if the

2    student could have the medicine of their choice?

3    A.     There was no need to.

4    Q.     Are you telling this jury that you never did that?  Can

5    you look at the jury and tell the jury if you've ever done

6    that while you worked at Mountain Park?

7    A.     That I never did -- please restate it.  I'm not

8    understanding what you're trying to ask me.

9    Q.     I'm trying to find out if you ever asked your superior,

10   any of your superiors if a certain student could have a cold

11   medicine that the student had requested?

12   A.     I can't -- I never went to any superior that I can ever

13   recall and ask them if they could have -- if they couldn't

14   have something, it would be logged on the log.  Otherwise it

15   would be -- if it's during the day, we'll have a tendency to

16   give them one that doesn't make them drowsy, where something

17   at night possibly they would get a different one.  I dealt

18   with the students at the medicine log was just between me and

19   the student.

20   Q.     Did your superiors ever come to you -- I asked you

21   about you going to your superiors.  Did your superiors ever

22   come to you and tell you not to allow a certain student to

23   have a certain cold medication that the student asked for?

24   A.     No.

25   Q.     Did you ever -- did a student ever ask for a particular

1    cold medicine that was not forbidden to them based on your

2    log, yet they were denied a medication?

3    A.     No, sir.

4    Q.     That never happened on your watch, is that what you're

5    saying?

6    A.     No, sir, it would be no need to.

7    Q.     Did you testify on direct that there were certain

8    ailments that were always referred up to higher level

9    personnel?

10   A.     Yes.

11   Q.     What were those ailments?

12   A.     If one of the girls did mention about this missing a

13   period, if it was brought to me, I would refer it over to

14   Julie so that we had one person dealing with it.  If a

15   student did come to me about something that we felt that

16   there was a doctor visit needed, I would go to -- I would

17   deal with the situation best I could then, and then I would

18   talk to one of the superiors about, okay, this student needs

19   a doctor's appointment.

20   Q.     So are you telling us that Julie Gerhardt was the next

21   person in command with respect to cessation of menses?

22   A.     For me, yes.

23   Q.     Were there -- was there another higher ranking person

24   that other low level employees took their complaints to?  Was

25   Julie Gerhardt the only one of the monitors or low level

1    staff that you would take the complaints of cessation of

2    menses to?

3    A.    Monitor has nothing to do with medicine call.

4    Q.    Okay.  Well, there were more than one person on

5    medicine call, correct?

6    A.    Yes, sir.

7    Q.    Actually Julie Gerhardt was on medicine call a good

8    part of the time, true?

9    A.    Yes.

10   Q.    So when she was -- you were on medicine call together

11   sometimes, correct?

12   A.    Not together.  Sometimes -- I would do more the morning

13   medicine call, and, say, maybe she'd do the afternoon

14   medicine call.  Depending on how our duty, but generally I

15   did the morning, generally she did the afternoon.  We could

16   swap different times, do the different duties if somebody

17   needed me to do something, or sometimes I would take night

18   medicine call.  Some days I might do all three, just

19   depending.  But if there was something that came about, a

20   particular thing that I thought maybe there was a doctor's

21   visit needed, yes, I would take it up to the next person.

22   Q.    Do you know where Julie Gerhardt was supposed to take

23   the complaint to?

24   A.    She would discuss it with Ms. Debbie.

25   Q.    Ms. Debbie Gerhardt?

1    A.    Yes, sir.

2    Q.    Did you do anything else with respect to that

3    complaint?

4    A.    Once I took it up to the next -- up to Julie, because

5    she was like the certain things would go for a central

6    person, then it was in her hands.

7    Q.    You didn't write that down in the logs, did you?

8    A.    No, I wouldn't write that down in the log, no.

9    Q.    To your knowledge nobody else wrote that in the logs

10   either, did they?

11   A.    There's no medication -- the medication log is to give

12   medication.  And there's no medication given, so why would

13   anything be put in the log if you're not giving medication

14   when it's a medication log.

15   Q.    Was there any written record kept of the complaints of

16   cessation of menses?

17   A.    That I don't know.

18   Q.    To your knowledge there was no record of the cessation

19   of menses or complaints thereof, correct?

20   A.    On my level, no.

21        MR. STILLEY:  Pass the witness.

22                      REDIRECT EXAMINATION

23   BY MR. BRIGGS:

24   Q.    Ms. Goodman, let's take a look again at Exhibit BB.

25   A.    Yes, sir.

1    Q.    And with respect to looking at the exhibit --

2    Ms. Goodman, if you could, could you just point for The Court

3    and the jury where some of your initials show up here on this

4    medication log.  Let's start off --

5    A.    Line 1 is my initials.

6    Q.    Okay.

7    A.    And if we go down to --

8    Q.    Is this one on March 21st?

9    A.    Yeah, on the 21st.

10   Q.    And then right above that?

11   A.    And this scribble right there is mine.  And down on the

12   22nd and --

13   Q.    Again on the 24th?

14   A.    Yes, that's mine.  And down on the -- on the 24th down

15   here at 9 p.m., that's mine.

16   Q.    Very good.

17   A.    You'll have to push the thing up for me to see anymore.

18   Q.    How about the entry at the bottom?

19   A.    The last one, that scribble is mine.

20   Q.    Very good.

21         MR. BRIGGS:  Thank you.

22         THE COURT:  Anything else?

23         MR. STILLEY:  No, Your Honor, I'm through.

24         THE COURT:  Thank you, Ms. Goodman.  Call your next

25   witness.

1            MR. BRIGGS:  At this time, Your Honor, we call Sam

2    Gerhardt to the stand.  Judge, may I approach the witness for

3    just a second?

4            THE COURT:  Sure.

5                      SAM GERHARDT,

6    Having been first duly sworn, was examined and testified as

7    follows:

8                    DIRECT EXAMINATION

9    BY MR. BRIGGS:

10   Q.    Would you please state your name for the record.

11   A.    My name is Sam Gerhardt.

12   Q.    And, sir, are you married to Debbie Gerhardt?

13   A.    Yes, sir, for 30 wonderful years.

14   Q.    I'm sorry?

15   A.    I said for 30 wonderful years.

16   Q.    Fantastic.  Are you the son-in-law of Bob and Betty

17   Wills?

18   A.    Yes, sir, I am.

19   Q.    Sir, did you graduate from college?

20   A.    Yes, sir, I did.

21   Q.    And let's see, can you briefly describe then your

22   college or post secondary education?

23   A.    Sure.  I began my post secondary education at Tennessee

24   Temple Bible College and University in Chattanooga.  I took

25   many hours there.  I continued on as the Lord moved me about

1    to William Carey College in Hattiesburg, Mississippi,

2    eventually finishing up a master's in Christian education

3    with Carolina University of Theology.

4    Q.    And while you were pursuing that master's degree, were

5    you also working at Mountain Park?

6    A.    Yes, sir, I was.

7    Q.    As part of that master's program, did you have any

8    projects that related to Mountain Park?

9    A.    Yes, sir, I did.

10   Q.    And what was that or those?

11   A.    The parent, what we're calling the Parent/Student

12   Handbook was basically my master's thesis.

13   Q.    Okay.  So you actually created the Parent/Student

14   Handbook?

15   A.    Yes, sir.

16   Q.    And when was that completed?

17   A.    In '98.

18   Q.    In 1998?

19   A.    Yes, sir.

20   Q.    And just so I understand it, our recollection is that

21   Tracey Ozuna attended Mountain Park in 1995 and 1996.  Have

22   you heard that in this trial?

23   A.    Yes, sir, I've heard that in this trial.

24   Q.    And have you also heard that Ms. Deboi attended

25   Mountain Park in 1997?

A.     Yes, sir.

Q.     Now, sir, are you an ordained minister?

A.     Yes, sir, I am.

Q.     And with respect to the handbook, Mr. Gerhardt, it's called the Parent/Student Handbook, but when you created it, was there ever an intent to give the students the handbook?

A.     No, sir, never was.

Q.     Why not?

A.     We had a history of oral tradition where the students learned the rules as they were passed down from student to student just like they would be in any family.  Parents teach the older children, the older children teach the younger children.  You know, you do that, mama is going to get you, boy.  And that was the way we did the rules.

Q.     And was that similar, I guess, also to the preaching and penitent kind of relationship?

A.     Yes, sir, certainly so.

Q.     Now, when did you first become involved in the ministry of Mountain Park?

A.     In the spring of 1993.

Q.     Can you tell the jury a little bit about what you did when you first got there?

A.     Yes, sir, when I first came in there my primary responsibility was the academic portion of the school itself. Moved into the learning center, began to act as the principal

1    of the school, and just make sure the school was running

2    smoothly and effectively.

3    Q.    And at some point did you progress to additional

4    positions?

5    A.    Yes, sir, as the school progressed and began to do

6    well, we earned a lot of school status with the ACE

7    curriculum we were using, which made us one of the excellent

8    schools in the ACE curriculum program.  And as we excelled

9    and did well with the school program, then my opportunities

10   for ministry continued on to a point I became associate

11   pastor, assistant pastor, and then eventually the pastor.

12   Q.    Now, you just described the ACE program.  Could you

13   describe for The Court and jury what you're talking about.

14   A.    Yes, sir.  The Accelerated Christian Education program

15   is a Christian school curriculum.  It comes out of

16   Lewisville, Texas.  They may have changed headquarters in

17   recent years.  They are more than 3,000 Christians schools in

18   the United States, more than 7,000 worldwide that use the

19   curriculum.  And it's an individually diagnosed self PACE

20   Christian school curriculum that presents an excellent

21   academic education from a Christ centered bible based point

22   of view.

23   Q.    Now, is this the program that uses PACES that we've

24   heard about?

25   A.    Yes, sir, it's the PACES, that acronym is a packet of

1    ACE curriculum.

2    Q.    Can you describe what a PACE is?

3    A.    PACE -- a PACE is a bite size unit of curriculum.  For

4    a student to complete one full year's worth of work, they had

5    to do 12 PACES and complete those making at least an

6    80 percent on each PACE.  In other words, they had to have

7    mastery of the material before they could move on that

8    assured that they were getting a solid education.  So an

9    individual PACE then would be one 12th of an academic years

10   worth of work.

11   Q.    And when students were first enrolled at Mountain Park,

12   did they have to take a test in relation to this ACE program?

13   A.    Yes, sir, that's correct.  The ACE provided us with a

14   diagnostic test for math and science, also for -- or excuse

15   me, for math and for English, two separate tests, and then a

16   combined diagnostic test for social studies and science.

17   Q.    Now, earlier in the trial we heard Jamie Woods

18   complaining that she had to do some first or second grade

19   math, some adding or subtracting when she started out.  What

20   do you have to say with respect to that.  Can you explain how

21   that relates to the program?

22   A.    Yes, sir, certainly so.  I can't speak that she was on

23   a first or second grade level, that would be unusual,

24   especially considering that she earned a college prep diploma

25   by the time she graduated, but the diagnostic test would have

1    revealed that there was some remedial math work that needed

2    to be done.  That could have been at the basic skills level.

3    That was very common for them to have some gaps in their

4    basic skills.  So before we would try to put them in algebra

5    or geometry, the advanced math, we would make sure they had

6    the basic skills down first, and then move them to the

7    advanced curriculum as quickly as they demonstrated the

8    aptitude and the attitude to do so.

9    Q.    So with respect to that, they may start out at a

10   remedial PACE, some more basic math; is that right?

11   A.    Yes, sir, that is correct.

12   Q.    And once they finish that PACE then, would they jump

13   back up more to the more advanced math?

14   A.    Yes, sir.  Our goal was to get them work in the most

15   difficult level of curriculum that they could be successful

16   in as soon as possible.  It was in our best interest as a

17   school to have them working as high a level of curriculum as

18   they could be successful in.

19   Q.    Now, Brother Gerhardt in relation to that, can you

20   describe what the ministry is at Mountain Park?

21   A.    Oh, yes, sir, the ministry is to reach the heart of

22   each individual student with the gospel of Jesus Christ.  We

23   believe that the root of the problem that they were having in

24   their life was a spiritual problem, and that the solution to

25   that was a personal relationship with Jesus.  That was the

1    root to the core.  And everything else that we did was to the

2    ultimate end to seek to bring them to a saving knowledge of

3    Christ, and then the desire to live a life directed by the

4    principles applied from the Word of God.

5    Q.    And in that pursuit, I guess did you have things like

6    structure and work on their self image?

7    A.    Oh, yes, sir.  We certainly did.  We wanted to provide

8    a structured lifestyle.  Again, without the structure, how do

9    you build anything?  It's like building a house, you got to

10   have a structure to build a house.  The sense of self worth,

11   that God so loved the world, that God so loved each

12   individual student who came to us, that God so loved each of

13   us that he sent his son Jesus Christ to die on Calgary's

14   cross for us that we might be born from above and have a

15   relationship with him.  Our self worth and their self worth

16   was the price paid to redeem their soul.

17   Q.    Very well.  Now, when you started out at Mountain

18   Park -- well, strike that.  Were students enrolled in

19   Mountain Park by their parents?

20   A.    Yes, sir, always.

21   Q.    And when students were enrolled at Mountain Park, was

22   there an interview held with the parents of that student just

23   prior to the time of enrollment?

24   A.    Yes, sir.  Initially when I first came, Brother Wills

25   was doing that.

1    Q.    So you weren't doing that when you first started out?

2    A.    No, sir, I was not.

3    Q.    And that typically happened on the same day as

4    enrollment?

5    A.    Yes, sir, it did typically.

6    Q.    So that was the general practice?

7    A.    Yes, sir, it was.

8    Q.    And then did you ultimately take over that position of

9    doing those interviews?

10   A.    Yes, sir, that's correct.

11   Q.    During those interviews did you discuss the policies

12   and practices of Mountain Park generally?

13   A.    Yes, sir, I did.

14   Q.    Among them did you discuss the discipline policy with

15   the parents?

16   A.    Of course, very important part of it.

17   Q.    And did you also discuss with the parents that students

18   could possibly be paddled under that policy?

19   A.    Yes, sir, we did.

20   Q.    And would you enroll a student whose parents didn't

21   want their student to be subject to the discipline policy?

22   A.    No, sir.  We would not.  We required that both parents

23   be in full agreement.

24   Q.    Now, Brother Gerhardt, were you involved in the

25   day-to-day supervision of the girls?

1    A.    In the day-to-day supervision of the girls, I was not.

2    Q.    However, if there was a serious health complaint raised

3    with respect to any of the girls, would that be brought to

4    your attention?

5    A.    Yes, sir, I would be aware.

6    Q.    For example, if a student had to go to the hospital for

7    some reason, you would know about that?

8    A.    Yes, sir, I would.

9    Q.    Or you would be told about that?

10   A.    Yes, sir, I would be informed.

11   Q.    Are you familiar with the plaintiffs in this case?

12   A.    Yes, sir, I am.

13   Q.    And do you recognize them from when they were students

14   at Mountain Park?

15   A.    Yes, sir, I do.

16   Q.    Did any of them ever complain to you about missing

17   their period?

18   A.    No, sir, never to me.

19   Q.    Did any of the plaintiffs ever complain to you about

20   being constipated?

21   A.    No, sir, never.

22   Q.    Did any of the plaintiffs ever complain to you about

23   being groggy or lethargic?

24   A.    No, sir, they never did.

25   Q.    Did any of the plaintiffs ever complain to you about

1    having a toothache or tooth pain?

2    A.    No, sir, they never did.

3    Q.    And if a student had a health complaint, could they

4    talk to you about it?

5    A.    Certainly, they had access to me whenever they needed

6    to.

7    Q.    You were available to the students?

8    A.    Yes, sir, I was.

9    Q.    Just like Mrs. Wills said this morning, this was more

10   than just a nine to five kind of job?

11   A.    Oh, yes, sir, it was our life.  It was who we were and

12   what we did.

13   Q.    Now, I think we've heard a comment during one of the

14   plaintiff's testimonies yesterday that one of the girls said

15   at one point that you had called the girls used tires.  Did

16   you ever call the girls that?

17   A.    No, sir, I never called the girls used tires.

18   Q.    Indeed, based upon what you testified about, would that

19   even jive with what you've talked about as far as the mission

20   of Mountain Park?

21   A.    No, sir, it would not.  I used analogies when trying to

22   help the girls and preach to the girls and encourage them to

23   be the very best and most that they could be, but used tires

24   was never one of those analogies.

25   Q.    Now, we've heard that the girls were not allowed to

1    keep journals while they were at Mountain Park?

2    A.    Yes, sir, that is correct.

3    Q.    So that was a practice at Mountain Park?

4    A.    Yes, sir.

5    Q.    Why did you keep -- excuse me, why didn't you permit

6    the students to keep journals?

7    A.    Again, in an effort to try to bring the girls out of

8    the old life and into a new life, oftentimes journals or

9    diaries were places where they would go back and talk about

10   old boys and relationships that they had or drugs or other

11   things that they had been involved in and how they couldn't

12   wait to get back to those kind of things and so on.  And so

13   our desire was to remove them from that and put their focus

14   on the opportunities of the future, not the failures that

15   produced the difficulties of the past.

16   Q.    Pardon me.  Now, some of the students also claimed that

17   their mail was read.  Was that a practice or policy at

18   Mountain Park?

19   A.    Yes, sir.  Again, we informed the parents when they

20   enrolled that all mail would come in and out through the

21   staff.

22   Q.    And why did you read mail coming in and going out?

23   A.    Well, first of all, you want to check the mail for

24   contraband.  You want to make sure, again, back to that

25   safety and security issue of the student, that the things

1    that were coming in, nothing would come in harmful or

2    detrimental to the students.  You had to check those packages

3    and check that mail for those kind of things.  Otherwise it

4    was to -- part of our role and responsibility was to assist

5    and help the parent as well.  So if the parent wrote

6    something that may not be helpful to their student as they

7    asked us to help, then we would be able to use that mail with

8    the parent, with the family member, and give them some

9    guidance and suggestion as to how to help them to do the job

10   that they asked us to do.

11   Q.    And in reading the mail, this was never done to prevent

12   communication between the parents and students?

13   A.    Oh, no, sir.  The parents were encouraged to -- I would

14   often make the statement to buy a postcard, "Welcome to

15   Missouri" before you ever left the state and return back home

16   and get it back in the mail to them right away.

17   Q.    Now, did students ever have to rewrite their letters?

18   A.    The only time that we would ever require a student to

19   rewrite a letter, in other words, the outgoing mail.

20   Incoming mail I might send back with a note of instruction to

21   a parent or family member.  But the outgoing mail, the

22   students' outgoing mail, it was always mailed out regardless.

23   If a student was writing a letter and it was full of foul

24   language and vulgarity and that kind of thing, I didn't want

25   to read it, I didn't want the staff to read it.  I didn't

1    want the parent to have to read that.  So I would tell the

2    student, you have to -- or designate a staff member to

3    instruct the student, you need to write another letter, tell

4    your parent what you want to, but leave the vulgarity and the

5    foul language out.  I would still mail both to parents.  That

6    was an instructive purpose for the student.  But I would

7    still mail out both letters.

8    Q.    Now, we've also heard that students had limited phone

9    calls, especially the plaintiffs.  Can you describe what the

10   practice was with respect to phones?

11   A.    Yes, sir.  Once the student was enrolled, they waited,

12   the parents waited at least three weeks before they called

13   the first time.  And then they would call once every two

14   weeks after that.  That gave them an opportunity to talk to

15   their student, to keep in touch with their student besides

16   just the mail.  But it also helped us to manage the time.  We

17   had a number of students.

18         Even when my children went to college, I noticed in

19   their dorm room, please limit all calls to no more than ten

20   minutes.  So it was just kind of a logistic thing to help us.

21   We only had so many lines.  And there was a certain window

22   during the day so it wouldn't interrupt with school and other

23   activities.  So there was a window of time during the day

24   that parents would call.  And we asked them to call during

25   that time and to limit their calls to not more than ten

1    minutes.

2             MR. BRIGGS:  That's all I have, Your Honor.

3                      CROSS-EXAMINATION

4    BY MR. STILLEY:

5    Q.    At this time you reside in Tennessee; is that correct?

6    A.    Yes, sir, that's correct.

7    Q.    And what is your current employment?

8    A.    I work for a vacation cottage rental.

9    Q.    And what's -- and your wife works there too, correct?

10   A.    Yes, sir, that's correct.

11   Q.    And that cottage was purchased with money earned by the

12   operations --

13             MR. BRIGGS:  Your Honor, I'm going to object at this

14   point.  What's the relevance?

15             THE COURT:  Sustained.

16             MR. STILLEY:  Judge, bias.

17             THE COURT:  No.

18             MR. STILLEY:  Interest.

19             THE COURT:  No.  No.

20             MR. STILLEY:  Your Honor, may I approach?

21             THE COURT:  No.

22             MR. STILLEY:  I need to make a record on this.

23             THE COURT:  No.  I got so many records up here of

24   yours, don't have any room for any more records.

25   BY MR. STILLEY:

1    Q.    You told us that you were really acting against your

2    financial interest in putting the kids in low grades; is that

3    correct?

4           MR. BRIGGS:  Your Honor, I'm going to object at this

5    point.

6           THE COURT:  I did not hear anything about financial

7    interest.  Sustained.

8    Q.    Against your interest, change that to just interest.

9    Is that correct?

10   A.    I said it was against the best interest of the school

11   to have a student working in -- it was in the best interest

12   of the school to have the young people working in the most

13   difficult level of material that they were capable of being

14   successful in.

15   Q.    And when you said "best interest of the school," what

16   did you mean by that?

17   A.    I certainly meant that for what we're producing, how

18   we're reaching the children, the best interest of that child.

19   If we're meeting the needs of the children by giving them the

20   best education that we can possibly give them, then that

21   helps everybody.  That helps the student, that helps the

22   school.  It advances the student's sense of self worth.  It

23   puts them in a higher level of curriculum to prepare them for

24   future opportunity.  It just didn't make any sense to keep a

25   student working remedial work if they were capable of working

 1    more work, especially considering our goal of giving them

 2    real value and purpose and a hope and a vision for the

 3    future.

 4    Q.    Tracey Ozuna came to Mountain Park twice, correct?

 5    A.    Yes.

 6    Q.    The first time she completed the seventh grade PACES,

 7    correct?

 8    A.    I'm not looking at the record.  I cannot say what's

 9    correct and what's not.

10    Q.    You cannot dispute that she completed the seventh and

11    entire eighth grade of PACES and started high school,

12    correct?

13    A.    I won't confirm or dispute.  I'm not looking at the

14    record.  I don't know what the records are.

15    Q.    Do you have any explanation of how that that could be

16    and then she could be started back at sixth grade PACES when

17    she returned?

18    A.    If a student was given a diagnostic test on the return

19    and she demonstrated that she had gaps in her learning even

20    from the previous material that she had covered, we'd want to

21    go back and review that material before we continued on, yes,

22    sir.

23    Q.    So you didn't even recognize your own achievement, the

24    achievement that --

25          MR. BRIGGS:  Your Honor, I'm going to object at this

1    point.  I don't believe that Tracey Ozuna's actual studies

2    came in in the case.  I'm not really sure what this is

3    relevant to.

4            MR. STILLEY:  He testified about this on direct.

5            THE COURT:  Well, you have a right to explore it to

6    a limited degree.  But you know what they say, you just can't

7    beat a horse to death, you know.  And we're still trying to

8    finish this within our lifetimes.  You know, you just jump

9    ship on it.  You're just gone.  As they say, hit it and quit

10   it.

11   BY MR. STILLEY:

12   Q.   Isn't it true that on past occasion you took a young

13   man who already had a high school diploma and put him in the

14   fifth grade?

15   A.   State that question again.  I'm not sure I'm

16   understanding what you're asking me.

17   Q.   Isn't it true that in the past, just a few years ago,

18   Mountain Park took a young man who was in the fifth grade --

19           MR. BRIGGS:  Your Honor, objection.  May we

20   approach?

21   Q.   -- who had a high school diploma and put him in the

22   fifth grade?

23           MR. STILLEY:  I need to complete my question.

24           THE COURT:  Well, you completed it.  Don't tackle

25   him.

1          MR. STILLEY:  Thank you, Judge.  I needed that.

2          THE COURT:  It looks like he was about to tackle you

3    there.  I got to watch him and keep an eye on him now.

4          MR. BRIGGS:  Your Honor, we've been through this.

5          THE COURT:  I don't think that there were many

6    specific instances that were in direct examination.  I'll

7    give you some leeway.  No, I'm going to sustain the objection

8    as to this situation.  If you want to deal with more of the

9    situations relative to your plaintiffs here, okay.

10         MR. STILLEY:  So I can't ask about other specific

11   instances with respect to putting kids far below their level?

12         THE COURT:  No, we aren't going to dwell on this.

13   You asked him general questions about this, and I think you

14   need to move on to your clients and relative to their

15   situation if you have something there.

16   BY MR. STILLEY:

17   Q.   In the declarations you made in this case, isn't it

18   true that you said the monthly cost for a student was $500?

19         MR. BRIGGS:  I'll object, Your Honor, what's this

20   relevant to?

21         THE COURT:  He can answer.

22   A.   I don't know that I've ever said the monthly cost was

23   $500.

24   Q.   Would it refresh your recollection if you were able to

25   take a look at the statement?

1          THE COURT:  Listen, you're looking so long, I'm
2     going to have to change my mind on my ruling.
3          MR. STILLEY:  Judge, let me -- I understand.  I'm
4     not the only person that's done that in the past.  Judge, let
5     me do this.  I'll come back to it.  Wait a minute.  I found
6     it.  I just found it.
7          MR. BRIGGS:  Mr. Stilley, what exhibit are you
8     referring to?
9          MR. STILLEY:  It is docket entry 60.  It is the
10    declaration of Sam Gerhardt, and it is paragraph 21.
11         MR. BRIGGS:  Your Honor, this is related to an issue
12    that's already been dismissed from the lawsuit.
13         MR. STILLEY:  It has nothing to do with that issue,
14    it has something to do with another issue.
15         THE COURT:  Right.  Well, hurry up and go through
16    this before I change my mind for real, okay.  Hurry up.
17         MR. STILLEY:  May I approach?
18         THE COURT:  Go ahead.
19    BY MR. STILLEY:
20    A.    Okay.  I recall what that's discussing.
21    Q.    And having reviewed your declaration, isn't it true
22    that the cost of room and board at Mountain Park was $500 per
23    month?
24    A.    As it relates to the enrollment of Erika Teasley, we
25    did accept $500 a month tuition for her.  But that was well

1    less than half.  We did that because we already -- we had a

2    familiarity with the family, and therefore we were doing that

3    as a favor to reach out and care for that girl because that

4    family did not have the resources, or they demonstrated to us

5    they did not have the resources to pay the full tuition.  So

6    that was all we charged them.  I cannot say that that was all

7    of our costs.  That's all it cost them.

8    Q.    But what you said was, isn't it true that what you said

9    was, they paid 500 per month for Ms. Teasley's tuition, which

10   was our cost for room and board.

11   A.    If that's what is written down there.  But, again, the

12   reality, that was their cost.  That was what I charged them.

13   Q.    Well, you stated this under oath, correct?

14   A.    Yes, I did.

15   Q.    Was it true when you made it?

16   A.    Our cost, their cost, the bottom line is that it was

17   not our cost.  Our cost was much greater than that.  That was

18   all it cost them.

19         MR. STILLEY:  Your Honor, may I place this document

20   on the ELMO?  What I want to do is show the actual statement

21   said "which was our cost".

22         THE COURT:  You already said that.  He didn't

23   disagree with it.  He explained it.

24         MR. STILLEY:  Can I lay it on the ELMO?

25         THE COURT:  There it is.  We're not going to argue

1    about this.  You go too far with these little things.

2    Sustained.  You don't need -- you may sit down over there,

3    Mr. Briggs.

4           MR. BRIGGS:  I promise I won't tackle anybody.

5           THE COURT:  We're not going to go off on this

6    tangent.

7    BY MR. STILLEY:

8    Q.    At what point in time did you cease your employment at

9    Mountain Park Boarding Academy?

10   A.    Mountain Park no longer had students as of May of 2004.

11   In the process of closing things down and wrapping things up,

12   it's all kind of brackish water.  I couldn't really tell you

13   when I ceased to be an employee of Mountain Park.  Sometime

14   after we closed the school in May 2004.

15   Q.    And how many students did you have to send either back

16   to their parents or to another school?

17          MR. BRIGGS:  Your Honor, object to relevance.

18          THE COURT:  Sustained.

19          MR. STILLEY:  Your Honor, can I explain?

20          THE COURT:  No.

21   BY MR. STILLEY:

22   Q.    Now, you told us about the oral tradition at Mountain

23   Park; is that correct?

24   A.    Yes, sir.

25   Q.    And I believe you also told us that your master's

1    thesis involved drafting this document, correct?

2    A.     That's correct.

3    Q.     Isn't it true that you had a document that was just

4    about the same as this document before the current version?

5    A.     The document was being worked on and produced during my

6    time as working on my master's.  I don't recall if anything

7    was published and distributed prior to that.  If so, it would

8    have been, again, the '97, '98 time period.

9    Q.     Now, you arrived at Mountain Park in '93, correct?

10   A.     Yes, sir, that's correct.

11   Q.     Isn't it true there was a Parent/Student Handbook that

12   was given to the parents at that point in time?

13   A.     No, sir, that is not correct.

14   Q.     Can you tell us then when the Parent/Student Handbook

15   first started to be sent out to parents?

16   A.     I thought I just answered that, '97, '98.

17   Q.     Were -- before that time were the rules written down

18   anywhere?

19   A.     No, sir, not that I'm aware of.

20   Q.     Since it was oral, what did you have to prevent the

21   rules from changing from time to time?

22   A.     To prevent the rules from changing from time to time?

23   Q.     Right.

24   A.     I don't know that the rules were prevented from

25   changing from time to time.

1    Q.    Was it possible then that you might have from time to

2    time made up a rule as you went along?

3    A.    Well, I'm not sure what you mean, made it up as we went

4    along.  Just like with any family or any Christian school at

5    any place, the longer you go down the trail, circumstances,

6    events, things take place that cause you to say, we need to

7    adjust this rule or we need to make a new rule.

8    Q.    Isn't it fair to say there are no written rules and

9    none of the students could tell you that you had acted

10   outside the bounds of the rules?

11   A.    I guess I don't understand your question.

12   Q.    Without written rules, how is a student going to hold

13   you to following your own rules?

14   A.    That wasn't the student's responsibility, that would

15   have been the parents' responsibility.

16   Q.    Well, wasn't it their responsibility, did they have any

17   opportunity or right to have a consistent set of rules

18   applied to them?

19   A.    I believe they did have a consistent set of rules

20   applied to them.

21   Q.    How did they make sure it was a consistent and accurate

22   set of rules that was applied to them?

23   A.    Again, you know, I'm going back to who and what we

24   were.  We operated like a gigantic family.  We -- how does my

25   son or daughter know that the rules are going to apply to

```
 1    them?  In my family, I never had a written set of rules.  For
 2    them to say, dad, you're doing something against your own
 3    rules.  We operated as a big family.  It would have been
 4    difficult.  I don't understand what you're looking for or how
 5    we could have done what you're asking.
 6    Q.    You said serious health complaints were brought to your
 7    attention, correct?
 8    A.    I said -- say that again.
 9    Q.    You said on direct that serious health complaints were
10    brought to your attention; is that correct?
11    A.    If the staff had been given serious health complaints
12    then, yes, sir, I believe they would have been brought to my
13    attention.
14    Q.    Do you agree that cessation of menses for at least
15    three months constitutes a serious health complaint?
16    A.    No, sir, I do not.
17    Q.    How long does the cessation of menses have to go on
18    before you think it's a serious health complaint?
19    A.    All I can answer to that is, you know, as a man, girls'
20    periods are just not something I want to know a whole lot
21    about.  I didn't want to know about my wife.  I didn't want
22    to know about my daughter.  They are just certain things I
23    didn't want to know about.  I have to tell you that in my
24    position as administrator of the school and pastor of the
25    church, I had heard from my mother-in-law the things that the
```

1   doctor had told us through the years.  I had heard from my

2   wife the things that the doctor had told us through the

3   years.  But there were a couple occasions that I talked to

4   Dr. Richard Gayle specifically myself and I asked him, same

5   thing I'm saying now, Dr. Richard, I know what mom says, and

6   I know what Deb says, but in my position I want to hear it

7   directly from you.  If a girl is missing her period, is there

8   any reason that I should be alarmed or I should be concerned

9   about that?  And he assured me that there was not.

10  Q.    Who assured you that there was not?

11  A.    Dr. Richard Gayle.

12  Q.    And did he say how long that the cessation of menses

13  could go on without it being a problem?

14  A.    No, sir, he did not.

15  Q.    So I take it that you weren't aware that osteoporosis

16  could result from cessation of menses?

17  A.    I'm not aware of it now.  I don't know anything about

18  it.  I'm a preacher.  I don't know.

19  Q.    You're not taking it upon yourself to find out about

20  what you knew to be a serious problem at the institution,

21  correct?

22       MR. BRIGGS:  Your Honor, at this point I'm going to

23  object.

24       THE COURT:  Sustained.  You're arguing with the

25  witness.

1          MR. STILLEY:  I'm asking questions.

2          THE COURT:  No, you're arguing.  Come up.

3          MR. STILLEY:  Sure.

4          (The following proceedings were held at the bench

5    and outside the hearing of the jury:)

6          THE COURT:  You're like a rudderless ship.  You've

7    gone over this with Dr. Gayle.  You keep going over this.

8    Don't you understand that it's like crying wolf.  Nobody is

9    going to believe you, they are going to miss what the real

10   points are.  I know you are fervent about what you're trying

11   to do, but, hey, you've hit this hard enough.  You need to

12   quit it.

13         MR. STILLEY:  I'll move on.

14         THE COURT:  Yeah, you don't understand.  You're

15   going to end up -- this jury is going to hate you so bad

16   because you keep messing with these witnesses.  This man who

17   obviously would not be the person to get into this subject

18   matter about.  You did this with Dr. Gayle.  You've done this

19   with the other female witnesses.  You need to let it go.

20         MR. STILLEY:  I have to just ask him a last question

21   on that subject.

22         THE COURT:  You need to figure this out for the

23   total picture.  You know what I mean?  You haven't figured

24   this out.  I don't know -- you know, you need the wakeup

25   call.  You know what I mean?  You know, a paddle, swat, none

1    of that stuff would do you no good.  We need to send you to

2    them.

3            (The following proceedings continued within the

4    hearing of the jury:)

5    BY MR. STILLEY:

6    Q.    You testified on direct about the students having

7    access to you to make complaints, correct?

8    A.    Yes, sir.

9    Q.    Isn't it true that you on occasions physically struck

10   students who came to you with complaints?

11           MR. BRIGGS:  Your Honor, I'm going to object.

12           MR. STILLEY:  I'm asking the question.

13           MR. BRIGGS:  He's talking about acts with other

14   students.  That's been excluded from the case.

15           MR. STILLEY:  Your Honor, what he said, anybody

16   could come up and make a complaint to him.

17           THE COURT:  Very well.  Go ahead.

18   A.    Say that one more time.

19   Q.    Isn't it true that on occasion, on more than one

20   occasion students who came to you and made complaints were

21   physically struck by you?

22   A.    No, sir.

23   Q.    That never happened?

24   A.    That never happened.

25   Q.    Now, you explained on direct why the journals and

1  diaries were not allowed, correct?

2  A.    Yes, sir.

3  Q.    Wouldn't it have been possible to satisfy the

4  difficulties that you had with that by simply inspecting the

5  journals and inspecting the diaries?

6  A.    Mr. Stilley, we had a great deal to do.  And to inspect

7  diaries and inspect journals, I would expect that if we were

8  searching through their diaries and journals, we'd probably

9  be facing something with you somewhere else at some other

10  time for messing with that.  I don't know how to answer that.

11  We had a great deal to do.  And to go through journals and

12  diaries just did not need to be added if we were going to do

13  the job that we were asked to do.

14  Q.    Isn't it also true that the students were prohibited

15  from exchanging their contact information such as address and

16  phone number?

17  A.    Yes, sir, that was a typical practice.

18  Q.    What was the reason for that?

19  A.    We wanted the students to move on from their life at

20  Mountain Park and make new friends and make new connections

21  in their own local family, in their own local churches, and

22  to continue on.  We did not want the students to take the

23  possibility of making negative contacts.

24  Q.    Isn't it true also that cameras and other recording

25  devices were prohibited?

```
 1    A.    No, sir, that's not true.

 2    Q.    That's not true?

 3    A.    No, sir.

 4    Q.    Were they allowed to have cameras?

 5    A.    Yes, sir.

 6    Q.    Were they allowed to -- cameras of any kind?

 7    A.    He did not allow Polaroid cameras.

 8    Q.    You allowed film cameras?

 9    A.    Yes, sir.

10    Q.    And what about recording devices?

11    A.    Yes, sir.  Tape recorders, yes, sir.

12    Q.    Those were allowed?

13    A.    Yes, sir.

14    Q.    If the recording devices were allowed, how would you

15    prevent the student from making a diary on the recording

16    device?

17          MR. BRIGGS:  I'll object, Your Honor.  I don't know

18    what the relevance is, and that would call for speculation.

19          THE COURT:  Sustained.

20    BY MR. STILLEY:

21    Q.    Did you ever tell any students to rewrite their letters

22    for any reason other than vulgarity?

23    A.    No, sir.

24    Q.    You sure about that?

25    A.    Yes, sir.
```

1              MR. STILLEY:  Pass the witness.

2              THE COURT:  Anything else?

3              MR. BRIGGS:  No, Your Honor.

4              THE COURT:  Thank you.  Mr. Gerhardt, thank you.

5    You may step down.  Where are we?

6              MR. SCHWARTZ:  May we approach, Your Honor?

7              THE COURT:  Why don't you just tell me.  Where are

8    we with witnesses?  We want to know.  We might have to take a

9    break here.  You all are reminding me of some of these folks

10   I play golf with.  It takes so long to swing, I need to shave

11   it took so long to swing.  You know what I mean?  Clothes

12   went out of style, you took so long to swing.  Go ahead.

13             MR. BRIGGS:  Judge, we have three witnesses left.

14   Our next one I think would be fairly brief.  And the other

15   two I don't think should take very long either.  I can't --

16   based on how cross has been going, I can't guarantee that

17   we'll be done today though.

18             THE COURT:  Why don't we take our break now and

19   we'll see how far we can go.  Why don't we return at five

20   minutes after four.  Recall the admonition.

21             (Court in recess from 3:47 p.m. until 4:07 p.m.)

22             THE COURT:  Call your next witness.

23             MR. BRIGGS:  Thank you, Your Honor.  Defendants call

24   Bob Wills to the stand.

25                          BOB WILLS,

1   Having been first duly sworn, was examined and testified as

2   follows:

3                          DIRECT EXAMINATION

4   BY MR. BRIGGS:

5   Q.    Please state your name.

6   A.    Bob Wills.

7   Q.    And, sir, are you an ordained minister?

8   A.    I am.

9   Q.    Did you frequently go by Brother Wills?

10  A.    Yes, sir.

11  Q.    Brother Wills, were you the founder of Mountain Park?

12  A.    Yes, sir.

13  Q.    And at some point in time did your son-in-law join the

14  ministry?

15  A.    He did.

16  Q.    Okay.  And I'm referring to Brother Gerhardt.  Is that

17  your understanding?

18  A.    Yes.

19  Q.    And at some point did you turn over the day-to-day

20  operation of the school to Brother Gerhardt and his wife,

21  your daughter Debbie?

22  A.    I did.

23  Q.    Now, we've already heard from Brother Gerhardt about

24  the fact that he had enrollment interviews with the parents,

25  in other words, when the parents enrolled their students he

1    met with them and they interviewed him.  Have you heard about

2    that?

3    A.    I heard that, yes, sir.

4    Q.    Now, did he adopt that practice from you?

5    A.    Yes, sir.

6    Q.    So when you founded Mountain Park and up until the time

7    you turned over the day-to-day operation to him, did you meet

8    with the parents when they enrolled students?

9    A.    Yes, sir, I did.

10   Q.    And was it your practice to do that around the time of

11   their enrollment?

12   A.    It was, yes, sir.

13   Q.    Back in 1995 were you the one who would have done those

14   interviews?

15   A.    Yes, sir.

16   Q.    And we heard Brother Gerhardt talk about how he

17   explained the discipline policy and practices to the parents

18   including the paddling.  Did you hear that?

19   A.    I did.

20   Q.    Now, with respect to that, did you follow that same

21   practice back in 1995?

22   A.    Yes, sir.

23   Q.    So when you met with the parents, you told the parents

24   about the discipline practices and possible corrections

25   including paddling, didn't you?

1    A.    Yes, sir, I did.

2    Q.    Now, we heard that Tracey Brazil, one of the plaintiffs

3    in this case, now her name is Tracey Ozuna, that she was

4    paddled or she said she was paddled in January 1996 after she

5    was enrolled in 1995.  Did you hear that testimony?

6    A.    Yes, sir.

7    Q.    Now, prior to Ms. Ozuna's enrollment, you would have

8    discussed the discipline policy and the paddling with her

9    parents?

10   A.    Yes.

11         MR. BRIGGS:  That's all I have, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. STILLEY:

14   Q.    You realize an oral understanding is not enough to

15   confer a legal right to discipline?

16         MR. BRIGGS:  Your Honor --

17         THE COURT:  Sustained.  No legal questions.  No

18   legal questions.

19   Q.    You told us about your name and also that you went by

20   another name.  Are there some other names that you go by as

21   well?

22   A.    Honey, Dr. Wills, Bobby.

23   Q.    Do you sometimes your use your initials?

24   A.    B.R., B.R. Wills.

25         MR. STILLEY:  Pass the witness.

```
 1              THE COURT:  Anything else?
 2              MR. BRIGGS:  That's all I have, Your Honor.
 3              THE COURT:  Thank you, Mr. Wills.  You may step
 4    down.  Call your next witness.
 5              MR. BRIGGS:  Your Honor, we call Julie Gerhardt to
 6    the stand.
 7              THE COURT:  Very well.
 8                          JULIE GERHARDT,
 9    Having been first duly sworn, was examined and testified as
10    follows:
11                        DIRECT EXAMINATION
12    BY MR. BRIGGS:
13    Q.    Would you please state your name.
14    A.    Julie Gerhardt.
15    Q.    Ms. Gerhardt, what do you do for a living?
16    A.    I stay at home with my kids, take care of my kids.
17    Q.    And as we heard earlier, you have two children?
18    A.    Yes.
19    Q.    How old are they?
20    A.    One and three.
21    Q.    Ma'am, did you graduate from high school?
22    A.    Yes.
23    Q.    Where did you graduate from high school?
24    A.    Mountain Park.
25    Q.    So when did you attend Mountain Park as a student?
```

```
 1    A.    I attended '94 to '97.

 2    Q.    Okay.  When did you graduate?

 3    A.    '97.

 4    Q.    And I guess I just assumed you did graduate from

 5    Mountain Park.  Well, we already said that, didn't we?

 6    A.    Yes, sir.

 7    Q.    With respect to that, were you a student at Mountain

 8    Park around the same times or did your time overlap with

 9    Jessica Deboi and Tracey Ozuna?

10    A.    Yes, sir, I believe they did.

11    Q.    Now, since you went to Mountain Park, can you briefly

12    describe what it was like for you as a new student when you

13    enrolled?

14    A.    Well, at first I didn't like it.  I did not know that I

15    was going to be going there, that my parents were going to

16    send me there.  So of course I didn't want to be there. I was

17    shocked or -- or shocked that I was there.  And so I didn't

18    want to be there.  I wanted to go home.  And I felt that way

19    for a little bit of time.  But during that time that I felt

20    that way, I was never mistreated.  I got a good education.  I

21    ate very well.  And any medical needs that I told a staff

22    member about were taken care of.

23    Q.    When you were a student, were you allowed to use the

24    bathroom when you had to?

25    A.    Yes, sir.
```

1    Q.    When you were a student was there privacy in the

2    bathrooms?

3    A.    Yes, sir.

4    Q.    And maybe could you describe the bathroom arrangement

5    in the dormitory when you were a student?

6    A.    We had stall doors or we had stalls in between the

7    toilets at that time.

8    Q.    Okay.  Does that mean that they were divided by walls?

9    A.    Yes, they were divided.

10   Q.    And was there a time when doors were put on them?

11   A.    Yes, it was not long after I had arrived there that the

12   doors were put on.

13   Q.    Okay.  And when did you arrive there?

14   A.    '94.

15   Q.    1994?

16   A.    Yes.

17   Q.    When you were first enrolled did you miss your period

18   for a time?

19   A.    Yes, I did.

20   Q.    Did it ultimately come back?

21   A.    Yes, it did.  Actually I never even -- I didn't have it

22   for quite awhile.  I never even really thought about it.  I

23   mean, it was just -- you know, girls would talk about it and

24   they'd say that, you know, they never had -- they didn't have

25   it for a little bit of time and it came back.  So, I mean, I

1   can remember being in the dorm and we'd be talking about not

2   being on our period or not -- or having a period and

3   complaining that, you know, I'm on my period, you know, and

4   we would complain that we were on our period.  We were

5   teenagers; we did not want a period.

6   Q.    Would it be fair to say you were kind of happy for a

7   spell that you weren't having one?

8   A.    Yes.

9   Q.    Now, could you briefly describe a typical day at

10  Mountain Park?  When you were a student what time did you get

11  up?

12  A.    I believe it was six o'clock.  I know that we were not

13  up any earlier that 5:15, so maybe between 5:15, six o'clock,

14  it may have depended.

15  Q.    And did that change from time to time?

16  A.    Yes.

17  Q.    And what time did you go to bed at night?

18  A.    Nine o'clock.  Unless it was maybe a special occasion,

19  like we would maybe New Year's Eve stay up until midnight

20  because it was New Year's Day, something like that.  But it

21  was very rare.

22  Q.    And if you could, what else did you do in the course of

23  an ordinary day as a student?

24  A.    The whole schedule of what we did from the time when I

25  woke up until the time I went to bed or --

1   Q.    Generally what were the major activities that you did

2   during the day?  You spent some time in school?

3   A.    Yes.

4   Q.    You also -- did you get three square meals a day?

5   A.    Yes, I did.

6   Q.    Did they give you enough to eat?

7   A.    Plenty.

8   Q.    When you first arrived at Mountain Park did you gain

9   some weight?

10  A.    Yes, I did.

11  Q.    Okay.  But over time did that kind of level off?

12  A.    Yes, it did.

13  Q.    Were you able to get seconds when you wanted to?

14  A.    Yes.

15  Q.    Can you briefly describe for the judge and the jury

16  what, if anything, Mountain Park as a student, what that did

17  in your life and for your life?

18  A.    Well, for me it was a life changing experience,

19  considering the background that I had come from before I

20  attended Mountain Park.  It was there that I had learned

21  about Jesus and that he died on the cross to save me from my

22  sins, and that he could take the way that I had been before

23  and completely change my life.  It's there I had gotten

24  saved.  In my heart I knew that there was a heaven or a hell,

25  and I knew that some day I would die and go to one of those

1    places, and I wanted to go to heaven and be with Jesus.   And

2    so that was a life changing experience.   It was there at

3    Mountain Park through the teaching and preachings there that

4    I had -- that I had -- that God had changed my direction of

5    how I used to be.

6    Q.    So Mountain Park helped change the direction in your

7    life?

8    A.    Yes.

9    Q.    While you were a student at Mountain Park were you

10   belittled or demeaned by the staff?

11   A.    Never.

12   Q.    After you graduated, what did you do?

13   A.    I stayed on for a few months.  I had to return home --

14   my mother had an illness and passed away, and then I returned

15   back to Mountain Park for a few months.  And then I went to

16   college for a few years and then returned back to Mountain

17   Park.

18   Q.    When you first became a staff member, after you

19   graduated, where -- I mean, did you stay with the girls in

20   the dorm or someplace else on campus?

21   A.    I stayed with the girls in the dorm.

22   Q.    Would it be fair to say since you stayed on as staff

23   that you liked it there as a student?

24   A.    Yes.

25   Q.    Mrs. Gerhardt, when you were you a student did you ever

1    feel groggy or lethargic?

2    A.    No, never, not one time.

3    Q.    When you first went on staff, what were your job

4    duties?

5    A.    I was a monitor in school.  And then outside of school

6    I was just back in the dorm with the girls.

7    Q.    Now, you have a last name Gerhardt as well.  Can you

8    describe the relationship you have to some of the other

9    defendants?

10   A.    I married Bo Gerhardt, which is Sam and Debbie

11   Gerhardt's son.

12   Q.    And did you two begin courting when you were in

13   college?

14   A.    It was the last -- it was our senior year, the end of

15   our senior year.

16   Q.    When you returned to Mountain Park after college did

17   you have the same job duties?

18   A.    No, I did not.

19   Q.    What were your job duties when you came back?

20   A.    I was a supervisor in the school.  Then I was back in

21   the dorm with the students.  I did PE with the girls.  And

22   then a little later I did medicine call.

23   Q.    When do you think you started doing medicine call?

24   A.    '01 -- '01, '02.  '01, I believe, but I don't know for

25   sure.

1  Q.   Now, Mrs. Gerhardt, I want to show you part of Exhibit

2  V.  This was Shari Lueken's medication log.  Is this document

3  familiar to you?

4  A.   I'm sorry?

5  Q.   Is this document familiar to you?

6  A.   Yes, sir.

7  Q.   I want to refer you to the entry that's second from the

8  top.  Do you see that?

9  A.   Yes.

10  Q.   What's the date on that entry?

11  A.   7/3.  Is that '00?  Yeah, '00.

12  Q.   And looking across the right-hand side, whose initials

13  are those?

14  A.   Mine.

15  Q.   And what's the medication that's being given?

16  A.   Pin-X.

17  Q.   Pin-X.  Are you familiar with Pin-X?

18  A.   Yes, it was --

19  Q.   Can you tell The Court what the Pin-X is?

20  A.   It was a worm medicine.

21  Q.   Did you have to take worm medicine when you were first

22  enrolled at Mountain Park?

23  A.   Yes, I was -- yes, I did.

24  Q.   Now, with respect to the Pin-X, it indicates that you

25  gave it.  At this point in time in July 2000, how long

1    after -- how long after -- how long from the time that you

2    returned from college was this entry made?

3    A.    Three months.

4    Q.    Okay.  And had you been giving out Pin-X to students at

5    that point in time?  In other words, was this a new practice

6    for you to give the Pin-X?

7    A.    Yes.

8    Q.    And were you doing medicine call at that point in time?

9    A.    Yes.

10   Q.    You were.  I thought you testified earlier that you

11   started in 2001?

12   A.    I don't know when I started, exactly when I started.

13   Q.    And was Pin-X given in medicine call?

14   A.    No.

15   Q.    So a student didn't line up and ask for the Pin-X,

16   correct?

17   A.    No.

18   Q.    Did you just take it upon yourself to write the Pin-X

19   into the medication log?

20   A.    Yes, I did.

21   Q.    Did you know at the time that any notes regarding Pin-X

22   would have been made someplace other than the medication log?

23   A.    No.

24   Q.    Did you subsequently learn that?

25   A.    Yes.

1    Q.    Now, we've already heard a lot of testimony about

2    medicine call, and I'm sure The Court doesn't need to hear it

3    all again.  But when you started doing medicine call, it was

4    your practice to record any oral medication that was given to

5    a student into their medication log, correct?

6    A.    Yes.

7    Q.    Now, we've also heard that at least Ms. Goodman said

8    that if a student had come to her complaining she had missed

9    her period, she would refer that student to you.  Did you

10   hear that testimony?

11   A.    Yes, I did.

12   Q.    How often did you get complaints from students that

13   they were missing their period?

14   A.    Not very often.

15   Q.    And if you did get a complaint from a student that she

16   was missing her period, what would you do in response?

17   A.    Ask her how long it had been, and if it hadn't been but

18   just two or three months, I would tell her to come back to

19   me, you know, next few months and to let me know that.  But I

20   don't ever recall anybody really ever coming back and telling

21   me at a later time that they had missed it.

22   Q.    Okay.  Ms. Gerhardt, can you say, did any of the

23   plaintiffs sitting at the plaintiffs' table, did any of them

24   complain to you they were missing their period?

25   A.    I don't believe they did.

1    Q.    And as you sit here right now, can you recall, did any

2    of the plaintiffs complain to you they were constipated?

3    A.    Did any of them complain to me that -- no.  No, not

4    that I recall.  I mean, maybe so, but I don't know for sure.

5    Q.    You don't have a recollection?

6    A.    I do not.

7    Q.    If a student had come to you complaining of

8    constipation, what would you do?

9    A.    Tell them to go get some prunes or something -- I'd

10   tell them to go get prunes, and if that didn't work to come

11   back to medicine call and I'd give them something else.

12   Q.    Could a student just get prunes, or what did they have

13   to do to get prunes?

14   A.    What do you mean?

15   Q.    Did they have to ask somebody else or could they just

16   get them?

17   A.    We -- they could get them.  They could just ask and

18   say, you know, Ms. Julie told me that I could have some

19   prunes, and then somebody would give it to them.

20   Q.    Ms. Gerhardt, I'd like to show you what's been marked,

21   previously marked as Defendants' Exhibit BB.  Is that a

22   document familiar to you?

23   A.    Yes, it is.

24   Q.    And if we look on this document, this is Erika

25   Teasley's medication log, is it not?

1    A.    Yes, it is.

2    Q.    With respect to this, do you see your initials on some

3    of the entries in this log?

4    A.    Yes, I do.

5    Q.    And just for the record, this is one of a two-page

6    document.  With respect to this, can you see where the first

7    date that a toothache complaint is raised in the medication

8    log?

9    A.    On March 15th.

10   Q.    And prior to that she has some complaints of headache.

11   If she had complained of a toothache, would that have been

12   written into the log?

13   A.    Yes, it would have been.

14   Q.    Now, Ms. Gerhardt, we've heard from Ms. Teasley that

15   she was complaining three times a day, every medicine call

16   about the pain she was having in her tooth.  Do you have a

17   recollection of that?

18   A.    No, I do not.  I would have given her medicine for it,

19   and I would have logged it down.

20   Q.    And do the records reflect that she complained of a

21   toothache three times a day?

22   A.    No.

23   Q.    And you made entries into these records in the ordinary

24   course of your business, didn't you?

25   A.    I'm sorry?

1   Q.    Did you put entries into this medication log in the

2   ordinary part of your duties?

3   A.    Yes.

4   Q.    And that was an important thing to do, wasn't it?

5   A.    Yes, it was.

6   Q.    Now, it seems as if maybe the plaintiffs are claiming

7   that you fabricated this log with respect to these entries.

8   Is that possible?

9   A.    No, it's -- no, it's not possible.

10  Q.    And why isn't it possible?

11  A.    Because that's my signature.  And it's just not

12  possible.  We wrote it down what was -- you know, what was

13  wrong with them and signed it.

14  Q.    And how many students would show up in a typical

15  medicine call?

16  A.    No telling.  How many would show up?  Several.

17  Q.    Okay.  I mean, would it be more than a dozen, say?

18  A.    At times.  Also depended on what time of day it was

19  also.

20  Q.    So you had to go through all those students' logs for

21  every time you gave them medication, correct?

22  A.    Yes, I did.

23  Q.    Ms. Gerhardt, while you were at Mountain Park as a

24  student did you ever see a student paddled?

25  A.    No, I never did.

1    Q.    Even as staff member did you ever see a student

2    paddled?

3    A.    No, I never did.

4         MR. BRIGGS:  A moment to confer, Your Honor.  That's

5    all I have.

6         THE COURT:  Very well.  Cross-examination.

7                      CROSS-EXAMINATION

8    BY MR. STILLEY:

9    Q.    Is it fair to say that at Mountain Park some girls were

10   treated quite differently than others?

11   A.    We were treated the same.

12   Q.    You sure about that?

13   A.    Well, I know experience as an orientation guide if I --

14   I actually -- there was more required of being an orientation

15   guide than there was of a single student, so I had a lot of

16   responsibility, so I maybe would get more corrected than a

17   single student or a new student.

18   Q.    What I'm trying --

19   A.    So I don't -- can you --

20   Q.    What I'm trying to get at, is it a possibility that one

21   student might have a good experience at Mountain Park while

22   another student would not have the same experience?

23        MR. BRIGGS:  I'll object to that, that would call

24   for speculation, Your Honor.

25        THE COURT:  Sustained.

1    BY MR. STILLEY:

2    Q.    Did you know Felicia Jones?

3          MR. BRIGGS:  Your Honor, I'm going to object at this

4    point.  May we approach?  This is a claim -- it's not related

5    to any of the named plaintiffs.

6          MR. STILLEY:  Can we approach?

7          THE COURT:  Well, come on.

8          (The following proceedings were held at the bench

9    and outside the hearing of the jury:)

10         MR. BRIGGS:  Your Honor, the basis for the objection

11   is that in the complaint one of the plaintiffs claims that

12   she had to give Felicia Jones a cold shower or something to

13   that extent.  With respect to that, Your Honor, you've

14   already ruled that incidents with other students are

15   excluded.

16         THE COURT:  Yeah.  I mean, you -- you seem to ask

17   the wrong questions.  You ask her -- she said she had a good

18   experience, so you have a little leeway there.  You know, I

19   mean, you want to go to the possibility.  And that's kind of

20   broad.  Why don't you ask her if she's aware of any other

21   students having bad experiences.

22         MR. STILLEY:  Sure, I'll do that.

23         THE COURT:  Go straight to the question.

24         MR. STILLEY:  I'll just jump right on it.

25         THE COURT:  I don't want to go into detail about any

1    kind of individual's bad experience.  Because I don't know

2    where you're going with that, okay.

3              MR. STILLEY:  Sure.

4              (The following proceedings continued within the

5    hearing of the jury:)

6    BY MR. STILLEY:

7    Q.    Were you aware of any girls that had bad experiences at

8    Mountain Park?

9    A.    Was I aware of any girls that had bad experiences?

10   Q.    I beg your pardon?

11   A.    As in what, they didn't want to be there or -- no, I

12   mean -- can you rephrase the question so I can understand a

13   little better?

14   Q.    Well, what I'm asking is if any of the students -- if

15   you knew of any students at Mountain Park who had a bad

16   experience there, something that would be considered

17   traumatic to them.

18   A.    I don't know.  I'm not them.  I don't know what they --

19   how they felt.

20   Q.    Basically you just know about your experience, correct?

21   A.    I know of other -- I do know of other girls who, yes,

22   they left the school, they wanted to stay and help other

23   girls or --

24   Q.    You came in '94, correct?

25   A.    Yes.

```
 1   Q.    Do you know when the doors were put on the girls'
 2   bathrooms?
 3   A.    I'm sorry?
 4   Q.    Do you know when the doors were put on the stalls in
 5   the girls' bathrooms?
 6   A.    Not long after I got there the doors were put on.
 7   Q.    So are you saying the doors were put on in 1994?
 8   A.    The doors, yes.
 9   Q.    Are you sure about that?
10   A.    Maybe the beginning of '05.  I got there the end of --
11   or, sorry, I got there the end of '94, so it may have been
12   possible the very beginning of '95 that they could have been
13   put on.  I just remember it was not long, I did not go very
14   long with not having a stall door.
15   Q.    And were the stall doors put on all the girls'
16   bathrooms?
17   A.    Yes.
18   Q.    You said you did miss your period at Mountain Park?
19   A.    Yes, I did.
20   Q.    About how many times?
21   A.    How many times did I miss my period?
22   Q.    About how many months?
23   A.    Nine.
24   Q.    Did you -- you didn't have any other explanation other
25   than stress for that missing of periods, did you?
```

1   A.    I don't even remember it's stress.   I mean --

2   Q.    Well, do you recall any reason for having missed a

3   period?

4   A.    I'm sorry?

5   Q.    Do you recall having any reason for missing your

6   periods for nine months?

7   A.    I don't know why I did.   I wasn't -- I just -- you

8   know, I would hear maybe other girls say that they hadn't had

9   theirs either, and it was just something that they ended up

10  getting, and I ended up getting mine too.   So it wasn't -- to

11  me it wasn't -- you know, I ended up getting it, so --

12  Q.    You never had a problem with your periods before

13  Mountain Park, did you?

14  A.    No.

15  Q.    And after you got out as a student, did you ever have

16  problems with your period then?

17  A.    No.

18  Q.    So when you were working as staff at Mountain Park you

19  didn't have problem with your periods then, correct?

20  A.    No.

21  Q.    When you got food, did you need permission for seconds?

22  A.    Did I need permission?

23  Q.    Did the students need to get permission in order to get

24  seconds of food?

25  A.    No.   They would -- if we had food left over, one of the

1    kitchen workers would come and say, seconds, and girls would

2    line up to get seconds if they wanted it.

3    Q.    Now, you told the jury about your experience of

4    conversion, becoming Christian, correct?

5    A.    Yes.

6    Q.    Now, being Christian doesn't mean you're perfect; is

7    that correct?

8    A.    That's correct.

9    Q.    And even after you've been converted, there's been some

10   things in your life that you're not proud of, correct?

11   A.    That's correct.

12   Q.    And some of them are pretty serious, correct?

13         MR. BRIGGS:  Your Honor, this is outside the scope

14   of direct.

15         MR. STILLEY:  Let me ask one other question.

16         THE COURT:  Try it again.

17   BY MR. STILLEY:

18   Q.    Your family and folks, the people at Mountain Park,

19   despite the knowledge of these things have been very patient

20   and kind to you, correct?

21         MR. BRIGGS:  I'll object, Your Honor, vague and

22   relevance.

23         MR. STILLEY:  Treatment of students, Judge.

24         THE COURT:  Well, I just don't know where you're

25   going.  I mean, the witness said they were saved.  They were

1    Christian.  So, I mean, I don't know -- do you want to show

2    something relative to this case or something relative to

3    these plaintiffs here?

4         MR. STILLEY:  What I'm trying to show relative to

5    these defendants, I'm trying to show something relative to

6    the defendants.  And what I'm trying to show is that the

7    defendants were very patient and very kind with her, and they

8    treated her as a --

9         THE COURT:  Why don't you perhaps ask how some of

10   these individuals treated her if that's what you want to ask.

11   BY MR. STILLEY:

12   Q.   Is it fair to say then that there were some incidents

13   in your life that you're not proud of that the Gerhardts and

14   the Wills became aware of?

15        MR. BRIGGS:  Your Honor, this is also prejudicial.

16        THE COURT:  Sustained.

17   Q.   Let me try this.  Isn't it fair that the Wills and the

18   Gerhardts have been especially and particularly kind and

19   patient to you particularly after you came back to work as

20   staff?

21        MR. BRIGGS:  Your Honor, same objection.

22        THE COURT:  Sustained.

23   Q.   Now, did you get worm medicine when you arrived?

24   A.   I'm sorry?

25   Q.   Did you get worm medicine?

1    A.     Yes, I did.

2    Q.     Was it liquid form?

3    A.     Yes, it was.

4    Q.     And did you get it again in two weeks after you got

5    there?

6    A.     I got it again.  I don't recall exactly how long after.

7    A week, two weeks, I don't know.  I didn't count the days.

8    Q.     On direct did you testify something about a change in

9    the practice concerning giving the girls worm medicine?

10   A.     Sorry, I can't hear you very well.  You're not talking

11   very loud.

12   Q.     Did you testify on direct about a change in the

13   practice of giving the girls worm medicine at some point in

14   time?

15   A.     There was never -- I don't recall a change in practice.

16   It was just -- I was coming on as a married staff member, so

17   I was learning how to -- you know, I was new at doing

18   medicine.  Is that what you --

19   Q.     What year are we talking about?

20   A.     I came on as a married staff member in 2000.

21   Q.     Okay.  Is that when the change took place?

22          MR. BRIGGS:  Your Honor, I'm going to object.  I

23   don't think she's testified there has been a change.

24          THE COURT:  Why don't you -- you've never answered

25   the question was there a change.

1    BY MR. STILLEY:

2    Q.    Was there a change in the practice of administration of

3    worm medicine that you became aware of during your employment

4    at Mountain Park -- well, from the time that you came as a

5    student until the end of your employment at Mountain Park,

6    did you at any time become aware of the change in the

7    administration of worm medicine to the students?

8    A.    There was never a change.  When a student came in they

9    were -- they got worm medicine.  I received worm medicine

10   when I was there and it continued on through the whole time.

11   A student received worm medicine.

12   Q.    So to your knowledge would it have been the same the

13   entire period, from 1994 until you quit?

14   A.    Yes, it would be the same.

15   Q.    And when did you quit?

16   A.    When Mountain Park closed the doors.

17   Q.    You told us a little bit about some of the medication

18   logs.  When you looked at those logs were you basing your

19   testimony on what you saw on the log or on your personal

20   recollection of what actually happened?

21   A.    When I looked at these?

22   Q.    Correct.

23   A.    And I did what?  I'm sorry.

24   Q.    I'm trying to find out if you can actually remember the

25   incident of giving medicine to any of the named plaintiffs?

1    A.    Not particularly.  If I saw Aleve on there I may not

2    have remembered giving that student Aleve because they had

3    cramps.  I don't remember that day that they specifically had

4    cramps.

5    Q.    Do you remember with -- did administration of

6    medication stand out enough that you would actually remember

7    that, have personal recollection of it?

8    A.    If a student was coming continually about a problem,

9    then, yes, I would have recollection of it, and it would be

10   taken to Miss Gerhardt and we would try to get her in to a

11   doctor or dentist or whatever.

12   Q.    Was there -- were there enough students that you had a

13   prune and cranberry juice call in the mornings?

14   A.    No, not when I was a staff member.

15   Q.    Was there a prune cranberry juice call at some other

16   time while you were a staff member?

17   A.    At some other time?  I don't ever remember as a staff

18   member there being a prune and juice call.  I just told a

19   student if they needed prunes just to go get them.  There was

20   no prune call.  I mean, they would just ask to get prunes,

21   and they got them.

22        MR. STILLEY:  Pass the witness.

23        MR. BRIGGS:  Nothing further, Your Honor.

24        THE COURT:  Thank you, Ms. Gerhardt.  Call your next

25   witness.

1              MR. BRIGGS:  Your Honor, we call Andrea Hill.

2                        ANDREA HILL,

3     Having been first duly sworn, was examined and testified as

4     follows:

5                      DIRECT EXAMINATION

6     BY MR. BRIGGS:

7     Q.    Please state your name.

8     A.    Andrea Hill.

9     Q.    Ms. Hill, were you on staff at Mountain Park at some

10    point in time?

11    A.    Staff?

12    Q.    Yes.

13    A.    Yes.

14    Q.    Now, during that time that you were a staff member, I

15    have to ask you this right out of the box, this is a really

16    important question.  One of the plaintiffs, Jamie Woods, has

17    alleged that you as a student pushed her down to the ground.

18    Now, Ms. Hill, did you ever do that?

19    A.    No, I did not.

20    Q.    And would you ever do that?

21    A.    No.

22    Q.    Now, in addition to being a staff member, were you also

23    a student at Mountain Park?

24    A.    Yes, I was.

25    Q.    Okay.  And when were you enrolled at Mountain Park?

```
 1    A.     May 17th of 1994.

 2    Q.     And for how long were you a student?

 3    A.     Three years.

 4    Q.     And did you graduate?

 5    A.     Yes, I did.

 6    Q.     When did you graduate?

 7    A.     May 23rd of '97.

 8    Q.     And, Ms. Hill, did Mountain Park help you in your life?

 9    A.     Yes, it did.

10    Q.     How?

11    A.     I've -- the structure there, the job that I have now,

12    if I didn't learn the structure and learn how to work there,

13    I wouldn't be a good worker today, you know.  I wouldn't

14    be -- my life would be completely different.  Who knows how

15    my life would be right now if I didn't go to Mountain Park as

16    a student.

17    Q.     Did you enjoy your experience at Mountain Park?

18    A.     Not at first, but then again, usually not many enjoyed

19    it at first because it's very different from what you're used

20    to.  But over time I, you know, became a Christian, developed

21    some strong friendships with the students.  You know, the

22    staff became like family to me when I became on staff.  So, I

23    mean, there's a lot of benefits.

24    Q.     For how long were you on staff at Mountain Park?

25    A.     A very long time.  From May 23rd of '97 until it closed
```

1    down.

2    Q.    And what were your job duties when you worked on staff

3    at Mountain Park?

4    A.    Just about anything and everything.  You mean from the

5    beginning or --

6    Q.    Well, for the sake of time, why don't we narrow this

7    down a little bit.  Ms. Hill, did you work in the learning

8    center?

9    A.    I worked in the computer room.

10   Q.    Okay.  And that's separate from the learning center,

11   correct?

12   A.    Yes.

13   Q.    Did you regularly do medicine call?

14   A.    No.

15   Q.    Did you regularly do PE or phys ed with the students?

16   A.    Yes, I always did PE.

17   Q.    How often would you do that?

18   A.    We did it just about every day.  Monday through Friday,

19   just about every day.

20   Q.    And going back to your experience as a student, did any

21   of the staff when you were a student, did they belittle you

22   at all?

23   A.    No.

24   Q.    Did they demean you?

25   A.    No.

1    Q.    And some of the plaintiffs or the plaintiffs in this

2    case are claiming that they missed their periods while they

3    were at Mountain Park for a period of time.  Did any of them

4    ever complain to you when you were a staff member that they

5    were missing their periods?

6    A.    I don't remember them personally coming to me.  I don't

7    recall anybody coming to me personally about not -- about

8    missing their period.  It was just kind of a known thing that

9    sometimes some people miss it and sometimes others had it.

10   Q.    And with respect to that, you said you didn't typically

11   do medicine call.  Was it the typical practice for students

12   to make their health complaints at medicine call?

13   A.    I would suppose so.  They didn't come to me about any

14   kind of health problems.

15   Q.    Did any of the plaintiffs ever complain to you about

16   being constipated?

17   A.    No.

18   Q.    And did Ms. Teasley, one of the plaintiffs, did she

19   ever complain to you about having a toothache?

20   A.    No.  I overheard her.  I overheard her in the dorm

21   talking about a toothache, but I didn't deal with medicine

22   so --

23   Q.    And she never said that specifically to you, did she?

24   A.    No.

25   Q.    Now, Ms. Hill, were you saved while you were at

1   Mountain Park?

2   A.    Yes, I was.

3   Q.    And did you act as an orientation guide for a time when

4   you were a student?

5   A.    It took me awhile to be an orientation guide, I was

6   kind of a hard case at the beginning.

7   Q.    How long did it take before you became an orientation

8   guide?

9   A.    I was there a little over a year.

10  Q.    Fair enough.

11       MR. BRIGGS:  May I confer, Your Honor?  That's it,

12  Your Honor.  Thank you.

13       THE COURT:  Cross-examination.

14                    CROSS-EXAMINATION

15  BY MR. STILLEY:

16  Q.    So you were a regular employee for, what, about seven

17  years?

18  A.    From '97 to when it closed down.  I'm not good at math,

19  so I can't tell you off the top of my head.

20  Q.    And you came May 17, '94; is that correct?

21  A.    Yes, it is.

22  Q.    And how long did it take before you graduated?

23  A.    Three years.

24  Q.    So you graduated in May '97?

25  A.    Yes.

1    Q.    And immediately joined on as staff?

2    A.    Excuse me?

3    Q.    You immediately joined on as staff?

4    A.    Well, I went home for a couple weeks and then came on

5    as staff.

6    Q.    And your pay when you started was?

7          MR. BRIGGS:  Your Honor, I'm going to object.  We've

8    already been through this.

9          MR. STILLEY:  No, we've not been through this,

10   certainly not with this witness.  I just want to find out

11   what the -- basically about her rank.

12         MR. BRIGGS:  Your Honor, we've been through this

13   with respect to that.

14         THE COURT:  I don't know what you're going to know

15   relative -- we don't know what anybody else got paid.  What

16   difference does it make?

17         MR. STILLEY:  Judge --

18         THE COURT:  I know you push hard on questions.  When

19   you look at the total picture, it don't make no difference.

20   Do you know what anybody else got paid?  Why you press on

21   stuff that don't make no difference?  Please.

22         MR. STILLEY:  Judge, can I explain why if you don't

23   mind me explaining.

24         THE COURT:  I've heard your explanations.  Fine.  Go

25   ahead.

```
1              MR. STILLEY:  What's the ruling?  The ruling?

2              THE COURT:  Go ahead.

3              MR. STILLEY:  Okay.  The witness can answer?

4    A.    I can't really tell you off the top of my head, it's

5    probably three something.  I don't know.

6    Q.    And when you finished you were making $550 a month?

7    A.    Probably.  That's been awhile ago, I don't remember the

8    exact amount.

9    Q.    And you worked many, many hours each day, correct?

10   A.    Correct.

11   Q.    And would it be fair to say that you really had a

12   concern for these girls?

13   A.    Yes, I did.

14   Q.    And as a matter of fact, you got close to a lot of

15   these girls, did you not?

16   A.    Yes, I did.

17   Q.    And you really did want to help them?

18   A.    I did.

19   Q.    You testified on direct that you didn't participate in

20   pushing Jamie Woods down; is that correct?

21   A.    That's correct.

22   Q.    Did you ever see Jamie Woods being pushed down?

23   A.    No, I did not.

24   Q.    Did you ever see any student being pushed down?

25   A.    No, I did not.
```

1          MR. STILLEY:  Pass the witness.

2          MR. BRIGGS:  Nothing further, Your Honor.

3          THE COURT:  Very good.  You have any other

4    witnesses?

5          MR. BRIGGS:  No, we have no other witnesses, Your

6    Honor.

7          THE COURT:  That's good.  You have any other

8    witnesses?

9          MR. STILLEY:  Your Honor, can I have just about five

10   minutes to talk to my clients?

11         THE COURT:  Take three minutes right there.  We'll

12   wait.  You may step down.

13         MR. STILLEY:  Your Honor, we don't have any further

14   witnesses.

15         THE COURT:  Very well.  We understand that there may

16   be administrative matters to take care of.  But as I've said

17   before, the jury and other people have places to be and folks

18   to see.  They're ready to go.

19         Ladies and gentlemen of the jury, we're going to

20   adjourn for the day as far as you all are concerned.  And

21   we'll stay here while.  Let's see, why don't you all return

22   at 9:30 tomorrow morning.  That ought to give us some time

23   hopefully to get these things together between this evening

24   and tomorrow morning.  We will see.  Have a pleasant evening.

25   We'll see you tomorrow at 9:30.  Recall the admonition.

1          (The following proceedings were held outside the

2     hearing of the jury:)

3          THE COURT:  We ready to go with these instructions?

4     What about that big stack that you all agreed upon,

5     Mr. Stilley?  Or we got to go back to Capital One again.

6     Counsel, why don't we do this, I'll come back at five after

7     and we'll see where we are.  If there are any administrative

8     matters, and you all put this stack together, and maybe we

9     can do these instructions together, and we can figure out any

10    instructions that need to be redone so we can have it done by

11    the time the jury gets here tomorrow morning.

12          MR. STILLEY:  Perfect.

13          THE COURT:  I'll see you all in about ten minutes.

14          (Court in recess from 5:56 p.m. until the 6:23 p.m.)

15          THE COURT:  In working on these instructions the

16    defendants have requested that The Court direct a verdict at

17    the close of the evidence relative to a number of the

18    negligence claims in this case, and particularly the

19    cessation of menses, constipation, and the lack of getting

20    medicine.  So let's address these things now.  Mr. Schwartz,

21    as to Ms. Kaufmann.

22          MR. SCHWARTZ:  As to --

23          THE COURT:  And I guess we're really talking about

24    all of them, all of the plaintiffs as to cessation of menses.

25    Go ahead.

1          MR. SCHWARTZ:  You want me to address this first,

2    cessation of menses?

3          THE COURT:  Yeah, let's do that, because I think

4    that will cover a number of people.  See where we are with

5    this.

6          MR. SCHWARTZ:  As to the cessation of menses, and

7    under the elements of the Stineman case and the Kersey case

8    from the Eighth Circuit and based on The Court's prior

9    summary judgment ruling, in order to prove their negligence

10   claim, the plaintiffs must prove that the defendants had --

11   must have been able to appreciate the severity of plaintiff's

12   injury, they had the skill to provide adequate medical

13   treatment, and whether failing to provide that medical

14   attention would have avoided the injury's ultimate harm.  And

15   those are the three elements.

16          And as to the cessation of menses, that they didn't

17   have their period, to that claim there's no evidence, first,

18   that that's even an injury.  There's no evidence that there

19   was any need for medical attention.  And there's no evidence

20   that any medical attention would have changed the result.

21   And, in fact, the only evidence, the only medical evidence

22   was that there was no problem, it was not a cause of concern.

23   In addition, two of the five plaintiffs were taken to the

24   doctor.  And when they were at the doctor, they didn't

25   complain about not having their period.

1        THE COURT:  Okay.  Mr. Stilley.

2        MR. STILLEY:  Let's take this one at a time.  No. 1,

3   you had to be able to appreciate the severity of the

4   condition.  Ms. -- I'm sorry, there's nobody here to watch so

5   I can get excited.  Ms. Wills testified that this cessation

6   of menses, that happened routinely from 1987 until the place

7   was closed down, so it's not a new thing for her.

8        THE COURT:  Well, she said it was usual, not a

9   problem.

10        MR. STILLEY:  I'm just debating that.  She said,

11   yeah, in was a common thing, and our policy was to take the

12   girls to the doctor and then get hormones or something like

13   that to solve the problem.  So element, No. 1, appreciate the

14   severity.  She knows it's something to be taken to the doctor

15   about, she testified to it.  You cannot escape that element.

16   She understands that it's a severe and threatening condition

17   that calls for a doctor's attention.

18        No. 2, skill to provide.  What do you have to do?

19   Take them to the doctor.  Three out of the five, we got

20   admission, didn't take them to the doctor.  Avoidance of

21   injury.  What did Ms. Wills testify to, we take them to the

22   doctor and get some hormones.  What do the hormones do?

23   Well, the hormones regulate that balance and stop the

24   cessation of menses.  And the damage result, now the

25   suggestion, oh, that's not a problem.  You know, there's a

1    lot of things that you might look at without looking at

2    anything else and maybe it's a symptom.   But when you look at

3    the underlying condition, there's other things that can be

4    causing that like cancers and various other diseases that

5    call for a doctor to take a look at it, see what's going on,

6    see what the problem is.

7         And irregardless of whether or not it might be

8    cancer or something like that, Dr. Gayle said, sure, it can

9    cause osteoporosis.   It's a threat.   It is a risk factor.   It

10   increases the risk of osteoporosis later in life.   We've got

11   all three.   Keep it in.

12        MR. SCHWARTZ:   You know, thankfully none of these

13   ladies have osteoporosis that we know of or cancer, so

14   there's really none of that matters.   The testimony was from

15   the doctor, the only doctor that testified, that this is not

16   a cause for concern unless they have other symptoms, which

17   none of them complained about.   And they all got their

18   periods back.   Some of them have gone on to have babies.

19   It's not an injury.

20        THE COURT:   That's part of it.   I don't see an

21   injury.   I don't see an injury.   I wanted to be generous and

22   allow many of these things to go and to not deal with a

23   directed verdict at the close of all the evidence, but I

24   think for me not to do what I should do is partially an

25   abdication of responsibility and will make it much more

1    difficult for the jury to reach a decision.  So I'm directing

2    those claims out.  They are out.  They are gone.

3              MR. STILLEY:  Can you state on the record what the

4    reasons, which element did you find was not supplied?

5              THE COURT:  First of all, injury.

6              MR. STILLEY:  So the increased risk of osteoporosis

7    is not sufficient?

8              THE COURT:  Has anybody got it?

9              MR. STILLEY:  Increased risk.

10             THE COURT:  Hey, there's a risk when you walk

11   outside that you might get hit by a car.  There's always some

12   kind of risk.  But an increased risk, what is the pain -- I

13   mean, the suffering, the injury?

14             MR. STILLEY:  There were other things that went

15   along with this like constipation.

16             THE COURT:  Appreciate the severity of the injury.

17   We had one doctor testify, said it was no problem.  Said it

18   was greater there at the school than other places.  But I

19   don't see the injury or ultimate harm.  It's gone.  They are

20   gone.

21             Now, so as far as this constipation, same ruling.

22   That's gone.

23             What about these various claims about not getting

24   medicine?  What problem was caused there?  What's the injury?

25             MR. STILLEY:  Anybody has ever had a cold and been

1    grossly miserable and been unable to get medication despite

2    the fact they asked for it understands that it hurts.  It's

3    painful.  It causes great discomfort.  It is a serious injury

4    to somebody to be in somebody's total control and possession

5    and to ask for medicine and be denied it.  That's what

6    happened to these girls.

7          THE COURT:  What's the injury relative to

8    Ms. Kaufmann, and then we can -- I mean, as far as the

9    cessation of menses, I think that's for everybody, all

10   plaintiffs.  That claim is out.  Not going to the jury.

11         Now, I don't know who all offhand was involved in

12   not getting the medicine that they requested, but let's -- we

13   can go through them if you like.  But I'm focusing on the

14   injury.

15         MR. SCHWARTZ:  Judge, two of the plaintiffs were

16   taken to the doctor and prescribed medication by the doctor.

17   One had an ear infection, the other one I think had flu

18   symptoms.  I don't see how they can have a complaint about

19   not getting medicine.  I mean, it was undisputed, they admit

20   they were taken to the doctor.  They talked about how they

21   were taken in the back door.  And they were taken to the

22   doctor and the doctor treated them.  So those should be out

23   as not getting medication or not getting any medical

24   treatment.  How can they complain about not getting medical

25   treatment, one was taken three times to the doctor and the

1    other was taken twice.  And they weren't even there that

2    long.

3              THE COURT:  Okay.  Who were those two?

4              MR. SCHWARTZ:  That would be Lueken and Jessica,

5    Jessica Deboi.  I'm sorry, that's hard for me to pronounce,

6    Deboi.  Jessica Deboi and Shari Lueken.

7              THE COURT:  What about the others, Ms. Woods?  Who

8    else -- who else, let's see, in terms of not getting

9    medicine?

10             MR. SCHWARTZ:  I don't recall any significant amount

11   of testimony about having any severe pain or anguish.

12             THE COURT:  I don't remember anything either, any

13   problems.  The real problems was -- the real problem I

14   remember was with Ms. Deboi with the ear pain and this kind

15   of thing, and she went to the doctor.  What about it,

16   Mr. Stilley?

17             MR. STILLEY:  Your Honor, I think they were all

18   denied their cold medication.

19             THE COURT:  They were what?

20             MR. STILLEY:  And none of them -- I don't think any

21   of them --

22             THE COURT:  Well, two went to the doctor.

23             MR. STILLEY:  Well, they went to the doctor for some

24   things.  That doesn't mean you got cold medicine when you

25   asked for it.

1          MR. SCHWARTZ:  Shari Lueken went to the doctor for

2     flu and cold symptoms.  That was the doctor's testimony.  She

3     did not deny that.  I think she admitted it too in her

4     testimony.  And Jessica Deboi went to the doctor for an ear

5     infection, and he testified he treated an ear infection.  She

6     was only there for, what, six or seven months, maybe eight

7     months.  I mean, she went there shortly before -- within a

8     month and a half after going -- after getting there, she went

9     to the doctor.  And Shari Lueken was taken to the doctor

10    three times and had every opportunity to make whatever

11    complaint or request for whatever medicine she wanted from

12    the doctor.  I don't know how else these people could provide

13    medical care other than to take the lady to the doctor.  They

14    can't prescribe it themselves.

15         I don't think there was any significant testimony

16    about any particular pain and anguish or lack of having colds

17    or whatever, and, in fact, many of them admitted they could

18    go and get medicine.  Many of them admitted that they could

19    go and get medicine at the medicine call.

20         MR. STILLEY:  Your Honor, I think they all testified

21    that there were times that they went and asked for cold

22    medicine and were denied the same, and they said, no, you

23    can't have it, not going to give it to you.  So we've got

24    testimony going one way and testimony going the other.

25         THE COURT:  Just because you don't get medicine, you

1    still got to show an injury.

2           MR. STILLEY:  A what?

3           THE COURT:  Injury.

4           MR. STILLEY:  The injury is the discomfort that goes

5    along with not having the medication that you need.  In The

6    Court's ruling you said this discomfort was sufficient to

7    suffice for injury.

8           THE COURT:  I don't know that I heard any great

9    testimony about any discomfort or injury.

10          MR. STILLEY:  Well, it may not be great testimony,

11   but it was certainly testimony.

12          THE COURT:  What testimony?  I'm trying to reflect

13   on that.

14          MR. STILLEY:  Your Honor, I think every one of them

15   said that they suffered discomfort because they were not able

16   to get the medication they needed for the colds they had.

17          MR. SCHWARTZ:  Judge, I think there has to be some

18   kind of a minimum act here.

19          THE COURT:  I mean, a cold is a common kind of

20   thing, you know.  I got a cold, so, I mean, please.

21          MR. STILLEY:  Your Honor, let's not minimize what

22   these young ladies went through.

23          THE COURT:  I am not trying to minimize their

24   situation.  You know, I'm not up here to provide sympathy.

25   This is a court of law.  Please.

1          MR. STILLEY:  Judge, you brought up the issue of a

2    directed verdict.  I didn't hear the defendants make any

3    directed verdict.  And what I think needs to be done is just

4    leave this directed verdict out of it.  Let's go ahead --

5          THE COURT:  In our discussion off the record the

6    subject matter came up, and I thought we needed to address

7    it.  I'm looking at all these problems that we're having

8    here, and perhaps many of them are because I should have

9    directed a verdict at the close of your evidence in the first

10   place.  But on the other hand, I would let all the evidence

11   go.  And off the record the discussions came up, so I decided

12   I would entertain this.

13         MR. SCHWARTZ:  For the record, Your Honor, we do

14   want to make a motion for directed verdict at the close of

15   all the evidence and request leave to supply a written motion

16   tomorrow.

17         MR. STILLEY:  Your Honor, let's not go outside the

18   motion that they said they wrote and supplied to The Court.

19         THE COURT:  Well, he's renewing his motion now and

20   so I'm addressing it, so we're not dealing with that.  I know

21   he made a motion before; I denied it.  He is making a motion

22   at this time.

23         MR. STILLEY:  Your Honor, can I read from their

24   motion and explain why -- just a minute, let me --

25         THE COURT:  I'm not concerned overwhelmingly about

```
1    that motion.  This is a new time.  This is a different
2    motion.
3              MR. STILLEY:  So you're saying that they can raise
4    different grounds in this motion --
5              THE COURT:  Oh, absolutely.  Okay.  This not getting
6    cold medicine, that's out.
7              MR. SCHWARTZ:  You want to address constipation,
8    Judge?
9              THE COURT:  That's out.  That's gone.  So let's see
10   what we've got left.  We got Woods on hearing.  We got, let's
11   see -- what other claim did Ms. Lueken have?  Fine.  Let's go
12   to Teasley.  What other claim did she have?
13             MR. STILLEY:  Busted up tooth, that she didn't get
14   medicine -- didn't get any treatment for.
15             THE COURT:  Dental care.  Ozuna, what other claim
16   did she have?
17             MR. STILLEY:  Oh, Shari had the scrapes on her side.
18   We can't let that go.
19             THE COURT:  Had the what?
20             MR. STILLEY:  The scrapes on her side.
21             THE COURT:  Scrapes on her side?
22             MR. STILLEY:  Right.
23             THE COURT:  Refresh my recollection there.
24             MR. STILLEY:  She got all beat up and bloodied from
25   being drug around, and didn't get the care for it.
```

1  MR. SCHWARTZ:  Your Honor, that was the testimony

2  where she said she didn't think it was that serious, and she

3  went to see Deborah Gerhardt and did not ask for medical

4  treatment.  She went to see her with another staff member,

5  and she was asked, did you think it was serious?  She goes,

6  ah, I didn't think it was that serious.  And did you ask for

7  medical treatment?  And she said no, I didn't ask.

8  THE COURT:  And that was the situation where we

9  didn't have any direction by a defendant.

10  MR. SCHWARTZ:  Right.

11  MR. STILLEY:  Well, we did.  It was clear, just

12  plain as day.  We had the witness to prove it.  But

13  because --

14  THE COURT:  I'm not talking about what -- you always

15  want to talk about something that didn't come in.  That

16  didn't come in.  You came up with that witness late.  Wasn't

17  that that situation?

18  MR. SCHWARTZ:  Yeah.

19  THE COURT:  You came up with the witness belatedly.

20  MR. STILLEY:  I disagree heartily with that.  I

21  disagree heartily with that.  You can make that ruling, but I

22  disagree heartily.

23  THE COURT:  What other situation was it?

24  MR. STILLEY:  I beg your pardon?

25  THE COURT:  What other situation was it?

1          MR. STILLEY:  Besides being late?

2          THE COURT:  The witness was not able to testify

3     about one of the defendants directing this dragging.

4          MR. STILLEY:  Well, the defendant said it was their

5     responsibility to supervise these kids to make sure that they

6     didn't get hurt.  So we got another reason, another theory,

7     that it was negligence, negligent supervision.

8          THE COURT:  That's out.  I'm directing that out.

9          MR. STILLEY:  Just a minute.  Let me ask Tracey --

10         THE COURT:  Ozuna.  What claim is left there?

11    Ozuna.  What claim is left for Ms. Deboi?

12         MR. STILLEY:  On Tracey, we have the asthma inhaler,

13    she couldn't get that.

14         THE COURT:  Okay.  I'll leave that in.  What about

15    Ms. Deboi?

16         MR. STILLEY:  Okay.  On her we got sleep depravation

17    and the depravation of Sudafed after she went to the doctor.

18         THE COURT:  No, she went to the doctor those times.

19    That's already gone.  All you got left is sleep depravation

20    it seems to me.  Was that it?

21         MR. STILLEY:  Sleep depravation, you going to take

22    that to the jury, sleep depravation?

23         THE COURT:  That was with everybody.  You talked

24    about sleep depravation, that they didn't get as much sleep

25    as they wanted or felt they needed.

1           MR. STILLEY:  Would it not be fair to take that to

2    the jury?

3           MR. SCHWARTZ:  Judge, do you know a teenager who

4    thinks they are getting enough sleep?

5           THE COURT:  That's gone.  Unless you can tell me

6    otherwise, the only claims we're going to have left will be

7    Ms. Woods' hearing, Ms. Teasley's dental care, and Ms.

8    Ozuna's asthma condition.  That's it.

9           MR. STILLEY:  Okay.  Tracey, the inhaler; Teasley,

10   the dental; and Woods, the hearing.

11          THE COURT:  That's it.  That's it on negligence.

12   Now, as far as Ms. Woods' hearing, the defendants will be

13   Betty Wills and/or Andrea Hill.  Now, Ms. Teasley's dental

14   care, who is responsible there?  What was the evidence as to

15   who is responsible as to these defendants?

16          MR. STILLEY:  Debbie Gerhardt, Betty Wills, and

17   Goodman.

18          THE COURT:  Goodman?  I don't think Goodman was at a

19   level where she had that kind of authority.

20          MR. SCHWARTZ:  She wasn't in a position to make a

21   dental appointment.

22          THE COURT:  No, she's out.  So Gerhardt and Wills.

23          MR. SCHWARTZ:  Well, Your Honor, Betty Wills wasn't

24   even -- wasn't even there at the time.  I don't think there's

25   any testimony that she knew anything about dental care.  She

1    was living in Florida at the time.

2          MR. STILLEY:  She said she called up to keep

3    everything running.

4          THE COURT:  Yeah, but you got to be specific about,

5    you know, she knew something about this and had something to

6    do with it.  Deborah Gerhardt only.

7          Now, Ms. Ozuna's asthma condition, defendants there.

8    Okay.  What about Ms. Ozuna in terms of that asthma

9    condition?

10          MR. STILLEY:  Debbie and Betty.

11          THE COURT:  Was Ms. Wills there?  Did she have

12    something to do with that?

13          MR. SCHWARTZ:  This is the inhaler?

14          THE COURT:  The inhaler for Ms. Ozuna.

15          MR. STILLEY:  I think that's right.

16          MR. SCHWARTZ:  Judge, I don't think there's -- I

17    don't know that there's any evidence that either of them knew

18    about it.  I think the evidence was that she told either

19    another staff member or -- and we can check her deposition.

20    I think the evidence was she told no staff member.  She told

21    an orientation guide.  I've got her deposition.  I can find

22    it pretty quickly here.  She told two staff members, Kim

23    Watson and Mary Lansdowne.  It says -- I'm reading from

24    page 35 of her deposition.  I know this was not the trial

25    testimony, but just for reference purposes.  "And you asked

1    Kim Watson on two occasions to use your inhaler.  And it's

2    your testimony on both occasions she said you didn't need

3    it."  I'm pretty sure that was the testimony at trial, Judge.

4            THE COURT:  Was there any difference in the

5    testimony other than these two employees who are not

6    defendants in this case?

7            MR. STILLEY:  Well, No. 1, we've got negligent

8    failure to supervise to provide for medical care.  And,

9    No. 2, I think there was -- my recollection was the testimony

10   was about these other two individuals being made aware of it.

11   Now, I don't know if the court reporter can do a search on

12   that or what you got.  But I'd be happy to take a look at it,

13   but that's what I thought.

14           MR. SCHWARTZ:  Judge, I don't think there was any

15   evidence of that.  This was something that was happening in

16   the playing field when she was exercising or they were doing

17   PE.  And Betty Wills and Debbie Gerhardt wouldn't have been

18   out there.  And she asked for it because she said she was

19   having trouble breathing on a couple occasions.

20           THE COURT:  What evidence do you have connecting

21   this to any of the defendants, Mr. Stilley?

22           MR. STILLEY:  Well, evidence that she needed the

23   inhaler, asked for the inhaler, and wasn't allowed to get it.

24           THE COURT:  We understand that, she asked for an

25   inhaler, but these were two employees.  What evidence do you

1    have connecting this to any of the defendants, that they knew

2    about it and then -- if they knew about it.

3            MR. STILLEY:  Well, the testimony from the stand was

4    that they had the chain of command, and all the complaints

5    were all shifted up to Betty or Debbie or both.

6            THE COURT:  When did this occur?  Was it during the

7    time that Ms. Wills was even there?

8            MR. STILLEY:  Yes, it was.

9            MR. SCHWARTZ:  I think --

10           MR. STILLEY:  Let me look at the time line on her.

11   I'll tell you when she was there.

12           MR. SCHWARTZ:  Your Honor, I think she would have

13   been there.  But there's no evidence about Ms. Wills on this

14   at all.  And there's no evidence on Ms. Gerhardt on it.

15           MR. STILLEY:  Well, they testified about the chain

16   of command and how they had such a wonderful setup there and

17   that's the way they did it.  Now, let's not forget when

18   Mr. Wills testifies that they talked to the parents, he is

19   going to get an instruction despite the fact that he never

20   said that he talked to Ozuna's parents or anybody else's,

21   he's going to get the instruction.  And I'd like the same

22   thing.  I'd like the converse, I want the instruction when

23   she told the employees, when the defendants themselves said,

24   yes, we supervise them, yes, we kept good records, yes, if

25   there was a complaint made, we knew about it so we could take

1    care of it.

2          MR. SCHWARTZ:  His testimony was he talked to all

3    the parents and that he would have been the one to talk to

4    these parents at the time and he told them all the same

5    thing.  So I don't think that's even an issue.

6          MR. STILLEY:  Well, that's certainly not his

7    evidence.  We've got that they kept medical logs, they had

8    the orientation guides to tell the personnel, the personnel

9    told the top brass, which was Debbie and Betty.

10         MR. SCHWARTZ:  It's all speculation as to what they

11   told them.

12         MR. STILLEY:  It is not speculation, and there is a

13   responsibility that you maintain the employees in your care

14   and make sure that they provide this information when it's

15   appropriate.  And now if there's a dispute on the testimony,

16   the defendants are saying you can come to us any time and

17   talk to us, it would be just fine, you wouldn't get hurt.

18   The defendants said if you took off to go talk to these

19   people, you get a dog paddle.  The jury is going to have to

20   decide who is telling the truth and who is lying.  So Tracey

21   Ozuna needs to be able to take this to the jury and see if

22   the responsibility is to be laid at the feet of Debbie and

23   Betty.

24         THE COURT:  Well, you got a situation where they

25   have to presume that one or both of them were told about this

1    situation and didn't do anything about it, failed to

2    appreciate the seriousness of it, could have done something

3    and didn't do it.

4         MR. STILLEY:  Well, we've got testimony from the

5    defendants that establish that.

6         THE COURT:  Well, I'll tell you what, I'll give you

7    that one.

8         MR. STILLEY:  Thank you, Judge.

9         THE COURT:  And we'll leave Betty Wills and Deborah

10   Gerhardt in there.

11        Now, listen, we've already gone over the battery

12   claims.  Can you all get these together with these elements?

13        MR. SCHWARTZ:  The battery claims, Judge?

14        THE COURT:  The battery claims are done.  We did

15   those.  We don't have a problem with those other than you're

16   going to put the tail on there.

17        Now, as far as these negligence claims, we've got

18   Woods, hearing; Teasley, dental care; Ozuna, asthma.  We've

19   got as to defendants' names, Betty Wills and Andrea Hill for

20   Woods hearing; Deborah Gerhardt for the dental care; Betty

21   Wills and Deborah Gerhardt for the asthma.

22        MR. SCHWARTZ:  Well, Judge, on the hearing, there's

23   no evidence that Andrea Hill could do anything about the

24   hearing.  I mean, it's the same thing.  All -- the testimony

25   is all that she could do is report it.

1          THE COURT:  What about that?  What about that?

2          MR. STILLEY:  Well, she had a duty to report it and

3     follow up.

4          MR. SCHWARTZ:  There's no evidence that she --

5          THE COURT:  Well, if she's not the one to call -- in

6     the chain of command if she's not the one to call the doctor

7     and get something done about it, then she's not the

8     appropriate defendant.  Betty Wills is the one who knows

9     she's in charge and she has the supervisory authority, she's

10    the one that handles this thing.

11         MR. STILLEY:  Well, it's -- there's clearly

12    testimony that Ms. Hill was told she had a duty to tell

13    somebody else and make sure --

14         THE COURT:  We're not concerned about her duty to

15    tell.  It gets to the duty of getting the medical care.  So

16    if she isn't in the line of getting the medical care, then

17    forget it.

18         MR. STILLEY:  And your ruling is?

19         THE COURT:  She's out.

20         MR. SCHWARTZ:  Judge, so we would have for the

21    hearing for Plaintiff Woods the claim is for the hearing

22    against --

23         THE COURT:  Betty Wills for the hearing.  Deborah

24    Gerhardt for the dental care.  Betty Wills and Deborah

25    Gerhardt for the asthma condition.  And we're going to use

1    these elements that we talked about under that Stineman case.

2         MR. SCHWARTZ:  Okay.

3         THE COURT:  Ability to appreciate whatever the

4    condition was, it would be hearing, need for dental care,

5    lack of asthma inhaler, and then we can go on from there.

6    That they had the ability to obtain adequate treatment.  You

7    could say treatment or whatever word that fits appropriately.

8         MR. SCHWARTZ:  Judge, this is what I had kind of

9    jotted down when we were talking before.  Your verdict must

10   be for the Plaintiff Woods if you believe, first, Defendant

11   Betty Wills was able to appreciate the severity of

12   plaintiff's hearing condition; and, second, defendants had

13   the ability to obtain treatment; and, third, defendant failed

14   to provide adequate treatment that would have avoided the

15   injury, or whatever the test was, something like that.

16        THE COURT:  Yeah, when it says avoid the injury's

17   ultimate harm.  I think it works as the ultimate injury.

18        MR. SCHWARTZ:  The ultimate injury or the injury's

19   ultimate harm.  I think the point is it's not the injury.  We

20   didn't cause the hearing loss, it's harm from failing to

21   correct it.  I think that's the point it's got to be.

22        THE COURT:  Or maybe it's just ultimate harm instead

23   of injury, and not put injury in.

24        MR. SCHWARTZ:  Okay.

25        THE COURT:  Because most of them are conditions as

1    opposed to injuries.  I mean, if anything is an injury, it's

2    an injury to Teasley's teeth or something.  But I think all

3    of them are conditions.  So I think if we go with condition,

4    we can take injury out and go with ultimate harm.

5         MR. SCHWARTZ:  But doesn't that assume -- doesn't

6    that have the instruction assuming it was ultimate harm?

7    Don't we have to -- I mean, you can't instruct the jury that

8    this was ultimate harm.  Defendants had the ability to obtain

9    treatment, and, third, they failed to provide adequate

10   treatment that would have corrected the --

11        THE COURT:  Well, maybe we got to put a fourth, a D

12   on there for a fourth one.  As a direct result -- we got to

13   say something about it was negligence.

14        MR. SCHWARTZ:  Well, we got to have damages.  And as

15   a direct result there was damages.  But I'm concerned about

16   having in the first paragraph something that says "and would

17   have avoided the ultimate harm" because it assumes there

18   wasn't any harm.  I mean, the way the case law, the case is

19   written, they already knew there was harm.  So when they

20   wrote the case, you can't just convert that to the

21   instruction.  We could -- we could say would have corrected

22   the medical condition or something like that.

23        THE COURT:  I can leave that to your ingenuity.

24        MR. SCHWARTZ:  Judge, I will propose --

25        THE COURT:  Because otherwise we're going to be here

1      forever.  That's the problem.  We'll be here forever.

2              MR. SCHWARTZ:  I'm willing to propose we go back to

3      our hotel --

4              THE COURT:  10 o'clock tomorrow.

5              MR. SCHWARTZ:  We have computers and a printer and

6      everything back there, and Mr. Briggs will be working late

7      tonight on that.

8              THE COURT:  I'll see you all at ten tomorrow.

9              MR. SCHWARTZ:  Ten tomorrow with this all ready to

10     go?

11             THE COURT:  Yes.

12             MR. SCHWARTZ:  With the agreed between us or what?

13             THE COURT:  Ten we'll have the conference.

14     Hopefully you all have -- perhaps you all ought to meet here

15     at -- I don't know, what time would be a good time for you

16     all to be here?

17             MR. SCHWARTZ:  I don't know what time they'll let us

18     in here.  What time will they let us in here?

19             THE COURT:  Nine.

20             MR. STILLEY:  Your Honor, can we talk by e-mail?  I

21     can actually talk better by e-mail.

22             THE COURT:  You all can work this out this evening.

23     But, you know, I made my decisions.  So that is that.  And

24     I'll just see you all here at ten.

25             MR. SCHWARTZ:  Judge, I also did -- I also prepared

1    what I think is the correct negligence instruction.

2         THE COURT:  Okay.  Let me look at those so we can

3    get that out of the way.

4         MR. SCHWARTZ:  I also want to ask for a withdrawal

5    instruction on emotional distress, but now that you made your

6    rulings, I may want to have a withdrawal instruction on some

7    other things.

8         THE COURT:  Yeah.  I mean, do you have some other

9    negligence instruction, Mr. Stilley?  This instruction is MAI

10   11.02, that the term negligent or negligence as used in these

11   instructions means the failure to use that degree of care

12   that an ordinarily careful person would use under the same or

13   similar circumstances.

14        MR. STILLEY:  The only change that mine has is

15   parent instead of person.

16        THE COURT:  Oh, no.  No.  Now, what about this --

17   we'll use this MAI 11.02 instruction.  Now, what were you

18   saying about this emotional distress instruction?

19        MR. SCHWARTZ:  Your Honor, there was testimony early

20   on in the case about, you know, a lot of emotional harm and

21   distress.  And, you know, there was just a whole lot of that.

22   And I think after the first day you started keeping a lot of

23   it out.  But some of it did come in about, you know, this

24   emotional, how it effected them emotionally.

25        THE COURT:  You're offering this instruction?

1          MR. SCHWARTZ:  Yes.

2          THE COURT:  Mr. Stilley?

3          MR. STILLEY:  You're offering which instruction?

4          THE COURT:  He's offering -- what is this, from MAI?

5          MR. SCHWARTZ:  Yeah -- yes.

6          THE COURT:  34.02, it says the issue of emotional

7    distress damages are withdrawn from the case and you're not

8    to consider such issue in arriving at your verdict.

9          MR. STILLEY:  I'd rather not.

10          THE COURT:  I know you'd rather not.  But they are

11    gone, and you keep trying to put them in, and that's probably

12    the reason I need to give it.

13          MR. STILLEY:  Well, make your ruling.

14          THE COURT:  Yeah, it's in.

15          MR. SCHWARTZ:  I may -- we'll think tonight.  There

16    may be other things that we should tell the jury are not in

17    the case given your rulings and we'll try to put those

18    together.

19          THE COURT:  Don't try to catch up with Mr. Stilley

20    and step too far over the line though.

21          MR. SCHWARTZ:  All right.  You want us to clean up

22    the battery stuff too, right?

23          THE COURT:  Everything.  Do you need these, any of

24    this stuff, my battery stuff that I did or you need any of

25    this stuff from the members of the jury and so forth?

1          MR. SCHWARTZ:  If you want to give us yours, we have

2     a better chance of it being accurate.

3          THE COURT:  Here.  Let me give you the members of

4     the jury and so forth.  Then I've got these battery

5     instructions and I got the final instructions, you know,

6     about the jury, their duties.

7          MR. SCHWARTZ:  Thank you.

8          THE COURT:  So I assume that that's correct.  I'll

9     just see you all at ten tomorrow.  You all need to get

10    together before then.  This thing can't go on forever.

11    Cannot go on forever.

12         MR. SCHWARTZ:  Thanks for your patience, Judge.

13         THE COURT:  Yeah.

14         (Court in recess at 7:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 282 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this _____ day of _____, 2006.


                              _____
                              /s/ Susan R. Moran
                              Registered Merit Reporter