```
 1                    UNITED STATES OF AMERICA
                    EASTERN DISTRICT OF MISSOURI
 2                      SOUTHEASTERN DIVISION

 3   JAMIE KAUFMANN WOODS, et al.,    )
                                      )
 4            Plaintiffs,             )
                                      )
 5        vs.                         )  No. 1:03-CV-105 CAS
                                      )
 6   BOB WILLS, et al.,               )
                                      )
 7            Defendants.             )

 8
                        TRANSCRIPT OF JURY TRIAL
 9
              BEFORE THE HONORABLE CHARLES A. SHAW
10                 UNITED STATES DISTRICT JUDGE

11                      December 15, 2005
                           Volume IV
12

13   APPEARANCES:

14   For Plaintiff:      Mr. Oscar Stilley
                         2120 North B Street
15                       Fort Smith, AR   72901

16
     For Defendant:      Mr. John D. Briggs
17                       Mr. Steven H. Schwartz
                         BROWN AND JAMES, P.C.
18                       1010 Market Street
                         20th Floor
19                       St. Louis, MO   63101

20
     REPORTED BY:        SUSAN R. MORAN, RMR
21                       Official Court Reporter
                         111 South 10th Street
22                       St. Louis, MO   63102
                         (314) 244-7983
23

24   Proceedings recorded by mechanical stenography, produced by
     computer-aided transcription.
25
```

1              I N D E X

2

INSTRUCTION CONFERENCE          3

3

4    INSTRUCTIONS OF THE COURT       30

5

CLOSING ARGUMENTS

6

        (By Mr. Stilley)        40
7        (By Mr. Schwartz)       50
        (By Mr. Stilley)        61

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held outside the

2     hearing of the jury on December 15, 2005 at 10:07 a.m.:)

3          THE COURT:  I mentioned to them that perhaps we need

4     to review this situation relative to Ms. Lueken in terms of

5     the eyesight situation.  That was one we didn't talk about

6     yesterday in terms of her claim as to the eyesight, so

7     whether or not that should remain in the case.

8          MR. STILLEY:  Your Honor, I think that it should

9     remain in the case.

10         THE COURT:  I know you think it should.  I don't

11    have to ask that.  But I wanted to deal with why it should

12    remain in the case in terms of those negligence factors we

13    talked about.

14         MR. STILLEY:  Well, that's something that -- it's

15    serious.  It is a serious bodily function.  And when it's

16    rapid deterioration, a reasonably careful person should

17    realize there's probably a cause for that and they need to

18    have it checked out.

19         THE COURT:  Basically she came down there and what

20    happened?  What are the facts that you would say relate that

21    support this?

22         MR. STILLEY:  Her eyesight deteriorated.

23         THE COURT:  In terms of the glasses.  You talk about

24    result.  Let's start with she comes to school and where are

25    her glasses?

1          MR. SCHWARTZ:  There was no testimony about that,

2     Judge.  The only testimony was she said my eyesight got worse

3     while I was there.  Her mother, which was called in the

4     plaintiffs' case, testified she took her to the eye doctor

5     twice while she was at the school.  And she wrote it in the

6     reports.  She wrote reports saying, went to the eye doctor

7     twice during the, what, two years she was there.  There was

8     no testimony about her not having glasses.  That was alleged,

9     but it wasn't testified to.

10          THE COURT:  Yeah.  There was an allegation, but I

11    don't recall any testimony about her not having her glasses,

12    just that her eyesight deteriorated.

13          MR. STILLEY:  Well, my recollection is that the

14    defendant said she would have to be there a number of months

15    before she could be taken for her eyeglasses and to get some

16    care for it.  And my contention would be that when somebody's

17    eyes, when they don't have their glasses or their eyesight is

18    deteriorating --

19          THE COURT:  There is no testimony she didn't have

20    her glasses.

21          MR. STILLEY:  Well, when her eyesight is

22    deteriorating, it's not something that needs to be done four

23    months or six months later, it needs to be done right then.

24          MR. SCHWARTZ:  Your Honor, she came there on

25    June 23, 2000.  The report that was put into evidence by the

1    plaintiff shows that her mother took her to the eye doctor on

2    March the 8th, 2001, which is less than a year from the time

3    she was dropped off at the school.  That's -- most people

4    only go to the eye doctor once a year.

5         MR. STILLEY:  But the testimony was that her

6    eyesight was deteriorating rapidly.  And when there's a rapid

7    deterioration, we want to know why, and we want to get it

8    cured.  So waiting a year is not enough.

9         MR. SCHWARTZ:  There wasn't any evidence that she

10   told anybody that she had problems with her eyes or she asked

11   to go to a doctor or complained about it.  She just said my

12   eyesight deteriorated.  And that's so ambiguous anyway.

13        THE COURT:  Yes.  Fine.  I'm going to direct a

14   verdict as to the claim, because I don't think you've got

15   enough evidence there to support any claim against any of the

16   defendants relative to that.  But I knew that was one we did

17   not discuss yesterday evening and it was on my mind, so I

18   wanted to do that.

19        Now, do we have those instructions together at this

20   point in time?

21        MR. STILLEY:  Your Honor, I think there was another

22   couple of them we didn't talk about.  One was the safety pin.

23   I just want a ruling.  I just want the record -- I think the

24   safety pin really should go to the jury too.

25        THE COURT:  I don't think the evidence was there.

1    It wasn't clear that they knew that the pin -- did she say

2    she told them the pin was -- they called the doctor.

3            MR. STILLEY:  She said that she was exhibiting signs

4    of serious distress.

5            THE COURT:  Okay.

6            MR. STILLEY:  Couldn't hardly even talk.  And that

7    there was blood in her mouth and --

8            THE COURT:  I don't recall her saying blood in her

9    mouth.

10           MR. SCHWARTZ:  Your Honor, can I respond to this?

11           THE COURT:  Sure.

12           MR. SCHWARTZ:  Her testimony was that she swallowed

13   the safety pin, it went down into her stomach, and she later

14   excreted it.  Now, there's no testimony that taking her to

15   the doctor would have been better for her.  I mean, she's

16   not -- there's no evidence that she has any internal

17   problems, there's anything wrong with her stomach, or she's

18   having any kind of illness or whatever.

19           THE COURT:  I mean, the medical, taking her to the

20   doctor would have avoided what?  Would have avoided what

21   harm?

22           MR. STILLEY:  Well, the pain of the pin going down.

23           THE COURT:  What are they going to do?  You think

24   they should have gone, taken her in and they would have done

25   surgery, opened her up?  I mean, please.

1          MR. STILLEY:  No, there's a hole right there to

2     stick something down in her mouth and close that pin up and

3     pull it back out.

4          MR. SCHWARTZ:  The testimony was it went down into

5     her stomach.  They would have to put her under and do

6     surgery.  Is that better off than what happened?

7          THE COURT:  That claim is gone also.

8          MR. STILLEY:  Okay.  We also got the Shari Lueken

9     cold shower.  And the witness, Ms. Gerhardt, said that was a

10     treatment to calm her down.  Not punishment, not discipline,

11     treatment to calm her down.  And my position would be that's

12     negligent treatment.  That's not the way to calm somebody

13     down even if they are out of line.  I think the jury needs to

14     decide if that's negligent or not.

15          MR. SCHWARTZ:  Your Honor --

16          THE COURT:  You talking about the cold shower of

17     Ms. Woods?

18          MR. STILLEY:  I'm talking about Shari Lueken's cold

19     shower.

20          MR. SCHWARTZ:  Your Honor, Debbie Gerhardt denied

21     giving a cold shower to Ms. Lueken.  So there was no

22     testimony that they gave it to her to calm her down.  She

23     claims she had a cold shower.  But that's -- that goes back

24     to intentional infliction of emotional distress.  It's not

25     lack of failing to give medical care.

1          THE COURT:  Fine.  That's gone.  That's an emotional

2     distress situation.

3          MR. STILLEY:  Well, Your Honor, if I may.  That

4     would cause physical discomfort.  And as I recall, the

5     testimony of the witness --

6          THE COURT:  Like the discomfort I'm feeling just

7     being here.  Okay.  Well, some things you just have to deal

8     with.

9          MR. STILLEY:  That would cause physical discomfort.

10    As I recall the testimony of the witness was, I didn't do it,

11    but if I did, it was to calm her down.  So it's a jury

12    question as to whether it happened and whether that was a

13    failure to use ordinary care.

14         THE COURT:  Physical discomfort, does that get to

15    the level of an injury?

16         MR. STILLEY:  You say in your order that's what you

17    said.

18         MR. SCHWARTZ:  It's not an injury.  You know, people

19    take cold showers on purpose sometimes.  I mean, the

20    testimony was that sometimes if we had somebody who was out

21    of control, we would have to give them a cold shower to calm

22    them down and get --

23         THE COURT:  That's gone.  Okay.  Let's go with these

24    instructions.

25         MR. SCHWARTZ:  Judge, unfortunately we did not make

1    copies.  We should have before we got started, but we have a

2    set to hand to you.  But this is the only set.

3              THE COURT:  Well, we can make other copies once we

4    get them together.

5              MR. SCHWARTZ:  The verdict form is here.  Those are

6    the verdict forms, Judge.

7              THE COURT:  Okay.  The first proposed instruction is

8    "Members of the jury, the instructions I gave at the

9    beginning and during the trial remain in effect and I'm now

10   giving additional instructions."  That's going to be No. 1.

11   Any objection to that instruction?

12             MR. STILLEY:  Your Honor, the standard ones I don't

13   have any objection to, any of the first.

14             THE COURT:  Let's go through them.  I mean, I know

15   they are standard ones, they are the boilerplate

16   instructions.  There is no significant consequence, but I'm

17   going to go through them and number them and see if you have

18   an objection.  If you do, so indicate, okay.

19             MR. STILLEY:  Well, I can't make an effective

20   objection without having a copy.  Can we make a copy first?

21   I do have some objections.  I want to protect the record.  I

22   want to make it as short as we can.

23             THE COURT:  Fine.  Michelle, would you make four

24   copies of these instructions as well as these verdict forms,

25   okay.

1          MR. SCHWARTZ:  While she's doing that, just for the

2     record I'm going to file my written motions, but I think

3     you've already made your rulings on it.

4          THE COURT:  Very well.  This is defendants' motion

5     for judgment as a matter of law at the close of all the

6     evidence.  The motion was discussed yesterday and The Court

7     made its rulings yesterday as well as this morning, and so

8     The Court is going to grant this motion in part and deny it

9     in part as specified on the record.  So that will be that.

10         MR. SCHWARTZ:  Judge, as an administrative matter,

11    do you need us to prepare a proposed judgment or order for

12    those things that are being dismissed by you prior to the

13    verdict?

14         THE COURT:  It probably would not hurt, but I don't

15    know that we're going to have time to do that.

16         MR. SCHWARTZ:  I'm not saying right now, but I mean

17    we can do it.

18         THE COURT:  Fine.

19         MR. SCHWARTZ:  We can do that later.

20         THE COURT:  Yeah, I'd appreciate that.  That would

21    be great.  Okay.  Why don't we discuss the time we need to

22    argue this case.  How much time do you need, Mr. Stilley?

23         MR. STILLEY:  Twenty minutes.

24         THE COURT:  Very well.  How do you want to divide

25    your 20 minutes?

1              MR. STILLEY:  Twelve and eight.

2              THE COURT:  What kind of warnings do you want?

3              MR. STILLEY:  One-minute warning.

4              THE COURT:  How much?

5              MR. STILLEY:  One-minute warning.

6              THE COURT:  Fine.  What kind of warning you want,

7    Mr. Schwartz?

8              MR. SCHWARTZ:  Can I have a warning halfway through

9    and five minutes?

10             THE COURT:  Very well.

11             (There was a brief recess.)

12             THE COURT:  Okay.  The first instruction is the --

13   these are these boilerplate instructions which starts with:

14   "Members of the jury, the instructions I gave at the

15   beginning of the trial and during the trial remain in

16   effect."  Any objection to that as No. 1?

17             MR. SCHWARTZ:  No.

18             MR. STILLEY:  No.

19             THE COURT:  Proposed Instruction No. 2, "Neither in

20   these instructions nor in any ruling or remark that I have

21   made during the trial have I intended to give any opinion and

22   so forth relative to what the verdict should be."  Any

23   objection to that?

24             MR. SCHWARTZ:  No.

25             MR. STILLEY:  No.

1          THE COURT:  Proposed Instruction No. 3 is the

2    credibility instruction about deciding what the facts are,

3    what testimony you believe and what testimony you do not

4    believe and so forth and evaluating a witness.  Any objection

5    to that as three?

6          MR. STILLEY:  No.

7          MR. SCHWARTZ:  No, sir.

8          THE COURT:  Proposed No. 4 is the burden of proof,

9    the preponderance of the evidence or greater weight

10   instruction.  Any objection to that as four?

11         MR. SCHWARTZ:  No, sir.

12         MR. STILLEY:  No.

13         THE COURT:  The instruction that we have as No. 5,

14   I'll take that out, that will be the final instruction.

15   That's the instruction relative to the jury in terms of

16   conducting their deliberations.  Now, we have some --

17         MR. SCHWARTZ:  Your Honor, can I just ask a question

18   about that?

19         THE COURT:  Sure.

20         MR. SCHWARTZ:  At the bottom of that instruction it

21   has a parenthetical about reading the form.  Does that stay

22   in there?

23         THE COURT:  I'll leave it in there.  It doesn't

24   matter.  I'm not going to read it.

25         MR. STILLEY:  Is that not going to be numbered then?

1          THE COURT:  Yeah, but it's going to be the last

2     instruction.  This is the final instruction I'm going to

3     give.  So it's not in the right place, so we'll take that out

4     for the time being.

5          The next instruction we have in the packet relates

6     to claims of --

7          MR. SCHWARTZ:  This is a withdrawal instruction,

8     Judge, that we were proposing.

9          THE COURT:  Okay.  This instruction reads:  "The

10    claims of Jessica Deboi and Plaintiff Shari Lueken are

11    withdrawn from the case and you're not to consider such

12    claims in arriving at your verdict.  The issue of emotional

13    distress damages is withdrawn from the case and you're not to

14    consider that.  The issue of missed periods is withdrawn from

15    the case and not for their consideration.  The issue of

16    constipation is withdrawn from the case and not to be

17    considered.  The issue of sleep depravation is withdrawn from

18    the case."  So you object to that, Mr. Stilley?

19         MR. STILLEY:  Yes, for all the reasons previously

20    stated.

21         THE COURT:  Yesterday, okay.  Well, those objections

22    will be noted again.  Overruled.  That will be Instruction

23    No. 5.

24         MR. STILLEY:  Actually, Judge, can I say one more

25    thing --

1          THE COURT:  Go for it.

2          MR. STILLEY:  -- in addition to everything before.

3     I think on the battery claim, that would be improper to say

4     that the emotional distress damage will be withdrawn, because

5     on a battery, whether or not -- the offense of touching is

6     sufficient.  Even if there is no damages, it could be a

7     nominal award, but I think that this could confuse the jury

8     into thinking that there wouldn't be a basis for finding in

9     favor of the plaintiff, for example, on the poking unless

10    there was some injury.

11         MR. SCHWARTZ:  Well, Your Honor, I will not -- if it

12    will satisfy The Court, I won't argue that.  But I think that

13    we are entitled to tell the jury that the emotional

14    distress -- there are a lot of other emotional distress that

15    was complained about that's not being submitted to the jury,

16    and I think we're entitled to get a withdrawal on that.  But

17    I will to satisfy the concern of counsel, agree that I will

18    not argue to the jury that they should not consider the

19    emotional response.

20         THE COURT:  As to the batteries.  You can go ahead

21    and argue it then.

22         MR. STILLEY:  Here's what I'd like to do.  Let's say

23    the issue of emotional distress damages is withdrawn from the

24    case with respect to the negligence counts.

25         MR. SCHWARTZ:  That will really confuse them.

1    What -- I don't know if they'll even know what that means.

2    Because they don't know what counts are in until they see

3    this.

4         MR. STILLEY:  Well, you'll be reading this to the

5    jury at this point in time and they will very quickly figure

6    that out.

7         THE COURT:  Well, I'll tell you what, I think it's

8    just simpler if you argue for -- if you're asking for

9    emotional distress as to the battery and indicate that, that

10   that instruction does not apply to that, and it's not going

11   to be opposed by Mr. Schwartz.

12        MR. STILLEY:  Is there a way that we can put this in

13   and make it less obvious, but say that the issue of emotional

14   distress damages is withdrawn?  Hey, how about this, with

15   respect to the verdict directors on the negligence, put that

16   sentence in those directions so that it will not be just as a

17   general direction, general instruction to the jury, so

18   they'll know what count it goes with.

19        THE COURT:  Listen, you just argue for it and

20   indicate to the jury that it does not apply to those.  And

21   Mr. Schwartz has indicated that he's not going to argue

22   otherwise.  I think that that will be sufficient.  Because

23   there's so many other issues there that relate to that.  So

24   I'm going to give that as Instruction No. 5 noting your

25   objections and suggestions and overruling.

1        Proposed Instruction No. 6 is, "The definition of

2   the term negligent or negligence as used in these

3   instructions means the failure to use that degree of care

4   that an ordinarily careful person would use under the same or

5   similar circumstances."  Any objection to that?  You had

6   something as a parent or something, didn't you, Mr. Stilley?

7        MR. STILLEY:  Yes, parent as opposed to person.  We

8   reserve that objection, otherwise it's satisfactory.

9        THE COURT:  No.  That's overruled.  That's No. 6.

10       Okay.  Now, let's see what goes in these -- this

11  would be -- it doesn't have a number on this one where it

12  says instructions blank through blank and general

13  instructions one through --

14       MR. SCHWARTZ:  This is a bridge, Judge.  Does this

15  need a number?  We can put one on.  I can reprint.  I can

16  give her the disk.

17       THE COURT:  We'll make that Instruction No. 7.

18  Okay.  So that would be -- first of all, we're going to use

19  Verdict A for Ms. Woods.  So that would go in that blank for

20  Verdict A.  And the specific instructions relative to her

21  would be eight, nine, ten, and 11.  So the first blank would

22  be eight through 11.  And the general instructions are one

23  through six.  And the last blank would be Verdict A.

24       Now, let's look at these specific instructions eight

25  through 11 relative to Ms. Woods.  Battery claim, Proposed

1    Instruction No. 8, on the claim of Plaintiff Jamie Kaufmann

2    Woods for battery against Defendant Andrea Hill, your

3    verdict -- is Andrea Hill still in the case?  Did we leave

4    her in?

5              MR. SCHWARTZ:  On this claim only.

6              THE COURT:  Okay.  Yeah, against Defendant Andrea

7    Hill, your verdict must be for Plaintiff Jamie Kaufmann Woods

8    if you believe:  First, Defendant Andrea Hill intentionally

9    pushed or caused others to push -- okay, the offensive

10   conduct and it would be offensive to a reasonable person.

11   Any objection to that instruction as No. 8?

12             MR. SCHWARTZ:  Yes, Your Honor.  We would object to

13   this instruction for the record at this time.  It's vague and

14   ambiguous.  It's a roving commission.  There is not

15   sufficient evidence to support it.  Based on the testimony

16   that was given, there was absolutely no injury caused by

17   this.  There's not sufficient evidence that it's an offensive

18   contact.  And I don't think it's in the proper form.  I think

19   that should be -- under the MAI it should be required that

20   there be a finding of bodily injury.

21             THE COURT:  Mr. Stilley.

22             MR. STILLEY:  Your Honor, I don't have an objection

23   to it of course.  I think it's pretty much straight out of

24   the MAI except that it's adapted to the facts of this case.

25             THE COURT:  Well, that's what The Court sees.  The

1    Court is concerned that even though there is a physical

2    contact where no injury is caused, that does not place a

3    plaintiff in a position where they should not be able to gain

4    relief unless there is injury.  So I'm going to overrule

5    those objections, give that instruction as eight.

6         Proposed Instruction No. 9 is Ms. Woods same

7    instruction but it's against Defendant Betty Wills in terms

8    of the poking, intentionally poked Ms. Woods, and contact was

9    offensive, would be offensive to a reasonable person.  That

10   is Proposed Instruction No. 9.  Any objection to that?

11        MR. SCHWARTZ:  Yes, Your Honor, we would object to

12   Instruction No. 9 for the same reasons as Instruction No. 8.

13   In addition, as a matter of law, this poking, which was

14   demonstrated in court and described by the plaintiff herself,

15   is not an offensive contact.  Not every touch between two

16   human beings is offensive contact.  The testimony was that

17   Ms. Wills to make a point tapped her chest bone with her

18   index finger -- or tapped Ms. Woods' chest bone with her

19   index finger.  There was no pain or suffering or harm caused

20   by it.  I don't think it's sufficient to go to the jury on

21   that basis.  And I think also for the same reasons I said in

22   Instruction No. 8, you need to have some bodily harm and the

23   finding by the jury of bodily harm.

24        THE COURT:  Well, the Court's opinion is the same

25   relative to this bodily harm situation in terms of injury.

1    Anything you wish to say, Mr. Stilley?

2            MR. STILLEY:  No objection.

3            THE COURT:  That's No. 9.  Okay, that's No. 9.

4            Proposed No. 10 is Ms. Woods' claim of negligence

5    against Betty Wills relative to her hearing condition.  And

6    that, you know, you have the instruction there that she

7    sustained damage relative to not obtaining treatment and so

8    forth and so on.  That's Proposed No. 10.  Any objection to

9    that?

10           MR. SCHWARTZ:  Yes, Your Honor, there is not

11   sufficient evidence to support this instruction, and I don't

12   think it correctly states the law.  The case -- the Eighth

13   Circuit case that this is based on was a case where a child

14   was hurt on a playground or in a ball field and injured his

15   eye, and the teacher or school person failed to take the

16   student to the -- to medical treatment.  As a result there

17   was medical testimony that as a result the student lost the

18   use of his eye because of the time lag in not getting quick

19   treatment.

20           This is not anywhere close to that case.  This is a

21   case where the plaintiff's only testimony was that she was

22   brought to school by her parents.  Her parents didn't bring

23   her hearing aids.  She asked her parents to give her the

24   hearing aids.  They didn't send them to her.  They came to

25   visit her and didn't bring her hearing aids.

1      So ultimately her own testimony was the school took

2   her to be tested, she got her hearing aids, and they enhanced

3   the sound system at church to help her with her hearing.

4   There is no evidence that they did anything wrong whatsoever.

5   I don't think this can be submitted in this way.  If this can

6   be done in this way, every school can be sued any time any

7   child has any complaint about they didn't get something in

8   time.  It really I think opens up Pandora's box, and I don't

9   think it's the proper form.  There is absolutely no form for

10   this sort of thing because it's so rare.

11      MR. STILLEY:  No objection.

12      THE COURT:  Okay.  Your objection is overruled,

13   Mr. Schwartz.  This is No. 10.

14      Proposed Instruction No. 11 is a damages instruction

15   for Ms. Woods.  Basically it's saying if you find in favor of

16   them, you must award her a sum that will fairly and justly

17   compensate her for damages that you believe she sustained.

18   And that's a direct result of the conduct submitted in

19   Instructions 8, 9, and 10 in the blanks.  Any objection to

20   that?

21      MR. STILLEY:  No objection.

22      THE COURT:  Now, here we go again.  These -- the

23   next set of instructions, and we'll have to put something

24   else there.  But this would be -- the last one was

25   Instruction No. 11.

1          And Proposed Instruction No. 12 is the bridge

2    instruction relating to the claims of Plaintiff Tracey Brazil

3    Ozuna relative to battery and negligence.  So, first of all,

4    it's going to be Verdict Form B in that last blank, and then

5    we've got Instructions No. 13, 14, 15, and 16.  So that would

6    be 13 through 16 in the first blank, and general instructions

7    one through seven.  So we'll need to do this when we put this

8    instruction blank at the top so it's in form with the others.

9          Now, Proposed Instruction No. 13 relative to

10   Ms. Ozuna.  This is a battery claim against Deborah Gerhardt

11   relative to the paddling of Ms. Ozuna.  Any objection to that

12   instruction?

13          MR. SCHWARTZ:  Yes, Your Honor, we would object to

14   this instruction on the basis that the undisputed testimony

15   of Ms. Ozuna was that she -- well, first of all, the

16   undisputed testimony was that her parents were told in

17   advance about the paddling policy, and that her testimony was

18   after she was paddled she went home.  She told her parents

19   about the paddling.  And then they brought her sister and her

20   back to the school.  And I think under the law, under the

21   instruction for the affirmative defense, consent, as a matter

22   law that shows consent and so therefore we're entitled to a

23   directed verdict on that basis.  So I think that that would

24   be my objection.

25          THE COURT:  Okay.  Well, the next instruction is

1    that affirmative defense instruction that you're speaking of

2    relative to the parents giving consent to this paddling

3    situation.  So I'm going to give Instruction No. 13.  Do you

4    have any objection to that, Mr. Stilley?

5              MR. STILLEY:  None other than those that I stated

6    yesterday.

7              THE COURT:  Okay.  And I guess those that you stated

8    relate to Instruction No. 14, which is the next instruction,

9    which is the defendants' affirmative defense that the parents

10   gave consent to any such paddling.

11             MR. STILLEY:  That is correct.

12             THE COURT:  Well, that objection is noted.  The

13   blank there will have 13 in it.  So we'll give 13 and 14.

14             Instruction No. 15 relates to Ms. Ozuna's claim of

15   negligence against Betty Wills and Deborah Gerhardt relative

16   to her asthma condition.

17             MR. SCHWARTZ:  Your Honor, I would make the same

18   objection to this as I made to the instruction regarding the

19   hearing aids, which was Instruction No. 10.  There was no

20   evidence to support this.  She said that she asked a staff

21   member for her inhaler when she was out at the ball field.

22   She's never testified she talked to Debbie Gerhardt or Betty

23   Wills about it.  And there was no evidence of any injury from

24   this.  She said she wanted her inhaler.  And she also said

25   that she didn't know if her parents had sent it to her.

 1    That's all it was.  That can't turn into -- this is not a

 2    claim.  It can't be.  I mean, she had the ability to ask her

 3    parents for it.  She could write to her parents.  She could

 4    talk to them on the phone.  And there's no evidence that she

 5    ever went to medicine call and said, I need my inhaler, I

 6    want an inhaler.  Or she went to Debbie or Betty or anyone

 7    else who had the authority to get her an inhaler.

 8             THE COURT:  Mr. Stilley.

 9             MR. STILLEY:  No objection.

10             THE COURT:  We talked about this yesterday and about

11    the supervisory responsibility, so I'm somewhat reluctant to

12    give it, but nevertheless I'm going to give it anyway.  So

13    that's Instruction No. 15.  I'm going to keep that in the

14    case.

15             Now, Proposed Instruction No. 16 is the damages

16    instruction for Ms. Ozuna.  And it speaks about fairly and

17    justly compensating her for damages she sustained as a result

18    of the conduct relative to instructions -- I guess that's 13

19    through 15.  Wait a minute.  Oh, 13 and 15.  I think that's

20    what should go in there, 13 and 15.  Because 14 was a

21    converse -- well, affirmative defense instruction.

22             Okay.  Proposed Instruction No. 17.

23             MR. SCHWARTZ:  Judge, do you have those proper ones

24    now?  Did somebody hand those to you?

25             THE COURT:  Yes, Mr. Briggs handed those to me.

1    Okay.  I'll put this one in first.  This has got a blank on

2    top of that.  Let's throw that away.  So that would be

3    Instruction No. 17, the bridge instruction for Ms. Teasley.

4    So that would be 17 and 18.

5            MR. SCHWARTZ:  I'm sorry, Judge.

6            THE COURT:  I'm mean, 18 and 19 rather.  It would be

7    the next two instructions following this.  Instructions 18

8    through 19, and general instructions one through seven apply

9    to the claim of Erika Teasley for negligence.  Use verdict

10   form -- that should be a Verdict Form C, okay.

11           Now, let's go to Instruction No. 18 on the claim of

12   Erika Teasley for negligence against Defendant Deborah

13   Gerhardt.  Your verdict must be for Ms. Teasley if you

14   believe -- this is the same negligence instruction.  This is

15   the toothache situation.  Any objection to that instruction?

16           MR. SCHWARTZ:  Yes, Your Honor.  We would object.  I

17   would object based on the same basis that I objected to

18   Instruction Nos. 10 and 15.  The evidence was that she

19   complained about a toothache.  She was given Tylenol and

20   other things and they took her to the dentist.  This does not

21   fit within the Siteman case or any of the Eighth Circuit case

22   law on this.  This is not an injury that they failed to

23   treat.  In fact, they took her to the dentist and she was

24   treated.

25           MR. STILLEY:  No objection.

1          THE COURT:  Fine.  The Court is going to give that.

2     Instruction No. 19 is a damages instruction for Ms. Teasley

3     and talks about fairly and justly compensating her as a

4     direct result of the conduct submitted in the previous

5     instruction, which would be 18 would go in that blank.

6          So those are all the instructions other than the

7     final instruction directing the jury as to their

8     deliberations, which would be No. 20.

9          Now, are there any other or further instructions

10    that are proposed before we go with this last instruction?

11         MR. SCHWARTZ:  No, Your Honor.

12         THE COURT:  How about that?

13         MR. STILLEY:  No, Your Honor.

14         THE COURT:  Okay.  Well, No. 20 then is the final

15    instruction about conducting their deliberations and the

16    rules that they must follow in terms of electing a foreperson

17    and the unanimity and so forth.  Any objection to that

18    instruction?

19         MR. SCHWARTZ:  About No. 20?

20         THE COURT:  Yeah.

21         MR. SCHWARTZ:  No objection.

22         MR. STILLEY:  No objection, Your Honor.  And let me

23    say something with respect to your last question.  The

24    plaintiffs, of course, do reserve their objections to the

25    lack of punitive damages instructions and the other, any

Case: 1:03-cv-00105-CAS  Doc. #: 140  Filed: 05/24/06  Page: 26 of 92 PageID #: 2248

IV - 26

```
 1        other instructions mentioned yesterday.

 2              THE COURT:  Very well.  The Court's ruling from

 3        yesterday will remain the same.  I think we're going to have

 4        to change some of those blanks where I put one through seven,

 5        it's one through six in terms of the boilerplate

 6        instructions.  So I'll make that change.

 7              MR. SCHWARTZ:  I thought you did.

 8              THE COURT:  I'm putting the one with the correct

 9        caption for Ms. Kaufmann Woods, so I'll go through the others

10        also.

11              MR. SCHWARTZ:  Do you have the verdict forms, Judge?

12              THE COURT:  Yeah, we're going to go over those

13        verdict forms next.

14              MR. SCHWARTZ:  Okay.

15              THE COURT:  I made those corrections to indicate one

16        through six as the general instructions relative to each

17        plaintiff.

18              Now, let's take a look at these verdict forms.

19        Verdict Form A.  Now, these relate to Ms. Woods' claims.  Any

20        objection to the Verdict Form A?

21              MR. STILLEY:  Yes.

22              THE COURT:  Well, we don't need all these people

23        signing.  It's just the foreperson.

24              MR. SCHWARTZ:  Judge, I think you've got an old

25        version.  We corrected that.
```

1          THE COURT:  Let's see if I have a new form.  Okay.

2     That's the old.  Now I got the new and improved.  Okay.  Any

3     objection to Verdict Form A?

4          MR. STILLEY:  No, Your Honor.

5          MR. SCHWARTZ:  No objection.

6          THE COURT:  Okay.  Michelle, let me have the

7     stapler, I'm going to staple these two pages as well as I'm

8     going to staple all these instructions together also when we

9     send them back.

10          Okay.  Verdict Form B relative to Ms. Ozuna.  That's

11     a two pager.  Any objection to that verdict form?

12          MR. SCHWARTZ:  I don't object.

13          MR. STILLEY:  Your Honor, actually I think we may

14     have a little problem here because we've got a request to

15     assess damages but it doesn't say -- well --

16          MR. SCHWARTZ:  You know what, the only --

17          MR. STILLEY:  No, that's okay.  Leave it.

18          MR. SCHWARTZ:  Judge, we just have a spacing -- I

19     think something in the conversion from Word to Word Perfect

20     unfortunately there's a spacing problem on the top of Verdict

21     Form B where it says Betty Wills.  It drops down to the next

22     line and that might be confusing to the jury.  I think we can

23     probably fix that pretty easy.  Your clerk has this already

24     on her -- she printed this out.

25          THE COURT:  What are you talking about, the note up

1    under the --

2              MR. SCHWARTZ:  Right below.  It says on the claim of

3    Plaintiff Tracey Ozuna for negligence against Defendant Betty

4    Wills.

5              THE COURT:  Well, I'll tell you what, I will just

6    put an arrow.

7              MR. SCHWARTZ:  Okay.

8              THE COURT:  That Ms. Wills' name, Betty goes before

9    the Wills.

10             MR. SCHWARTZ:  I just know sometimes the spacing in

11   all these different paragraphs.

12             THE COURT:  I understand.  I don't think it's

13   overwhelming except just the first name is out of line with

14   the last name.  And just put an arrow with it and it goes

15   right there.

16             Now, any other problem, objection to Verdict Form B?

17             MR. STILLEY:  No, Your Honor.

18             THE COURT:  Okay.  What about Verdict Form C?

19             MR. STILLEY:  It's fine by me.

20             MR. SCHWARTZ:  It's fine.

21             THE COURT:  Okay.  Fine.  11 o'clock we'll bring

22   them in and we'll commence.

23             MR. SCHWARTZ:  Can I just have a procedural

24   question?

25             THE COURT:  Sure.  I'll read them first.  You want

```
1    me to read them first?
2            MR. SCHWARTZ:  I was going to ask.  Whatever you do
3    is fine.
4            THE COURT:  I can read them first, then you can deal
5    with the instructions.
6            MR. SCHWARTZ:  Okay.
7            THE COURT:  That will give you an opportunity.
8    That's the way they do it in the state.  I never did like the
9    way they do it in federal court for the most part, reading
10   them last.  I think it's better if I read them first.
11           MR. SCHWARTZ:  Okay.
12           THE COURT:  Any problem with that?
13           MR. STILLEY:  Your Honor, that's the way I like it
14   too.
15           THE COURT:  Fine.  I'll read them first at
16   11 o'clock.  We'll check on the jurors and do it.  What else?
17           MR. SCHWARTZ:  Do you send all the exhibits back or
18   they have to ask for them?
19           THE COURT:  They are going to have to ask for them.
20           MR. SCHWARTZ:  Okay.
21           THE COURT:  No point in belaboring this if they
22   don't need them.
23           MR. SCHWARTZ:  I understand.
24           MR. STILLEY:  Your Honor, I would ask to send them
25   back anyway.  Otherwise I'm going to have to ask them to ask.
```

1           THE COURT:  You can ask them to ask.  But you see,

2     we'll have to take a look at these.  Some of these exhibits I

3     guess -- I don't know if they were allowed in for some

4     limited purpose.  I mean, I see those medicine logs.  They

5     probably all can go back.  You know, I'd have to --

6           MR. SCHWARTZ:  There were some redactions needed on

7     some things.

8           THE COURT:  There were some things we needed

9     redactions on.  So if you ask them to ask for things, that's

10    going to be a little time if they ask for them in terms of

11    making the redactions.  There were some that are not going

12    back in their full flower.

13          MR. STILLEY:  Are there any that are going to be

14    completely kept out that you can think of?

15          THE COURT:  I'll make that ruling when I get to it.

16          MR. STILLEY:  Okay.

17          THE COURT:  Okay.

18          (Court in recess from 10:55 a.m. until 11:02 a.m.)

19          THE COURT:  Good morning, ladies and gentlemen of

20    the jury.

21          THE JURORS:  Good morning.

22          THE COURT:  You may be seated.  Ladies and gentlemen

23    of the jury, the instructions that I gave at the beginning of

24    the trial and during the trial remain in effect.  I'm now

25    going to give you some additional instructions.  You must, of

1    course, continue to follow the instructions which were given

2    earlier as well as those that are given now.  You must not

3    single out some instructions and ignore others because all

4    are equally important.  This is true even though some of

5    those I gave at the beginning of the trial and during the

6    trial are not repeated here.

7         The instructions that I'm giving you now are in

8    writing and I'll send them back to you in your jury room.  I

9    emphasize, however, that this does not mean they are more

10   important than the earlier instructions.  Again, all

11   instructions, whenever given and whether in writing or not

12   must be followed.

13        Neither in these instructions nor in any action,

14   ruling or remark that I've made during the course of the

15   trial have I intended to give any opinion or suggestion what

16   your verdict should be.  That is entirely up to you.

17        In deciding what the facts are, you may have to

18   decide what testimony you believe and what testimony you do

19   not believe.  You may believe all of what a witness has said,

20   only part of it, or none of it.  In deciding what testimony

21   to believe consider the witness' intelligence, the

22   opportunity the witness had to have seen or heard the things

23   testified about, the witness' memory, any motives the witness

24   may have for testifying a certain way, the manner of the

25   witness while testifying, whether the witness said something

1   different at an earlier time, the general reasonableness of

2   the witness' testimony, and the extent to which the testimony

3   is consistent with other evidence that you believe.

4          In deciding whether or not to believe a witness,

5   keep in mind that people sometimes hear and see things

6   differently and sometimes forget things.  You need to

7   consider, therefore, whether a contradiction is an innocent

8   misrecollection or a lapse of memory or an intentional

9   falsehood.  And that may depend upon whether it has to do

10  with an important fact or only a small detail.

11         In these instructions you're told that your verdict

12  depends upon whether you find that certain facts have been

13  proved.  The burden of proving a fact is upon the party whose

14  claim or defense depends upon that fact.  The party who has

15  the burden of proving a fact must prove it by the greater

16  weight or the preponderance of the evidence.

17         To prove something by the greater weight or

18  preponderance of the evidence is to prove that it is more

19  likely true than not true.  It is determined by considering

20  all of the evidence and deciding which evidence is more

21  believable.

22         If on any issue in the case the evidence is equally

23  balanced, you cannot find that that issue has been proved.

24  The greater weight or preponderance of the evidence is not

25  necessarily determined by the greater number of witnesses or

1    exhibits a party has presented.

2              You may have heard of the term proof beyond a

3    reasonable doubt.  That is a stricter standard which applies

4    in criminal cases, it does not apply in civil cases such as

5    this.  You should, therefore, put it out of your minds.

6              The claims of Plaintiff Jessica Deboi and Shari

7    Lueken are withdrawn from the case and you're not to consider

8    such claims in arriving at your verdict.

9              The issue of emotional distress damages is withdrawn

10   from the case and you're not to consider such issue in

11   arriving at your verdict.

12             The issue of missed periods is withdrawn from the

13   case and you're not to consider such issue in arriving at

14   your verdict.

15             The issue of constipation is withdrawn from the case

16   and you're not to consider such issue in arriving at your

17   verdict.

18             Lastly, the issue of sleep depravation is withdrawn

19   from the case and you're not to consider that in arriving at

20   your verdict.

21             The term negligent or negligence as used in these

22   instructions means the failure to use that degree of care

23   that an ordinarily careful person would use under the same or

24   similar circumstances.

25             Instructions 8 through 11 and the general

1    instructions one through six apply to the claims of Plaintiff

2    Jamie Kaufmann Woods for battery and negligence.  Use Verdict

3    A to return your verdict on these claims.

4         On the claim of Plaintiff Jamie Kaufmann Woods for

5    battery against Defendant Andrea Hill, your verdict must be

6    for Plaintiff Jamie Kaufmann Woods if you believe:

7         First, Defendant Andrea Hill intentionally pushed or

8    caused others to push Plaintiff Jamie Kaufmann Woods to the

9    ground.

10        And second, Defendant Andrea Hill thereby caused a

11   contact with the plaintiff which was offensive to plaintiff.

12        Third, such contact would be offensive to a

13   reasonable person.

14        On the claim of Plaintiff Jamie Kaufmann Woods for

15   battery against Defendant Betty Wills, your verdict must be

16   for Jamie Kaufmann Woods if you believe:

17        First, Defendant Betty Wills intentionally poked

18   Plaintiff Jamie Kaufmann Woods.

19        And second, Defendant Betty Wills thereby caused the

20   contact with plaintiff which was offensive to plaintiff.

21        And third, such contact would be offensive to a

22   reasonable person.

23        On the claim of Plaintiff Jamie Kaufmann Woods for

24   negligence against Defendant Betty Wills, your verdict must

25   be for Plaintiff Jamie Kaufmann Woods if you believe:

1          First, Defendant Betty Wills was able to appreciate
2   the severity of plaintiffs' hearing condition.
3          Second, Defendant Betty Wills had the ability to
4   obtain treatment.
5          And third, had Defendant Betty Wills obtained
6   adequate treatment, the condition would have been remedied.
7          And fourth, Defendant Betty Wills was thereby
8   negligent.
9          Fifth, as a direct result of such negligence
10  Plaintiff Jamie Kaufmann Woods sustained damage.
11         If you find in favor of Plaintiff Jamie Kaufmann
12  Woods then you must award plaintiff such sum as you believe
13  will fairly and justly compensate plaintiff for damages you
14  believe plaintiff sustained as a direct result of the conduct
15  of defendant as submitted in Instruction Nos. 8, 9, and 10.
16         Instructions 13 through 16 and general instructions
17  one through six apply to the claims of Tracey Brazil Ozuna
18  for battery and negligence.  Use Verdict Form B to return
19  your verdict on these forms.
20         On the claim of Plaintiff Tracey Brazil Ozuna for
21  battery against Defendant Deborah Gerhardt, your verdict must
22  be for Tracey Brazil Ozuna if you believe:
23         First, Defendant Deborah Gerhardt intentionally
24  caused Plaintiff Tracey Brazil Ozuna to be paddled.
25         And second, defendant thereby caused a contact with

1    plaintiff which was offensive to plaintiff.

2           And third, such contact would be offensive to a

3    reasonable person.

4           Unless you believe that Plaintiff Tracey Brazil

5    Ozuna is not entitled to recover by Instruction No. 14, which

6    reads:

7           Your verdict on the previous Instruction No. 13,

8    must be for Defendant Deborah Gerhardt if you believe that

9    Tracey Brazil Ozuna's parents by words or conduct consented

10   to the acts of defendant and the reasonable consequences

11   thereof.

12          On the claim of Plaintiff Tracey Brazil Ozuna for

13   negligence against Defendant Betty Wills and Deborah

14   Gerhardt, your verdict must be for Plaintiff Tracey Brazil

15   Ozuna if you believe:

16          First, Defendant Betty Wills and/or Defendant

17   Deborah Gerhardt was able to appreciate the severity of

18   plaintiff's asthma condition.

19          And second, Defendant Betty Wills and/or Deborah

20   Gerhardt had the ability to obtain treatment.

21          And third, had Defendant Betty Wills and/or

22   Defendant Deborah Gerhardt had obtained adequate treatment

23   the conditions would have been remedied.

24          And fourth, the Defendant Betty Wills and/or Deborah

25   Gerhardt were thereby negligent.

1          And fifth, as a direct result of such negligence

2     Plaintiff Tracey Brazil Ozuna sustained damages.

3          If you find in favor of defendant -- plaintiff,

4     rather, Tracey Brazil Ozuna, then you must award plaintiff

5     such sum as you believe will fairly and justly compensate

6     plaintiff for any damages you believe plaintiff has sustained

7     as a direct result of the conduct of defendant as submitted

8     in Instruction Nos. 13 and 15.

9          Instructions 18 through 19 and general instructions

10    one through six apply to the claim of Plaintiff Erika Teasley

11    for negligence.  You may use Verdict Form C to return a

12    verdict on this claim.

13         On claim -- on the claim of Plaintiff Erika Teasley

14    for negligence against Defendant Deborah Gerhardt, your

15    verdict must be for Plaintiff Erika Teasley if you believe:

16         First, Defendant Deborah Gerhardt was able to

17    appreciate the severity of Plaintiff Erika Teasley's

18    toothache.

19         And second, Defendant Deborah Gerhardt had the

20    ability to obtain treatment.

21         Third, had Defendant Deborah Gerhardt obtained

22    adequate treatment, the condition would have been remedied.

23         Fourth, Defendant Deborah Gerhardt was thereby

24    negligent.

25         Fifth, as a direct result of such negligence,

1    Plaintiff Erika Teasley sustained damage.

2         If you find in favor of Plaintiff Erika Teasley then

3    you must award plaintiff such sum as you believe will fairly

4    and justly compensate plaintiff for any damages you believe

5    plaintiff had sustained as a direct result of the conduct of

6    defendant as submitted in Instruction No. 18.

7         In conducting your deliberations and returning a

8    verdict, there are certain rules that you must follow.

9    First, when you go to your jury room you must select one of

10   your members to act as your foreperson.  That person will

11   preside over your deliberations and speak for you here in

12   court.  It is your duty as jurors to discuss this case with

13   one another in your jury room.  You should try to reach

14   agreement if you can do so without violence to individual

15   judgment because your verdict must be unanimous.

16        Each of you must make your own conscientious

17   decision but only after you have considered all of the

18   evidence, discussed it fully with your fellow jurors, and

19   listened to the views of your fellow jurors.  Do not be

20   afraid to change your opinions if the discussion persuades

21   you that you should.  But do not come to a decision simply

22   because the other jurors think it is right or simply to reach

23   a verdict.  Remember at all times that you are not partisans,

24   you are judges, judges of the facts.  Your sole interest is

25   to seek the truth from the evidence in the case.

1              If you need to communicate with me during your

2    deliberations, you may send a note to me through the marshal,

3    bailiff, or court security person signed by one or more of

4    you jurors.  I'll respond as soon as possible either in

5    writing or orally here in open court.  Remember that you

6    should not tell anyone, including me, how your votes stand

7    numerically.  Your verdict must be based solely on the

8    evidence and the law which has been given in the

9    instructions.  Your verdict must be unanimous.  Nothing that

10   I've said or done or any ruling or remark that I've made have

11   I intended to suggest what your verdict should be, that is

12   entirely for you to decide.

13             These verdict forms, this A, B, and C that we've

14   talked about are here, and they are merely the written notice

15   of the decision that you reach in the case.  And you'll take

16   these forms along with the instructions back to your jury

17   room.  And when each of you have agreed upon your verdicts,

18   the foreperson can then fill out the form, verdict forms, and

19   sign and date them and advise the bailiff or court security

20   person that you're ready to return to the courtroom.  When

21   you've completed your work, you'll have to return the forms

22   and the instructions to the courtroom.

23             So now we'll have the argument.  You ready,

24   Mr. Stilley?

25             MR. STILLEY:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. STILLEY:  May it please The Court, counsel.

3    Ladies and gentlemen of the jury, thank you very much for

4    your time here.  I really appreciate this.  I know this is a

5    considerable burden to take time out of your lives to come

6    here and to listen to this.

7          Now, this case has been made considerably simpler

8    than I thought it was going to be and actually simpler than I

9    wanted it to be.  It's been narrowed down.  We've got three

10   individuals here.  There's three individuals, three counts of

11   battery, and three counts of negligence.

12         And we've got direct testimony on this side saying

13   that the facts establish that the plaintiffs have proved

14   their case.  We've got testimony on the other side saying,

15   no, it's not true, they have not proved their case, it's not

16   true.  So we have the classic credibility, classic swearing

17   contest.

18         What we have to do in this case, what your job is,

19   is to find out who am I going to believe and who am I going

20   to disbelieve, who is telling the truth, who is more credible

21   in this case.

22         Now, we have some exhibits in this case, not a whole

23   lot, just a few.  And they are not going to come back to your

24   deliberations unless you ask for them.  I'm going to request

25   that you ask for those.  Since there's not very many, there's

1    no reason not to just ask for them all at once, have them

2    brought back to you so you can take a look at that because

3    there's some important things.  And I'm going to tell you

4    about a few of those things in my closing statement.

5           But, remember, when we present a case in the court

6    of law, what I'm trying to do is paint a picture, but I can't

7    paint a perfect picture.  I can't paint a complete picture.

8    I can put a stroke here and a stroke there and try to make

9    that picture come together.  And no matter how I try, the

10   minutes that I have, I cannot give you all the information

11   that can be gleaned by looking at the evidence that was

12   introduced in this case and the documents that bear on the

13   issues in this case.

14          Now, concerning credibility, let's think about this.

15   I want to go to a country song.  I'm probably sure some of

16   you are country music fans or at least listen to a little bit

17   of it.  There's a country song that says, all my Xs live in

18   Texas, that's why I reside in Tennessee.  Now, Ms. Wills, one

19   of the defendants here, one of the chief defendants here, she

20   says the reason that I reside in Tennessee, the reason that

21   we quit, ceased operations of Mountain Park is because of my

22   husband's health.  That's the reason.

23          Now, let's stop and think about this.  What the

24   evidence shows is that Sam Gerhardt stated under oath in this

25   case, it cost us $500 a month.  Now, he tried to bicker a

1    little bit, but what he said in writing and signed was our

2    cost is $500 a month.  They charge $1,200 a month.  That

3    leaves 700.  How many students do we have?  About 250, maybe

4    a little over 250.  Folks, you can do the math.  That's about

5    $2 million a year profit.

6         Now, we've also got testimony that Bob and Betty

7    Wills generally stay together, that's normal, husband and

8    wife, they stay together.  They flew back and forth from

9    Florida to Betty Wills' air strip in Florida back to

10   Missouri.  They flew back and forth on a regular basis for

11   many years before the place closed down.

12        The day-to-day operations were done by Sam and

13   Debbie Gerhardt.  Now, let's think about this.  Would a

14   normal rational person give up a two million a year income

15   stream because --

16        MR. SCHWARTZ:  Objection, Your Honor, this is beyond

17   the evidence.

18        MR. STILLEY:  It's credibility, Judge.  It's

19   credibility.

20        THE COURT:  I have no idea where you are going with

21   this that has to do with battery and negligence.

22        MR. STILLEY:  It's down to who is telling the truth

23   and who is not.

24        THE COURT:  I understand that.  I understand you're

25   talking about credibility is always in the case.

1          MR. STILLEY:  Your Honor, can I move on maybe.

2          THE COURT:  Go ahead.

3          MR. STILLEY:  Ladies and gentlemen, I'll tell you

4     another little story.  I like stories.  I'm not the best

5     story teller, I must confess, but I told you, this is not my

6     bag, this is not my cup of tea.  I do federal criminal

7     defense, I do tax work, I do securities litigation.  I did

8     this for these young ladies.  But it's helpful to tell

9     stories sometimes.

10          And my wife and I have had occasion to go to Russia,

11     actually twice.  We discovered an orphanage there.  We go to

12     Russia.  We went in February and July of last year -- no,

13     maybe it was this year.  Anyway --

14          MR. SCHWARTZ:  Your Honor, I object to this, it's

15     beyond the evidence.  It's not proper argument.

16          MR. STILLEY:  Your Honor, I'm just trying to tell a

17     little story.

18          THE COURT:  Well, hurry up and tell the story.  I

19     have no idea where you're going.

20          MR. STILLEY:  Ladies and gentlemen, all of us, I

21     think all of us have in our hearts the desire to help people,

22     and that's what these defendants said.  All of us, we might

23     have a different thing, it might not be going to an

24     orphanage, it might be something else, but all of us have in

25     our hearts a desire to help other people.

1           You heard Andrea Hill testify that she was trying to

2    help these girls, and you heard the questions that I asked.

3    I was not asking those to be silly, because I believe a lot

4    of that was the truth, that she wanted to help those kids.

5    Let's think about this.  Let's think about her testimony.

6    She was there for two or three years, and she immediately

7    turned around and became staff.  $300 a month.  Worked for

8    about ten years and was making $550 a month when she left.

9           MR. SCHWARTZ:  Your Honor, I object to this, it's

10   not proper argument.  It's outside the evidence.

11          THE COURT:  Go ahead.

12          MR. STILLEY:  She testified that not only did she

13   not take Jamie Woods and push her to the ground, she didn't

14   do that.  She didn't do that to her.  She didn't do that to

15   anybody else.  She didn't even see it done.  Wait a minute,

16   folks.  You got 250 kids here or thereabouts, and they are

17   supposedly troubled teens.  They are bad kids.  What's the

18   chances that you can work in this place tremendous hours a

19   day for ten years, and you never see a kid have to be taken

20   to the ground?  No matter how good you are, you have to take

21   a kid to the ground.  Let me suggest, you may take this with

22   a grain of salt.  Don't believe that.

23          Now, let's think about something else too.  I'm

24   going to go through these issues with you.  And some of them

25   are little and some are big.  One of them is poking the

1    chest.  One of them is paddling.  I think we all agree that

2    the paddling was so severe that she trembled, could barely

3    sit down, and it hurt for a week.  That's pretty serious.

4    Poking the chest, I think we can all agree that that's a lot

5    less.  Let me ask you this.  If these individuals sitting

6    here were going to lie to you, could they not make up a

7    bigger and better lie than that?

8         Ladies and gentlemen, let's start with the battery

9    on Tracey Ozuna, her claim of battery.  Here's what the

10   defendants say, we didn't do it, but if we did, we got

11   permission.  Now, they had forms for that, did they not?  Did

12   you see any forms?  When you ask for all the exhibits, look

13   and see if any of those forms are in there.  See if the

14   writing is there.  Now, we've also got a handbook.  We've got

15   a handbook that they said it's a Parent/Student Handbook,

16   that's what it said on the front of it, Parent/Student

17   Handbook.  The parents got it, student didn't.  I want you to

18   look at the handbook and see how long it takes you to figure

19   out why the students didn't get copies of that handbook.  Was

20   it because as Mr. Gerhardt testified we just like the oral

21   tradition?  Is that why we don't have the copy of the

22   agreement with the parents?

23        Ladies and gentlemen, I would suggest that that's

24   not really what's going on.  I want you to look in that

25   handbook and see what was told to the parents, and you will

1    know why it was not given to the students.  That told the

2    parents never keep secrets.  Don't keep secrets.  If you keep

3    secrets, that's considered voluntarily taking your child out

4    of the school.  And you owe us for a year.  You look at

5    documents and see if they don't say that.

6         The handbook says be prepared for it, your kids are

7    going to tell you, they beat me, they abuse me, they starve

8    me.

9         MR. SCHWARTZ:  Objection, Your Honor, that is not in

10   evidence.  The handbook is not in evidence.  This is

11   completely outside the evidence, and it's not -- it's

12   completely untrue.

13        MR. STILLEY:  That's Exhibit 2, it was admitted.

14        MR. SCHWARTZ:  Your Honor, it was admitted for a

15   limited purpose.

16        THE COURT:  Well, go ahead.

17        MR. STILLEY:  Thank you, Judge.  Let's think about

18   this.  They say we got a five swat max.  This young lady says

19   I got eight swats very hard.  They say our rules say we keep

20   a record of the paddlings.  We don't have a record of it, we

21   didn't do it.  But if we did it, we had permission.  What

22   about the paddle?  Not a big paddle, a little paddle.  Do you

23   have the paddle?  No, we don't have the paddle.  Can't bring

24   that paddle.

25        Ladies and gentlemen, I will submit that's a true

1    story.  You listened to the witness.  You saw the witness.

2    And you saw how much that did to her.  After all these years

3    later you saw the pain to relive that.  What did she get in

4    trouble for?  They testified, she's a good girl, she was well

5    behaved.  She sat on her bunk.  Why did she have to sit on

6    her bunk?  She did.  That was the rule.  She was on the top

7    bunk.  She needed to get her pillow off the floor.  Tried

8    five minutes to get somebody's attention so she could get

9    permission.  And then jumps down and gets the pillow and gets

10   back on the bed, and gets eight swats.  She's was in pain for

11   a week.

12         Ladies and gentlemen, let me tell you something

13   about the law.  The law allows in cases of battery -- now,

14   don't get confused, on the battery instruction, that's where

15   you get the information on that.  If someone -- if it's an

16   offensive touch, say, on the poking the chest and you don't

17   find a lot of damage, there's something called nominal

18   damages.  If you find it's appropriate, you can put down a

19   dollar.  For whatever reason, you can put down a dollar.

20   But, ladies and gentlemen, I want you to believe these young

21   ladies.  When Jamie says I was poked in the chest, well, we

22   got the admission from Ms. Wills that they did that.  She was

23   poked in the chest, and that was offensive.  That hurts her.

24   To this day that is painful for her.

25         Ladies and gentlemen, I respectfully submit that she

1    should be believed.  She should be credited.  And I want you

2    to look.  How much is that worth?  How much is it worth what

3    these young ladies went through?

4         Ms. Teasley, this is negligence.  There is a tooth.

5    Once again we got two stories.  Didn't know about it.  It

6    took too long to get into the dentist.  We got 250 girls.  Do

7    you ever have emergencies?  No, no, no, that really didn't

8    come up, didn't have emergencies.  Once again, if somebody

9    gives you an inconsistent story about why they didn't do

10   something, we need to question it.  And you don't have to be

11   a brain surgeon to figure out that if your tooth breaks out

12   and you take it in a cup and you show it to somebody, it

13   hurts.  That's not a good thing.  You need dental care and

14   you need it then.  You don't need it two or three months

15   later.  And you can look at the medicine logs.  Look at those

16   logs and see how they would give her medicine by their

17   accounts for the toothache.  Look and see.

18        Now, you can look at those logs and you can draw

19   your own conclusion.  I pointed some things out about those,

20   but even based on what they say, they were negligent in

21   dealing with Ms. Teasley and that caused her tremendous pain.

22        As I told you, this is credibility.  It's about --

23        THE COURT:  One minute.

24        MR. STILLEY:  Thank you, Judge.  This is

25   credibility.  This is about painting a picture.  This is

1    about looking at little things.  We have a story about, a

2    consistent story of honesty and openness and truthfulness on

3    this side.  What do we have on the other side?  Now, I know

4    we got limited things we're focusing on, but what was the

5    story of Debbie Gerhardt versus Julie Gerhardt on worm

6    medicine?  I want you to think about that.  What did Debbie

7    Gerhardt say about cold showers?  It's not punishment, it's

8    not correction, we just calm her down.

9           Now, my time is just about up here.  I want you to

10   keep this in mind.  You heard about some letters that said, I

11   love it here.  Ms. Wills said -- we told kids until you don't

12   want to leave, you're not ready to leave.  Any time a child

13   is under 18 and anything that they write saying that they

14   love the place, it's suspect.  They've already been told,

15   here's how you get out, say you love the place.  What have

16   they done?  Set up a system so that these kids will have to

17   say things they don't believe in order to avoid what to them

18   is the heart of Mountain Park.  And then they bring those

19   stories from these kids back in and say we didn't do them

20   wrong, they loved us.  It's not true.

21          And I request that you take a look.  Look at the

22   verdict forms.  Find in favor of these plaintiffs on each

23   count and put a number in there that you find is right and

24   right to compensate them for the damages they've suffered.

25   Thank you.

```
1            THE COURT:  Mr. Schwartz.

2            MR. SCHWARTZ:  Thank you, Your Honor.  May it please

3    The Court, counsel.  Members of the jury, I too want to thank

4    you for your time and patience this week.  I know you've been

5    working very hard because it's much harder to sit and listen

6    than it is to talk.  So the people who are working the

7    hardest are the court reporter and jury.

8            Now, you heard a lot of evidence in this case.  But

9    Judge Shaw has instructed you that there are only a few

10   issues left for you to consider.  The Court has instructed

11   you that you are not to consider in this case, first of all,

12   any of the claims made by -- and this is Instruction 5, which

13   The Court has read to you, any of the claims made by Jessica

14   Deboi or Shari Lueken.  Those are out of the case.

15           You're not to consider any emotional distress

16   damages.  That's been withdrawn from the case.

17           You're not to consider any claims about missed

18   periods, that's out.  Out of the case.

19           You're not to consider anything about constipation.

20           You're not to consider anything about claims of

21   sleep depravation.

22           You don't need to worry about any of that.  You

23   heard a lot about it.  It's out.  You don't need to worry

24   about it, consider it anymore, that's what The Court has

25   instructed you.
```

1              Now, what's left?  What Mr. Stilley talked about is

2     left.  There is a claim about the paddling, which we'll talk

3     about.  There's a claim about the poking.  There's a claim by

4     Jamie Kaufmann that Andrea Hill pushed her down.  And then

5     there's the claim -- there's a claim that Andrea Hill -- I

6     mean, Jamie Kaufmann didn't get her hearing aids.  There's a

7     claim that Tracey Ozuna didn't get her inhaler.  And there's

8     a claim that Ms. Teasley didn't get to go to the dentist

9     timely.  That's what's left.  That's all that's left.  So let

10    me talk about the issues that are left in the case.

11             Let me talk about Tracey Ozuna's claim first.  She's

12    claiming that Debbie Gerhardt instructed the employee to swat

13    her.  That's the claim.  Now, you heard about the discipline

14    policy at Mountain Park.  And you heard about the types of

15    corrections that they try first before they swatted anyone.

16    You heard that they tried other things.  And you heard people

17    testify that they got corrections like that.  They got

18    dessert taken away or had to write lines or something.  Now,

19    all schools have to have a discipline policy.  Different

20    people can have different philosophies about how to

21    discipline their children.  Different schools have different

22    philosophies how to discipline children that are there.

23             And in this case as in most schools, the parents are

24    told in advance, this is our policy, and this is how we do

25    it.  And they have to agree to it before they could bring

 1   their children to this school.

 2          But at Mountain Park they didn't just swat somebody

 3   for no reason.  They tried other things first.  And if there

 4   was someone who wasn't changing their ways because of the

 5   other things, then they had a swatting policy.  But the

 6   testimony you heard was that this paddle was about 12 inches

 7   and that this lady held it with two hands.  Well, my hands

 8   aren't very big, but if you're holding a paddle with two

 9   hands and it's 12 inches, there wouldn't be much left of that

10   paddle to cause the kind of damage that Ms. Ozuna claims that

11   she had.  You wouldn't be able to get the kind of leverage

12   that she claims.

13          In any event, even if this were to have occurred,

14   and we say it didn't and I'll show you why it didn't.  I'll

15   be able to prove to you it didn't happen.  But even if it

16   did, her parents were told about it in advance, all the

17   parents were told that they use this type of discipline.

18   And, in fact, before they brought Tracey to the school, they

19   brought her sister Michelle.  She was there first.  She's not

20   a defendant here.  She hasn't testified here.  She's not a

21   plaintiff here.  She did not testify here.  But she was

22   there.  Then they brought Tracey there.  And she claims the

23   first time she was there, and she was there twice, you'll

24   remember.  First in December, December of '95 until April

25   '96, and she came back in February '97.  It's the first time

1    that she says she was paddled.

2           Her own testimony was that she went home, she told

3    her parents what had happened, and they brought her back.

4    And at the same time, or shortly thereafter they brought her

5    sister back.  Now, if her parents thought whatever happened

6    to her at Mountain Park was terrible, they would not bring

7    three of their daughters to this school.  They wouldn't have

8    brought her back.  They had to have an agreement with

9    Mountain Park as to what they were doing.  And The Court has

10   instructed you that you cannot find against Debbie Gerhardt

11   on this battery claim if you believe -- if you believe that

12   Tracey Ozuna's parents by words or conduct consented to

13   these -- to the act of the defendant and the reasonable

14   consequences, you must find in favor of Defendant Deborah

15   Gerhardt.  That is the judge's instructions.

16          And there isn't any question that her parent, she

17   testified she told her parents about it.  There isn't any

18   question that her parents brought her and her sister back to

19   the school.  By words or conduct if they consent, you must

20   find in favor of Deborah Gerhardt.

21          Now, putting all that aside, this did not happen.

22   And let me show you the evidence that proves it did not

23   happen.  First of all, Deborah Gerhardt didn't even have

24   authority to order the swatting.  She couldn't have ordered

25   it.  Betty Wills was the only one.  They took this very

1   seriously at Mountain Park.  Betty Wills was the only one who

2   could order swatting.  She was the only one who could do the

3   swatting, whoever did the swatting when she was there.  And

4   the testimony even from Ms. Ozuna was that Betty Wills was

5   there at the time.  There's no question about that.

6          She claims that Laura Mathews swatted her.  She

7   could not have.  Betty Wills was the only one who did

8   swatting at that time.

9          She testifies it was done in the dorm.  They didn't

10  do swatting in the dorm.  They did not do swatting in the

11  dorm.  You heard Andrea Hill and Julie Gerhardt, they were

12  there at the same time.  They both testified they never saw

13  anyone swatted.  They could not have seen anyone swatted

14  because it wasn't done in the dorm, it was done in Ms. Wills'

15  office only.

16         I'll just mention one thing about this handbook.  I

17  don't think this handbook is really important to this case,

18  but since Mr. Stilley brought it up, there was no handbook at

19  the time that Tracey Ozuna says that she was swatted, so it's

20  not relevant to that at all.

21         Now, also the testimony is that they would have made

22  a record of it.  There's no record of it.  It did not happen.

23  But most of all, we know this would have been against the

24  philosophy of the school.  They didn't just swat girls for no

25  reason.  They would not have swatted her because a pillow

1    fell on the floor.  They would not do that at all.  That is

2    completely against the mission of this school.

3          Shari Lueken testified that she lied and cheated

4    when she was at the school.  She didn't get swatted.

5          Now, all of this is based only on the word of Tracey

6    Ozuna.  There are no witnesses.  Now, Mrs. Gerhardt --

7          THE DEFENDANT:  Ten minutes.

8          MR. SCHWARTZ:  Thank you, sir.  She could have made

9    up a story about this.  But she was very honest.  She said

10   Tracey was a good girl, there was no reason to swat her.

11         Finally, the most telling piece of evidence is a

12   letter written in Tracey's own hand that she wrote to

13   Ms. Debbie after she left.

14         THE JURORS:  The screen is not on.

15         MR. SCHWARTZ:  You haven't seen anything I've showed

16   you?  This is the letter, and this is Exhibit E.  And you can

17   ask for Exhibit E, and I suggest you read this letter because

18   this is critical.  She is not at the school at the time she

19   writes this letter.  This is after she's left the school the

20   second time in 1998.  She left the school the end of '97, the

21   second time she left.  And she writes this a few months later

22   to Ms. Debbie.  And in the letter she says, I miss everyone

23   at Mountain Park.  And in the letter she says, tell all the

24   girls in the dorm I miss them, and the only thing I don't

25   miss is the ten-minute showers and getting up at 5:15.  Now,

1     how could someone that is hurt that bad that she claims she

2     was swatted say that she doesn't miss anything except getting

3     up early and taking a short shower?

4            She even says in here, tell mama and papa, Mr. and

5     Mrs. Wills, to come and stay with us.  And she says, I love

6     you for everything you've done too, Ms. Debbie, the person

7     she is suing on this battery claim.

8            Now, she says she made this up.  Her testimony is I

9     made this up because I wanted to get in the good graces

10    because I thought my parents might take me back again.  Well,

11    she wouldn't have to write this detailed letter if that's

12    what she wanted to do to get into the good graces.  She talks

13    in here about her life, her boyfriend, all kinds of things

14    going on in her life.  That doesn't make sense.  You decide.

15    Is this a fabrication?  Is this a manipulation that was done

16    before anyone thought about filing a lawsuit?  Is this the

17    manipulation before anyone hired a lawyer and decided to file

18    a lawsuit?  That's what she's claiming.  You decide where the

19    manipulation is.

20           Now, I'm going to quickly go through some other

21    things.  This claim about Ms. Wills poked Jamie.  You have to

22    find that's an offensive contact in order to find battery.

23    This is not offensive contact.  She was just trying to get

24    the girl's attention.  That is not -- it shouldn't be in

25    court.  This is not an offensive contact.

1      Jamie Woods says Andrea Hill pushed her.  Well,

2 Andrea Hill denied it.  And I thought quite frankly, and you

3 decide, she was a very credible witness.  She's not employed

4 there anymore.  She's a very credible witness.  Again, this

5 is based purely on Jamie Woods' uncorroborated testimony.  No

6 witnesses.

7      If you're not sure, you've got one person saying one

8 thing and another person saying another thing, The Court's

9 instructions say if you can't decide, that means they haven't

10 proved their case, and if they haven't proved their case, you

11 must find for my clients.  They have the burden of proof.  So

12 if you get back to the jury room and you're saying, I just

13 can't decide, you have to find for the defendants, that's The

14 Court's instructions.

15      Now, Jamie Woods also says, I didn't get my hearing

16 aids, they should have got me my hearing aids.  Well, you

17 know, she testified that her parents took her there when they

18 went past Taco Bell and dropped her there without her hearing

19 aids.  She talked to them on the phone.  She asked for her

20 hearing aids.  She didn't get them.  They came and visited,

21 they didn't bring the hearing aids.  Brother Gerhardt

22 testified the parents are supposed to do the regular

23 maintenance type things, take their kids to the regular

24 annual visits, checkups and that short of thing.  That's the

25 parents' job.

1          Well, what happened?  What did the school do?  Well,

2     ultimately when she wasn't getting the hearing aids from her

3     parents, the school took her.  The school took her and took

4     care of the hearing aids.  They also helped change the sound

5     system to help her in the church.  So they did more than the

6     parents.  They helped her.  I don't know why she's suing for

7     that.

8          Now, also the most telling thing on this hearing aid

9     issue is that she wrote a letter too.  Now, she says --

10     again, she says this is a manipulation, she was still there

11     when she wrote the letter.  But what does she say in the

12     letter?  She says, first I want to thank you Debbie and

13     Brother Gerhardt for being so patient with me through the

14     whole hearing thing.

15          THE COURT:  Five minutes.

16          MR. SCHWARTZ:  Thank you, sir.  She's thanking them

17     for taking care of the hearing problem.  Now she's suing for

18     it.  You decide.  She didn't have a lawyer then, she wasn't

19     trying to get money in court.  Was that the manipulation or

20     is the manipulation going on now?

21          Now, Ms. Teasley has this claim about the toothache.

22     The treatment, the medical logs, which there's no question

23     that these were done at the time.  This shows, and you can

24     look at this in the jury room, this is Exhibit BB, that she

25     complained for the first time about tooth pain on March the

1    15th, and then she complained about colds and headaches, and

2    all the time they are giving her medicine.  And then she

3    complains about a toothache on April 11th and on April

4    15th -- April 11th, by the way, is a Friday.  On April 15th,

5    two business days later, and this is in her note, Exhibit KK,

6    where she went to the dentist, April 15th she goes to the

7    dentist.  There's no claim about that at all.  She complained

8    the second time April 11th.  A few days later they take her

9    to the dentist.

10          All these claims -- oh, one of the claims about

11   Tracey Ozuna, she said she didn't get her inhaler.  There is

12   no evidence that Debbie, Ms. Wills knew anything about an

13   inhaler.  There is no evidence they had an inhaler for it.

14   She didn't go to medicine call.  She didn't ask them to get

15   the inhaler.  She said she talked to some staff members

16   during PE or something.  Again, her parents didn't send the

17   inhaler.

18          But they took these children to doctors all the

19   time.  If she wanted to get it, she could have asked for it

20   and clearly they would have given it to her, they were giving

21   medicine all the time.

22          There is no damages in this case.  They haven't

23   shown any evidence of damages.  These ladies are doing fine.

24   They are very productive citizens and they've moved on with

25   their lives.

1          Now, I want to talk very briefly about the verdict

2     form.  Here is what the verdict form says.  I don't want you

3     to be confused.  There are three verdict forms.  You have to

4     write plaintiff or defendant in each line on each count.

5     It's very simple, on Verdict A at the top you write Andrea

6     Hill, then you write Betty Wills and Betty Wills in the

7     second two lines.  Verdict B, you write Betty Wills on the

8     top line.  Deborah Gerhardt.  You don't need to worry about

9     damages.  You find for the defendant, you fill in defendant's

10    name, you are done.  Foreperson signs it, turn it in.  That's

11    all you have to do.  Deborah Gerhardt goes at the bottom of

12    that form.  And then on Verdict C, Deborah Gerhardt, there's

13    only one count.  Verdict C is for Erika Teasley.  Verdict B

14    is for Tracey Ozuna.  That's what it looks like.

15          Now, I'm going to sit down in a minute.  Mr. Stilley

16    is going to get a chance to get back up.  I want you to know,

17    I don't get to talk last.  I told you before, he gets to talk

18    first, he gets to talk last.  I don't want you to think

19    because I don't get up and contradict what he says that means

20    I agree with it, I probably don't.

21          When you get back in the jury room, don't leave your

22    common sense in the hallway.  Think about the documents that

23    were created back at the time, not what is just said here in

24    court, the contemporaneously prepared documents, the

25    documents prepared before anyone thought about hiring a

1   lawyer and file a lawsuit and trying to get money.  That's

2   what you should be looking at.  That's common sense.  And I

3   ask that you return a verdict for my clients, the defendants.

4          MR. STILLEY:  Ladies and gentlemen, first thing I

5   want to do is to say counsel for the defense is correct on

6   the first thing that he said.  He said consider no other

7   claims except to determine who is telling the truth.  Because

8   basically that's what we have to help us to decide who is

9   telling the truth and who is not telling the truth.

10          Now, I want to start here with Tracey Ozuna about

11  the story that it just couldn't have happened that way, we

12  didn't do that, that's just impossible, we tried other things

13  for discipline.  Well, the testimony is diametrically

14  opposed.  You're going to have to decide, somebody is going

15  to tell the truth here.  They said we didn't paddle in the

16  dorms.  We only give five licks.  That's impossible.  She's

17  saying they violated their own rules.  How is this kid

18  supposed to enforce the rule in their favor when they didn't

19  get a copy of the rules?  How would they know that the

20  spanking is supposed to take place somewhere else?  How do

21  they know that eight is the limit?  What was she told?  If

22  you resist in any way, for each time you resist you get

23  another lick, so stand there and take it.

24          Once again, I heard from the defense counsel, and I

25  wrote it, down, even if it did happen, we didn't do it, but

1    if it did, it's okay, parents, the parents sent her back.

2    She was paddled age of 12, and she went home, and her parents

3    sent her back.  Once again we're getting down to this oral

4    tradition.  Oh, Bob Wills says, I called everybody.  I talked

5    to them.  Did he say he talked to those parents?  No.  He

6    just said I called and talked to folks.

7          Do we have any evidence at all about the reaction of

8    the parents?  No.  We don't have the writing, although we

9    know that there were writings made, we don't have that.

10    Isn't it possible that the parent could be upset with

11    somebody and nonetheless for whatever reason send a young

12    person back?  In our society isn't it true that we sometimes

13    punish parents for the neglect or the mistreatment of their

14    own children?  It's not a defense.  You can't say the parents

15    said it was okay.  If you abuse a child, if you do wrong to a

16    child, there is still remedy to be had for that.

17          The parents, let's think about this too, in his

18    handbook you're going to see, the parents are told, these

19    kids are liars.  They don't say it exactly that way, but when

20    you start looking all through there, that's what they are

21    saying, all these kids are liars, don't believe what they say

22    about what's going on here, so they can deny, deny, deny to

23    the parents too.  And isn't it possible that a parent might

24    not believe something and nonetheless allow their child to be

25    harmed again or put in harms way again?  That's not good

1    enough.   That doesn't work.

2          Debbie couldn't order swats.   Now are we to believe

3    this, that because -- what was the chain of command at

4    Mountain Park?  What did they say about that?  Basically that

5    every man is for himself.  But now they are saying, no, no,

6    no, that couldn't have happened, it was against our rules so

7    it didn't happen.   In essence it didn't happened, so it

8    didn't happen.

9          Now, the defendants will tell you, we're just

10   thinking about the Lord, trying to help these kids become

11   Christians.  I'm a Christian, I'm all 100 percent in favor of

12   being a Christian.  Now, let's stop and think about this.  In

13   war, money is the worst of all contraband because it commands

14   everything else.  If you had a $2 million a year income

15   stream --

16         MR. SCHWARTZ:  Objection, Your Honor, this has

17   already been excluded.

18         THE COURT:  Sustained.

19         MR. STILLEY:  Okay.  Now, let's look on these

20   letters.  Both these letters were written while these

21   children were less than 18.  Defendants themselves admit that

22   you weren't ready to leave until you said you didn't want to

23   leave.  They got information from the parents.  And you heard

24   testimony, these kids were in stark terror of going back.

25   Isn't that good enough reason?  Now, maybe you shouldn't say

1    things that you don't really believe, but is that not terror

2    enough to make somebody write a letter like this?  And then,

3    of course, they get this hurled back in their face, you said

4    these things, you wrote this letter and you didn't say

5    anything about this.

6         Jamie had some -- needed hearing aids and they say

7    that's not our fault, the parents are supposed to do that.

8    Now, what did we hear from Marilyn Lueken and Shari Lueken?

9    Shari Lueken got in trouble for stealing shampoo.  What

10   happened when Ms. Lueken when to pick up Shari?  She got

11   about three years supply of shampoo.  It didn't matter that

12   you had the goods, you had to have permission to use them.

13        Now, let's think about this, when you got somebody

14   behind barbed wire fences, they are totally dependent on you

15   for everything that they get, then you have an obligation,

16   that person that has custody has an obligation to make sure

17   that child is kept with the things that they need.  You can't

18   just shove it off on somebody else and say somebody else.

19   No, you have your own obligation.

20        The defendants have told us, look, these girls did

21   good, they succeeded, everything is all right.  Well, look at

22   Jessica Deboi here, she's just doing fine.  I didn't jump up

23   and object to that.  Although didn't have any evidence that

24   the girls did well afterwards, let me say something, these

25   girls succeeded in spite of Mountain Park, not because of

```
 1    Mountain Park.  When anything -- when we tried to say

 2    anything about the condition; physical, mental, or

 3    otherwise --

 4          MR. SCHWARTZ:  Objection, Your Honor.  Objection.

 5          THE COURT:  Overruled.  Go ahead.

 6          MR. STILLEY:  They objected.  They don't have a

 7    right --

 8          MR. SCHWARTZ:  Objection, Your Honor.

 9          THE COURT:  They have a right to object.  Overruled.

10          MR. STILLEY:  Yes.  But they don't have a right to

11    come back and say the condition of the girls was fine when

12    there is no evidence to show that.  If they want evidence,

13    they shouldn't -- if they want evidence, they have the

14    remedies to get that evidence in.

15          Ladies and gentlemen, there is suggestion on the --

16    from the defense on the poking of the chest.  Well, that's

17    just not enough.  Ladies and gentlemen, there's not much left

18    here.  These girls have been through a long battle.  What

19    they've got, whatever it is, it's very important to them.

20    And I would respectfully request that you go back there and

21    you take those forms, and on each one of them you mark in

22    favor of plaintiffs to say we believe you, we believe what

23    you said.

24          THE COURT:  One minute.

25          MR. STILLEY:  We do not give credit to the
```

1    statements -- you don't need to worry about the others.  Just

2    worry about these and say we give you credit that you were

3    telling the truth.  You heard Jamie, her testimony, that she

4    was desperate for the approval of her parents.  She wanted

5    those things so bad.  I want you to look, and look in the

6    exhibits that come back to you and look at that handbook and

7    see what was -- and also think about Marilyn Lueken's

8    testimony about what they did, about building a relationship

9    with the parents and students as opposed to tearing it down.

10            Thank you so much.

11           THE COURT:  Very well.  Michelle, here are the

12   instructions and the verdict forms, take the jury back, see

13   what they want for lunch, let them commence their

14   deliberations.

15           (Jury sent to deliberate at 12 p.m.)

16           (The following proceedings were held outside the

17   hearing of the jury at 12:18 p.m.:)

18           THE COURT:  Exhibit 2 was admitted.  There was some

19   discussion on the record of that being the proper witness.

20   The Court assumed at that time that it would be further

21   referred to, and that it would be admitted by some proper

22   person.  I don't think that ever came up, but yet it still

23   was admitted.  What about the handbook did come in to

24   testimony?

25           MR. STILLEY:  Your Honor, I asked Ms. Wills numerous

1    questions about that, and she responded to numerous questions

2    about the contents of the handbook.  And, wait a minute,

3    there's another thing, and that is Sam Gerhardt testified

4    that it was his master's thesis, and he testified about when

5    they set it up and why they set it up that way and why it was

6    not given to the students and the history of it and just all

7    kinds of things about that.  He even talked about some of the

8    rules that were involved in it.  So we just went around and

9    around on it.

10              THE COURT:  Okay.  Well, there was a long

11   conversation I know with Gerhardt.  I don't think it was ever

12   asked to be admitted again.  I did admit it.  I was trying to

13   see whether or not there were other references to it that

14   would allow it to be appropriate to go back to the jury.  I'm

15   inclined to let it go back to the jury.  Why shouldn't I?  It

16   was referred to by several witnesses from the defense as well

17   as the plaintiff and it was admitted.

18              MR. SCHWARTZ:  This is a really big document.  They

19   could be reading this for a long time.  It's about -- it's a

20   book.  And my understanding, and I could have misunderstood,

21   but my understanding of your ruling was that you were

22   admitting it for a limited purpose, and that he still needed

23   to lay the foundation for if he was going to use it.  It was

24   referred to, but it was never read to the jury, it was never

25   shown to the jury.

1          THE COURT:  Yeah, what about the handbook -- how

2     many pages is the handbook?

3          MR. STILLEY:  I've got it right here.

4          MR. BRIGGS:  Eighty-five pages.

5          THE COURT:  It's an 85-page document.  What about

6     the document is relevant in terms of going in that was

7     discussed?

8          MR. STILLEY:  Your Honor, let me explain it like

9     this.  I would have been terrified to ask you to admit a

10    document that you already admitted.  I believe the law on

11    that says that once a document is admitted, it can be

12    referred to by either party, it's in the case.

13         So I know it's a long document.  I'm hesitant to

14    take things out because I don't want to make the jury

15    suspicious about why they don't have all the pages or

16    anything like that.  And clearly it was referred to

17    repeatedly.  And you were asking me to move the thing along,

18    and I did try.  So I didn't want to trot up there every

19    little bit to --

20         THE COURT:  My concern is it is a long document and

21    there may be things that are contained in the document that

22    may be inappropriate to go back to the jury.  What, if

23    anything, is inappropriate?  Otherwise I'll look at maybe we

24    can make eight copies and send it back.

25         MR. SCHWARTZ:  The problem, Judge, I think is that

1    it was referred to, but in general.  I mean, it wasn't read

2    from.  It's just -- we're giving the jury a lot of stuff

3    that's not part of this case.

4         THE COURT:  That's what I'm talking about.  So what

5    parts of it are not part of the case?

6         MR. SCHWARTZ:  Most -- I mean, well, I don't think

7    any of it is, but --

8         MR. STILLEY:  Your Honor, my position on that for

9    plaintiffs would be if they wanted to excise parts of it then

10   they needed to do that some other time if they objected to

11   parts of the documents.  They didn't make that objection,

12   it's waived.

13        MR. SCHWARTZ:  Judge, I think there is a difference

14   between having something in evidence and sending it to the

15   jury.

16        THE COURT:  Well, I've always made that distinction

17   in that regard in terms of something being admitted and then

18   going to the jury.  And generally that distinction has been

19   that things that were not discussed in any way or part of the

20   evidence of the case.

21        MR. SCHWARTZ:  I mean, I would think if this was so

22   important, he would have showed it to somebody and maybe read

23   from part of it or something he wanted to point out and

24   direct the jury's attention to, and he didn't do that.  Do

25   you want to see it?

```
 1              THE COURT:  Yes.  Let me take a look at it.  You all
 2      can't seem to make this call.  I mean, I am inclined to let
 3      some portions of it go back.
 4              Counsel, is there any objection to the other
 5      exhibits by anybody?  Maybe we can send those on back and the
 6      jury can have those and they can get going with those.
 7              MR. SCHWARTZ:  There are some that were supposed to
 8      be redacted, which I don't think they've been redacted yet.
 9              THE COURT:  Well, were there?  I mean, two of the
10      letters, once they were put up, they were put up in full.
11              MR. SCHWARTZ:  No, Judge, there was a couple of
12      plaintiffs' exhibits that you said he could put into evidence
13      but only redacted versions of them that were not shown to the
14      jury.
15              MR. STILLEY:  Your Honor, my understanding is we
16      were going to take that up later.  I do remember the
17      redaction question.
18              THE COURT:  I remember.  But I'm asking now which
19      exhibits are those?  What can we send back to the jury that
20      you all are in agreement on?
21              MR. STILLEY:  The defense -- where are the
22      defendants'?  I'm happy with the defendants' set of
23      instructions -- not instructions, exhibits.
24              THE COURT:  I've taken a look at this handbook.  And
25      I'm looking at perhaps pages 1 through 27 to go back
```

1    excluding the procedures on the arbitration which comes

2    before the table of contents, and then sending back 1 through

3    27.

4         MR. SCHWARTZ:  Judge, which -- unfortunately I think

5    ours is slightly different than his.  Which pages are you

6    saying would be excluded?

7         THE COURT:  28 starts with finances.

8         MR. SCHWARTZ:  Okay.

9         THE COURT:  And the arbitration comes -- okay, hold

10   on a minute.  As far as the defendants' exhibits,

11   Mr. Stilley, you said you have no objection to those?  I want

12   to start sending something back to the jury so they can start

13   looking at them.

14        MR. STILLEY:  Send the defendants' back, plaintiffs

15   have no objection to those.

16        THE COURT:  Fine.  Let's take those on back.

17        MR. SCHWARTZ:  Judge, where is the part about the

18   arbitration that you said?

19        THE COURT:  I think that almost came -- it seems

20   that mine after the --

21        MR. BRIGGS:  It was after page 13.  It was

22   interspersed.

23        THE COURT:  This book here starts almost with

24   page 8.

25        MR. BRIGGS:  The way he produced it, the pages were

1    not in the accurate order.

2         MR. SCHWARTZ:  Why are we using one that's not an

3    accurate copy of the book?

4         MR. STILLEY:  Well, if they've got a more accurate

5    copy, I want to see it.  I thought this was the right one,

6    but the pagination was very confusing to me as well.

7         THE COURT:  Well, we can put it in the correct

8    order.  Or I can take this -- yeah, because the table of

9    contents is out of order.

10        MR. SCHWARTZ:  There's some handwriting on his copy

11   of it.  What is that?  Why don't we use ours.  This is one we

12   produced.

13        THE COURT:  I may have two different pages or two

14   different paginations of 8 through 13.  Yeah, 8 through 13,

15   I've got two sets of that, but they are different.

16        MR. SCHWARTZ:  So we ought to be using -- this is

17   something that Marilyn Lueken apparently brought to court or

18   produced, it's not what our clients produced.

19        THE COURT:  Okay.  Then what about taking the

20   arbitration information out and going one -- going up to the

21   point of where it starts with the finances.  And that seems

22   to be in the version I have, the finances start on page 28.

23        MR. STILLEY:  Your Honor, let me say this.  Your

24   Honor, let me say this.  I understand that there is two

25   page 8s.

```
 1              THE COURT:  There are two pages 8 through 13.
 2              MR. STILLEY:  Right, but they are different pages.
 3     And this is what my client was provided.  That's what she was
 4     given, and I think it's the relevant document to go back.
 5              MR. SCHWARTZ:  She didn't testify -- that's the
 6     whole problem, no one said this copy is the copy of the
 7     exhibit.
 8              THE COURT:  Well, let's not worry about that.  If
 9     they got the same information, what's the point?  It just
10     makes sense to have pages that flow similarly.  The concern
11     is the information in there, not that one person had it, one
12     person didn't.
13              MR. SCHWARTZ:  Well, Your Honor, I have a
14     suggestion.  There is a page 8 through 13 prior to the table
15     of contents are duplicative of pages 8 through 13 after the
16     table of contents.  So I don't think we need to have them in
17     there twice.
18              MR. STILLEY:  The problem with that, look at pages
19     eight after the first eight pages, look at that, it says
20     mailing packages.
21              THE COURT:  Well, one starts with communication and
22     it has mailing packages under that.
23              MR. SCHWARTZ:  I understand.
24              THE COURT:  And it seems to have pretty much the
25     same thing.
```

1          MR. SCHWARTZ:  I think that she must have had two

2    versions of this, and it somehow got jumbled.  I'm not

3    accusing anybody of doing anything wrong, but it's just

4    jumbled.

5          THE COURT:  Why don't you all get one version of

6    that together.

7          MR. SCHWARTZ:  All right.

8          THE COURT:  And let's send it back.  I'm going to --

9    here, I'm going to give you this one back.  I'm going to put

10   this other 8 through 13, I'm going to turn it sideways.  I

11   don't know which was the first, and then I'll put this

12   arbitration.  Because this arbitration stuff comes in --

13         MR. STILLEY:  Your Honor, I have another solution I

14   can propose.  Since this was a proposed exhibit for the

15   defense, how about we let them put theirs in and also put

16   this one in, because it's clear --

17         THE COURT:  No, no, no, we're not going to do that.

18   We're going to send one back.  There is only going to be one

19   set is going back, and the limitations as I have indicated.

20   There is going to be one version.  These pages -- these pages

21   say the same thing as far as I can see other than one starts

22   with communication and has a preface before it gets to mail

23   and packages on communication, and the other does not.  Now,

24   why don't you all look at these and get some understanding.

25   Let's look at those taking out the arbitration and stopping

1   when -- as it gets to finances, and we can go from there,

2   okay.  And let me know when you got that done.  Here is yours

3   here.  I'm returning this.  Whoever set that one up, there it

4   is.  And I've turned the second set of 8 through 13 sideways.

5           MR. BRIGGS:  Thank you, Judge.

6           THE COURT:  We're not going to be sending two sets

7   back.  Mr. Stilley, you have to make things more confusing.

8   Your solutions are more confusing.

9           (Court in recess from 12:34 p.m. until 12:47 p.m.)

10          THE COURT:  Now, as far as the student handbook is

11  concerned, which is Exhibit 2, any problems with these pages,

12  we have them here, 1 through 27?

13          MR. STILLEY:  Your Honor, I'm just going to reserve

14  my objection that the complete document that was submitted

15  should go back to the jury.

16          THE COURT:  Well, there was certain portions of it

17  that talked about finances and so forth that I don't think

18  are appropriate.  I mean, you're going to have to have some

19  specific reasons why you want the other portions back for me

20  to even consider.  If you don't have any reasons other than

21  some general off-the-wall I want the whole thing, well, you

22  never talked about the whole thing with anybody, so I got no

23  reason to send it back.

24          MR. STILLEY:  Your Honor, I'm talking about 80 pages

25  would have taken too much time.

1           THE COURT:  Pardon?

2           MR. STILLEY:  I'm talking about 80 pages I think

3    would have taken too much time.

4           THE COURT:  It's not like that, it's in sections me

5    man, please.  Come on, wake up.  Stop being obstinate.

6    You're talking about arbitration.  Why should they get

7    something on arbitration?  Please.  You're being a hindrance.

8    The book has sections to it.  And the appendix, there was no

9    discussion about civil lawsuits.  I mean, if we want to put

10   in girls' clothing, the directions.

11          MR. STILLEY:  Your Honor --

12          THE COURT:  What in there are you talking about?

13   You want Christian character and development, you want that

14   in?

15          MR. STILLEY:  No, I want the whole thing.  I

16   certainly want the part about their philosophy --

17          THE COURT:  You don't want to discuss it.  You're

18   talking about -- you're not any help at all because I'm not

19   sending the whole thing back.  That's obvious.

20          MR. STILLEY:  Can I swap out -- can I make a

21   proposal that would put in the part about civil lawsuits?

22          THE COURT:  Oh, no, no, no.

23          MR. STILLEY:  Can we have an instruction to the jury

24   that certain parts are being sent back so that they know that

25   that's not all?

1          THE COURT:  Well --

2          MR. STILLEY:  I'm just asking.  I want a ruling.

3          THE COURT:  I may do that, let them know that this

4    is all you're going to receive.  Is there any other portion

5    of it that you want to see?  I mean, a portion of it about

6    civil lawsuits?  No.  You know, you're just totally

7    unreasonable.

8          MR. STILLEY:  Your Honor --

9          THE COURT:  You're totally unreasonable.  You know

10   that that's not appropriate for them to have.  But, you know,

11   you just stretch too far.  You have to understand that as an

12   officer of the court you got to at least be within some kind

13   of reason, you know, some kind of sanity about the process.

14         MR. STILLEY:  I made my objections, and I feel like

15   it's a complete -- that it should go back as a complete

16   document.

17         THE COURT:  Fine.

18         MR. STILLEY:  And the objection was not made in

19   time.

20         THE COURT:  Fine.  That's enough.  Fine.

21   Mr. Schwartz.

22         MR. SCHWARTZ:  Your Honor, we don't object to that

23   portion of the document going back.

24         THE COURT:  What about this portion about since that

25   was talked about, this Christian character development.  It

1    starts on page 38.

2              MR. SCHWARTZ:  Thirty-eight?

3              THE COURT:  Or any other portions that were talked

4    about.

5              MR. SCHWARTZ:  Thirty-eight?

6              THE COURT:  Well, in this table of contents it talks

7    about Christian character development, and on the line it has

8    page 38.

9              MR. SCHWARTZ:  I can look at that and see if --

10             MR. STILLEY:  Yes, I think that that would be

11   important.  We did talk about orientation.

12             THE COURT:  Wait a minute.  You made your objection

13   already.  I'm about to cut you out here.  You said all or

14   nothing, so come on.

15             MR. SCHWARTZ:  Your Honor, I think what you have in

16   front of you is fine to go back.  That's my response.

17             THE COURT:  Well, I'm inclined to do this, just send

18   this portion back, which is page 1 through 27, which followed

19   the table of contents, and stop at the finances which start

20   on page 28.

21             Now, the two things, one of advising the jury that

22   these -- this is the portion of the handbook that The Court

23   will allow you to have.  And perhaps redacting this table of

24   contents to stop after page -- after when it starts with

25   finances.

1          MR. SCHWARTZ:  Or take it out altogether.  I mean,
2     why do they need a table of contents?
3          THE COURT:  Well, it may be helpful for them in
4     terms of getting to -- because I'm looking at not sending one
5     copy back but eight copies, so they can all refer to them
6     simultaneously if they so desire.
7          MR. STILLEY:  Do we really have to redact that?
8          THE COURT:  Well, it will leave out a lot of
9     speculation.  The Court is going to redact it, this page.
10    I'm going to send this back, and I'll have a note with that.
11    And I'm going to draft a note right now to the jury.  I'm
12    inclined to send this note back stating, "This is the part of
13    the student handbook that The Court will allow you to have.
14    Charles A. Shaw, Judge."
15         MR. STILLEY:  Thank you, Judge.
16         MR. SCHWARTZ:  That's all right.
17         THE COURT:  Fine.  So she's making the eight copies
18    as we talked about.
19         MR. SCHWARTZ:  Your Honor, there's a couple other
20    exhibits that I think are at issue.
21         THE COURT:  Oh, the exhibits that we talked about
22    redacting.  What about those exhibits?
23         MR. SCHWARTZ:  Well, I want to raise something about
24    this Exhibit 6, and I'll hand it to you.
25         THE COURT:  Sure.

1          MR. SCHWARTZ:  It has information that was not shown

2     to the jury.  It has financial information about costs to go

3     to the school.  I don't think it should go back to the jury.

4     This was something from the web site.  And it was not

5     discussed or talked about in the case at all.

6          THE COURT:  What about this?  It was admitted.  The

7     only thing it seems to have been relevant in here is the

8     philosophy.

9          MR. STILLEY:  Your Honor, may I speak to that?

10         THE COURT:  With the finance being -- maybe I think

11    perhaps with the finance, it can go back.  So what's the

12    situation, Mr. Stilley?

13         MR. STILLEY:  Your Honor, No. 1, plaintiffs'

14    position would be that there was no objection made to this

15    exhibit, whereas most of the exhibits were objected to.  And

16    there was testimony about the annual and monthly rates.

17         THE COURT:  Okay, fine.  What about that?  There's

18    been no objection to this.  I guess the information you're

19    objecting to is the financial information, is that it,

20    Mr. Schwartz?

21         MR. SCHWARTZ:  Well, as I said before, Judge, the

22    difference between admitting it and sending it back to the

23    jury.  We don't dispute it is what it purports to be, but it

24    doesn't mean that the jury should be shown that.

25         THE COURT:  Well, that was the discussion about this

1      medical escrow and so forth and so on.

2              MR. SCHWARTZ:  Well, it was only brought up by the

3      defendant, and I think we had all of our objections sustained

4      to it.  We didn't bring up anything about that.  And there

5      was no relevance to anything about medical escrow.  There was

6      no argument or claim that someone wasn't taken to a doctor or

7      dentist because there wasn't money in the medical escrow,

8      that was not testified to.  There was no argument about that

9      whatsoever.  I think that he may have asked somebody, did

10     they have to submit a $500 medical escrow.  But that says

11     what the tuition is and all this other stuff, which was not

12     testified to.

13             THE COURT:  Well, there's been a lot -- there's been

14     a discussion just about everything on here other than the

15     annual tuition --

16             MR. STILLEY:  Your Honor --

17             THE COURT:  -- personal account, registration fee,

18     but the medical escrow was talked about.  And --

19             MR. SCHWARTZ:  We could just redact the tuition.

20             MR. STILLEY:  Your Honor, if I could speak to that.

21             THE COURT:  Sure.

22             MR. STILLEY:  I asked Ms. Lueken how much she paid a

23     month.  She said it was $1,200.  It's a matter of math to

24     figure out how much it is a year.  Anybody can figure that

25     out.

1        MR. SCHWARTZ:  Judge, I think you sustained the

2    objection to that question.

3        MR. STILLEY:  That's not what I recall.

4        MR. SCHWARTZ:  I mean, I know he asked her a number

5    of questions that we objected to and it was sustained on that

6    matter.

7        THE COURT:  Well, I mean, there were significant

8    objections and attempts to keep out every effort you made

9    relative to this tuition.  The Court had deemed it not

10   relevant to the lawsuit.

11       MR. STILLEY:  Your Honor, let me say one other

12   thing.  When Sam Gerhardt, I was able to get in in the

13   testimony what the amount was, and then the amount that he

14   said that was Mountain Park's costs.  This was our cost, the

15   $500.  So -- and I got both of those numbers come up with the

16   difference of $700 and that came in, but my recollection --

17       THE COURT:  I'll tell you what, why don't I send

18   this back.  There was no objection to it.  I'm concerned

19   about it, but there's been a bunch of testimony around and

20   about it.  I don't know it's going to make a world of

21   difference either way.

22       MR. SCHWARTZ:  We object, Your Honor, based on the

23   prejudice.

24       THE COURT:  Well, The Court is going to send it

25   back, Exhibit 6.  Here is a note to go on top of those eight

1    student handbook packets.  Here is six.  What other exhibit?

2         MR. SCHWARTZ:  Well, he has an Exhibit 69, which our

3    notes show was not admitted.

4         THE COURT:  I don't recall any 69 being admitted.

5    How about yourself, Michelle, do you have a 69?

6         THE CLERK:  I think maybe it was identified and not

7    admitted.  Cathy has a check mark by it.  I would have to see

8    what that indicated.  I know it was identified.

9         MR. SCHWARTZ:  I don't think it was identified,

10   but I don't think --

11        THE COURT:  What is Exhibit 69?

12        MR. SCHWARTZ:  It's a Mountain Park Baptist Boarding

13   Academy -- what do you call this -- enrollment form.  And I

14   recall there were objections on this, Judge.  And I think you

15   would not let him get into this.  It has legal jargon on it.

16   Because this was about the claim that was dismissed, about

17   the fraud claim, and we objected to getting into that.

18        THE COURT:  Why do you want this to go back to the

19   jury, Mr. Stilley?

20        MR. STILLEY:  Your Honor, I thought the testimony

21   was about that.  I thought we had testimony about various

22   aspects of that.  For example, Sam Gerhardt testified you had

23   to keep the student in for a year, that the term was a year.

24   We've got other documents that say --

25        THE COURT:  Well, that's what I'm saying, what is in

1    here that you want in?

2         MR. STILLEY:  Well, I'd really like the whole thing,

3    but if --

4         MR. SCHWARTZ:  Judge, all we have to determine --

5         THE COURT:  You really want this agreement in, is

6    that what you want?  Is that it?  Why don't you just come on

7    up with it?  You will not be straightforward.  You become an

8    untrustworthy person.  Just come on straight with it.  Why

9    you got to beat around the bush?  You know it's coming out as

10   to what your play is, and then you become untrustworthy when

11   you want to be straightforward.

12        MR. STILLEY:  Judge.

13        THE COURT:  No, I don't want to hear it.  Okay,

14   let's look at this.  This is what you want, you want the

15   applicants are only admitted for the express -- on the

16   express condition that they should remain at the school until

17   the end of the written agreement unless suspended or allowed

18   to withdraw because of sustained illness, the parent and

19   guardian leaves the school because of voluntary withdrawal --

20   no part of the fee shall be refunded.

21        MR. SCHWARTZ:  Your Honor, if it wasn't admitted,

22   it's really not an issue.

23        THE COURT:  Yeah.  I'm not going to allow this in.

24   It wasn't admitted.  I think you referred to it and you were

25   trying to get to this agreement portion, which is about the

1    fees not being refunded, so I'm not going to allow that.

2    That's refused.

3            MR. STILLEY:  Your Honor, can we get the court

4    reporter to do a little search and see if it was admitted or

5    not?

6            THE COURT:  We've done all the searching we were

7    going to do, because there was an objection relative to this

8    agreement portion, and that's not appropriate to go back.  It

9    seems obvious to The Court since you won't acknowledge it,

10   because I think most of the other information is not really

11   significant other than in the agreement they don't get their

12   money back if the child leaves school on the parent --

13   because the parents decide that that is the thing to do, that

14   they won't get any refund on the money, or if they owe money,

15   they'll still have to pay it for the remainder of the

16   agreement.  So that's out.  No, it was objected to before.

17   The exhibit was never admitted.  The exhibit was never

18   admitted.  We had difficulty with No. 2 because it was

19   admitted even though I was suggesting at the time that there

20   should be limitations, and that to expedite this matter,

21   which was really much longer than it should have been, so

22   that's the end of that.  What else?  Any other exhibits?

23           MR. STILLEY:  So the basis for that --

24           THE COURT:  It was not admitted.

25           MR. STILLEY:  Okay.  That's the sole basis, correct?

1          THE COURT:  Yes.  I'm not going over all this.  I'm

2    through with it.  Any other exhibits?

3          MR. STILLEY:  Okay, we've got 63-1, 63-2, 63-3, and

4    63-4.

5          MR. SCHWARTZ:  Your Honor, I believe 63-1 and 63-2

6    you instructed him that he could only admit certain portions

7    that were discussed, and he'd have to redact the rest.

8          THE COURT:  Let me see.  What are those, the

9    letters?

10         MR. SCHWARTZ:  Yes.  These are references, notes by

11   Brother Gerhardt and --

12         THE COURT:  Hold on just a minute.  Go ahead,

13   Mr. Schwartz.

14         MR. SCHWARTZ:  There were some notes written by

15   Brother Gerhardt and there was some testimony from the

16   witness about the notes.  And as I recall the ruling was that

17   only the portions that were discussed by the witness would be

18   allowed to go to the jury.  And I specifically remember us

19   talking about redacting, which he hasn't done.

20         THE COURT:  I remember that that was the ruling at

21   the time, but what in here is objectionable?  We've got the

22   other letters in.  And even though I indicated that at that

23   time, I don't know what's in here that's objectionable.

24         MR. SCHWARTZ:  Your Honor, it's full of hearsay, and

25   one of them is I think written by the student and one written

1    by the parent.

2             THE COURT:  All I got -- 63-1 here is written by the

3    parent.

4             MR. SCHWARTZ:  You know, Judge, this is -- Shari

5    Lueken is not even in the case anymore.

6             THE COURT:  Oh, yes.  What's the point?  She's out

7    of the case.

8             MR. STILLEY:  Judge, that was admitted for the

9    purpose of -- it was admitted in the case, and when it's

10   admitted, it's admitted unless there's some restriction.

11            THE COURT:  Well, that was admitted before she was

12   dismissed from the case.  And since she's no longer in the

13   case.

14            MR. STILLEY:  Your Honor, let me say this.

15   Credibility is the issue right now, who we're going to

16   believe.  And what the defendants are saying is that we just

17   outloved these kids.  That's what the orientation guides are

18   taught to do, just outlove your student.  And we just build

19   them up.  And that shows that that's a lie, they don't build

20   these kids up.

21            MR. SCHWARTZ:  We don't object to these, the rest of

22   these.

23            THE COURT:  Well, those letters from Shari Lueken

24   and the parents are not going back.  She's out of the case.

25   That's it.  What are the others you have no problem with?

1    We'll send those back.  You have no problem with these?

2              MR. SCHWARTZ:  No problem.

3              THE COURT:  Fine, then I'll give them.  And what are

4    those exhibits, three, four, five?

5              THE CLERK:  And then I have six.

6              MR. SCHWARTZ:  And there were two others that were

7    there.

8              THE COURT:  Hand them to them so we can put on the

9    record what they are.

10             MR. SCHWARTZ:  It's Plaintiffs' Exhibit 3, 4, 5,

11   63-3, 63-4, and then you're allowing six over our objection.

12             THE COURT:  Fine.

13             MR. STILLEY:  Your Honor, can we also have a note to

14   the jury that The Court just ruled that two letters won't go

15   back?

16             THE COURT:  No.

17             (Court in recess from 1:10 p.m. until 2:42 p.m.)

18             THE COURT:  Well, we understand they have a verdict.

19   But counsel, come up for just a moment.

20             (The following proceedings were held at the bench

21   and outside the hearing of open court:)

22             THE COURT:  I don't know what their verdict is.  I

23   just wanted to advise you they did have a question, however,

24   that I answered.  And the question was something to the

25   effect was that if we come back with a verdict for the

1    plaintiffs, but give them no money, what happens.  And I just

2    responded you must be guided by the instructions.

3          MR. SCHWARTZ:  Okay.

4          THE COURT:  So I really gave them no answer.  So

5    maybe that's what happened.  I have no idea.  We'll see.

6    Okay.

7          (The following proceedings continued within the

8    hearing of the jury:)

9          THE COURT:  Bring the jury on.  Good afternoon,

10   ladies and gentlemen of the jury.  Mr. Palmer, has the jury

11   reached a verdict?

12         JUROR PALMER:  Yes, Your Honor, we have.

13         THE COURT:  Very well.  Would you give it to Cathy,

14   please.  Clerk, publish the verdict, please.

15         THE CLERK:  Verdict A, on the claim of Plaintiff

16   Jamie Kaufmann Woods for battery against Defendant Andrea

17   Hill, we the undersigned jurors find in favor of Andrea Hill.

18         On the claim of Plaintiff Jamie Kaufmann Woods for

19   battery against Defendant Betty Wills, we the undersigned

20   jurors find in favor of Jamie Kaufmann Woods.  We the

21   undersigned jurors assess the damages of Plaintiff Jamie

22   Kaufmann Woods for battery by Betty Wills at zero.

23         On the claim of Plaintiff Jamie Kaufmann Woods for

24   negligence against Defendant Betty Wills, we the undersigned

25   jurors find in favor of Betty Wills.

1          And this Verdict A is signed by foreperson Perry

2     Patterson, dated October 15 -- December 15, 2005.

3          Verdict B:  On the claim of Plaintiff Tracey Brazil

4     Ozuna for negligence against Defendant Betty Wills, we the

5     undersigned jurors find in favor of Betty Wills.

6          On the claim of Tracey Brazil Ozuna for negligence

7     against Defendant Deborah Gerhardt, we the undersigned jurors

8     find in favor of Deborah Gerhardt.

9          On the claim of Plaintiff Tracey Brazil Ozuna for

10    battery against Defendant Deborah Gerhardt, we the

11    undersigned jurors find in favor of Deborah Gerhardt.

12         And it's signed again by foreperson Perry Patterson,

13    December 15, 2005.

14         Verdict C:  On the claim of Plaintiff Erika Teasley

15    for negligence against Defendant Deborah Gerhardt, we the

16    undersigned jurors find in favor of Deborah Gerhardt.

17         Again, signed by foreperson Perry Patterson, dated

18    December 15, 2005.

19         THE COURT:  Does either party wish to have the jury

20    polled?

21         MR. STILLEY:  Yes, Your Honor.

22         THE COURT:  Clerk, poll the jury.

23         (The jury was polled and the verdicts were

24    unanimous.)

25         THE COURT:  Ladies and gentlemen of the jury, I want

1    to thank you for your time, attention, and patience.  The

2    case went a little bit longer than we thought, but not overly

3    long, at least in terms of what you were told.

4             And as far as the admonition is concerned, that is

5    lifted.  You can discuss this case as fully and freely as you

6    choose with anyone you choose to discuss it with.  The

7    lawyers are not allowed to ask you about the case, but if you

8    choose to discuss this with them or anyone else, that's

9    entirely up to you.

10            So thank you again for your time, attention, and

11   patience.  You're excused.  Happy holidays.

12            (Jury excused.)

13            THE COURT:  Is there anything else?

14            MR. STILLEY:  I think we're through, Judge, at this

15   point.

16            THE COURT:  I think we're through.  Happy holidays

17   everyone.

18            MR. SCHWARTZ:  Thank you, Judge.

19            MR. BRIGGS:  Thank you, Judge.

20            THE COURT:  Sure.

21            (Court in recess at 2:47 p.m.)

22

23

24

25

1              C E R T I F I C A T E

2              I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9              I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12             I further certify that this transcript contains

13   pages 1 - 92 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this _____ day of

18   _____, 2006.

19

20                         _____

21                         /s/ Susan R. Moran
                           Registered Merit Reporter

22

23

24

25